Nos. 20-1, 21-8

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| BRANDON COUNCIL, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

On Appeal from the United States District Court
for the District of South Carolina
No. 4:17-cr-866-RBH

# JOINT APPENDIX
## Volume I of XVI
### (pp. 1-506)

Jaclyn L. Tarlton
Federal Defender Office, EDNC
150 Fayetteville Street, Ste 450
Raleigh, NC 27601
(919) 856-4236 tel.
Jackie_tarlton@fd.org

Barry J. Fisher
Federal Defender Office, NDNY
54 State Street, Ste 310
Albany, New York 1207
(518) 242-4010
barry_fisher@fd.org

Joshua K. Handell
Appellate Section
Criminal Division, Ste.1515
United States DOJ
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 305-4244 tel.
joshua.handell@usdoj.gov

*Attorneys for Defendant-Appellant*

*Attorney for Plaintiff-Appellee*

# TABLE OF CONTENTS

## Volume I

District Court Docket Sheet ........................................................................ 1

## Docket Entries

DE 1 - Criminal Complaint (August 24, 2017) ........................................ 56

DE 3 - Rule 5(c)(3) Documents (August 25, 2017) ................................. 62

DE 4 - Arrest of Brandon Michael Council (August 25, 2017) .............. 68

DE 16 - Indictment (September 21, 2017) .............................................. 69

DE 35 - Defendant's Motion to Continue (October 16, 2017) ................ 79

DE 42 - Order Granting Defendant's Motion to Continue
    (October 18, 2017) ........................................................................ 82

DE 54 - Text Order, Pretrial Status Conference
    (November 28, 2017) ..................................................................... 84

DE 57 - Defendant's Response to Court's Text Order
    (December 4, 2017) ........................................................................ 86

DE 61 - Email from Government to Court and Counsel
    (December 4, 2017) ...................................................................... 103

DE 66 - Defendant's Motion to Continue (January 5, 2018) ............... 109

DE 67 - Order Granting Defendant's Motion to Continue
    (January 8, 2018) ......................................................................... 113

DE 70 – Transcript, Pre-trial Conference (December 4, 2017) ........... 115

DE 73 - Defendant's Motion to Continue (February 20, 2018) ............ 132

i

DE 79 – Order Granting Defendant's Motion to Continue
(February 21, 2018) ..................................................................136

DE 81 - Notice of Intent to Seek Death Penalty (March 21, 2018) ......138

DE 83 - Text Order, Pre-trial Status Conference (March 22, 2018) ....144

DE 84 - Motion to Continue Status Conference (March 23, 2018).......145

DE 87 - Defense Reply to Government's Response to Continue Status
Conference (March 26, 2018) ......................................................147

DE 91 - Government's Motion to Set Schedule (March 30, 2018)........150

DE 92 - Defense Motion to Set Schedule (April 4, 2018) .....................156

DE 93 - Text Entry, Pre-trial Status Conference (April 6, 2018).........181

DE 94 - Minute Entry Hearing Regarding Competency
(April 6, 2018) ...........................................................................182

DE 96 - Government's Motion for Disclosure of Competency
Evaluation (April 9, 2018)............................................................183

DE 97 - Defendant's Motion in Opposition to Disclosure of
Competency Evaluation (April 9, 2018) .......................................196

DE 99 - Order to Continue (April 10, 2018) .........................................209

DE 108 - Government's Response to Defense Opposition to
Competency Evaluation (April 17, 2018) .....................................211

DE 111 - Defense Reply to Court Order (April 26, 2018) .....................213

DE 115 - Declaration of William F. Nettles, IV (April 30, 2018) .........215

DE 116 - Order Granting in Part Opposition to Mental Competency
Exam (April 30, 2018) ................................................................216

DE 121 - Scheduling Order (May 2, 2018)..............................................220

DE 130 - Amended Scheduling Order (May 15, 2018)..........................223

DE 133 - Defendant's Motion Requesting Order on Jury Selection
     Procedures (May 18, 2018)..............................................................226

DE 141 - Defendant's Declaration of Michael A. Meetze
     (June 1, 2018) ....................................................................................310

DE 240-1 - Confession Video Transcript (July 27, 2018)......................311

DE 251 - Defendant's Motion to Strike Non-Statutory Aggravating
     Factors (September 12, 2018) .........................................................492

## <u>Volume II</u>

DE 256 - Defendant's Motion to Strike FDPA (September 18, 2018)..507

DE 257 - Defendant's Motion to Strike the Death Penalty
     (September 18, 2018)........................................................................537

DE 259 - Defendant's Motion to Continue Jury Selection & Trial
     (September 20, 2018)........................................................................643

DE 260 - Defendant's Motion to Seal *Ex Parte* Motion to Continue
     (September 20, 2019)........................................................................659

DE 278 - Government's Response to Motion to Continue
     (September 25, 2018)........................................................................675

DE 282 – Defendant's Motion to Continue Jury Selection
     (October 3, 2018) .............................................................................678

DE 289 – Government's Response in Opposition to Motion to Strike
     (October 10, 2018) ...........................................................................935

DE 292 – Transcript, Pretrial Conference & Status Conference
(April 6, 2018) ................................................................. 965

## Volume III

DE 293 – Transcript, *Ex Parte* Hearing (April 6, 2018) ..................... 1024

DE 294 – Transcript, Sidebar Status Conference
(April 17, 2018) ............................................................. 1029

DE 306 – Defendant's Reply to Motion to Strike Non-Statutory
Aggravating Factors (October 29, 2018) ..................................... 1032

DE 307 – Order Granting Continuance (October 31, 2018) .............. 1046

DE 308 – Second Amended Scheduling Order (October 31, 2018)..... 1054

DE 413 – Order Denying Motion to Strike (May 7, 2019) ................. 1057

DE 414 – Order Denying Motion to Strike FDPA (May 7, 2019)....... 1070

DE 419 – Transcript, Motion to Suppress/Motion to Strike
Hearing (April 10, 2019) ................................................... 1081

DE 427 – Order No. 3 Regarding Prospective Juror Requests
(June 4, 2019) ............................................................... 1225

DE 428 – Joint Supplemental Questionnaire (June 5, 2019)............. 1337

DE  428-1 – Defendant's Brief on Supplemental Questionnaire
(June 5, 2019) ............................................................... 1387

DE 428-2 – Government's Brief Regarding Proposed
Supplemental Case Questionnaire (June 5, 2019) .................... 1415

DE 495 – Decorum Order (July 10, 2019) .......................................... 1424

DE 496 – Defendant's Motion for Additional Time to Complete
Mitigation Investigation (July 11, 2019) .................................... 1428

DE 500 – Order Regarding Supplemental Case Questionnaire
(July 11, 2019) ......................................................................... 1435

DE 502 – Government's Response to Motion to Continue & Seal
(July 15, 2019) ......................................................................... 1437

DE 504 – Defendant's Response to Court's Proposed Voir
Dire Script (July 15, 2019) ...................................................... 1445

DE 508 –Document in Support of Additional Time
(July 16, 2019) ......................................................................... 1454

DE 513 – Government's Response to Defendant's Voir Dire
Script (July 17, 2019) ............................................................... 1469

DE 529 – Defendant's *Motion In Limine – Bank Video Images*
(July 22, 2019) ......................................................................... 1472

DE 531 – Defendant's *Motion In Limine* to Exclude
Government's Proposed Exhibit Numbers 55, 60, 61, 62
and 68 (July 22, 2019) ............................................................. 1479

DE 532 – Defendant's *Motion In Limine – Prejudicial and
Irrelevant Evidence of Films Filed in His Possession*
(July 22, 2019) ......................................................................... 1486

## <u>Volume IV</u>

DE 551 – Government's First Omnibus Penalty Phase *Motion
In Limine* (July 22, 2019) ......................................................... 1504

DE 603 – Amended Notice of Intent to Seek the Death Penalty
(July 26, 2019) ......................................................................... 1561

DE 615 – Government's Proposed Penalty Phase Jury
   Instructions (July 30, 2019) .......................................................... 1565

DE 617 – Government's Brief Regarding Jury Instructions
   (July 30, 2019) ................................................................................. 1621

DE 619 – Defendant's Memorandum in Support of Proposed
   Penalty Phase Instructions (July 30, 2019) .............................. 1633

DE 619-1 – Defendant's Proposed Penalty-Phase Jury
   Instructions (July 30, 2019) .......................................................... 1661

DE 624 – Order Regarding Finalized Video Script
   (August 1, 2019) .............................................................................. 1824

DE 624-1 – Finalized Video Script (August 1, 2019) .......................... 1826

DE 629 – Defendant's Combined Response to Government's
   First Omnibus Motions *In Limine* (August 6, 2019) ................. 1834

DE 630 – Government's Response to Defendant's Motion for
   Discovery (August 6, 2019) ........................................................... 1858

DE 638 – Government's Motion *In Limine* to Exclude Certain
   Expert Opinions (August 9, 2019) ............................................... 1878

DE 640 – Defense Response to Government's Penalty-Phase
   Motion *In Limine* to Exclude Opinion of Dr. McCarter
   (August 9, 2019) .............................................................................. 1883

DE 643 – Transcript – Motion to Continue (July 17, 2019) ............... 1896

DE 644 – Transcript – *Ex Parte* Motion Hearing (July 17, 2019) ..... 1918

DE 648 – Defendant's Response to Government's Penalty
   Phase Motion to Exclude (August 13, 2019) .............................. 1941

DE 649 – Defendant's Response to Government's Brief
Regarding Jury Instructions (August 14, 2019) ....................... 1946

DE 680 – Defendant's Response to Government's Motion
for Discovery (August 20, 2019)............................................... 1965

DE 683 – Order Regarding Motions *In Limine* (August 21, 2019) .... 1976

DE 684 – Order Regarding Government's Motion for Discovery
(August 21, 2019) ....................................................................... 1988

## <u>Volume V</u>

DE 685 – Transcript – Motions Hearing (August 14, 2019).............. 1992

DE 690 – Supplemental Case Questionnaire (August 23, 2019) ....... 2096

DE 695 – Minute Entry Regarding Jury Selection Process
(August 26, 2019) ....................................................................... 2115

DE 724 – Minute Entry Regarding Jury Selection
(August 27, 2019) ....................................................................... 2116

DE 727 – Minute Entry Regarding Jury Selection Process
(August 28, 2019) ....................................................................... 2117

DE 731 – Government's Motion to Dismiss Count Three of the
Indictment (August 30, 2019) .................................................... 2118

DE 741 – Defendant's Motion to Exclude Post-Offense Conduct
(September 4, 2019)..................................................................... 2124

DE 742 – Defendant's Motion for Protective Measures
(September 4, 2019)..................................................................... 2129

DE 755 – Government's Response to Motion for Protective
Measures (September 5, 2019) ................................................... 2141

DE 756 – Government's Response to Defendant's Motion
*In Limine* (September 5, 2019) ..................................................2146

DE 758 – Defendant's Reply to Response to Defendant's Motion
*In Limine* (September 5, 2019) ..................................................2150

DE 760 – Text Order Regarding Motion to Exclude
(September 5, 2019) ..................................................................2154

DE 761 – Text Order Regarding Motion for Protective Measures
(September 5, 2019) ..................................................................2155

DE 763 – Defendant's Requested Individual
Voir Dire Questions (September 5, 2019) ...............................2156

DE 779 – Minute Entry Regarding Jury Selection Process
(September 9, 2019) ..................................................................2160

DE 781 – Minute Entry, Jury-Selection Proceedings
(September 10, 2019) ................................................................2161

DE 783 – Defendant's Motion to Exclude Rebuttal Expert
Testimony (September 11, 2019) ..............................................2162

DE 785 – Minute Entry, Jury-Selection Proceedings
(September 11, 2019) ................................................................2172

DE 789 – Minute Entry, Jury-Selection Process
(September 12, 2019) ................................................................2173

DE 795 – Minute Entry, Jury-Selection Process
(September 13, 2019) ................................................................2174

DE 796 – Minute Entry, Jury-Selection Process
(September 16, 2019) ................................................................2175

DE 805 – Defendant's Motion for Competency Evaluation
(September 19, 2019) ................................................................2176

DE 807 – Minute Entry, In Camera Motion Hearing
(September 20, 2019)....................................................2184

DE 809 – Email Regarding Hilkey & Schwartz
(September 20, 2019)....................................................2185

DE 810 – Email Regarding Ballenger (September 20, 2019) ............2186

DE 811 – Maddox & Hilkey Affidavit (September 23, 2019).............2188

DE 812 – Minute Entry, Competency Hearing
(September 23, 2019)....................................................2207

DE 819 – Verdict Form (September 24, 2019) ...................................2208

DE 821 – Defendant's Motion to Limit Victim Impact Evidence
(September 24, 2019)....................................................2209

DE 823 – Government's Response to Defendant's Motion
*In Limine* (September 25, 2019) ...................................2215

DE 835 – Penalty-Phase Jury Instructions, Closing
(September 27, 2019)....................................................2219

DE 853 – Penalty-Phase Jury Instructions (October 3, 2019) ...........2276

DE 856 – Verdict Form, Count 1 (October 3, 2019) ...........................2305

DE 857 – Verdict Form, Count 2 (October 3, 2019) ...........................2319

DE 859 – Transcript – Formal Judge-Sentencing
(October 3, 2019) .......................................................2333

DE 860 – Judgment (October 7, 2019)..............................................2343

DE 865 – Text Order, Extension of Time (October 10, 2019).............2348

DE 866 – Defendant's Motion for New Sentencing Trial
(November 4, 2019) ................................................................ 2350

DE 867 – Government's Response to Motion for New Sentencing
Trial (November 8, 2019) ........................................................ 2359

DE 869 – Court Order Denying Motion for New Trial
(December 17, 2019) ................................................................ 2364

DE 870 – Order Assigning Counsel for Appeal
(December 17, 2019) ................................................................ 2373

DE 872 – Defendant's Notice of Appeal (December 30, 2019) ............ 2374

DE 878 – Order Appointing Appellate Counsel (January 6, 2020) .... 2376

DE 879 – Government's Exhibit List (January 9, 2020) .................... 2378

DE 880 – Defendant's Exhibit List (January 9, 2020) ...................... 2389

DE 882 – Transcript, Motion to Continue (October 18, 2018) ............ 2393

DE 883 – Transcript, Motion Hearing (October 18, 2018) ................. 2401

DE 884 – Transcript, Jury Selection Day 1 of 3 (August 26, 2019) ... 2433

## Volume VI

DE 885 – Transcript, Jury Selection Day 2 of 3 (August 27, 2019) ... 2518

DE 886 – Transcript, Jury Selection Day 3 of 3 (August 28, 2019) ... 2592

DE 887 – Transcript, Individual Voir Dire, Day 1 of 5
(September 9, 2019) ................................................................ 2666

## Volume VII

DE 888 – Transcript, Individual Voir Dire, Day 2 of 5
(September 10, 2019) .............................................................. 2902

DE 889 – Transcript, Individual Voir Dire, Day 3 of 5
    (September 11, 2019) .................................................................. 3197

## Volume VIII

DE 890 – Transcript, Individual Voir Dire, Day 4 0f 5
    (September 12, 2019) .................................................................. 3514

DE 891 – Transcript, Individual Voir Dire, Day 5 of 5
    (September 13, 2019) .................................................................. 3804

## Volume IX

DE 892 – Transcript, Jury Strikes & Jury Seated
    (September 16, 2019) .................................................................. 4067

DE 893 – Transcript, Jury Trial, Day 1 of 4 (September 17, 2019) ... 4086

    Witness:  Khristi Brown
        Direct Examination ............................................................. 4123
        Cross Examination ............................................................. 4154
        Redirect Examination ......................................................... 4160
        Recross Examination .......................................................... 4161

    Witness:  Jawanda Nicole Aklin
        Direct Examination ............................................................. 4163

    Witness:  Steven Francis Collinson, Jr.
        Direct Examination ............................................................. 4190

    Witness:  Freda Gore
        Direct Examination ............................................................. 4213

    Witness:  Dennis McClain Lewis
        Direct Examination ............................................................. 4231
        Cross Examination ............................................................. 4277
        Redirect Examination ......................................................... 4284
        Recross Examination .......................................................... 4286

Witness:  Dale Long
    Direct Examination ........................................................... 4289

DE 894 – Transcript, Jury Trial, Day 2 of 4 (September 18, 2019) ... 4322

Witness:  Tamika C. Alston
    Direct Examination ........................................................... 4327
    Cross Examination ............................................................ 4338

Witness:  Henry Tripp
    Direct Examination ........................................................... 4342
    Cross Examination ............................................................ 4357
    Redirect Examination ........................................................ 4362

Witness:  Mary Perkins Singh
    Direct Examination ........................................................... 4364
    Cross Examination ............................................................ 4375

Witness:  Rajinder Parimu
    Direct Examination ........................................................... 4379

Witness:  William Victor Slaughter
    Direct Examination ........................................................... 4388
    Cross Examination ............................................................ 4396

Witness:  Jeremiah Lovelace
    Direct Examination ........................................................... 4400
    Cross Examination ............................................................ 4418
    Redirect Examination ........................................................ 4430

Witness:  Tyler Griffith Whaley
    Direct Examination ........................................................... 4433
    Cross Examination ............................................................ 4447

Witness:  Gregory Coats
    Direct Examination ........................................................... 4459
    Cross Examination ............................................................ 4488

Redirect Examination ......................................................... 4509

Witness: Matthew Taylor McKnight
Direct Examination .............................................. 4512
Cross Examination ............................................... 4523
Redirect Examination ........................................... 4524
Recross Examination ............................................ 4525

## Volume X

DE 895 – Transcript, Jury Trial, Day 3 of 4 (September 19, 2019) ... 4530

Witness: Norman Kuylen
Direct Examination .............................................. 4534
Cross Examination ............................................... 4568

Witness: Douglas Halepaska
Direct Examination .............................................. 4569

Witness: Ashley Michelle Leon
Direct Examination .............................................. 4607

Witness: Mike Connelly
Direct Examination .............................................. 4618
Cross Examination ............................................... 4691

Witness: Edward Proctor, Jr.
Direct Examination .............................................. 4715
Cross Examination ............................................... 4730

DE 896 – Transcript, Motion for Competency Hearing
(September 20, 2019) .................................................. 4743

DE 897 – Transcript, *Ex Parte* Hearing (September 20, 2019) .......... 4767

DE 898 – Transcript, Competency Hearing (September 23, 2019) .... 4779

DE 899 – Transcript, Advising Defendant of Rights
 (September 23, 2019) ................................................... 4791

DE 900 – Transcript, Jury Trial, Day 4 of 4; Penalty Phase,
 Day 1 of 7 (September 24, 2019) ................................... 4795

 Witness: Cathy Gore Lambert
  Direct Examination ........................................... 4913

 Witness: Gracie Branch McClary
  Direct Examination ........................................... 4926

DE 901 – Transcript, Penalty Phase, Day 2 of 7
 (September 25, 2019) ................................................... 4938

 Witness: Tracy Lawrence Skeen
  Direct Examination ........................................... 4950

 Witness: Betty Richardson Davis
  Direct Examination ........................................... 4969

 Witness: Patricia Floyd
  Direct Examination ........................................... 4995

 Witness: Laura Davis
  Direct Examination ........................................... 5011

 Witness: Martena Armston
  Direct Examination ........................................... 5042

 Witness: Daisy Muroz-Alvarez
  Direct Examination ........................................... 5055

 Witness: Diane Denise Jones
  Direct Examination ........................................... 5070

## Volume XI

DE 902 – Transcript, Penalty Phase, Day 3 of 7
(September 26, 2019)................................................................5079

Witness:  Mohan Patel
Direct Examination ...........................................................5083
Cross Examination .............................................................5090
Redirect Examination ........................................................5092
Recross Examination..........................................................5093

Witness:  Brandon Black
Direct Examination ...........................................................5096
Cross Examination .............................................................5109
Redirect Examination ........................................................5112

Witness:  Jalen Vines
Direct Examination ...........................................................5114
Cross Examination .............................................................5161
Redirect Examination ........................................................5177
Recross Examination..........................................................5178

Witness:  Tmyah Brown
Direct Examination ...........................................................5180
Cross Examination .............................................................5200

Witness:  William Christopher Wingfield
Direct Examination ...........................................................5208
Cross Examination .............................................................5215

Witness:  Mike Connelly
Direct Examination ...........................................................5220
Cross Examination .............................................................5239
Redirect Examination ........................................................5252
Recross Examination..........................................................5254

Witness:  Heather Lee Turner
Direct Examination ...........................................................5258

Witness:  Bonnie Lynn Reed
    Direct Examination ............................................................ 5274

Witness:  Douglas McCrea
    Direct Examination ............................................................ 5285

Witness:  Katie McCrea
    Direct Examination ............................................................ 5298

DE 903 – Transcript, Penalty Phase, Charge Conference
    (September 27, 2019).................................................... 5338

DE 904 – Transcript, Penalty Phase, Day 4 of 7
    (September 30, 2019).................................................... 5354

Witness:  Nelson Battle
    Direct Examination ............................................................ 5364
    Cross Examination ............................................................. 5375

Witness:  Sherry Marie Lynn
    Direct Examination ............................................................ 5378
    Cross Examination ............................................................. 5413
    Redirect Examination ....................................................... 5417

Witness:  Ashley Lynn Spells
    Direct Examination ............................................................ 5419
    Cross Examination ............................................................. 5431
    Redirect Examination ....................................................... 5436

Witness:  Tammy Proctor
    Direct Examination ............................................................ 5438
    Cross Examination ............................................................. 5445
    Redirect Examination ....................................................... 5446

Witness:  Hilda Anderson Bridgers
    Direct Examination ............................................................ 5448
    Cross Examination ............................................................. 5469

Witness:  Robert Glenn Reaves
  Direct Examination ............................................ 5472
  Cross Examination ............................................. 5490
  Redirect Examination ......................................... 5493

Witness:  Samantha Alexandra Arrington
  Direct Examination ............................................ 5495
  Cross Examination ............................................. 5503

Witness:  Sharon Elizabeth Farmer Walker
  Direct Examination ............................................ 5505
  Cross Examination ............................................. 5511
  Redirect Examination ......................................... 5513

Witness:  James Green, Jr.
  Direct Examination ............................................ 5515
  Cross Examination ............................................. 5526

Witness:  Susan McCarter
  Direct Examination ............................................ 5528
  Cross Examination ............................................. 5552
  Redirect Examination ......................................... 5575

Witness:  Quentin Wingate
  Direct Examination ............................................ 5583

Witness:  Kenneth Cox
  Direct Examination ............................................ 5589
  Cross Examination ............................................. 5609

Witness:  Anthony Tindall
  Direct Examination ............................................ 5611
  Cross Examination ............................................. 5629

Witness:  Demetrius McMillian
  Direct Examination ............................................ 5630
  Cross Examination ............................................. 5644

Witness:  Demetrius Thacker
    Direct Examination ............................................................. 5645
    Cross Examination .............................................................. 5661
    Redirect Examination .......................................................... 5662

Witness:  Larry Johnson
    Direct Examination ............................................................. 5664
    Cross Examination .............................................................. 5674

Witness:  Tyquan Hines
    Direct Examination ............................................................. 5676

## <u>Volume XII</u>

DE 905 – Transcript, Penalty Phase, Day 5 of 7 (October 1, 2019) ... 5686

Witness:  Deborah Taylor Grey
    Direct Examination ............................................................. 5700
    Cross Examination .............................................................. 5822

Witness:  Anthony Hargett
    Direct Examination ............................................................. 5882
    Cross Examination .............................................................. 5899
    Redirect Examination .......................................................... 5921
    Recross Examination ........................................................... 5923

DE 906 – Transcript, Penalty Phase, Day 6 of 7, Closings
    & Charge (October 2, 2019) ...................................................... 5930

DE 907 – Transcript, Penalty Phase, Day 7 of 7, Verdict
    (October 3, 2019) ...................................................................... 6070

DE 909 – Initial Appearance (September 14, 2017) ........................... 6096

DE 910 – Arraignment (October 3, 2017) ........................................... 6101

DE 915 – Email from Appellate Counsel (June 19, 2020) .................. 6107

DE 916 – Defendant's Motion for Additional Record Materials
    (June 30, 2020) ............................................................ 6108

DE 918 – Government's Response to Motion for Access
    (July 14, 2020) ............................................................. 6119

DE 919 – Defendant's Reply to Motion for Access (July 15, 2020) .... 6122

DE 920 – Order on Motion for Access (September 10, 2020) ............. 6126

DE 921 – Text Entry, Jury Orientation Video
    (September 10, 2020)................................................... 6133

DE 922 – Notice of Stipulation (October 20, 2020) ............................ 6134

## Volume XIII

DE 923 – Defendant's Motion to Vacate Death Sentence
    (July 21, 2021) ............................................................. 6170

DE 925 – Government's Response in Opposition (August 5, 2021) ... 6352

DE 927 – Defendant's Reply Motion to Vacate (August 13, 2021)..... 6362

DE 928 – Order Relieving Counsel (September 8, 2021).................... 6373

DE 929 – Order Denying Motion to Vacate (September 10, 2021) .... 6374

DE 930 – Notice of Appeal, Electrocution Motion
    (September 14, 2021)................................................... 6387

DE 933 – Order Appointing Appellate Counsel
    (September 15, 2021)................................................... 6389

DE 934 – Joint Motion to Unseal Material (November 18, 2021)...... 6390

DE 935 – Stipulated Order (November 23, 2021) .............................. 6402

DE 936 – Second Joint Unsealing Motion (February 12, 2022) ......... 6407

DE 937 – Stipulated Order (February 14, 2022) ................................ 6413

## Volume XIV

### Exhibits

### Government

GX 33, Photo, Bait Bills, CresCom Log ............................................... 6415

GX 34, Photo, Bait Bills, Money Recovered ....................................... 6416

GX 35, Stolen Money Property Receipt ............................................... 6417

GX 36, Loss Tabulation ...................................................................... 6418

GX 41, Photo, Skeen Credenza 1 ........................................................ 6419

GX 74, Photo, CresCom, Round in Wall ............................................. 6420

GX 80, Photo, Conway Express, Item 3 .............................................. 6421

GX 93, Transcript, Defendant Interview ............................................ 6422

GX 94, Advice of Rights & Consent to Search Forms ......................... 6524

GX 96, Photo, Chrysler at Economy Inn ............................................ 6526

GX 97, Photo, Chrysler at Economy Inn with Tape ............................ 6527

GX 124, Photo, Mercedes, Pistol in Blue Fleece Pocket ..................... 6528

GX 125, Photo, Mercedes, Pistol Partially Out of Blue Fleece ........... 6529

GX 126, Photo, Mercedes, Pistol on Top of Blue Fleece ..................... 6530

GX 127, Photo, Pistol with Rounds ....................................................... 6531

GX 130, Photo, Tied Pillowcase in Bag ................................................ 6532

GX 131, Photo, Pillowcase on Top of Bag ............................................ 6533

GX 132, Photo, Open Pillowcase ......................................................... 6534

GX 133, Photo, Contents of Pillowcase ................................................ 6535

GX 134, Photo, Box of Ammo ............................................................. 6536

GX 136, Photo, Box of Unfired Ammo ................................................. 6537

GX 155, Photo, DVD's on Spindle ....................................................... 6538

GX 157, Photo, HTC Phone ................................................................ 6539

GX 176, Photo, Conway Express Paperwork ...................................... 6540

GX 187, Photo, Rock Garden 1 ........................................................... 6542

GX 188, Photo, Rock Garden 2 ........................................................... 6543

GX 192, Photo, Rock Garden 6 ........................................................... 6544

GX 198, Photo, Skeen, Down Wedding Aisle ...................................... 6545

GX 200, Photo, Betty & Skeen (store) ................................................. 6546

GX 201, Photo, Betty & Skeen (short hair) ......................................... 6547

GX 202, Photo, John & Skeen (Maggie Valley) ................................... 6548

GX 204, Photo, Skeen (pigtails) .......................................................... 6549

GX 206, Horse Picture ........................................................................ 6550

GX 208, Photo, Patty at Wedding ........................................................ 6551

GX 211, Photo, Fayetteville 2 ............................................................ 6552

GX 212, Photo, Got to Have Faith Winning ....................................... 6553

GX 214, Miles for Miles Photo & Notes .............................................. 6554

GX 223, Food Lion Loss Tabulation .................................................... 6559

GX 225, BB&T Drawer Count .............................................................. 6560

GX 227, Photo, BB&T Bank Counter 2 ............................................... 6561

GX 228, BB&T Note on Counter .......................................................... 6562

GX 230, Photo, Note from BB&T ......................................................... 6563

GX 231, Economy Inn Paperwork ....................................................... 6564

GX 232a, Pirate Auto Sales Paperwork .............................................. 6565

GX 232b, Cade Insurance Receipt ...................................................... 6576

GX 233, Allstate Paperwork ............................................................... 6577

GX 235, Photo, Outside the Mall ........................................................ 6582

GX 236, Dunham's Receipt ................................................................. 6583

GX 237, Photo, Box of Ammo .............................................................. 6584

GX 240, Photo, Wallet Contents ......................................................... 6586

GX 243, Photo, Major & Children ....................................................... 6599

GX 247, Journal Entry 8.21.17 (Eclipse) ............................................ 6600

GX 248, Journal Entry 8.21.17 (Eclipse 2) ......................................... 6601

GX 251, Photo, Dan's Quilt ................................................................ 6602

GX 258, Photo, Jersey Shore Tent Houses ......................................... 6603

GX 261, Photo, Katie & Major (Jersey Shore) .................................... 6604

GX 264, Photo, Thanksgiving Matching Clothes ................................. 6605

## Defense

DX 1, Suggs Church Photo ................................................................. 6606

DX 2, Suggs Church 11.11.00, Wilson Daily Times ............................ 6607

DX 3, Brandon Baby Picture .............................................................. 6608

DX 4, Photo, Brandon Recliner .......................................................... 6609

DX 5, Photo, Bessie & Earl Spells ..................................................... 6610

DX 6, Photo, Bessie & Grandkids ...................................................... 6611

DX 7, Brandon 6th Grade Yearbook Photo ........................................ 6612

DX 8, Dobbs Intake Forms ................................................................ 6613

DX 9, Performance Audit, May 2003 ................................................. 6615

DX 11, 2004 Annual Report ............................................................... 6616

DX 12, NC Department of Juvenile Justice & Delinquency
       Prevention ................................................................................ 6617

DX 13, NC Sentencing & Policy Advisory Commission ...................... 6618

DX 15, NC Department of Justice Delinquency Prevention .............. 6619

DX 17, 2015 Annual Report, Deputy Commissioner ......................... 6620

DX 18, Juvenile Secure Temporary Custody Trends, NC ................. 6621

DX 20, Dobbs Youth Development, Center Sign Photo ..................... 6622

DX 21, Photo, Dobbs Youth Development Center,
    Larkins Housing Unit ................................................................ 6623

DX 28, Death Certificate, Brian Keith McCarter, June 25, 1999 ...... 6624

DX 31, Excerpt of Transcript, April 10, 2019 ................................... 6625

DX 32, Signed Stipulation, Offer to Plead Guilty .............................. 6630

DX 33, Brandon Council Family Health History ............................... 6631

DX 34, End of Grade Testing ........................................................... 6632

DX 35, Part One, Early Childhood ................................................... 6633

DX 36, Part Two, Things Fall Apart ................................................. 6634

DX 37, Dobbs Chart, July 25, 2019 ................................................. 6635

DX 38, Joseph Edward Tucker, Transcript, July 10, 2001 ................ 6637

DX 40, Rodney Alston, NCDC Subpoena Records, August 27, 2019 . 6638

DX 41, Part Three Rehabilitation, Violence, Chaos & Abuse ............ 6650

DX 42, Beth & Charles Council, 1986 Wilson Superior Court
    Subpoena Records .................................................................... 6651

DX 43, Reforms Credited for Driving Juvenile Crime Down in NC .. 6673

## Other Record Material

Transcript, Rule 5 Appearance (August 24, 2017).............................6675

Summons (Blank) ...............................................................................6695

Summons/Standard Juror Questionnaire (Blank)...........................6696

Supplemental/Case-Specific Juror Questionnaire (Blank)................6704

Email Correspondence With Court Reporter Beth Krupa, Regarding
    Transcript Pauses.......................................................................6723

## Volume XV (SEALED)

Completed Summons Questionnaires (Selected Jurors)

    Juror No. 145 ............................................................................6740
    Juror No. 261 ............................................................................6745
    Juror No. 377 ............................................................................6753
    Juror No. 399 ............................................................................6758
    Juror No. 441 ............................................................................6764
    Juror No. 544 ............................................................................6770
    Juror No. 573 ............................................................................6776

Completed Supplemental/Case-Specific Juror Questionnaire
    (Selected Jurors)

    Juror No. 26 ..............................................................................6782
    Juror No. 53 ..............................................................................6799
    Juror No. 64 ..............................................................................6816
    Juror No. 145 ............................................................................6833
    Juror No. 188 ............................................................................6850
    Juror No. 204 ............................................................................6867
    Juror No. 261 ............................................................................6884
    Juror No. 320 ............................................................................6901
    Juror No. 350 ............................................................................6918
    Juror No. 377 ............................................................................6935

Juror No. 378 ................................................................ 6952
Juror No. 385 ................................................................ 6969
Juror No. 395 ................................................................ 6986
Juror No. 399 ................................................................ 7003
Juror No. 414 ................................................................ 7020
Juror No. 441 ................................................................ 7037
Juror No. 455 ................................................................ 7054
Juror No. 459 ................................................................ 7071
Juror No. 481 ................................................................ 7088
Juror No. 484 ................................................................ 7105
Juror No. 500 ................................................................ 7122
Juror No. 520 ................................................................ 7139
Juror No. 529 ................................................................ 7156
Juror No. 537 ................................................................ 7173
Juror No. 544 ................................................................ 7190
Juror No. 564 ................................................................ 7207
Juror No. 573 ................................................................ 7224

## Volume XVI (SEALED)

Juror No. 596 ................................................................ 7241
Juror No. 635 ................................................................ 7258
Juror No. 672 ................................................................ 7275
Juror No. 678 ................................................................ 7292
Juror No. 889 ................................................................ 7309
Juror No. 906 ................................................................ 7326
Juror No. 1011 .............................................................. 7343
Juror No. 1038 .............................................................. 7360
Juror No. 1051 .............................................................. 7377
Juror No. 1170 .............................................................. 7394
Juror No. 1192 .............................................................. 7411
Juror No. 1193 .............................................................. 7428
Juror No. 1241 .............................................................. 7445
Juror No. 1301 .............................................................. 7462
Juror No. 1333 .............................................................. 7479
Juror No. 1355 .............................................................. 7496
Juror No. 1370 .............................................................. 7513
Juror No. 1441 .............................................................. 7530

Juror No. 1533 ........................................................................ 7547
Juror No. 1583 ........................................................................ 7564
Juror No. 1611 ........................................................................ 7581
Juror No. 1628 ........................................................................ 7598
Juror No. 1688 ........................................................................ 7615
Juror No. 1720 ........................................................................ 7632
Juror No. 1758 ........................................................................ 7649
Juror No. 1775 ........................................................................ 7666
Juror No. 1787 ........................................................................ 7683
Juror No. 1805 ........................................................................ 7700
Juror No. 1901 ........................................................................ 7717

Panel 252 Juror List Alphabetical, Pool No. 401190801
        (June 28, 2019) ........................................................... 7734

DE 797 - Panel Strike List (September 16, 2019) .............................. 7810

DE 798 - Jury List (September 16, 2019) ........................................ 7814

Government's Guilt-Phase Closing PowerPoint ................................. 7815

Government's Penalty-Phase Opening PowerPoint........................... 7841

Government's Penalty-Phase Closing PowerPoint ............................ 7853

GX 21, Photo, Behind Counter.......................................................... 7876

GX 23, Photo, Donna Major .............................................................. 7877

GX 47, Photo, Skeen on Floor ........................................................... 7878

GX 56, Photo, Skeen Injuries ............................................................ 7879

GX 59, Photo, Major on Floor............................................................ 7880

<span style="color:green">APPEAL</span>,<span style="color:red">CLOSED</span>,<span style="color:red">DEATH</span>

# U.S. District Court
## District of South Carolina (Florence)
## CRIMINAL DOCKET FOR CASE #: 4:17-cr-00866-RBH-1

Case title: USA v. Council

Magistrate judge case number: 4:17-mj-00203-MCRI

Date Filed: 09/20/2017

Date Terminated: 10/07/2019

Assigned to: Chief Judge R Bryan Harwell

Appeals court case numbers: 20-1 4CCA,
21-8 4CCA

### Defendant (1)

**Brandon Michael Council**
*TERMINATED: 10/07/2019*

represented by **Akin Adepoju**
Office of the Public Defender
800 King Street
Suite 200
Wilmington, DE 19801
302-573-6010
Email: Akin_Adepoju@fd.org
*TERMINATED: 12/30/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Barry Fisher**
Federal Public Defender
54 State Street, Suite 310
Albany, NY 12207
518-242-4010
Email: barry_fisher@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Duane K Bryant**
1207 Brentwood Street
High Point, NC 27260
336-887-4804
Email: duanekbryantlaw@gmail.com

*TERMINATED: 12/30/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Lisa Lorish**
401 E Market Street
Suite 106
Charlottesville, CA 22902
434-220-3380
Email: lisa_lorish@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Michael Allen Meetze**
Federal Public Defender's Office (Flo)
McMillan Federal Building
401 West Evans Street
Suite 105
Florence, SC 29501
843-662-1510
Fax: 843-667-1355
Email: michael_meetze@fd.org
*TERMINATED: 12/30/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**William F Nettles , IV**
Federal Public Defender's Office
McMillan Federal Building
401 West Evans Street
Suite 105
Florence, SC 29503
843-662-1510
Fax: 843-667-1355
Email: bill_nettles@fd.org
*TERMINATED: 12/30/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**                    **Disposition**

18:2113 DEATH AS A RESULT OF BANK ROBBERY Defendant, by force, violence, and intimidation did take from the person and presence of another, approximately $15,294 in United States Currency belonging to and in the care, custody, control, management, and possession of the CresCom Bank of Conway, South Carolina, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and in committing such offense, Defendant did kill a person resulting in the person's death; All in violation of Title 18, United States Code, Sections 2113(a) and 2113(e); with NOTICE OF SPECIAL FINDINGS PURSUANT TO TITLE 18, UNITED STATES CODE, SECTIONS 3591 AND 3592 and forfeiture allegations (1)

18:924 VIOLENT CRIME/DRUGS /MACHINE GUN WHERE DEATH OCCURS Defendant knowingly did use and carry a firearm during and in relation to a crime of violence, as charged in Count 1, which is prosecutable in a court of the United States, and did cause the death of a person through the use of a firearm in such a manner to constitute murder as defined in Title 18, United States Code, Section 1111, in that Defendant with malice aforethought did unlawfully kill a person by shooting her with a firearm; All in violation of Title 18, United States Code, Sections 924 (c) (1), 924 (c) (1) (A) (iii), and 924 (j) (1); with NOTICE OF SPECIAL FINDINGS PURSUANT TO TITLE 18, UNITED STATES CODE, SECTIONS 3591 AND 3592 ; and forfeiture allegations (2)

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: Upon jurys verdict, the defendant is sentenced to death on Counts 1 and 2 of the Indictment. Defendant is committed to the custody of the Attorney General until the exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences. See 18 U.S.C. Sec. 3596(a). When the sentence of death is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. See 18 U.S.C. Sec. 3596(a). The defendant shall pay the mandatory $200 special assessment fee, due immediately.

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: Upon jurys verdict, the defendant is sentenced to death on Counts 1 and 2 of the Indictment. Defendant is committed to the custody of the Attorney General until the exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences. See 18 U.S.C. Sec. 3596(a). When the sentence of death is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. See 18 U.S.C. Sec. 3596(a). The defendant shall pay the mandatory $200 special assessment fee, due immediately.

## **Highest Offense Level (Opening)**

Felony

## **Terminated Counts**

18:922 UNLAWFUL TRANSPORT OF FIREARMS, ETC. Defendant, having been convicted of a crime punishable by

## **Disposition**

Dismissed on Government's motion.

imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce, a firearm, that is, a Smith and Wesson . 22 caliber pistol, and ammunition, all of which had been shipped and transported in interstate commerce; In violation of Title 18, United States Code, Sections 922 (g)(1),924(a)(2) , and 924(e) ; with NOTICE OF SPECIAL FINDINGS PURSUANT TO TITLE 18, UNITED STATES CODE, SECTIONS 3591 AND 3592 and forfeiture allegations
(3)

### Highest Offense Level (Terminated)

Felony

| Complaints | Disposition |
| --- | --- |
| Title 18, USC, Sections 2113(a), (d)and (e) Title 18, USC, Section 924(c) Armed bank robbery with a deadly weapon resulting in death. Use and carry of a firearm during and in relation to, and possession of a firearm in furtherance of a crime of violence. | |

### Plaintiff

**USA**                                    represented by **Derek Alan Shoemake**
US Attorneys Office (Flor)
401 W Evans Street
Suite 222
Florence, SC 29501
843-665-6688
Fax: 843-678-8809
Email: derek@lawconnell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Scott Rian Hixson**
15th Circuit Solicitor's Office
PO Box 1276
Conway, SC 29528
843-915-8607
Email: hixsons@horrycounty.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Designation: Assistant US Attorney*

**Everett Eugene McMillian**
US Attorneys Office (Flor)
401 W Evans Street
Suite 222
Florence, SC 29501
843-665-6688
Fax: 843-678-8809
Email: everett.mcmillian@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**John David Rowell**
US Attorneys Office (Cola)
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Email: jd.rowell@usdoj.gov
*TERMINATED: 08/31/2018*
*Designation: Assistant US Attorney*

**Julius Ness Richardson**
US Attorneys Office (Cola)
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3136
Email: jay.n.richardson@usdoj.gov
*TERMINATED: 09/06/2018*
*Designation: Assistant US Attorney*

**Nathan Stuart Williams**
US Attorneys Office (Chas)
151 Meeting Street
Suite 200
Charleston, SC 29401-2238
843-727-4381
Email: nathan@scfederaldefense.com
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Sherri A Lydon**
US Attorneys Office (Cola)
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Fax: 803-254-2912

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2017 | 1 | COMPLAINT as to Brandon Michael Council (1). (Attachments: # 1 Affidavit) (swel, ) [4:17-mj-00203-MCRI] (Entered: 08/24/2017) |
| 08/24/2017 | 3 | Rule 5c3 Documents Received as to Brandon Michael Council (Attachments: # 1 minutes, # 2 order appointing FPD, # 3 waiver, # 4 commitment order)(swel, ) [4:17-mj-00203-MCRI] (Entered: 08/25/2017) |
| 08/24/2017 | 4 | Arrest of Brandon Michael Council in Eastern District of North Carolina. Clerk notified by: USA. (swel, ) [4:17-mj-00203-MCRI] (Entered: 08/25/2017) |
| 08/24/2017 | 5 | CJA 23 Financial Affidavit (Restricted Access) by Brandon Michael Council (swel, ) [4:17-mj-00203-MCRI] (Entered: 08/25/2017) |
| 09/06/2017 | 6 | **ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Brandon Michael Council. Signed by Magistrate Judge Thomas E Rogers, III on 9/6/17. (swel, )** [4:17-mj-00203-MCRI] (Entered: 09/06/2017) |
| 09/13/2017 | 9 | NOTICE OF HEARING as to Brandon Michael Council Initial Appearance set for 9/14/2017 02:30 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Magistrate Judge Thomas E Rogers III. (swel, ) [4:17-mj-00203-MCRI] (Entered: 09/13/2017) |
| 09/14/2017 | 10 | **Minute Entry for proceedings held before Magistrate Judge Thomas E Rogers, III: Initial Appearance as to Brandon Michael Council held on 9/14/2017. AUSA Jay Richardson present. Defendant present in custody and represented by AFPD Michael Meetze. Defendant received copy of complaint, indicated he understood charges, waived reading, waived his right to a preliminary hearing. Defendant also waived his right to a detention hearing. Court Reporter Raymond Simmons. (swel, )** [4:17-mj-00203-MCRI] (Entered: 09/14/2017) |
| 09/14/2017 | 11 | WAIVER of Preliminary Hearing by Brandon Michael Council (swel, ) [4:17-mj-00203-MCRI] (Entered: 09/14/2017) |
| 09/14/2017 | 12 | **ORDER OF DETENTION (detention hearing waived) as to Brandon Michael Council. Signed by Magistrate Judge Thomas E Rogers, III on 9/14/17.(swel, )** [4:17-mj-00203-MCRI] (Entered: 09/14/2017) |
| 09/15/2017 | 14 | Warrant Returned Executed on 08/23/2017 in case as to Brandon Michael Council. (bwalters-USMS, ) [4:17-mj-00203-MCRI] (Entered: 09/15/2017) |
| 09/20/2017 | 16 | INDICTMENT (Sealed Grand Jury Ballot attached) as to Brandon Michael Council (1) count(s) 1, 2, 3. (Attachments: # 1 GJ Ballot) (swel, ) (Entered: 09/21/2017) |
| 09/21/2017 | 19 | NOTICE OF HEARING as to Brandon Michael Council Arraignment set for TUESDAY 10/3/2017 at 02:30 PM in Florence #1, McMillan Federal Bldg., 401 W. Evans St., Florence before Magistrate Judge Thomas E Rogers III. (swel, ) Modified courtroom # on 9/21/2017 (swel, ). (Entered: 09/21/2017) |

| Date | Doc | Description |
|---|---|---|
| 09/21/2017 | [20](#) | NOTICE OF ATTORNEY APPEARANCE Julius Ness Richardson appearing for USA. (Richardson, Julius) (Entered: 09/21/2017) |
| 09/27/2017 | 23 | Case Reassigned as to Brandon Michael Council to Judge Honorable R Bryan Harwell. Judge Unassigned - CRI no longer assigned to the case. (pcas, ) (Entered: 09/27/2017) |
| 09/27/2017 | **[24](#)** | **ORDER appointing Duane K. Bryant as counsel for Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 9/27/2017. (hcic, )** (Entered: 09/27/2017) |
| 10/03/2017 | **32** | **Minute Entry for proceedings held before Magistrate Judge Thomas E Rogers, III: Arraignment as to Brandon Michael Council (1) Count 1,2,3 held on 10/3/2017. AUSA J.D. Rowell present. Defendant present in custody and represented by AFPD William F Nettles IV and Duane K. Bryant. Defendant received copy of indictment, indicated he understood charges, waived reading. Court enters plea of Not Guilty. Government's position is for Defendant to remain detained. Defendant continues to waive his right to a detention hearing. Defendant remains detained. Court Reporter Raymond Simmons. (swel, )** (Entered: 10/03/2017) |
| 10/04/2017 | [33](#) | MOTION for Leave to Appear Pro Hac Vice Attorney: Mr. Duane K. Bryant. by Brandon Michael Council. No proposed order (Attachments: # [1](#) Main Document Application/Affidavit for Pro Hac Vice Application, # [2](#) Supporting Documents Certificate of good standing)(Meetze, Michael) (Entered: 10/04/2017) |
| 10/10/2017 | [34](#) | SCHEDULING NOTICE as to Brandon Michael Council: Pretrial Conference set for 10/23/2017 at 10:00 AM; Pleas will be taken on 10/24/17 at 9:30 AM; Jury Selection set for 10/26/2017 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell (hcic, ) (Entered: 10/10/2017) |
| 10/16/2017 | [35](#) | MOTION to Continue *(Joint Motion for a Continuance)* by Brandon Michael Council. No proposed order (Attachments: # [1](#) Supporting Documents Waiver of Speedy Trial Rights)(Nettles, William) (Entered: 10/16/2017) |
| 10/16/2017 | [36](#) | MOTION for Disclosure *of Intent to Use Evidence of Other Crimes, Wrongs or Acts Under Federal Rules of Evidence of 404(B)* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/16/2017 | [37](#) | MOTION for Discovery *and Inspection* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/16/2017 | [38](#) | MOTION for Disclosure *(Disclose) Intention to Use Evidence* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/17/2017 | [39](#) | MOTION for Discovery *(Reciprocal)* by USA as to Brandon Michael Council. No proposed order(Rowell, John) (Entered: 10/17/2017) |
| 10/17/2017 | [40](#) | MOTION *to Allow Defense Investigators to Visit Defendant at Jail* by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Nettles, William) (Entered: 10/17/2017) |
| 10/18/2017 | 41 | **TEXT ORDER granting [33](#) motion for Pro Hac Vice admission. The Court notes it had previously appointed Mr. Bryant on a provisional basis as lead "learned counsel" based on consultation with and recommendation of the Federal Public Defender, review of Mr. Bryant's curriculum vitae, and the Court's inquiry** |

| | | |
|---|---|---|
| | | concerning his qualifications and willingness to serve. Mr. Bryant is now appointed on a permanent basis as lead "learned counsel." Signed by Honorable R Bryan Harwell on 10/18/2017.(tmcb, ) (Entered: 10/18/2017) |
| 10/18/2017 | 42 | ORDER granting 35 Motion to Continue as to Brandon Michael Council. Case continued to next term, 12/7/2017. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017) |
| 10/18/2017 | 43 | NOTICE OF CANCELLATION OF HEARING: Pretrial Conference on 10/23/2017 at 10:00 AM and Jury Selection on 10/26/2017 at 9:30 AM cancelled as to Brandon Michael Council. (hcic, ) (Entered: 10/18/2017) |
| 10/18/2017 | 45 | CJA Appointment of Duane K Bryant for Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017) |
| 10/18/2017 | 46 | ORDER granting 40 Motion to Allow Defense Investigators to Visit Defendant at Jail as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017) |
| 11/20/2017 | 50 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 11/28/2017, Pretrial Conference set for 12/4/2017 at 10:00 AM; Pleas will be taken on 12/5/2017 at 9:30 AM, Jury Selection set for 12/7/2017 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell.(hcic, ) (Entered: 11/20/2017) |
| 11/21/2017 | 51 | MOTION for Leave to Appear Pro Hac Vice Attorney: Akin Adepoju, Esq.. by Brandon Michael Council. No proposed order (Attachments: # 1 Main Document Application, # 2 Supporting Documents Certificate of Good Standing)(Meetze, Michael) (Entered: 11/21/2017) |
| 11/28/2017 | 52 | TEXT ORDER granting 51 Motion for Leave to Appear Pro Hac Vice for Akin Adepoju as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 11/28/2017. (hcic, ) (Entered: 11/28/2017) |
| 11/28/2017 | 53 | NOTICE OF RESCHEDULED HEARING as to Brandon Michael Council. Pretrial Conference previously set for 12/4/2017 at 10:00 AM cancelled and rescheduled to: Pretrial Conference set for 12/4/2017 at 3:30 PM (time change only) in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 11/28/2017) |
| 11/28/2017 | 54 | TEXT ORDER re Pretrial/Status Conference - Monday, December 4, 2017 at 3:30 p.m.: The lawyers should be prepared to discuss a general timetable for the disposition of the case including the completion of the Department of Justice's capital case review, and their position on possible consideration of a flexible court-imposed schedule, subject to extension for good cause, regarding a decision/resolution of whether the government will be seeking the death penalty (if the Court decides to issue a DOJ decision schedule, the Court will receive input from the attorneys and if necessary and requested, ex parte from defense counsel); the amount of time necessary to prepare for trial after the DOJ's decision, as well as tentative trial dates; any proposals for scheduling pretrial motions or deferring same until after the DOJ's capital case review; any Section 4241 competency issues; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 11/28/2017.(tmcb, ) (Entered: 11/28/2017) |

| | | |
|---|---|---|
| 12/04/2017 | 57 | REPLY to 54 Order,,,, *(Defendant's Response to the Court's Text Order (ECF #54))* (Attachments: # 1 Supporting Documents Declaration of Kevin McNally regarding preparation time before meeting with the attorney general's capital case reveiw committee, # 2 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time, # 3 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time)(Nettles, William) (Entered: 12/04/2017) |
| 12/04/2017 | 58 | NOTICE OF ATTORNEY APPEARANCE Scott Rian Hixson appearing for USA. (Hixson, Scott) (Entered: 12/04/2017) |
| 12/04/2017 | 59 | **Minute Entry for proceedings held before the Honorable R Bryan Harwell: Pretrial Conference as to Brandon Michael Council held on 12/4/2017. Julius Richardson, AUSA, and John David Rowell, AUSA, present. Duane K Bryant, Michael Meetze, and William Nettles present with defendant. Court Reporter: Beth Krupa. CJA Time: 1 hour, 15 mins. (hcic, )** (Entered: 12/04/2017) |
| 12/04/2017 | 60 | **ORDER TO CONTINUE - Ends of Justice as to Brandon Michael Council; case continued to next term, 1/11/2018. Signed by the Honorable R Bryan Harwell on 12/4/2017. (hcic, )** (Main Document 60 replaced on 12/5/2017 with corrected document) (hcic, ). (Entered: 12/04/2017) |
| 12/04/2017 | 61 | E-mail from AUSA to Judge Harwell and all counsel as to Brandon Michael Council re: scheduling matters. Filed at the direction of Chambers. (Attachments: # 1 Proposed order) (hcic, ) (Entered: 12/04/2017) |
| 12/05/2017 | 62 | **TEXT ENTRY: The Court held a pretrial/status conference on December 4, 2017. Defendant waived his rights under the Speedy Trial Act on the record, and the Court continued this case. Additionally, after hearing from counsel, the Court stated it would not be imposing a Court ordered deadline for a decision by the Department of Justice regarding whether it would seek the death penalty. The Court indicated it would defer a scheduling order until after the D.O.J.'s capital case review. Signed by Honorable R Bryan Harwell on 12/5/2017.(tmcb, )** (Entered: 12/05/2017) |
| 12/06/2017 | 63 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 12/18/2017; Pretrial Conference set for 1/8/2018 at 10:00 AM; Pleas will be taken on 1/9/2018 at 9:30 AM, Jury Selection set for 1/11/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 12/06/2017) |
| 01/05/2018 | 66 | MOTION to Continue by Brandon Michael Council. No proposed order (Attachments: # 1 Addendum)(Nettles, William) (Entered: 01/05/2018) |
| 01/08/2018 | 67 | **ORDER granting 66 Motion to Continue as to Brandon Michael Council (1). Signed by the Honorable R Bryan Harwell on 1/8/2017. (hcic, )** (Entered: 01/08/2018) |
| 01/11/2018 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on 12/4/2017, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent |

| | | |
|---|---|---|
| | | to Request Redaction. Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 2/12/2018. Release of Transcript Restriction set for 4/11/2018. (bkru, ) (Entered: 01/11/2018) |
| 01/16/2018 | 71 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 2/6/2018, Pretrial Conference set for 2/26/2018 at 10:00 AM; Pleas will be taken on 2/27/2018 at 9:30 AM; Jury Selection set for 3/1/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 01/16/2018) |
| 02/20/2018 | 73 | MOTION to Continue *(Joint Motion for a Continuance)* by Brandon Michael Council. No proposed order (Attachments: # 1 Supporting Documents Waiver of Speedy Trial Rights)(Nettles, William) (Entered: 02/20/2018) |
| 02/21/2018 | 79 | **ORDER granting 73 Motion to Continue as to Brandon Michael Council (1); case continued to next term of Court, 4/19/2018. Signed by the Honorable R Bryan Harwell on 2/21/2018. (hcic, )** (Entered: 02/21/2018) |
| 03/07/2018 | 80 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 3/27/2018, Pretrial Conference set for 4/16/2018 at 10:00 AM; Pleas will be taken on 4/17/2018 at 9:30 AM; Jury Selection set for 4/19/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/07/2018) |
| 03/21/2018 | 81 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Brandon Michael Council (Richardson, Julius) (Entered: 03/21/2018) |
| 03/22/2018 | 83 | **TEXT ORDER re Pretrial/Status Conference set for Thursday, March 29, 2018 at 10:00 a.m. - The lawyers should be prepared to discuss a proposed scheduling order and consult each other regarding same. The lawyers should also be prepared to discuss the Court's consideration of a Section 4241 competency evaluation; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 3/22/2018. (tmcb, )** (Entered: 03/22/2018) |
| 03/23/2018 | 84 | MOTION to Continue *Status Conference* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 03/23/2018) |
| 03/23/2018 | 85 | **TEXT ORDER shortening response time. The government shall file a response to Defendant's 84 motion to continue status conference no later than Monday, March 26, 2018, at 12:00 p.m. Signed by Honorable R Bryan Harwell on 3/23/2018.(tmcb, )** (Entered: 03/23/2018) |
| 03/23/2018 | 86 | RESPONSE in Opposition by USA as to Brandon Michael Council re 84 MOTION to Continue *Status Conference* (Rowell, John) (Entered: 03/23/2018) |
| 03/26/2018 | 87 | REPLY to 86 Response in Opposition (Nettles, William) (Entered: 03/26/2018) |
| 03/26/2018 | 88 | NOTICE OF ATTORNEY APPEARANCE Everett Eugene McMillian appearing for USA. (McMillian, Everett) (Entered: 03/26/2018) |
| 03/26/2018 | 89 | **TEXT ORDER granting in part Defendant's 84 motion to continue pretrial/status conference. The pretrial/status conference is hereby rescheduled for April 6, 2018, at 10:00 a.m. Signed by Honorable R Bryan Harwell on 3/26/2018.(tmcb, )** (Entered: 03/26/2018) |

| 03/26/2018 | 90 | NOTICE OF HEARING as to Brandon Michael Council: Pretrial Conference/Status Conference set for 4/6/2018 at 10:00 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/26/2018) |
|---|---|---|
| 03/30/2018 | 91 | MOTION To Set Schedule re 61 Letter, 83 Order,, by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Order for Schedule) (Richardson, Julius) (Entered: 03/30/2018) |
| 04/04/2018 | 92 | MOTION To Set a Scheduling Order by Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Scheduling Order, # 2 Exhibit A-Declaration of Kevin McNally, # 3 Exhibit B-Declaration of Kevin McNally)(Nettles, William) Modified on 4/4/2018 to add descriptive names to exhibits (hcic, ). (Entered: 04/04/2018) |
| 04/06/2018 | 93 | **Minute Entry for proceedings held before the Honorable R Bryan Harwell: Pretrial Conference/Status Conference as to Brandon Michael Council held on 4/6/2018. John David Rowell (AUSA), Julius Ness Richardson (AUSA), and Scott Rian Hixon (AUSA) present; Duane K Bryant, William Nettles IV, and Michael Meetze present with defendant. Court considering jury selection date of January 14, 2019. Counsel to meet next week to formulate a proposed scheduling order working from that date and submit a joint proposed schedule by April 17, 2018. Counsel to submit memos to the Court on April 9, 2018 regarding § 4241 issue of whether the government is entitled to see the report if the Court orders a competency examination. Government to file motion for disclosure of non-mental health mitigation factors by April 13, 2018. Defendant shall file a response to the Government's motion for disclosure within 20 days. Defendant waives speedy trial rights. The Court also briefly took up a matter with the defense ex parte. Court Reporter: Beth Krupa. CJA Time: 2 hours, 15 mins. (hcic, )** (Entered: 04/06/2018) |
| 04/09/2018 | 96 | MOTION for Disclosure *of Competency Evaluation* by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Supporting Documents US v. Loughner filing)(Rowell, John) (Main Document 96 replaced on 4/9/2018 with corrected document provided by filer) (hcic, ). (Entered: 04/09/2018) |
| 04/09/2018 | 97 | MOTION in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 04/09/2018) |
| 04/10/2018 | 98 | E-mail from Duane K Brant in re Brandon Michael Council re submission of proposed continuance order. (hcic, ) (Entered: 04/10/2018) |
| 04/10/2018 | 99 | **ORDER TO CONTINUE - Ends of Justice as to Brandon Michael Council; case continued to 1/14/2019 term of Court. Signed by the Honorable R Bryan Harwell on 4/10/2018. (hcic, )** (Entered: 04/10/2018) |
| 04/10/2018 | 100 | NOTICE OF CANCELLATION OF HEARING: Pretrial Conference previously set for 4/16/2018 at 10:00 AM cancelled. (hcic, ) (Entered: 04/10/2018) |
| 04/10/2018 | 101 | **TEXT ORDER: The Government is to respond to 97 Motion in Opposition to Mental Competency Examination by Tuesday, April 17, 2018. Signed by the Honorable R Bryan Harwell on 4/10/2018. (hcic, )** (Entered: 04/10/2018) |

| | | |
|---|---|---|
| 04/12/2018 | 102 | MOTION to Seal by Brandon Michael Council. No proposed order (Attachments: # 1 Memo in Support of Motion to Seal, # 2 Non-Confidential Descriptive Index, # 3 Certification of Compliance)(Nettles, William) (Entered: 04/12/2018) |
| 04/12/2018 | 103 | **TEXT ORDER: The Government is to respond to Defendant's 102 Motion to Seal by Thursday, April 19, 2018. Signed by the Honorable R. Bryan Harwell on 4/12/2018.(eney, )** (Entered: 04/12/2018) |
| 04/13/2018 | 104 | MOTION for Disclosure *Motion for Pre-trial Disclosure of Defendant's Proposed Mitigating Factors* by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Certificate of Service)(McMillian, Everett) (Entered: 04/13/2018) |
| 04/13/2018 | 105 | **TEXT ORDER: Defendant shall file a response to the Government's 104 Motion for Disclosure by April 27, 2018. *See* Local Crim. Rule 12.05 (D.S.C.). Should defense counsel need more time to respond, they may file a motion for an extension of time for the Court's consideration. Signed by the Honorable R. Bryan Harwell on 4/13/2018.(eney, )** (Entered: 04/13/2018) |
| 04/16/2018 | 106 | RESPONSE in Support by USA as to Brandon Michael Council re 102 MOTION to Seal (Rowell, John) (Entered: 04/16/2018) |
| 04/17/2018 | 107 | **Minute Entry for proceedings held before the Honorable R. Bryan Harwell: Scheduling Conference as to Brandon Michael Council held on 4/17/2018. Everett McMillian, AUSA, present for the Government; William Nettles IV, present for Defendant. Pursuant to Federal Rule of Criminal Procedure 43(b)(3), both counsel agreed Defendant's presence was not required. The Government and Defendant jointly requested an extension of time until the close of business on Tuesday, April 24, 2018, to submit their proposed scheduling order to the Court. The Court granted the requested extension, and the parties are to submit their joint proposed scheduling order to chambers by the close of business on April 24, 2018. Court Reporter: Beth Krupa. (hcic, )** (Entered: 04/17/2018) |
| 04/17/2018 | 108 | RESPONSE to Motion by USA as to Brandon Michael Council re 97 MOTION in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government (McMillian, Everett) (Entered: 04/17/2018) |
| 04/24/2018 | 109 | MOTION To Set Scheduling Order by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Order Proposed Scheduling Order, # 2 Supporting Documents Scheduling Chart)(McMillian, Everett) (Entered: 04/24/2018) |
| 04/25/2018 | 110 | **TEXT ORDER: The Government has filed a motion captioned "Government's Motion to Set a Scheduling Order" stating "the parties have agreed upon a number of deadlines" and attaching a "Joint Proposed Scheduling Order" and related chart of proposed deadlines. *See* ECF No. 109 . This filing omitted signatures of defense counsel confirming the representation made in the Joint Proposed Scheduling Order. Defense counsel are requested to file such confirmation by tomorrow, April 26, 2018. Signed by the Honorable R. Bryan Harwell on 4/25/2018. (eney, )** (Entered: 04/25/2018) |
| 04/26/2018 | 111 | REPLY to 110 Order,, (Nettles, William) (Entered: 04/26/2018) |
| 04/27/2018 | 112 | RESPONSE in Opposition by Brandon Michael Council re 104 MOTION for Disclosure *Motion for Pre-trial Disclosure of Defendant's Proposed Mitigating Factors* (Nettles, William) (Entered: 04/27/2018) |

| 04/30/2018 | 113 | **TEXT ORDER: On April 24, 2018, the government filed a motion to set a scheduling order 109 , which included a proposed joint scheduling order that set forth deadlines agreed to by the parties. The motion also included a chart that reflected deadlines that were agreed to by the parties and deadlines over which there was a dispute. Upon close review, there appear to be several discrepancies between the chart and the proposed joint scheduling order.** |
|---|---|---|
| | | **First, it appears that the chart reference to a November 5, 2018 deadline (Sent. Non-Mental Health) was totally omitted from the proposed joint scheduling order and the Court is unsure whether the November 5, 2018 deadline was meant to be included in paragraph 9 of the proposed joint scheduling order. There are also inconsistencies between the chart and the proposed joint scheduling order for the remaining deadlines in paragraph 9.** |
| | | **Second, the chart reference to an August 27, 2018 deadline (Dispositive Issues - challenges to indictment, grand jury process, etc.) was totally omitted from the proposed joint scheduling order.** |
| | | **The parties are directed to consult and resubmit a proposed joint scheduling order no later than Tuesday, May 1, 2018, that is consistent with the dates to which they previously agreed.** |
| | | **The chart also reflects that the parties could not agree on dates for: 1) disclosure of mitigation factors not related to Rule 12.2 mental health; 2) disclosure of mitigation not known by the defense; 3) disclosure of mitigation factors not related to Rule 12.2 mental health (penalty phase); 4) disclosure of mitigation offered under Rule 12.2 at disclosure of mental health evidence under Rule 12.2(c)(3); and 5) defense witness and exhibit lists for the guilt and penalty phase. It appears the parties have fully briefed their positions with respect to items 1 through 3 above regarding the disclosure of mitigation factors not related to Rule 12.2 mental health and the Court expects to issue a ruling shortly on disclosure of statutory mitigation factors.** |
| | | **Item number 4 above (disclosure of mitigation offered under Rule 12.2 at disclosure of mental health evidence under Rule 12.2(c)(3)) seems likely to be addressed when the parties file their respective proposals regarding Rule 12.2 procedures. However, to the extent the parties do not expect to address item 4 above when they file their respective proposals on the matter of Rule 12.2 procedures, the parties are directed to file briefs addressing the disclosure of mitigation offered under Rule 12.2 no later than Tuesday, May 1, 2018.** |
| | | **As to item number 5 above (defense witness and exhibit lists for guilt and penalty phase), the parties are directed to file briefs addressing deadlines for the disclosure of defense witness and exhibit lists for the guilt and penalty phase no later than Tuesday, May 1, 2018. Signed by Honorable R Bryan Harwell on 4/30/2018.(tmcb, ) (Entered: 04/30/2018)** |
| 04/30/2018 | 114 | **TEXT ORDER granting 102 Motion to Seal: Defendant has filed a 102 Motion to Seal the declaration of defense counsel William F. Nettles, IV (which is submitted in conjunction with Defendant's 97 Motion in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government). *See* ECF No. 102 . Defendant has** |

| | | |
|---|---|---|
| | | attached to the motion a Non-Confidential Descriptive Index identifying Mr. Nettles' declaration, *see* ECF No. 102-2, and has separately submitted Mr. Nettles' declaration for the Court's in camera review. The Government has filed a response indicating it "does not object and consents to the sealing of" Mr. Nettles' declaration. *See* ECF No. 106 . Accordingly, the Court GRANTS Defendant's 102 Motion to Seal and DIRECTS the Clerk to file Mr. Nettles' declaration under seal for the duration of the criminal proceedings against Defendant or until further order of the Court. Signed by the Honorable R. Bryan Harwell on 4/30/2018. (eney, ) (Entered: 04/30/2018) |
| 04/30/2018 | 115 | Sealed Document. (hcic, ) (Entered: 04/30/2018) |
| 04/30/2018 | 116 | **ORDER granting in part 97 Motion in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government; finding as moot 96 MOTION for Disclosure of Competency Evaluation. Signed by the Honorable R Bryan Harwell on 4/30/2018. (hcic, )** (Entered: 04/30/2018) |
| 04/30/2018 | 117 | NOTICE OF ATTORNEY APPEARANCE Nathan Stuart Williams appearing for USA. (Williams, Nathan) (Entered: 04/30/2018) |
| 05/01/2018 | 118 | MOTION By the Parties (Joint) for A Scheduling Order by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Amended Proposed Scheduling Order, # 2 Amended Scheduling Chart)(Rowell, John) (Entered: 05/01/2018) |
| 05/02/2018 | 119 | **TEXT ORDER: The parties attached a proposed scheduling order to their joint motion to set a scheduling order, which indicates that the parties could not agree on a deadline for motions *in limine* as to the penalty phase and that the parties would brief the Court as to their respective positions. *See* [ECF No. 118-1]. Accordingly, the parties shall file a brief <u>no later than May 14, 2018</u>, setting forth their respective positions regarding a deadline for motions *in limine* as to the penalty phase. Signed by Honorable R Bryan Harwell on 5/2/2018.(tmcb, )** (Entered: 05/02/2018) |
| 05/02/2018 | 120 | **ORDER denying 104 Motion for Disclosure as to Brandon Michael Council (1). Signed by the Honorable R Bryan Harwell on 5/2/2018. (hcic, )** (Entered: 05/02/2018) |
| 05/02/2018 | 121 | **SCHEDULING ORDER as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 5/2/2018. (hcic, )** (Entered: 05/02/2018) |
| 05/03/2018 | 122 | MOTION by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Supporting Documents Proposed Order)(Rowell, John) (Entered: 05/03/2018) |
| 05/14/2018 | 128 | MOTION Joint Motion to Set Scheduling Deadline for Motions in Limine for the Penalty Phase by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(McMillian, Everett) (Entered: 05/14/2018) |
| 05/15/2018 | 130 | **AMENDED SCHEDULING ORDER. Signed by Honorable R Bryan Harwell on 5/15/2018.(tmcb, )** (Entered: 05/15/2018) |

| | | |
|---|---|---|
| 05/18/2018 | 133 | MOTION Requesting Order on Jury Selection Procedures by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit A - Kevin McNally Declaration Regarding Jury Selection Practices, # 2 Exhibit B - United States v. Hans Partial Transcript of Voir Dire)(Nettles, William) (Entered: 05/18/2018) |
| 05/21/2018 | 134 | MOTION *to Establish Rule 12.2 Procedures* by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit McCluskey Order)(McMillian, Everett) (Entered: 05/21/2018) |
| 06/01/2018 | 141 | Sealed Document. (hcic, ) (Entered: 06/01/2018) |
| 06/01/2018 | 142 | STIPULATION *(Brandon Council's Position on Change of Venue)* (Nettles, William) (Entered: 06/01/2018) |
| 06/04/2018 | 144 | RESPONSE to Motion by Brandon Michael Council re 122 MOTION (Nettles, William) (Entered: 06/04/2018) |
| 06/04/2018 | 145 | RESPONSE to Motion by USA as to Brandon Michael Council re 133 MOTION Requesting Order on Jury Selection Procedures (Attachments: # 1 Attachment A - Proposed Order, # 2 Attachment B - Death Penalty Jury Selection Presentation Materials, # 3 Attachment C - Overview of the Colorado Method of Capital Voir Dire, # 4 Attachment D - Sample Supplemental Case Questionnaire, # 5 Attachment E - Example of Proposed Voir Dire Questions, # 6 Attachment F - Tsarnaev Order Regarding Jury Selection Procedures)(Williams, Nathan) (Entered: 06/04/2018) |
| 06/06/2018 | 153 | MOTION for Rule 12.2 Procedures by Brandon Michael Council. No proposed order (Attachments: # 1 Fulks Order, # 2 O'Reilly Order)(Nettles, William) (Entered: 06/06/2018) |
| 06/20/2018 | 171 | RESPONSE in Opposition by USA as to Brandon Michael Council re 153 MOTION for Rule 12.2 Procedures (McMillian, Everett) (Entered: 06/20/2018) |
| 06/20/2018 | 172 | RESPONSE in Opposition by Brandon Michael Council re 134 MOTION *to Establish Rule 12.2 Procedures* (Attachments: # 1 Exhibit A - Summary of Proposals)(Nettles, William) (Entered: 06/20/2018) |
| 07/17/2018 | 182 | MOTION for Disclosure by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(McMillian, Everett) (Main Document 182 replaced on 7/17/2018) (swel, ). (Entered: 07/17/2018) |
| 07/17/2018 | **183** | **ORDER granting in part and denying in part the government's 122 Motion for an order regarding jury selection procedures; granting in part and denying in part Defendant's 133 Motion for an order regarding jury selection procedures. Signed by Honorable R Bryan Harwell on 7/17/2018.(tmcb, )** (Entered: 07/17/2018) |
| 07/17/2018 | **185** | **ORDER governing jury selection procedures. Signed by Honorable R Bryan Harwell on 7/17/2018. (mcot, )** (Entered: 07/17/2018) |
| 07/17/2018 | 186 | DELETION OF ECF No. 184 as to Brandon Michael Council. Reason: document refiled per instruction from Chambers. Corrected ECF No. 185 . (mcot, ) (Entered: 07/17/2018) |
| 07/18/2018 | **187** | **ORDER Regarding Jury Venire as to Brandon Michael Council. Signed by Chief Judge Terry L Wooten on 7/18/2018. (hcic, )** (Entered: 07/18/2018) |

| | | |
|---|---|---|
| 07/19/2018 | 188 | **TEXT ORDER as to Brandon Michael Council re 182 MOTION for Disclosure filed by USA. Defense counsel to file any response in opposition to motion 182 by 7/20/2018. Signed by the Honorable R Bryan Harwell on 7/19/2018. (hcic, )** (Entered: 07/19/2018) |
| 07/20/2018 | 192 | RESPONSE to Motion by Brandon Michael Council re 182 MOTION for Disclosure (Nettles, William) (Main Document 192 replaced on 7/20/2018 as requested by and provided by filer) (hcic, ). (Entered: 07/20/2018) |
| 07/20/2018 | 193 | MOTION to Suppress *Defendant's Statement* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/20/2018) |
| 07/20/2018 | 194 | **TEXT ORDER as to Brandon Michael Council re 193 MOTION to Suppress Defendant's Statement filed by Brandon Michael Council. Government is to file a response to Motion 193 by 8/4/2018. Signed by the Honorable R Bryan Harwell on 7/20/2018. (hcic, )** (Entered: 07/20/2018) |
| 07/20/2018 | 195 | **DISCLOSURE ORDER granting 182 Motion for Disclosure as to Brandon Michael Council (1). Signed by the Honorable R Bryan Harwell on 7/20/2018. (hcic, )** (Entered: 07/20/2018) |
| 07/20/2018 | 196 | **PROTECTIVE ORDER as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 7/20/2018. (hcic, )** (Entered: 07/20/2018) |
| 07/23/2018 | 197 | MOTION to Suppress by Brandon Michael Council. No proposed order (Attachments: # 1 Memo in Support)(Meetze, Michael) (Entered: 07/23/2018) |
| 07/24/2018 | 198 | **TEXT ORDER re 197 MOTION to Suppress filed by Brandon Michael Council. Government to file response to Motion 197 by 8/8/2018. Signed by the Honorable R Bryan Harwell on 7/24/2018. (hcic, )** (Entered: 07/24/2018) |
| 08/03/2018 | 206 | MOTION to Seal by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Supporting Documents Local Rule 49.01(B)(2) Index and Certificate)(Williams, Nathan) (Entered: 08/03/2018) |
| 08/06/2018 | 207 | **TEXT ORDER as to Brandon Michael Council re 206 Motion to Seal filed by USA. Defense counsel to file response to Motion 206 by 8/21/2018. Signed by the Honorable R Bryan Harwell on 8/6/2018. (hcic, )** (Entered: 08/06/2018) |
| 08/10/2018 | 209 | WITHDRAWAL of Motion by Brandon Michael Council re 205 EX PARTE MOTION SEALED filed by Brandon Michael Council. (hcic, ) (Entered: 08/10/2018) |
| 08/20/2018 | 220 | MOTION to Preserve Law Enforcement's Rough Notes by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 08/20/2018) |
| 08/20/2018 | 221 | RESPONSE in Support by Brandon Michael Council re 206 MOTION to Seal (Nettles, William) (Entered: 08/20/2018) |
| 08/20/2018 | 222 | **ORDER as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 8/20/2018. (hcic, )** (Entered: 08/20/2018) |
| 08/21/2018 | 223 | **TEXT ORDER as to Brandon Michael Council re 220 Motion to Preserve Law Enforcement's Rough Notes filed by Brandon Michael Council. Government to file response to Motion 220 by 9/4/2018. Signed by the Honorable R Bryan Harwell on 8/21/2018. (hcic, )** (Entered: 08/21/2018) |

| | | |
|---|---|---|
| 08/23/2018 | 229 | First MOTION for Discovery *Supplemental* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 08/23/2018) |
| 08/24/2018 | 230 | **TEXT ORDER as to Brandon Michael Council re 229 First MOTION for Discovery Supplemental filed by Brandon Michael Council. Government to file response to Motion 229 by 9/7/2018. Signed by the Honorable R Bryan Harwell on 8/23/2018. (hcic, )** (Entered: 08/24/2018) |
| 08/27/2018 | 232 | Consent MOTION for Extension of Time *to File Dispositive Motions* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 08/27/2018) |
| 08/29/2018 | 233 | **TEXT ORDER granting 232 Consent Motion for Extension of Time to File dispositive motions as to Brandon Michael Council (1). Dispositive motions now due September 26, 2018. Signed by Honorable R Bryan Harwell on 8/29/2018. (tmcb, )** (Entered: 08/29/2018) |
| 08/29/2018 | 234 | **ORDER REGARDING RULE 12.2 PROCEDURES - TIMING AND CONTENT OF NOTICE - GOVERNMENT REBUTTAL EXAMINATION as to Brandon Michael Council. Signed by Honorable R Bryan Harwell on 8/29/18.(swel, )** (Entered: 08/29/2018) |
| 08/29/2018 | 235 | RESPONSE to Motion by USA as to Brandon Michael Council re 220 MOTION to Preserve Law Enforcement's Rough Notes (McMillian, Everett) (Entered: 08/29/2018) |
| 08/29/2018 | 236 | NOTICE OF ATTORNEY APPEARANCE Sherri A Lydon appearing for USA. (Lydon, Sherri) (Entered: 08/29/2018) |
| 08/30/2018 | 239 | **TEXT ORDER granting the government's 206 motion to file under seal certain documents until further order of this Court. Defendant has filed two motions to suppress 193 and 197 . The government has filed a motion to seal 206 both its response in opposition to the motions to suppress and the attached exhibits. The government's motion to seal complied with Local Criminal Rule 49.01 and included a memoranda and descriptive index. Pursuant to Local Criminal Rule 49.01(B)(4), docketing the motion to seal on August 3, 2018, served as public notice of the motion to seal. On August 20, 2018, Defendant filed a response in support of the motion to seal indicating no objection. Therefore, the Court grants the government's motion to file under seal the documents listed in its descriptive index [206-1] until further order of this Court. Signed by Honorable R Bryan Harwell on 8/30/2018.(tmcb, )** (Entered: 08/30/2018) |
| 08/30/2018 | 240 | Sealed Document: Government's Response to 193 and 197 Motions to Suppress. (Attachments: # 1 Exhibit 2-Transcript of Defendant's Statement, # 2 Exhibit 3-Document Executed by Defendant, # 3 Exhibit 4-Search Warrant, Affidavit, and Return (Exhibit 1 is a nonstandard item (DVD) held in Chambers))(hcic, ) (Entered: 08/30/2018) |
| 08/30/2018 | 241 | MOTION to Withdraw as Attorney *for the United States of America* by J.D. Rowell.by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Rowell, John) (Entered: 08/30/2018) |
| 08/31/2018 | 242 | NOTICE of Intent to Call Expert Witness by USA as to Brandon Michael Council (Williams, Nathan) (Entered: 08/31/2018) |
| 08/31/2018 | 243 | **TEXT ORDER granting 241 Motion to Withdraw as Attorney. Signed by the Honorable R Bryan Harwell on 8/31/2018.(hcic, )** (Entered: 08/31/2018) |

| 09/05/2018 | 245 | MOTION to Withdraw as Attorney *for the United States of America* by Julius Ness Richardson.by USA as to Brandon Michael Council. No proposed order(Richardson, Julius) (Entered: 09/05/2018) |
|---|---|---|
| 09/06/2018 | 246 | **TEXT ORDER granting 245 Motion to Withdraw as Attorney. Signed by the Honorable R Bryan Harwell on 9/6/2018. (hcic, )** (Entered: 09/06/2018) |
| 09/07/2018 | 248 | RESPONSE to Motion by USA as to Brandon Michael Council re 229 First MOTION for Discovery *Supplemental* (Williams, Nathan) (Entered: 09/07/2018) |
| 09/12/2018 | 251 | MOTION to Strike *Non-Statutory Aggravating Factors or in the Alternative For Other Relief* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 09/12/2018) |
| 09/18/2018 | 256 | MOTION to Strike *the Federal Death Penalty Act Allegations from the Indictment and as a Possible Punishment in this Case* by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit USA v. Donald Fell Transcript)(Nettles, William) (Entered: 09/18/2018) |
| 09/18/2018 | 257 | MOTION to Strike *the Death Penalty Because it is Applied Unconstitutionally and Disproportionately to Those Charged with the Murder of White, Female Victims* by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit Kevin McNally Declaration Re: Federal Death Sentences and the Race and Gender of Defendant's and Victims, # 2 Exhibit Chart of Closed Federal Captial Cases Involving Bank Robbery or Armored Vehicle through June 11, 2018)(Nettles, William) (Entered: 09/18/2018) |
| 09/19/2018 | 258 | **TEXT ORDER as to Brandon Michael Council re 251 Motion to Strike Non-Statutory Aggravating Factors or in the Alternative For Other Relief, 256 Motion to Strike the Federal Death Penalty Act Allegations from the Indictment and as a Possible Punishment in this Case, and 257 Motion to Strike the Death Penalty Because it is Applied Unconstitutionally and Disproportionately to Those Charged with the Murder of White, Female Victims. Government to file responses to Motions 251 , 256 , and 257 by 10/9/2018. Signed by the Honorable R Bryan Harwell on 9/19/2018. (hcic, )** Modified on 9/19/2018 to edit text (hcic, ). (Entered: 09/19/2018) |
| 09/20/2018 | 259 | MOTION to Continue *Current Jury Selection and Trial Date to Permit Effective Representation* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/20/2018) |
| 09/20/2018 | 260 | MOTION to Seal *Ex Parte Motion to Continue* by Brandon Michael Council. No proposed order (Attachments: # 1 Memo in Support, # 2 Non-Confidential Descriptive Index, # 3 Certification of Compliance)(Nettles, William) (Entered: 09/20/2018) |
| 09/20/2018 | 261 | **TEXT ORDER re: 259 Motion to Continue Current Jury Selection and Trial Date to Permit Effective Representation and 260 Motion to Seal Ex Parte Motion to Continue filed by Brandon Michael Council. Government to file responses to Motions 259 and 260 by 9/25/2018. Signed by the Honorable R Bryan Harwell on 9/20/2018. (hcic, )** (Entered: 09/20/2018) |
| 09/25/2018 | 278 | RESPONSE to Motion by USA as to Brandon Michael Council re 259 MOTION to Continue *Current Jury Selection and Trial Date to Permit Effective Representation* (Williams, Nathan) (Entered: 09/25/2018) |

| 09/25/2018 | 279 | RESPONSE to Motion by USA as to Brandon Michael Council re 260 MOTION to Seal *Ex Parte Motion to Continue* (Williams, Nathan) (Entered: 09/25/2018) |
|---|---|---|
| 09/25/2018 | 280 | **TEXT ORDER: The Court hereby STAYS the deadlines set forth in its 185 Order Governing Jury Selection Procedures pending its rulings on Defendant's recently filed 259 Motion to Continue Current Jury Selection and Trial Date to Permit Effective Representation and 260 Motion to File Under Seal Ex Parte Motion to Continue. The Clerk shall not send the jury summonses until further order of the Court. Signed by the Honorable R. Bryan Harwell on 9/25/2018.(eney, )** (Entered: 09/25/2018) |
| 10/03/2018 | 281 | **TEXT ORDER granting the Defendant's 260 motion to seal Defendant's ex parte motion to continue and attached exhibits. Defendant requests that his motion to continue and exhibits be sealed because it reveals attorney client communications, attorney work product, defense strategy, mitigation strategy, and the results of the mitigation investigation to date. Defendant's motion to seal complied with Local Criminal Rule 49.01 and included a memoranda and descriptive index. Pursuant to Local Criminal Rule 49.01(B)(4), docketing the motion to seal served as public notice of the motion to seal on September 20, 2018.**<br><br>**On September 25, 2018, The government filed a response to the motion to seal indicating that "[i]f the Court finds that the proposed documents are consistent with Defendant's description and that such documents warrant sealing pursuant to Local Crim. Rule 29.01, the government does not object."**<br><br>**The Court has reviewed the documents in camera and agrees that the documents warrant sealing because they disclose attorney client communications, defense strategy, and the results of defense counsels' investigations thus far. The Court has considered less drastic alternatives to sealing and finds that less drastic alternatives are not appropriate in this case**<br><br>**For the reasons stated above and argued by Defendant in his motion to seal, the Court GRANTS the Defendant's 260 motion to seal. Defendant's ex parte motion to continue and attached exhibits shall be filed under seal until further order of this Court. Signed by Honorable R Bryan Harwell on 10/3/2018.(tmcb, )** (Entered: 10/03/2018) |
| 10/03/2018 | 282 | Sealed Document -Ex Parte Motion to Continue and Exhibits re: ECF No. 281. (mcot, ) (Entered: 10/03/2018) |
| 10/09/2018 | 284 | NOTICE OF EX PARTE HEARING as to Brandon Michael Council: In Camera Hearing re: Ex Parte Motion to Continue set for 10/12/2018 at 2:30 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 10/09/2018) |
| 10/09/2018 | 288 | NOTICE OF RESCHEDULED HEARING as to Brandon Michael Council: In Camera Hearing re: Ex Parte Motion to Continue previously set for 10/12/2018 at 2:30 PM cancelled and rescheduled to: In Camera Hearing set for 10/18/2018 at 2:00 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 10/09/2018) |

| | | |
|---|---|---|
| 10/10/2018 | 289 | RESPONSE in Opposition by USA as to Brandon Michael Council re 251 MOTION to Strike *Non-Statutory Aggravating Factors or in the Alternative For Other Relief* (McMillian, Everett) (Entered: 10/10/2018) |
| 10/10/2018 | 290 | RESPONSE in Opposition by USA as to Brandon Michael Council re 256 MOTION to Strike *the Federal Death Penalty Act Allegations from the Indictment and as a Possible Punishment in this Case*, 257 MOTION to Strike *the Death Penalty Because it is Applied Unconstitutionally and Disproportionately to Those Charged with the Murder of White, Female Victims* (Attachments: # 1 Exhibit A - Order Denying Motion to Strike (Roof))(McMillian, Everett) (Entered: 10/10/2018) |
| 10/12/2018 | 292 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on April 6, 2018, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 11/2/2018. Redacted Transcript Deadline set for 11/13/2018. Release of Transcript Restriction set for 1/10/2019. (bkru, ) (Entered: 10/12/2018) |
| 10/12/2018 | 293 | TRANSCRIPT - SEALED as to Brandon Michael Council Ex Partae Hearing held on April 6, 2018, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR. (bkru, ) (Entered: 10/12/2018) |
| 10/12/2018 | 294 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on April 17, 2018, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 11/2/2018. Redacted Transcript Deadline set for 11/13/2018. Release of Transcript Restriction set for 1/10/2019. (bkru, ) (Entered: 10/12/2018) |
| 10/18/2018 | 301 | **Minute Entry for proceedings held before the Honorable R Bryan Harwell: In Camera Hearing as to Brandon Michael Council held on 10/18/2018. Nathan Williams and Everett McMillian, AUSA, present; Duane K Bryant, William Nettles, and Michael Meetze present with defendant. Courtroom cleared except for defendant, his counsel, and courtroom personnel. Defendant's motion for continuance is taken under advisement. Defendant waives speedy trial. Court Reporter: Beth Krupa. CJA Time: 1.5 hours. (hcic, ) (Entered: 10/18/2018)** |
| 10/19/2018 | 302 | **TEXT ORDER sealing the transcript of the ex parte portion of the hearing on Defendant's 259 motion to continue and 282 ex parte motion to continue held on October 18, 2018. Signed by Honorable R Bryan Harwell on 10/19/2018.(tmcb, )** (Entered: 10/19/2018) |

| 10/29/2018 | 306 | REPLY TO RESPONSE to Motion by Brandon Michael Council re 251 MOTION to Strike *Non-Statutory Aggravating Factors or in the Alternative For Other Relief* (Attachments: # 1 Exhibit Notice Of Intent re: Dylann Storm Roof)(Meetze, Michael) (Entered: 10/29/2018) |
|---|---|---|
| 10/31/2018 | 307 | **ORDER: The Court GRANTS in substantial part Defendant's request for a continuance [ECF Nos. 259 & 282 ] and CONTINUES the trial of this case to September 2019. Signed by the Honorable R Bryan Harwell on 10/31/2018. (hcic, )** (Entered: 10/31/2018) |
| 10/31/2018 | 308 | **SECOND AMENDED SCHEDULING ORDER as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 10/31/2018. (hcic, )** (Entered: 10/31/2018) |
| 10/31/2018 | 309 | **AMENDED ORDER GOVERNING JURY SELECTION PROCEDURES. Signed by the Honorable R Bryan Harwell on 10/31/2018. (hcic, )** (Entered: 10/31/2018) |
| 10/31/2018 | 310 | **AMENDED ORDER REGARDING RULE 12.2 PROCEDURES - TIMING AND CONTENT OF NOTICE - GOVERNMENT REBUTTAL EXAMINATION. Signed by the Honorable R Bryan Harwell on 10/31/2018.(hcic, )** (Entered: 10/31/2018) |
| 01/17/2019 | 324 | NOTICE OF ATTORNEY APPEARANCE Derek Alan Shoemake appearing for USA. (Shoemake, Derek) (Entered: 01/17/2019) |
| 03/01/2019 | 341 | NOTICE OF HEARING ON MOTIONS in case as to Brandon Michael Council re 197 MOTION to Suppress and 193 MOTION to Suppress Defendant's Statement: Motions Hearing set for 4/10/2019 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/01/2019) |
| 03/01/2019 | 342 | NOTICE OF HEARING ON MOTION in case as to Brandon Michael Council re 251 MOTION to Strike Non-Statutory Aggravating Factors or in the Alternative For Other Relief: Motion Hearing set for 4/10/2019 at 3:30 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 03/01/2019) |
| 03/29/2019 | 358 | MOTION to Seal by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support, # 2 Non-Confidential Descriptive Index, # 3 Certification of Compliance)(Meetze, Michael) (Entered: 03/29/2019) |
| 04/03/2019 | 363 | RESPONSE in Opposition by USA as to Brandon Michael Council re 197 MOTION to Suppress *Supplemental* (Attachments: # 1 Exhibit 1 - Consent to Search)(Williams, Nathan) (Entered: 04/03/2019) |
| 04/04/2019 | 394 | MOTION for Protective Order *Regarding Confidential Defense Information in the Possession of the Florence County Detention Center* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 04/04/2019) |
| 04/04/2019 | 395 | WITHDRAWAL of Motion by Brandon Michael Council re 358 MOTION to Seal filed by Brandon Michael Council (Meetze, Michael) Modified on 4/4/2019 to correct event type (mcot, ) (Entered: 04/04/2019) |

| | | |
|---|---|---|
| 04/04/2019 | 396 | DELETION OF ECF No. 393 as to Brandon Michael Council. Reason: document refiled using the correct event. Corrected Filing -ECF No. 395 ; Modified filing date to that of original filing: 4/4/2019. (mcot, ) (Entered: 04/04/2019) |
| 04/04/2019 | 397 | **TEXT ORDER as to Brandon Michael Council re ECF No. 394 MOTION for Protective Order** *Regarding Confidential Defense Information in the Possession of the Florence County Detention Center* **filed by Brandon Michael Council. Government to file response to Motion, ECF No. 394 , by 4/18/2019. Signed by Chief Judge R Bryan Harwell on 4/4/2019.**(mcot, ) (Entered: 04/04/2019) |
| 04/10/2019 | 401 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Motion Hearing in case as to Brandon Michael Council held on 4/10/2019. Sherri Lydon, Everett McMillian, Nathan Williams, and Derek Shoemake present; William Nettles, Michael Meetze, and Duane K Bryant present with defendant. Counsel have no objection to the Court relying on briefs for motions 256 and 257 . Counsel agree that motions 220 and 229 are resolved and need no ruling. Witnesses, exhibits. 193 Motion to Suppress and 197 Motion to Suppress denied; 251 Motion to Strike taken under advisement. Court Reporter: Beth Krupa. (hcic, )** (Entered: 04/10/2019) |
| 04/10/2019 | 402 | EXHIBIT LIST. Exhibits with counsel. (hcic, ) (Entered: 04/10/2019) |
| 04/16/2019 | 407 | MOTION for Extension of Time to File Response/Reply as to 394 MOTION for Protective Order *Regarding Confidential Defense Information in the Possession of the Florence County Detention Center* by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Certificate of Service)(Shoemake, Derek) (Entered: 04/16/2019) |
| 04/16/2019 | 408 | **TEXT ORDER granting the government's 407 Motion for Extension of Time to File Response to Defendant's motion for a protective order, with the consent of counsel for Defendant. Response now due May 3, 2019. Signed by Chief Judge R Bryan Harwell on 4/16/2019.**(tmcb, ) (Entered: 04/16/2019) |
| 05/03/2019 | 409 | RESPONSE to Motion by USA as to Brandon Michael Council re 394 MOTION for Protective Order *Regarding Confidential Defense Information in the Possession of the Florence County Detention Center* (Attachments: # 1 Certificate of Service) (Shoemake, Derek) (Entered: 05/03/2019) |
| 05/07/2019 | 413 | **ORDER denying 251 Motion to Strike as to Brandon Michael Council (1). Signed by Chief Judge R Bryan Harwell on 5/7/2019.**(hcic, ) (Entered: 05/07/2019) |
| 05/07/2019 | 414 | **ORDER denying 256 Motion to Strike the Federal Death Penalty Act Allegations from the Indictment and as a Possible Punishment in this Case; denying 257 Motion to Strike the Death Penalty Because it is Applied Unconstitutionally and Disproportionately to Those Charged with the Murder of White, Female Victims. Signed by Chief Judge R Bryan Harwell on 5/7/2019. (hcic, )** (Entered: 05/07/2019) |
| 05/07/2019 | 415 | **CONSENT PROTECTIVE ORDER re: 394 Motion for Protective Order as to Brandon Michael Council (1). Signed by Chief Judge R Bryan Harwell on 5/7/2019.**(hcic, ) (Entered: 05/07/2019) |
| 05/13/2019 | 419 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on 4/10/2019, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal |

| | | |
|---|---|---|
| | | or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 6/3/2019. Redacted Transcript Deadline set for 6/13/2019. Release of Transcript Restriction set for 8/12/2019. (bkru, ) (Entered: 05/13/2019) |
| 05/20/2019 | 420 | ORDER #1 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 5/20/2019. (hcic, ) Modified on 5/21/2019 to edit text (hcic, ). (Entered: 05/20/2019) |
| 05/28/2019 | 423 | ORDER #2 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents)Signed by Chief Judge R Bryan Harwell on 5/28/2019. (hcic, ) Modified on 5/28/2019 to edit text (hcic, ). (Entered: 05/28/2019) |
| 06/04/2019 | 427 | ORDER #3 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 6/4/2019.(hcic, ) (Entered: 06/04/2019) |
| 06/05/2019 | 428 | Proposed Supplemental Case Questionnaire. (Attachments: # 1 Defendant's Brief regarding Proposed Supplemental Case Questionnaire, # 2 Government's Brief regarding Proposed Supplemental Case Questionnaire)(hcic, ) (Entered: 06/05/2019) |
| 06/11/2019 | 429 | ORDER #4 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 6/11/2019. (hcic, ) (Entered: 06/11/2019) |
| 06/17/2019 | 432 | ORDER #5 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 6/17/2019. (hcic, ) (Entered: 06/17/2019) |
| 06/18/2019 | 433 | NOTICE of Intent to Call Expert Witness by USA as to Brandon Michael Council *(Supplemental)* (Williams, Nathan) (Entered: 06/18/2019) |
| 06/19/2019 | 438 | Consent MOTION for Electronic Submission of the Standard Juror Questionnaires by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Shoemake, Derek) (Entered: 06/19/2019) |
| 06/20/2019 | 440 | **CONSENT ORDER FOR ELECTRONIC SUBMISSION OF THE STANDARD JUROR QUESTIONNAIRES. Order granting 438 Motion as to Brandon Michael Council (1). Signed by Chief Judge R Bryan Harwell on 6/20/2019.(hcic, )** (Entered: 06/20/2019) |
| 06/24/2019 | 445 | NOTICE of Intent to Call Expert Witness by USA as to Brandon Michael Council *(Penalty Phase)* (Williams, Nathan) (Entered: 06/24/2019) |
| 06/24/2019 | 448 | ORDER #6 Regarding Prospective Juror Requests (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 6/24/2019.(hcic, ) (Entered: 06/24/2019) |
| 06/25/2019 | 450 | **AMENDED SCHEDULING ORDER as to Brandon Michael Council. Signed by Chief Judge R Bryan Harwell on 6/25/2019.(hcic, )** (Entered: 06/25/2019) |

| 07/01/2019 | 457 | ORDER #7 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 7/1/2019. (hcic, ) (Entered: 07/01/2019) |
|---|---|---|
| 07/01/2019 | 469 | MOTION for Jail to Provide Basic Writing Materials and Relief from Unduly Harsh Conditions of Pretrial Confinement by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/01/2019) |
| 07/02/2019 | 470 | **TEXT ORDER re 469 Motion for Jail to Provide Basic Writing Materials and Relief from Unduly Harsh Conditions of Pretrial Confinement filed by Brandon Michael Council. Government to file response to Motion 469 by Monday, 7/8/2019. Signed by Chief Judge R Bryan Harwell on 7/2/2019.(hcic, )** (Entered: 07/02/2019) |
| 07/02/2019 | 471 | NOTICE OF REQUEST FOR PROTECTION from Court Appearance as to Brandon Michael Council for August 8-9, 2019 & August 19-20, 2019 (Nettles, William) (Entered: 07/02/2019) |
| 07/02/2019 | 472 | NOTICE OF HEARING ON MOTION in case as to Brandon Michael Council 469 Motion for Jail to Provide Basic Writing Materials and Relief from Unduly Harsh Conditions of Pretrial Confinement: Motion Hearing set for 7/9/2019 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 07/02/2019) |
| 07/05/2019 | 476 | RESPONSE to Motion by USA as to Brandon Michael Council re 469 MOTION for Jail to Provide Basic Writing Maerials and Relief from Unduly Harsh Conditions of Pretrial Confinement (McMillian, Everett) (Entered: 07/05/2019) |
| 07/08/2019 | 477 | ORDER #8 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 7/8/2019.(hcic, ) (Entered: 07/08/2019) |
| 07/08/2019 | 478 | NOTICE OF CANCELLATION OF HEARING: Motion Hearing as to Brandon Michael Council previously set for 7/9/2019 cancelled. (hcic, ) (Entered: 07/08/2019) |
| 07/09/2019 | 494 | **TEXT ORDER finding as moot 469 Motion for Jail to Provide Basic Writing Materials and Relief from Unduly Harsh Conditions of Pretrial Confinement. Signed by Chief Judge R. Bryan Harwell on 7/9/2019.(eney, )** (Entered: 07/09/2019) |
| 07/10/2019 | 495 | **DECORUM ORDER as to Brandon Michael Council. Signed by Chief Judge R Bryan Harwell on 7/10/2019.(hcic, )** (Main Document 495 replaced on 7/10/2019) (hcic, ). (Entered: 07/10/2019) |
| 07/11/2019 | 496 | MOTION to Continue *(Motion for Additional Time to Complete the Defense Mitigation Investigation)* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/11/2019) |
| 07/11/2019 | 497 | MOTION to Seal *Ex Parte Document in Support of Defendant's Motion for Additional Time to Complete the Defense Mitigation Investigation* by Brandon Michael Council. No proposed order (Attachments: # 1 Memo in Support, # 2 Non-Confidential Descriptive Index, # 3 Certification of Compliance)(Nettles, William) (Entered: 07/11/2019) |

| | | |
|---|---|---|
| 07/11/2019 | 498 | **TEXT ORDER 496 MOTION to Continue, 497 MOTION to Seal. Government to file response to Motions 496 and 497 by Monday 7/15/2019. Signed by Chief Judge R Bryan Harwell on 7/11/2019. (hcic, ) (Entered: 07/11/2019)** |
| 07/11/2019 | 499 | NOTICE OF HEARING ON MOTION in case as to Brandon Michael Council re 496 MOTION to Continue: Motion Hearing set for 7/17/2019 at 10:00 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 07/11/2019) |
| 07/11/2019 | 500 | ORDER REGARDING SUPPLEMENTAL CASE QUESTIONNAIRE (Attachments: # 1 SUPPLEMENTAL CASE QUESTIONNAIRE) Signed by Chief Judge R Bryan Harwell on 7/11/2019. (hcic, ) (Entered: 07/11/2019) |
| 07/11/2019 | 501 | ORDER REGARDING PROPOSED VIDEO SCRIPT. (Attachments: # 1 PROPOSED VIDEO SCRIPT) Signed by Chief Judge R Bryan Harwell on 7/11/2019. (hcic, ) (Entered: 07/11/2019) |
| 07/15/2019 | 502 | RESPONSE to Motion by USA as to Brandon Michael Council re 496 MOTION to Continue *(Motion for Additional Time to Complete the Defense Mitigation Investigation)*, 497 MOTION to Seal *Ex Parte Document in Support of Defendant's Motion for Additional Time to Complete the Defense Mitigation Investigation* (Shoemake, Derek) (Entered: 07/15/2019) |
| 07/15/2019 | 503 | ORDER #9 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 7/15/2019 (hcic, ) (Entered: 07/15/2019) |
| 07/15/2019 | 504 | REPLY to 501 Sealed Document (Nettles, William) (Additional attachment(s) added on 7/16/2019: # 1 Exhibit) (hcic, ). (Entered: 07/15/2019) |
| 07/16/2019 | 507 | **TEXT ORDER granting the Defendant's 497 motion to seal ex parte document in support of Defendant's motion to continue. Defendant requests that a brief in support of his motion to continue be sealed because it contains attorney client communications, attorney work product, trial and mitigation strategy, and information concerning the mitigation investigation. Defendant's motion to seal complied with Local Criminal Rule 49.01 and included a memoranda and descriptive index. Pursuant to Local Criminal Rule 49.01(B)(4), docketing the motion to seal served as public notice of the motion to seal on July 11, 2019.** <br><br> **On July 15, 2019, the government filed a response to the motion to seal indicating no objection to sealing the ex parte document.** <br><br> **The Court has reviewed the document in camera and agrees that the document warrants sealing because it contains attorney-client communications, defense strategy, and the results of defense counsel's investigations. The Court has considered less drastic alternatives to sealing and finds that less drastic alternatives are not appropriate in this case.** <br><br> **For the reasons stated above and argued by Defendant in his motion to seal, the Court GRANTS the Defendant's 497 motion to seal. Defendant's ex parte brief in support of his motion to continue shall be filed under seal until further order of this Court. Signed by Chief Judge R Bryan Harwell on 7/16/2019.(tmcb, ) (Entered: 07/16/2019)** |

| 07/16/2019 | 508 | Ex Parte Brief in Support of Defendant's 496 Motion to Continue. (hcic, ) (Entered: 07/16/2019) |
|---|---|---|
| 07/17/2019 | 512 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: In Camera Motion Hearing as to Brandon Michael Council held on 7/17/2019 re 496 MOTION to Continue filed by Brandon Michael Council. AUSAs Sherri Lydon, Nathan Williams, Derek Shoemake, and Everett McMillian present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Courtroom cleared except for defendant, his counsel, and courtroom personnel. 496 Motion to Continue denied for reasons detailed on the record. Court Reporter: Beth Krupa. CJA Time: 1 hour 30 mins. (hcic, ) (Entered: 07/17/2019)** |
| 07/17/2019 | 513 | GOVERNMENT'S RESPONSE TO DEFENDANT'S PROPOSED VOIR DIRE SCRIPT. (hcic, ) (Entered: 07/17/2019) |
| 07/19/2019 | 525 | ORDER #10 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 7/19/2019. (hcic, ) (Entered: 07/19/2019) |
| 07/22/2019 | 529 | MOTION in Limine *(Bank Video Images)* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/22/2019) |
| 07/22/2019 | 530 | MOTION in Limine *(Video and Photographic Images)* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/22/2019) |
| 07/22/2019 | 531 | MOTION in Limine *To Exclude Governments Proposed Exhibit Numbers 55, 60, 61, 62, AND 68* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/22/2019) |
| 07/22/2019 | 532 | MOTION in Limine *Prejudicial and Irrelevant Evidence of Films Filed in HIs Possession* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 07/22/2019) |
| 07/22/2019 | 533 | DELETION OF ORIGINAL DOCKET ENTRY NUMBER 532 as to Brandon Michael Council Reason: Filed in error. Deleted at the request of filer immediately after it was filed. Corrected filing done the same day as original filing and has the same number 532 . (hcic, ) (Entered: 07/22/2019) |
| 07/22/2019 | 534 | Joint Strikes for Cause. (hcic, ) (Entered: 07/22/2019) |
| 07/22/2019 | 550 | MOTION in Limine */ Government's First Omnibus Guilt Phase Motion in Limine and Memorandum in Support* by USA as to Brandon Michael Council. No proposed order(Shoemake, Derek) (Entered: 07/22/2019) |
| 07/22/2019 | 551 | MOTION in Limine */ Government's First Omnibus Penalty Phase Motion in Limine and Memorandum in Support* by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit)(Shoemake, Derek) (Entered: 07/22/2019) |
| 07/23/2019 | 563 | **TEXT ORDER re 531 MOTION in Limine To Exclude Government's Proposed Exhibit Numbers 55, 60, 61, 62, AND 68, 532 MOTION in Limine - Prejudicial and Irrelevant Evidence of Films Filed in His Possession, 529 MOTION in Limine (Bank Video Images), 530 MOTION in Limine (Video and Photographic Images). Government to file responses to Motions 529 , 530 , 531 , and 532 by 8/6/2019. Signed by Chief Judge R Bryan Harwell on 7/23/2019.(hcic, ) (Entered: 07/23/2019)** |

| | | |
|---|---|---|
| 07/23/2019 | 564 | **TEXT ORDER re 551 MOTION in Limine - Government's First Omnibus Penalty Phase Motion in Limine and Memorandum in Support, 550 MOTION in Limine - Government's First Omnibus Guilt Phase Motion in Limine and Memorandum in Support. Defendant to file responses to Motions 550 and 551 by 8/6/2019. Signed by Chief Judge R Bryan Harwell on 7/23/2019. (hcic, ) (Entered: 07/23/2019)** |
| 07/24/2019 | 584 | Consent MOTION to Amend/Correct *Death Penalty Notice Aggravating Factor* by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Attachment)(Shoemake, Derek) (Entered: 07/24/2019) |
| 07/25/2019 | 600 | MOTION in Limine / *Governments Penalty Phase Motion In Limine To Exclude Certain Opinions Of Dr. Susan McCarter and Memorandum In Support* by USA as to Brandon Michael Council. No proposed order(Shoemake, Derek) (Entered: 07/25/2019) |
| 07/25/2019 | 601 | **ORDER. Signed by Chief Judge R Bryan Harwell on 7/25/2019. (hcic, ) (Entered: 07/25/2019)** |
| 07/25/2019 | 602 | **ORDER ALLOWING AMENDED NOTICE OF INTENT. Signed by Chief Judge R Bryan Harwell on 7/25/2019.(hcic, ) (Entered: 07/25/2019)** |
| 07/26/2019 | 603 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Brandon Michael Council *(Amended)* (Shoemake, Derek) (Entered: 07/26/2019) |
| 07/26/2019 | 605 | **TEXT ORDER re 600 MOTION in Limine - Government's Penalty Phase Motion In Limine To Exclude Certain Opinions Of Dr. Susan McCarter and Memorandum In Support. Defendant shall file a repsonse to Motion 600 by 8/9/2019. Signed by Chief Judge R Bryan Harwell on 7/26/2019.(hcic, ) (Entered: 07/26/2019)** |
| 07/29/2019 | 606 | ORDER #11 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 7/29/2019. (hcic, ) (Entered: 07/29/2019) |
| 07/29/2019 | 607 | Supplemental Joint Strikes for Cause. (hcic, ) (Entered: 07/29/2019) |
| 07/29/2019 | 608 | Email from defense counsel. (hcic, ) (Entered: 07/29/2019) |
| 07/29/2019 | 609 | MOTION to Withdraw as Attorney by Sherri A. Lydon.by USA as to Brandon Michael Council. No proposed order(Lydon, Sherri) (Entered: 07/29/2019) |
| 07/29/2019 | 610 | Sealed Document re Order 601 (Meetze, Michael) (Entered: 07/29/2019) |
| 07/29/2019 | 611 | **TEXT ORDER: At the conclusion of the July 17, 2019 hearing, the Court asked counsel to speak informally in chambers about the proposed video script. The Court discussed with counsel its concerns regarding the different sentencing options for Count One as compared to Count Two and how to incorporate those options into the script. Count One charges a violation of 18 U.S.C. § 2113(a) and (e), which provides for punishment "by death or life imprisonment." Count Two charges a violation of 18 U.S.C. § 924(j), which provides for punishment "by death or by imprisonment for any term of years or for life." Notably, the Federal Death Penalty Act ("FDPA") provides that "the jury by unanimous vote... shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18** |

| | | |
|---|---|---|
| | | U.S.C. § 3593(e). Counsel for both parties indicated they would submit briefs regarding their position on this matter by Monday, July 22, 2019. Nothing was received from either party by that date.<br><br>However, today (July 29), the Court received an email from defense counsel (with a copy sent to the Government's counsel) indicating Defendant will request that the Court not instruct the jury on the "term of years" option provided for in § 924(j). Defendant also cited several cases supporting his position, including *United States v. Quinones*, 511 F.3d 289, 321-22 (2d Cir. 2007), and *United States v. Moussaoui*, 591 F.3d 263, 304-05 (4th Cir. 2010), wherein the Second and Fourth Circuits recognized a defendant can make a "tactical decision" to argue (and have the district court instruct the jury) that death and life imprisonment without the possibility of release are the <u>only</u> two sentencing options (and <u>not</u> the "term of years"/"other lesser sentence" option provided by §§ 924(j) and 3593(e)).<br><br>The Court has raised this issue sua sponte based on its own research. *See Hicks v. Oklahoma*, 447 U.S. 343 (1980) (holding that when a defendant "ha[s] a statutory right to have a jury fix his punishment," due process requires the jury to be "correctly instructed" of all available sentencing options); *Jones v. United States*, 527 U.S. 373, 405-22 (1999) (Ginsburg, J., dissenting) (discussing the "three sentencing options" available under the FDPA: "death, life imprisonment without release, or some other lesser sentence" and how/when a district court should instruct a jury on those options); *United States v. Ostrander*, 411 F.3d 684, 688 (6th Cir. 2005) ("At sentencing, the jury was appropriately instructed that it could recommend a sentence of death, life without the possibility of release, or a term of years, pursuant to § 924(j).").<br><br>Having reviewed defense counsel's email, the Court DIRECTS counsel for the parties to consult and then to formally brief their positions on the § 924(j) sentencing option issue and to submit their briefs by <u>5:00 P.M. on Wednesday, July 31, 2019.</u><br><br>Signed by Chief Judge R. Bryan Harwell on 7/29/2019.(eney, ) (Entered: 07/29/2019) |
| 07/30/2019 | 612 | **TEXT ORDER granting 609 Motion to Withdraw as Attorney. Signed by Chief Judge R Bryan Harwell on 7/30/2019.(hcic, ) (Entered: 07/30/2019)** |
| 07/30/2019 | 614 | **TEXT ORDER as to Brandon Michael Council re 610 Sealed Document. Government to file response to 610 by Thursday, 8/1/2019. Signed by Chief Judge R Bryan Harwell on 7/30/2019. (hcic, ) (Entered: 07/30/2019)** |
| 07/30/2019 | 615 | GOVERNMENT'S PROPOSED PENALTY PHASE JURY INSTRUCTIONS. (Attachments: # 1 Email from AUSA Everett McMillian)(hcic, ) (Entered: 07/30/2019) |
| 07/30/2019 | 616 | GOVERNMENT'S PROPOSED PENALTY PHASE SPECIAL VERDICT FORM. (Attachments: # 1 Email from AUSA Everett McMillian)(hcic, ) (Entered: 07/30/2019) |
| 07/30/2019 | 617 | GOVERNMENT'S BRIEF REGARDING JURY INSTRUCTIONS. (Attachments: # 1 Email from AUSA Everett McMillian)(hcic, ) (Entered: 07/30/2019) |

| | | |
|---|---|---|
| 07/30/2019 | 618 | PARTIES' PROPOSED GUILT PHASE JURY INSTRUCTIONS. (Attachments: # 1 Email from AUSA Everett McMillian)(hcic, ) (Entered: 07/30/2019) |
| 07/30/2019 | 619 | BRANDON COUNCIL'S MEMORANDUM IN SUPPORT OF PROPOSED PENALTY PHASE JURY INSTRUCTIONS. (Attachments: # 1 BRANDON COUNCIL'S PROPOSED PENALTY PHASE JURY INSTRUCTIONS, # 2 Basham Jury Instruction Transcripts, # 3 Kevin McNally Affidavit, # 4 Kevin McNally Affidavit re Death Penalty, # 5 Email from AFPD William Nettles)(hcic, ) (Entered: 07/30/2019) |
| 07/30/2019 | 620 | Proposed Joint Guilt Phase Verdict Form. (Attachments: # 1 Email from AUSA Everett McMillian)(hcic, ) (Entered: 07/30/2019) |
| 07/30/2019 | 621 | Sealed Document re Order 601 . (Shoemake,Derek) (hcic, ) (Entered: 07/30/2019) |
| 07/31/2019 | 622 | MOTION by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit Waiver)(Nettles, William) (Main Document 622 replaced on 7/31/2019 with corrected document as requested by and provided by filer) (hcic, ). (Entered: 07/31/2019) |
| 08/01/2019 | 623 | **TEXT ORDER granting 622 Motion as to Brandon Michael Council (1). Signed by Chief Judge R. Bryan Harwell on 8/1/2019.(eney, )** (Entered: 08/01/2019) |
| 08/01/2019 | 624 | ORDER REGARDING FINALIZED VIDEO SCRIPT -Signed by Chief Judge R Bryan Harwell on 8/1/2019 (Attachments: # 1 Finalized Video Script). (mcot, ) Modified on 8/1/2019 to edit text (mcot, ). (Entered: 08/01/2019) |
| 08/01/2019 | 625 | ORDER REGARDING PROCEDURE FOR INDIVIDUAL VOIR DIRE and PEREMPTORY STRIKES -Signed by Chief Judge R Bryan Harwell on 8/1/2019 (Attachments: # 1 Preliminary Instructions -Individual Voir Dire). (mcot, ) (Entered: 08/01/2019) |
| 08/02/2019 | 626 | Supplemental Joint Strikes for Cause. (mcot, ) (Entered: 08/02/2019) |
| 08/02/2019 | 627 | Email from Defense Counsel. (mcot, ) Modified on 8/2/2019 to edit text (mcot, ). (Entered: 08/02/2019) |
| 08/02/2019 | 628 | ORDER #12 Regarding Prospective Juror Requests -Signed by Chief Judge R. Bryan Harwell on 8/2/2019 (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents). Signed by Chief Judge R Bryan Harwell on 8/2/2019. (mcot, ) (Entered: 08/02/2019) |
| 08/06/2019 | 629 | RESPONSE in Opposition by Brandon Michael Council re 551 MOTION in Limine / *Government's First Omnibus Penalty Phase Motion in Limine and Memorandum in Support*, 550 MOTION in Limine / *Government's First Omnibus Guilt Phase Motion in Limine and Memorandum in Support* (Nettles, William) (Entered: 08/06/2019) |
| 08/06/2019 | 630 | RESPONSE in Opposition by USA as to Brandon Michael Council re 531 MOTION in Limine *To Exclude Governments Proposed Exhibit Numbers 55, 60, 61, 62, AND 68*, 532 MOTION in Limine *Prejudicial and Irrelevant Evidence of Films Filed in HIs Possession*, 529 MOTION in Limine *(Bank Video Images)*, 530 MOTION in Limine *(Video and Photographic Images)* (Shoemake, Derek) (Entered: 08/06/2019) |
| 08/07/2019 | 631 | NOTICE OF HEARING ON MOTIONS in case as to Brandon Michael Council re: 531 MOTION in Limine To Exclude Government's Proposed Exhibit Numbers 55, 60, 61, 62, AND 68, 532 MOTION in Limine Prejudicial and Irrelevant Evidence of Films Filed in His Possession, 550 MOTION in Limine - Government's First Omnibus Guilt |

| | | |
|---|---|---|
| | | Phase Motion in Limine and Memorandum in Support, 600 MOTION in Limine - Government's Penalty Phase Motion In Limine To Exclude Certain Opinions Of Dr. Susan McCarter, 551 MOTION in Limine - Government's First Omnibus Penalty Phase Motion in Limine, 530 MOTION in Limine (Video and Photographic Images), 529 MOTION in Limine (Bank Video Images): Motions Hearing set for 8/14/2019 at 11:00 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 08/07/2019) |
| 08/08/2019 | 633 | ORDER #13 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/8/2019.(hcic, ) (Entered: 08/08/2019) |
| 08/09/2019 | 635 | MOTION for Discovery *of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 08/09/2019) |
| 08/09/2019 | 636 | **TEXT ORDER re 635 Motion for Discovery of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession. Government to file response to Motion 635 by 8/12/2019. Signed by Chief Judge R Bryan Harwell on 8/9/2019.(hcic, )** (Entered: 08/09/2019) |
| 08/09/2019 | 637 | RESPONSE to Motion by USA as to Brandon Michael Council re 635 MOTION for Discovery *of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession* (Shoemake, Derek) (Entered: 08/09/2019) |
| 08/09/2019 | 638 | MOTION in Limine / *Penalty Phase Motion in Limine to Exclude Certain Opinions of Deborah Taylor Grey and Memorandum in Support* by USA as to Brandon Michael Council. No proposed order(Shoemake, Derek) (Entered: 08/09/2019) |
| 08/09/2019 | 639 | REPLY to 616 Proposed Jury Instructions (Attachments: # 1 Exhibit Defense Proposed Verdict Form, # 2 Exhibit Affidavit of Matthew Rubenstein, # 3 Exhibit 2 A - List of Cases, # 4 Exhibit 2 B - Relevant Portions of Jury Verdict Forms, # 5 Exhibit 2 C - Relevant Portions of Jury Instructions)(Nettles, William) (Entered: 08/09/2019) |
| 08/09/2019 | 640 | RESPONSE in Opposition by Brandon Michael Council re 600 MOTION in Limine / *Governments Penalty Phase Motion In Limine To Exclude Certain Opinions Of Dr. Susan McCarter and Memorandum In Support* (Nettles, William) (Entered: 08/09/2019) |
| 08/12/2019 | 641 | **TEXT ORDER re 638 MOTION in Limine - Penalty Phase Motion in Limine to Exclude Certain Opinions of Deborah Taylor Grey filed by USA. Defendant to file response to Motion 638 by 8/13/2019. Signed by Chief Judge R Bryan Harwell on 8/12/2019.(hcic, )** (Entered: 08/12/2019) |
| 08/12/2019 | 642 | AMENDED NOTICE OF HEARING ON MOTIONS re: 531 MOTION in Limine To Exclude Government's Proposed Exhibit Numbers 55, 60, 61, 62, AND 68, 532 MOTION in Limine Prejudicial and Irrelevant Evidence of Films Filed in His Possession, 550 MOTION in Limine - Government's First Omnibus Guilt Phase Motion in Limine and Memorandum in Support, 600 MOTION in Limine - Government's Penalty Phase Motion In Limine To Exclude Certain Opinions Of Dr. Susan McCarter, 551 MOTION in Limine - Government's First Omnibus Penalty Phase Motion in Limine, 530 MOTION in Limine (Video and Photographic Images), 529 MOTION in Limine (Bank Video Images), 635 MOTION for Discovery of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession, and 638 MOTION in Limine / Penalty Phase Motion in |

| | | |
|---|---|---|
| | | Limine to Exclude Certain Opinions of Deborah Taylor Grey: Motion Hearing set for 8/14/2019 at 11:00 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 08/12/2019) |
| 08/12/2019 | 643 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion to Continue as to Brandon Michael Council held on July 17, 2019, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/3/2019. Redacted Transcript Deadline set for 9/12/2019. Release of Transcript Restriction set for 11/12/2019. (bkru, ) (Entered: 08/12/2019) |
| 08/12/2019 | 644 | TRANSCRIPT - SEALED as to Brandon Michael Council Ex Parte Hearing held on July 17, 2019, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR. (bkru, ) (Entered: 08/12/2019) |
| 08/13/2019 | 648 | RESPONSE in Opposition by Brandon Michael Council re 638 MOTION in Limine / *Penalty Phase Motion in Limine to Exclude Certain Opinions of Deborah Taylor Grey and Memorandum in Support* (Nettles, William) (Entered: 08/13/2019) |
| 08/14/2019 | 649 | REPLY to 617 Proposed Jury Instructions (Nettles, William) (Entered: 08/14/2019) |
| 08/14/2019 | 652 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Motion Hearing as to Brandon Michael Council held on 8/14/2019. AUSAs Nathan Williams, Derek Shoemake, and Everett McMillian present; Duane Bryant, William Nettles, Michael Meetze, and Akin Adepoju present with defendant. Motions 529 , 530 , 531 , 532 , 550 , 551 , 600 , 635 , and 638 taken under advisement. Counsel to prepare consent order regarding 635 Motion for Discovery of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession. Court Reporter: Beth Krupa. CJA Time 2 hours, 50 minutes. (hcic, )** Modified on 8/16/2019 to edit text (hcic, ). (Entered: 08/16/2019) |
| 08/16/2019 | 651 | Sealed Document. Exhibits re Motion Hearing held on 8/14/2019. Non Standard Item received: CD w/ videos. Held in Clerk's office (hcic, ) Modified on 8/16/2019 to edit text (hcic, ). (Entered: 08/16/2019) |
| 08/19/2019 | 654 | Supplemental Joint Strikes for Cause. (hcic, ) (Entered: 08/19/2019) |
| 08/19/2019 | 655 | MOTION for Discovery *of Basis of Defense Expert's Opinions* by USA as to Brandon Michael Council. No proposed order(McMillian, Everett) (Entered: 08/19/2019) |
| 08/19/2019 | 656 | **TEXT ORDER re 655 MOTION for Discovery of Basis of Defense Expert's Opinions filed by USA. Defendant to file response to Motion 655 by 8/20/2019. Signed by Chief Judge R Bryan Harwell on 8/19/2019. (hcic, )** (Entered: 08/19/2019) |
| 08/19/2019 | 675 | ORDER #14 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/19/2019. (hcic, ) (Entered: 08/19/2019) |

| 08/20/2019 | 680 | RESPONSE in Opposition by Brandon Michael Council re 655 MOTION for Discovery *of Basis of Defense Expert's Opinions* (Nettles, William) (Entered: 08/20/2019) |
|---|---|---|
| 08/21/2019 | 681 | Supplemental Joint Strikes for Cause. (hcic, ) (Entered: 08/21/2019) |
| 08/21/2019 | 682 | ORDER #15 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 State Court Documents, # 3 Supporting Documents, # 4 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/21/2019.(hcic, ) (Entered: 08/21/2019) |
| 08/21/2019 | 683 | **ORDER ON MOTIONS IN LIMINE. The Court denies Motion 529 ; denies Motion 530 ; grants in part and denies in part Motion 531 ; grants in part and denies in part Motion 532 ; grants in part and reserves ruling in part as to Motion 550 ; grants in part and denies in part Motion 551 ; finds as moot Motion 600 ; and denies Motion 638 . Signed by Chief Judge R Bryan Harwell on 8/21/2019. (hcic, )** (Entered: 08/21/2019) |
| 08/21/2019 | 684 | **ORDER denying 655 Motion for Discovery of Basis of Defense Expert's Opinions. Signed by Chief Judge R Bryan Harwell on 8/21/2019.(hcic, )** (Entered: 08/21/2019) |
| 08/22/2019 | 685 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motions Hearing as to Brandon Michael Council held on August 14, 2019, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/12/2019. Redacted Transcript Deadline set for 9/23/2019. Release of Transcript Restriction set for 11/20/2019. (bkru, ) (Entered: 08/22/2019) |
| 08/23/2019 | 687 | ORDER #16 Regarding Prospective Juror Requests (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents, # 4 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/23/2019. (mcot, ) (Entered: 08/23/2019) |
| 08/23/2019 | 688 | NOTICE of Intent to Call Expert Witness by USA as to Brandon Michael Council *Supplemental* (McMillian, Everett) (Entered: 08/23/2019) |
| 08/23/2019 | 689 | ORDER #17 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/23/2019. (hcic, ) (Entered: 08/23/2019) |
| 08/23/2019 | 690 | Sealed Document: SUPPLEMENTAL CASE QUESTIONNAIRE (hcic, ) (Entered: 08/23/2019) |
| 08/26/2019 | 691 | ORDER #18 Regarding Prospective Juror Requests (Attachments: # 1 Supporting Documents). Signed by Chief Judge R Bryan Harwell on 8/26/2019. (mcot, ) (Entered: 08/26/2019) |
| 08/26/2019 | 692 | Supplemental Joint Strikes for Cause. (hcic, ) (Entered: 08/26/2019) |

| 08/26/2019 | 694 | ORDER #19 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/26/2019.(hcic, ) (Entered: 08/26/2019) |
|---|---|---|
| 08/26/2019 | 695 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS (Day #1) as to Brandon Michael Council held on 8/26/2019. AUSAs Nathan Williams, Derek Shoemake, and Everett McMillian present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Jury selection process to reconvene on 8/27/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7.5. (hcic, )** Modified on 8/28/2019 to edit text (hcic, ). (Entered: 08/27/2019) |
| 08/27/2019 | 696 | ORDER #20 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 8/27/2019.(hcic, ) (Entered: 08/27/2019) |
| 08/27/2019 | 724 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS (Day #2) as to Brandon Michael Council held on 8/27/2019. AUSAs Nathan Williams and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Jury selection process to reconvene on 8/28/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7.5 hours. (hcic, )** Modified on 8/28/2019 to edit text (hcic, ). (Entered: 08/28/2019) |
| 08/28/2019 | 722 | TEXT ORDER: As indicated by the sealed attachment, the Jury Administrator recommends deferring two prospective jurors. The Court has spoken with counsel for both parties, and they do not object to deferring both prospective jurors. Accordingly, the Court will defer them. Signed by Chief Judge R. Bryan Harwell on 8/28/2019. (hcic, ) (Entered: 08/28/2019) |
| 08/28/2019 | 726 | Sealed Document. (hcic, ) (Entered: 08/28/2019) |
| 08/28/2019 | 727 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS (Day #3) as to Brandon Michael Council completed on 8/28/2019. AUSAs Nathan Williams and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Individual voir dire to begin 9/9/2019 at 9:30 AM. Court Reporter: Beth Krupa. CJA Time: 6 hours. (hcic, )** (Entered: 08/29/2019) |
| 08/28/2019 | 728 | Receipt by Parties for Supplemental Questionnaires. (hcic, ) (Entered: 08/29/2019) |
| 08/29/2019 | 729 | MOTION to Dismiss *Count Three of the Indictment* by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit Alabama Order)(Nettles, William) (Entered: 08/29/2019) |
| 08/29/2019 | 730 | **TEXT ORDER re 729 MOTION to Dismiss Count Three of the Indictment filed by Brandon Michael Council. Government to file response to Motion 729 by Noon 8/30/2019. Signed by Chief Judge R Bryan Harwell on 8/29/2019.(hcic, )** (Entered: 08/29/2019) |
| 08/30/2019 | 731 | MOTION to Dismiss *Count Three of the Indictment and Government's Response to Defendant's Motion to Dismiss Count Three of the Indictment* by USA as to Brandon Michael Council. No proposed order(Shoemake, Derek) (Entered: 08/30/2019) |

| | | |
|---|---|---|
| 09/03/2019 | 732 | ORDER #21 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/3/2019. (hcic, ) (Entered: 09/03/2019) |
| 09/03/2019 | 733 | **TEXT ORDER: The Court GRANTS the Government's 731 Motion to Dismiss Count Three of the Indictment and DISMISSES Count Three *without prejudice*. Defendant's related 729 motion to dismiss is MOOT. Signed by Chief Judge R Bryan Harwell on 9/3/2019. (hcic, )** (Entered: 09/03/2019) |
| 09/03/2019 | 735 | Supplemental MOTION for Discovery *of Disqualifying Juror Information in the Government's Possession* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/03/2019) |
| 09/03/2019 | 736 | **TEXT ORDER re 735 Supplemental MOTION for Discovery of Disqualifying Juror Information in the Government's Possession filed by Brandon Michael Council. Government to file response to Motion 735 by 12:00 PM on 9/4/2019. Signed by Chief Judge R Bryan Harwell on 9/3/2019.(hcic, )** (Entered: 09/03/2019) |
| 09/03/2019 | 737 | ORDER #22 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/3/2019. (hcic, ) (Entered: 09/03/2019) |
| 09/03/2019 | 738 | MOTION to Exclude *Irrelevant and Unfairly Prejudicial Surveillance Video* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/03/2019) |
| 09/03/2019 | 739 | **TEXT ORDER re 738 MOTION to Exclude Irrelevant and Unfairly Prejudicial Surveillance Video. Government to file response to Motion 738 by 12:00 PM 9/4/2019. Signed by Chief Judge R Bryan Harwell on 9/3/2019. (hcic, )** (Entered: 09/03/2019) |
| 09/04/2019 | 741 | MOTION to Exclude *Irrelevant and Unfairly Prejudicial Post-Offense Conduct* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/04/2019) |
| 09/04/2019 | 742 | MOTION for Protective Measures Against Implicit Racial Bias by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/04/2019) |
| 09/04/2019 | 743 | **TEXT ORDER re 741 MOTION to Exclude Irrelevant and Unfairly Prejudicial Post-Offense Conduct. Government to file response to Motion 741 by 9:00 AM 9/5/2019. Signed by Chief Judge R Bryan Harwell on 9/4/2019.(hcic, )** (Entered: 09/04/2019) |
| 09/04/2019 | 745 | **TEXT ORDER re 742 MOTION for Protective Measures Against Implicit Racial Bias. Government to file response to Motion 742 by 9:00 AM 9/5/2019. Signed by Chief Judge R Bryan Harwell on 9/4/2019. (hcic, )** (Entered: 09/04/2019) |
| 09/04/2019 | 746 | RESPONSE in Opposition by USA as to Brandon Michael Council re 738 MOTION to Exclude *Irrelevant and Unfairly Prejudicial Surveillance Video* (Shoemake, Derek) (Entered: 09/04/2019) |
| 09/04/2019 | 747 | RESPONSE in Opposition by USA as to Brandon Michael Council re 735 Supplemental MOTION for Discovery *of Disqualifying Juror Information in the Government's Possession* (Shoemake, Derek) (Entered: 09/04/2019) |
| 09/04/2019 | 751 | Supplemental Joint Strikes for Cause. (hcic, ) (Entered: 09/04/2019) |

| | | |
|---|---|---|
| 09/04/2019 | 752 | **TEXT ORDER denying 738 Motion to Exclude Irrelevant and Unfairly Prejudicial Surveillance Video: The Court DENIES this motion on the merits and because it is untimely, as argued by the Government in its response in opposition. *See* ECF No. 746 . Regarding the guilt phase, the Court finds the bank surveillance video clips referenced in Defendant's motion are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 401, 402, & 403. Regarding the potential penalty phase, the clips are relevant to the sentence and proof of the Government's aggravating factors, and their probative value is not outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. *See* 18 U.S.C. § 3593(c). Signed by Chief Judge R. Bryan Harwell on 9/4/2019.(eney, )** (Entered: 09/04/2019) |
| 09/04/2019 | 753 | **TEXT ORDER finding as moot 635 Motion for Discovery of Juror Criminal Records and Contradictory or Disqualifying Juror Information in the Government's Possession; and denying 735 Supplemental Motion for Discovery of Disqualifying Juror Information in the Government's Possession: Defendant originally requested that the Government "provide contradictory or disqualifying juror information in its possession as well as juror criminal records." ECF No. 635 at p. 1. In its original response, the Government indicated it "generally has no opposition to Defendant's Motion, and would request that Defendant provide the Government the same information in its possession." ECF No. 637 at p. 1. At a hearing on the matter, the Court raised its concerns. *See* ECF No. 685 at pp. 97-101. Subsequently, the parties submitted to the Court a proposed consent order (which is attached to this Text Order and hereby made part of the record). Defendant then filed a supplement to his original motion asking the Court to enter the proposed consent order. *See* ECF No. 735 . The Government filed a response indicating it (1) has provided the defense "a spreadsheet that summarizes open-source internet research" and (2) "has agreed to provide the defense the results of any criminal background checks it conducts on members of the jury pool." ECF No. 747 at p. 1. The Government further indicates that Defendant "broadly seeks disclosure of all 'evidence that contradicts any responses on the jury questionnaire or answers provided during jury selection by any prospective juror in this case,'" and that the Government is not aware of any authority requiring it to disclose such information." *Id.* at pp. 1-2 (quoting ECF No. 735 ). The Government also indicates it is aware of its general duty of candor to the Court. *Id.* at p. 2 (citing cases).**

**In light of the above, the Court finds Defendant's original 635 motion is MOOT because the Government has provided or agreed to provide the requested information in its possession (i.e., the spreadsheet of open-source internet research and the results of any criminal background checks on potential jurors). This obviates the need for any order or ruling by the Court, and therefore the Court DENIES Defendant's 735 supplemental motion seeking entry of the proposed consent order. Separately, the Court notes the proposed consent order presents numerous concerns in addition to those raised by the Court at the hearing. Namely, the Court is unaware of any criminal discovery rule or any authority requiring disclosure of juror research/information; several portions are vague and overly broad; and key terms are undefined (such as "social media inquiry," "any other investigative search," and "other individuals").** |

| | | **Signed by Chief Judge R Bryan Harwell on 9/4/2019. (hcic, )** (Entered: 09/04/2019) |
|---|---|---|
| 09/04/2019 | 754 | TEXT ORDER: In light of the dismissal of Count Three, the Court has revised its individual voir dire preliminary instructions and has omitted any reference to Count Three and indicated that the case involves a two count indictment instead of a three count indictment. These changes are reflected on the first page. Any objections to these revisions should be filed by 5:00 p.m. today. Signed by Chief Judge R Bryan Harwell on 9/4/2019. (hcic, ) (Entered: 09/04/2019) |
| 09/05/2019 | 755 | RESPONSE in Opposition by USA as to Brandon Michael Council re 742 MOTION for Protective Measures Against Implicit Racial Bias (Shoemake, Derek) (Entered: 09/05/2019) |
| 09/05/2019 | 756 | RESPONSE in Opposition by USA as to Brandon Michael Council re 741 MOTION to Exclude *Irrelevant and Unfairly Prejudicial Post-Offense Conduct* (Shoemake, Derek) (Entered: 09/05/2019) |
| 09/05/2019 | 757 | **ORDER #23 Regarding Prospective Juror Requests. Signed by Chief Judge R Bryan Harwell on 9/5/19. (Attachments: # 1 Supporting Documents)(swel, )** (Entered: 09/05/2019) |
| 09/05/2019 | 758 | REPLY to 756 Response in Opposition (Nettles, William) (Entered: 09/05/2019) |
| 09/05/2019 | 760 | **TEXT ORDER granting in part and denying in part 741 Motion to Exclude Irrelevant and Unfairly Prejudicial Post-Offense Conduct: The Court GRANTS this motion as to the guilt phase and DENIES this motion as to the potential penalty phase. Evidence that Defendant---*after* the alleged offenses---"went to a store to purchase ammunition" (ECF No. 741 ) is not relevant in the guilt phase. *See* Fed. R. Evid. 401 & 402. However, in the potential penalty phase, this evidence is relevant to proof of the Government's nonstatutory aggravating factor of lack of remorse, and the probative value is not outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. *See* 18 U.S.C. § 3593(c). The Court notes, however, that Defendant has *not* moved to exclude evidence of the ammunition *itself*, which was found in his car at the arrest scene, and the Court's ruling is limited to "evidence that days after the alleged offenses... Brandon Council went to a store to purchase ammunition." ECF No. 741 at p. 1. Signed by Chief Judge R. Bryan Harwell on 9/5/2019.(eney, )** (Entered: 09/05/2019) |
| 09/05/2019 | 761 | **TEXT ORDER denying 742 Motion for Protective Measures Against Implicit Racial Bias: The Court DENIES the motion, which appears to be a repeat of an earlier request by the defense. *See* ECF No. 504 . Specifically, in its Order Regarding Finalized Video Script (for the 80 member panels who filled out the Supplemental Case Questionnaire), the Court ruled that its addition to the video script derived from 18 U.S.C. § 3593(f) sufficiently addressed Defendant's concern about "implicit racial biases." *See* ECF No. 624 . Additionally, in the Supplemental Case Questionnaire, the Court included six questions that sufficiently probe racial bias/attitude. *See* ECF No. 690 . The Court included several questions over the Government's objection, and the Court even asked its own question---derived from *Turner v. Murray*, 476 U.S. 28 (1986)---that was not proposed by either party. The Court has done what is constitutionally required, and then some. Finally, for the reasons argued by the Government (ECF No. 755 ), the Court denies Defendant's requests to show jurors a video on "implicit racial bias" and to conduct an "Implicit Association Test" of the jurors. Signed by** |

| | | |
|---|---|---|
| | | **Chief Judge R. Bryan Harwell on 9/5/2019.**(eney, ) (Entered: 09/05/2019) |
| 09/05/2019 | 762 | DELETION OF DOCKET ENTRY NUMBER 762 as to Brandon Michael Council Reason: Filed in error. Deleted at the request of filer. (hcic, ) (Entered: 09/05/2019) |
| 09/05/2019 | 763 | Sealed Document (Nettles, William) (Entered: 09/05/2019) |
| 09/05/2019 | 765 | ORDER #24 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/5/2019. (hcic, ) (Entered: 09/05/2019) |
| 09/06/2019 | 768 | Sealed Document. (hcic, ) (Entered: 09/06/2019) |
| 09/06/2019 | 777 | ORDER #25 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/6/2019. (hcic, ) (Entered: 09/06/2019) |
| 09/09/2019 | 778 | ORDER #26 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/9/2019.(hcic, ) (Entered: 09/09/2019) |
| 09/09/2019 | 779 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council held on 9/9/2019. Individual Voir Dire begun. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court to reconvene on 9/10/2019 at 9:30 AM. Court Reporter: Beth Krupa. CJA Time: 7.5 hours. (hcic, )** Modified on 9/10/2019 to edit text (hcic, ). (Entered: 09/10/2019) |
| 09/10/2019 | 780 | ORDER #27 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/10/2019. (hcic, ) (Entered: 09/10/2019) |
| 09/10/2019 | 781 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council held on 9/10/2019. Individual Voir Dire continued. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court to reconvene on 9/11/2019 at 9:30 AM. Court Reporter: Beth Krupa. CJA Time: 9 hours. (hcic, )** (Entered: 09/10/2019) |
| 09/11/2019 | 782 | Sealed Document. (hcic, ) (Entered: 09/11/2019) |
| 09/11/2019 | 783 | MOTION to Exclude *Rebuttal Expert Testimony or Motion to Compel Written Summary of SuchTestimony* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/11/2019) |
| 09/11/2019 | 785 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council held on 9/11/2019. Individual Voir Dire continued. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court to reconvene on 9/12/2019 at 9:30 AM. Court Reporter: Beth Krupa. CJA Time: 9 hours. (hcic, )** (Entered: 09/12/2019) |
| 09/12/2019 | 784 | **TEXT ORDER re 783 MOTION to Exclude Rebuttal Expert Testimony or Motion to Compel Written Summary of Such Testimony filed by Brandon Michael Council. Government to file response to Motion 783 by Monday 9/16/2019. Signed by Chief Judge R Bryan Harwell on 9/12/2019.(hcic, )** (Entered: |

| | | |
|---|---|---|
| | | 09/12/2019) |
| 09/12/2019 | 786 | COURT EXHIBITS as to Brandon Michael Council. (hcic, ) (Entered: 09/12/2019) |
| 09/12/2019 | 787 | Sealed Documents. (Attachments: # 1 Supporting Documents, # 2 Supporting Documents, # 3 Supporting Documents) (hcic, ) (Entered: 09/12/2019) |
| 09/12/2019 | 788 | Sealed Document. (hcic, ) (Entered: 09/12/2019) |
| 09/12/2019 | 789 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council held on 9/12/2019. Individual Voir Dire continued. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court to reconvene on 9/13/2019 at 9:30 AM. Court Reporter: Beth Krupa. CJA Time: 8.5 hours. (hcic, )** (Entered: 09/13/2019) |
| 09/13/2019 | 790 | ORDER #28 Regarding Prospective Juror Requests. (Attachments: # 1 Supporting Documents) Signed by Chief Judge R Bryan Harwell on 9/13/2019. (hcic, ) (Entered: 09/13/2019) |
| 09/13/2019 | 795 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council held on 9/13/2019. Individual Voir Dire completed. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Jury Selection set for 9/16/2019 at 9:30 AM. Jury Trial set for 9/17/2019 at 9:30 AM Court Reporter: Beth Krupa. CJA Time 8.5 hours (hcic, )** (Entered: 09/16/2019) |
| 09/15/2019 | 791 | First MOTION Jury Selection Procedure *Fed. R. Crim. Pro 24(c)(4)* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/15/2019) |
| 09/15/2019 | 792 | RESPONSE to Motion by USA as to Brandon Michael Council re 791 First MOTION Jury Selection Procedure *Fed. R. Crim. Pro 24(c)(4)* (Shoemake, Derek) (Entered: 09/15/2019) |
| 09/16/2019 | 793 | Sealed Document. (Attachments: # 1 Sealed Document) (hcic, ) (Entered: 09/16/2019) |
| 09/16/2019 | 794 | RESPONSE in Opposition by USA as to Brandon Michael Council re 783 MOTION to Exclude *Rebuttal Expert Testimony or Motion to Compel Written Summary of SuchTestimony* (Attachments: # 1 Exhibit)(McMillian, Everett) (Entered: 09/16/2019) |
| 09/16/2019 | 796 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: JURY SELECTION PROCESS as to Brandon Michael Council completed on 9/16/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. 791 Motion re Jury Selection Procedure Fed. R. Crim. Pro 24(c)(4) resolved by agreement of the parties. 12 jurors and 4 alternates seated. Jury Trial to begin on 9/17/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 4.5. (hcic, )** (Entered: 09/16/2019) |
| 09/16/2019 | 797 | Panel Strike List as to Brandon Michael Council. (hcic, ) (Entered: 09/16/2019) |
| 09/16/2019 | 798 | Jury List as to Brandon Michael Council. (hcic, ) (Entered: 09/16/2019) |
| 09/17/2019 | 799 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial Begun as to Brandon Michael Council on 9/17/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant,** |

| | | |
|---|---|---|
| | | **William Nettles, and Michael Meetze present with defendant. Jury sworn, jury instruction, opening statements. Witnesses and exhibits presented. Trial to resume on 9/18/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7 hours. (hcic, )** (Entered: 09/18/2019) |
| 09/18/2019 | 804 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial as to Brandon Michael Council held on 9/18/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Witnesses and exhibits presented. Trial to resume on 9/19/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7.5 hours. (hcic, )** (Entered: 09/19/2019) |
| 09/19/2019 | [802](#) | Proposed Jury Instructions by Brandon Michael Council (Nettles, William) (Entered: 09/19/2019) |
| 09/19/2019 | [803](#) | Sealed Document (Attachments: # [1](#) Exhibit Part One - Juror Questionnaires, # [2](#) Exhibit Part Two - Juror Questionnaires, # [3](#) Exhibit Part Three - Juror Questionnaires, # [4](#) Exhibit Part Four - Juror Questionnaires, # [5](#) Exhibit Part Five - Juror Questionnaires, # [6](#) Exhibit Part Six - Juror Questionnaires, # [7](#) Exhibit Part Seven - Juror Questionnaires, # [8](#) Exhibit Part Eight - Juror Questionnaires, # [9](#) Exhibit Part Nine - Juror Questionnaires, # [10](#) Exhibit Part Ten - Juror Questionnaires)(Nettles, William) (Entered: 09/19/2019) |
| 09/19/2019 | [805](#) | MOTION for Competency Evaluation and Motion for Continuance of Trial Proceedings by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/19/2019) |
| 09/19/2019 | 806 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial as to Brandon Michael Council held on 9/19/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Witnesses and exhibits presented. Government rests. Oral motion of defendant for dismissal denied. Trial to resume on 9/20/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7.25. (hcic, )** (Entered: 09/20/2019) |
| 09/20/2019 | 807 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: In Camera Motion Hearing as to Brandon Michael Council held on 9/20/2019 re [805](#) Motion for Competency Evaluation and Motion for Continuance of Trial Proceedings. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane K Bryant, William Nettles, and Michael Meetze present with defendant. Courtroom cleared except for defendant, his counsel, and courtroom personnel. Motion for continuance granted and the Court found reasonable cause for a competency hearing under 18 U.S.C. Section 4241(a). Court Reporter: Beth Krupa. CJA Time: 1.5 hours. (hcic, )** (Entered: 09/20/2019) |
| 09/20/2019 | 808 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial as to Brandon Michael Council not held on 9/20/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Jury excused until further notice from the Court. Court Reporter: Beth Krupa. CJA Time: 15 mins. (hcic, )** (Entered: 09/20/2019) |
| 09/20/2019 | [809](#) | Sealed Document. (hcic, ) (Entered: 09/20/2019) |

| 09/20/2019 | 810 | Sealed Document. (hcic, ) (Entered: 09/20/2019) |
|---|---|---|
| 09/23/2019 | 811 | Sealed Document. (Attachments: # 1 CV-Dr. Maddox, # 2 CV-Dr. Hilkey) (hcic, ) (Entered: 09/23/2019) |
| 09/23/2019 | 812 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Competency Hearing as to Brandon Michael Council held on 9/23/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Defendant found competent to proceed. Jury Trial to resume on 9/24/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 1 hour. (hcic, )** (Entered: 09/24/2019) |
| 09/23/2019 | 813 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Hearing as to Brandon Michael Council held on 9/23/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Defendant advised of his right to testify. Court Reporter: Beth Krupa. CJA Time: 20 mins. (hcic, )** (Entered: 09/24/2019) |
| 09/24/2019 | 814 | Sealed Document. (hcic, ) (Entered: 09/24/2019) |
| 09/24/2019 | 815 | Sealed Document. (Attachments: # 1 Supporting Documents) (hcic, ) (Entered: 09/24/2019) |
| 09/24/2019 | 816 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial (Guilt Phase) Completed as to Brandon Michael Council on 9/24/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Defendant's renewed oral motion for dismissal is denied. Closing arguments, charge, deliberation, verdict published. Guilty on both counts. Exhibits returned to counsel. Forfeiture allegation dismissed by government.**<br><br>**Jury Trial - Death Penalty Phase as to Brandon Michael Council begun on 9/24/2019. Jury sworn, jury instruction, opening statements. Witnesses and exhibits presented. Jury Trial (Penalty Phase) to resume on 9/25/2019 at 9:00 AM.**<br><br>**Court Reporter: Beth Krupa. CJA Time: 5 hours. (hcic, )** (Entered: 09/24/2019) |
| 09/24/2019 | 817 | Jury Instructions. (hcic, ) (Entered: 09/24/2019) |
| 09/24/2019 | 819 | JURY VERDICT as to Brandon Michael Council: Guilty on Counts 1 and 2. (hcic, ) (Entered: 09/24/2019) |
| 09/24/2019 | 820 | **ORDER RETURNING GUILT PHASE EXHIBITS as to Brandon Michael Council. Signed by Chief Judge R Bryan Harwell on 9/24/2019. (Attachments: # 1 Receipt for Exhibits)(hcic, )** Modified on 9/24/2019 to edit text (hcic, ). (Entered: 09/24/2019) |
| 09/24/2019 | 821 | MOTION in Limine *to the Government's Victim Impact Evidence* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/24/2019) |
| 09/24/2019 | 822 | **TEXT ORDER re 821 MOTION in Limine to the Government's Victim Impact Evidence filed by Brandon Michael Council. Government to file response to Motion 821 by 8:00 AM 9/25/2019. Signed by Chief Judge R Bryan Harwell on 9/24/2019. (hcic, )** (Entered: 09/24/2019) |

| | | |
|---|---|---|
| 09/25/2019 | 823 | RESPONSE in Opposition by USA as to Brandon Michael Council re 821 MOTION in Limine *to the Government's Victim Impact Evidence* (Shoemake, Derek) (Entered: 09/25/2019) |
| 09/25/2019 | 824 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial - Death Penalty Phase as to Brandon Michael Council held on 9/25/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Motion 821 granted in part and the Court gave a curative instruction. Witnesses and exhibits presented. Jury Trial (Penalty Phase) to resume on 9/26/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 5 hours. (hcic, )** (Entered: 09/25/2019) |
| 09/25/2019 | 826 | MOTION Exclusion of Witness by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/25/2019) |
| 09/25/2019 | 827 | RESPONSE in Opposition by USA as to Brandon Michael Council re 826 MOTION Exclusion of Witness (McMillian, Everett) (Entered: 09/25/2019) |
| 09/26/2019 | 828 | SEALED MOTION by USA as to Brandon Michael Council. (hcic, ) (Entered: 09/26/2019) |
| 09/26/2019 | 829 | **TEXT ORDER re 828 SEALED MOTION filed by USA. Defendant to file response to Motion 828 by 5:00 PM 9/26/2019. Signed by Chief Judge R Bryan Harwell on 9/26/2019. (hcic, )** (Entered: 09/26/2019) |
| 09/26/2019 | 830 | Sealed Response by Defendant to Sealed Motion of USA 828 . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (hcic, ) (Entered: 09/26/2019) |
| 09/26/2019 | 832 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial - Death Penalty Phase as to Brandon Michael Council held on 9/26/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Witnesses and exhibits presented. Government rests. Jury excused until 9/30/2019. Jury Trial (Penalty Phase) to resume on 9/30/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 7 hours. (hcic, )** (Entered: 09/27/2019) |
| 09/26/2019 | 833 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Motion Hearing held on 9/26/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court takes Motion 826 under advisement. Parties rely on briefs re Motion 828 , taken under advisement. Order to follow. Court Reporter: Beth Krupa. CJA Time: 1 hour. (hcic, )** (Entered: 09/27/2019) |
| 09/27/2019 | 831 | JURY INSTRUCTIONS PENALTY PHASE - OPENING INSTRUCTIONS. (Attachments: # 1 Email from Both Counsel re no objections) (hcic, ) (Entered: 09/27/2019) |
| 09/27/2019 | 834 | **SEALED TEXT ORDER denying 828 motion: The Government has filed a "Motion in Limine to Preclude Certain Mitigating Factors" seeking (1) to strike Defendant's Proposed Mitigating Factors 49 and 50 and (2) to strike or rephrase Factors 3, 19, and 31. *See* ECF No. 828 . Defendant has filed a response in opposition. *See* ECF No. 830 .**<br><br>**Factor 3 alleges: "Brandon's father's side of the family has mental health and** |

substance abuse impairments. Factor 19 alleges: "All 12-year-olds need care, love, structure and guidance. Brandon lost these things when his grandmother died." Factor 31 alleges: "Numerous students were sexually exploited by staff members while at Dobbs. Staff members who were charged with Brandon's care and custody instead sexually exploited Brandon at Dobbs." Factor 49 alleges: "The penalty of life without the possibility of release is a severe sentence." Factor 50 alleges: "All life has value."

The Court will deny the Government's motion. Factors 49 and 50 are appropriate nonstatutory mitigating factors. *See, e.g., United States v. Hager*, 721 F.3d 167, 178 (4th Cir. 2013) (mitigator alleging "'[a] sentence of life imprisonment without the possibility of release is severe'"); *United States v. Lighty*, 616 F.3d 321, 347 (4th Cir. 2010) (mitigator alleging "'[a]ll life has value'"). Moreover, Factors 3, 19, and 31 are appropriate nonstatutory mitigating factors as written, and the Court will not strike or rephrase them. *See generally Hager*, 721 F.3d 167, 193 (4th Cir. 2013) ("It is well settled that a capital defendant is entitled to submit any mitigating evidence in support of a sentence less than death."). As for the Government's argument regarding Factor 3 and its reliance on *United States v. Jackson*, 327 F.3d 273, 299 (4th Cir. 2003), defense counsel has affirmatively represented that his witnesses (including Deborah Taylor Grey) will not testify that Defendant suffers from mental illness, disease, defect, or cognitive difficulty (as recognized in earlier orders by the Court, *see* ECF Nos. 683 & 684 ). *Jackson* is distinguishable because in that case the defendant "hoped to establish that because his biological sister manifested abnormal behaviors, the conclusion could be reached that he too would be expected to manifest the same behaviors," 327 F.3d at 299---this simply is not Defendant's intention in the instant case. Rather, Factor 3 encompasses Defendant's family history. *See Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982) (recognizing a defendant's "family background" is relevant mitigating evidence). In sum, the Court DENIES the Government's 828 motion.

Signed by Chief Judge R Bryan Harwell on 9/27/2019. (hcic, ) (Entered: 09/27/2019)

| | | |
|---|---|---|
| 09/27/2019 | 835 | Sealed Document: Proposed Penalty Phase Jury Instructions. (Attachments: # 1 Proposed Verdict Form - Count 1, # 2 Proposed Verdict Form - Count 2) (hcic, ) (Entered: 09/27/2019) |
| 09/27/2019 | 836 | NOTICE OF HEARING as to Brandon Michael Council: Hearing set for 9/27/2019 11:00 AM re Sealed Document 835 Proposed Penalty Phase Jury Instructions in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Chief Judge R Bryan Harwell. (hcic, ) (Entered: 09/27/2019) |
| 09/27/2019 | 837 | Counsel's emails regarding 826 and 827 . (hcic, ) (Entered: 09/27/2019) |
| 09/27/2019 | 838 | TEXT ORDER denying 826 Motion to Preclude Government from Calling an Undisclosed Penalty Phase Witness: Defendant has filed a motion seeking to preclude the Government from calling Anthony Maurice Hargett as a rebuttal witness, arguing the Government has failed to comply with 18 U.S.C. § 3432. *See* ECF No. 826 . The Government filed a response in opposition to the motion. *See* ECF No. 827 . The Court heard the motion yesterday.

The Court will deny Defendant's motion. First, the Fourth Circuit has squarely held---in a case involving the Federal Death Penalty Act---that § 3432 does not |

require the prosecution to include rebuttal witnesses on the list." *United States v. Fulks*, 454 F.3d 410, 422 n.5 (4th Cir. 2006) (citing *Goldsby v. United States*, 160 U.S. 70, 76 (1895)); *see Goldsby*, 160 U.S. at 76 ("The words 'for proving the indictment' [in 18 U.S.C. § 3432], and the connection in which they are used, clearly refer to the witnesses relied upon by the prosecution to establish the charge made by the indictment. They do not extend to such witnesses as may be rendered necessary for rebuttal purposes resulting from the testimony introduced by the accused in his defense."). Other courts have recognized the same principle. *See United States v. Hessler*, 469 F.2d 1294, 1295 (7th Cir. 1972); *Turner v. United States*, 441 F.2d 736, 739 (5th Cir. 1971); *United States v. Rosenberg*, 195 F.2d 583, 599 & n.14 (2d Cir. 1952); *Gordon v. United States*, 289 F. 552, 554 (D.C. Cir. 1923). Thus, under a plain reading of *Fulks* (and *Goldsby*), the Government was not required to disclose Hargett on its § 3432 pretrial witness list.

Of note, the two witnesses at issue in *Fulks* were not rebuttal witnesses and were part of the Government's case-in-chief in the sentencing trial. *See* 454 F.3d at 422 n.5. Also, the witness at issue in *United States v. DeLeon*---a case upon which Defendant relies---was "not a rebuttal witness" because that district court could "not soundly characterize [him] as a rebuttal witness." 2019 WL 1780092, at *29 (D.N.M. Apr. 23, 2019).

Second, the Fourth Circuit has held "§ 3432 imposes no per se bar against testimony from witnesses discovered after the prosecution's witness list is due." *Fulks*, 454 F.3d at 423. Here, even assuming *arguendo* that § 3432 applies to rebuttal witnesses (which it plainly does not, as indicated by the *Fulks* footnote quoted above), the Court finds that the Government's failure to include Hargett on its witness list "was in good faith and not the result of a lack of diligent investigation" and that Defendant cannot "demonstrate actual prejudice resulting from the lack of pretrial notice" of Hargett. *Id.* at 424 (establishing the test for when a witness is not included on the government's § 3432 pretrial witness list). The Government's actions, as summarized in its brief (ECF No. 827 ) and at the hearing yesterday afternoon, were in good faith and reflect a diligent investigation. The defense received notice of Hargett on the morning of Wednesday, September 25, 2019, as well as the FBI agents' 302 report and notes. It is now Friday, September 27, 2019. The defense will have ample time (including this weekend) to prepare for Hargett's potential rebuttal testimony (which would not occur until next week at the earliest---*after* Defendant's mitigation case). The Court further agrees with the arguments in the Government's brief and email. *See* ECF Nos. 827 & 837 .

For the above reasons, the Court DENIES Defendant's 826 motion.

Signed by Chief Judge R. Bryan Harwell on 9/27/2019.(eney, ) (Entered: 09/27/2019)

| 09/27/2019 | 840 | Email from defense counsel. (hcic, ) (Entered: 09/27/2019) |
| 09/27/2019 | 843 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Hearing as to Brandon Michael Council held on 9/27/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Charge Conference held. Court Reporter: Beth Krupa. CJA Time: 1 hour. (hcic, ) (Entered: 09/30/2019)** |

| | | |
|---|---|---|
| 09/28/2019 | 841 | MOTION in Limine *to exclude exhibits and testimony of certain specific instances of alleged bad conduct* by USA as to Brandon Michael Council. No proposed order(Shoemake, Derek) (Entered: 09/28/2019) |
| 09/30/2019 | 842 | RESPONSE in Opposition by Brandon Michael Council re 841 MOTION in Limine *to exclude exhibits and testimony of certain specific instances of alleged bad conduct* (Nettles, William) (Entered: 09/30/2019) |
| 09/30/2019 | 844 | MOTION to Prohibit Improper Jury Arguments by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 09/30/2019) |
| 09/30/2019 | 846 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial - Death Penalty Phase as to Brandon Michael Council held on 9/30/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. 841 MOTION in Limine to exclude exhibits and testimony of certain specific instances of alleged bad conduct filed by USA denied. Witnesses and exhibits presented. Jury Trial (Penalty Phase) to resume on 10/1/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 8.5 hours. (hcic, )** (Entered: 10/01/2019) |
| 10/01/2019 | 845 | RESPONSE in Opposition by USA as to Brandon Michael Council re 844 MOTION to Prohibit Improper Jury Arguments (Shoemake, Derek) (Entered: 10/01/2019) |
| 10/01/2019 | 847 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial - Death Penalty Phase as to Brandon Michael Council held on 10/1/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Witnesses and exhibits presented. Defense rests. Government rests its rebuttal case. Jury Trial (Penalty Phase) to resume on 10/2/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 8.5. (hcic, )** (Entered: 10/02/2019) |
| 10/02/2019 | 849 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial - Death Penalty Phase as to Brandon Michael Council held on 10/2/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Defendant's oral motion for mistrial denied. Defendant's oral motion to strike the death penalty denied. Closing arguments, charge, deliberations begun. Jury deliberations to continue 10/3/2019 at 9:00 AM. Court Reporter: Beth Krupa. CJA Time: 8.5 hours. (hcic, )** (Entered: 10/03/2019) |
| 10/02/2019 | 850 | Jury Notes as to Brandon Michael Council (hcic, ) (Entered: 10/03/2019) |
| 10/03/2019 | 851 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Jury Trial (Penalty Phase) Completed as to Brandon Michael Council on 10/3/2019. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Deliberation. Jury reached a verdict. Verdict published, jury polled. Jury discharged. Defendant's oral motion for continuance of 60 days regarding sentencing, in order for the filing of post-trial motions pursuant to Rule 33, denied. Defendant's oral motion to find the Federal Death Penalty Act unconstitutional denied. Sentencing set for 10/3/2019. Court Reporter: Beth Krupa. CJA Time: 2 hours. (hcic, )** (Entered: 10/07/2019) |

| 10/03/2019 | 852 | **Minute Entry for proceedings held before Chief Judge R Bryan Harwell: Sentencing held on 10/3/2019 as to Brandon Michael Council. AUSAs Nathan Williams, Everett McMillian, and Derek Shoemake present; Duane Bryant, William Nettles, and Michael Meetze present with defendant. Court Reporter: Beth Krupa. CJA Time: 30 mins. (hcic, )** (Entered: 10/07/2019) |
|---|---|---|
| 10/03/2019 | 853 | Jury Instructions (Penalty Phase-Closing Instructions) as to Brandon Michael Council. (hcic, ) (Entered: 10/07/2019) |
| 10/03/2019 | 856 | JURY VERDICT (Count 1). (hcic, ) (Entered: 10/07/2019) |
| 10/03/2019 | 857 | JURY VERDICT (Count 2). (hcic, ) (Entered: 10/07/2019) |
| 10/03/2019 | 858 | **ORDER RETURNING EXHIBITS. Signed by Chief Judge R Bryan Harwell on 10/3/2019. (Attachments: # 1 Receipt for Exhibits) (hcic, )** (Entered: 10/07/2019) |
| 10/07/2019 | 859 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Sentencing Hearing as to Brandon Michael Council held on 10/3/2019, before Chief Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 10/28/2019. Redacted Transcript Deadline set for 11/7/2019. Release of Transcript Restriction set for 1/6/2020. (bkru, ) (Entered: 10/07/2019) |
| 10/07/2019 | 860 | **JUDGMENT as to Brandon Michael Council. Counts 1 and 2: The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: Upon jury's verdict, the defendant is sentenced to death on Counts 1 and 2 of the Indictment. Defendant is committed to the custody of the Attorney General until the exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences. See 18 U.S.C. Sec. 3596(a). When the sentence of death is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. See 18 U.S.C. Sec. 3596(a). The defendant shall pay the mandatory $200 special assessment fee, due immediately. Signed by Chief Judge R Bryan Harwell on 10/7/2019. (hcic, )** (Entered: 10/07/2019) |
| 10/09/2019 | 862 | MOTION for Reconsideration *of Denial of Motions for Extension of Time to File Post-Trial Motions* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 10/09/2019) |
| 10/09/2019 | 863 | **TEXT ORDER re 862 MOTION for Reconsideration of Denial of Motions for Extension of Time to File Post-Trial Motions filed by Brandon Michael Council. Government to file response to Motion 862 by 12:00 PM 10/10/2019. Signed by Chief Judge R Bryan Harwell on 10/9/2019. (hcic, )** (Entered: 10/09/2019) |
| 10/09/2019 | 864 | RESPONSE to Motion by USA as to Brandon Michael Council re 862 MOTION for Reconsideration *of Denial of Motions for Extension of Time to File Post-Trial Motions* (McMillian, Everett) (Entered: 10/09/2019) |

| | | |
|---|---|---|
| 10/10/2019 | 865 | **TEXT ORDER: For good cause shown, the Court GRANTS IN PART Defendant's 862 motion for an extension. Defendant may file any post-trial motion(s) under Fed. R. Crim. P. 29 and 33 by November 4, 2019. The Government's response to any motion is due by November 8, 2019. Defendant may reply to the Government's response by November 13, 2019. Signed by Chief Judge R. Bryan Harwell on 10/10/2019.(eney, )** (Entered: 10/10/2019) |
| 11/04/2019 | 866 | MOTION for New Trial *(Sentencing) and/or For Judgment of Acquittal as to Sentencing* by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 11/04/2019) |
| 11/08/2019 | 867 | RESPONSE in Opposition by USA as to Brandon Michael Council re 866 MOTION for New Trial *(Sentencing) and/or For Judgment of Acquittal as to Sentencing* (Shoemake, Derek) (Entered: 11/08/2019) |
| 11/13/2019 | 868 | EX PARTE MOTION SEALED by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Nettles, William) (Entered: 11/13/2019) |
| 12/17/2019 | 869 | **ORDER denying 866 Motion for New Trial as to Brandon Michael Council (1). Signed by Chief Judge R Bryan Harwell on 12/17/2019. (hcic, )** (Entered: 12/17/2019) |
| 12/17/2019 | 870 | **ORDER ASSIGNING COUNSEL FOR APPEAL. Signed by Chief Judge R Bryan Harwell on 12/17/2019. (hcic, )** (Entered: 12/17/2019) |
| 12/30/2019 | 872 | NOTICE OF APPEAL OF FINAL JUDGMENT by Brandon Michael Council re 860 Judgment,,, 869 Order on Motion for New Trial - The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Nettles, William) (Entered: 12/30/2019) |
| 01/02/2020 | 873 | Transmittal Sheet for Notice of Appeal to USCA as to Brandon Michael Council to US Court of Appeals re 872 Notice of Appeal - Final Judgment. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (hcic, ) (Entered: 01/02/2020) |
| 01/06/2020 | 878 | ORDER of USCA as to Brandon Michael Council re 872 Notice of Appeal - Final Judgment filed appointing Federal Capital Appellate Resource Counsel Barry Fisher, who is based in the Federal Public Defender Office for the Northern District of New York as lead counsel and appoints Assistant Federal Defender Lisa Lorish from the Federal Public Defender Office for the Western District of Virginia as co-counsel for Brandon Michael Council in 20-1. (swel, ) (Entered: 01/06/2020) |
| 01/09/2020 | 879 | Government's EXHIBIT LIST. (hcic, ) (Entered: 01/09/2020) |
| 01/09/2020 | 880 | Defense's EXHIBIT LIST. (hcic, ) (Entered: 01/09/2020) |
| 03/03/2020 | 881 | ORDER of USCA as to Brandon Michael Council re 872 Notice of Appeal - Final Judgment. ORDER filed granting Motion to extend time to file transcript. (hcic, ) (Entered: 03/03/2020) |

| 03/03/2020 | 882 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Motion to Continue for dates of 10/18/2018 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| --- | --- | --- |
| 03/03/2020 | 883 | TRANSCRIPT - SEALED as to Brandon Michael Council Ex Parte Hearing held on 10/18/2018, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR. re 872 Notice of Appeal - Final Judgment, ***Does this satisfy all appellate orders for this reporter? N***<br><br>(bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 884 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Selection for dates of 08/26/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 885 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Selection for dates of 8/27/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 886 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Selection for dates of 8/28/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After |

| | | that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N*** |
| | | |
| | | Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 887 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. VOIR DIRE DAY 1 OF 5 for dates of 09/09/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N*** |
| | | |
| | | Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 888 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. VOIR DIRE DAY 2 OF 5 for dates of 09/10/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N*** |
| | | |
| | | Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 889 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. VOIR DIRE DAY 3 OF 5 for dates of 09/11/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N*** |
| | | |
| | | Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 890 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. VOIR DIRE DAY 4 OF 5 for dates of 09/12/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the |

| | | filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
|------------|-----|---|
| 03/03/2020 | 891 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. VOIR DIRE DAY 5 OF 5 for dates of 09/13/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 892 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Peremptory Strikes and Seating of the Jury for dates of 09/16/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 893 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Guilt Phase, Day 1 OF 4 for dates of 09/17/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) Modified on 3/3/2020 to edit text (hcic, ). (Entered: 03/03/2020) |
| 03/03/2020 | 894 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Guilt Phase, Day 2 OF 4 for dates of 09/18/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have |

| | | |
|---|---|---|
| | | 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 895 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Guilt Phase, Day 3 OF 4 for dates of 09/19/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 896 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Motion for Competency Hearing for dates of 09/20/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 897 | TRANSCRIPT - SEALED as to Brandon Michael Council Ex Parte Hearing held on 09/20/2019, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR. re 872 Notice of Appeal - Final Judgment, ***Does this satisfy all appellate orders for this reporter? N***<br><br>(bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 898 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Competency Hearing for dates of 09/23/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |

| | | |
|---|---|---|
| 03/03/2020 | 899 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Advising of Rights for dates of 09/23/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 900 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Guilt Phase, Day 4 OF 4; Penalty Phase Day 1 OF 7 for dates of 09/24/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 901 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 2 of 7 for dates of 09/25/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 902 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 3 of 7 for dates of 09/26/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |

| 03/03/2020 | 903 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Hearing/Charge Conference for dates of 09/27/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 904 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 4 of 7 for dates of 09/30/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 905 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 5 of 7 for dates of 10/01/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |
| 03/03/2020 | 906 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 6 of 7 for dates of 10/02/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) (Entered: 03/03/2020) |

| | | |
|---|---|---|
| 03/03/2020 | 907 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Jury Trial/Penalty Phase Day 7 of 7 for dates of 10/03/2019 before Judge R. Bryan Harwell, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (bkru, ) Modified on 3/10/2020 to edit text (hcic, ). (Entered: 03/03/2020) |
| 03/09/2020 | 909 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Initial Appearance for dates of 09-14-2017 before Judge Thomas E. Rogers, III, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Robin L. Herrera, RMR, CRR, CRC, Telephone number/E-Mail robin_herrera@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 3/30/2020. Redacted Transcript Deadline set for 4/9/2020. Release of Transcript Restriction set for 6/8/2020. (rher, ) (Entered: 03/09/2020) |
| 03/09/2020 | 910 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council. Arraignment for dates of 10-03-2017 before Judge Thomas E. Rogers, III, re 872 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Robin L. Herrera, RMR, CRR, CRC, Telephone number/E-Mail robin_herrera@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 3/30/2020. Redacted Transcript Deadline set for 4/9/2020. Release of Transcript Restriction set for 6/8/2020. (rher, ) (Entered: 03/09/2020) |
| 03/09/2020 | 911 | DELETION OF DOCKET ENTRY NUMBER 908 as to Brandon Michael Council. Reason: Duplicate of filing # 859 . (hcic, ) (Entered: 03/09/2020) |
| 03/11/2020 | 913 | Email from appellate counsel Barry Fisher as to Brandon Michael Council. (hcic, ) (Entered: 03/11/2020) |
| 06/19/2020 | 915 | Email from appellate counsel Barry Fisher. (hcic, ) (Entered: 06/19/2020) |
| 06/30/2020 | 916 | MOTION for Copies , MOTION to Inspect by Brandon Michael Council. No proposed order(Fisher, Barry) (Entered: 06/30/2020) |

| 06/30/2020 | 917 | **TEXT ORDER re 916 MOTION for Copies, MOTION to Inspect filed by Brandon Michael Council. Government to file response to Motion 916 by 7/14/2020. Signed by Chief Judge R Bryan Harwell on 6/30/2020. (hcic, )** (Entered: 06/30/2020) |
|---|---|---|
| 07/14/2020 | 918 | RESPONSE to Motion by USA as to Brandon Michael Council re 916 MOTION for Copies MOTION to Inspect (Shoemake, Derek) (Entered: 07/14/2020) |
| 07/15/2020 | 919 | REPLY TO RESPONSE to Motion by Brandon Michael Council re 916 MOTION for Copies MOTION to Inspect (Fisher, Barry) (Entered: 07/15/2020) |
| 09/10/2020 | 920 | **ORDER: Defendant's [ECF No. 916 ] motion for access to additional record material is GRANTED in part and DENIED in part. Signed by Chief Judge R Bryan Harwell on 9/10/2020. (hcic, )** (Entered: 09/10/2020) |
| 09/10/2020 | 921 | NON-STANDARD ITEM RECEIVED: Jury orientation video held in the Clerk's office. (hcic, ) (Entered: 09/10/2020) |
| 10/20/2020 | 922 | STIPULATION *AND NOTICE OF STIPULATION* (Fisher, Barry) (Entered: 10/20/2020) |
| 07/21/2021 | 923 | MOTION to Vacate *Sentences of Death by Electrocution* by Brandon Michael Council. No proposed order (Attachments: # 1 Exhibit)(Fisher, Barry) (Additional attachment(s) added on 7/21/2021: # 1 Table of Exhibits, # 2 Exhibit A Affidavit of Bryan P. Stirling, # 3 Exhibit B Letter from Bryan P. Stirling, # 4 Exhibit C Harold Hillman, An Unnatural Way to Die, # 5 Exhibit D Affidavit, John P. Wikswo, Jr., Ph.D, # 6 Exhibit E Affidavit of Jonathan L. Arden, MD, # 7 Exhibit F Affidavits of Witnesses to Executions by Electrocution, # 8 Exhibit G Harold Hillman, The Possible Pain Experienced During Execution by Different Methods, # 9 Exhibit H Post-Mortem Reports (Excerpts) and Photos from Executions by Electrocution, # 10 Exhibit I Post-Mortem Photographs of Ronnie Gardner, Execution by Firing Squad) (hcic, ). (Entered: 07/21/2021) |
| 07/22/2021 | 924 | **TEXT ORDER re 923 MOTION to Vacate Sentences of Death by Electrocution filed by Brandon Michael Council. Government to file response to Motion 923 by 8/5/2021. Signed by Chief Judge R Bryan Harwell on 7/22/2021.(hcic, )** (Entered: 07/22/2021) |
| 08/05/2021 | 925 | RESPONSE in Opposition by USA as to Brandon Michael Council re 923 MOTION to Vacate *Sentences of Death by Electrocution* (Shoemake, Derek) (Entered: 08/05/2021) |
| 08/06/2021 | 926 | **TEXT ORDER re 923 MOTION to Vacate Sentences of Death by Electrocution filed by Brandon Michael Council. Defendant to file Reply to 925 Response in Opposition by 8/16/2021. Signed by Chief Judge R Bryan Harwell on 8/6/2021. (hcic, )** (Entered: 08/06/2021) |
| 08/13/2021 | 927 | REPLY TO RESPONSE to Motion by Brandon Michael Council re 923 MOTION to Vacate *Sentences of Death by Electrocution* (Fisher, Barry) (Entered: 08/13/2021) |
| 09/08/2021 | 928 | ORDER of USCA as to Brandon Michael Council re 872 Notice of Appeal. ORDER filed granting motion to withdraw/relieve/substitute counsel. New attorney appointed. (hcic, ) (Entered: 09/08/2021) |

| 09/10/2021 | 929 | **ORDER denying 923 Motion to Vacate as to Brandon Michael Council. Signed by Chief Judge R. Bryan Harwell on 9/10/2021.(eney, )** (Entered: 09/10/2021) |
|---|---|---|
| 09/14/2021 | 930 | NOTICE OF APPEAL OF FINAL JUDGMENT by Brandon Michael Council re 929 Order on Motion to Vacate - The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Fisher, Barry) (Entered: 09/14/2021) |
| 09/15/2021 | 931 | Transmittal Sheet for Notice of Appeal to USCA as to Brandon Michael Council to US Court of Appeals re 930 Notice of Appeal. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (hcic, ) (Entered: 09/15/2021) |
| 09/15/2021 | 933 | ORDER of USCA as to Brandon Michael Council re 930 Notice of Appeal. ORDER filed appointing Federal Capital Appellate Resource Counsel Barry Fisher, who is based in the Federal Public Defender Office for the Northern District of New York as lead counsel and appoints Assistant Federal Defender Jaclyn L. Tarlton from the Federal Public Defender Office for the Eastern District of North Carolina as co-counsel for Brandon Michael Council in 21-8. (hcic, ) (Entered: 09/15/2021) |
| 11/18/2021 | 934 | Joint MOTION to Unseal Document *for Appeal* by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Fisher, Barry) (Entered: 11/18/2021) |
| 11/23/2021 | 935 | **ORDER granting 934 Motion to Unseal Certain Record Material for Appeal. Signed by Chief Judge R Bryan Harwell on 11/23/2021.(hcic, )** (Entered: 11/23/2021) |
| 02/12/2022 | 936 | Joint MOTION to Unseal Document *For Appeal* by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Fisher, Barry) (Entered: 02/12/2022) |
| 02/14/2022 | 937 | **ORDER granting 936 Joint Motion to Unseal Certain Documents For Appeal. Signed by Chief Judge R Bryan Harwell on 2/14/2022.(hcic, )** (Entered: 02/14/2022) |
| 11/14/2022 | 938 | Letter from Brandon Michael Council re appellate counsel. (Attachments: # 1 Supporting Documents, # 2 Envelope)(hcic, ) (Entered: 11/14/2022) |
| 11/14/2022 | 939 | ***DOCUMENT MAILED as to Brandon Michael Council re filed copy w/NEF of 938 Letter placed in U.S. Mail from Florence Clerks Office to Brandon Michael Council #63961-056 USP Terre Haute U.S. PENITENTIARY P.O. BOX 33 TERRE HAUTE, IN 47808 (hcic, ) (Entered: 11/14/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/09/2023 14:32:57 | | |
| **PACER Login:** | tmcloughlin83 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:17-cr-00866-RBH |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

AO 91 (Rev. 11/11)  Criminal Complaint

RECEIVED
USDC CLERK, FLORENCE, SC

2017 AUG 24  AM 9: 17

# UNITED STATES DISTRICT COURT
### for the
District of South Carolina

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 4:17 mj 203 |
| BRANDON MICHAEL COUNCIL ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 21, 2017 _____ in the county of _____ Horry _____ in the

_____ District of _____ South Carolina _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| Title 18, USC, Sections 2113(a), (d) and (e) | Armed bank robbery with a deadly weapon resulting in death. Use and carry of a firearm during and in relation to, and possession of a |
| Title 18, USC, Section 924(c) | firearm in furtherance of, a crime of violence. |

This criminal complaint is based on these facts:

See FBI Special Agent Jeffrey M. Long's attached affidavit in support of this criminal complaint.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Jeffrey M. Long, Special Agent FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ 08/24/2017 _____

_____
_Judge's signature_

City and state: _____ Florence, South Carolina _____

Kaymani D. West, United States Magistrate Judge
_Printed name and title_

JA0056

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jeffrey M. Long, Special Agent, Federal Bureau of Investigation (FBI), being duly sworn, state the following:

1. I have been a Special Agent of the FBI for more than 20 years, and have been assigned to the Columbia Division, Myrtle Beach Resident Agency since 1997. The statements contained in this affidavit are based on my own personal knowledge, as well as information provided to me by other law enforcement officials and employees of the FBI. I have not included in this Affidavit each and every fact and circumstance known to me, but only the facts and circumstances I believe are sufficient to establish probable cause to believe the defendant, BRANDON MICHAEL COUNCIL, has committed the offense of Armed Bank Robbery with Death Resulting, in violation of Title 18 United States Code Sections 924 (c) and 2113(e).

2. On August 11, 2017, the BB&T Bank located at 1604 South Tarboro Street, Wilson, North Carolina (NC) was robbed. Shortly after this robbery, BRANDON MICHAEL COUNCIL was identified as the prime suspect of this robbery. A review of COUNCIL's criminal record shows that on March 16, 2011, COUNCIL was convicted in North Carolina for "habitual felon" and "larceny greater than $1000." COUNCIL's parole on these charges expired 11 days prior to the BB&T robbery referenced above.

3. On August 15, 2017, surveillance footage at the Conway Express Inn, 1240 Pine Street, Conway, South Carolina (SC) 29526, captured a white 1999 Chrysler Town and Country minivan bearing North Carolina tag PEY1246 with two men and a woman unloading luggage and carrying it into room 110 of the hotel. A review of

NC motor vehicle records shows that the registered owner of the minivan is Melissa Taylor Fogg, date of birth August 22, 1966, with an address of 1210 Tarboro Street West, Wilson, NC.  After the three people unloaded luggage into room 110, the surveillance footage captured a black male with long dreadlocks resembling COUNCIL remain at the hotel (room 110) while the other male and the female drove away in the white minivan.

4. Melissa Fogg was interviewed by law enforcement on August 21, 2017. Fogg stated that she and Daryl Artis dropped COUNCIL off at the Conway Express Inn at the address referenced above on August 15, 2017.  Fogg stated that prior to leaving COUNCIL, both she and Artis observed COUNCIL stomp on his white cellular phone in an attempt to destroy it.  COUNCIL then removed the battery and the SIM card, attempted to destroy the battery, and then he disposed of the phone in the parking lot of a Hardees restaurant located in front of the Conway Express Inn.

5.  On August 21, 2017 at approximately 1:10 pm, hotel surveillance footage from the Conway Inn Express captured COUNCIL leaving room 110 on foot dressed in a distinctive blue striped polo style shirt and blue jean pants.  The video also captured him holding a white cell phone in his left hand, a white watch on his right wrist, and a gold in color bracelet on his right wrist.

After COUNCIL was captured on the Conway Inn Express video surveillance, COUNCIL was captured on video surveillance entering the CresCom Bank, located at 1230 16th Avenue in Conway, South Carolina (SC).  COUNCIL is captured on the CresCom video at approximately 1:13 pm wearing the same clothing as described above and as captured on the Conway Inn footage.

6. A review of the CresCom Bank footage shows COUNCIL enter the bank and have a brief conversation with the female teller. COUNCIL then pulls a firearm, points it at the teller and shoots her multiple times. COUNCIL then jumps over the teller counter. COUNCIL is also captured locating a second female employee of the bank who was hiding underneath a desk. Upon finder her, the video captures COUNCIL shooting the employee multiple times as she attempts to hide under the desk. During the course of the robbery, COUNCIL is captured on video jumping the teller counter multiple times. Both victims of the robbery were killed as a result of the gunshot wounds inflicted by COUNCIL.

7. Video surveillance captured COUNCIL driving away in a white 2013 Chrysler 200 belonging to one of the victims of the robbery. The other victim drove a Honda vehicle whose key fob was missing when law enforcement arrived on scene. Also missing were multiple bank credit cards belonging to each of the victims.

8. A bank audit showed a loss amount of 15,294.00 in United States Dollars (USD). I have confirmed with CresCom management that these deposits were insured by the Federal Deposit Insurance Corporation (FDIC).

9. The same day at approximately 1:20 pm, surveillance footage from the Conway Express Inn captured COUNCIL (dressed in the same clothing referenced above) drive up in a white 2013 Chrysler 200. COUNCIL is captured leaving the driver side door open, going inside room 110 and then placing luggage and belongings from the room in the trunk of the car. COUNCIL is then captured on the hotel surveillance driving away.

10. On August 23, 2017 at approximately 12:30 pm, surveillance units spotted COUNCIL driving a white Mercedes Benz leaving a motel parking lot in Greenville, NC. COUNCIL drove the vehicle to another motel where he got out of the vehicle. Marked police units responded and COUNCIL fled on foot. After a brief foot chase, COUNCIL was taken into custody. COUNCIL was searched and found to be in possession of his NC identification card and key fobs for Chrysler and Honda vehicles.

11. COUNCIL was advised of his Miranda warnings, which he stated he understood. After he waived his rights and agreed to make a statement, COUNCIL confessed to the August 15, 2017 CresCom bank robbery. COUNCIL further admitted to shooting both bank employees during the course of the robbery. COUNCIL told agents that he was desperate, he needed money and that he knew he was going to shoot someone. COUNCIL stated that he knew that he was going to hurt somebody that day. COUNCIL told agents that he had watched a movie called "Get Rich or Die Trying." COUNCIL stated that he did not deserve to live.

12. Based on the above stated facts, I submit there is probable cause to believe that the defendant, BRANDON MICHAEL COUNCIL, by force, violence and intimidation did take (or attempt to take) from the person and presence of another, approximately $15240.00 in money belonging to and in the care, custody, control, management and possession of the CresCom Bank, located at 1230 16th Avenue in Conway, South Carolina, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and in committing such offense, the defendant did assault and put in jeopardy the life of another person by the use of a dangerous weapon, that is a

firearm; and further, in committing such offense defendant did kill two employees of said bank, in violation of Title 18, United States Code, Sections 2113(a), 2113(d), and 2113(e).

13. I further submit that the above facts establish probable cause to believe that the defendant, BRANDON MICHAEL COUNCIL, did use and carry a firearm during and in relation to, and did possess a firearm in furtherance of a crime of violence that being armed bank robbery, and during the commission of said offense the defendant did discharge the firearm in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

14. Based on the foregoing, I respectfully request that this Court issue an arrest warrant and criminal complaint for the above referenced violations.

15. AUSA JD Rowell has reviewed this affidavit and concurs with this request.

JEFFREY M. LONG
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before this 24th day of August 2017,

Kaymani D. West
United States Magistrate Judge

CLOSED

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Eastern Division)
# CRIMINAL DOCKET FOR CASE #: 4:17-mj-01139-KS-1

Case title: USA v. Council                      Date Filed: 08/24/2017
Other court case number: 4:17-MJ-203 District of South      Date Terminated: 08/24/2017
Carolina

---

Assigned to: Magistrate Judge
Kimberly A. Swank

**Defendant (1)**

**Brandon Michael Council**
*TERMINATED: 08/24/2017*

| Pending Counts | Disposition |
| --- | --- |
| None | |

**Highest Offense Level (Opening)**

None

| Terminated Counts | Disposition |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
| --- | --- |
| Armed Bank Robbery With a Deadly Weapon Resulting in Death and use and Carry a Firearm During and in Relation to a Crime of Violence | Case Transferred to the District of South Carolina |

---

**Plaintiff**

USA                          represented by **John H. Bennett**
US Attorney's Office
US Courthouse Annex ,215 South
Evans St.

JA0062

Suite 206
Greenville, NC 27858
252-830-0335
Fax: 830-1132
Email: john.bennett2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/23/2017 | | Arrest (Rule 5) of Brandon Michael Council. (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 1 | Charging Documents from the District of South Carolina as to Brandon Michael Council. (Attachments: # 1 Warrant) (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | | Set Hearing as to Brandon Michael Council: Initial Appearance - Rule 40 set for 8/24/2017 at 2:00 PM in Greenville Annex Courtroom before Magistrate Judge Kimberly A. Swank. (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 2 | CJA 23 Financial Affidavit by Brandon Michael Council (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 3 | Minute Entry for proceedings held before Magistrate Judge Kimberly A. Swank:Initial Appearance in Rule 5 Proceedings as to Brandon Michael Council held on 8/24/2017. Defendant present with counsel. Counsel for USA present. Public Defender appointed. Defendant waives Identity Hearing; requests detention hearing be held in the District of South Carolina. Court orders defendant be detained and transported to the District of South Carolina to stand trial. (Court Reporter - FTR Gold) (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | | ORAL MOTION for Detention filed by USA as to Brandon Michael Council. (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 4 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Brandon Michael Council. Signed by Magistrate Judge Kimberly A. Swank on 8/24/2017. (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 5 | Waiver of Rule 5(c)(3) Hearing by Brandon Michael Council. (Foell, S.) (Entered: 08/24/2017) |
| 08/24/2017 | 6 | COMMITMENT TO ANOTHER DISTRICT as to Brandon Michael Council. Defendant committed to the District of of South Carolina to stand trial. Signed by Magistrate Judge Kimberly A. Swank on 8/24/2017. (Foell, S.) (Entered: 08/24/2017) |

JA0063

# - MINUTES -
## INITIAL APPEARANCE PROCEEDINGS
## RULE 5

**Date: 8/24/2017**

**Court Convenes: 2:11 pm**

**Location: Greenville - Annex**

**Proceedings Recorded: FTR Gold (**M:\GRA\2017\Aug**)**

**Hearing Time: 2:11 - 2:34 pm**

**COURT OFFICERS**
**Presiding Judge: Kimberly Swank**
**Deputy Clerk: Shelia Foell**
**USPO: Rebecca Rabone**

## USA vs. Brandon Michael Council
## CASE #: 4:17-MJ-1139

**Asst. US Attorney: John Bennett**
**Defense Counsel: James Martin**

- **Defendant advised of rights, charges, penalties & right to counsel**
- **CJA23 Financial Affidavit executed by defendant**
- **Federal Public Defender appointed to represent defendant**
- **Oral Motion for Detention**
- **Defendant waives identity hearing and requests detention hearing be held in the charging district - (D/SC)**
- **Defendant remanded to USM custody**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN    DIVISION
CASE NO.:    4:17-MJ-1139

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | ORDER |
| | ) | |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

Defendant having demonstrated eligibility for appointment of counsel at government expense, the Federal Public Defender is directed to provide representation in this action.

The court further determines that the defendant is unable to pay the fees of any witness, and pursuant to Federal Rule of Criminal Procedure 17(b), the Clerk shall issue a subpoena for any witness necessary to present an adequate defense to the pending charge or charges.

It is FURTHER ORDERED that the United States Marshal shall serve any subpoena presented to him in this case by the office of the Federal Public Defender, and shall pay the appropriate fees and expenses to witnesses so subpoenaed, in accordance with Fed. R. Crim. P. 17(b).

SO ORDERED this the 24  day of AUGUST , 2017 .

KIMBERLY A. SWANK

UNITED STATES MAGISTRATE JUDGE

AO 466A (Rev. 12/09) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of North Carolina

*FILED IN OPEN COURT*
*ON*
*Peter A. Moore, Jr., Clerk*
*US District Court*
*Eastern District of NC*

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.  4:17-MJ-1139 |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | Charging District's Case No.   4:17-MJ-203 |
| *Defendant* | ) | |

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the *(name of other court)*     District of South Carolina

I have been informed of the charges and of my rights to:

(1)    retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)    an identity hearing to determine whether I am the person named in the charges;

(3)    production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)    a preliminary hearing within 14 days of my first appearance if I am in custody and 21 days otherwise — unless I am indicted — to determine whether there is probable cause to believe that an offense has been committed;

(5)    a hearing on any motion by the government for detention;

(6)    request transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☐    an identity hearing and production of the warrant.

☐    a preliminary hearing.

☐    a detention hearing.

☑    an identity hearing, production of the warrant, and any preliminary or detention hearing to which I may be entitled in this district. I request that those hearings be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date:     08/24/2017

*+ Brandon M. Council*
*Defendant's signature*

*James A. Martin*
*Signature of defendant's attorney*

*James A. Martin*
*Printed name of defendant's attorney*

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of North Carolina

*FILED IN OPEN COURT*
*ON 8-24-17*
*Peter A. Moore, Jr., Clerk*
*US District Court*
*Eastern District of NC*
*50c*

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   4:17-MJ-1139 |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | Charging District's |
| *Defendant* | ) | Case No.   4:17-MJ-203 |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____ District of   SOUTH CAROLINA ,

*(if applicable)* _____ division. The defendant may need an interpreter for this language:

_____ .

The defendant:   ☐ will retain an attorney.

☑ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date:   08/24/2017

_____
*Judge's signature*

_____ KIMBERLY A. SWANK, US MAGISTRATE JUDGE _____
*Printed name and title*

```
MIME-Version:1.0
From:SCDEfilingstat@scd.uscourts.gov
To:scd_ecf_nef@localhost.localdomain
Bcc:
--Case Participants: John David Rowell (caseview.ecf@usdoj.gov, jd.rowell@usdoj.gov,
shauna.autry@usdoj.gov, usa-sc-ecf-docket-j@usdoj.gov, usa-sc-ecf-flu@usdoj.gov,
usa-sc-ecf-vw-col@usdoj.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:8010531@scd.uscourts.gov
Subject:Activity in Case 4:17-mj-00203-MCRI USA v. Council Arrest - Other District
```
Content–Type: text/html

## U.S. District Court

## District of South Carolina

## Notice of Electronic Filing

The following transaction was entered on 8/25/2017 at 8:09 AM EDT and filed on 8/24/2017

| | |
|---|---|
| **Case Name:** | USA v. Council |
| **Case Number:** | 4:17–mj–00203–MCRI |
| **Filer:** | |
| **Document Number:** | 4(No document attached) |
| **Docket Text:** | |

**Arrest of Brandon Michael Council in Eastern District of North Carolina. Clerk notified by: USA. (swel, )**

**4:17–mj–00203–MCRI–1 Notice has been electronically mailed to:**

John David Rowell    jd.rowell@usdoj.gov, CaseView.ECF@usdoj.gov, Shauna.Autry@usdoj.gov,
USA–SC–ECF–Docket–J@usdoj.gov, USA–SC–ECF–FLU@usdoj.gov,
USA–SC–ECF–VW–COL@usdoj.gov

**4:17–mj–00203–MCRI–1 Notice will not be electronically mailed to:**

USCA4 101

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-866 |
| | 18 U.S.C. § 922(g)(1) |
| | 18 U.S.C. § 924(a)(2) |
| | 18 U.S.C. § 924(c)(1)(A)(iii) |
| | 18 U.S.C. § 924(e) |
| v. | 18 U.S.C. § 924(j)(1) |
| | 18 U.S.C. § 2113(a) |
| | 18 U.S.C. § 2113(e) |
| | 18 U.S.C. § 3591 |
| | 18 U.S.C. § 3592 |
| BRANDON MICHAEL COUNCIL | 18 U.S.C. § 924(d) |
| | 18 U.S.C. § 981(a)(1)(C) |
| | 28 U.S.C. § 2461(c) |

**INDICTMENT**

THE GRAND JURY CHARGES:

1.    On August 21, 2017, Defendant BRANDON MICHAEL COUNCIL planned to enter CresCom Bank to rob the bank and kill its employees. Shortly after entering the bank, Defendant BRANDON MICHAEL COUNCIL drew a revolver and shot bank teller Donna Major multiple times. Defendant BRANDON MICHAEL COUNCIL then ran into a nearby office where he shot bank manager Kathryn Skeen as she sheltered under her desk. Defendant BRANDON MICHAEL COUNCIL then proceeded to take more than $15,000 in cash from the bank before fleeing.

-1-

## COUNT 1

THE GRAND JURY FURTHER CHARGES:

2.    On or about August 21, 2017, in the District of South Carolina, Defendant BRANDON MICHAEL COUNCIL, by force, violence, and intimidation did take from the person and presence of another, approximately $15,294 in United States Currency belonging to and in the care, custody, control, management, and possession of the CresCom Bank of Conway, South Carolina, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and in committing such offense, Defendant BRANDON MICHAEL COUNCIL did kill a person resulting in the person's death;

All in violation of Title 18, United States Code, Sections 2113(a) and 2113(e).

-2-

<u>**COUNT 2**</u>

THE GRAND JURY FURTHER CHARGES:

3.    That on or about August 21, 2017, in the District of South Carolina, Defendant BRANDON MICHAEL COUNCIL knowingly did use and carry a firearm during and in relation to a crime of violence, as charged in Count 1, which is prosecutable in a court of the United States, and did cause the death of a person through the use of a firearm in such a manner to constitute murder as defined in Title 18, United States Code, Section 1111, in that Defendant BRANDON MICHAEL COUNCIL with malice aforethought did unlawfully kill a person by shooting her with a firearm;

All in violation of Title 18, United States Code, Sections 924(c)(1), 924(c)(1)(A)(iii), and 924(j)(1).

-3-

## COUNT 3

THE GRAND JURY FURTHER CHARGES:

4.    That on or about August 21, 2017, in the District of South Carolina, Defendant BRANDON MICHAEL COUNCIL, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce, a firearm, that is, a Smith and Wesson .22 caliber pistol, and ammunition, all of which had been shipped and transported in interstate commerce;

In violation of Title 18, United States Code, Sections 922(g)(1), 924(a)(2), and 924(e).

-4-

NOTICE OF SPECIAL FINDINGS PURSUANT TO TITLE 18, UNITED STATES
CODE, SECTIONS 3591 AND 3592

THE GRAND JURY FURTHER FINDS:

1.    As to Counts 1 and 2, Defendant BRANDON MICHAEL COUNCIL:

(a) was 18 years of age or older at the time of the
offense;

(b) intentionally killed Donna Major and Kathryn Skeen
(18 U.S.C. § 3591(a)(2)(A));

(c) intentionally inflicted serious bodily injury that
resulted in the deaths of Donna Major and Kathryn Skeen
(18 U.S.C. § 3591(a)(2)(B));

(d) intentionally participated in an act, contemplating
that the life of a person would be taken and intending
that lethal force would be used in connection with a
person, other than one of the participants in the
offense, and Donna Major and Kathryn Skeen died as a
direct result of such act (18 U.S.C. § 3591(a)(2)(C));

(e) intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of
death to a person, other than one of the participants in
the offense, such that participation in the act
constituted a reckless disregard for human life and
Donna Major and Kathryn Skeen died as a direct result of
the act (18 U.S.C. § 3591(a)(2)(D));

-5-

(f) in committing the offense intentionally killed more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)); and

(g) committed the offense in the expectation of the receipt of anything of pecuniary value (18 U.S.C. § 3592(c)(8)).

JA0074

**FORFEITURE**

1.  <u>FIREARM OFFENSES</u>:

Upon conviction for one or more felony violations of Title 18 as charged in this Indictment, the Defendant, **BRANDON MICHAEL COUNCIL**, shall forfeit to the United States all of the Defendant's right, title and interest in and to any property, real and personal,

      (a)   any firearms and ammunition (as defined in 18 U.S.C. § 921) -

            (1) involved in or used in any knowing violations of 18 U.S.C. §§ 922 and 924, or violation of any other criminal law of the United States, or intended to be used in a crime of violence;

2.  <u>BANK ROBBERY</u>:

Upon conviction for violations of Title 18, United States Code, Section 2113 as charged in this Indictment, the Defendant, **BRANDON MICHAEL COUNCIL**, shall forfeit to the United States any property, real or personal, constituting, derived from or traceable to proceeds the Defendant obtained directly or indirectly as a result of such offenses.

3.  <u>PROPERTY</u>:

Pursuant to Title 18, United States Code, Sections 924(d) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the property which is subject to forfeiture upon conviction of the

JA0075

Defendant for the offense charged in this Indictment includes, but is not limited to, the following:

A.    Firearm:

Smith and Wesson .22 caliber revolver
(serial number 1K3994)

B.    Vehicle:

1996 Mercedes Benz E300
VIN: WDBJF20F8TJ005298
Seized from: Michael Brandon Council
Asset ID: 17-FBI-005650

C.    CASH PROCEEDS/MONEY JUDGMENT:

A sum of money equal to all proceeds the Defendant obtained directly or indirectly from the offenses charged in the Indictment, and all interest and proceeds traceable thereto, in that such sum equals property, that the Defendant obtained as the result of his violations of 18 U.S.C. § 2113.

4.    SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendants –

(a)    cannot be located upon the exercise of due diligence;
(b)    has been transferred or sold to, or deposited with, a third person;
(c)    has been placed beyond the jurisdiction of the Court;
(d)    has been substantially diminished in value; or
(e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. § 982(b)(1) to seek forfeiture of any other property of defendants

-8-

up to an amount equivalent to the value of the above-described
forfeitable property;

Pursuant to Title 18, United States Code, Sections 924(d) and
981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A _TRUE_____ Bill

BETH DRAKE        (jdr)
UNITED STATES ATTORNEY

-9-

RECORD OF GRAND JURY BALLOT

C/ ___4:17cr866  CRI___

THE UNITED STATES OF AMERICA v. BRANDON MICHAEL COUNCIL

(SEALED UNTIL FURTHER ORDER OF THE COURT)

IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| -vs- | ) | **JOINT MOTION FOR A CONTINUANCE** |
| | ) | |
| | ) | |
| **BRANDON MICHAEL COUNSEL** | ) | |

PLEASE TAKE NOTICE that counsel for the defendant, **BRANDON MICHAEL COUNSEL,** and the United States of America, hereby moves this court for a continuance based on the following reasons:

## SPECIFIC FACTS RELEVANT TO THIS MOTION

Mr. Counsel is charged with several offenses for which the possible punishments are life imprisonment without the possibility of parole or death. The indictment charging Mr. Counsel includes also statutory aggravating circumstances, which, if found by the jury, could make Mr. Council eligible for the death penalty.

In this case, according to the indictment, the offense occurred on August 21, 2017. The indictment in this case was true billed by the Grand Jury on September 20, 2017. "Learned Counsel," was appointed pursuant to 18 U.S.C. §3005 on September 27, 2017. Mr. Council was arraigned on October 3, 2017.

Since this case involves the possible application of the death penalty pursuant to 18 U.S.C. §3591 *et seq,* this case should be continued under the provisions of 18 U.S.C. §§3161(h)(7)(A) and (B). In this case, due to the nature of the prosecution, or the existence of novel questions of fact or law, it is unreasonable to expect adequate preparation for pretrial or trial itself within the time limits set by the Speedy Trial Act, 18 U.S.C. §3161 *et seq.*

**ATTORNEY CERTIFICATION AND WAIVER OF SPEEDY TRIAL RIGHTS**

I, William F. Nettles, IV, attorney for Mr. Council, hereby certify that I have met with Mr. Council to discuss the contents of this motion and Mr. Council's rights under the Speedy Trial Act. Based on this meeting, I further certify that Mr. Council is aware of his rights pursuant to the Speedy Trial Act, and he understands those rights. Mr. Council wishes to waive those rights for the reasons stated above so that his case may be continued beyond the current term of court. This waiver is made freely and voluntarily without threats, promises, or other means of coercion or inducement, as evidenced by the attached waiver executed by Mr. Council.

**CONCLUSION**

For the foregoing reasons, and pursuant to *Zedner v. United States*, 126 S.Ct. 1976 (2006), and 18 U.S.C. §3161(h)(7)(B)(ii) and (iv), counsel for the Defendant and the United States respectfully believes that the ends of justice would be served by the Court granting a continuance in this matter beyond the current term of court.

Respectfully Submitted,

/s/ **WILLIAM F. NETTLES, IV**,
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
**Attorney ID#: 5935**

Florence, South Carolina

October 16, 2017

I SO MOVE:

**JOHN DAVID ROWELL (ATTORNEY ID# 9802)**
ASSISTANT U.S. ATTORNEY

JA0080

## WAIVER OF SPEEDY TRIAL RIGHTS

I am aware of my rights under the Speedy Trial Act.  I would like to waive those rights and have

my case continued beyond the next term of court.  No one has forced, threatened, or coerced me

to waive my rights.  No one has promised me anything.  My waiver is given freely and voluntarily.

I have discussed this waiver with my attorney.

*[signature]* 10-12-17

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**FLORENCE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. **4:17-cr-00866-RBH (1)** |
| | ) | |
| vs. | ) | **ORDER OF CONTINUANCE** |
| | ) | |
| **BRANDON MICHAEL COUNCIL** | ) | |
| _____ | ) | |

Pending before the court is a joint motion filed by the defendant and the Government, to continue this case until the Court's next scheduled term. In the motion, the defendant acknowledges that he is waiving his rights under the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

Based on the representations made by the parties and the file, the Court finds, pursuant to 18 U.S.C. § 3161(h)(7)(A), that the ends of justice served by the granting of a continuance outweigh the best interests of the public and the defendant in a speedy trial.  In reaching this conclusion, the Court has considered the following factor(s) under 18 U.S.C. § 3161(h)(7)(B):

☐ **(i)** The failure to grant a continuance in the proceeding would be likely to make a continuation of the proceeding impossible, or result in a miscarriage of justice.

**(ii)** The case is so unusual or so complex due to

      ☐     the number of defendants,

      ■     the nature of the prosecution, or

      ■     the existence of novel questions of fact or law,

that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

**(iii)** In a case in which arrest precedes indictment, delay in the filing of the indictment is caused

☐      because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or

☐      because the facts upon which the grand jury must base its determination are unusual or complex.

**(iv)** The failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), but

☐      would deny the defendant reasonable time to obtain counsel,

☐      would unreasonably deny the defendant or the Government continuity of counsel, or

☐      would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

■    **(v)** Other: Would deny both counsel reasonable time for effective preparation.

For all the foregoing reasons, the motion for a continuance is **GRANTED**.  It is hereby **ORDERED** that this case shall be continued until the Court's next scheduled term, and that all such period of delay is hereby excluded in computing the time within which trial must begin pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

     **IT IS SO ORDERED.**

                                        s/R. Bryan Harwell
                                        R. Bryan Harwell

October 18,  2017                        United States District Judge
Florence, South Carolina

JA0083

| | | Rogers, III on 9/14/17.(swel, ) [4:17-mj-00203-MCRI] (Entered: 09/14/2017) |
|---|---|---|
| 09/15/2017 | 14 | Warrant Returned Executed on 08/23/2017 in case as to Brandon Michael Council. (bwalters-USMS, ) [4:17-mj-00203-MCRI] (Entered: 09/15/2017) |
| 09/20/2017 | 16 | INDICTMENT (Sealed Grand Jury Ballot attached) as to Brandon Michael Council (1) count(s) 1, 2, 3. (Attachments: # 1 GJ Ballot) (swel, ) (Entered: 09/21/2017) |
| 09/21/2017 | 19 | NOTICE OF HEARING as to Brandon Michael Council Arraignment set for TUESDAY 10/3/2017 at 02:30 PM in Florence #1, McMillan Federal Bldg., 401 W. Evans St., Florence before Magistrate Judge Thomas E Rogers III. (swel, ) Modified courtroom # on 9/21/2017 (swel, ). (Entered: 09/21/2017) |
| 09/21/2017 | 20 | NOTICE OF ATTORNEY APPEARANCE Julius Ness Richardson appearing for USA. (Richardson, Julius) (Entered: 09/21/2017) |
| 09/27/2017 | 23 | Case Reassigned as to Brandon Michael Council to Judge Honorable R Bryan Harwell. Judge Unassigned - CRI no longer assigned to the case. (pcas, ) (Entered: 09/27/2017) |
| 09/27/2017 | 24 | **ORDER appointing Duane K. Bryant as counsel for Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 9/27/2017. (hcic, ) (Entered: 09/27/2017)** |
| 10/03/2017 | 32 | **Minute Entry for proceedings held before Magistrate Judge Thomas E Rogers, III: Arraignment as to Brandon Michael Council (1) Count 1,2,3 held on 10/3/2017. AUSA J.D. Rowell present. Defendant present in custody and represented by AFPD William F Nettles IV and Duane K. Bryant. Defendant received copy of indictment, indicated he understood charges, waived reading. Court enters plea of Not Guilty. Government's position is for Defendant to remain detained. Defendant continues to waive his right to a detention hearing. Defendant remains detained. Court Reporter Raymond Simmons. (swel, ) (Entered: 10/03/2017)** |
| 10/04/2017 | 33 | MOTION for Leave to Appear Pro Hac Vice Attorney: Mr. Duane K. Bryant. by Brandon Michael Council. No proposed order (Attachments: # 1 Main Document Application/Affidavit for Pro Hac Vice Application, # 2 Supporting Documents Certificate of good standing)(Meetze, Michael) (Entered: 10/04/2017) |
| 10/10/2017 | 34 | SCHEDULING NOTICE as to Brandon Michael Council: Pretrial Conference set for 10/23/2017 at 10:00 AM; Pleas will be taken on 10/24/17 at 9:30 AM; Jury Selection set for 10/26/2017 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell (hcic, ) (Entered: 10/10/2017) |
| 10/16/2017 | 35 | MOTION to Continue *(Joint Motion for a Continuance)* by Brandon Michael Council. No proposed order (Attachments: # 1 Supporting Documents Waiver of Speedy Trial Rights)(Nettles, William) (Entered: 10/16/2017) |
| 10/16/2017 | 36 | MOTION for Disclosure *of Intent to Use Evidence of Other Crimes, Wrongs or Acts Under Federal Rules of Evidence of 404(B)* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/16/2017 | 37 | MOTION for Discovery *and Inspection* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/16/2017 | 38 | MOTION for Disclosure *(Disclose) Intention to Use Evidence* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 10/16/2017) |
| 10/17/2017 | 39 | MOTION for Discovery *(Reciprocal)* by USA as to Brandon Michael Council. No proposed order(Rowell, John) (Entered: 10/17/2017) |
| 10/17/2017 | 40 | MOTION *to Allow Defense Investigators to Visit Defendant at Jail* by Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel(Nettles, William) (Entered: 10/17/2017) |
| 10/18/2017 | 41 | **TEXT ORDER granting 33 motion for Pro Hac Vice admission. The Court notes it had previously appointed Mr. Bryant on a provisional basis as lead "learned counsel" based on consultation with and recommendation of the Federal Public Defender, review of Mr. Bryant's curriculum vitae, and the Court's inquiry concerning his qualifications and willingness to serve. Mr. Bryant is now appointed on a permanent basis as lead "learned counsel." Signed by Honorable R Bryan Harwell on 10/18/2017. (tmcb, ) (Entered: 10/18/2017)** |
| 10/18/2017 | 42 | **ORDER granting 35 Motion to Continue as to Brandon Michael Council. Case continued to next term, 12/7/2017. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017)** |
| 10/18/2017 | 43 | NOTICE OF CANCELLATION OF HEARING: Pretrial Conference on 10/23/2017 at 10:00 AM and Jury Selection on 10/26/2017 at 9:30 AM cancelled as to Brandon Michael Council. (hcic, ) (Entered: 10/18/2017) |
| 10/18/2017 | 45 | **CJA Appointment of Duane K Bryant for Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017)** |
| 10/18/2017 | 46 | **ORDER granting 40 Motion to Allow Defense Investigators to Visit Defendant at Jail as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 10/18/2017. (hcic, ) (Entered: 10/18/2017)** |
| 11/20/2017 | 50 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 11/28/2017, Pretrial Conference set for 12/4/2017 at 10:00 AM; Pleas will be taken on 12/5/2017 at 9:30 AM, Jury Selection set for 12/7/2017 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell.(hcic, ) (Entered: 11/20/2017) |
| 11/21/2017 | 51 | MOTION for Leave to Appear Pro Hac Vice Attorney: Akin Adepoju, Esq.. by Brandon Michael Council. No proposed order (Attachments: # 1 Main Document Application, # 2 Supporting Documents Certificate of Good Standing)(Meetze, Michael) (Entered: 11/21/2017) |
| 11/28/2017 | 52 | **TEXT ORDER granting 51 Motion for Leave to Appear Pro Hac Vice for Akin Adepoju as to Brandon Michael Council. Signed by the Honorable R Bryan Harwell on 11/28/2017. (hcic, ) (Entered: 11/28/2017)** |
| 11/28/2017 | 53 | NOTICE OF RESCHEDULED HEARING as to Brandon Michael Council. Pretrial Conference previously set for 12/4/2017 at 10:00 AM cancelled and rescheduled to: Pretrial Conference set for 12/4/2017 at 3:30 PM (time change only) in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 11/28/2017) |
| 11/28/2017 | 54 | **TEXT ORDER re Pretrial/Status Conference - Monday, December 4, 2017 at 3:30 p.m.: The lawyers should be prepared to discuss a general timetable for the disposition of the case including the completion of the Department of Justice's capital case** |

JA0084

| | | |
|---|---|---|
| | | review, and their position on possible consideration of a flexible court-imposed schedule, subject to extension for good cause, regarding a decision/resolution of whether the government will be seeking the death penalty (if the Court decides to issue a DOJ decision schedule, the Court will receive input from the attorneys and if necessary and requested, ex parte from defense counsel); the amount of time necessary to prepare for trial after the DOJ's decision, as well as tentative trial dates; any proposals for scheduling pretrial motions or deferring same until after the DOJ's capital case review; any Section 4241 competency issues; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 11/28/2017.(tmcb, ) (Entered: 11/28/2017) |
| 12/04/2017 | 57 | REPLY to 54 Order,,,, *(Defendant's Response to the Court's Text Order (ECF #54))* (Attachments: # 1 Supporting Documents Declaration of Kevin McNally regarding preparation time before meeting with the attorney general's capital case reveiw committee, # 2 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time, # 3 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time)(Nettles, William) (Entered: 12/04/2017) |
| 12/04/2017 | 58 | NOTICE OF ATTORNEY APPEARANCE Scott Rian Hixson appearing for USA. (Hixson, Scott) (Entered: 12/04/2017) |
| 12/04/2017 | 59 | Minute Entry for proceedings held before the Honorable R Bryan Harwell: Pretrial Conference as to Brandon Michael Council held on 12/4/2017. Julius Richardson, AUSA, and John David Rowell, AUSA, present. Duane K Bryant, Michael Meetze, and William Nettles present with defendant. Court Reporter: Beth Krupa. CJA Time: 1 hour, 15 mins. (hcic, ) (Entered: 12/04/2017) |
| 12/04/2017 | 60 | ORDER TO CONTINUE - Ends of Justice as to Brandon Michael Council; case continued to next term, 1/11/2018. Signed by the Honorable R Bryan Harwell on 12/4/2017. (hcic, ) (Main Document 60 replaced on 12/5/2017 with corrected document) (hcic, ). (Entered: 12/04/2017) |
| 12/04/2017 | 61 | E-mail from AUSA to Judge Harwell and all counsel as to Brandon Michael Council re: scheduling matters. Filed at the direction of Chambers. (Attachments: # 1 Proposed order) (hcic, ) (Entered: 12/04/2017) |
| 12/05/2017 | 62 | TEXT ENTRY: The Court held a pretrial/status conference on December 4, 2017. Defendant waived his rights under the Speedy Trial Act on the record, and the Court continued this case. Additionally, after hearing from counsel, the Court stated it would not be imposing a Court ordered deadline for a decision by the Department of Justice regarding whether it would seek the death penalty. The Court indicated it would defer a scheduling order until after the D.O.J.'s capital case review. Signed by Honorable R Bryan Harwell on 12/5/2017.(tmcb, ) (Entered: 12/05/2017) |
| 12/06/2017 | 63 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 12/18/2017; Pretrial Conference set for 1/8/2018 at 10:00 AM; Pleas will be taken on 1/9/2018 at 9:30 AM, Jury Selection set for 1/11/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 12/06/2017) |
| 01/05/2018 | 66 | MOTION to Continue by Brandon Michael Council. No proposed order (Attachments: # 1 Addendum)(Nettles, William) (Entered: 01/05/2018) |
| 01/08/2018 | 67 | ORDER granting 66 Motion to Continue as to Brandon Michael Council (1). Signed by the Honorable R Bryan Harwell on 1/8/2017. (hcic, ) (Entered: 01/08/2018) |
| 01/11/2018 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on 12/4/2017, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 2/12/2018. Release of Transcript Restriction set for 4/11/2018. (bkru, ) (Entered: 01/11/2018) |
| 01/16/2018 | 71 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 2/6/2018, Pretrial Conference set for 2/26/2018 at 10:00 AM; Pleas will be taken on 2/27/2018 at 9:30 AM; Jury Selection set for 3/1/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 01/16/2018) |
| 02/20/2018 | 73 | MOTION to Continue *(Joint Motion for a Continuance)* by Brandon Michael Council. No proposed order (Attachments: # 1 Supporting Documents Waiver of Speedy Trial Rights)(Nettles, William) (Entered: 02/20/2018) |
| 02/21/2018 | 79 | ORDER granting 73 Motion to Continue as to Brandon Michael Council (1); case continued to next term of Court, 4/19/2018. Signed by the Honorable R Bryan Harwell on 2/21/2018. (hcic, ) (Entered: 02/21/2018) |
| 03/07/2018 | 80 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 3/27/2018, Pretrial Conference set for 4/16/2018 at 10:00 AM; Pleas will be taken on 4/17/2018 at 9:30 AM; Jury Selection set for 4/19/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/07/2018) |
| 03/21/2018 | 81 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Brandon Michael Council (Richardson, Julius) (Entered: 03/21/2018) |
| 03/22/2018 | 83 | TEXT ORDER re Pretrial/Status Conference set for Thursday, March 29, 2018 at 10:00 a.m. - The lawyers should be prepared to discuss a proposed scheduling order and consult each other regarding same. The lawyers should also be prepared to discuss the Court's consideration of a Section 4241 competency evaluation; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 3/22/2018.(tmcb, ) (Entered: 03/22/2018) |
| 03/23/2018 | 84 | MOTION to Continue *Status Conference* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 03/23/2018) |
| 03/23/2018 | 85 | TEXT ORDER shortening response time. The government shall file a response to Defendant's 84 motion to continue status conference no later than Monday, March 26, 2018, at 12:00 p.m. Signed by Honorable R Bryan Harwell on 3/23/2018.(tmcb, ) (Entered: 03/23/2018) |
| 03/23/2018 | 86 | RESPONSE in Opposition by USA as to Brandon Michael Council re 84 MOTION to Continue *Status Conference* (Rowell, John) (Entered: 03/23/2018) |
| 03/26/2018 | 87 | REPLY to 86 Response in Opposition (Nettles, William) (Entered: 03/26/2018) |
| 03/26/2018 | 88 | NOTICE OF ATTORNEY APPEARANCE Everett Eugene McMillian appearing for USA. (McMillian, Everett) (Entered: 03/26/2018) |
| 03/26/2018 | 89 | TEXT ORDER granting in part Defendant's 84 motion to continue pretrial/status conference. The pretrial/status conference is hereby rescheduled for April 6, 2018, at 10:00 a.m. Signed by Honorable R Bryan Harwell on 3/26/2018.(tmcb, ) (Entered: |

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NUMBER: 4:17CR00866-RBH(1) |
| | ) | |
| | ) | **Defendant's Response to the Court's Text** |
| | ) | **Order (ECF # 54)** |
| vs | ) | |
| | ) | |
| **BRANDON MICHAEL COUNCIL** | ) | |

The undersigned, as counsel for **BRANDON MICHAEL COUNCIL**, hereby moves this court to take notice of the following:

First, counsel for the Defendant see no reason to impose a deadline for the completion of the government's death-penalty authorization process.[1] While district courts occasionally impose such deadlines to ensure that the government's decision-making process proceeds expeditiously, there is no danger of undue delay in this case. On the contrary, the Government appears to be rushing this matter through the authorization process at an almost unprecedented speed. In so doing, the Government has not allowed the defendant sufficient time to investigate and present reasons why Attorney General of the United States should not authorize the death penalty, but should instead direct the United States Attorney to accept the defendant's already-submitted offer to plead guilty as charged to all charges in the indictment in exchange for multiple sentences of life imprisonment without possibility of release. Although learned counsel was not appointed until September 27, 2017, the Government required the attorneys for the defendant to submit any

---

[1] Counsel for Mr. Council has notified the Government of opposition to this deadline and the proposed scheduling order prepared by the Government

information pertinent to the authorization of the death penalty by October 31, 2017. The Government sought this information to include in the Government's initial submission to the DOJ Capital Unit. The Government has now scheduled a January 8, 2018 meeting before the Attorney General's Capital Case Review Committee at the Department of Justice headquarters in Washington.   The attorneys for Mr. Council intend to request a reasonable delay of this meeting so as to ensure compliance with DOJ's own regulations requiring that the defense be afforded "a reasonable opportunity to present information . . . which may bear on the decision whether to seek the death penalty."  US Attorneys' Manual 9-10.080.

In requesting that the Government slow the rushed process by which the death penalty is being considered, the defense is not asking for anything unusual. The average time between indictment and the defense 'mitigation" presentation to the Capital Case Review Committee is 12.7 months. *Declaration of Kevin McNally Regarding Preparation Time Before Meeting with the Attorney General's Capital Case Review Committee at 3* (June 6, 2017).  The meeting scheduled by the Government in January, 2018 is not consistent with that of other cases and severely limits Mr. Council's attorneys from having any meaningful input into the authorization process.

The Government has proposed a **deadline** of April 30, 2018, for the Government's decision to seek the death penalty. This deadline is supposedly based on the *United States v. Dylann Roof* case. Yet no deadline was set by the presiding judge in the Roof case, presumably so as not to short-circuit or rush the Government's deliberative process on so grave a matter as whether the death penalty should be sought. Indeed, the proposed deadline in this case is much quicker than the actual decision in *Roof*. In *Roof*, the defendant was arrested on June 18, 2015, and, according to the Government's proposal, the Notice of Intent to seek the death penalty was filed on May 24, 2016, more than 11 months later. Here, the Government seeks to shorten the process to eight (8)

months. Of course, the Government is free to render its decision when it chooses to do so.  But there is no reason for the Court to set an early deadline, and reasons (as set forth above) why it should not.

Moreover, even without a court-imposed deadline, the speed in which the *Roof* case advanced was unusual.  From 2004 until August 12, 2014, the average time between indictment and the filing of a Notice of Intent to Seek the Death Penalty in all federal capital cases throughout the country was 16.1 months.  *Declaration of Kevin McNally Regarding Pre-Trial Preparation Time at 3*. (August 12, 2014)   The deadline proposed by the Government here would tend to change the authorization process from one in which the defense is to have meaningful input into one in which the defendant is largely excluded.

Second, the Government has proposed a full trial scheduling order, apparently on the assumption that the Attorney General will, in fact, authorize the death penalty and reject the defendant's offer to plead guilty as charged for a life-without-release sentence. The Government's proposal is unusual if not unprecedented and is, to put it mildly, premature.  There is a reason why no other federal district court has, to our knowledge, established such a detailed motions and trial schedule long in advance of the Attorney General's decision to seek or waive the death penalty. The defense is not far enough into its investigation into the facts of the case, its research into the legal issues involved at this stage of the case, or its investigation into the facts and circumstances relevant to a possible capital sentencing hearing, to hazard a guess at a reasonable scheduling order. The trial schedule proposed by the Government would severely and needlessly limit Mr. Council's lawyers in their efforts to provide Mr. Council with the adequate legal representation mandated by the Sixth Amendment to the Constitution of the United States. See *Strickland v. Washington*, 467

US 1267 (1984), AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003).

On its merits, the Government's proposal to begin trial less than seven months after filing its notice of intent to seek the death penalty is unreasonable. Between 2004 and 2014, for example, the average time that elapsed between the death notice and trial was 20.4 months -- nearly *three times* as long as the government proposes here. *Declaration of Kevin McNally Regarding Pre-Trial Preparation Time at 3*. (August 12, 2014).

Moreover, the Government's proposed scheduling order appears to assume rulings that most other federal courts have declined to make--such as, for example, that Mr. Council will be required to disclose proposed mitigating factors and witnesses prior to trial, despite the absence of any statute or rule requiring such disclosure. These issues are subject to litigation if the Government seeks such information, and should not be resolved in a scheduling order.

Finally, a word should be said about the Government's apparent desire to use the *Roof* case as the template for scheduling this one. *Roof* was litigated and tried on an extremely compressed time schedule *at the request of the defense,* for reasons having no relevance to this case. The Government is well aware of the unique considerations driving the motions and trial schedule in *Roof*, and its suggestion that this Court should copy the rushed (and, as it turned out, almost impossible) *Roof* deadlines is not well taken.

The large majority of federal death-eligible cases do *not* lead to a decision by the Attorney General to seek the death penalty. The mechanism for this selectivity is a highly-structured review process, detailed in USAM 9-10.000 *et seq.,* which provides the defense with a reasonable opportunity to present all the reasons why death should not be sought. If the court sets an early deadline now for the completion of the Attorney General's decision-making process, the effect

will be to curtail the defense's ability to participate meaningfully in the authorization process. Similarly, Mr. Council's opposition to a proposed scheduling order at this very early stage of the case reflects an understanding that death penalty cases are very complex with a number of moving parts, the number and contours of which are not knowable only three months after the offense was committed and two months after the appointment of learned counsel.

The undersigned have worked hard to discharge their responsibilities in this case. But the short amount of time that has elapsed from offense to this pre-trial conference necessarily means that counsel has only been able to scratch the surface in the investigation of factual and legal issues. Counsel, therefore, opposes any scheduling order at this time. The constitutional requirement of effective assistance of counsel requires such opposition. Counsel intends to diligently pursue effective representation for Mr. Council in the Department of Justice's authorization process, and, at the same time, pursue investigations and legal remedies as required by the Constitution of the United States. Mr. Council's defense team does not intend to oppose scheduling orders solely for the purpose of delay. It simply is too early in this case to make any scheduling order.

Respectfully submitted,

/s/ WILLIAM F. NETTLES, IV
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Room 105
Florence, SC 29501
Telephone: (843) 662-1510
**Attorney ID#: 5935**

/s/ MICHAEL A. MEETZE,
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Room 105
Florence, SC 29501
Telephone: (843) 662-1510
**Attorney ID#: 6662**

/s/ **D**UANE **K B**RYANT
*PRO HAC VICE*
1207 Brentwood Street
High Point, NC 27260
Telephone: (336)887-4804

/s/ **A**KIN **A**DEPOJU,
*PRO HAC VICE*
Office of the Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Telephone: (302) 573-6010

Florence, South Carolina

December 4, 2017

**DECLARATION OF KEVIN McNALLY**
**REGARDING PREPARATION TIME BEFORE MEETING WITH THE**
**ATTORNEY GENERAL'S CAPITAL CASE REVIEW COMMITTEE**

1.  I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/file/originalspencerreportpdf. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, orders and opinions by the District Court and by telephonic or in-person interviews with defense counsel or consultation with chambers. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource Counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990.  This collection of data includes the intervals of time between various pre-trial milestones.  Considerable preparation time has been routinely granted between the

---

An update to the Report stated: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx

2

indictment and/or the appointment of counsel and the meeting held at Main Justice with the Attorney General's Capital Case Review Committee.  We have collected information as to 234 defendants who were authorized for a federal capital prosecution.  The average time between indictment and the defense "mitigation" presentation at the Department of Justice was 12.7 months.[2]

5. Pursuant to my responsibilities as the Director of the Federal Death Penalty Resource Counsel Project, I have compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

---

[2]Eight of these 234 were cases in which the Department of Justice meeting occurred before indictment: *United States v. Carlos David Caro* (W.D. VA No. 06-CR-00001); *United States v. Demario James Atwater* (M.D. NC No. 1:08-CR-00384); *United States v. Michael O'Driscoll* (M.D. PA No. 4-CR-01-277); *United States v. Gary Watland* (D. CO No. 1:11-CR-00038); *United States v. John Millner* (E.D. KY No. 7:09-MJ-25-EBA); *United States v. Samuel Stone* (C.D. CA No. 1:12-CR-00072-AWI-DLB); *United States v. Patrick Andrews* (N.D. WV No. 1:12-CR-00100-IMK-JSK) and *United States v. Andrew Rogers* (S.D. IN No. 2:16-CR-00018-WTL-CMM). An additional defendant was involved in the Pan Am flight terrorist murders in 1986. Although the defendant was indicted in 1991, he was not arrested until 2002. *United States v. Zayd Hassan Abd Latif Safarini* (D. DC No. 91-CR-504).  These cases are not included in this analysis.

3

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct.  Executed this 6th day of June, 2017.

_/s/ Kevin McNally_____
Kevin McNally

4

## DECLARATION OF KEVIN McNALLY
## REGARDING PRE-TRIAL PREPARATION TIME

1.  I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.  An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990.  This collection of data includes the intervals of time between various pretrial milestones and trial.  The federal courts have, with  few exceptions, permitted considerable time between the indictment and mitigation submission and between

---

consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx

2

the government's notice of intent to seek the death penalty and the commencement of trial.

5.  The average time between indictment and the trial date in federal capital cases is approximately 28.1 months.  The average time between indictment and the notice of intent to seek the death penalty is 13.2 months.  The average time between the notice of intent to seek the death penalty and the trial date is approximately 16.4 months.[2]

6.  Pursuant to declarant's responsibilities as Federal Death Penalty Resource Counsel, declarant has compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct.  Executed this 9th day of August, 2017.

/s/ Kevin McNally
Kevin McNally

_____

[2]The Project has obtained the date for 503 indictments, 491 notices of intent to seek the death penalty and the date or scheduled date for 452 trials. These dates are in the attached report. This accounts for the apparent disparity in the figures above.

3

## DECLARATION OF KEVIN McNALLY
## REGARDING PRE-TRIAL PREPARATION TIME

1.  I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.  A recent update to the Report stated: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, orders and opinions by the District Court and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990.  This collection of data includes the intervals of time between various pretrial milestones and trial.  The federal courts have, with  few exceptions, permitted considerable time between the indictment and mitigation submission and between

---

consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx

2

the government's notice of intent to seek the death penalty and the commencement of trial.

5. The average time between indictment and the trial date in federal capital cases, from 2004 forward, which actually began trial, is approximately 36.5 months. The average time between indictment and the notice of intent to seek the death penalty is 16.1 months. The average time between the notice of intent to seek the death penalty and the trial date is approximately 20.4 months.[2]

6. The median for the time between indictment and the trial date in federal capital cases, from 2004 forward is 32.6 months. The median for the time between the indictment and the notice of intent is 12.5 months. The median for the time between the notice of intent to seek the death penalty and the trial date is 15.2 months.

7. Pursuant to declarant's responsibilities as Federal Death Penalty Resource Counsel, declarant has compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

---

[2]There are three defendants included in this total that had two trials since 2004. These figures include only the first trial for Donnell Young, Ronell Wilson and George Lecco.

3

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct.  Executed this 12th day of August, 2014.

/s/ Kevin McNally
Kevin McNally

4

Page 1 of 2

 Proposed E-mail to Harwel

Rowell, JD (USASC)
to:
harwell_ecf@scd.uscourts.gov
11/30/2017 01:52 PM
Cc:
"D. Bryant", Bill Nettles, "Michael_Meetze@fd.org", "Richardson, Jay N. (USASC)",
"Whaley, Clarissa (USASC)"
Hide Details
From: "Rowell, JD (USASC)" <JD.Rowell@usdoj.gov> Sort List...
To: "harwell_ecf@scd.uscourts.gov" <harwell_ecf@scd.uscourts.gov>
Cc: "D. Bryant" <duanekbryantlaw@gmail.com>, Bill Nettles <Bill_Nettles@fd.org>,
"Michael_Meetze@fd.org" <Michael_Meetze@fd.org>, "Richardson, Jay N. (USASC)"
<Jay.N.Richardson@usdoj.gov>, "Whaley, Clarissa (USASC)"
<Clarissa.Whaley@usdoj.gov>

5 Attachments



226 Interim Order re 12.2 Procedures.pdf  276 Joint Motion re Disclosure Schedule for Mitigating Factors.pdf

 

226 Interim Order re 12.2 Procedures.pdf  223 Order re Expert and Witness Disclosures.pdf  Proposed Scheduling Order.docx

Judge Harwell

In response to your text order concerning scheduling in the *Council* matter, please find the attached proposed interim scheduling order.  Also attached, please find several orders issued in the *Roof* case, on which this proposed order is largely based.
They are similar as follows:

| | | |
|---|---|---|
| Preliminary scheduling order issued: | Roof-7/7/2016 | Council-12/2017 |
| *Notice of Intent to Seek (Filed/Deadline): | Roof-5/24/2016 | Council-4/13/2018 |
| Joint proposal deadline for jury selection procedures: | Roof-6/24/2016 | Council-1/30/2018 |
| Rule 12.2  procedures joint proposals: | Roof-6/24/2016 | Council-1/20/2018 |
| Deadline for Defense notice of R 12.2: | Roof-7/11/2016 | Council-7/11/2018 |
| Deadline for *Atkins* claim: | Roof-6/27/2016 | Council-7/21/2018 |
| Venue/Indictment/Dispositive: | Roof-7/1/2016 | Council-6/1/2018 |
| Motions to Suppress: | Roof-7/18/2016 | Council-6/15/2018 |
| Non-Mental Health Expert Summaries: | Roof-7/22/2016 | Council-7/28/2018 |
| Responsive Summaries: | Roof-8/15/2016 | Council-8/21/2018 |
| Expert Challenges: | Roof-9/6/2016 | Council-9/5/2018 |
| Mitigating Factor Notice: | Roof-8/22/2016 | Council-8/25/2018 |
| Jury Charges: | Roof-9/1/2016 | Council-10/1/2018 |
| Govt Witness/Exhibit List: | Roof-10/10/2016 | Council-10/5/2018 |
| Defense Witness/Exhibit List: | Roof-10/17/2016 | Council-10/15/2018 |
| Motions in Limine: | Roof-9/1/2016 | Council-10/25/2018 |
| Jury Selection Start Date: | Roof-11/7/2016 | Council-11/5/2018 |

*Notice was filed before scheduling orders issued in Roof.

Given the relative factual differences in the two cases, we believe this schedule is fair and reasonable. In addition to the attached proposed order, I am also attaching the following Roof orders which address most of the above.

ECF 179: Order
ECF 180: Order
ECF 223: Order
ECF 226: Order
ECF 281: Text Order (adopting ECF 276).

We look forward to discussing these matters on Monday. Please let me know if you have any questions or concerns!

Sincerely,

JD

JD Rowell
Assistant United States Attorney
Deputy Chief-Violent Crimes Section
USAO-District of South Carolina
1441 Main Street, Suite 500
Columbia, South Carolina 29201
803-929-3000
jd.rowell@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH |
| v. | |
| **BRANDON MICHAEL COUNCIL** | **PROPOSED SCHEDULING ORDER** |

The Court hereby sets the following schedule in the above-captioned matter:

1.  The deadline[1] for the Department of Justice to provide notice of its intent to seek the death penalty is **April 13, 2017.**

2.  The parties are directed to confer on the matter of jury selection procedures and to submit to the Court on or before **January 20, 2018,** a joint proposal regarding any areas of common agreement and separates proposals regarding any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **February 5, 2018.**

---

[1] Each deadline may be extended by the Court for good cause.

3.  The parties are directed to confer on the matter of Rule 12.2 procedures and to submit to the Court on or before **January 20, 2018**, a joint proposal regarding any areas of common agreement and separate proposals for any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **February 5, 2018**. The deadline for any defense notice of intent to offer evidence required under Fed. R. Crim. P. 12.2 is **July 11, 2018**.

4.  The deadline for the defendant to raise issues of competency or claims under *Atkins v. Virginia*, 536 U.S. 304 (2002) is **July 21, 2018**.

5.  The deadline for filing any motions addressing venue challenging the indictment, or raising any dispositive issues is **June 1, 2018**. The Government may respond by **June 29, 2018**.

6.  The deadline for motions to suppress is **June 15, 2018**. The Government may respond by **July 16, 2018**.

7.  The parties are directed on or before **July 28, 2018**, to make disclosure of guilt and sentencing phase non-mental health expert summaries required

by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Crim. P. 16(a)(1)(C). Parties are directed to file on or before **August 21, 2018**, any summaries for experts identified in response to the opposing party's **July 28** summaries. Any challenge to the testimony of such experts must be filed on or before **September 5, 2018**, with responses due on **September 30, 2018**.

8.  Any motion challenging the death penalty and the Government's notice of intent (if any) shall be filed on or before **June 30, 2018**. The Government may respond by **July 30, 2018**.

9.  The defendant will provide notice of mitigating factors not related to Rule 12.2 mental health evidence not later than **August 25, 2018**. Notice of additional non-mental-health-related mitigating factors that were not known to the defense by **August 25** will be provided promptly when defense counsel have sufficient information to supplement the notice. The defense will provide notice of mitigating factors related to the defendant's mental health or condition being offered under the

3

Rule 12.2 procedures at the same time that it discloses mental-health-related evidence pursuant to Rule 12.2(c)(3).

10. The parties are directed to confer on the matter of jury instructions for all phases of the trial and to submit on or before **October 1, 2018**, a joint proposal regarding any areas of common agreement and separates proposals regarding any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **October 15, 2018**.

11. The Government shall produce its witness and exhibit list on or before **October 5, 2018**. The defendant shall produce his witness and exhibit list on or before **October 15, 2018**.

12. Any motions in limine shall be filed on or before **October 25, 2018**.

13. The Court will begin jury selection, with trial to follow, on or about **November 5, 2018**.

4

IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| -vs- | ) | **JOINT MOTION FOR A CONTINUANCE** |
| | ) | |
| | ) | |
| **BRANDON MICHAEL COUNSEL** | ) | |

PLEASE TAKE NOTICE that counsel for the defendant, **BRANDON MICHAEL COUNSEL,** with the consent of the United States of America, hereby moves this court for a continuance beyond the term of court beginning January 8, 2017, based on the following reasons:

## SPECIFIC FACTS RELEVANT TO THIS MOTION

Mr. Counsel is charged with several offenses for which the possible punishments are life imprisonment without the possibility of parole or death. The indictment charging Mr. Counsel includes also statutory aggravating circumstances, which, if found by the jury, could make Mr. Council eligible for the death penalty.

In this case, according to the indictment, the offense occurred on August 21, 2017. The indictment in this case was true billed by the Grand Jury on September 20, 2017. "Learned Counsel," was appointed pursuant to 18 U.S.C. §3005 on September 27, 2017. Mr. Council was arraigned on October 3, 2017. The Department of Justice is in the process of determining if it will authorize the death penalty in this case. Attorneys for Mr. Council are investigating the facts and circumstances of the case. In cases where capital eligible offenses are charged, such as this, it is common for courts to grant continuances so that the parties may discharge their respective obligations.

Since this case involves the possible application of the death penalty pursuant to 18 U.S.C.

§3591 *et seq,* this case should be continued under the provisions of 18 U.S.C. §§3161(h)(7)(A) and (B). In this case, due to the nature of the prosecution, or the existence of novel questions of fact or law, it is unreasonable to expect adequate preparation for pretrial or trial itself within the time limits set by the Speedy Trial Act, 18 U.S.C. §3161 *et seq.*

### ATTORNEY CERTIFICATION AND WAIVER OF SPEEDY TRIAL RIGHTS

I, William F. Nettles, IV, attorney for Mr. Council, hereby certify that I have met with Mr. Council to discuss the contents of this motion and Mr. Council's rights under the Speedy Trial Act. Based on this meeting, I further certify that Mr. Council is aware of his rights pursuant to the Speedy Trial Act, and he understands those rights.  Mr. Council wishes to waive those rights for the reasons stated above so that his case may be continued beyond the current term of court. This waiver is made freely and voluntarily without threats, promises, or other means of coercion or inducement, as evidenced by the attached waiver executed by Mr. Council.

### CONCLUSION

For the foregoing reasons, and pursuant to *Zedner v. United States*, 126 S.Ct. 1976 (2006), and 18 U.S.C. §3161(h)(7)(B)(ii) and (iv), counsel for the Defendant believes that the ends of justice would be served by the Court granting a continuance in this matter beyond the current term of court.

Respectfully Submitted,

/s/ **WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
**Attorney ID#: 5935**

Florence, South Carolina

January 8, 2017

I CONSENT:

s/ John David Rowell
**JOHN DAVID ROWELL**
ASSISTANT U.S. ATTORNEY

## WAIVER OF SPEEDY TRIAL RIGHTS

I am aware of my rights under the Speedy Trial Act. I would like to waive those rights and have my case continued beyond the next term of court. No one has forced, threatened, or coerced me to waive my rights. No one has promised me anything. My waiver is given freely and voluntarily. I have discussed this waiver with my attorney.

*Brandon M Council  1-2-18*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:17-cr-00866-RBH-1 |
| | ) | |
| vs. | ) | **ORDER OF CONTINUANCE** |
| | ) | |
| | ) | |
| Brandon Michael Council | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On January 5, 2018, the parties filed a joint motion for continuance that included a Speedy

Trial Waiver signed by the Defendant.  The Speedy Trial Waiver indicated that Defendant waived

his rights under the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

Based on the representations made by the parties and the file, the Court finds, pursuant to 18

U.S.C. § 3161(h)(7)(A), that the ends of justice served by the granting of a continuance outweigh

the best interests of the public and the defendant in a speedy trial.  In reaching this conclusion, the

Court has considered the following factor(s) under 18 U.S.C. § 3161(h)(7)(B):

☐ **(i)** The failure to grant a continuance in the proceeding would be likely to make a
continuation of the proceeding impossible, or result in a miscarriage of justice.

**(ii)** The case is so unusual or so complex due to

☐ the number of defendants,

■ the nature of the prosecution, or

■ the existence of novel questions of fact or law,

that it is unreasonable to expect adequate preparation for pretrial proceedings or for
the trial itself within the time limits established by this section.

**(iii)** In a case in which arrest precedes indictment, delay in the filing of the indictment is caused

☐  because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or

☐  because the facts upon which the grand jury must base its determination are unusual or complex.

**(iv)** The failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), but

☐  would deny the defendant reasonable time to obtain counsel,

☐  would unreasonably deny the defendant or the Government continuity of counsel, or

☐  would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

■  **(v)** Other (Specify: Would deny both counsel reasonable time for effective preparation in a potential capital case).

For all the foregoing reasons, the motion for a continuance is **GRANTED**. It is hereby

**ORDERED** that this case shall be continued until the Court's next scheduled term, and that all such

period of delay is hereby excluded in computing the time within which trial must begin pursuant to

the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

**IT IS SO ORDERED.**

January 8, 2018                                    s/ R. Bryan Harwell
Florence, South Carolina                          R. Bryan Harwell
                                                  United States District Judge

2

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
                         FLORENCE DIVISION


UNITED STATES OF AMERICA,        }  4:17-CR-00866-RBH
                                 }
            VERSUS               }  DECEMBER 4, 2017
                                 }
BRANDON MICHAEL COUNCIL          }  FLORENCE, SC
- - - - - - - - - - - - - - - -  }



              BEFORE THE HONORABLE R. BRYAN HARWELL
                  UNITED STATES DISTRICT JUDGE


                  TRANSCRIPT OF PROCEEDINGS
                     PRETRIAL CONFERENCE



        A P P E A R A N C E S:

FOR THE GOVERNMENT:  JOHN DAVID ROWELL, AUSA
                     JULIUS NESS RICHARDSON, AUSA
                     U.S. ATTORNEYS' OFFICE
                     1441 MAIN STREET
                     COLUMBIA, SC 29201


FOR THE DEFENDANT:   DUANE K. BRYANT, ESQUIRE
                     1207 BRENTWOOD STREET
                     HIGH POINT, NC 27260

                     WILLIAM F. NETTLES, IV, AFPD
                     MICHAEL ALLEN MEETZE, AFPD
                     FEDERAL PUBLIC DEFENDER'S OFFICE
                     401 WEST EVANS STREET, SUITE 105
                     MCMILLAN FEDERAL BUILDING
                     FLORENCE,SC  29503


             (STENOTYPE/COMPUTER-AIDED TRANSCRIPTION)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                   BETH A. KRUPA, RPR, CRR
                 UNITED STATES COURT REPORTER
                    401 WEST EVANS STREET
                    FLORENCE, SC  29501
```

2

1          THE COURT:  Thank you.  Be seated.  Give me just a

2     second.  All right.  If you'll call the case, please.

3          ATTORNEY ROWELL:  Good afternoon, Judge Harwell.

4     We're here in the case of United States of America versus

5     Brandon Michael Council.  It's Criminal No. 4:17-866.  Your

6     Honor, the defendant is present with his attorneys.  Judge,

7     at your request we are here prepared to discuss

8     preliminarily scheduling in this matter.

9          This is the second time that this case has come up

10    for pretrial.  The first pretrial was continued on motion of

11    the parties.  This is the first real opportunity for us to

12    get in front of Your Honor and start talking about the

13    scheduling in this case.

14         We did submit to Your Honor, the government did,

15    an email and a letter with a proposed schedule to sort of

16    get the ball rolling and we're happy to talk about that and

17    the government is ready to go forward with this pretrial

18    hearing and try to discuss some of these matters.

19         THE COURT:  All right.  Thank you.  And let me

20    address defense counsel as well.  Mr. Bryant, good

21    afternoon.

22         ATTORNEY BRYANT:  Good afternoon, Your Honor.

23         THE COURT:  Mr. Bryant, I believe this is the

24    first opportunity I've had to speak with you.  Good to have

25    you here.

1        ATTORNEY BRYANT:  Thank you, Your Honor.

2        THE COURT:  First of all, let's go ahead and get

3    the formalities out of the way anyway.  With regard to

4    continuance, everyone wants a continuance and your client

5    understands his speedy trial rights and is waiving those; is

6    that correct?

7        ATTORNEY BRYANT:  That's correct, and he's done so

8    before, Your Honor.

9        THE COURT:  All right.  Let me just ask the

10   defendant.

11       ATTORNEY BRYANT:  Stand up if you would.

12       THE COURT:  Mr. Brandon Council, Mr. Council, you

13   understand and are waiving your rights under the Speedy

14   Trial Act freely and voluntarily; is that right?

15       THE DEFENDANT:  Yes, sir.

16       THE COURT:  And you want me to continue the case,

17   correct?

18       THE DEFENDANT:  Yes, sir.

19       THE COURT:  All right.  And the government

20   obviously wants me to as well.  I did issue this text order.

21   I felt like it was appropriate for us to get together and

22   have a status conference regarding the case.

23       First of all, is there any objection to the Court

24   filing the email I believe that Mr. Rowell sent to me?  I

25   think that probably needs to be part of the record.  Any

4

1    objection with that?

2            ATTORNEY ROWELL:  None from the government, Your

3    Honor.

4            ATTORNEY BRYANT:  I think it ought to be a part of

5    the record, Your Honor.

6            THE COURT:  I think it should be too.  Okay.

7    Let's chat a minute about a general timetable.  I felt like

8    it might be helpful to at least discuss whether or not the

9    parties would entertain a general flexible timetable.

10           I've gotten the defense counsel's response that

11   was filed today which is self-explanatory.  As I understand

12   it, Mr. Bryant, the defense objects to any sort of

13   court-imposed deadline with regard to the notice of intent;

14   is that correct?

15           ATTORNEY BRYANT:  That's correct, Your Honor, and

16   I think we've outlined our reasons in there.  If the Court

17   would like to hear further, I'm prepared to discuss that

18   further with the Court, but I think we did a fairly good job

19   of outlining our situation there.

20           THE COURT:  Well, I'll be glad to hear from you

21   anyway with regard to it.

22           ATTORNEY BRYANT:  Well, just to be brief, Your

23   Honor, and, again, we have expressed in that memo or in that

24   filing with you our concerns about the pace of this case.

25   We feel and we've expressed and I guess as boldly as we

5

1    could that the pace of this case is moving along at a rate

2    that does not give us the opportunity to effectively

3    represent Mr. Council.

4           There are a number of things that must be done.  I

5    think the Court understands that I was only appointed or

6    assigned this case the latter part of September.  If my

7    recollection is correct we had an arraignment the second day

8    of October and we found ourselves having to ask for a

9    continuance at the first scheduled session of a scheduling

10    order.

11           We now find ourselves meeting a deadline, the

12    latter part or the early part of January, 8 January 2018

13    with the committee.  And so what we've said and what we are

14    continuing to say is that in every ruling, in every

15    protocol, in every statement, every judiciary policy, we

16    find the term reasonableness and a certain amount of time, a

17    reasonable amount of time in order to prepare this case is

18    needed and called for.

19           I believe further, as we look at this thing, the

20    pace at which we're proceeding, I think it's unprecedented.

21    I don't know of any other case, I can find no other case in

22    this jurisdiction and then I would say maybe throughout the

23    United States where the case and the timelines imposed upon

24    defense counsel have ever been had in a case like this.

25           So that's it in a nutshell.  We just simply

6

1    haven't had enough time to effectively do anything except

2    work diligently towards representing this young man.

3    THE COURT:  All right.  Well, let me tell you I

4    recognize the seriousness of the case and I recognize your

5    obligations with regard to representing Mr. Council and I've

6    got four attorneys representing Mr. Council and I'm going to

7    make sure that you have sufficient time to afford him

8    competent representation.

9    Let me hear from the government with regard to the

10   position with regard to a deadline on the notice of intent.

11   Let me hear from you, please, sir.  I've got your proposed

12   schedule, which I think you used the Roof case as a

13   template, so to speak, but let me hear from you.

14   ATTORNEY ROWELL:  Thank you, Your Honor.

15   J.D. Rowell for the government and, you know, Judge, when

16   you issued your text order, we looked at it and we certainly

17   recognize that you got to start somewhere.  We have to sort

18   of pick a date and certain dates flow from whatever dates we

19   pick.

20   And we started with the obvious date, a date when

21   the department is -- the Court would ask the department to

22   reach a decision on the penalty in this case, that date that

23   we currently have, April 13, 2017, is roughly four months

24   from today.

25   And, Judge, you know, we looked at that date.  We

1   also looked at the rights of crime victims statute, 18 USC

2   3771 that certainly guides us and says that the victims in

3   cases are entitled to proceedings free from unreasonable

4   delay.

5          And we looked at this case, the nature of this

6   case, and we did, in truth, compare it to the Roof case

7   which is the most recent case tried in this district and we

8   laid out some dates that we thought were very reasonable.

9          We've had -- we've been in communication with the

10  defense from the day that they were appointed.  We have

11  tried to give them meaningful opportunities to provide input

12  and at times they have asked for extensions, but they really

13  haven't told us why.  They just told us that they needed

14  more time.

15         And so for the victims' sake and for the

16  government's sake, we're trying to move this case along at

17  what we think is a very reasonable pace.  And we have -- we

18  have, like I said, compared it to the Roof case and I would

19  submit that the schedule we have laid out is not as

20  aggressive as it might first seem.

21         If you look, Judge, the vast majority of the

22  deadlines prior to the April 13th deadline deal with

23  procedure, and they ask the parties to get together and talk

24  about things like how the jury will be selected and some

25  other matters and to come up with as much agreement as we

8

1    can before we reach that deadline on the decision.

2         And then after that April date, that's really when

3    sort of the rubber meets the road and things start flowing.

4    And as the Court knows, you have the authority to move these

5    dates and to be flexible, but we --

6         THE COURT:  I think that's what I indicated in my

7    text order, that I would try to be flexible.

8         ATTORNEY ROWELL:  Yes.  And so I think what you're

9    left with is you've got a proposal from us that we would

10   submit is very reasonable, that is similar to, in many

11   respects, a case that was tried in this district and then

12   you've got a response from the defense that says that we

13   want no schedule.

14        So we're trying to -- we're trying to move the

15   ball down the field in a way that we think makes sense and

16   avoid unreasonable delay and that's why we submitted the

17   schedule that we did.

18        I'm happy to answer any sort of specific questions

19   that you might have, but to your general question as to how

20   do we -- how do we pick the date by which we need to make a

21   decision on punishment, we picked that date, quite frankly,

22   based on the date that this incident occurred in late August

23   of 2017, and given other factors that we looked at, internal

24   factors, we thought that was a reasonable time by which the

25   department should be able to make a decision and all other

9

1    dates in this schedule sort of flow from that.

2            THE COURT:  They could make a decision before

3    then.

4            ATTORNEY ROWELL:  They could, yes, sir.

5            THE COURT:  I mean that's -- that's internally

6    with the DOJ.

7            ATTORNEY ROWELL:  That is correct, yes, sir.

8            THE COURT:  Let me ask you this:  In most of the

9    cases and I don't believe in the Roof case, was there a

10   court-imposed flexible deadline?  I don't think there was

11   for the notice of intent.

12           ATTORNEY ROWELL:  No, sir, there was not.

13           THE COURT:  In most cases, in most cases is there

14   a court-imposed deadline with regard to the DOJ capital case

15   review decision on the notice?

16           ATTORNEY ROWELL:  I don't believe so, Your Honor.

17   I'm not -- to be candid, I'm not sure.

18           THE COURT:  Well, that's what I want you to be is

19   candid with me.

20           ATTORNEY ROWELL:  I am not sure.

21           THE COURT:  It's probably the exception to the

22   rule, but in some cases, you may have a defendant or a

23   defense that wants a deadline.

24           ATTORNEY ROWELL:  Yes, sir, that's correct.

25           THE COURT:  But they've clearly indicated that

10

1    they don't want a deadline in this case.

2            ATTORNEY ROWELL:  I think that deadline is most

3    helpful because, obviously, once that decision is made,

4    that's, you know, we know sort of which of the two

5    directions we're going and so that just seems to be sort of

6    a whatever metaphor you want to use, that's sort of the date

7    around which all other deadlines will flow.

8            THE COURT:  I read in the defense's response to my

9    text order that there was a declaration by Kevin McNally who

10   is the director of the federal death penalty resource

11   council project and he indicated that the average time

12   between indictment and filing of the notice of intent to

13   seek the death penalty in federal capital cases was about

14   16 months, that's from -- the average time was from -- well,

15   he's comparing the years of 2004 until 2014.  Do you know if

16   that's still about the average time or for the last two or

17   three years?  Do you have any idea on that?

18           ATTORNEY RICHARDSON:  What I can tell you is I

19   think that the Roof case took less than a year and that did

20   not seem like it was quick, but I don't have a ton of

21   background on that, Your Honor.

22           What I can tell you is that the Roof case was a

23   drawn out process and that was less than a year from

24   indictment, I believe, it was about ten months, but I -- I

25   can't tell you outside of South Carolina.  I think the

11

1  challenge, the statistics is that they're fact specific.

2          I think what you look at are cases like Roof that

3  was similar in nature.  You had an incident.  You had a

4  relatively quick indictment that followed that and you had a

5  team of lawyers, you know, appointed, very good lawyers to

6  represent him that are able to do that kind of work.

7          ATTORNEY BRYANT:  If I may.

8          THE COURT:  Yes, sir.

9          ATTORNEY BRYANT:  Again, with all due respect

10  here, the Roof case, as I understand it, was almost a legal

11  anomaly.  The defense in that case were faced with having to

12  try that case before the state of North Carolina -- excuse

13  me, South Carolina -- I'm still thinking North Carolina --

14  South Carolina went forward.

15          In fact, the defense in that case asked for and

16  were granted permission to try that case, I think, in

17  November of that year, and I think the state was going to

18  try him in December.

19          There's no other pattern, a template that I know

20  that speaks of a case of this nature or any other nature in

21  this jurisdiction or throughout the United States that

22  outlines this pace or this pattern.

23          And even if as suggested this is reasonable

24  somehow, it would even be quicker than Roof as outlined in

25  the memorandum that you have there in front of you.  The

12

1   discussion, as I see it, Judge, is what do we do prior to

2   preauthorization?

3          Now, we're making some assumptions that it is

4   going to be an authorization for death.  At no time do we

5   intend to take our foot off the pedal.  We're working and

6   we'll continue to work.  We'll work diligently.

7          The timelines imposed by the template of Roof I

8   submit to you are not applicable for this case or any other

9   case to be tried for -- in the nature that we have here.

10   Now, what I do suggest --

11          THE COURT:  Well, I think you do have to look at

12   them on an individual basis every time.

13          ATTORNEY BRYANT:  Yes, sir, yes, sir.  What I

14   would suggest is this:  And it's fairly simple for us to

15   address this as we move along.  We could schedule status

16   conferences if we have to on a monthly or bi-monthly basis.

17          The Court could ask us to submit a discussion as

18   to where we are, if we're anywhere, but it seems so out of

19   position, so -- what is the word I'm looking for -- so

20   unusual to be having this conversation prior to a

21   preauthorization for death.

22          If they decide otherwise, I submit to you that

23   there may not be any need for anything further.  If it comes

24   back nondeath, but until that authorization happens and I'm

25   sure everyone in this room knows that there are some other

13

1  folks who are driving the train, there's a committee in

2  Washington and, in fact, there are actually two such

3  committees that are reviewing this, and when it happens and

4  if it happens, then I think this would then be a proper time

5  to have these discussions.

6        And, we're not going to be sitting around waiting

7  on whether or not the authorization happens.  We've already

8  been busy.  We've been very busy in trying to diligently

9  represent this young man.  If you have questions of me, I

10  will try to answer those questions, Your Honor.

11       THE COURT:  No, sir.  Anything else,

12  Mr. Richardson or Mr. Rowell?

13       ATTORNEY ROWELL:  No, sir, thank you.

14       THE COURT:  All right.  I'm not going to impose a

15  court-ordered deadline on the decision by the DOJ.  I think

16  that would be the exception to the rule or, so to speak, and

17  I think prosecutors have confirmed that with me that in most

18  cases there is not a court-imposed deadline.

19       There wasn't one in the Roof case and in most of

20  the cases there is not a court-imposed deadline.  And if in

21  the event a notice is filed, at that time and I think

22  defense counsel would agree with this that certainly at that

23  time we would need to promptly address in the event notice

24  is filed, we would need to promptly address a general

25  timetable or general schedule that would be flexible to some

14

1    extent.

2            Is that a fair assessment, Mr. Bryant and

3    Mr. Nettles?

4            ATTORNEY BRYANT:  I think so, Your Honor.  Would

5    you agree, Mike?

6            ATTORNEY MEETZE:  Yes.

7            ATTORNEY BRYANT:  Bill?

8            ATTORNEY NETTLES:  Yes.

9            THE COURT:  Mr. Nettles, I would ask for each term

10   of court I have that you would submit for the record a

11   written waiver of any speedy trial rights by your client.

12           ATTORNEY NETTLES:  Yes, sir, yes, sir, no problem.

13           THE COURT:  I had also indicated in the text order

14   whether there were any other matters or issues that we

15   needed to take up.  We've discussed generally the item

16   dealing with the court-imposed deadline and, again, with

17   regard to the notice, it's up to the DOJ how slow or how

18   fast they proceed with that capital case review.

19           But I wanted to, since this was our first status

20   conference regarding the case, I wanted to see if there were

21   any other issues that we needed to discuss on the record.

22   One of the matters I put in the text order was any

23   Section 4241 competency issues or evaluation issues?

24           ATTORNEY BRYANT:  Still too early for us, Judge.

25   We're working through that.  We're aware of that and if it

15

 1    develops, we'll notify the other side as well as the Court.

 2              THE COURT:  Okay.  Anything with regard to that,

 3    Mr. Rowell or Mr. Richardson?

 4              ATTORNEY ROWELL:  Not at this time, Your Honor.

 5              THE COURT:  All right.  Well, do you take any

 6    position, does anybody take any position about whether or

 7    not, if there are any issues, whether or not if there's an

 8    evaluation that needs to be done, should it be done in the

 9    event a notice is filed, that it's done after that point if

10    it's an issue?

11              ATTORNEY BRYANT:  Your Honor, and I know you want

12    answers and we're trying to give you the best answers we

13    can.  Obviously, if we raise it, then, of course, 12.2 kicks

14    in and then there's the whole series of things that must

15    transpire.

16              I would, again, ask this Court for its indulgence

17    in allowing us to at least look at it.  We won't dillydally

18    around as it relates to this issue or any other issue and we

19    believe that that is an important issue and we do intend to

20    look at it.

21              THE COURT:  Well, of course, I've got to be

22    satisfied that he's competent to stand trial.

23              ATTORNEY BRYANT:  I understand that.  I truly do.

24              THE COURT:  And I think you have that obligation

25    as well.

16

1          ATTORNEY BRYANT:  Yes, sir.

2          THE COURT:  Yes, sir.

3          ATTORNEY BRYANT:  That is correct.  And, you're

4    correct, Your Honor, that is an issue that, among the other

5    issues, I mean and there are numerous issues that we're

6    currently balancing and among those are some of the ones

7    that we've already discussed here today.  We are -- we

8    understand how important that is and it will be important in

9    this case as well.

10          THE COURT:  All right.  Any other matters we need

11   to take up at this time?

12          ATTORNEY BRYANT:  I don't know of any.

13          THE COURT:  Anything that anybody needs to bring

14   to my attention?

15          ATTORNEY ROWELL:  None from the government, no,

16   sir.

17          ATTORNEY BRYANT:  None from the defense, Your

18   Honor.

19          THE COURT:  Okay.  All right.  We'll stand at

20   ease.  Thank you.

21          (Hearing was concluded at 4:12 p.m.)

22

23

24

25

17

1     \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

2                 CERTIFICATE OF REPORTER

3

4     I certify that the foregoing is a correct transcript of

5 the proceedings taken from my stenographic notes in the

6 above-entitled matter.

7

8 /S/ Beth A. Krupa           January 11, 2018

9 Beth A. Krupa, RPR, CRR     Date
  Official Court Reporter
10 United States District Court
  District of South Carolina

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Beth A. Krupa, RPR, CRR*

JA0131

IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| -vs- | ) | **JOINT MOTION FOR A CONTINUANCE** |
| | ) | |
| | ) | |
| **BRANDON MICHAEL COUNCIL** | ) | |

PLEASE TAKE NOTICE that counsel for the defendant, **BRANDON MICHAEL COUNCIL,** with the consent of the United States of America, hereby moves this court for a continuance beyond the term of court beginning March 29, 2018, based on the following reasons:

### SPECIFIC FACTS RELEVANT TO THIS MOTION

Mr. Council is charged with several offenses for which the possible punishments are life imprisonment without the possibility of parole or death. The indictment charging Mr. Council includes also statutory aggravating circumstances, which, if found by the jury, could make Mr. Council eligible for the death penalty.

In this case, according to the indictment, the offense occurred on August 21, 2017. The indictment in this case was true billed by the Grand Jury on September 20, 2017. "Learned Counsel," was appointed pursuant to 18 U.S.C. §3005 on September 27, 2017. Mr. Council was arraigned on October 3, 2017. The Department of Justice is in the process of determining if it will authorize the death penalty in this case. Attorneys for Mr. Council are investigating the facts and circumstances of the case. In cases where capital eligible offenses are charged, such as this, it is common for courts to grant continuances so that the parties may discharge their respective obligations.

Since this case involves the possible application of the death penalty pursuant to 18 U.S.C.

§3591 *et seq,* this case should be continued under the provisions of 18 U.S.C. §§3161(h)(7)(A)

and (B). In this case, due to the nature of the prosecution, or the existence of novel questions of

fact or law, it is unreasonable to expect adequate preparation for pretrial or trial itself within the

time limits set by the Speedy Trial Act, 18 U.S.C. §3161 *et seq.*

### ATTORNEY CERTIFICATION AND WAIVER OF SPEEDY TRIAL RIGHTS

I, William F. Nettles, IV, attorney for Mr. Council, hereby certify that I have met with Mr.

Council to discuss the contents of this motion and Mr. Council's rights under the Speedy Trial Act.

Based on this meeting, I further certify that Mr. Council is aware of his rights pursuant to the

Speedy Trial Act, and he understands those rights.  Mr. Council wishes to waive those rights for

the reasons stated above so that his case may be continued beyond the current term of court. This

waiver is made freely and voluntarily without threats, promises, or other means of coercion or

inducement, as evidenced by the attached waiver executed by Mr. Council.

### CONCLUSION

For the foregoing reasons, and pursuant to *Zedner v. United States*, 126 S.Ct. 1976 (2006),

and 18 U.S.C. §3161(h)(7)(B)(ii) and (iv), counsel for the Defendant believes that the ends of

justice would be served by the Court granting a continuance in this matter beyond the current term

of court.

Respectfully Submitted,

/s/ **WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
**Attorney ID#: 5935**

Florence, South Carolina

February 20, 2018

I CONSENT:

s/ John David Rowell
**JOHN DAVID ROWELL**
ASSISTANT U.S. ATTORNEY

## WAIVER OF SPEEDY TRIAL RIGHTS

I am aware of my rights under the Speedy Trial Act. I would like to waive those rights and have my case continued beyond the next term of court. No one has forced, threatened, or coerced me to waive my rights. No one has promised me anything. My waiver is given freely and voluntarily. I have discussed this waiver with my attorney.

*Brendan M. Council*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:17-cr-00866-RBH-1 |
| | ) | |
| vs. | ) | **ORDER OF CONTINUANCE** |
| | ) | |
| | ) | |
| Brandon Michael Council | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On February 20, 2018, the parties filed a joint motion for continuance that included a Speedy Trial Waiver signed by the Defendant. The Speedy Trial Waiver indicated that Defendant waived his rights under the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

Based on the representations made by the parties and the file, the Court finds, pursuant to 18 U.S.C. § 3161(h)(7)(A), that the ends of justice served by the granting of a continuance outweigh the best interests of the public and the defendant in a speedy trial. In reaching this conclusion, the Court has considered the following factor(s) under 18 U.S.C. § 3161(h)(7)(B):

☐     **(i)** The failure to grant a continuance in the proceeding would be likely to make a continuation of the proceeding impossible, or result in a miscarriage of justice.

    **(ii)** The case is so unusual or so complex due to

         ☐     the number of defendants,

         ■     the nature of the prosecution, or

         ■     the existence of novel questions of fact or law,

that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

**(iii)** In a case in which arrest precedes indictment, delay in the filing of the indictment is caused

☐    because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or

☐    because the facts upon which the grand jury must base its determination are unusual or complex.

**(iv)** The failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), but

☐    would deny the defendant reasonable time to obtain counsel,

☐    would unreasonably deny the defendant or the Government continuity of counsel, or

☐    would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

■    **(v)** Other (Specify: Would deny both counsel reasonable time for effective preparation in a potential capital case).

For all the foregoing reasons, the motion for a continuance is **GRANTED**. It is hereby **ORDERED** that this case shall be continued until the Court's next scheduled term, and that all such period of delay is hereby excluded in computing the time within which trial must begin pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 et seq.

**IT IS SO ORDERED.**

February 21, 2018                    s/ R. Bryan Harwell
Florence, South Carolina          R. Bryan Harwell
                                    United States District Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA

v.

**BRANDON MICHAEL COUNCIL**

CR. NO.: 4:17-CR-866-RBH

## **NOTICE OF INTENT TO SEEK THE DEATH PENALTY**

The United States of America, by and through its undersigned counsel and pursuant to Section 3593(a) of Title 18 of the United States Code, notifies the Court and Defendant BRANDON MICHAEL COUNCIL that the United States believes the circumstances of the offenses charged in Counts 1 and 2 of the Indictment are such that, in the event of a conviction, a sentence of death is justified under Chapter 228 (Section 3591 through 3598) of Title 18 of the United States Code and that the United States will seek the sentence of death for these offenses (armed bank robbery resulting in death (Count 1) and use of a firearm in furtherance of a crime of violence to commit murder (Count 2)).

The United States will prove the following factors as justifying a sentence of death with regard to Counts 1 and 2:

(A)  BRANDON MICHAEL COUNCIL was 18 years of age or older at the time of the offense.

(B)  Statutory Threshold Factors Enumerated under 18 U.S.C. § 3592(a)(2)(A)-(D).

    (1)  Intentional Killing. BRANDON MICHAEL COUNCIL intentionally killed Donna Major and Kathryn Skeen. 18 U.S.C. § 3591(a)(2)(A).

    (2)  Intentional Infliction of Serious Bodily Injury. BRANDON MICHAEL COUNCIL intentionally inflicted serious bodily injury that resulted in the deaths of Donna Major and Kathryn Skeen. 18 U.S.C. § 3591(a)(2)(B).

    (3)  Intentional Participation in Acts Resulting in Death. BRANDON MICHAEL COUNCIL intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Donna Major and Kathryn Skeen died as a direct result of such action. 18 U.S.C. § 3591(a)(2)(C).

(4) Intentional Engagement in Acts of Violence, Knowing that the Acts Created a Grave Risk of Death to a Person. BRANDON MICHAEL COUNCIL intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Donna Major and Kathryn Skeen died as a direct result of such action. 18 U.S.C. § 3591(a)(2)(D).

(C) Statutory Aggravating Factors Enumerated under 18 U.S.C. § 3592(c).

(1) Multiple Killings. BRANDON MICHAEL COUNCIL, in committing the offense, intentionally killed more than one person in a single criminal episode. 18 U.S.C. § 3592(c)(16).

(2) Pecuniary Gain. BRANDON MICHAEL COUNCIL committed the offense in the expectation of the receipt of anything of pecuniary value. 18 U.S.C. § 3592(c)(8).

-3-

(D)  Non-Statutory Aggravating Factors Identified under 18 U.S.C. § 3593(a)(2).

(1)  Victim Impact. BRANDON MICHAEL COUNCIL caused injury, harm, and loss to the individuals that he killed as well as to the family, friends and co-workers of those individuals. The injury, harm, and loss caused by BRANDON MICHAEL COUNCIL with respect to each victim is evidenced by each victim's personal characteristics and by the impact of the victim's death upon her family, friends, and co-workers.

(2)  Continuing and Escalating Pattern of Criminal Activity. BRANDON MICHAEL COUNCIL engaged in a continuing and escalating pattern of criminal activity – including a robbery of a Food Lion grocery store in Wilson, North Carolina on or about August 10, 2017, and a robbery of a Branch Bank and Trust (BB&T) bank located in Wilson, North Carolina on or about August 11, 2017 – culminating with the armed robbery of the

-4-

CresCom bank located in Conway, South Carolina on August 21, 2017.

(3) Targeting Innocent Victims. BRANDON MICHAEL COUNCIL displayed particular cruelty and callous disregard for human life by shooting both victims, who were unknown to him, multiple times at close range without warning and without provocation or resistance from the victims, in spite of the fact that such violence was not necessary to successfully complete the robbery of the CresCom bank.

(4) Lack of Remorse. BRANDON MICHAEL COUNCIL's actions from the commission of the offenses on August 21, 2017, until his arrest on August 23 2017, demonstrated a lack of remorse.

In support of the imposition of the death penalty the United States further gives notice that, in addition to evidence of the above-listed aggravating factors, it intends to rely upon all the evidence admitted by the Court at the guilt phase of the trial and the offenses of conviction as alleged in the Indictment as it relates to the background and character of BRANDON MICHAEL COUNCIL, his moral culpability, and the

nature and circumstances of the offenses charged in the Indictment.

Respectfully submitted,

BETH DRAKE
UNITED STATES ATTORNEY

By: s/ Julius N. Richardson
Julius N. Richardson (ID #9823)
J.D. Rowell (ID #9802)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
803-929-3000

March 21, 2018

| | | review, and their position on possible consideration of a flexible court-imposed schedule, subject to extension for good cause, regarding a decision/resolution of whether the government will be seeking the death penalty (if the Court decides to issue a DOJ decision schedule, the Court will receive input from the attorneys and if necessary and requested, ex parte from defense counsel); the amount of time necessary to prepare for trial after the DOJ's decision, as well as tentative trial dates; any proposals for scheduling pretrial motions or deferring same until after the DOJ's capital case review; any Section 4241 competency issues; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 11/28/2017.(tmcb, ) (Entered: 11/28/2017) |
|---|---|---|
| 12/04/2017 | 57 | REPLY to 54 Order,,,, *(Defendant's Response to the Court's Text Order (ECF #54))* (Attachments: # 1 Supporting Documents Declaration of Kevin McNally regarding preparation time before meeting with the attorney general's capital case reveiw committee, # 2 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time, # 3 Supporting Documents Declaration of Kevin McNally regarding pre-trial preparation time)(Nettles, William) (Entered: 12/04/2017) |
| 12/04/2017 | 58 | NOTICE OF ATTORNEY APPEARANCE Scott Rian Hixson appearing for USA. (Hixson, Scott) (Entered: 12/04/2017) |
| 12/04/2017 | 59 | Minute Entry for proceedings held before the Honorable R Bryan Harwell: Pretrial Conference as to Brandon Michael Council held on 12/4/2017. Julius Richardson, AUSA, and John David Rowell, AUSA, present. Duane K Bryant, Michael Meetze, and William Nettles present with defendant. Court Reporter: Beth Krupa. CJA Time: 1 hour, 15 mins. (hcic, ) (Entered: 12/04/2017) |
| 12/04/2017 | 60 | ORDER TO CONTINUE - Ends of Justice as to Brandon Michael Council; case continued to next term, 1/11/2018. Signed by the Honorable R Bryan Harwell on 12/4/2017. (hcic, ) (Main Document 60 replaced on 12/5/2017 with corrected document) (hcic, ). (Entered: 12/04/2017) |
| 12/04/2017 | 61 | E-mail from AUSA to Judge Harwell and all counsel as to Brandon Michael Council re: scheduling matters. Filed at the direction of Chambers. (Attachments: # 1 Proposed order) (hcic, ) (Entered: 12/04/2017) |
| 12/05/2017 | 62 | TEXT ENTRY: The Court held a pretrial/status conference on December 4, 2017. Defendant waived his rights under the Speedy Trial Act on the record, and the Court continued this case. Additionally, after hearing from counsel, the Court stated it would not be imposing a Court ordered deadline for a decision by the Department of Justice regarding whether it would seek the death penalty. The Court indicated it would defer a scheduling order until after the D.O.J.'s capital case review. Signed by Honorable R Bryan Harwell on 12/5/2017.(tmcb, ) (Entered: 12/05/2017) |
| 12/06/2017 | 63 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 12/18/2017; Pretrial Conference set for 1/8/2018 at 10:00 AM; Pleas will be taken on 1/9/2018 at 9:30 AM, Jury Selection set for 1/11/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 12/06/2017) |
| 01/05/2018 | 66 | MOTION to Continue by Brandon Michael Council. No proposed order (Attachments: # 1 Addendum)(Nettles, William) (Entered: 01/05/2018) |
| 01/08/2018 | 67 | ORDER granting 66 Motion to Continue as to Brandon Michael Council (1). Signed by the Honorable R Bryan Harwell on 1/8/2017. (hcic, ) (Entered: 01/08/2018) |
| 01/11/2018 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon Michael Council held on 12/4/2017, before Judge R. Bryan Harwell. Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 2/12/2018. Release of Transcript Restriction set for 4/11/2018. (bkru, ) (Entered: 01/11/2018) |
| 01/16/2018 | 71 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 2/6/2018, Pretrial Conference set for 2/26/2018 at 10:00 AM; Pleas will be taken on 2/27/2018 at 9:30 AM; Jury Selection set for 3/1/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 01/16/2018) |
| 02/20/2018 | 73 | MOTION to Continue *(Joint Motion for a Continuance)* by Brandon Michael Council. No proposed order (Attachments: # 1 Supporting Documents Waiver of Speedy Trial Rights)(Nettles, William) (Entered: 02/20/2018) |
| 02/21/2018 | 79 | ORDER granting 73 Motion to Continue as to Brandon Michael Council (1); case continued to next term of Court, 4/19/2018. Signed by the Honorable R Bryan Harwell on 2/21/2018. (hcic, ) (Entered: 02/21/2018) |
| 03/07/2018 | 80 | SCHEDULING NOTICE as to Brandon Michael Council: Motions due by 3/27/2018, Pretrial Conference set for 4/16/2018 at 10:00 AM; Pleas will be taken on 4/17/2018 at 9:30 AM; Jury Selection set for 4/19/2018 at 9:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/07/2018) |
| 03/21/2018 | 81 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Brandon Michael Council (Richardson, Julius) (Entered: 03/21/2018) |
| 03/22/2018 | 83 | TEXT ORDER re Pretrial/Status Conference set for Thursday, March 29, 2018 at 10:00 a.m. - The lawyers should be prepared to discuss a proposed scheduling order and consult each other regarding same. The lawyers should also be prepared to discuss the Court's consideration of a Section 4241 competency evaluation; any discovery issues; and any other matters the lawyers believe need addressing at this time. Signed by Honorable R Bryan Harwell on 3/22/2018.(tmcb, ) (Entered: 03/22/2018) |
| 03/23/2018 | 84 | MOTION to Continue *Status Conference* by Brandon Michael Council. No proposed order(Meetze, Michael) (Entered: 03/23/2018) |
| 03/23/2018 | 85 | TEXT ORDER shortening response time. The government shall file a response to Defendant's 84 motion to continue status conference no later than Monday, March 26, 2018, at 12:00 p.m. Signed by Honorable R Bryan Harwell on 3/23/2018.(tmcb, ) (Entered: 03/23/2018) |
| 03/23/2018 | 86 | RESPONSE in Opposition by USA as to Brandon Michael Council re 84 MOTION to Continue *Status Conference* (Rowell, John) (Entered: 03/23/2018) |
| 03/26/2018 | 87 | REPLY to 86 Response in Opposition (Nettles, William) (Entered: 03/26/2018) |
| 03/26/2018 | 88 | NOTICE OF ATTORNEY APPEARANCE Everett Eugene McMillian appearing for USA. (McMillian, Everett) (Entered: 03/26/2018) |
| 03/26/2018 | 89 | TEXT ORDER granting in part Defendant's 84 motion to continue pretrial/status conference. The pretrial/status conference is hereby rescheduled for April 6, 2018, at 10:00 a.m. Signed by Honorable R Bryan Harwell on 3/26/2018.(tmcb, ) (Entered: |

IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| -vs- | ) | **MOTION TO CONTINUE** |
| | ) | **STATUS CONFERENCE** |
| | ) | |
| **BRANDON MICHAEL COUNCIL** | ) | |

PLEASE TAKE NOTICE that counsel for the defendant, **BRANDON MICHAEL COUNCIL,** hereby moves this court to continue the status conference currently scheduled for March 29, 2018, for two weeks.

## <u>REASONS FOR A CONTINUANCE</u>

Unexpectedly, one of the defense lawyers may be medically unavailable from now until possibly shortly after March 29, 2018. This proceeding is moving at unprecedented speed. The Government filed its Notice of Intent to seek the Death Penalty on March 21, 2018. The Government has provided over 3000 pages of discovery. The defense is still in the nascent stages of discovering and developing the facts and law applicable to this case. Additionally, the parties are scheduled to meet on March 28, 2018, to discuss the case. At this meeting, the parties will be able to address the issues noted by the court in its text order. After preliminarily discussing the issues raised by the court with the attorneys for the Government, the defense will use the additional time occasioned by this continuance to assess its position and more concretely respond to the issues the court addressed in its text order. Rather than causing delay, the defense submits that a two-week continuance will allow the case to proceed more efficiently. The defense maintains that a two weeks continuance will be beneficial to both sides in the effort to resolve the status conference issues as efficiently as possible.

<u>**CONCLUSION**</u>

For the foregoing reasons, the defense requests that the court continue the status conference in this matter for two weeks from the its currently scheduled date of March 29, 2018.

Respectfully Submitted,

<u>/s/ **MICHAEL A. MEETZE**,</u>
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
**Attorney ID#: 6662**

Florence, South Carolina

March 23, 2018

IN THE DISTRICT COURT OF THE UNITED STATES

DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| -vs- | ) | **Reply to Government's Response** |
| | ) | **to Defendant's Motion to Continue** |
| | ) | **Status Conference** |
| **BRANDON MICHAEL COUNCIL** | ) | |

PLEASE TAKE NOTICE that counsel for the defendant, **BRANDON MICHAEL COUNCIL,** hereby replies to the Government's Response Objecting to the Defendant's Motion to Continue Status Conference for two weeks.

First, the government cites the victims' rights to have the proceedings heard without unreasonable delay as a reason not to continue the status conference. The Government tacitly concedes that a one-week delay is not unreasonable in light of the undersigned's unexpected medical procedure. Scheduling this matter an additional week after that hardly constitutes unreasonable delay. It is hard to imagine any prejudice inuring to any party as a result of such a short delay. Delaying this status conference does not mean trial will be delayed. The defense is mindful of the concerns of the victims' families. Indeed, it is why Mr. Council immediately offered to plead guilty to all the charges and agree to be sentenced to life without the possibility of parole.

Second, to the extent the Government perceives this request for a two-week continuance to be seeking a ruling on the merits of its proposed scheduling order, it is mistaken. The government is free to argue at the status conference for whatever schedule it deems appropriate. In spite of a death in his immediate family occurring on March 22, 2018, learned counsel Duane Bryant intends to keep the appointment with government counsel for March 28, 2018, which was

1

made before the text order noticing the status conference for March 29, 2018.[1] This court has directed the parties to discuss scheduling. *See* ECF No. 83. Counsel for Mr. Council intend to do just that at the meeting with government counsel on March 28, 2018. To the extent that the parties find common ground on scheduling, if possible, the more efficiently this matter will proceed.

Finally, in considering this request for a brief delay of the scheduling conference, the undersigned requests that this court consider the atypical speed at which this case has proceeded to date. The Government filed its Notice of Intent to Seek the Death Penalty (NOI) only seven months after the date of the offense, and six months after the appointment of learned counsel. For comparison purposes, in *United States v. Roof*, the Government filed its Notice of Intent on May 24, 2016, more than eleven months after the offenses occurred. In *United States v. Chadrick Evan Fulks*, 4:02-cr-992-(JFA)-1, the Government filed NOI on September 12, 2003, eleven months after the offenses occurred. *See*,*Fulks* ECF at 194; *Roof,* ECF at 178-180. Thus, even by District of South Carolina federal death penalty standards, the case against Mr. Council is proceeding very rapidly.[2] Scheduling orders in *Fulks* and *Roof* were entered after the NOIs were filed, meaning that counsel for the defense in those cases had at least four more months in which to develop their cases than counsel for Mr. Council does now. This additional time is crucial to allow the defense to provide a meaningful and educated estimate as to a reasonable time for disposition of the case.

Even more remarkable is the speed with which the meeting between Mr. Council's defense attorneys and the Attorney General's Capital Review Committee (CRC) took place, compared to normal practice in federal capital cases. On average, these meetings take place approximately 16 months after indictment. *See* ECF No. at 57 at 3. Truncating the time between indictment and the CRC meeting has severely limited the amount of information that Mr. Council's defense could

---

[1] At the time of the drafting of this pleading, funeral arrangements were not completed.
[2][2] The offense in *Fulks* occurred in November 2002. Jury selection in that proceeding began in May 2004, eighteen months after the offense occurred. Trial commenced the day after Memorial Day 2004.

gather and present in its effort to persuade the Government to accept his already-tendered guilty plea and a sentence of life without the possibility of release, rather than seeking the death penalty,

Given the foregoing, counsel submit that a brief two-week continuance of the status conference is reasonable and warranted, and that it will neither materially delay the trial of this case, nor prejudice the rights of any party or victim.

Respectfully Submitted,

/s/ **WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
**Attorney ID#: 5935**

Florence, South Carolina

March 26, 2018

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH |
| v. | |
| **BRANDON MICHAEL COUNCIL** | **GOVERNMENT'S MOTION TO SET A SCHEDULING ORDER** |

The United States requests that this Court enter the attached proposed scheduling order.

On November 28, 2017, this Court requested a proposed schedule for pretrial and trial matters. Dkt. No. 54. On November 30, 2017, the Government provided a proposed scheduling order based upon the schedule successfully used in *United States v. Dylann Storm Roof*, Cr. No. 15-472. *See* Dkt. No. 61 (attaching a proposed scheduling order and referencing various scheduling orders from the *Roof* trial). The Court deferred entering a scheduling order until after the capital case review was completed and the United States notified the Court whether it intended to seek the death penalty. Dkt. No. 62. On March 21, 2018, the United States notified the Court and Defendant that the United States will seek the sentence

of death in the event of a conviction. Dkt No. 81. *See* 18 U.S.C. § 3593(a).

The United States asks this Court to enter the attached updated proposed schedule for a fair resolution of this case without unnecessary delay.[1]

Respectfully submitted,

BETH DRAKE
UNITED STATES ATTORNEY

s/ Julius N. Richardson
Julius N. Richardson (ID #9823)
J.D. Rowell (ID #9802)
Everett McMillian
Assistant United States
Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
803-929-3000

March 30, 2018

---

[1] On March 28, 2018, the Government met with defense counsel to discuss scheduling and other matters. The parties were unable to agree upon a proposed trial date and, thus, could not reach agreement on the other applicable dates. However, after discussions about Rule 12.2 and jury instructions, the Government modified those dates in the attached proposal in an attempt to accommodate defense counsels' concerns. On March 28, the Government provided a copy of this proposed motion and order. On March 30, defense counsel stated that they objected to this proposal.

```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
                  FLORENCE DIVISION
```

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH |
| v. | |
| **BRANDON MICHAEL COUNCIL** | **UNITED STATES' PROPOSED SCHEDULING ORDER** |

The Court hereby sets the following schedule in the above-captioned matter:

1.    The parties are directed to confer on the matter of jury selection procedures and to submit to the Court on or before **April 30, 2018**, a joint proposal regarding any areas of common agreement and separates proposals regarding any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **May 11, 2018.**

2.    The parties are directed to confer on the matter of Rule 12.2 procedures and to submit to the Court on or before **April 30, 2018**, a joint proposal regarding any areas of common agreement and separate proposals for any areas in dispute. The parties may file

responses to the proposals of the opposing party on or before **May 11, 2018**. The deadline for any defense notice of intent to offer evidence required under Fed. R. Crim. P. 12.2 is **July 23, 2018**.

3.  The deadline for the defendant to raise issues of competency or claims under *Atkins v. Virginia*, 536 U.S. 304 (2002) is **July 21, 2018**.

4.  The deadline for filing any motions addressing venue challenging the indictment, or raising any dispositive issues is **June 1, 2018**. The Government may respond by **June 29, 2018**.

5.  The deadline for motions to suppress is **June 15, 2018**. The Government may respond by **July 16, 2018**.

6.  The parties are directed on or before **July 28, 2018**, to make disclosure of guilt and sentencing phase non-mental health expert summaries required by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Crim. P. 16(a)(1)(C). Parties are directed to file on or before **August 21, 2018**, any summaries for experts identified in response to the opposing party's **July 28** summaries. Any challenge to the testimony of such

experts must be filed on or before **September 5, 2018**, with responses due on **September 30, 2018**.

7. Any motion challenging the death penalty and the Government's notice of intent (if any) shall be filed on or before **June 30, 2018**. The Government may respond by **July 30, 2018**.

8. The defendant will provide notice of mitigating factors not related to Rule 12.2 mental health evidence not later than **August 25, 2018**. Notice of additional non-mental-health-related mitigating factors that were not known to the defense by **August 25** will be provided promptly when defense counsel have sufficient information to supplement the notice. The defense will provide notice of mitigating factors related to the defendant's mental health or condition being offered under the Rule 12.2 procedures at the same time that it discloses mental-health-related evidence pursuant to Rule 12.2(c)(3).

9. The parties are directed to confer on the matter of jury instructions for all phases of the trial and to submit on or before **October 15, 2018**, a joint

proposal regarding any areas of common agreement and separates proposals regarding any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **October 24, 2018**.

10. The Government shall produce its witness and exhibit list on or before **October 5, 2018**. The defendant shall produce his witness and exhibit list on or before **October 15, 2018**.

11. Any motions in limine shall be filed on or before **October 25, 2018**.

12. The Court will begin jury selection, with trial to follow, on or about **November 5, 2018**.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| vs | ) | |
| | ) | |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

**BRANDON COUNCIL'S MOTION TO SET A SCHEDULING ORDER**

On March 21, 2018, the government notified Mr. Council and the Court that it would seek death sentences if Mr. Council is convicted at trial. *See* Docket No. 81. The parties met to discuss trial and other related deadlines on March 28, 2018. The prosecution proposed an accelerated trial date of November 5, 2018, which does not provide Mr. Council adequate time to prepare and offer a defense. The primary issue to be resolved at this week's status conference is the trial date, since all other deadlines depend on when trial is actually expected to begin.

The defense proposes a quick but realistic trial date of April 1, 2019, which is approximately 18 months from the date Mr. Council was indicted, and just over 12 months from the government's Notice of Intent to Seek the Death Penalty. To put this proposal in context, the average time between indictment and trial in all tried and scheduled federal capital cases to date is 28.1 months – approximately 65% more time than the defense is requesting here. *See* Exhibit A, ¶ 5[1].

---

[1] This 28.1-month figure likely understates the typical interval under *current* practice, as the average pretrial preparation time allowed in more recent cases that reached trial

For its part, the prosecution proposes a schedule so rushed – with a trial date of November 5, 2018 – to be almost without precedent. The one precedent the prosecution cites – *United States v. Roof* – is an aberration. Indeed, the *Roof* district court stated, "[Y]ou know, what Mr. Bruck is asking to do in this case, is to go to trial *far faster* than most capital defendants go." ECF 207 (Bar Meeting, June 7, 2016), at 35-36 (emphasis added). Similarly, the three other federal capital cases tried in this district to date began jury selection approximately 18, 21, and 20 months after indictment respectively. *See United States v. Fulks & Basham*, No. 02-CR-992; *United States v. Hans*, No. 05-CR-01227.

The only justification the prosecution has offered for its unreasonably rushed trial schedule is the victims' families' interests in a speedy resolution. But the government's invocation of the victims' rights as a reason to deny the defense a reasonable amount of pretrial preparation time is unpersuasive, because this case would have already been resolved – by Mr. Council's guilty plea and the imposition of multiple life-without-release sentences – had the government not insisted in seeking the death penalty. Having decided to complicate and delay this case by demanding the death penalty, the government should not now be heard to invoke the victims' families' interest in a prompt resolution as a justification for an unprecedented rush to judgment. Mr. Council's offer to plead guilty to every offense charged and to accept life imprisonment without possibility of release still stands, and the government can end this litigation by accepting it whenever it chooses. But

---

between 2004 and August 2014 was 36.5 months, or just over three years. *See* Exhibit A, Declaration of Kevin McNally Regarding Pretrial Preparation Time (2004-2014).

no one's interest will be served by setting an unreasonably short time for pretrial preparation, which would only guarantee further pretrial, post-trial, appellate, and post-conviction litigation over whether lack of time worked to deprive Mr. Council of his constitutional rights.

If there is to be a capital trial, it is important that it be fair. That means giving both sides, not just the prosecution, enough time to investigate, uncover, and present all relevant evidence. The Constitution and Supreme Court case law demands it. Based on its need to effectively prepare, the defense respectfully moves this Court to enter the Proposed Scheduling Order.

I.    **Governing Legal Principles**

**A. Mr. Council's Six Amendment Right to Effective Assistance of Counsel.**

The Sixth Amendment entitles a defendant to more than mere legal representation; an accused has the right to the effective assistance of competent counsel. *Powell v. Alabama*, 287 U.S. 45, 58 (1932). To fulfill that Constitutional guarantee and render effective assistance, counsel must be given adequate time to prepare for trial. *See Powell*, 287 U.S. at 71 (inadequate case preparation can jeopardize an accused's right to effective assistance of counsel). To provide effective assistance in capital cases, counsel must conduct a thorough investigation of the accused's background. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003) (counsel's failure to fully investigate Wiggins' background and present mitigating evidence of his "excruciating life history" violated his Sixth Amendment right to counsel). In addition to legal issues, this involves locating, cultivating and earning

the trust of many witnesses reluctant to be involved in a capital case. Such investigation will required to adequately make a case for Brandon Council's life.

While "the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial, the denial of adequate time for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel." *Avery v. Alabama*, 308 U.S. 444, 446 (1940). "The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense." *Powell*, 287 U.S. at 59. Obtaining adequate time to properly prepare for representing a person facing death is essential.

Defense counsel face difficult and time-consuming tasks in capital cases, especially in light of the fact that they operate without the resources available to the government. When a person's life is at stake, counsel is required to exhaustively explore every factual and legal aspect of the "defendant's character or record and any of the circumstances of the offense that the defendant [may] proffer[] as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In effect, counsel are preparing for two trials. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (capital trial counsel provided constitutionally deficient representation where they "did not fulfill their obligation to conduct a thorough investigation of the defendant's

background") (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d. ed. 1980.)

Moreover, a capital trial is different from all other cases, not just by degree, but in kind. The American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) ("ABA Guidelines") codify the expectations of the profession concerning the obligations of counsel in capital cases. Guideline 10.7 states:

> Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> 1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.
>
> 2. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

ABA Guidelines, 31 Hofstra L. Rev. 913, 1015 (2003).

The Supreme Court has also stressed the duty of capital-case counsel to conduct a thorough investigation. *See, e.g., Williams*, supra; *Wiggins*, 539 U.S. at 524-25 (citing ABA Guidelines). *See also Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002), cert. denied, 536 U.S. 951 (2002) ("It is imperative that all relevant mitigation information be unearthed for consideration at the capital sentencing phase."); *id*. (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present expert testimony explaining "effects of the severe physical, emotional, and

psychological abuse to which Caro was subjected as a child"); *Jackson v. Calderon*, 211 F.3d 1148, 1161-64 (9th Cir. 2000) (trial counsel ineffective in capital penalty trial for failing "to compile a social history" and investigate evidence of intoxication).

Here, counsel have been diligent in attempting to fulfill their responsibilities as outlined by the ABA Standards and Guidelines "to which [the Supreme Court] long [has] referred as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524. *See also* United States Judicial Conference, Guidelines for the Administration of the Criminal Justice Act and Related Statutes ("CJA Guidelines"). Inherent in the Guidelines is the requirement that the capital defendant "receive the assistance of all expert, investigative, and other ancillary professional services . . . appropriate . . . at all stages of the proceedings." *Id*. at 952. *Cf*. 18 U.S.C. §§ 3005 & 3599.

Capital cases are fundamentally different than any other criminal case, not only in the severity of the potential penalty but in the nature of the evidence and information which must be developed. Sensitive historical facts concerning the defendant and his family need to be disclosed to members of the defense team who are essentially strangers to the defendant. It takes time to develop the trust necessary to learn vital information, and what is learned in the initial investigation may create a mandatory duty to investigate further. *Wiggins*, 539 U.S. at 525; *Doulgas v. Woodford*, 316 F.3d 1079, 1088-89 (9th Cir. 2003). This takes months or, in some cases, years. Then evaluation by relevant experts must follow. *See Wallace v. Stewart*, 184 F.3d 1112, 1117-18 (9th Cir. 1999); *Bean v. Calderon*, 163 F.3d 1073, 1080-81 (9th Cir. 1998), cert. denied, 528 U.S. 922 (1999) (presentation of medical experts

without preparation and foundation prejudicial at penalty phase). *See also Rompilla v. Beard*, 545 U.S. 374 3 (2005) (prejudice found due to change in experts' opinions which were brought about by thorough post-conviction investigation); *Castro v. Oklahoma*, 71 F.3d 1502, 1514 (10th Cir. 1995) (individual lay witnesses to events in defendant's troubled childhood not satisfactory substitute for comprehensive life history investigation; *id.*, (granting penalty phase relief on violation of *Ake v. Oklahoma*, 470 U.S. 68, 82 (1985)  stating defendant needs "assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense")). Additionally, patient, time-intensive work will need to be done with potential witnesses to gain some degree of cooperation in such an atmosphere where any sort of cooperation with the defense (as opposed to the FBI or the prosecution) reasonably appears to carry great shame or personal risk.

"The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." ABA Guideline 10.7, commentary, 31 Hofstra L. Rev. 913, 1025 (2003). Without adequate time to develop the relationship of trust required for effective representation in a capital case, counsel may never learn -- much less be able effectively to present – the most crucial facts about the defendant, facts without which any understanding of his alleged actions is impossible.

### B. Mr. Council has an Eighth Amendment Right to a Reliable, Individualized Sentencing Proceeding.

The Eighth Amendment requires that a capital sentencing proceeding must permit individualized consideration of the defendant and the circumstances of the

offense. *Woodson v. North Carolina*, 428 U.S. 280 (1976) (consideration of the character of the defendant is "a constitutionally indispensable part of the process of inflicting the penalty of death"); *Zant v Stephens*, 462 U.S. 862, 878-79 (1983) ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime"). In *Enmund v. Florida*, 458 U.S. 782 (1982), the Supreme Court stated "[W]e insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' which means that we must focus on 'relevant facets of the character and record of the individual offender." 458 U.S. at 798 (quoting *Lockett*, supra, and *Woodson*, supra, 428 U.S. at 303-04).

A reliable, individualized capital sentencing can occur only if the sentencing body has before it all relevant mitigation evidence. Individualized sentencing requires the presentation of mitigation evidence, properly investigated, documented, and presented with the help of appropriate experts. Expert assistance is required in part because the scope of permissible testimony has been held to be very broad, by constitutional necessity. *See generally Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (rejecting lower courts' effort to find a "constitutional relevance" limitation in Supreme Court's Eighth Amendment jurisprudence); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (death sentence vacated because sentencer did not recognize that defendant's troubled childhood was a mitigating factor and weigh it in deciding punishment); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (jury must be able to consider mental retardation as mitigating); *Woodson*, 428 U.S. at 304 (any of the "diverse

frailties of humankind" constitute mitigating factors which must be considered as a matter of law in deciding punishment).  It falls to counsel to gather data about the defendant's family, medical background, educational background, and social and cultural history to identify appropriate experts, and to provide them information necessary to forming reliable opinions. Time is needed to do the appropriate investigation and consultation.

### C. Mr. Council has a Due Process Right to Expert Assistance in Developing Evidence for Trial.

*Ake v. Oklahoma*, 470 U.S. 68 (1985), the case most associated with the right of an indigent to the assistance of a needed expert, is a capital due process case in which the defendant's interests included his life. There, the Supreme Court established the right of a capital defendant to expert assistance of a psychiatrist in the evaluation, preparation, and presentation of the defense. The *Ake* Court's holding has subsequently been read to include the use of other types of expert assistance. *See e.g., Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1989) (right guaranteed under *Ake* includes right to obtain non-testifying expert); *United States v. Kreutzer*, 61 M.J. 293 (2005) (recognizing defendant's entitlement to assistance of mitigation specialist); *United States v. Warner*, 62 M.J. 115 (2002) (under facts of case defendant had right to assistance of expert in pediatric medicine): *Terry v. Rees*, 985 F.2d 283 (6th Cir. 1993) (holding defendant was entitled to independent pathologist to assist counsel); *Leonard v. Michigan*, 256 F. Supp.2d 723 (W.D. Mich. 2003) (defense counsel entitled to assistance of independent DNA expert to test prosecution's use of DNA evidence). Counsel is expected to use and retain several experts during this case.

Counsel cannot rationally construct a strategy for either stage of trial without adequate investigation into evidence that might be used at one stage or the other, or both. Consequently, any logistical or litigation problems that exist for one aspect of the investigation impair counsel's overall preparation.

## II. Analysis

### A. Mr. Council's proposed trial date of April 1, 2019, is quicker than the average federal death penalty case.

To be sure, most federal capital cases are resolved by negotiated guilty pleas rather than by trial. However, in the 150 cases that did go to trial from January 1, 2004 to August 2014, district courts have allowed an *average* of approximately 36 months preparation time between indictment and start of trial. *See* Exhibit B, ¶ 5 (Declaration of Kevin McNally). The *median* time between indictment and trial is 32.6 months. *Id*. at ¶6. There have been very few federal capital cases tried in the intervening 3.5 years since Mr. McNally's declaration.

Mr. Council was indicted on September 20, 2017. *See* Docket No. 16. Mr. Council was arraigned on October 3, 2017. *See* Docket No. 19. Six months after indictment, on March 21, 2018, the prosecution filed its Notice of Intent to Seek the Death Penalty. *See* Docket No. 81. The median time between indictment and the notice of intent to seek the death penalty is 12.5 months. *See* Exhibit B, ¶ 6. Here, it was done in half the time.

The defense is requesting a trial date of April 1, 2019, a quick but realistic time frame to accomplish what needs to be done on Mr. Council's behalf. Using this trial date, the elapsed time from indictment to trial would be 18 months, 12 days (558

days). As stated in the attached Declaration of Kevin McNally, the average time between indictment and trial date in a federal capital cases is approximately 36.5 months. *See* Exhibit B, ¶ 5. So far, Mr. Council's case has been on a much faster track than the norm.

For purposes of defense trial preparation, the period of time between the Notice of Intent to Seek the Death Penalty and trial is the most significant, for it is only upon notice of the prosecution's case for death that the defense knows with certainty the kind of case it will confront. *Cf. Rompilla v. Beard*, 545 U.S. 374 (2005) (trial counsel ineffective for failing to investigate aggravation evidence of which prosecution gave notice and for failing to prepare response to case in aggravation). The death notice exponentially increases the issues and evidence the defense must investigate and prepare for. It requires a quantum leap in trial preparation, because the certainty that the government will seek the death penalty means that trial preparation can leave no stone unturned. Additionally, it is clear now that the trial will likely have multiple phases, which in turn requires more preparation time. *See* ABA Guideline 10.10.1 & commentary, 31 Hofstra L. Rev. at 1047. This is one reason why capital cases almost always take longer to prepare and try. Nationally, the average time between the filing of the notice and trial is 14.8 months (roughly 450 days). Here, the notice was filed on March 21, 2018. Again, the defense's proposed trial date is even shorter than the average, resulting in 12 months, 11 days (376 days).

We do not suggest that the trial schedule in this case should be dictated by the schedules adopted in all of the federal capital trials over the past decade, or by any

other single consideration. But in deciding whether a given trial schedule allows the defense too little time to prepare, the contemporary practices of all of the federal courts throughout the nation provide a valuable baseline for comparison.

### B. **The circumstances of a capital case justify a proposed trial date consistent with Mr. Council's proposal**.

Motions practice will be more detailed and complex in this capital case as opposed to criminal cases not involving the potential penalty of death. Based on their investigation so far, defense counsel contemplates several motions will be filed in this case requiring evidentiary hearings.

The ABA Guidelines then provide that counsel are obligated to explore: medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use; pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); family and social history, including physical, sexual or emotional abuse, family history of mental illness, cognitive impairments, substance abuse, or domestic violence, poverty, familial instability, neighborhood environment and peer influence, other traumatic events such as exposure to violence, the loss of a loved one; experiences of racism or other social or ethnic bias, cultural or religious influences, failures of government or social intervention; educational history; employment and training history; and prior juvenile and adult correctional experience. *See* Commentary, at 81-82. Obtaining, reviewing, and analyzing these records take time.

Simply put, given these Constitutional obligations and duties, as well as the circumstances of this case and counsel's schedule, counsel cannot effectively try this case before April 1, 2019. Counsel proposes the following Schedule:

| | |
|---|---|
| Jury Selection: | April 1, 2019 |
| Jury Selection Charge/Instructions: | 90 days before Jury Selection |
| Jury Questionnaire: | 90 days before Jury Selection |
| Responses to Jury Questionnaire: | Within 20 days of return of same |
| Motions *in Limine*: | 60 days before Jury Selection |
| Prosecution Witness List: | 90 days before Jury Selection |
| Defense Witness List: | 75 days before Jury Selection |
| Notice of Intent to Introduce Mental Health Expert Testimony Regarding Punishment | 75 days before jury selection |
| Government Motion to Examine Defendant: | 90 days before jury selection |
| Motions to Suppress: | 150 days before jury selection |
| Motions for Venue/Indictment/Dispositive: | Not later than June 15, 2018 |
| Deadline for proposed 12.2 joint procedure: | Not later than August 15, 2018 |
| Deadline for *Atkins* Motion, if any: | Not later than August 15, 2018 |
| Deadline for 18 U.S.C. 4241 Defense Mental Competency Motion: | Not later than June 1, 2018 |
| Challenges to Death Penalty: | Not later than June 15, 2018 |
| Final/Motions Claims by Either Party: | Not later than March 1, 2019 |

[signature blocks to follow]

Respectfully Submitted,

**/s/ WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935

**/s/ DUANE K. BRYANT,**
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ MICHAEL A. MEETZE,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

**/s/ AKIN ADEPOJU,**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| vs | ) | |
| | ) | PROPOSED SCHEDULING ORDER |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

The Government has given Notice of Intent to Seek Death in the above captioned matter. After consideration and review of Scheduling Order Proposals by the Government and by the Defense, the Court hereby sets the following schedule in this matter:

1.    **JURY SELECTION:** The Court will begin Jury Selection, with trial to follow, on April 1, 2019.

2.    **JURY SELECTION CHARGE and JURY INSTRUCTIONS:** The Parties are directed to confer on the matters of Jury Selection Procedure and Jury Instructions for all phases of the trial and to submit on or before January 1, 2019.

3.    **JURY QUESTIONNAIRE:** The Parties are directed to confer on the matter of Jury Questionnaire and to submit 1. A Joint Proposed Jury Questionnaire; 2. The Procedure to be used in conducting the Jury Questionnaire; 3. The procedure and timing for the Government and the Defense to Respond to the Questionnaire; 4. The procedure Strikes for Causes; and 5. The manner of Jury Selection on or before January 1, 2019.

4.     **MOTIONS IN LIMINE:**  Any Motions In Limine shall be filed on or before February 1, 2019.

5.     **GOVERNMENT WITNESS LIST:**  The Government shall produce its Witness List on or before January 1, 2019.

6.     **DEFENSE WITNESS LIST:**  The Defense shall produce its Witness List on or before February 15, 2019.

7.     **MITIGATION FACTOR NOTICE:**  In the event of a Guilty Verdict in this matter, the Defense shall, within 12 hours, present its Notice of Mitigation Factors.

8.     **NOTICE OF INTENT TO INTRODUCE MENTAL HEALTH EXPERTS (PENALTY PHASE):** Notice of Intent to Introduce Mental Health Expert testimony shall be filed on or before February 15, 2019.

9.     **NOTICE OF INTENT TO SUPPLEMENT EXPERT/TESTS:**  Notice of Intent to Supplement Mental Health Expert or Mental Health Tests shall be filed on or before February 28, 2019. Responses/objections to this filing shall be filed on or before March 10, 2019.

10.     **MOTIONS TO SUPPRESS:**  Motions to Suppress shall be filed on or before November 1, 2018.

11.     **MOTIONS FOR VENUE/INDICTMENT/DISPOSITIVE:**  Defense Motions addressing Venue, Challenges to the Indictment, or Raising Dispositive Issues shall be filed on or before June 15, 2018.  Any Government responses shall be filed not later than June 30, 2018.

12.    **RULE 12.2 JOINT PROCEDURE:** The Parties are directed to confer on the matter of Rule 12.2 procedures and to submit to the Court on or before August 15, 2018, a joint proposal regarding any areas of common agreement and separate proposals for any areas in dispute.  Each party may file responses to the proposals of the opposing party on or before September 1, 2018.  The Defense must file any defense notice of intent to offer evidence under Fed. R. Crim. P. 12.2 on or before September 15, 2018.

13.    **ATKINS CLAIMS:**  Any Defense claim or motion that raises issues of competency or claims under *Atkins v. Virginia,* 536 U.S. 304 (2002) shall be filed on or before August 15, 2018.

14.    **DEADLINE FOR 18 U.S.C. 4241 DEFENSE MENTAL COMPETENCY MOTION:**  In the event no motion is filed, the Defense shall file an *Ex Parte* declaration under seal explaining why such a motion was not filed.  Deadline June 1, 2018.

15.    **CHALLENGES TO THE DEATH PENALTY:**  Defense shall file any challenges to the death penalty and the Government's Notice of Intent on or before June 1, 2018.  The Government may respond on or before June 15, 2018.

16.    **FINAL MOTIONS/CLAIMS BY EITHER PARTY:** Any Motions, Claims or concerns, still outstanding shall be filed on or before March 1, 2019.  The Court will direct either hearings or written disposition of the same.

This the ___ day of April, 2018.

_____
R. BRYAN HARWELL
United States District Court Judge

*Exhibit A*

## DECLARATION OF KEVIN McNALLY
## REGARDING PRE-TRIAL PREPARATION TIME

1. I currently serve as the Director of the Federal Death Penalty Resource

Counsel Project, assisting court-appointed and defender attorneys charged with the

defense of capital cases in the federal courts. I have served as Resource Counsel

since the inception of the Resource Counsel Project in January, 1992. The Project is

funded and administered under the Criminal Justice Act by the Defender Services

Office of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of

all federal capital prosecutions throughout the United States in order to assist in the

delivery of adequate defense services to indigent capital defendants in such cases.

This effort includes the collection of data on the initiation and prosecution of federal

capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50. An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990. This collection of data includes the intervals of time between various pretrial milestones and trial. The federal courts have, with few exceptions, permitted considerable time between the indictment and mitigation submission and between

---

consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/Up dateFederalDeathPenaltyCases.aspx

2

the government's notice of intent to seek the death penalty and the commencement of trial.

5.  The average time between indictment and the trial date in federal capital cases is approximately 28.1 months.  The average time between indictment and the notice of intent to seek the death penalty is 13.2 months.  The average time between the notice of intent to seek the death penalty and the trial date is approximately 16.4 months.[2]

6.  Pursuant to declarant's responsibilities as Federal Death Penalty Resource Counsel, declarant has compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct.  Executed this 9th day of August, 2017.

/s/ Kevin McNally
Kevin McNally

---

[2]The Project has obtained the date for 503 indictments, 491 notices of intent to seek the death penalty and the date or scheduled date for 452 trials.  These dates are in the attached report.  This accounts for the apparent disparity in the figures above.

3

*Exhibit B*

## DECLARATION OF KEVIN McNALLY
## REGARDING PRE-TRIAL PREPARATION TIME

1.  I currently serve as the Director of the Federal Death Penalty Resource

Counsel Project, assisting court-appointed and defender attorneys charged with the

defense of capital cases in the federal courts.  I have served as Resource Counsel

since the inception of the Resource Counsel Project in January, 1992.  The Project is

funded and administered under the Criminal Justice Act by the Defender Services

Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of

all federal capital prosecutions throughout the United States in order to assist in the

delivery of adequate defense services to indigent capital defendants in such cases.

This effort includes the collection of data on the initiation and prosecution of federal

capital cases.[1]

-------------------------

[1]The work of the Federal Death Penalty Resource Counsel Project is described in
a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee
on Defender Services, Judicial Conference of the United States, FEDERAL DEATH
PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF
DEFENSE  REPRESENTATION  (May,  1998),  at  28-30.
www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the
judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource
Counsel Project ..., which has become essential to the delivery of high quality, cost-
effective representation in death penalty cases ...." *Id.* at 50.  A recent update to the
Report stated: "Many judges and defense counsel spoke with appreciation and
admiration about the work of Resource Counsel. Judges emphasized their assistance
in recruiting and recommending counsel for appointments and their availability to

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, orders and opinions by the District Court and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990.  This collection of data includes the intervals of time between various pretrial milestones and trial.  The federal courts have, with  few exceptions, permitted considerable time between the indictment and mitigation submission and between

---

consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx

the government's notice of intent to seek the death penalty and the commencement of trial.

5.  The average time between indictment and the trial date in federal capital cases, from 2004 forward, which actually began trial, is approximately 36.5 months. The average time between indictment and the notice of intent to seek the death penalty is 16.1 months. The average time between the notice of intent to seek the death penalty and the trial date is approximately 20.4 months.[2]

6.  The median for the time between indictment and the trial date in federal capital cases, from 2004 forward is 32.6 months. The median for the time between the indictment and the notice of intent is 12.5 months. The median for the time between the notice of intent to seek the death penalty and the trial date is 15.2 months.

7.  Pursuant to declarant's responsibilities as Federal Death Penalty Resource Counsel, declarant has compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

---

[2]There are three defendants included in this total that had two trials since 2004. These figures include only the first trial for Donnell Young, Ronell Wilson and George Lecco.

3

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 12th day of August, 2014.

/s/ Kevin McNally
Kevin McNally

4

| | | 03/26/2018) |
|---|---|---|
| 03/26/2018 | 90 | NOTICE OF HEARING as to Brandon Michael Council: Pretrial Conference/Status Conference set for 4/6/2018 at 10:00 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before the Honorable R Bryan Harwell. (hcic, ) (Entered: 03/26/2018) |
| 03/30/2018 | 91 | MOTION To Set Schedule re 61 Letter, 83 Order,, by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Order for Schedule)(Richardson, Julius) (Entered: 03/30/2018) |
| 04/04/2018 | 92 | MOTION To Set a Scheduling Order by Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Scheduling Order, # 2 Exhibit A-Declaration of Kevin McNally, # 3 Exhibit B-Declaration of Kevin McNally)(Nettles, William) Modified on 4/4/2018 to add descriptive names to exhibits (hcic, ). (Entered: 04/04/2018) |
| 04/06/2018 | 93 | Minute Entry for proceedings held before the Honorable R Bryan Harwell: Pretrial Conference/Status Conference as to Brandon Michael Council held on 4/6/2018. John David Rowell (AUSA), Julius Ness Richardson (AUSA), and Scott Rian Hixon (AUSA) present; Duane K Bryant, William Nettles IV, and Michael Meetze present with defendant. Court considering jury selection date of January 14, 2019. Counsel to meet next week to formulate a proposed scheduling order working from that date and submit a joint proposed schedule by April 17, 2018. Counsel to submit memos to the Court on April 9, 2018 regarding § 4241 issue of whether the government is entitled to see the report if the Court orders a competency examination. Government to file motion for disclosure of non-mental health mitigation factors by April 13, 2018. Defendant shall file a response to the Government's motion for disclosure within 20 days. Defendant waives speedy trial rights. The Court also briefly took up a matter with the defense ex parte. Court Reporter: Beth Krupa. CJA Time: 2 hours, 15 mins. (hcic, ) (Entered: 04/06/2018) |
| 04/09/2018 | 96 | MOTION for Disclosure of Competency Evaluation by USA as to Brandon Michael Council. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Supporting Documents US v. Loughner filing)(Rowell, John) (Main Document 96 replaced on 4/9/2018 with corrected document provided by filer) (hcic, ). (Entered: 04/09/2018) |
| 04/09/2018 | 97 | MOTION in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government by Brandon Michael Council. No proposed order(Nettles, William) (Entered: 04/09/2018) |
| 04/10/2018 | 98 | E-mail from Duane K Brant in re Brandon Michael Council re submission of proposed continuance order. (hcic, ) (Entered: 04/10/2018) |
| 04/10/2018 | 99 | ORDER TO CONTINUE - Ends of Justice as to Brandon Michael Council; case continued to 1/14/2019 term of Court. Signed by the Honorable R Bryan Harwell on 4/10/2018. (hcic, ) (Entered: 04/10/2018) |
| 04/10/2018 | 100 | NOTICE OF CANCELLATION OF HEARING: Pretrial Conference previously set for 4/16/2018 at 10:00 AM cancelled. (hcic, ) (Entered: 04/10/2018) |
| 04/10/2018 | 101 | TEXT ORDER: The Government is to respond to 97 Motion in Opposition to Mental Competency Examination by Tuesday, April 17, 2018. Signed by the Honorable R Bryan Harwell on 4/10/2018. (hcic, ) (Entered: 04/10/2018) |
| 04/12/2018 | 102 | MOTION to Seal by Brandon Michael Council. No proposed order (Attachments: # 1 Memo in Support of Motion to Seal, # 2 Non-Confidential Descriptive Index, # 3 Certification of Compliance)(Nettles, William) (Entered: 04/12/2018) |
| 04/12/2018 | 103 | TEXT ORDER: The Government is to respond to Defendant's 102 Motion to Seal by Thursday, April 19, 2018. Signed by the Honorable R Bryan Harwell on 4/12/2018.(eney, ) (Entered: 04/12/2018) |
| 04/13/2018 | 104 | MOTION for Disclosure / Motion for Pre-trial Disclosure of Defendant's Proposed Mitigating Factors by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Certificate of Service)(McMillian, Everett) (Entered: 04/13/2018) |
| 04/13/2018 | 105 | TEXT ORDER: Defendant shall file a response to the Government's 104 Motion for Disclosure by April 27, 2018. See Local Crim. Rule 12.05 (D.S.C.). Should defense counsel need more time to respond, they may file a motion for an extension of time for the Court's consideration. Signed by the Honorable R Bryan Harwell on 4/13/2018.(eney, ) (Entered: 04/13/2018) |
| 04/16/2018 | 106 | RESPONSE in Support by USA as to Brandon Michael Council re 102 MOTION to Seal (Rowell, John) (Entered: 04/16/2018) |
| 04/17/2018 | 107 | Minute Entry for proceedings held before the Honorable R. Bryan Harwell: Scheduling Conference as to Brandon Michael Council held on 4/17/2018. Everett McMillian, AUSA, present for the Government; William Nettles IV, present for Defendant. Pursuant to Federal Rule of Criminal Procedure 43(b)(3), both counsel agreed Defendant's presence was not required. The Government and Defendant jointly requested an extension of time until the close of business on April 24, 2018, to submit their proposed scheduling order to the Court. The Court granted the requested extension, and the parties are to submit their joint proposed scheduling order to chambers by the close of business on April 24, 2018. Court Reporter: Beth Krupa. (hcic, ) (Entered: 04/17/2018) |
| 04/17/2018 | 108 | RESPONSE to Motion by USA as to Brandon Michael Council re 97 MOTION in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government (McMillian, Everett) (Entered: 04/17/2018) |
| 04/24/2018 | 109 | MOTION To Set Scheduling Order by USA as to Brandon Michael Council. No proposed order (Attachments: # 1 Proposed Order Proposed Scheduling Order, # 2 Supporting Documents Scheduling Chart)(McMillian, Everett) (Entered: 04/24/2018) |
| 04/25/2018 | 110 | TEXT ORDER: The Government has filed a motion captioned "Government's Motion to Set a Scheduling Order" stating "the parties have agreed upon a number of deadlines" and attaching a "Joint Proposed Scheduling Order" and related chart of proposed deadlines. See ECF No. 109 . This filing omitted signatures of defense counsel confirming the representation made in the Joint Proposed Scheduling Order. Defense counsel are requested to file such confirmation by tomorrow, April 26, 2018. Signed by the Honorable R. Bryan Harwell on 4/25/2018. (eney, ) (Entered: 04/25/2018) |
| 04/26/2018 | 111 | REPLY to 110 Order,, (Nettles, William) (Entered: 04/26/2018) |
| 04/27/2018 | 112 | RESPONSE in Opposition by Brandon Michael Council as to 104 MOTION for Disclosure / Motion for Pre-trial Disclosure of Defendant's Proposed Mitigating Factors (Nettles, William) (Entered: 04/27/2018) |
| 04/30/2018 | 113 | TEXT ORDER: On April 24, 2018, the government filed a motion to set a scheduling order 109 , which included a proposed joint scheduling order that set forth deadlines agreed to by the parties. The motion also included a chart that reflected deadlines that were agreed to by the parties and deadlines over which there was a dispute. Upon close review, there appear to be several discrepancies between the chart and the proposed joint scheduling order. |

JA0181

```
MIME-Version:1.0
From:SCDEfilingstat@scd.uscourts.gov
To:scd_ecf_nef@localhost.localdomain
Bcc:
--Case Participants: Michael Allen Meetze (brittni_s_welsh@fd.org, kris_jumper@fd.org,
mia_woolridge@fd.org, michael_meetze@fd.org), William F Nettles, IV (bill_nettles@fd.org,
brittni_s_welsh@fd.org, kris_jumper@fd.org, mia_woolridge@fd.org), Akin Adepoju
(akin_adepoju@fd.org), Duane K Bryant (duanekbryantlaw@gmail.com), Honorable R Bryan
Harwell (harwell_ecf@scd.uscourts.gov)
--Non Case Participants: jcar (jeff_cargile@scd.uscourts.gov)
--No Notice Sent:

Message-Id:8364573@scd.uscourts.gov
Subject:Activity in Case 4:17-cr-00866-RBH USA v. Council In Camera Hearing
```
Content−Type: text/html

## U.S. District Court

### District of South Carolina

## Notice of Electronic Filing

The following transaction was entered on 4/6/2018 at 3:22 PM EDT and filed on 4/6/2018

| | |
|---|---|
| **Case Name:** | USA v. Council |
| **Case Number:** | <u>4:17−cr−00866−RBH</u> |
| **Filer:** | |
| **Document Number:** | 94(No document attached) |

**Docket Text:**
 **Ex Parte Minute Entry for proceedings held before the Honorable R Bryan Harwell: Ex Parte Hearing as to Brandon Michael Council held on 4/6/2018. Duane K Bryant, William Nettles IV, and Michael Meetze present with defendant. The Court discussed its concerns regarding the need for a competency evaluation with defense counsel additionally based on entries contained in defense counsel's CJA voucher. Court Reporter: Beth Krupa. CJA Time 15 mins. (hcic, )**

**4:17−cr−00866−RBH−1 Notice has been electronically mailed to:**

William F Nettles, IV     bill_nettles@fd.org, Kris_Jumper@fd.org, brittni_s_welsh@fd.org, mia_woolridge@fd.org

Michael Allen Meetze     michael_meetze@fd.org, Kris_Jumper@fd.org, brittni_s_welsh@fd.org, mia_woolridge@fd.org

Duane K Bryant     duanekbryantlaw@gmail.com

Akin Adepoju     Akin_Adepoju@fd.org

**4:17−cr−00866−RBH−1 Notice will not be electronically mailed to:**

USCA4 330

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH |
| v. | |
| **BRANDON MICHAEL COUNCIL** | |

**GOVERNMENT'S MOTION TO PERMIT DISCLOSURE OF THE
COMPETENCY EVALUATION**

The Government respectfully requests that it be provided a copy of any competency evaluation because it is entitled to this information pursuant to 18 U.S.C. § 4247(c) and no constitutional provision or rule limits this disclosure.

**I.      The Government is Entitled to Full and Prompt Access to a Competency
Evaluator's Report**

Any limitations on disclosure of any competency report directly contravene the plain language of 18 U.S.C. §§ 4241 and 4247, are not required by the Constitution, and would fundamentally undermine the competency evaluation process by forcing the Government to litigate this critical issue blindfolded.

**A.      Section 4247(c) Requires that the Evaluator's Report be Provided
Simultaneously to the Court as well as the Government and the Defense**

The plain language of § 4247(c) makes clear that counsel for the Government is entitled to a copy of the full psychiatric report prepared by the designated examiner at the same time that

it is provided to defense counsel.[1]  Section 4247(c) mandates that the evaluator's report "*shall* be filed with the court with copies provided to the counsel for the person examined *and to the attorney for the Government . . . .*"  18 U.S.C. § 4247(c) (emphasis added); *see, e.g.*, *United States v. Nyhan*, No. 5:12–HC–2101–FL, 2012 WL 1655409, at *1 (E.D.N.C. May 10, 2012) (ordering that competency reports be provided to attorneys for the government and defendant).  Congress's use of the term "shall" means that this requirement is mandatory.  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("'[S]hall' makes the act of filing a[] charge [] within the specified time period mandatory."); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section.").  The legislative history is likewise clear that "[co]pies of this report *must* also be sent to the counsel for the defendant and the attorney for the government."  S. Rep. No. 98-225, at 235 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3417 (emphasis added).

Regardless of the evaluator's finding, Section 4241(d) makes clear that this Court, not the evaluator, must determine whether the defendant has met his burden to prove he is mentally incompetent to stand trial.  *See, e.g.*, *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam) (1983) (upholding trial court's decision to place little weight on an "unimpeached" psychiatric evaluation and to rely on its observations of the defendant to conclude that the "surprise, eleventh-hour motion" for a competency hearing was "just a subterfuge" to delay trial).  Regardless of the expert's opinions, the Government is entitled to review the evaluator's report

---

[1] Section 4147 requires that the evaluator's report include the defendant's history and present symptoms; a description of any tests conducted by the examiner; the examiner's findings; and the examiner's opinions as to diagnosis, prognosis, and "whether [the defendant] is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4247(c)(1)-(4)(A).

and be afforded the opportunity to address any concerns based on the entire record before this Court makes its required finding.  *See United States v. Speelman*, No. 7:15-CR-69, 2016 WL 3129180, at * 6 (E.D.N.C. June 2, 2016) (describing trial court's assessment of psychiatric evaluations and the court's own questioning of the defendant in determining the defendant's competency); *United States v. Clark*, No. 3:13–CR–163, 2014 WL 4829052, at **1-3 (W.D.N.C. Sept. 29, 2014) (describing testimony and arguments presented during competency hearing).[2]

While this court surely acts with discretion in the face of statutory silence, it may not ignore the mandatory language of § 4247.  *Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 302 (1989) (describing the terms "shall or must" as mandatory and compulsory). Section 4247 gives both parties the opportunity to simultaneously receive and review the report, without censorship by the other party, because both parties have an equal right and interest in ensuring that the Defendant is competent to stand trial and in adequately preparing for the competency hearing.  There is no authority to deny the Government its statutory right and the opportunity to examine, support, and/or challenge the unedited findings of the evaluator.

### B.    No Constitutional Provision or Rule Limits Such Disclosure

The Fifth and Sixth Amendments preclude only certain *uses* of a defendant's statements made during pretrial competency evaluations, not the Government's exposure to them.  *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454 (1981).

---

[2] Courts have likewise rejected attempts by other defendants to delay or otherwise restrict the full disclosure of the evaluator's report to the Government.  For example, in *United States v. Loughner*, counsel for the defendant requested that the evaluator's report be first provided to the defense and the court so that "counsel may propose those redactions necessary to protect [the defendant's] Fifth and Sixth Amendment rights and matters of attorney client privilege."  *Loughner*, 4:11-cr-187, Def.'s Requests re: Competency Procedures, DE 159, at 4-5 (D.Az. Mar. 16, 2011) (attached as Exhibit A).  The district court denied the defendant's request.  *See Loughner*, 770 F. Supp. 2d 1026, 1028 (D. Az. 2011) (rejecting defense requests "concerning the manner and protocol for conducting the competency examination").

1. **The Fifth Amendment and Rule 12.2 do not justify the Defendant's proposal to restrict the prosecution team's access to mental health evidence related to his competency**

The Fifth Amendment is not violated by the Government's mere exposure to mental health evidence. The Supreme Court and the Fourth Circuit have repeatedly addressed the use of pretrial competency evaluations during the penalty phase of capital cases, and they have never suggested that the Government's access to the Defendant's statements made during those evaluations constitutes a constitutional violation. *See, e.g.*, *Kansas v. Cheever*, 134 S. Ct. 596, 601-02 (2013); *Buchanan v. Kentucky*, 483 U.S. 402, 423-28 (1987); *Estelle,* 451 U.S. at 465-68; *Giarratano v. Procunier*, 891 F.2d 483, 486-87 (4th Cir. 1989). Rather, these cases establish that where a defendant does not introduce any mental health evidence during trial, the Fifth Amendment prohibits the Government from *using* a defendant's compelled statements made during a court-ordered competency examination. *Estelle*, 451 U.S. at 467-68.[3] Thus a prohibited *use*, not mere exposure, is the touchstone of the constitutional inquiry.

The Government is, of course, permitted to use a defendant's statements made during a competency evaluation and other psychiatric evaluations to rebut any mental health evidence that a defendant uses as a defense to his guilt or as mitigation at sentencing. *See Cheever*, 134 S. Ct. at 601-02; *Buchanan*, 483 U.S. at 422.[4] Where a defendant plans to offer mental health evidence

---

[3] The Defendant suggests that the Government is not entitled to review "defense-collected" evidence because such evidence may implicate the Fifth Amendment. Even if implicated, such concerns do not require non-disclosure. Moreover, the Fifth Amendment's privilege against self-incrimination is not implicated unless a defendant is compelled by the Government to incriminate himself. "Defense-collected" evidence, including any statements made by a defendant to his own experts, is not compelled and therefore not covered by the Fifth Amendment.

[4] As the Supreme Court has declared, "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state . . . ." *Cheever*, 134 S. Ct. at 601. This rule "harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination." *Id.*

4

*solely* in capital sentencing proceedings, Rule 12.2(c)(2) delays disclosure of that specific mental health evidence until after the defendant is convicted and reaffirms his intent to offer mental health evidence in the penalty phase. If, however, evidence is used in the competency evaluation process, the Government is entitled to it, regardless of whether it might also be used in some later proceeding. Nothing in Rule 12.2 warrants the appointment of firewall counsel for the competency proceeding.

As an initial matter, the delayed disclosure procedures provided by Rule 12.2(c)(2) are not a constitutional rule. *See United States v. Hall*, 152 F.3d 381, 398-99 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez Salazar*, 528 U.S. 304 (2000) (in a pre-Rule 12.2(c) case, rejecting argument that the court could not order the defendant to undergo a mental health examination unless it sealed the results of the examination until the penalty phase).

Nor does Rule 12.2 have any application to competency hearings. The evaluation of the Defendant's competency is governed by the provisions of 18 U.S.C. §§ 4241 and 4247, and not, as the Defendant suggests, Rule 12.2.[5] The Sixth Circuit rejected a defendant's request to require firewall counsel to handle his competency hearing, declaring "Rule 12.2 has no applicability here. [The defendant's] situation is controlled entirely by 18 U.S.C. § 4241." *United States v. Thompson*, 462 Fed. App'x 561, 565 (6th Cir. 2012) (unpublished); *see also* Fed. R. Crim. Pro. 12.2, Adv. Comm. Note (stating that Rule 12.2 "does not deal with the issue of mental competency to stand trial").

_____

[5] Rule 12.2 is limited to three specific contexts: (1) where the defendant relies on the defense of his "insanity at the time of the offense," *see* Fed. R. Crim. P. 12.2(a); (2) where the defendant uses expert mental health expert evidence that bears on "the issue of guilt," *id.* at 12.2(b)(1); and (3) where the defendant uses mental health expert evidence that bears on "the issue of punishment in a capital case", *id.* at 12.2(b)(2). None of the contexts covered by Rule 12.2 – insanity at the time of the offense, guilt, or capital sentencing – is implicated by the competency issue raised by the Defendant and, as such, Rule 12.2 does not apply here.

Even if Rule 12.2(c)(2) did apply, it does not limit the Government's access to evidence that the Defendant intends to offer to establish that he is incompetent to stand trial.  Rule 12.2(c)(2), by its express terms, is narrowly limited to mental health evidence that is used "solely" during the capital sentencing phase.  Fed. R. Crim. Pro. 12.2(c)(2); *see also* Fed. R. Crim. Pro. 12.2(c), Adv. Comm., 2002 Amendments (explaining Rule 12.2(c) was amended to address "if, and to what extent, the prosecution may see the results of the examination, which may include the defendant's statements, when evidence of the defendant's mental condition is being presented *solely at a capital sentencing proceeding*") (emphasis added)); *see also United States v. Karake*, No. 02-CR-0256, 2006 WL 623676 (D.D.C. March 6, 2006) (noting that "Rule 12.2(b)(2) applies only to 'the issue of punishment in a capital case,' not to the issue of guilt at trial or the admissibility of relevant evidence at pre-trial proceedings" (internal citation omitted)).  Rule 12.2(c)(2) simply ensures that, consistent with *Estelle*, the Government does not gain access to a defendant's compelled statements until after the guilt phase if the defendant withholds that evidence until the capital sentencing proceedings.

However, if a defendant chooses not to reserve such evidence until the sentencing phase, the delayed disclosure procedures in Rule 12.2(c)(2) no longer apply.  Instead, Rule 12.2(c)(4) expressly provides that the statements made by the defendant that are otherwise covered by Rule 12.2 may be admitted into evidence against the defendant after the defendant "has introduced evidence of incompetency."  Rule 12.2 does not provide any basis to shield the prosecution team from the competency hearing and relevant evidence.

## 2. The Sixth Amendment is not violated where the Defendant has had the opportunity to consult with counsel

The Supreme Court has held that the Sixth Amendment may be violated where a defendant is not given the opportunity to consult with counsel in advance of a psychiatric

6

examination regarding the scope of the examination and the decision of whether to submit to the examination, and the evaluating expert testifies concerning an issue that the defendant's counsel could not have anticipated. *Estelle*, 451 U.S. at 471; *see also Powell v. Texas*, 492 U.S. 680 (1989) (per curiam); *Buchanan*, 483 U.S. at 424-25 (holding no Sixth Amendment violation where counsel was on notice of the possible uses of the psychiatric evidence). The Sixth Amendment *may* limit the Government's use of the competency evaluation at trial, but it does not bar the Government's access to the evaluation for the purposes of participating in the competency proceedings.

In conclusion, the Government is entitled to receive a copy of a competency evaluation as demonstrated by the statutory authority and case law cited. No constitutional provision or rule limits this disclosure. Therefore, the Government respectfully requests a copy of any such evaluation performed in this case.

Respectfully submitted,

BETH DRAKE
UNITED STATES ATTORNEY

BY: s/*Julius N.* Richardson
BY:*s/J.D. Rowell*
JULIUS N. RICHARDSON (ID #9823)
J.D. ROWELL (ID# 9802)
EVERETT E. MCMILLIAN (ID # 11791)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
April 9, 2018        Tel. (803) 929-3000

7

1   Judy Clarke
    Clarke and Rice, APC
2   1010 2nd Avenue, Suite 1800
    San Diego, CA 92101
3   (619) 308-8484

4   Mark Fleming
    Law Office of Mark Fleming
5   1350 Columbia Street, #600
    San Diego, CA 92101
6   (619) 794-0220

7   Reuben Camper Cahn
    Federal Defenders of San Diego, Inc.
8   225 Broadway, Suite 900
    San Diego, CA 92101
9   (619) 234-8467

10  Attorneys for Defendant Jared Lee Loughner

11              UNITED STATES DISTRICT COURT

12              DISTRICT OF ARIZONA

13  UNITED STATES OF AMERICA,      )    Case No. CR 11-0187-TUC LAB
                                   )
14          Plaintiff,             )
                                   )
15  v.                             )    **DEFENDANT'S REQUESTS RE:**
                                   )    **COMPETENCY PROCEDURES**
16  JARED LEE LOUGHNER,            )
                                   )
17                                 )
            Defendant.             )
18  _____)

19          On March 14, 2011, counsel met to discuss logistical procedures for a court ordered

20  competency evaluation of Mr. Loughner.  No agreement was reached.  Defense counsel now

21  propose the following procedures for these proceedings:

22          (1) **Location of court-ordered evaluation and designation of examiner**

23          We resisted the government's motion for a competency hearing due to our concern that

24  such an evaluation would disrupt our ongoing efforts to develop and maintain a stable attorney-

25  client relationship with our seriously ill client.  Now that the evaluation has been ordered despite

26  these concerns, we request that any court ordered evaluation take place at U.S.P. Tucson, where

27  Mr. Loughner is currently housed.  This will allow Mr. Loughner to remain in the physical

28  surroundings he is now in, and avoid his movement to yet a third facility in nine weeks.  We

                                        1

appreciated the suggestion of the government to move Mr. Loughner to the MCC in San Diego, but believe that the physical transfer itself would be disruptive. Beyond this, San Diego's MCC is the oldest high rise federal detention facility in the nation, and lacks dedicated visiting facilities. It is not possible to arrange truly private visits with clients at the MCC in San Diego. Finally, while defense counsel live in San Diego, other defense team members involved in visiting with Mr. Loughner do not, and they are able to visit with him, as well as to accomplish other case-related tasks so long as he remains in Tucson.

After initially recognizing the gravity of these concerns, the government has now apparently shifted course and asks that Mr. Loughner be removed to a facility far more distant, where none of the defense team resides, and where not only Mr. Loughner's physical location will be disrupted, but also the entire work of the defense team. This request flies in the face of even the government's own expert, Dr. Faerstein, who opines that "In most cases, the interview alone is sufficient to reach a credible opinion." *See* DE 156-2, p. 2. It is undisputed that this clinical interview can be performed in any location, including U.S.P. Tucson. Even the closest of the BOP facilities recommended by the government will require substantial travel, loss of time, and limited access by the defense team.[1] Beyond this, removal to a distant BOP facility for a BOP sponsored competency evaluation will impose significant and unnecessary costs, impede the work of the defense, and prevent the defense from undertaking its own work with

---

[1] Indeed, 18 U.S.C. §4247(b), appears to recognize the impact such movement can have on the work of the defense and the attorney client relationship; the statute contemplates that when the court commits an individual for a competency evaluation, it will be done in a suitable facility "closest to the court." U.S.P. Tucson is that facility. The government's preference for a lengthy commitment to an MRC is based only on the possibility that evaluation at U.S.P. Tucson might prove difficult. *See* DE 156-1, Memo of Dr. Lewis (mission of U.S.P. is inconsistent with a "competency study" when another BOP facility is more suited). It is also surprising that the government would now argue that the competency examination should not take place in the institution where it chose to place Mr. Loughner. When it chose to place him there, the government knew full well that any defense evaluations would have to take place at U.S.P. Tucson. Certainly, the government anticipated the defense doing its work with Mr. Loughner at the U.S.P., and reaching necessary accommodations for such.

2

1    Mr. Loughner.  Finally, as noted below, we specifically object to a competency evaluation by

2    BOP employees.

3    **(2)    Designation of Examiner**

4        18 U.S.C. §4241(b) provides that prior to the date of the competency hearing "the court

5    may order that a psychiatric or psychological examination of the defendant be conducted, and

6    that a psychiatric or psychological report be filed with the court, pursuant to the provisions of

7    section 4247(b) and (c)."  The statute requires that, if an examination is ordered, the examiner

8    "shall be designated by the court."  *See* 18 U.S.C. §4247(b).[2]  The statute also provides that the

9    examination shall be conducted by a "licensed or certified psychiatrist or psychologist."

10   Consistent with this Court's practice in competency proceedings, we request that the Court

11   designate a qualified examiner to travel to U.S.P. Tucson for purposes of the evaluation.[3]

12   Considering the devastating effect the crime charged had on the Tucson metropolitan area,

13   counsel request that the Court select an examiner who is not from the Tucson area.  To ensure

14   that the examiner both be and appear to be impartial, counsel further request that the Court not

15

16       [2]  Indeed, §4247(b) provides for an additional examiner selected by the defendant in

17   §§4245, 4246 or 4248 proceedings.  The statute does not provide for an examiner selected by

18   the government for §4241 proceedings, or any other proceedings under Chapter 313.

19       [3] As the Court noted during the hearing on March 9, it is common to bring in an outside
     psychiatrist on competency issues to go to the jail to perform the clinical examination:

20

21   THE COURT:              Can it be done here so that he is not disrupted from his cell and that

22                           counsel can continue to see him?

23   MR. KLEINDIENST:        B.O.P. here doesn't have that capacity, but I suspect we can get a
                             psychiatrist to examine him, Judge.

24

25   THE COURT:              I don't know what the practice is here, but in the district where I am
                             from, we frequently bring in an outside psychiatrist on competency

26                           issues who go to the jail where the defendant is and do a clinical
                             examination, and then do a report and report back to the court. I

27                           think that would be less disruptive than pulling him away.

28       Transcript of Hearing, March 9, 2011, at p. 34-35.

3

JA0192

1  appoint any examiner employed by the government, and specifically object to any evaluation by

2  Bureau of Prison employees.  We think that appointing a government employed evaluator would

3  be especially inappropriate in view of the fact that the examination and hearing have been

4  ordered on motion of the government and over defense objection.

5              **(3)    Notice of Any Proposed Testing Instruments**

6          The defense requests notice of any psychological testing instruments or protocols that the

7  examiner intends to employ in the course of the competency evaluation.  The defense makes this

8  request, so that it may object to the use of any irrelevant or unreliable instruments.  Beyond this,

9  the defense specifically objects to any personality testing since the results of such testing or

10  personality inventories would not be in any way relevant to the issue of competency.

11  Undersigned counsel request further that the Court's order designating the examiner make clear

12  that the evaluation is to be for competency only and should not expand into areas of diminished

13  capacity, sanity at the time of the offense, or sentencing aggravating or mitigating factors.

14              **(4)    Protection of Statements and Materials**

15          The competency evaluation and hearing have been ordered over defense objection and

16  are thus compelled.  Adverse use of statements made by Mr. Loughner during that examination

17  in his prosecution – including his responses to test questions – would violate the Fifth

18  Amendment.  *See Estelle v. Smith*, 451 U.S. 454 (1981)(prosecution use at capital sentencing

19  hearing of statements obtained during compelled competency examination violates Fifth

20  Amendment.).  As a result, we request that the Court enter an order directing that any and all

21  statements, and fruits of statements, made by Mr. Loughner during this court ordered

22  competency evaluation be protected from use during any proceedings against Mr. Loughner.[4]

23          Furthermore, although the Court is primarily concerned with Jared Loughner's ability to

24  understand the nature of the proceedings, the examination is to extend to the second prong of the

25

26          [4]  Absent such protective order, the court would have to further order Mr. Loughner's

27  participation in the evaluation.  *See Estelle v. Smith*, 451 U.S. 454, 469 (in face of Fifth
Amendment objection, competency examination can proceed upon condition that the results

28  would be applied solely for that purpose).

competency standard, namely, whether he is able to assist counsel. As the Court recognized, input from defense counsel on this issue is critical. *See* March 9, 2011, R.T. 45 ("I am deferential to you on the first prong, I am. And necessarily so. Whether he is cooperating with you in the first instance is best answered by you and his other counsel. But I am not going to try to limit the psychiatrist to one or two prongs that are at issue in the case."). Counsel can provide a court appointed evaluator with information and candid impressions gleaned from their privileged communications with their client only if assured that such matters will not be disclosed to the government.

Accordingly, counsel further request that information and materials provided by defense counsel remain privileged and confidential and that the examiner's report be disclosed first to the defense and court only, so that counsel may propose those redactions necessary to protect Mr. Loughner's Fifth and Sixth Amendment rights and matters of attorney client privilege.[5]

### (5)    Videotaping of Examination

The competency evaluation is a critical proceeding at which defendant has the right to counsel. *Estelle*, 451 U.S. at 469-71. In order to safeguard Mr. Loughner's Sixth Amendment rights, as well as to create a full and reliable record of the basis of the evaluator's opinion, counsel requests that provision be made for observation by defense counsel of the examination by live video feed, that the examination be videotaped, that the videotape be secured, and be disclosed only to defense counsel. *Accord*, *e.g., United States v. Johnson*, 362 F. Supp. 2d 1043, 1085-91 (D. Iowa 2005) (rejecting defense counsel's request under Fifth and Sixth Amendments to be present at government testing under Rule 12.2, but ordering that government examination be tape recorded and copies provided immediately to defense counsel); *United States v. Fell*, 372 F. Supp. 2d 753, 761 (D. Vt. 2005) (rejecting defense request under Fifth and Sixth Amendment

---

[5] Should the Court determine that BOP records (which are at issue in a motion currently pending before the Court) should be produced to the examiner for purposes of this competency proceeding, it is requested that these materials also be protected from further use in proceedings against Mr. Loughner.

5

to be present at government testing under Rule 12.2, upon government's agreement to tape

record interview and provide defense counsel with option of simultaneous audio-feed).

Respectfully submitted,

*Judy Clarke*

DATED: March 16, 2011

_____
JUDY CLARKE
MARK FLEMING
REUBEN CAMPER CAHN
Attorneys for Jared Lee Loughner

Copies of the foregoing served electronically to:
Wallace H. Kleindienst, Beverly K. Anderson
Christina M. Cabanillas, Mary Sue Feldmeier

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| vs | ) | |
| | ) | |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

**BRANDON COUNCIL'S OPPOSITION TO MENTAL COMPETENCY
EXAMINATION AND PREMATURE DISCLOSURE OF PRETRIAL
PSYCHIATRIC OR PSYCHOLOGICAL EXAMINATION REPORT TO THE
GOVERNMENT**

In this federal capital proceeding, the court asked the parties to brief the issue
of whether the government is entitled to a copy of a report of a competency evaluation
conducted under 18 U.S.C. § 4241. The defense has neither argued nor suggested that
Mr. Council is incompetent to stand trial, and he has not introduced evidence of
incompetence. Additionally, the prosecution has stated that from its perspective,
competence to stand trial is not an issue in the case. The court has nevertheless raised
the issue of competency, and of the need for a competency evaluation, *sua sponte*. The
defense objects to such an examination as unwarranted and potentially prejudicial to
Mr. Council. However, if the court compels such an examination over the defense's
objection, the defense further objects to the court's providing the government with
any competency report -- or with any other detailed information --derived from Mr.
Council's participation in a competency examination.

**A.      Background on federal competency statute**

The federal statute covering competence to stand trial is 18 U.S.C. § 4241 *et seq*. The competency test is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 40 2 (1960). Before a competency evaluation is conducted, there must be reasonable cause to believe that the defendant may be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature of the proceedings against him or to assist properly in his own defense. *See* 18 U.S.C. § 4241(a). Under such circumstance, the court may order a psychiatric or psychological hearing be conducted and a report be filed with the court. 18 U.S.C. §§ 4241(b) and 4247(b) and (c).

**B.      In death penalty cases, competency determinations must be conducted with due regard to the special capital-case provisions of Federal Rule of Criminal Procedure 12.2**

The issue of premature disclosure of penalty-phase mental health information obtained through a competency evaluation pursuant to a § 4241 evaluation does not arise in non-capital cases. Therefore, the general competence statute, § 4241, does not address this issue directly. However, the 2002 amendments to Rule 12.2 of the Federal Rules of Criminal Procedure, which were designed to allow for pretrial disclosure of certain sensitive mental health information by the defendant in a capital proceeding, provide a comprehensive scheme for forensic mental health examinations in capital cases.

Rule 12.2(b)(2)-(e) reflects an effort to balance between protecting a capital defendant's Fifth Amendment rights and the government's ability to fairly and efficiently respond to any expert evidence the defendant introduces concerning his mental condition at the penalty phase of trial. *See* Fed. R. Crim. P. 12.2 (2002 Amendment advisory committee's note); *United States v. Sampson*, 82 F. 3d 502 (D. Mass. 2014). In sum, Rule 12.2 allows the government's experts, but not the government's lawyers, to have pretrial access to a defendant who intends to present expert mental health evidence in the event of a conviction. But the Rule guards against premature discovery of the defendant's case by sealing the government's experts' work product until the start of the penalty phase, and grants the prosecution access to its own expert's report only if the defendant reconfirms his intent to introduce expert mental health testimony in mitigation of punishment. Allowing the prosecution to have access to the report of a § 4241 evaluation when Mr. Council has *not* placed his mental health or insanity at issue would upset the constitutional balance provided by Rule 12.2, and violate the United States Constitution.

## C.     Competency evaluation process under 18 U.S.C. § 4241

Under § 4241, either party or the court may move for a competency evaluation, and the court "shall grant the motion . . . if there is reasonable cause to believe the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against or to assist properly in his defense." 18 U.S.C. § 4241(a). If the court orders such an examination, the statute requires that a

report of the examination be prepared, which must include findings, tests, diagnosis, etc. *See* 18 U.S.C. §§ 4241(b), 4247(b) and (c). After the examination is concluded, and before a hearing, if necessary, the report of the examination "shall be filed with the court with copies provided to counsel for the person examined and to the attorney for the Government…" 18 U.S.C. § 4247(c).

Here, neither party moved for a competency evaluation. Notably, although the prosecution states that Mr. Council's competence to stand trial is not an issue in this case, it still wants a copy of the report of the § 4241 evaluation if the court orders one over the defense's objection.[1]

**D.    Fifth and Sixth Amendments protection is undermined if the court orders an evaluation and provides the report to the prosecution**

This is a case in which the government seeks to have Mr. Council executed. Without request from either party, this court is considering compelling Mr. Council to submit to a competency evaluation over defense counsel's objection. *Cf. Medina v. California*, 505 U.S. 437, 450 (1997) ("counsel will often have the best-informed view of the defendant's ability to participate in his defense."); *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1990) ("[w]hile the opinion of counsel certainly is not determinative,

---

[1] The government also stated that the court might order a competency evaluation to be conducted by a local, qualified forensic psychologist or psychologist. Such an evaluation may be conducted without undue delay. Moreover, the defendant will not be removed from this jurisdiction during the examination process. If the defendant is moved to a BOP facility for the examination, he will be separated from his counsel and any potential experts and consultants essential to the defense of the defendant. Such separation may result in scheduling delays for defense testing and consultation. From the defendant's standpoint, a local evaluation is a better option than a BOP evaluation from a logistics standpoint, in addition to the other reasons set forth herein.

a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings").

A mental evaluation implicates the Fifth and Sixth Amendments' protections against compelled self-incrimination and right to counsel. *See Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866 (1981). In *Estelle,* the Supreme Court held that when a criminal defendant "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence," his compelled statements to a psychiatrist cannot be used against him. Subjecting Mr. Council to an examination will involve questioning him about matters that, with the death penalty hanging over his head, are constitutionally protected areas.

In *Buchanan v. Kentucky,* 483 U.S. 402, 423–24 (1987), the Supreme Court held that where a defense expert who examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence for the purpose of "limited rebuttal." As the Court later explained, "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." *Kansas v. Cheever,* 571 U.S. 87, 134 S. Ct. 596, 601 (2013). So even under those circumstances, a defendant's introduction of expert evidence concerning his mental condition does not justify the admission of all evidence the government may want to introduce. *Id.* at 603. Rather, the court must assure that the government's evidence does not "exceed[] the scope of rebuttal testimony permitted by the Fifth Amendment or by the [] evidentiary rules." *Id.*

Ordering Mr. Council to submit to a § 4241 competence evaluation at this juncture in the case forces defense counsel to make judgments about the presentation of mental health evidence before counsel has concluded its mental health mitigation investigation and made a decision about the presentation of mental health evidence if the cases reaches a sentencing phase. If the prosecution will be provided a copy of the § 4241 evaluation report, it risks providing the government with a preview of both the mental health issues in the case and its own potential case in rebuttal, while undermining the defense's mental health investigation and the trust being built between client and counsel.

**E.    Disclosure of competency report also undermines the protections of Rule 12.2**

Rule 12.2 obligates a defendant to provide notice of an insanity defense, Fed. R. Crim. P. 12.2(a), and of his intention to present expert mental health evidence bearing on issue of punishment in a capital case. Fed. R. Crim. P. 12.2(b)(2). It further provides for examination of the defendant by a government expert in certain circumstances. Fed. R. Crim. P. 12.2(c). The Court's authority to order a mental examination of a defendant is found in Rule 12.2(c)(1):

(A)    The court may order the defendant to submit to a competency examination under 18 U.S.C. § 4241.

(B)    If the defendant provides notice under Rule 12.2(a) (insanity), the court must, upon the government's motion, order the defendant to be examined under 18 U.S.C. § 4242. If the defendant provides notice under Rule 12.2(b), the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.

JA0201

As Rule 12.2(c)(1) indicates, if a defendant intends to assert an insanity defense, examination is mandatory. However, if a defendant plans to offer expert evidence on guilt, or on punishment in a capital case, it is discretionary. A defendant's notice pursuant to Rule 12.2(b) triggers the discretionary aspect of Rule 12.2(c)(1)(B). In addition, Rule 12.2(c)(2) provides as follows:

> The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

Rule 12.2(c)(2) was amended in 2002 and

> "adopts the procedure used by some courts to seal or otherwise insulate the results of the examination until it is clear that the defendant will introduce expert evidence about his or her mental condition at a capital sentencing hearing; i.e., after a verdict of guilty on one or more capital crimes, and a reaffirmation by the defendant of an intent to introduce expert mental-condition evidence in the sentencing phase."

Fed. R. Crim. P. 12.2 advisory committee note (2002). "Most courts that have addressed the issue have recognized that if the government obtains early access to the accused's statements, it will be required to show that it has not made any derivative use of that evidence." *Id.*

Rule 12.2(c)(2) ensures that pretrial access to a capital defendant by prosecution experts will not impinge on his constitutional protections. It accomplishes this by denying the prosecution *access* to its own mental health experts' examinations before a guilty verdict and the defendant's affirmation that he intends to introduce mental health testimony during the sentencing

phase. If the defendant plans on using expert evidence as to a mental condition

in the sentencing phase, then it is improper to allow the government access to

these materials pre-trial; thus, it is proper to insulate or seal the results of a §

4241 examination from the government. Section 4247(c) has no such

protections, and statements made to the forensic examiners are not

confidential or privileged.

**F.    A § 4241 evaluation report is privileged information which the prosecution is not entitled access under these circumstances.**

Standard 7-4.6 of the American Bar Association's *Criminal Justice Mental Health Standards* (2d. Ed, 1989), states:

> Any information or testimony elicited from the defendant at any hearing or examination on competence or contained in any motion filed by the defendant or any information furnished by the defendant to the court or to any person evaluating or providing mental health or mental retardation services, and any information derived therefrom and any testimony of experts or others based on information elicited from the defendant, should be considered privileged information and should be used only in a proceeding to determine the defendant's competence to stand trial and related treatment or habilation issues.

Rule 12.2(c)(4) provides: "No statement made by a defendant in the course of

any examination conducted under this rule (whether conducted with or without the

defendant's consent), no testimony by the expert based on the statement, and no other

fruits of the statement may be admitted into evidence against the defendant in any

criminal proceeding except on an issue regarding mental condition on which the

defendant:

> (A)    has introduced evidence of incompetency or evidence requiring notice under Rule 12.2(a) or (b)(1), or

(B)    has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

According to the advisory committee notes, Rule 12.2(c), previously "restricted admissibility of the defendant's statements during the course of an examination conducted under the rule to an issue respecting mental condition on which the defendant "has introduced testimony"—expert or otherwise." Fed. R. Crim. P. 12.2 advisory committee note (2002). However, when Rule 12.2 was amended in 2002, Rule 12.2(c)(4) "provides that the admissibility of such evidence in a capital sentencing proceeding is triggered only by the defendant's introduction of expert evidence." *Id*. In this context, the "Committee believed it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant has first introduced expert evidence on issue." *Id*.

The Government intends to use any information included in a 4241 competency evaluation to rebut any mental health claims a Defendant may assert in a penalty phase.

This court should strike the right balance between this court's concerns for the defendant's competence and putting the defendant to an unfair disadvantage as a result of a competency evaluation which has not been sought by the Government or the Defendant. The Government has cited *United States v. Loughner*, 4:11-cr-187, see ECF 96 at 3, n.2, in support of its position. *Loughner*, however, is a case where the defendant moved for a competency evaluation. This case is the exact opposite of *Loughner* and presents a more compelling case against disclosure of the report of any such evaluation, because neither Mr. Council nor the prosecution put his competence

at issue. Providing the prosecution with a copy of the report prepared as a result of a compelled § 4241 examination would undermine Mr. Council's Fifth and Sixth Amendment rights, as well as his right to a fair trial and a fair penalty phase should one become necessary.

By obtaining a copy of the § 4241 report, the government would be getting a leg up from the court through free discovery of Mr. Council's personal medical and mental health history in an "end run" around the carefully crafted Rule 12.2(c) restrictions and sealing requirements. Indeed, as contemplated by this court, if past practice is a reliable guide, the DOJ-employed forensic examiners at Butner FMC would be allowed to subject the defendant to a wide range of diagnostic testing, such as personality testing (MMPI), intelligence testing (WAIS), brain imaging, and psychopathy testing – all testing which, when carefully considered, experts retained by the defense may advise for or against performing for various reasons. It is too early in the investigation for the defense to determine which, if any, of the above type of testing is necessary in this case. In reviewing one recent report of a § 4241 evaluation in a non-capital case, the forensic examiners performed the following tests: Rey Fifteen Item Test, Test of Memory Malingering, Validity Indicator Profile, Minnesota Multiphasic Personality Inventory, Personality Assessment Inventory, Wechsler Abbreviated Scale of Intelligence, Wide Range Achievement Test, and Evaluation of Competence to Stand Trial. The examiners are not limited as to the tests and diagnostic procedures they are allowed to perform. Nevertheless, personality testing and psychopathy testing are clearly beyond the scope of a

competency evaluation and should not be permitted if the court orders the evaluations.

Such unlimited freedom to perform whatever test the BOP evaluators deem appropriate, even if dubious in theory and/or dubious in practice, is to Mr. Council's legal detriment. Indeed, it is impossible for Mr. Council to know what questions will be asked of him and what tests will be performed, thereby significantly impairing his due process rights.

The defendant's concerns about the advantage the Government would be given if it is given a copy of the report of a competency evaluation are borne out by the Government's Request for Disclosure, *US v. Council*, 4:17-cr-00866, ECF No. 96. The Government candidly admits that it intends to use any statements made by the defendant and information about the Defendant learned during a court compelled competency evaluation. "The Government is, of course, permitted to use a defendant's statement made during a competency evaluation and other psychiatric evaluations, but to rebut any mental health evidence that a defendant uses as a defense to his guilt or as mitigation at sentencing." Id at 4.

Given that the report would include various tests and other diagnostic tools, the Government will undoubtedly make those items available to its rebuttal experts. The Government intends to use any test or diagnostic procedure or statements made by the defendant during the competency evaluation against the defendant to rebut claims not related to competency, but, more narrowly, mental health evidence under Rule 12.2(b)(2). By disclosing the report of the competency evaluation to the

Government, the court unnecessarily expands the amount of rebuttal evidence the Government has far beyond that envisioned in Rule 12.2 and *Kansas v. Cheever*, 134 S. Ct. at 603. [2]

## **CONCLUSION**

Mr. Council has not placed his competence or mental health at issue in this case, and the court has before it no reason to doubt his present competency to stand trial. For this reason, the court should not order a competency examination. But should such an examination be ordered, the court should at least take all necessary measures to ensure that it does not provide ammunition for the government's effort to secure Mr. Council's execution. If the court orders a competency evaluation examination, it should not provide the prosecution with a report. No prejudice will inure to the prosecution if it does not obtain a copy of the report of the § 4241 evaluation. The prosecution, which has stated that competence is not an issue in this case, should receive no unfair windfall from Mr. Council's cooperation with a court ordered competency evaluation.

[signature blocks to follow]

---

[2] *Kansas v. Cheever,* 134 S.Ct. 596. *Buchanan v. Kentucky*, 483 U.S. 402, *Estelle v. Smith,* and *Giarratano v. Procunier,* 891 F.2d 483 (4th Circ. 1989) did not hold that the Government is entitled to a copy of a competency evaluation. This Court should not hold the Government is entitled to a copy of the report by negative implication in cases where that issue did not arise. None of these cases concerned the tension between the disclosure of a report on a 4241 evaluation and Rule 12.2, particularly where, as here, neither the Government nor defense have requested a competency evaluation.

Respectfully submitted,

**/s/ DUANE K. BRYANT,**
Learned Counsel
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935

**/s/ MICHAEL A. MEETZE,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

**/s/ AKIN ADEPOJU,**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH-1

v.

**BRANDON MICHAEL COUNCIL**

### ORDER FOR CONTINUANCE

This matter comes before this court after a pretrial hearing on April 6, 2018, wherein the parties discussed the scheduling of this matter for a jury trial. Defendant Brandon Michael Council is charged with several offenses for which the death penalty is a possible punishment. The Government filed a notice of intent of to seek the death penalty on March 21, 2018. *See* Docket Entry ("DE") 81. Prior to the hearings, the Government (DE 91) and Council's attorneys (DE 92) filed proposed scheduling orders with the Court. During the hearing, the Court scheduled the trial of this case for January 14, 2019, in addition to requesting briefing on several issues.

After discussions on the matters of scheduling, the Court questioned Defendant Council on the matter of his rights under the Speedy Trial Act. Mr. Council advised that he understood that he has a right to a speedy trial. After acknowledging those

-1-

rights, he orally waived his rights to a speedy trial and agreed to a continuance.

Accordingly, the Court finds that a continuance is justified under the provisions of Title 18, United States Code Section 3161(h)(7)(A), because the Court finds that the ends of justice served by granting the motion for continuance outweigh the best interest of the public and the defendant in a speedy trial. In making this finding, the Court has considered the fact that this case is both unusual and complex, the nature of the prosecution, and the fact that this case likely involves novel questions of fact and/or law, such that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section. *See* 18 U.S.C. § 3161(h)(7)(B).

IT IS THEREFORE ORDERED that the trial of this case is continued until January 14, 2019.

IT IS FURTHER ORDERED that any period of delay resulting from this continuance is excluded under the provisions of Title 18, United States Code, Section 3161(h)(7)(A).

April 10, 2018                          s/ R. Bryan Harwell
Florence, South Carolina                R. Bryan Harwell
                                        United States District Judge

-2-

JA0210

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 4:17-cr-00866-RBH |
| v. | |
| BRANDON MICHAEL COUNCIL | GOVERNMENT'S RESPONSE TO DEFENSE BRIEF OPPOSING COMPETENCY EVALUATION |

The Court directed the Government to respond to the Defendant's brief addressing a potential competency evaluation pursuant to 18 U.S.C. § 4241.   ECF Nos. 97, 101.   The Government defers to the Court's own evaluation in determining whether reasonable cause exists to question the Defendant's competency.  *See United States v. Banks*, 482 F.3d 733 (4th Cir. 2007). Regardless, as explained in the Government's Motion to Permit Disclosure of the Competency Evaluation, ECF No. 96, the notion that any prejudice would result from such an evaluation is unfounded and should not inform the Court's decision.  Moreover, if an evaluation is ordered, the Government is entitled to timely receive a copy pursuant to 18 U.S.C. § 4247(c).[1]

Congress has directed that trial courts must *sua sponte* order competency evaluations "under specified circumstances."  *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007).  To comply with this Court's independent obligation, it:

> . . . shall order such a hearing on its own motion [] *if there is reasonable cause* to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

---

[1] The Government incorporates its arguments on the issues of prejudice and the Government's right to a copy of an evaluation which are set forth in ECF No. 96 as if set forth herein.

18 U.S.C. § 4241(a) (emphasis added).  To determine whether reasonable cause exists, a court should look to "all of the record evidence pertaining to the defendant's competence, including: (1) any history of irrational behavior; (2) the defendant's demeanor; and (3) any prior medical opinions on competency." *United States v. General*, 278 F.3d 389, 397 (4th Cir. 2002); *cf. Dusky v. United States*, 362 U.S. 402 (1960) (The test for determining competency is whether "[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as a factual understanding of the proceedings against him.").[2] While the Government has not sought a competency evaluation at this time, it defers to the Court's own evaluation of the record in determining whether the dictates of Section 4241(a) require this Court to order such an evaluation.

Respectfully submitted,

BETH DRAKE
UNITED STATES ATTORNEY

BY: s/*Everett E. McMillian*_____
      JULIUS N. RICHARDSON (ID #9823)
      J.D. ROWELL (ID #9802)
      EVERETT E. MCMILLIAN (ID #11791)
      Assistant United States Attorneys
      1441 Main Street, Suite 500
      Columbia, South Carolina 29201
      Tel. (803) 929-3000

April 17, 2018

---

[2] The decision *not* to order a competency evaluation, even upon the motion of a party, is reviewed for an abuse of discretion.  *See, e.g., Banks*, 482 F.3d at 742-43  (no abuse of discretion in failing to order competency evaluation, *sua sponte*, for defendant  who was initially cooperative with his attorney but later turned on him and began filing frivolous motions and engaging in disruptive behavior in courtroom); *General*, 278 F.3d at 369-99 (applying reasonable cause standard, no error in district court's failure to order competency hearing before accepting guilty plea *sua sponte*, or in denying counsel's motion to continue sentencing to conduct further evaluation).

2
JA0212

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| vs | ) | **REPLY TO COURT ORDER** |
| | ) | |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

Comes now the Defendant, Brandon Michael Council, by and through his undersigned attorneys, and would show unto the Court that the Defendant concurs in the dates set forth in the pleading filed by the Government at ECF No. 109, based on this Court's ruling setting a trial date of January 14, 2019. The Defendant continues to object to the trial date of January 14, 2019. The Defendant specifically concurs with the deadlines to which the Government has stated the parties are in agreement; as to the deadlines to which the parties have not agreed, the court must resolve.

Respectfully Submitted,

**/s/ DUANE K. BRYANT,**
Learned Counsel
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ WILLIAM F. NETTLES, IV,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501

JA0213

Phone: (843) 662-1510
Attorney ID#: 5935

**/s/ MICHAEL A. MEETZE,**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

**/s/ AKIN ADEPOJU,**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA )   CR. NO.: 4:17CR00866-RBH(1)
                         )
        v.               )
                         )
BRANDON MICHAEL COUNCIL  )

1. My name is William F. Nettles, IV. I am one of the attorneys appointed by the court to represent Brandon Council in this capital case.
2. I began work as an Assistant Federal Public Defender in June 1995. I have worked in that position continuously since then.
3. In this case, I have met with Brandon Council, both in and out of court. To date, Brandon Counsel has been appropriately cooperative with counsel. Brandon Council has present ability to consult with counsel to a reasonable degree of rational understanding, and has a rational and factual understanding of the proceedings against him.
4. To make doubly sure that Brandon Council is competent, I had a board certified forensic psychologist, Dr. Geoffrey R. McKee, Ph D., ABPP, conduct a competency evaluation of Brandon Council on Monday, April 9, 2018. On April 10, 2018, Dr. McKee advised me that in his opinion Brandon Council was competent to stand trial.
5. Upon penalty of perjury, the foregoing is true and correct.


                                   Respectfully Submitted,

                                   /s/ WILLIAM F. NETTLES, IV,
                                   Assistant Federal Public Defender
                                   c/o McMillan Federal Building
                                   401 W. Evans Street, Suite # 105
                                   Florence, South Carolina 29501
                                   Phone: (843) 662-1510
                                   Attorney ID#: 5935

Florence, South Carolina

April 12, 2018

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.:  4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for a ruling on the Government's "Motion to Permit Disclosure of the Competency Evaluation" and Defendant Brandon Michael Council's "Motion in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government." *See* ECF Nos. 96 & 97.  For the reasons explained below, the Court grants in part Defendant's motion and finds the Government's motion is moot.

## Background

At the pretrial/status conference on April 6, 2018, the Court—out of an abundance of caution—expressed its initial concerns regarding whether Defendant's competency would be an issue in this case, and if so, whether to promptly order a mental (i.e., psychiatric of psychological) evaluation of Defendant pursuant to 18 U.S.C. § 4241.[1]  The Court asked counsel to submit memoranda regarding this issue, *see* ECF No. 93, and the parties filed the instant motions.  *See* ECF Nos. 96 & 97.  The Government also filed a response to Defendant's motion.  *See* ECF No. 108.

## Applicable Law

Under § 4241, a defendant or the Government may move for a hearing to determine the defendant's mental competency, or the district court "shall order such a hearing on its own motion, **if**

---

[1]    On March 22, 2018, the Court entered a Text Order directing the lawyers to be prepared to discuss the Court's consideration of a § 4241 evaluation at the April 6 conference. *See* ECF No. 83.

**there is reasonable cause** to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."[2] 18 U.S.C. § 4241(a) (emphasis added); *see United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007) (explaining the reasonable cause standard applies "when neither party to a criminal trial moves for a competency hearing"); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995) ("The district court must *sua sponte* order a competency hearing if reasonable cause is demonstrated."). "Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247 (b) and (c)." 18 U.S.C. § 4241(b).

"In determining whether there is reasonable cause to order a competency hearing, a trial court must consider all evidence before it, including evidence of irrational behavior, the defendant's demeanor . . . , and medical opinions concerning the defendant's competence." *Mason*, 52 F.3d at 1290. "Medical opinions are usually persuasive evidence on the question of whether a sufficient doubt exists as to the defendant's competence." *Id.* (internal quotation marks omitted). "Whether reasonable cause exists is a question left to the discretion of the district court." *United States v. General*, 278 F.3d 389, 396 (4th Cir. 2002).

## Discussion

On April 6, 2018, the Court explained its reasons for bringing the issue of competency to the

---

[2]      "The test for determining competency in a federal court is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.'" *United States v. Basham*, 789 F.3d 358, 379 (4th Cir. 2015) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

2

parties' attention, and counsel for both parties have continuously represented that in their opinion a mental evaluation bearing on the issue of competency was unnecessary. Moreover, in his instant motion, Defendant "objects to such an examination as unwarranted," emphasizes he "has *not* placed his competence or mental health at issue," represents "the [C]ourt has before it no reason to doubt his present competency to stand trial," and states "the [C]ourt should not order a competency examination." ECF No. 97 at pp. 1, 3, 12.

Additionally, Defendant's Proposed Scheduling Order filed on April 4, 2018, contains a "Deadline for 18 U.S.C. 4241 Defense Mental Competency Motion" and states that "[i]n the event no motion is filed, the Defense shall file an *Ex Parte* declaration under seal explaining why such a motion was not filed." ECF No. 92-1 at p. 3. Defendant subsequently filed a Motion to Seal in conjunction with its instant "Motion in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government," *see* ECF No. 102, and Defendant submitted for the Court's in camera review a declaration of defense counsel William F. Nettles, IV. The Government did not oppose the motion to seal, *see* ECF No. 106; the Court granted the motion, *see* ECF No. 114; and Mr. Nettles' declaration has now been filed under seal, *see* ECF No. 115.

Furthermore, the Court has not noticed any unusual behavior by Mr. Council at any hearing, and the Court is unaware of any unusual behavior before any magistrate judge. Defense counsel is fully aware, as they have indicated on the record, of their responsibilities regarding the issue of competency, and they have neither argued nor suggested that Mr. Council is incompetent to stand trial. *See, e.g.*, *United States v. Torrez*, 869 F.3d 291, 322 (4th Cir. 2017) (observing "[d]efense counsel's opinion about [the a]ppellant's competency was unequivocal"); *Tate v. True*, 264 F. App'x 314, 319 (4th Cir.

3

2008) ("[A] defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings[.]").  Additionally, the Government has represented Mr. Council's competency to stand trial is not an issue from its perspective, and has filed a response stating it "defers to the Court's own evaluation in determining whether reasonable cause exists to question the Defendant's competency." ECF No. 108.  Finally, the Court notes neither party has requested a mental evaluation or moved for a competency hearing at any time.

Based on the record, including the submissions and representations of counsel, the Court at this time does not have reasonable cause under 18 U.S.C. § 4241(a) to doubt Defendant's mental competency to stand trial.[3]  Accordingly, the Court **GRANTS IN PART** Defendant's motion[4] and **FINDS AS MOOT** the Government's motion.

**IT IS SO ORDERED.**

Florence, South Carolina                                      s/ R. Bryan Harwell
April 30, 2018                                                R. Bryan Harwell
                                                             United States District Judge

---

[3]     The Court emphasizes its initial consideration of a mental evaluation was simply a precautionary measure to avoid the issue of competency being raised at the eleventh hour.  And again, § 4241(a) requires the district court to order a competency hearing "if there is ***reasonable cause*** to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a) (emphasis added).

[4]     The Court **FINDS AS MOOT** Defendant's objection "to the [C]ourt's providing the [G]overnment with any competency report - - or with any other detailed information - - derived from Mr. Council's participation in a competency examination," ECF No. 97, as no § 4241 examination has been ordered.

4

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Crim. No.: 4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **SCHEDULING ORDER** |
| | ) | |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Court hereby sets the following schedule in the above-captioned matter:[1]

1.      The Government is directed to file a proposal on the matter of jury selection procedures on or before **May 4, 2018**.  The Defense is directed to respond to the Government's proposal on or before **May 18, 2018**.  The parties may file responses to the proposals of the opposing party on or before **June 4, 2018**.  **In addition to general jury selection procedures such as the method of strikes, manner of conducting voir dire, etc., Counsel are also directed to address deadlines for submission of a case specific questionnaire and any request for a state-wide panel.**

2.      The Government is directed to file a proposal on the matter of Rule 12.2 procedures on or before **May 21, 2018**. The Defense is directed to respond to the Government's proposal on this matter on or before **June 6, 2018**. The parties may file responses to the proposals of the opposing party on or before **June 20, 2018**. The deadline for any Defense notice of intent to offer evidence required under Fed. R. Crim. P. 12.2 is **October 15, 2018**.

3.      The deadline for the defendant to raise issues of competency is **June 1, 2018**. In the event that no motion is filed, the Defense shall file an ex parte declaration under seal explaining why.

4.      The deadline for the defendant to raise claims under *Atkins v. Virginia*, 536 U.S. 304 (2002) is **August 31, 2018**.

5.      The deadline for filing any motions addressing venue is **June 1, 2018**. The Government may respond by **June 25, 2018**.

---

[1]      Except for the Notice of Mitigation Factors deadline in paragraph 15 below, this Scheduling Order is based on dates agreed to by the parties as set forth in the joint motion to set a scheduling order. [ECF No. 118]. The Court may, in its discretion, alter this schedule if the need should arise.  Should either party believe a necessary deadline has not been addressed, they should consult and bring the matter to the Court's attention.

      The Court will issue a subsequent order addressing Rule 12.2 disclosures and procedures and jury selection procedures after it receives the parties' proposals as set forth in paragraphs 1 and 2 above.

6.      The deadline for filing motions to suppress any statements made by the Defendant is **September 17, 2018**.  The Government's response to any motions to suppress statements is due on or before **October 8, 2018**.

7.      The deadline for defendant to file motions that would be dispositive (i.e. motions to dismiss based on challenges to sufficiency of the indictment, grand jury process, etc.) is **August 27, 2018**.  The Government's response to any such motions is due on or before **September 10, 2018**.

8.      The deadline for filing motions to suppress evidence that is the fruit of any searches is **July 20, 2018.**[2]   The Government's response to any motions to suppress evidence that is the fruit of any searches is due on or before **August 3, 2018**.

9.      The parties are directed on or before **August 31, 2018**, to make disclosure of guilt phase non-mental health expert summaries required by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Crim. P. 16(b)(1)(C). Parties are directed to file on or before **September 21, 2018**, any summaries for experts identified in response to the opposing party's August 31 summaries. Any challenge to the testimony of guilt phase non-mental health experts or experts identified in response to such experts must be filed on or before **November 12, 2018**, with responses due on **November 26, 2018**.

10.     The parties are directed on or before **November 5, 2018**, to make disclosure of sentencing phase non-mental health expert summaries required by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Crim. P. 16(b)(1)(C). Parties are directed to file on or before **November 19, 2018**, any summaries for experts identified in response to the opposing party's November 5 summaries. Any challenge to the testimony of sentencing phase non-mental health experts or experts identified in response to such experts must be filed on or before **December 3, 2018**, with responses due on **December 19, 2018**.

11.     Any motion challenging the death penalty and the Government's notice of intent (if any) shall be filed on or before **September 18, 2018**. The Government may respond by **October 9, 2018**.

12.     The parties are directed to confer on the matter of jury instructions and verdict form for all phases of the trial and to submit on or before **November 16, 2018**, a joint proposal regarding any areas of common agreement and separate proposals regarding any areas in dispute. The parties may file responses to the proposals of the opposing party on or before **November 30, 2018**.

13.     The Government shall produce its guilt and sentencing phase witness and exhibit lists no

---

[2]      This deadline is based on the Government's assurances it will provide all outstanding discovery known to the Government by June 1, 2018.

later than **November 16, 2018**. The Defense shall produce its witness and exhibit list for the guilt phase (excluding any witnesses or exhibits related to Rule 12.2) no later than **December 31, 2018**. The Defense shall produce its witness and exhibit lists for any additional witnesses for the sentencing phase at the close of the Government's evidence in the guilt phase.

14.     Any motions *in limine* regarding the guilt phase shall be filed on or before **December 7, 2018**.  Deadlines regarding motions *in limine* as to the penalty phase shall be decided by the Court pursuant to briefings to be filed by the parties.

15.     In the event of a guilty verdict in this matter, the Defense shall, **within 12 hours of a guilty verdict**, present its Notice of Mitigation Factors.

16.     The Court will begin jury selection, with trial to follow, on or about **January 14, 2019**.[3]

        IT IS SO ORDERED.

May 2, 2018                                                s/ R. Bryan Harwell
Florence, South Carolina                                  R. Bryan Harwell
                                                          United States District Judge

---

[3]     The Court notes defense counsel's continuing objection to beginning the trial on or about January 14, 2019.  The government proposed a November 5, 2018 trial date. *See* [ECF No. 91-1].  Defense counsel proposed an April 1, 2019 trial date. *See* [ECF No. 92-1].  The Court, in its discretion, rejected both proposed dates and has set a date for January 14, 2019.

        The Court previously continued this case to January 14, 2019. *See* [ECF No. 99].  The Court construes defense counsel's continuing objection to the January 14, 2019 trial date as a request to continue the case beyond January 14, 2019.  Defense counsel contends that this case is proceeding faster than most other death penalty cases and suggests Defendant's 5th, 6th, and 8th Amendment rights could be violated if Defendant is rushed to trial. *See* [ECF No. 92].

        "In the course of trial, after due appointment of competent counsel, many procedural questions necessarily arise which must be decided by the trial judge in the light of facts then presented and conditions then existing.  Disposition of a request for continuance is of this nature and is made in the discretion of the trial judge, the exercise of which will ordinarily not be reviewed." *Avery v. State of Alabama*, 308 U.S. 444, 446 (1940); *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (stating "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for a delay' violates the right to assistance of counsel").

        The Defendant has four exceptional and highly qualified lawyers representing him.  The Court is not aware of any reason Defendant's lawyers cannot be ready to try this case on January 14, 2019, and defense counsel has offered no specific reason why they cannot be adequately prepared for trial on January 14, 2019.  Therefore, the Court, at this time, denies defense counsel's request for a continuance beyond the January 14, 2019 trial date.

3

JA0222

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Crim. No.: 4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **AMENDED SCHEDULING ORDER** |
| | ) | |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
|‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾| ) | |

The Court hereby sets the following schedule in the above-captioned matter:[1]

1.      The Government is directed to file a proposal on the matter of jury selection procedures on or before **May 4, 2018**.  The Defense is directed to respond to the Government's proposal on or before **May 18, 2018**.  The parties may file responses to the proposals of the opposing party on or before **June 4, 2018**.  **In addition to general jury selection procedures such as the method of strikes, manner of conducting voir dire, etc., Counsel are also directed to address deadlines for submission of a case specific questionnaire and any request for a state-wide panel.**

2.      The Government is directed to file a proposal on the matter of Rule 12.2 procedures on or before **May 21, 2018**. The Defense is directed to respond to the Government's proposal on this matter on or before **June 6, 2018**. The parties may file responses to the proposals of the opposing party on or before **June 20, 2018**. The deadline for any Defense notice of intent to offer evidence required under Fed. R. Crim. P. 12.2 is **October 15, 2018**.

3.      The deadline for the defendant to raise issues of competency is **June 1, 2018**. In the event that no motion is filed, the Defense shall file an ex parte declaration under seal explaining why.

4.      The deadline for the defendant to raise claims under *Atkins v. Virginia*, 536 U.S. 304 (2002) is **August 31, 2018**.

5.      The deadline for filing any motions addressing venue is **June 1, 2018**. The Government may respond by **June 25, 2018**.

---

[1]      Except for the Notice of Mitigation Factors deadline in paragraph 15 below, this Scheduling Order is based on dates agreed to by the parties as set forth in the joint motion to set a scheduling order. [ECF No. 118]. The Court may, in its discretion, alter this schedule if the need should arise.  Should either party believe a necessary deadline has not been addressed, they should consult and bring the matter to the Court's attention.
        The Court will issue a subsequent order addressing Rule 12.2 disclosures and procedures and jury selection procedures after it receives the parties' proposals as set forth in paragraphs 1 and 2 above.

6.      The deadline for filing motions to suppress any statements made by the Defendant is
**September 17, 2018**.  The Government's response to any motions to suppress statements is due
on or before **October 8, 2018**.

7.      The deadline for defendant to file motions that would be dispositive (i.e. motions to
dismiss based on challenges to sufficiency of the indictment, grand jury process, etc.) is **August
27, 2018**.  The Government's response to any such motions is due on or before **September 10,
2018**.

8.      The deadline for filing motions to suppress evidence that is the fruit of any searches is
**July 20, 2018.**[2]   The Government's response to any motions to suppress evidence that is the fruit
of any searches is due on or before **August 3, 2018**.

9.      The parties are directed on or before **August 31, 2018**, to make disclosure of guilt phase
non-mental health expert summaries required by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R. Crim.
P. 16(b)(1)(C). Parties are directed to file on or before **September 21, 2018**, any summaries for
experts identified in response to the opposing party's August 31 summaries. Any challenge to the
testimony of guilt phase non-mental health experts or experts identified in response to such
experts must be filed on or before **November 12, 2018**, with responses due on **November 26,
2018**.

10.     The parties are directed on or before **November 5, 2018**, to make disclosure of sentencing
phase non-mental health expert summaries required by Fed. R. Crim. P. 16(a)(1)(G) and Fed. R.
Crim. P. 16(b)(1)(C). Parties are directed to file on or before **November 19, 2018**, any
summaries for experts identified in response to the opposing party's November 5 summaries. Any
challenge to the testimony of sentencing phase non-mental health experts or experts identified in
response to such experts must be filed on or before **December 3, 2018**, with responses due on
**December 19, 2018**.

11.     Any motion challenging the death penalty and the Government's notice of intent (if any)
shall be filed on or before **September 18, 2018**. The Government may respond by **October 9,
2018**.

12.     The parties are directed to confer on the matter of jury instructions and verdict form for
all phases of the trial and to submit on or before **November 16, 2018**, a joint proposal regarding
any areas of common agreement and separate proposals regarding any areas in dispute. The
parties may file responses to the proposals of the opposing party on or before **November 30,
2018**.

13.     The Government shall produce its guilt and sentencing phase witness and exhibit lists no

---

[2]      This deadline is based on the Government's assurances it will provide all outstanding discovery
known to the Government by June 1, 2018.

later than **November 16, 2018**. The Defense shall produce its witness and exhibit list for the guilt phase (excluding any witnesses or exhibits related to Rule 12.2) no later than **December 31, 2018**. The Defense shall produce its witness and exhibit lists for any additional witnesses for the sentencing phase at the close of the Government's evidence in the guilt phase.

14.     Any motions *in limine* regarding the guilt phase shall be filed on or before **December 7, 2018**. Any motions *in limine* regarding the penalty phase shall be filed **after December 7, 2018**. After this date, motions shall be filed as soon as reasonably possible as determined by counsel once an issue is known to the party filing the motion. In no event shall motions be filed more than 48 hours after counsel learning of the issue, unless otherwise authorized by the Court.

15.     In the event of a guilty verdict in this matter, the Defense shall, **within 12 hours of a guilty verdict**, present its Notice of Mitigation Factors.

16.     The Court will begin jury selection, with trial to follow, on or about **January 14, 2019**.[3]

        IT IS SO ORDERED.

May 15, 2018                                    s/ R. Bryan Harwell
Florence, South Carolina                       R. Bryan Harwell
                                               United States District Judge

---

[3]       The Court notes defense counsel's continuing objection to beginning the trial on or about January 14, 2019. The government proposed a November 5, 2018 trial date. *See* [ECF No. 91-1]. Defense counsel proposed an April 1, 2019 trial date. *See* [ECF No. 92-1]. The Court, in its discretion, rejected both proposed dates and has set a date for January 14, 2019.
        The Court previously continued this case to January 14, 2019. *See* [ECF No. 99]. The Court construes defense counsel's continuing objection to the January 14, 2019 trial date as a request to continue the case beyond January 14, 2019. Defense counsel contends that this case is proceeding faster than most other death penalty cases and suggests Defendant's 5th, 6th, and 8th Amendment rights could be violated if Defendant is rushed to trial. *See* [ECF No. 92].
        "In the course of trial, after due appointment of competent counsel, many procedural questions necessarily arise which must be decided by the trial judge in the light of facts then presented and conditions then existing. Disposition of a request for continuance is of this nature and is made in the discretion of the trial judge, the exercise of which will ordinarily not be reviewed." *Avery v. State of Alabama*, 308 U.S. 444, 446 (1940); *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (stating "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for a delay' violates the right to assistance of counsel").
        The Defendant has four exceptional and highly qualified lawyers representing him. The Court is not aware of any reason Defendant's lawyers cannot be ready to try this case on January 14, 2019, and defense counsel has offered no specific reason why they cannot be adequately prepared for trial on January 14, 2019. Therefore, the Court, at this time, denies defense counsel's request for a continuance beyond the January 14, 2019 trial date.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.: 4:17CR00866-RBH |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

**BRANDON COUNCIL'S MOTION REQUESTING ORDER ON JURY
SELECTION PROCEDURES**

It is difficult to conceive of a greater burden to impose on a citizen than

deciding whether another human being should live or die. The decision must be made

by each capital juror, who is "called upon to make a 'highly subjective, unique,

individualized judgment'" as to which punishment the defendant deserves. *Turner v.*

*Murray*, 476 U.S. 28, 33-34 (1986). Selecting twelve people to make this daunting

decision fairly, unburdened as much as possible by pre-existing biases and

misconceptions, is a matter of crucial importance. The prosecution has submitted a

proposed order that it requests that the Court enter on order of jury selection

procedures. *See* Docket No. 122. The defense agrees with some of the requests made

but disagrees in other aspects. The defense requests that (1) the jury be drawn from

the district, (2) that attorneys participate in the questioning of prospective jurors,

and (3) that the parties should exercise peremptory challenges immediately following

the questioning of each individual juror so as to promote efficiency in the jury-

selection process.

1. **The Sixth Amendment requires that a jury be drawn from a fair cross section of the community and this should include a jury pool randomly drawn from the District of South Carolina.**

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community" as "an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 527-28 (1975). The impartial jury must be drawn from "the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI. The state and district here is South Carolina.

The modern judicial district is borne from statute. The Jury Selection and Service Act of 1968 specifically provides for splitting a district into divisions and using only one division's jury wheel for petit juries: "[A]ll litigants in Federal court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The language of § 1861 ("fair cross section of the community in the district or division") endorses the defendant's request and is allowed by this District's jury selection plan.

A. **Nothing prevents jury selection from the entire District**

It is beyond dispute that this Court has the authority to order that a jury be drawn from the entire district. *See generally United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972) (upholding conviction from trial with pool of potential jurors drawn from outside the division where defendant lived); *United States v. Grisham*, 63 F.3d 1074, 1081 (11th Cir. 1995) (upholding conviction where jury selection was district-

wide). The Jury Selection Plan for the District of South Carolina permit a district-wide petit jury upon order of the Chief Judge. *See* Amended Jury Selection Plan at 6[1]. One cannot imagine a better case to use a district-wide panel than in a capital case.

A statewide jury pool has been utilized in this District. *See United States v. Fulks*, No. 02-CR-992. The use of district-wide panels is not unusual. *See e.g., United States v. Blom*, 242 F.3d 799, 804 (8th Cir. 2001) (noting district court took proper precautions to assure the selection of an unbiased jury—including expanding the area from which the pool was drawn to the entire district); *United States v. Erickson*, 75 F.3d 470, 476 (9th Cir. 1996) (affirming decision to call additional venire persons from outside of district court's division). It is especially prudent in this case in light of the high publicity this case has generated.

**B. A jury pool drawn from the District of South Carolina will better ensure the avoidance of impartiality and exclusion.**

This case has received substantial pretrial publicity, particularly within the Florence division area. The chart below gives a brief overview of the media coverage this case has received.

| Tabor-Loris Tribune – 4 total | | | |
|---|---|---|---|
| __TAB__ | __DATE__ | __HEADLINE__ | __PERTINENT INFO__ |
| 1-1 | 8/22/17 | Bank robbery murder victims from Green Sea, Conway | Previous convictions of BC; Visitation/funeral arrangements |
| 1-2 | 8/23/17 | UPDATE: Murder, other charges await Council | Lists charges; Advancing the Kingdom Church: Newspring Church of Myrtle Beach (both set up funds for |

---

[1] Available online at: http://www.scd.uscourts.gov/Forms/Jury/Jury_Selection_Plan.pdf (last accessed May 12, 2018.

| | | | children/grandchildren of victims' families) |
|---|---|---|---|
| 1-3 | 9/12/17 | Arraignment Thursday for accused double murderer | Arraignment dates: state prosecutors to be present |
| 1-4 | 9/20/17 | Federal Grand Jury indicts on CresCom robbery, murders | Details of indictment |

**The State – 11 total**

| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
|---|---|---|---|
| 2-1 | 8/23/17 | Funeral plans made for victim of SC bank robbery | Visitation/funeral arrangements; statement from Mayor; named Council as person of interest |
| 2-2 | 8/23/17 | Police tweet: SC bank robbery suspect in custody. Minutes later, the tweet is deleted | Lt. Small states they have not yet confirmed custody |
| 2-3 | 8/24/17 | 'He was going to hurt somebody.' NC suspect outlines fatal SC bank robbery, affidavit says. | Details provided from affidavit; pieces of confession; events transpired before incident; court appearance and arrest |
| 2-4 | 8/27/17 | 'We can grieve, we can also have hope.' Conway mourns shooting death of 2 women | Statement from Tracy Pickens (owner of The Haberdashberry – mens clothing store); Statement from Travis Dannelly (Conway Chamber of Commerce board President); Statement from Rebecca Condeluci (realtor/Surfside resident); Newspring Church of Myrtle Beach set up account for Major grandchildren; Statement from Kaleb Dees (Pastor of Newspring Church); |
| 2-5 | 9/15/17 | Death sentence option on the table for suspect in deadly Conway bank robbery | "one of the nations deadliest bank robberies in recent years'; details from affidavit; bank audit details; state/federal court charges |

**My Horry News – 26 total**

| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
|---|---|---|---|
| 3-1 | 8/23/17 | 'They were beloved': Friends, colleagues remember Conway bank robbery victims | Statement from Richard Causey (former co-worker at Waccamaw/First Community Bank); Statement from David Morrow (CresCom Bank CEO); mention of attended churches: Statement from Kaleb Dees (Pastor of Newspring Church); Statement of Billy Green (known Skeen most of life) |

| 3-2 | 8/24/17 | Daisy Fair Flowers unifies Conway after tragedy | Not able to print whole article: talks about how flower shop made bows for display in memory of two victims |
|------|---------|---------|---------|
| 3-3 | 8/24/17 | Records: Suspect in Conway bank robbery admits to killings, robbery | Details of affidavit; mentions "Get Rich or Die Tryin"; Camera footage of Artis and Fogg; mention of Council destroying phone; amount of loss |
| 3-5 | 9/1/17 | Church Talk: Deceitful and desperately wicked! | Larry Deeds discusses murders across country (Roof, ISIS, Columbine, Watts, Ferguson, etc.); states problem is not skin, but sin |
| 3-6 | 9/22/17 | Death penalty being considered for NC man charged in murders at Conway bank | Federal prosecutors say death is a punishment option. |
| 3-7 | 1/8/18 | Court date postponed for suspect in Conway bank killings; Feds still deciding whether to seek death penalty | |
| 3-8 | 3/21/18 | Feds intend to seek death penalty for Conway murder suspect | Notice of Intent of death filed; Drake states reasons authorized |

| **Myrtle Beach – Online – 23 total** | | | |
|------|---------|---------|---------|
| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
| 4-1 | 9/01/17 | Police detail minute-by-minute response to fatal CresCom bank robbery | Details provided from affidavit; pieces of confession; events transpired before incident; court appearance and arrest |
| 4-2 | 9/14/17 | Death sentence option on the table for suspect in deadly Conway bank robbery | "one of the nations deadliest bank robberies in recent years'; details from affidavit; bank audit details; state/federal court charges |
| 4-3 | 12/13/17 | Deadly Conway bank robbery case set for speedy trial | Trial could go in January; Government cannot comment on ongoing investigations; charges weight capital punishment |
| 4-4 | 3/22/18 | Feds seek death penalty in Conway double murder, bank robbery | Notice of Intent of death filed; Drake states reasons authorized |
| 4-5 | 4/06/18 | Trial dates set in Conway double-murder, bank robbery case | Tentative January 2019 trial date; victims families not allowed to speak; competency evaluation possible |
| 4-6 | 5/03/18 | Will Conway bank robbery, homicide suspect undergo a mental evaluation? | Judge will not for Council to undergo mental evaluation; excerpts from Harwell's order; if convicted, 12 hours to provide mitigating factors; |

| WMBF News – 33 total | | | |
|---|---|---|---|
| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
| 5-1 | 8/22/17 | 'How could somebody go in there and hurt innocent people?:' Community reacts to Conway bank robbery that left two dead | Statement from Terry Massey (works near bank); Statement from Charles Clinton (citizen staying at nearby inn); statement from The Brandon Agency on behalf of CresCom Bank |
| 5-2 | 8/24/17 | Council admits to robbery, double-murder; told FBI he was 'desperate and needed money' | details from affidavit; bank audit details; state/federal court charges |
| 5-3 | 8/24/17 | Memorial funds established in memory of victims of deadly CresCom bank robbery | Advancing the Kingdom Church set up fund for Skeen family; Anderson Brothers Bank Miles for Miles Foundation (taking donations for Skeen children); CresCom Bank Skeen Educational Fund; CresCom Bank Major Grandchildren's Scholarship Fund; Coastline Women's Center to take donations for Major; Statement from Travis Dannelly (Conway Chamber of Commerce board President) |
| 5-4 | 8/28/17 | Hundreds gather for service honoring CresCom victim | Statement from Pamela Anderson; Statement from Ernest Anderson |
| 5-5 | 8/31/17 | Bank employees thank officers with breakfast; department donates trees to deadly bank robbery victims' families | Staff of CresCom bank serve MB Police Department breakfast to show appreciation; MB Police Deparment donates tree to each victims families (trees donated by Southern Scapes Landscaping and Garden Center – location on Hwy 501, Myrtle Beach) |
| 5-6 | 9/22/17 | Suspect in deadly CresCom bank robbery to be arraigned in Florence federal court Oct. 3 | Arraignment scheduled; details from indictment; excerpts from affidavit |
| 5-7 | 10/2/17 | Memorial rock garden for bank robbery victims approved by Conway City Council | Group "Conway Rocks" painted stones in honor of victims; permanent rock garden at Collins Park; future installation of bench and flag |
| 5-8 | 11/18/17 | Local motorcycle club hosts memorial ride for women murdered in CresCom bank robbery | Rivertown Riders host memorial ride for Skeen and Major; Statement of Gene Herring (member of Rivertown Riders) |
| 5-9 | 12/4/17 | Attorneys: Case against deadly CresCom Bank robbery suspect moving at 'almost unprecedented speed' | Excerpts from court documents regarding speed of trial |

| 5-10 | 1/8/18 | Man charged in deadly Conway bank robbery requests another trial delay | Court grants continuance motion filed; common for capital trials |
| 5-11 | 3/7/18 | 'Could you please just return them?' Rocks stolen from Conway memorial rock garden | Rock garden destroyed; Statement from Lisa Abbs (member of the 'Conway Rocks' group) |
| 5-12 | | Video piece – Case against deadly CresCom Bank robbery suspect moving at 'almost unprecedented speed' | |

| WBTW News – 17 total | | | |
| :---: | :---: | :---: | :---: |
| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
| 6-1 | 8/21/17 | Coroner IDs employees killed in Conway bank robbery | Names of victims listed; funeral arrangements; demographics of suspect; names Council as person of interest; wanted for another robbery in Wilson, NC; FBI on scene; CresCom Bank statement; Mayor Blain-Bellamy statement |
| 6-2 | 8/22/17 | Conway community gathers to remember victims killed in bank robbery | Search continues for person of interest; community members place flowers at bank in remembrance of victims; Statement from Jeannie Smith (Conway resident – acquaintance of both victims); Statement from Kathryn Barnhill (local banker, knew both victims) |
| 6-3 | 8/23/17 | Man arrested in NC faces murder charges for deadly Conway bank robbery | Council taken into custody in NC; state charges listed; funds set up for both families at churches attended and CresCom bank; Statement from Mayor Bellamy; Press Conference to be held |
| 6-4 | 8/24/17 | Conway Chamber of Commerce reacts to CresCom 'senseless evil acts' | Statement of Travis Dannelly (Chamber board president) |
| 6-5 | 8/24/17 | Conway bank double murder suspect will be taken back to SC to stand trial | Hearing in Federal Court in Greenville; explanation of identity hearing; Statement from Jimmy Richardson (15th circuit Solicitor); tip in Greenville led to apprehension; Council suspected in bank robbery previously in Wilson, NC |
| 6-6 | 8/24/17 | Conway double murder suspect admits to killings, claims he was 'desperate,' affidavit says | Details from affidavit; mention of Conway Express Inn; Mention of FBI interview of Fogg and Artis; bank audit; Council confessed; Get Rich or Die |

| | | | Trying; Council suspect in BB&T robbery in Wilson, NC; Council prior criminal history |
|---|---|---|---|
| 6-7 | 8/24/17 | Funeral arrangements for Conway double murder victims | Account set up for victims' families at respective churches they attended; Statement from both pastors; funeral arrangements |
| 6-8 | 8/27/18 | Conway businesses hang ribbons in storefronts to honor bank shooting victim | Daisy Fair Flowers passes out ribbons to local businesses to remember vicitms; Statement from Daved Kinard (owner of Daisy Fair Flowers) |
| 6-9 | 9/12/17 | CresCom Bank double murder suspect back in SC | Council booked into the FCDC for safekeeping; prime suspect in BB&T Robbery in Wilson, NC; Council to appear in Federal Court in SC |
| 6-10 | 9/21/17 | Conway police serve warrants to accused killer in CresCom Bank robbery | Conway PD warrants served; Criminal complaint filed; Indictment filed; |
| 6-11 | 10/03/17 | CresCom bank double murder suspect pleads not guilty to federal charges | Council indicted/arraigned; Life without parole/death penalty eligible; Statement from Jimmy Richardson (15th Circuit Solicitor); waived rights to detention hearing |
| 6-12 | 10/16/17 | Continuance granted in Conway bank double murder trial | Joint motion for continuance granted by Judge |
| 6-13 | 10/23/17 | CresCom Bank in Conway re-opens, returns to normal operations | Bank closed almost two months; Statement from David Morrow (CEO of CresCom Bank); case continued in federal court |
| 6-14 | 12/04/17 | Man charged for Conway bank murders makes offer to feds | Offer to plead guilty to all charges for multiple life sentences; DOJ to decide if Council will be eligible for death penalty |
| 6-15 | 3/22/18 | "Exactly what he had hope would happen," what's next for the case of alleged bank robber | Death penalty authorized; reasons for approval of death penalty |
| 6-16 | 3/22/18 | Death penalty sought against Conway CresCom double murder suspect | Death penalty to be sought; Council admits to murders; bank audit information; excerpts from complaint affidavit; Council is suspect of Food Lion robbery and Bank robbery in Wilson, NC; Council's criminal history; unclear of next court date |

| WBTW Facebook – 2 total | | | |
|---|---|---|---|
| **TAB** | **DATE** | **HEADLINE** | **PERTINENT INFO** |
| 7-1 | 8/23/17 | Conway Police Department holds press conference in connection with CresCom double murder investigation | 401 reacted; 251 liked post; 194 comments (some listed below); "Good, should have killed him"; "Heard he killed those people in 2006"; "He should have never been let out of jail, this wouldn't have happened to the sweet ladies, you can't fix these animals"; "I hope they hang him if this is the one"; "Take him straight to the death chamber"; "Two beautiful souls because the devil walks among us"; "lol, they don't have a soul or heart how could they have a conscience?"; "Would have been a perfect ending had he be stiff and cold. Good job cops!"; "No he will go to jail, eat sleep and be merry ☺"; "He should be hung upside down and gas pours on him and see him a fire let him burn alive!!!"; "Once a thug always a thug…these families did not deserve this. His parents should be ashamed of him."; "Condolences from Kingstree Federal Savings and Loan Association"; "Glad they got this POS!"; "Do to him what he did to those 2 women"; "I hope they pursue the death penalty"; "Hang him up by a noose!!"; "Death penalty"; "This man needs to be taken out in the same manner in which he killed his two innocent victims.  He is a horrible monster."; "Hang him."; "Just shoot him and b done with it!!"; "Shoot this creep! But wait… I'm sure we'll waste tax payer dollars on this low life!!! ☹ ☹☹☹" |
| 7-2 | 3/21/18 | WHATS NEXT? Tonight on WBTW News 13 at 11… I'll break down what Brandon Council's alleged confession means for his defense + the specific reasons the feds are seeking the death penalty. | 8 reacted 7 liked post; 5 comments (listed below); "Got plenty of nice oak trees at old court house in Conway.  Guess we can scrounge up some rope.." |

It is anticipated that almost all of the prospective jurors will have some degree of familiarity with the case. The divisions in this district have deeply rooted and unique racial and social demographics, political histories, and beliefs regarding crime—all of which impacts the ability to seat a fair and impartial jury. The use of a district-wide venire could help mitigate the types of bias issues that would provide basis for trying this case outside Florence division. Selecting prospective jurors from the entire District of South Carolina is the soundest, most reliable means for ensuring the case is tried before a jury representing a fair cross section of the community. The defense at this time is not asking the Court for a change of venue, but rather it seeks to mitigate against the need for a venue change by ensuring a jury may be empaneled that may "lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *Hayes v. Ayers*, 632 F.3d 500, 511 (9th Cir. 2011) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

C. **Individual, sequestered *voir dire* with questioning by the Court and follow-up questioning by counsel is the norm and vital to the selection of a fair jury in a capital case.**

Focused and thorough inquiry is required to elicit sufficient information to discern whether potential jurors harbor any disqualifying prejudice that could support a challenge for cause, and to allow counsel to intelligently exercise peremptory challenges. This will ensure Mr. Council's right to a fair and impartial jury, to which he is entitled under the Sixth Amendment. *See, e.g., Morgan v. Illinois*, 504 U.S. 719, 928 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Gray v. Mississippi*, 481 U.S. 648, 658 (1987). Attorney participation is routine.

Specifically in this District, counsel for both parties fully participated in jury selection. *See United States v. Fulks & Basham*, No. 02-CR-992 (trying defendant's cases individually and separately); *United States v. Hans*, No. 05-CR-01227. The only case to the contrary here is *United States v. Roof*, 15-CR-472-RMG, in which the defendant represented himself at that stage.

In capital cases, the court's general practice is to conduct preliminary *voir dire* of prospective jurors and allow all relevant follow-up questioning by counsel. *See, e.g.,* Exhibit B (*United States v. Hans*, No. 05-CR-01227, *voir dire* transcript). The defense finds this to be a sound approach. The defense proposes that the Court conduct the initial questioning of individual prospective jurors based upon follow-up to answers on the questionnaire or any other relevant issues. If the prospective juror is not disqualified at that point, the Court allows counsel for both parties (if they so choose) to ask questions of the prospective juror on the topic of capital punishment, bias, mental health, and other related, relevant issues. The parties then either accept the prospective juror as qualified, present a contested cause challenge to the Court, or agree that the juror should not be seated. Quite frankly, it is often the case that the parties will come to agreement on whether a particular prospective juror is substantially impaired and should be excused for cause.

This division of responsibilities is practical. As discussed above, it is often necessary to ask jurors specific questions about the type of case they could be hearing. Before trial, attorneys know the evidence best and are in the best position to frame those questions with relevant follow-up. *United States v. Ible*, 630 F.2d 389, 395 (5th

Cir. 1980) ("[V]oir dire may have little meaning if it is not conducted at least in part by counsel. . . . [I]t is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case").

The prosecution, however, proposes that all questioning be done by the Court. And then once individual, sequestered voir dire occurs, "the prospective juror will then be escorted out of the courtroom, and the parties may propose additional voir dire questions to the Court." Docket No. 122-1, p. 10. After the Court review the questions, follow-up "questioning on private or sensitive topics may be conducted." *Id*. The prosecution does not explain who conducts such questioning or what happens in the event the responses to the follow-up questions generate more follow-up questions. Presumably, the same process of escorting the prospective juror out of the courtroom would be repeated. There is no need for the relatively cumbersome and inefficient compared to the benefits of limited and focused direct inquiry by counsel for the parties. Additionally, the prosecution's approach is a less effective way to ferret out potential bias on the part of the potential jurors because it breaks up the natural flow of open-ended questions that occur in a conversation which helps the Court and the parties test jurors' actual beliefs and views, particularly as they concern capital punishment, in areas where bias can be difficult to bring to the surface. *See e.g, United States v. Fell*, 372 F. Supp. 2d 766, 772-73 ("Clearly, answers to open-ended questions are more likely to reveal a juror's true feelings").

While no system for screening jurors will ever be foolproof, allowing counsel for the parties an opportunity to probe jurors' views directly enhances the likelihood

that any disqualifying biases will be detected in time. Effective probing in jury selection is well worth the time and effort required to properly empanel an impartial jury.

Notably, the Supreme Court has cited the ability of defense counsel to participate in voir dire questioning as evidence of the fairness of the process, and of the reliability of the trial judge's eventual rulings on cause challenges. *See e.g., Wainwright v. Witt*, 469 U.S. 412,434-435 (1985) (defense counsel's decision not to question anti-death penalty juror supports inference that she was properly excused); *Skilling v. United States*, 561 U.S. 358, 372, 374, 388 n.22, 389 (2010) (noting, as evidence of the adequacy of the *voir dire* examination, that trial court allowed counsel to pose follow-up questions to prospective jurors). Similarly, the Supreme Court has referred to attorney questioning as a means of ensuring jury impartiality in capital cases. "'As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning*, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper.'" *Morgan v. Illinois*, 504 U.S. 719, 733 (1992) (quoting *Witt*, supra, 469 U.S.at 423) (emphasis in *Morgan*); *see also Utrecht v. Brown*, 551 U.S. 12, 20 (2007) (trial court's ruling on a challenge for cause is entitled to deference when "there is lengthy questioning of a prospective juror and the trial court has *supervised* a diligent and thoughtful voir dire") (emphasis added).

Federal judges have permitted attorney-conducted questioning of prospective jurors in the large majority–over 80 percent–of death penalty cases to have been tried in the post-*Gregg* era. *See* Exhibit1, Declaration of Kevin McNally Regarding Jury Selection Practices, January 18, 2016, at ¶5 (stating that "[i]n the vast majority of federal capital trials, attorneys are permitted to ask the jury questions. As of January 15, 2016, jury selection has begun 230 times in a federal capital case. Attorney questioning of potential jurors was allowed in 189 (or 82%) of these trials"). The authors of the Federal Judicial Center's Resource Guide for Managing Capital Cases (rev. 2004) likewise report:

> Judges in death-penalty cases have taken a number of approaches with respect to allowing attorney participation in the *voir dire* process. Most have allowed attorney participation in some form, even if this is not their standard procedure in criminal cases. Most frequently, judges allow attorneys to question the jurors directly, often placing a time limit on the questioning of each juror.

*Resource Guide* at 35 (http://www.fjc.gov/library/fjc_catalog.nsf) (last viewed June 22, 2016).

Attorney participation in voir dire is also efficient. Allowing counsel to ask a relevant questions of jurors is more expeditious than requiring counsel for both sides

- to propose specific questions in writing, in advance, concerning each potential juror;

- to make requests throughout jury selection for follow-up questions of individual jurors;

- to make objections for each individual juror questioned regarding questions not asked; and

- to file motions throughout the process.

Finally, allowing attorney-conducted questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias and creates a more reliable record for appellate review.

### E. Attorney participation in voir dire produces a better jury selection process.

Allowing counsel to question jurors is also more effective for exposing bias because jurors are more likely to be honest about their views when questioned by attorneys rather than by judges. Social science research has long shown that people are more willing to disclose information to those whom they perceive as having similar status to themselves than to those of higher status. Suggs & Sales, J*uror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 268 (1981) ("A large status differential between the interactants will most likely reduce perceived similarity and, in turn, the degree of self-disclosure").In court, the judge sits elevated, wears distinctive attire and is addressed as "Your Honor"—all of which emphasize the difference in status between the judge and everyone else in the room. *See also* Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behavior, 131, 143 (Jun. 1987) ("subjects were considerably more candid in disclosing their attitudes and beliefs about a large number of potentially important topics during an attorney-conducted voir dire"). The effect appears to be a response to the authority of the judge's role and the respect afforded to judges, and has little to do with the particular judge's personality or style of questioning. Answering to an esteemed figure, such as a judge, encourages potential jurors' tendency to offer the "socially desirable"—rather than

the most accurate—response. Neil Vidmar, *When All of Us Are Victims: Juror Prejudice and "Terrorist" Trials*, 78 Chi.-Kent L. Rev. 1143, 1150 (2003) ("The tendency to provide such [socially desirable] answers can be enhanced by the authoritative presence of the judge").

> A federal judge who has presided over two capital trials explained:
>
> [E]mpirical research suggests that potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges. As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can "be fair."

Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 160 (2010); *see also* Hans and Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. at 1194 ("The judge's approval is important to a lot of prospective jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably"). The parties and the Court will need accurate and complete information from potential jurors to assess whether they are qualified to serve in a trial with life-or-death stakes. Both experience and social science research demonstrate that a voir dire process that includes questioning by counsel best facilitates juror honesty.

**2. The Clerk's Office should maintain a list of undeliverable summons and a list of any disqualified, exempted, or excused jurors.**

To preserve the integrity and representativeness of the initial draw from the master wheel, we request that the Court require appropriate follow up by the Clerk's Office on any undeliverable summonses or summonses that received no response.

In the event of any appeal, the defense request that the Court require the Clerk's Office to maintain, under seal, the original draw, of any undeliverable summons or summonses that received no response, and a list of any disqualified, exempted, or excused jurors, along with any request forms or questionnaires associated with those prospective jurors).

### 3.  The court should utilize the far more efficient "strike as you go" method of exercising peremptory challenges.

A "strike as you go" process is far more efficient because it would save the parties and the court time by averting the need to qualify many extra jurors. The process works as follows: at the conclusion of each juror's individual *voir dire*, the potential juror would be temporarily excused from the room where the questioning has taken place, and the Court would hear and decide any cause challenges raised by the parties. If the potential juror is not excused for cause, the parties, alternating the order, would be required either to accept the juror or exercise a peremptory challenge. If the potential juror is not excused by the use of a peremptory challenge, the individual becomes a seated juror for the trial. If a juror is seated, the juror will serve: no subsequent peremptory striking (sometimes referred to as "back-striking") would be permitted.

Each day, those jurors not excused for cause would be sent home with instructions to remain on call for the start of the trial. This process would continue

until the requisite number of trial jurors has been reached. After the parties exhaust their peremptory challenges or agree upon a panel, six alternates will then be selected utilizing the same process. Additionally, to preserve the ability of each party to make appropriate motions under *Batson v. Kentucky*, jurors who have been peremptorily challenged would not be notified of that fact until any such *Batson* challenges were disposed of, or until the time for making them had elapsed. It would not be necessary, however, for peremptorily challenged jurors to return to court once a jury of twelve members and six alternates was finally selected.

The alternative, as proposed by the government, is to pre-qualify a jury pool of 70 individuals and then have those 70 individuals return to Court for the exercise of peremptory challenges.

The benefit of the strike-as-you-go proposal is that it would minimize the time and effort spent qualifying or excusing individual jurors, because the process ends when both sides are satisfied with the trial jury. The prosecution's procedure, by contrast, would end only after the maximum possible number of jurors has been qualified, as it embodies the assumption that each side will utilize every last available peremptory challenge on both trial and alternate jurors. But that assumption is a worst-case scenario that need not be built into the jury selection process. Put differently, a strike-as-you-go system allows for the possibility that each side will not exhaust its peremptory challenges, and in this way may allow the Court to complete jury selection after having qualified substantially fewer jurors. For example, if each side was satisfied with the jury after using only 15 of its 20 challenges, and only one

of its three alternate challenges, the Court would be able to empanel a jury after qualifying only 50 jurors, rather than the minimum of 64 (or 70, under the prosecution's proposal) that will be inflexibly required under the system advanced by the government.

Death-qualifying and life-qualifying a capital jury, especially in a highly-publicized case such as this, is a laborious and time-consuming process—much more so than in the ordinary criminal case, where striking from a qualified panel may be the norm. The savings in time, judicial resources, and stress on prospective jurors resulting from using a strike-as-you-go system may prove very large, and justify using such a system instead of that proposed by the government.

## CONCLUSION

The defense requests the Court order the Jury Administrator to issue summonses to prospective jurors residing throughout the District of South Carolina and that attorney-conducted *voir dire* should be the process of jury selection.

Respectfully submitted,

**/s/ DUANE K. BRYANT**
Learned Counsel
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ AKIN ADEPOJU**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

**/s/ MICHAEL A. MEETZE**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

**/s/ WILLIAM F. NETTLES, IV**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935

**EXHIBIT A**

**DECLARATION REGARDING JURY SELECTION PRACTICES**

1.  I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases.  This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

3.  In order to carry out the duties entrusted to me, I maintain a comprehensive

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30.  www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50. A recent update to the Report stated: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDea thPenaltyCases.aspx

list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, orders and opinions by the District Court and by telephonic or in-person interviews with defense counsel or consultation with chambers. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.   I have personally assisted appointed counsel in voir dire in the following federal capital trials: *United States v Richard Tipton, et al.,* (E.D. Va. No. 3-92-CR-68); *United States v. John Javilo McCullah* (E.D. OK. CR-92-032-S); *United States v. Michael Murray* (M.D. Penn. No. 1:CR-92-200); *United States v. Jean Claude Oscar, et al.* (E.D. Va. 93-CR-131-Morgan); *United States v. Stacey Culbert* (E.D. Mich. No. CR-92-81127); *United States v. Louis Jones* (N.D. Texas No. 6-95 CR 0015-C); *United States v. Orlando Hall* (N.D. Tex. No. 4:94-CR-121-Y); *United States v. Bruce Webster* (N.D. Tex. No. 4:94-CR-121-Y) and *United States v. Len Davis* (E.D. La. No. 94-381). I have observed portions of the jury selections in other cases: *United States v. Thomas Pitera* (E.D. N.Y. No. CR 90-0424 (RR)) and *United States v. Dennis B. Moore* (W.D. Mo. No. CR 94-00194-01-12-CR-W-9). I have selected federal capital trial juries as counsel of record. *United States  v.*

2

*Quinones and Rodriguez* (S.D. NY CR No. 00 CR 0761 (JSR)) and *United States v. Valerie Friend* (S.D. WV CR No. 2:05-00107). I have assisted in preparing defense counsel for jury selection in other cases: *United States v. Jason De la Torre* (D.N.M. No. CR 95-538-MV); *United States v. Timothy McVeigh* (W.D. OK CR No. M-95-98-H) (Alley) on change of venue to (D. CO CR No. 96-CR-68-M) (Matsch); *United States v. Theodore Kaczysnki* (E.D. CA. No. CR-S-96-259) and *United States v. Angela Johnson* (N.D. IA CR No. 00 CR 3034-MWB).

### A. Attorney Questioning

5. In the vast majority of federal capital trials, attorneys are permitted to ask the jury questions. As of January 15, 2016, jury selection has begun 230 times in a federal capital case. Attorney questioning of potential jurors was allowed in 189 (or 82%) of these trials (189/230).[2]

### B. Jury Questionnaires

6. In the vast majority of cases, jury questionnaires containing additional questions beyond those found in standard questionnaires have been used in order to reduce the amount of in-court time necessary to select a jury.

---

[2] In one trial, attorney questioning was permitted for a defendant for almost half of the jury panel, then was stopped (*Battle*). In three other cases, attorney questioning was not allowed initially, but then was allowed (*Acosta-Martinez/Rivera-Alejandro* (D PR), *Bobbitt/Jones* (ED VA) and *Tsarnaev* (D MA)).

3

---

7. In all but 11 of these trials, the district court ordered or approved a juror questionnaire which asked questions in addition to the standard questions. In a few of these 230 trials, there was no request for use of an extensive questionnaire. In a majority of the 219 trials where a questionnaire was used (95%, 219 of 230), the questionnaire was extensive.[3]

8. The reason that so many district judges approve the use of prospective juror questionnaires, including extensive questionnaires, is that it conserves precious judicial resources by eliminating the need for time-consuming in-person questioning on a variety of topics.[4] Rather, district court judges have chosen to use an expanded questionnaire as a tool to identify specific areas that may require testimony by potential jurors.

9. Appellate courts have rejected claims in federal capital cases that voir dire was inadequate, in part relying upon the district court's use of in-depth questionnaires. *See,*

---

[3]Five of the "expanded" questionnaires were very brief.

[4]*The Benchbook for United States District Court Judges,* §3.01 "Death Penalty Procedures," Pretrial ¶(A)(5), p. 117 (March 2000 rev), suggests consideration of "having veniremembers complete a jury questionnaire" prior to a federal capital trial and providing the same to counsel. This is the reason the *Resource Guide for Managing Capital Cases,* Chapter III A1, p. 33 (Federal Judicial Center, 2002) states: "All the judges we interviewed used questionnaires." The Guide also states: "Nearly all federal judges who have had a death penalty trial to date have used a written jury questionnaire." *Id.,* Chapter III A2, p. 34. "Most questionnaires have been in the range of ten to fifteen pages." *Id.*

4

*e.g., United States v. McVeigh,* 153 F.3d 1166, 1208 (10th Cir. 1998) ("an extensive questionnaire"); *United States v. Ortiz,* 315 F.3d 873, 888 (8th Cir. 2002) ("a questionnaire of 103 questions").

### C. Individual and Sequestered Voir Dire

*10.*    Similarly, relatively few judges have declined to conduct individual, sequestered (away from other potential jurors) voir dire, *at least on the issue of punishment views* in federal death penalty cases.[5] To our knowledge, judges refused individual, sequestered (private - apart from other jurors) voir dire on the issue of the death penalty 31 times.[6] So, 87% of federal judges conduct "private" individual questioning of potential jurors *at least on the issue of capital punishment views* (199 of 230).

11.    Punishment questioning in a group setting carries with it 1) a danger that other jurors, who listen to the answers of fellow potential jurors, may be contaminated

---

[5]The *Benchbook for United States District Court Judges,* §3.01, ¶(A)(7), p. 119, recommends that punishment questions be posed individually "at sidebar ..." *See also Chambers to Chambers,* Vol. 10, No. 1, pp. 3-7 (Federal Judicial Center 1995). The *Resource Guide for Managing Capital Cases,* Chapter III A3a, p. 36, states that all the district judges interviewed used a combination of group (for general issues) and individual (for death penalty issues) voir dire. Of course, group voir dire is well suited and time efficient for non-sensitive topics – although some judges have conducted all questioning in private and individually.

[6]Five judges permitted individual questions in private "as necessary."

5

or improperly influenced by those responses and thus 2) may shade their answers based on what they hear and 3) is demonstrably inferior in identifying biased jurors and 4) requires repeated exposure to questions about the death penalty which presume guilt and creates a less than neutral jury.

12.    In those federal cases where the district court required small group questioning, sensitive issues (the death penalty, exposure to pretrial publicity or racial or ethnic attitudes) often end up requiring some questioning out of the hearing of other jurors, usually at the bench.  In the end, the process is not time efficient, particularly if there is no questionnaire allowing counsel and the court to focus on troublesome topics.  Rather than bring individual jurors in on a scheduled basis for questioning, the group approach often requires a large panel of jurors to sit idly (whether they can hear the answers of other jurors or not). This unnecessarily wastes the time of many citizens, as opposed to setting up an individual interview schedule, which creates the least imposition on each citizen.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 18th day of January, 2016.

/s/ Kevin McNally

6

**EXHIBIT B**

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
                    GREENVILLE DIVISION


UNITED STATES OF AMERICA,       )
                                )
                                )
     -versus-                   )        6:05-1227
                                )
                                )        July 16, 2007
ERIC PRESTON HANS,              )
                                )        Greenville, SC
         Defendant.             )


            PARTIAL TRANSCRIPT OF VOIR DIRE
              JURORS NOS. 144, 145 & 277

       BEFORE THE HONORABLE HENRY M. HERLONG, JR.
        UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Government:             JONATHAN S. GASSER, AUSA
                                REGAN A. PENDLETON, AUSA
                                A. LANCE CRICK, AUSA
                                U.S. Attorney's Office
                                P.O. Box 10067
                                Greenville, SC 29603

For the Defendant:              RICHARD W. VIETH, ESQ.
                                360 E. Henry Street
                                Spartanburg, SC 29302

                                BENJAMIN T. STEPP, ESQ.
                                Federal Public Defender
                                501 E. McBee Ave., Ste. 202
                                Greenville, SC 29601

Court Reporter:                 KAREN E. MARTIN, RMR, CRR
                                P.O. Box 10771
                                Greenville, SC 29603



The proceedings were taken by mechanical stenography and
the transcript produced by computer.
```

2

1                    **INDEX OF WITNESSES**

2    *JUROR NO. 144*

3         Voir Dire By The Court  . . . . . . . . . . 3

4         Voir Dire By Mr. Gasser . . . . . . . . . 8

5         Voir Dire By Mr. Vieth  . . . . . . . . . .13

6    *JUROR NO. 145*

7         Voir Dire By The Court  . . . . . . . . . .20

8         Voir Dire By Mr. Vieth  . . . . . . . . . .26

9         Voir Dire By Mr. Gasser . . . . . . . . . .31

10   *JUROR NO. 277*

11        Voir Dire By The Court  . . . . . . . . . .37

12        Voir Dire By Mr. Gasser . . . . . . . . . .41

13        Voir Dire By Mr. Vieth  . . . . . . . . . .46

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                     Monday, July 16, 2007

 2         (Beginning of requested portion of voir dire.)

 3             THE COURT:  Bring in the next juror.

 4         (WHEREUPON, Juror No. 144, a white male, came into

 5         open court.)

 6             THE COURT:  Come forward to the witness chair,

 7    please, sir.

 8                     VOIR DIRE EXAMINATION

 9    BY THE COURT

10    Q    Good afternoon.  You are Juror No. 144.  I'm not

11    going to refer to your name.  I'm going to refer to you as

12    that number only.  And I've instructed the attorneys when

13    they speak to you in a moment to only refer to you by your

14    number, not your name.

15    A    Okay.

16    Q    You are a potential juror in the trial of this case,

17    which is the case involving an indictment.  An indictment,

18    I tell you, is merely a formal charge.  The defendant is

19    presumed innocent.  And throughout the case the burden of

20    proof is on the Government to prove the defendant guilty

21    beyond a reasonable doubt.  And a defendant does not have

22    to prove his innocence.

23         This case alleges in the indictment that this

24    defendant committed arson, which is the intentional

25    setting of a fire, of the Comfort Inn on January 24th,
```

Juror No. 144 – Voir Dire by the Court

4

1    2004, located on Congaree Road here in Greenville, South

2    Carolina, in which six deaths occurred and 11 people were

3    injured seriously.  And there is nothing wrong with the

4    fact that you may have heard about this case or read

5    anything about it.  Do you recall hearing anything or

6    reading anything about this case?

7    **A**    Just vaguely.

8    **Q**    All right.  And in spite of that, can you consider

9    the case with an open mind, in spite of what you know

10   about the case?

11   **A**    Yes, sir.

12   **Q**    And have you made up any opinion as to whether the

13   defendant is guilty or not guilty?

14   **A**    No, sir.

15   **Q**    We are in the process, as you can see, of selecting a

16   jury one by one, bringing prospective jurors in.  I don't

17   know how long this process is going to take.  It could

18   take the better part of this week.  And then the trial of

19   the case could take potentially around three weeks more or

20   less.  From your answers to your questionnaire apparently

21   you would be available if selected to be a juror during

22   that time period; is that correct?

23   **A**    Yes, sir.

24   **Q**    Have you discussed this case with anyone?

25   **A**    No, sir.

1    **Q**    Has anyone discussed it with you?

2    **A**    No, sir.

3    **Q**    Have you formed any opinion -- has anyone given you

4    their opinion about this case?

5    **A**    No, sir.

6    **Q**    As I told you, a defendant is presumed innocent of

7    the charges.  And the charges in this case are simply

8    accusations and nothing more.  And a defendant cannot be

9    found guilty of any charge until the Government has proven

10   its guilt beyond a reasonable doubt.  That's the law.  Do

11   you have any trouble following that rule of law?

12   **A**    No, sir.

13   **Q**    And under our laws the defendant has the right to

14   decide whether he will testify.  The burden of proof is on

15   the Government.  A defendant does not have to prove his

16   innocence.  He has the right to remain silent and not

17   testify.  And if he chooses to remain silent, would you

18   hold that against him?  The law says you could not hold

19   that against him.  Could you follow that rule of law?

20   **A**    Yes, sir.

21   **Q**    Now, until the trial is over members of the jury must

22   not read, watch or listen to any news accounts of the case

23   or have others report those accounts to them and must not

24   talk with anyone about the case even the other jurors

25   until the jury retires to deliberate on its verdict.  Do

6

1   you have any difficulty accepting that legal rule?

2   **A**    No, sir.

3   **Q**    Do you know of any reason why you could not decide

4   this case solely on the evidence and the law as the Court

5   will instruct you without regard to sympathy, bias or

6   prejudice?

7   **A**    No, sir.

8   **Q**    Do you know of any reason, even a reason that has not

9   been asked, that would make it difficult for you to be a

10  completely fair and impartial juror in this case?

11  **A**    No, sir.

12  **Q**    Have you had any past experience in any way that

13  causes you doubt of your ability to sit as a fair and

14  impartial juror in this case?

15  **A**    No, sir.

16  **Q**    As you know, service in this case may require you to

17  consider the death penalty.  And I'm going to ask you some

18  questions about the death penalty because of that.

19  Generally speaking, what are your views on the death

20  penalty?

21  **A**    I agree with it if it's a deterrence for crime.

22  **Q**    All right.  Does that mean that if a person is

23  eligible for the death penalty and is found guilty, you

24  would automatically give the death penalty?

25  **A**    If I was without a doubt, yes, sir.

Juror No. 144 – Voir Dire by the Court

7

Q    Well, let me tell you the process.  The process is a
two-step process.  The first stage of the trial would be a
guilt phase.  And if the jury was not convinced of the
defendant's guilt beyond a reasonable doubt, the jury
should and would be required to find the defendant not
guilty.  That would be the end of the case.  Should the
jury be convinced the Government had proven its case
beyond a reasonable doubt, the defendant was guilty, then
we would go to the second phase.

And at that time the Government would be seeking the
death penalty and would have the right to introduce
additional evidence of what we call aggravating
circumstances and other evidence to ask for the death
penalty.  And on the other hand, the defense would have
the opportunity to urge that the jury not impose the death
penalty but instead impose a sentence of life without
parole because we don't have parole in federal court.  And
if a defendant receives a life sentence, a defendant would
never be released from imprisonment.

Could you on the one hand, if the facts and law
require it, impose the death penalty?

A    Yes, sir.

Q    Could you consider mitigation if the facts and law
required it even though you may have found the defendant
guilty, could you impose a life sentence?

1    **A**    Yes, sir.

2    **Q**    Is there any reason whether as a matter of moral,

3    religious or philosophical belief or as a matter of

4    conscience or personal belief or any other reason why you

5    would never vote to impose the death penalty under any

6    circumstance?

7    **A**    No, sir.

8         **THE COURT:**  At this time the attorneys have an

9    opportunity to ask questions of you.

10         **MR. GASSER:**  May it please the Court, Your

11    Honor?

12                    VOIR DIRE EXAMINATION

13    **BY MR. GASSER**

14    **Q**    Good afternoon.  As the judge indicated we can't

15    refer to you by name to protect your identity.

16    **A**    All right.

17    **Q**    But as I was introduced to you earlier this morning,

18    my name is Johnny Gasser.  I'm an Assistant U.S. Attorney

19    and I'm one of the prosecutors handling the case and I

20    just have a few questions for you, okay?

21    **A**    Okay.

22    **Q**    That questionnaire that you filled out this morning,

23    I'm not going to go over every question, but on Question

24    No. 5, you indicated that regarding the death penalty

25    which of the following statements represents the way you

Juror No. 144 – Voir Dire by Mr. Gasser

9

1    feel?  And they gave you -- the Court gave you six

2    categories.  Of course, you read all six of them, correct?

3    **A**    Yes.

4    **Q**    And you fell somewhere in the middle.  You indicated

5    C, "I generally favor the death penalty, but I would base

6    the decision to impose it on the facts and the law in the

7    case."  Do you remember answering that?

8    **A**    Yes, sir.

9    **Q**    And do you still feel that way as you are sitting

10   here today?

11   **A**    Yes, sir.

12   **Q**    And do you still feel that way as you have answered

13   Judge Herlong's questions?

14   **A**    Yes.

15   **Q**    You could have answered, "If a person is convicted of

16   murder and the death penalty is requested I will always

17   vote to impose it regardless of the facts and the law in

18   the case."  But you didn't answer that, did you?

19   **A**    No, sir.

20   **Q**    Because that's not how the way you feel?

21   **A**    Right.

22   **Q**    You could even have answered, "I am strongly in favor

23   of the death penalty and would have a difficult time

24   voting against it regardless of the facts of the case,"

25   but you didn't answer that one either?

Juror No. 144 – Voir Dire by Mr. Gasser

10

1　**A**　　No, sir.

2　**Q**　　So you answered, "I generally favor the death

3　penalty," but you want to know all of the facts.  Is that

4　a fair statement?

5　**A**　　That's correct.

6　**Q**　　You want to hear everything about the case.  And if

7　you and your fellow jurors were to convict somebody of a

8　homicide, you would want to know everything about the

9　victims and you would want to know everything about the

10　defendant and the defendant's background before you made

11　that ultimate decision; is that correct?

12　**A**　　That's correct.

13　**Q**　　Would you be fair to the Government?

14　**A**　　Yes.

15　**Q**　　Would you be fair in this case to Mr. Hans if you

16　were selected on the case?

17　**A**　　Yes.

18　**Q**　　You don't have an opinion as you sit there as to the

19　facts of this case because you don't know anything about

20　it, correct?

21　**A**　　No.

22　**Q**　　And you don't have an opinion as to what the

23　appropriate punishment would be because you don't know

24　anything about it; is that correct?

25　**A**　　No.

Juror No. 144 – Voir Dire by Mr. Gasser

11

1   **Q**    Would you follow the oath that the Court would give

2   you and keep an open mind throughout this entire process?

3   **A**    Yes.

4   **Q**    And depending on the facts and circumstances of any

5   case, could you envision a set of circumstances that you

6   believe the death penalty would be the appropriate

7   punishment?  Don't tell me what they are, but could you

8   envision that in your mind that there are certain crimes,

9   certain homicides in which the death penalty is

10  appropriate?

11  **A**    I would say yes.

12  **Q**    Okay.  And then, do you also agree with the fact that

13  there are certain homicides, depending on the facts and

14  circumstances, in which life in prison without parole is

15  the appropriate punishment?

16  **A**    Yes.

17  **Q**    And you would agree with me that life in prison

18  without parole, that's a pretty serious offense [sic]?

19  **A**    Correct.

20  **Q**    If you were selected on any death penalty case, not

21  simply this one but any death penalty case, and the Court

22  told you that you would have to listen to the evidence the

23  Government put up in aggravation and consider it, and you

24  would have to listen to the evidence the defense put up in

25  mitigation and you would have to consider it, would you

Juror No. 144 - Voir Dire by Mr. Gasser

12

1    listen to the Court and abide by that law?

2    **A**    Yes.

3    **Q**    And would you respect your oath to abide by the law

4    that a Court told you you needed to abide by?

5    **A**    Yes.

6    **Q**    And lastly, would you -- just one question before I

7    get to the final question.  The questionnaire that you

8    sent in a couple of months ago, do you remember filling

9    that out?

10   **A**    Yes.

11   **Q**    And I hate to get into any of your personal life, but

12   I just wanted to make sure I read this question

13   appropriately.  When you answered that have you or any of

14   your family members ever received any mental health

15   evaluation, you put down there "Meds, antidepressant," was

16   that for you or someone in your family?

17   **A**    That was for my wife.

18   **Q**    I needed to ask that question and I apologize.

19   **A**    That's fine.

20   **Q**    And lastly, sir, should you be selected on this case

21   or any death penalty case, before you made your ultimate

22   decision, would you want to know all of the facts and

23   circumstances and want to know what the law was before you

24   made your decision?

25   **A**    Yes, sir.

Juror No. 144 – Voir Dire by Mr. Gasser

13

1          **MR. GASSER:**  That's all we have, Your Honor.

2          **MR. VIETH:**  May it please the Court?

3                    VOIR DIRE EXAMINATION

4     **BY MR. VIETH**

5     **Q**     Good afternoon, sir.

6     **A**     Afternoon.

7     **Q**     I've introduced myself earlier.  My name's Rick

8     Vieth.  And I, along with Ben Stepp, the Federal Public

9     Defender, represent Mr. Hans in this case.  It's unique

10    for all of us because we don't ever get to ask questions

11    of jurors, and you don't get to sit in that kind of hot

12    seat and have to answer questions.  So we are all trying

13    to just relax and understand views of the death penalty

14    which probably you never think about on a daily basis.  Is

15    that fair to say?

16    **A**     It's true, yes.

17    **Q**     So when you run in this morning and they hand you

18    these questionnaires to fill out and you are trying to

19    rush through and fill out some, it doesn't -- it gives us

20    some information from which we can delve a little deeper.

21    And that's what we are trying to do and that's all we are

22    trying to do.  So there are no right or wrong answers at

23    all.

24          I thought, and I may have misunderstood you, that in

25    your initial talking about the death penalty you said that

Juror No. 144 – Voir Dire by Mr. Vieth

14

1    you would give it if it was a deterrence to crime or

2    something to that effect?

3    **A**    That's correct.

4    **Q**    What did you mean by that?  What does that mean to

5    you?

6    **A**    Well, just basically if a person knew the

7    repercussion of what they were doing, if it was wrong,

8    being the death penalty, that would be a deterrent for

9    them to maybe think about what they were going to do or

10   maybe change their mind or go a different direction as to

11   that, if it was premeditated or something along that line.

12   **Q**    Okay.  So let's revisit the issue of a trial.  A

13   trial is going to be, in a normal trial, a hearing to

14   determine whether someone has been proven guilty beyond a

15   reasonable doubt by the Government.  That's what the

16   normal trial is all about, bank robbery, stealing social

17   security checks, drugs.  There is going to be a trial

18   where you as a juror sit here and at the end of the day

19   you decide whether proof beyond a reasonable doubt has

20   been given to you.  Do you understand?

21   **A**    Uh-huh.

22   **Q**    Now, if a person that was charged with a crime

23   offered no evidence, didn't put up any type of

24   explanation, didn't do anything, and you found in a

25   capital case, a murder case that someone by premeditation,

Juror No. 144 – Voir Dire by Mr. Vieth

1    it was intentional, wasn't any question about it, it

2    wasn't a mistake, it wasn't a self-defense or wasn't

3    insanity, it was intentionally done, murder, cold blooded

4    and you have found guilt, is then your deterrent to crime

5    the death penalty?  Is that where you are coming from?

6    **A**    Yes.

7    **Q**    Okay.  So if you found guilt beyond a reasonable

8    doubt of a premeditated, cold-blooded murder, then your

9    penalty is the death penalty.  Is that what you are

10   saying?

11   **A**    That's correct.

12   **Q**    Okay.  Life without parole in that situation would or

13   would not be acceptable to you?

14   **A**    It would be acceptable but I wouldn't feel

15   comfortable about that if I knew it was premeditated or

16   along that line.

17   **Q**    Okay.  So if it's a clear case in your mind that it

18   was a murder case, you're going to say the death penalty

19   is the appropriate penalty?

20   **A**    Yes, sir.

21   **Q**    Okay.  And then if a person that you've found guilty,

22   if then the Government comes in and then gives you more

23   stuff, like victim impact, showing how this has impacted

24   the lives of people, family members without children or

25   children without family members depending on the facts,

1  would that solidify your deterrence to crime that the

2  death penalty is appropriate?

3  **A**    Yes, sir.  Yes, sir.

4  **Q**    And even though life without parole is a serious

5  offense [sic] in your opinion, I'm sure, that would not be

6  the appropriate sentence in such a case where you found

7  premeditated murder?

8  **A**    I wouldn't think so, no, yeah.

9  **Q**    I'm not trying to put words in your mouth.  I'm

10  trying to get an answer.

11  **A**    Yes.

12  **Q**    You would want something from a defendant then to do

13  something better than death or would that even matter?

14  **A**    I would still go for the death penalty.

15        **MR. VIETH:**  Thank you very much for your time.

16        **THE COURT:**  Let me follow-up based on those

17  responses, sir.  As I told you there is a two-step process

18  should there be a finding of guilt.  There is a penalty

19  phase.  And the law does not permit any sentence to be

20  imposed or certainly a death sentence to be imposed just

21  because of a finding of guilt.

22        The Government has the right to put up, as you

23  were just informed, victim impact information and other

24  evidence of aggravating circumstances and ask for the

25  death penalty and say because of this, we want you to

Juror No. 144 – Voir Dire by Mr. Vieth

17

1   impose the death penalty.  On the other hand, the

2   defendant has a right to put up mitigating circumstances

3   and ask that you not impose the death penalty, but instead

4   impose a life sentence which means life without parole.

5           The question, the ultimate question is, the law

6   would require a juror to be able to sit on such a case

7   that the juror would not automatically give a death

8   sentence just because the defendant was convicted of the

9   crime.  Do you understand that?

10          **THE POTENTIAL JUROR:**  Yes.

11          **THE COURT:**  It would require that a juror weigh

12  the evidence, even though they found the defendant guilty,

13  and decide after weighing that additional evidence and

14  considering everything whether to impose a death sentence.

15  Do you understand that?

16          **THE POTENTIAL JUROR:**  Yes, sir.

17          **THE COURT:**  And it's not wrong or right for

18  anybody to have any certain opinion.  There is no right or

19  wrong answer.  We are just trying to find out how you feel

20  about it.  And that would be the law the Court would

21  instruct you on should you be a juror.

22          And the ultimate question is, I guess I used the

23  word automatically, would you be able to view the evidence

24  in the penalty phase and impose, even if you had found the

25  defendant guilty, could you weigh the evidence and impose

1   a life sentence if you thought the facts and circumstances

2   warranted it even though you had found the defendant

3   guilty?

4          **THE POTENTIAL JUROR:**  Yes.

5          **THE COURT:**  And of course, apparently, it

6   appears that you also could impose a death sentence if you

7   thought it was appropriate.  Is that right?

8          **THE POTENTIAL JUROR:**  Yes, sir.

9          **THE COURT:**  All right.  Any short follow-up?

10         **MR. GASSER:**  No, sir.

11         **THE COURT:**  You may step down and wait on

12  further instructions.

13      (WHEREUPON, Juror No. 144 left the courtroom.)

14         **THE COURT:**  Any motions regarding this defendant

15  juror?

16         **MR. GASSER:**  Your Honor, the Government believes

17  he is qualified based on his responses to your initial

18  questions, the Government's questions and to your

19  follow-up questions.  And I know the defense is going to

20  make a motion that he is not qualified.  But again, I

21  guess I will just respectfully request to be able to

22  respond to that.

23         **THE COURT:**  Anything from the defendant?

24         **MR. VIETH:**  Yes, sir.  Your Honor, he told me

25  the only penalty was the death penalty if he found

19

1   premeditated murder.  And I appreciate the Court and the

2   Government trying to rehabilitate him, but that's what he

3   said.  It is on the record.  So we would move to excuse

4   for cause.

5           THE COURT:  Well, that's why I went in to

6   clarify with him and I'm convinced that in the totality of

7   his responses that he could be fair to both sides,

8   therefore, I deny the motion to excuse for cause.

9           MR. GASSER:  Government presents the juror.

10          MR. VIETH:  Excuse the juror for this trial.

11          THE COURT:  All right.  Bring in the next juror.

12          MR. VIETH:  When we take a break, can I address

13  something with the Court?

14          THE COURT:  Sure.

15          Well, hold on.

16          Yes, sir?

17          MR. VIETH:  Judge, we are trying to get a

18  transcript of it.  My impression of your comments to the

19  jury is that the defendant may have to present mitigation

20  to ask for life without parole.  And I may be

21  misinterpreting the comments.

22          THE COURT:  I didn't mean to say that if I said

23  it.  I'm saying they have a right to.

24          MR. VIETH:  That's fine.

25          THE COURT:  And I do need to clarify that.  I

20

1  think what you are saying is I need to say the burden

2  stays with the Government.

3            **MR. VIETH:**  Yes, sir.

4            **THE COURT:**  But I forgot how I phrased it.

5            **MR. VIETH:**  We tried to get that before lunch.

6  I didn't want to keep raising it but I think it's just

7  that we have -- that life without parole is an appropriate

8  penalty whether you hear from anybody.  I think to say we

9  have a burden to put up mitigation to ask for life without

10  parole --

11            **THE COURT:**  Well, that's certainly not what I

12  meant to convey.

13            **MR. VIETH:**  No problem.

14            **MS. PENDLETON:**  Your Honor, the Government would

15  also want to clarify, the indictment alleges the

16  Government intends to prove the fire happened on or about

17  January the 25th of 2004.

18            **THE COURT:**  My notes are wrong.

19            Okay.  Bring in the next juror.

20       (WHEREUPON, Juror No. 145, a white female, came into

21       open court.)

22            **THE CLERK:**  Juror No. 145.

23                      VOIR DIRE EXAMINATION

24  **BY THE COURT**

25  **Q**    Good afternoon.  You are Juror No. 145 and I'm going

1   to refer to you by that number, not by your name.  And

2   I've instructed the attorneys -- shortly, in a moment,

3   they are going to ask you some questions.  And if they

4   want to refer to you, it will be only by your number.

5       You have been selected as a potential juror in this

6   case.  We are going -- we are in the process of drawing a

7   jury, selecting a jury which should take the better part

8   of this week.  And the trial will take approximately three

9   weeks more or less.  And I understand from your answers to

10  your questionnaire you would be available during that

11  period of time; is that correct?

12  **A**    Yes, sir.

13  **Q**    And this case involves an indictment.  An indictment

14  is merely a charge.  It is no evidence of guilt.  It

15  charges this defendant -- and this defendant is presumed

16  innocent of this charge and that's the law.  It charges

17  him with being involved in having committed this crime of

18  arson, which is the intentional setting of a fire, of the

19  Comfort Inn on January 25th, 2004, located on Congaree

20  Road in Greenville, South Carolina, in which six deaths

21  occurred and 11 people were seriously injured.  There is

22  nothing wrong with you having heard something about this

23  case or having read something about this case.  It

24  certainly does not necessarily disqualify you in this

25  case.  Do you recall hearing anything or reading anything

Juror No. 145 – Voir Dire by the Court

22

1    about this case?

2    **A**    Yes, sir, on the news.

3    **Q**    Okay.  And tell us what you know about it from what

4    you've heard.

5    **A**    Just about the suspected arson and that the people

6    were killed.

7    **Q**    All right.  And have you talked to anyone about this

8    case?

9    **A**    No, sir.

10   **Q**    Has anyone talked to you about it, tried to express

11   an opinion?

12   **A**    No, sir.

13   **Q**    Have you expressed any opinion about this case to

14   anyone?

15   **A**    No, sir.

16   **Q**    Regardless of what you may have heard or seen about

17   the case, do you feel in your mind you could be a fair and

18   impartial juror?

19   **A**    Yes, sir.

20   **Q**    As I have told you, the defendant is presumed

21   innocent of the charges against him.  And the charges in

22   this case are simply accusations and nothing more.  A

23   defendant cannot be found guilty of any charge until the

24   Government has proved his guilt beyond a reasonable doubt.

25   That's the law.  Do you have any difficulty accepting that

1  law?

2  **A**    No, sir.

3  **Q**    And under our laws the defendant has the right to

4  decide whether he wants to testify or not.  If he choses

5  not to testify, that fact cannot be held against him.

6  That's the law.  Could you follow that instruction of the

7  law?

8  **A**    Yes, sir.

9  **Q**    If you are selected as a juror, until the trial is

10 over members of the jury must not read, watch or listen to

11 any news accounts of the case or have others report those

12 accounts to them and must not talk with anyone about the

13 case even the other jurors until the jury retires to

14 deliberate on its verdict.  And that's what I would

15 instruct the jury.  Could you follow that instruction?

16 **A**    Yes, sir.

17 **Q**    Do you know of any reason why you could not decide

18 this case solely on the evidence and the law as the Court

19 will instruct you regardless of any sympathy or bias or

20 prejudice?

21 **A**    No, sir.

22 **Q**    Do you know of any reason, even a reason that has not

23 been asked of you, that would make it difficult for you to

24 be completely fair and impartial in this case?

25 **A**    No, sir.

Juror No. 145 – Voir Dire by the Court

24

1    **Q**    Have you had any past experiences that in anyway

2    might cause you to doubt your ability to sit as a fair and

3    impartial juror in this case?

4    **A**    No, sir.

5    **Q**    As you know, service on the jury in this case may

6    require you to consider the death penalty and I'm going to

7    ask you a few questions generally about the death penalty.

8    There are no right or wrong answers.  But we need to find

9    out your views.  Generally speaking, what are your views

10    on the death penalty?

11    **A**    If you are asking do I believe in the death penalty,

12    yes, sir, in certain instances.

13    **Q**    All right.  And now, in this case, if you are

14    selected as a juror, there would be a trial as to whether

15    the defendant is guilty or not.  And that's called the

16    guilt phase.  If the jury finds the Government failed in

17    its burden of proof, the jury would find the defendant not

18    guilty.  That would be the end of the case.  Should the

19    jury find that the Government had proved its case beyond a

20    reasonable doubt and found the defendant guilty, the jury

21    would move to the penalty phase.  And the Government would

22    be asking the jury to impose the death penalty.  The

23    defendant would be asking the jury to impose a life

24    sentence.  And a life sentence would mean -- there is no

25    parole in federal court.  And if a defendant received a

Juror No. 145 - Voir Dire by the Court

25

1   life sentence, he would never be released from prison.

2   Under the proper circumstances, could you impose a death

3   penalty if you thought it was appropriate?

4   **A**    Yes, sir.

5   **Q**    It would not be appropriate for a juror to want to

6   impose a death penalty automatically just because a

7   defendant is guilty.  And that's the law.  The jury would

8   have to consider each -- the defendant's facts and

9   circumstances and the Government's proof and whether the

10  Government has proven enough evidence in connection with

11  aggravating circumstances as to whether a death penalty

12  would be imposed.  Do you feel that you would

13  automatically impose a death sentence just because the

14  defendant was found guilty in such a case?

15  **A**    No.  I think you have to look at all the facts and

16  consider each case and in this case in particular.

17  **Q**    All right.  And could you in a case in which -- a

18  case of this nature with charges of this nature under the

19  proper circumstances, if the Government failed to impress

20  upon you that a death penalty was required, could you

21  impose a life sentence?

22  **A**    Yes, sir.

23          **THE COURT:**  At this time the attorneys will ask

24  you certain questions.

25          **MR. VIETH:**  May it please the Court?

Juror No. 145 – Voir Dire by Mr. Vieth

VOIR DIRE EXAMINATION

1

2 **BY MR. VIETH**

3 **Q**    Good afternoon.

4 **A**    Hi.

5 **Q**    Ma'am, I introduced myself to you this morning when

6 the group was here.  My name's Rick Vieth.  I live in

7 Spartanburg or practice law in Spartanburg.  And I, along

8 with Ben Stepp, the Federal Public Defender, represent

9 Eric Hans.  Okay?  And what we are doing by this process

10 is simply trying to determine your views on the death

11 penalty.  The argument's always said sometimes it's like

12 the cart before the horse.  We are already assuming that

13 you've found guilt and we are trying to get into your

14 brain a little bit about the views on the death penalty.

15 So it's unique and we don't ever get to ask questions of a

16 juror in a normal trial, only in this type of case.  So

17 it's kind of a colloquy, back and forth without any right

18 or wrong answers, okay?  You live in Union County?

19 **A**    Yes, sir.

20 **Q**    How long a drive is that for you?

21 **A**    I came up last night and spent the night with a

22 friend that lives right outside of Greenville.  But it's

23 about 65 miles.  I live in the little down of Buffalo,

24 which is right outside of Spartanburg.

25 **Q**    And will that in and of itself cause you any great

Juror No. 145 – Voir Dire by Mr. Vieth

27

```
 1    imposition if you are elected to serve?
 2    A    I have a mother with Alzheimer's and I retired from
 3    the school system in May to help with her.  But she still
 4    lives with my father, but they are older and, you know, I
 5    do help with her.
 6    Q    All right.  Well, it's kind of like now is the time
 7    or forever hold your peace.
 8    A    I'm not the total caregiver but I do help with her
 9    every day.
10    Q    Okay.  In a normal work day, if this goes on for
11    several weeks, do you feel you are going to be comfortable
12    in sitting as a juror?
13    A    Yes, sir.
14    Q    Okay.  That's fine.  I just want to ask that because
15    I knew you lived not right around the block from here when
16    I saw your questionnaire.  Ma'am, in a death penalty type
17    case, have you ever -- I noticed you've sat on jury duties
18    apparently in magistrate's court in Union?
19    A    And regular.
20    Q    And general sessions court?
21    A    (The prospective juror nodded.)
22    Q    Then you know if you've sat on a jury that when you
23    reached a verdict -- it doesn't matter to me whether it
24    was guilty or not guilty -- but if you found someone
25    guilty your role was over?
```

Juror No. 145 – Voir Dire by Mr. Vieth

1    **A**    Uh-huh.

2    **Q**    Did you sit on such a jury as a criminal case and

3    make a finding of guilty or not guilty?

4    **A**    Yes, sir.

5    **Q**    Do you recall what your finding was?

6    **A**    Guilty.

7    **Q**    All right.  On that guilty verdict you left?

8    **A**    Yes, sir.

9    **Q**    In other words, they gave you a little, small token

10    of appreciation, a couple dollars for being there, and

11    then you left and had nothing to do with sentencing.

12    **A**    No.

13    **Q**    And you may read in the paper the next day what the

14    sentence was but you didn't control that.  Do you remember

15    that?

16    **A**    Yes, sir.

17    **Q**    So all you did was determine whether the state had

18    proven guilt beyond a reasonable doubt.

19    **A**    Yes, sir.

20    **Q**    Okay.  In this case, if you make such a finding, we

21    are going to stop and regroup, come back here a day or two

22    later and start what they call a penalty phase.  I didn't

23    know if you knew that or not.  I know the judge mentioned

24    that to you but I didn't know if you knew that before

25    today.

1    **A**    Yes, I understand.

2    **Q**    So at that hearing you will hear evidence, what they

3    call aggravating evidence which is supposed to say this is

4    why the crime warrants the death penalty.  And you may

5    hear mitigating factors that do not excuse the crime but

6    may explain the person to you.  Okay?

7    **A**    Uh-huh.

8    **Q**    Would those things be important for you to know, both

9    of them, before imposing a penalty?

10    **A**    Yes, sir, definitely.

11    **Q**    Definitely?  So finding guilt in and of itself, just

12    saying we find guilt, premeditated, cold-blooded murder,

13    guilty, would that in itself render the death penalty the

14    only option in your mind?

15    **A**    Well, like you said, I think you have to consider

16    all -- everything that led up to the crime.

17    **Q**    All right.  Well, let's assume that regardless of

18    what led up to the crime you found guilt.  Okay?  I'm

19    not -- you just found someone guilty.  Whatever you tried

20    in your case, you just found guilt, okay?  Whether it's a

21    lover's quarrel, whether it was a cop killing case,

22    anything that you can think of, if you found someone

23    guilty, do you think life without possibility of parole

24    would be a severe penalty?

25    **A**    It would be a severe penalty, but I'm not saying that

Juror No. 145 – Voir Dire by Mr. Vieth

30

1    would be the only answer.

2    **Q**    Well, the only other answer is going to be the death

3    penalty.

4    **A**    The death penalty.

5    **Q**    And I assume you obviously feel that to be a severe

6    penalty?

7    **A**    Yes, sir.

8    **Q**    So the question begs itself, do you feel that life

9    without parole is a severe penalty in a premeditated

10   killing?

11   **A**    That's hard to answer.  I still believe in the death

12   penalty in certain instances.  And I cannot say that I

13   wouldn't -- would think life imprisonment would be the

14   correct answer.

15   **Q**    We are not asking for your answer in a case.  We are

16   just trying to get to your point -- in other words --

17   **A**    Do I believe that could be an answer, yes.  But I

18   also believe in the death penalty, so I can't say that I

19   would reject one or the other.

20   **Q**    All right.  And if a defendant, if someone that you

21   found guilty, produced no evidence, either in the guilt

22   phase or didn't put anything up in the determination of

23   what his penalty should be, just silence and you just

24   heard the bad stuff, would you still consider life without

25   parole?

1    **A**    No, sir.

2    **Q**    Okay.  So if you didn't hear from the defendant

3    sometime, either in the first trial or the second trial,

4    and you determined premeditated killing, then your only

5    answer would be the death penalty?

6    **A**    Yes.

7    **Q**    And you are not going to change that opinion if

8    someone else asked you something about it?  That's the way

9    you feel?

10    **A**    Yes.

11        **MR. VIETH:**  Thank you.

12            VOIR DIRE EXAMINATION

13    **BY MR. GASSER**

14    **Q**    Good afternoon.

15    **A**    Hi.

16    **Q**    My name is Johnny Gasser.  I too, was introduced to

17    you earlier this morning when y'all were sitting out there

18    as a panel.  And myself and Mr. Crick and Ms. Pendleton,

19    we represent the prosecution in this case.

20    **A**    Yes, sir.

21    **Q**    And we thank you.  Even though this wasn't a

22    voluntary service, we thank you for being here today.  And

23    I have just got some follow-up questions of Judge Herlong

24    and Mr. Vieth.  You remember the questionnaire that you

25    filled out this morning when you first got here after you

Juror No. 145 – Voir Dire by Mr. Gasser

32

1   watched Judge Herlong's video?

2   **A**    Uh-huh.

3   **Q**    And on Question No. 5, and I will just speed this up,

4   I will just read it to you, regarding the death penalty,

5   which of the following statements represents the way you

6   feel?  And you circled, "I generally favor the death

7   penalty, but I would base a decision to impose it on the

8   facts and the law in the case."  Do you remember answering

9   it that way?

10  **A**    That's what I was trying to tell him.

11  **Q**    Okay.  All right.  Because you could have answered,

12  "If a person's convicted of murder and the death penalty

13  is requested, I will always vote to impose it."  You could

14  have answered that and you didn't answer that, did you?

15  **A**    (The prospective juror shook her head.)

16  **Q**    And why didn't you answer that?

17  **A**    I guess, like I said, it depends on the case involved

18  and, you know, try to keep an open mind.

19  **Q**    Okay.  And you could have even said, "I am strongly

20  in favor of the death penalty and would find it difficult

21  in voting against it," but you didn't answer that as well.

22  You answered, "I generally favor the death penalty," but

23  you would want to base your decision to impose it on all

24  of the facts and law.  Is that fair?

25  **A**    Yes.

Juror No. 145 – Voir Dire by Mr. Gasser

33

1   **Q**    Would you, if you were selected on any death penalty

2   case involving a homicide, would you do that, ma'am?

3   Would you keep an open mind throughout the entire process?

4   **A**    Yes, sir.

5   **Q**    For a juror to sit on any death penalty case that

6   juror must be able to under oath before a judge and the

7   lawyers, under oath indicate to the Court that they would

8   follow the law that the Court instructs them even if they

9   disagreed with the law.  Would you be able to do that,

10  ma'am?

11  **A**    Yes.

12  **Q**    And you haven't formed an opinion on this case, have

13  you?

14  **A**    No, sir.

15  **Q**    Because you don't know the facts.

16  **A**    No, sir.

17  **Q**    And you haven't formed what the appropriate

18  punishment would be in this case because you haven't heard

19  all the facts; is that correct?

20  **A**    Right.

21  **Q**    If the Court instructed you on any death penalty case

22  that in order to sit you would have to be able to

23  consider, consider the possibility of voting for a life in

24  prison without parole as the appropriate punishment, could

25  you do that?  Could you follow the Court's instruction and

Juror No. 145 – Voir Dire by Mr. Gasser

34

1   consider giving somebody life in prison without parole?

2   **A**    I could consider it, yes, sir.

3   **Q**    And do you understand that in the federal system life

4   in prison without parole means just that, you never get

5   out.  Pine box death.  You die in prison.  Do you

6   understand that?

7   **A**    Yes, sir.

8   **Q**    And you would agree with me, spending the rest of

9   your life in prison where you die in prison, that's a

10  pretty significant punishment, is it not?

11  **A**    Yes, sir.

12  **Q**    And what you are telling us, would you be able to

13  listen to evidence in aggravation, and if the defense

14  presents evidence that mitigates the crime or mitigates,

15  gives background information about a particular defendant,

16  you would be willing to listen to the evidence the

17  prosecutors presented, would you not?

18  **A**    Yes, sir.

19  **Q**    And you would be willing to listen and consider the

20  evidence should a defendant or defense attorneys wish, you

21  would be willing to listen to that evidence and consider

22  it as well, correct?

23  **A**    Yes, sir.

24  **Q**    And depending on the facts and circumstance of any

25  homicide, would you be able to depending on the facts and

Juror No. 145 – Voir Dire by Mr. Gasser

35

1    circumstances give the death penalty?

2    **A**    Yes, sir.

3    **Q**    And would you be able to depending on the facts and

4    circumstances of a particular homicide vote for life in

5    prison without parole?  Would you be able to do that?

6    **A**    Yes, sir.

7              **MR. GASSER:**  That's all we have, Your Honor.

8              **THE COURT:**  You may step down and wait further

9    instructions please.

10             **THE POTENTIAL JUROR:**  Thank you.

11        (WHEREUPON, Juror No. 145 left the courtroom.)

12             **THE COURT:**  I'll hear from you on cause.

13             **MR. VIETH:**  May it please the Court?  Move to

14   excuse for cause.  She is clearly a burden-shifting juror.

15   She said if she didn't hear anything from the defendant,

16   the death penalty would be the only penalty she would

17   impose.  I asked her would she change her mind or answer

18   any differently to anybody else, she answered no.  So the

19   death penalty in the abstract, what we've been talking

20   about and these questionnaires is one thing.  But when you

21   start burden shifting and say I require to hear from a

22   defendant to see what led up to it or something about him,

23   if I don't hear from him, then the death penalty is the

24   only appropriate penalty is a clear burden-shifting juror.

25   She should be excused for cause.

1          **THE COURT:**  And I will hear from the Government,

2    but she also -- I think you misstated something to her

3    when you said early on prior to that she said it depends

4    on the facts and circumstances of the case and it does.

5    Prior to it -- that's even in the guilt phase she would

6    want to hear from you and she said, no, that doesn't

7    matter.

8          But I'll be glad to hear from you.

9          **MR. GASSER:**  Your Honor, the way -- you know,

10   Mr. Vieth is a very experienced lawyer.  He is setting

11   some of these jurors up to fail because what he does is he

12   prefaces before that question is if this was a

13   premeditated, cold blooded, he uses those buzz words.  Of

14   course, that's not what the judge -- the Court is not

15   going to charge premeditation, is not going to charge -- I

16   mean, the phrase cold-blooded murder, premeditation, he

17   talks about that.  And he is, in essence, setting them up

18   for failure.  And you wouldn't want to hear anything

19   about -- if anything -- what the defense might present.

20   That's why it's the Government's position you have got to

21   look at the responses in its totality.  And in this case

22   the way she responded to the Court and the way she

23   responded to the Government clearly makes her a qualified

24   juror.

25          **THE COURT:**  I think under the totality of the

37

1    circumstances I'm convinced she would be fair and would

2    easily under the proper circumstances render a life

3    sentence.  Therefore, I deny the motion.  And when you are

4    ready, I will hear from you.

5            **MR. VIETH:**  Yes, sir.  Excuse the juror for this

6    trial, please.

7            **THE COURT:**  All right.  Bring in the next juror.

8        (There was a break in the requested voir dire.)

9            **THE COURT:**  All right.  Bring the next juror in.

10       (WHEREUPON, Juror No. 277, a black male, came into

11       open court.)

12           **THE CLERK:**  This is Juror No. 277.

13                    VOIR DIRE EXAMINATION

14   **BY THE COURT**

15   **Q**    Good afternoon.

16   **A**    Good afternoon.

17   **Q**    I'm going to ask you some questions.  I will tell you

18   now, I need to find out a few things.  And I will get into

19   a series of questions that there are no right or wrong

20   answers, we just need to get your opinion about them, how

21   you feel about it.

22   **A**    Okay.

23   **Q**    We are selecting a jury one at a time.  It is going

24   to take us the better part of a week.  And the trial could

25   take up to three weeks probably starting next week.  And I

Juror No. 277 - Voir Dire by the Court

38

1  understand from your answers to your questionnaire you

2  would be available during that time; is that right?

3  **A**    Yes, sir.

4  **Q**    This indictment is only a charge and it's no evidence

5  of guilt.  This defendant who's been charged with this

6  crime is presumed innocent.  The burden of proof is on the

7  Government to prove his guilt beyond a reasonable doubt

8  and he does not have to prove his innocence.  It charges

9  him with committing arson, which is the intentional

10  setting of a fire, at the Comfort Inn here on Congaree

11  Road, January 25th, 2004, in Greenville, South Carolina,

12  in which six deaths occurred and 11 people were seriously

13  injured.  Have you heard from any source whatsoever or

14  read anything about this case?

15  **A**    I read some in the newspaper.

16  **Q**    All right.  Has that affected your opinion as to

17  whether this defendant is guilty or not guilty?

18  **A**    No, it hasn't.

19  **Q**    Has anyone expressed their opinion to you about

20  whether he is guilty or not guilty?

21  **A**    No, they haven't.

22  **Q**    Has anything you have read or seen about this case

23  interfered in any way with your ability to be a fair and

24  impartial juror?

25  **A**    Well, I only read a little bit in the Greenville

Juror No. 277 – Voir Dire by the Court

39

1    News.  Sometimes I get it at work, but that's the only

2    thing I really read about it.

3    **Q**    But that hasn't influenced you as to whether you

4    think he is already guilty or already not guilty, has it?

5    **A**    No, it hasn't influenced me none.

6    **Q**    As I told you, he is presumed innocent.  And the law

7    is that the burden of proof in a criminal case is on the

8    Government.  A defendant does not have to prove his guilt

9    and he is presumed innocent.  That burden on the

10   Government is proof beyond a reasonable doubt.  That's the

11   law.  Could you follow that rule?

12   **A**    Yes, I could.

13   **Q**    A defendant does not have to testify.  And if he

14   chooses not to testify or to even introduce any evidence,

15   that cannot be held against him.  That's the law.  Could

16   you follow that rule?

17   **A**    Yes, I could.

18   **Q**    Until the trial is over, members of the jury must not

19   read or listen or watch anything about this case.  Could

20   you follow that rule?

21   **A**    Yes, I could.

22   **Q**    And do you know of any reason why you could not be a

23   fair and impartial juror in the trial of this case?

24   **A**    I have no reason.

25   **Q**    Now, this case involves a case in which the

Juror No. 277 – Voir Dire by the Court

40

1    Government is asking that the death penalty be imposed and

2    I need to ask you some questions about that.  And there

3    are no right or wrong answers.  We just want to know how

4    you feel about it.  And generally speaking, how do you

5    feel about the death penalty?

6    **A**    Well, really, I never really looked into it and not

7    read much on the death penalty.

8    **Q**    All right.  Well, you have heard about people getting

9    the death penalty or either being tried and not getting

10   the death penalty, haven't you?

11   **A**    Yes, I have.

12   **Q**    You answered this question on your questionnaire, the

13   question was regarding the death penalty which of the

14   following statements represent the way you feel?  And you

15   were asked to circle the one that best expresses your

16   views and you circled D which says, "I'm generally opposed

17   to the death penalty, but I believe I could put aside my

18   feelings against the death penalty and impose it if it is

19   called for by the facts and the law in the case."  And

20   there were other choices that you could have chosen,

21   starting with the fact that you would always vote to

22   impose it regardless of facts all the way down to you

23   would never impose it.  You selected the one that said

24   that you are generally opposed to it but you could impose

25   it depending on the facts.  Is that how you feel about it?

1    **A**    Yes, I do.

2    **Q**    In this case as in any capital case, which is what we

3    call a case in which they are asking for the death

4    penalty, a juror would not be qualified if they just

5    automatically would just impose the death penalty just

6    because the person is guilty.  A juror would not be

7    qualified if they would never impose the death penalty.

8    So are you saying in the appropriate case you could impose

9    the death penalty?

10   **A**    Yes, I could.

11   **Q**    And in an appropriate case could you also not impose

12   a death penalty, even though the defendant was found

13   guilty, and impose a life sentence which means he would

14   never be released on parole?

15   **A**    Yes, sir, I could.

16            **THE COURT:**  Answer any questions of the

17   attorneys, please.

18            **MR. GASSER:**  May it please the Court, Your

19   Honor?

20                    VOIR DIRE EXAMINATION

21   **BY MR. GASSER**

22   **Q**    Good afternoon, sir.  As Judge Herlong indicated we

23   only can refer to you by number, not name.  That's to

24   protect your identity during these proceedings.

25   **A**    Okay.

1    Q    So I apologize on the front end meaning no

2    disrespect.  We just can't refer to you by name but Juror

3    No. 277.  I was introduced to you earlier this morning.

4    I'm Johnny Gasser and I'm one of the Assistant U.S.

5    Attorneys that's handling this case along with Mr. Crick

6    and Ms. Pendleton.  And I just have a few follow-up

7    questions based on your responses to Judge Herlong and

8    your responses to the questionnaire this morning.

9         And I just wanted to preface my questions with the

10   idea that there is no -- like Judge Herlong said, there is

11   no right or wrong answers.  You don't know us.  You have

12   never met me.  You have never met Mr. Vieth and Mr. Stepp.

13   And here we are asking you some questions about something

14   that as you indicated you've never really thought of

15   before.  So I hope you just kind of bear with us a few

16   minutes, okay?

17   A    Okay.

18   Q    With regard to this whole issue of the death penalty,

19   have you ever had an opportunity with either family

20   members or friends, co-workers, watching something on

21   television, not this case but watching a case on

22   television or reading about a case, have you had an

23   opportunity to discuss the death penalty with people?

24   A    No, I never really discussed the death penalty.

25   Q    You know that there are some people that are -- that

Juror No. 277 – Voir Dire by Mr. Gasser

43

1  either because of their religion, what church they go to,

2  or for whatever philosophical or social reason may be that

3  they are opposed to the death penalty and that's okay.

4  They just don't think the death penalty should be used in

5  our country.  I take it from your response to the

6  questionnaire and your response to Judge Herlong you are

7  not one of those people?

8  **A**    No.

9  **Q**    You seem to be the type of person that if the facts

10 warrant it and the set of circumstances warranted it, then

11 you believe the death penalty may be appropriate in a

12 certain type of homicide case; is that correct?

13 **A**    Yes, sir, I do.

14 **Q**    Now, do you understand that some people -- issues,

15 such as the death penalty, saying that you might be in

16 favor of it in the abstract is one thing, but as far as

17 actually sitting on a jury, not necessarily this jury but

18 a death penalty jury, and having to make those important

19 decisions, are you telling us that even though it might be

20 difficult that you could, given a set of circumstances,

21 given a set of facts and circumstances, you could vote to

22 sentence somebody to die; is that correct, sir?

23 **A**    If I thought the crime was bad enough I could.

24 **Q**    Okay.  And likewise, despite the fact that

25 somebody -- you were on a jury that convicted somebody of

Juror No. 277 – Voir Dire by Mr. Gasser

44

1   killing multiple people, depending on the facts and

2   circumstances as to what you heard and the law that you

3   were charged by the Court, you could also vote for life in

4   prison without parole?

5   **A**    Yes, I could.

6   **Q**    And you would agree with me that life in prison

7   without parole, that's a pretty substantial sentence in

8   and of itself, is it not?

9   **A**    Yes, it is.

10  **Q**    And in the federal system life without parole really

11  means that.  We refer to it as a pine box sentence.  You

12  die in prison.  Do you understand that?

13  **A**    Yes.

14  **Q**    Now, there are some people that even though they

15  generally favor the death penalty, if the other option is

16  definitely life without parole, I mean, they are

17  definitely going to die in prison, they would always vote

18  for life without parole because they just can't envision

19  themselves sentencing somebody to die.  You don't seem to

20  fall in that category.  You still could vote for the death

21  penalty even if life without parole is the other

22  alternative?

23  **A**    I believe I could.

24  **Q**    And in the federal system if you were selected on a

25  death penalty case and you and your fellow jurors

1  convicted the individual, found him guilty of the crimes

2  charged, and you went into the sentencing proceeding and

3  you heard all the facts and the law in the sentencing

4  proceeding, and you went back in your jury room and you

5  and your fellow jurors believed that the death penalty was

6  appropriate, each one of you individually would have to

7  sign your name on a death verdict form.  And the Court by

8  law would have to accept that verdict.  I know it might be

9  difficult, but given the set of circumstances, could you

10  sign your name on that piece of paper?

11  **A**    Like I said, if I thought he was guilty, yes, I could

12  do it.

13  **Q**    And lastly, I notice on your questionnaire that you

14  sent in a couple of months ago that you have a daughter;

15  is that correct?

16  **A**    Yes.

17  **Q**    And she is in her late 20's; is that correct?

18  **A**    Yes.

19  **Q**    The facts and circumstances -- if you were to be

20  selected on this jury, the evidence would come out that

21  four out of the six victims in this case are young women

22  relatively close in age to your daughter.  The fact that

23  you have got a daughter in her late 20's, you could set

24  that aside and you could still be able to give the

25  Government a fair trial and give the defendant a fair

Juror No. 277 – Voir Dire by Mr. Gasser

1  trial despite the fact that you may hear evidence that

2  might remind you of your daughter?  You would still be

3  able to do that, would you not, sir?

4  **A**    Yes, I would.  I wouldn't put her in that place.

5        **MR. GASSER:**  That's all we have, Your Honor.

6        **MR. VIETH:**  May it please the Court?

7                VOIR DIRE EXAMINATION

8  **BY MR. VIETH**

9  **Q**    Goods afternoon, sir.

10  **A**    Good afternoon.

11  **Q**    I'm the last one that gets to talk to you.  I'm Rick

12  Vieth and I introduced myself to you earlier and I

13  practice law in Spartanburg.  Ben Stepp is the Federal

14  Public Defender and he and I represent Eric Hans, okay?

15  **A**    Uh-huh.

16  **Q**    And the process, it seems like the more someone will

17  ask you a question, the more it opens up another channel

18  to go down.  So I have got to go down another channel that

19  I wasn't planning on.  In response to Mr. Gasser's

20  question about the death penalty, my notes that I wrote

21  down seemed to indicate that you said that if you thought

22  a person was guilty you would impose the death penalty.

23  **A**    If I thought he was -- did the crime enough to be put

24  to death because, like this, if you take another person's

25  life for unwillingly and no reason, I don't think you

Juror No. 277 - Voir Dire by Mr. Vieth

47

1   should be able to live when you take another person's life

2   because the other person that they took the life had the

3   right to live just like they did.

4   **Q**   Okay.  You have heard the phrase eye for an eye?

5   **A**   Yes.

6   **Q**   Is that the way you look at it?

7   **A**   No, no, no, not like that.

8   **Q**   Not like that?

9   **A**   No.

10  **Q**   Okay.  So if you found that someone committed murder,

11  and I don't want to -- it's hard being the third person to

12  ask you questions.  I'm not trying to reinvent everything,

13  I just want to make sure I understand you, because you

14  wrote down, "If I thought he was guilty I could do it."

15  So what did you mean by that?

16  **A**   I meant, like, a bunch of people, you take a bunch of

17  people's life for no reason, you know, you don't need to

18  live neither.  If you took their life for no reason, they

19  deserve to live.

20  **Q**   Okay.  So if there was a murder for no reason --

21  **A**   Yes.

22  **Q**   -- follow that up for me.  What does that mean?  If

23  there was a murder for no reason --

24  **A**   You take some people's lives and, you know, for no

25  reason you just brutally just kill them for nothing.

1   **Q**    Right.  Then what?

2   **A**    They don't need to live.  He don't need to live right

3   there.

4   **Q**    So then your penalty would not be life without

5   parole?

6   **A**    I think it would be death.

7   **Q**    I understand you are thinking it would be death.  My

8   question is not -- and we are not trying to get a question

9   answered with specific or specificity where you have got

10   to give an answer.  But if you said if I determined that

11   someone took a life, premeditated murder, okay, it's

12   murder, it's not an accident.  It is not self-defense.  To

13   your point it's a calculated murder.  If that happened,

14   could you consider life without parole as an appropriate

15   sentence?

16   **A**    Like I said, it would be from hearing the evidence.

17   **Q**    Well, you have heard the evidence.  The evidence is

18   to your point murder, no excuses, none, case is over.  You

19   have heard the evidence.  You have found guilt beyond a

20   reasonable doubt.  There is no excuse for it.  Then you go

21   into a penalty phase.  Then you say, okay, let's see what

22   we got here.  I have got two choices, life in prison or

23   death.  Based upon what I just found, that this guy killed

24   someone without justification, would you consider life

25   without parole or would it just automatically be the death

Juror No. 277 - Voir Dire by Mr. Vieth

49

1  penalty?

2  **A**    Maybe not just automatically the death penalty.

3  **Q**    Well, go ahead and explain yourself.

4  **A**    I mean, like, like I said earlier, if you just -- a

5  person just take another person's life for no reason, why

6  should they be able to live, too?

7  **Q**    So where am I reading in that that you are saying

8  life without parole isn't appropriate?  Am I just making

9  that up?

10 **A**    No, you are not making it up.

11 **Q**    Okay.

12 **A**    I mean, you seen then, what you asked me you are

13 saying would I consider.

14 **Q**    Could you consider -- and when you say someone don't

15 deserve to live --

16 **A**    Oh, you said could I consider?

17 **Q**    Let's back up and start over.

18 **A**    Okay.

19 **Q**    If the penalty can be only one of two --

20 **A**    Okay.

21 **Q**    -- life without parole, death, and your choices are

22 based upon your moral thoughts, the way you think as a

23 person.  And I agree, you say I have never thought of the

24 death penalty before, never really passed my mind.  So we

25 are hitting you in 20 minutes with stuff that you have

Juror No. 277 – Voir Dire by Mr. Vieth

50

1    never thought of and probably don't want to think of

2    again.  But the point that you made, and it is well taken,

3    there is no right or wrong answers as everybody's told you

4    is that if someone takes a life on purpose, then they

5    shouldn't live themselves, that that's not a good enough

6    penalty.  I thought I heard you say that.  If I didn't --

7    **A**    Yes, you did.

8    **Q**    That's what I heard?

9    **A**    Yeah.

10   **Q**    Okay.  So if you found in a trial that someone took a

11   life on purpose, then your reaction is that person who I

12   found guilty of that crime should not live.  Is that

13   correct or not correct?

14   **A**    That's correct.

15   **Q**    That's correct.  Okay.  Now, when we say meaningful

16   consideration, we mean that -- you know, you may say would

17   you ever consider doing drugs, and you may say, well, I'll

18   consider it, but it goes through one ear and out the

19   other, you are never going to consider it.  Okay?  So when

20   you say meaningful consideration, you are really going to

21   give it some thought.  Okay?  In the scenario that I just

22   said, murder without any excuse, would you truly be able

23   to give meaningful consideration to life without parole or

24   is your answer that you gave earlier that that person

25   doesn't deserve to live be your answer?

Juror No. 277 – Voir Dire by Mr. Vieth

51

1    **A**    I'd probably consider it after listening to it.

2    **Q**    You would consider what?

3    **A**    Life on parole.

4    **Q**    You would consider life without parole?

5    **A**    Yes.  Like I said, I never had thought of the death

6    penalty.

7    **Q**    Well, you would agree it is a severe penalty?

8    **A**    Yes, it is.

9    **Q**    All right.  Do you consider life without parole to be

10   a serious penalty?

11   **A**    Yes.

12   **Q**    Given that you are not going to get any mitigation --

13   mitigation just means an explanation.  You are not --

14   let's say you don't get any explanation to a case.  You

15   don't get any reason to know why someone was murdered.  It

16   was just done.  Okay?  And you don't hear anything else.

17   When you get back in that jury room, are you going to be

18   able to consider -- and now, this is important stuff.  And

19   you say what's on your mind because I thought you said

20   that you could not consider that it was basically if he

21   takes a life on purpose that he does not deserve to live.

22   **A**    Yes, that's what I said.

23   **Q**    And is that what you mean?

24   **A**    Well, like I said, I really hadn't, like I said,

25   thought of the death penalty.  It would be kind of hard

Juror No. 277 – Voir Dire by Mr. Vieth

52

1   for me to just say that I could sentence him to death just

2   like that.

3   **Q**    Okay.  We'll move on.  Let's move on.  Have you

4   indicated that you have heard anything about this case at

5   all?

6   **A**    I just read some out the newspaper.

7   **Q**    If part of a murder involved a young child, would

8   that impact your decision as to a penalty?

9   **A**    I couldn't really say.

10  **Q**    Could you still consider life without parole in that

11  kind of situation?

12  **A**    It just depends how they killed the child.

13  **Q**    Sir?

14  **A**    It depends on how the child was killed.

15  **Q**    So there is a good murder and a bad murder?

16  **A**    No, there's not.  No murder is good.

17  **Q**    Okay.  But it's a murder.  It's a killing.  Someone

18  died.

19  **A**    I mean, it depends on whether he raped them or drug

20  them or beat them or something like that.

21  **Q**    So depending on how a child was killed would depend

22  on the sentence?

23  **A**    Yeah, it depends on how he should be sentenced.

24  **Q**    Well, you are going to be the one sentencing.  You

25  are the sentencer.  Okay?  So my question is, could you

Juror No. 277 – Voir Dire by Mr. Vieth

53

1    consider life without parole where a child may be

2    involved, regardless of how, just was the victim of a

3    murder?

4    **A**    It's kind of hard to say about that one.

5    **Q**    Okay.  What are you thinking?

6    **A**    I mean, I could say the death penalty and I could say

7    life without parole because life without parole he would

8    constantly have to think about what he did to a child.

9    **Q**    All right.  Do you understand that the Government

10   never has to get the death penalty?  In other words, you

11   can decide life without parole and never give it just

12   because they are asking for it.  Do you understand that?

13   **A**    Yes.

14   **Q**    That's something you don't ever have to give.  Okay?

15   Would you have to hear from the person that you found

16   guilty?  Would you have to hear from that person or

17   somebody on his behalf as to an excuse or an explanation

18   in order to consider life without parole?

19           **MR. GASSER:**  I'm going to object to the form of

20   the question.

21           **THE COURT:**  Sustained.  It's misleading because

22   that's not the law.

23   **Q**    All right.  The Government will put up what they call

24   aggravators.  Aggravators are things that make the crime

25   appear worse.  Essentially -- let me back up, Mr. 277.

Juror No. 277 – Voir Dire by Mr. Vieth

54

1    You can't seek the death penalty in every murder.  The law

2    doesn't allow it.  Okay?  And no one knows that unless you

3    are in this system.  I mean, no one knows that a murder

4    can't seek the death penalty.  And I'm sure you don't have

5    any clue when you can seek the death penalty and when you

6    can't.

7    **A**    No, I don't.

8    **Q**    But a murder by itself cannot give the death penalty.

9    You have got to have something more, like killing a cop or

10   killing a child under the age of ten in state court.  You

11   have got to have something.  Okay?

12       The defendant, on the other hand, can put up things

13   that would show who he is, why he got to this position in

14   life, whether it is poverty or drugs in his life or any

15   number of things.  Those are called mitigators.  They

16   don't excuse the crime, they kind of explain it.  Do you

17   understand the difference?

18   **A**    Yeah.

19   **Q**    So you have got these aggravators that make it worse

20   and you have got mitigators that may come in to try to

21   show about the person.  My question simply is can you

22   consider mitigating factors?  Would you want to know about

23   the person before you sentenced them or would it matter?

24   **A**    Would I want to know about the person that did the

25   crime?

Juror No. 277 – Voir Dire by Mr. Vieth

55

1   **Q**    Right.

2   **A**    Well, I would like to know something about him, see

3   how he came up and see was he like that all his life,

4   hate's in the heart all the time.

5   **Q**    Okay.  And if you heard things like that, would that

6   help you to consider the penalty?

7   **A**    Yes.

8          **MR. VIETH:**  Okay.  Thank you very much.

9          **THE COURT:**  Sir, I just want to clarify.  I

10  think I understand.  You've been very thoughtful in your

11  answers.  And as everyone has explained to you, when you

12  start talking about the death penalty there are no right

13  or wrong answers because we just want to make sure that

14  you are qualified as a juror.  And I think I understand

15  how you feel about it.  And I want to go over it with you

16  just to make sure because I know how you answered your

17  questionnaire when you read the possible responses and I

18  know how you answered the questions.

19          The law is -- this is the law.  The law is just

20  because someone is guilty of murder or a capital crime, or

21  as this person is charged, arson resulting in death, just

22  because they are guilty doesn't automatically mean that

23  they get the death penalty.  It's up to the jury to

24  decide.  If you are a juror, I think you have said that --

25  and if the facts -- you would want to know all the facts

56

1   and hear all the facts about the case, wouldn't you?

2            THE POTENTIAL JUROR:  Yes, sir.

3            THE COURT:  And after hearing all the facts and

4   how you feel about the death penalty, I believe it's your

5   position that you could impose the death penalty.

6            THE POTENTIAL JUROR:  Yes, I could.

7            THE COURT:  If the person was guilty of this

8   crime which I described to you and you heard all the

9   facts, could you impose a life sentence?  Would it depend

10  on the facts?

11           THE POTENTIAL JUROR:  Yes, the facts.

12           THE COURT:  Okay.  And I'm not trying to put

13  words in your mouth.  I want you to tell me how you feel.

14  But depending on the facts, do you feel like if a person

15  was guilty of this crime, and there again, we are not

16  talking about the facts because they are not out there,

17  would they automatically in your opinion deserve the death

18  penalty or could you impose a life sentence?

19           THE POTENTIAL JUROR:  I think I could give the

20  death penalty.

21           THE COURT:  Well, I know you could give the

22  death penalty.  I'm not asking you that because you said

23  you could give the death penalty.  I'm asking you could

24  you also give a life sentence?

25           THE POTENTIAL JUROR:  Yes, I probably could.

57

1          **THE COURT:**  All right.  Thank you, sir.  You are

2    excused and wait for further instructions.

3        (WHEREUPON, Juror No. 277 left the courtroom.)

4          **THE COURT:**  Government's position?

5          **MR. GASSER:**  Your Honor, we believe he's

6    qualified and would move to seat the juror.

7          **MR. VIETH:**  Your Honor, the totality of the

8    circumstances issue I think he is not qualified.  I don't

9    think there is any question that he feels like if someone

10   takes a life he should give a life.  And after all the

11   rehabilitation that was trying to be done, he still said I

12   would give the death penalty.

13         **THE COURT:**  I don't know who was trying to

14   rehabilitate him -- who was trying to lead him which way,

15   but I wasn't trying to lead him any way.

16         **MR. VIETH:**  I didn't mean to imply --

17         **THE COURT:**  I know you weren't but.

18         **MR. VIETH:**  I believe he be refused for cause.

19         **THE COURT:**  I deny the request.  What says the

20   Government?

21         **MR. GASSER:**  Seat the juror.

22         **THE COURT:**  What's the defendant's position?

23         **MR. VIETH:**  Excuse the juror for this trial.

24         **THE COURT:**  All right.  Bring the next juror in,

25   please.

58

1          (End of requested voir dire for this day.)

2                              ***

3    I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6      s/Karen E. Martin                    11/29/07
     _____         _____
7    Karen E. Martin, RMR, CRR              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:17CR00866-RBH(1) |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | **EX PARTE DECLARATION** |
| BRANDON MICHAEL COUNCIL | ) | |

1. On April 12, 2018, William F. Nettles, IV, submitted a declaration under seal on behalf of the defense team which stated that based on all of his observations and interactions with Brandon Council that Brandon Council was appropriately cooperative and had the present ability to consult with counsel to a reasonable degree of rational understanding, and that he had a rational and factual understanding of the proceedings against him.

2. Mr. Nettles' declaration also disclosed that Dr. Geoffrey R. McKee, Ph.D., ABPP, a board certified forensic psychologist, conducted a competency evaluation of Brandon Council, and that in Dr. McKee's opinion, Brandon Council was competent to stand trial.

3. Since Dr. McKee's evaluation, counsel has met several times with Mr. Council. During those meetings, nothing arose that indicated That Dr. McKee's opinion as to competency should be questioned. In addition, two other mental health consultants, while not evaluating the defendant for competence, have separately indicated to counsel that Mr. Council is presently competent to stand trial.

4. Based on the foregoing, the defense does not intend to file a motion for a competency evaluation.

5. Upon penalty of perjury, the foregoing is true and correct.


Respectfully Submitted,

**/s/ MICHAEL A. MEETZE**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

Florence, South Carolina

June 1, 2018

*In the Matter Of:*

# In Re: FBI Interview of Brandon Council

---

## Brandon Council Audio Transcription

July 27, 2018

---



**A. William Roberts, Jr. & Associates**
Court Reporting & Litigation Solutions
www.scheduledepo.com | 800-743-DEPO

**We're About Service ... Fast, Accurate and Friendly!**

    

court reporting | trial presentation | document services | videography | nationwide scheduling

1          In Re:  FBI Interview of Brandon Council

2

3                        NO. 4:17-866

4

5

6                      AUDIO TRANSCRIPT

7

8

9

10

11

12   INTERVIEWEE:        Brandon Council

13   INTERVIEWERS:       Federal Agent Todd Richards

14                       Federal Agent Greg Coates

15   DATE:               August 23, 2017

16   TIME:               3:00 p.m.

17   TRANSCRIBED BY:  Tia Shean, Court Reporter

18   _____

19        A. WILLIAM ROBERTS, JR., & ASSOCIATES

20            Fast, Accurate & Friendly

21   Charleston, SC  Hilton Head, SC  Myrtle Beach, SC
     (843)722-8414    (843)785-3263     (843)839-3376
22
     Columbia, SC     Greenville, SC    Charlotte, NC
23   (803)731-5224    (864)234-7030     (704)573-3919

24                     Asheville, NC
                       (828)123-9876
25

2

1                     AUDIO TRANSCRIPT

2                AGT. RICHARDS:  Mr. Council.

3                MR. COUNCIL:  Mmm-hmm.

4                AGT. RICHARDS:  How are you, sir?

5                MR. COUNCIL:  Okay.

6                AGT. RICHARDS:  How's everything

7   going?  You doing all right?

8                MR. COUNCIL:  Mmm-hmm.

9                AGT. RICHARDS:  My name is

10  Todd Richards.  I'm an FBI agent.

11                MR. COUNCIL:  Yes, sir.

12                AGT. RICHARDS:  This is Mr. Coates.

13  He's an FBI agent.

14                MR. COUNCIL:  All right.

15                AGT. RICHARDS:  Okay.  We just want

16  to -- are you doing okay today?

17                MR. COUNCIL:  (Inaudible)

18                AGT. RICHARDS:  Are you doing

19  okay today?

20                MR. COUNCIL:  I'm all right.

21                AGT. RICHARDS:  Are you under any

22  -- are you under the influence of any alcohol or

23  drugs or anything like that?

24                MR. COUNCIL:  No.

25                AGT. RICHARDS:  Okay.  What I want to

3

```
1   do, before we get started, Mr. Council, is just
2   -- just think about where you're at --
3               MR. COUNCIL:  I'll keep it real with
4   you, man.
5               AGT. RICHARDS:  Okay.
6               MR. COUNCIL:  I -- I want to
7   talk, man.
8               AGT. RICHARDS:  That's --
9               MR. COUNCIL:  I don't even want to
10  hear you talk.  I want to talk.
11              AGT. RICHARDS:  That's really cool.
12  Okay.
13              MR. COUNCIL:  All right.
14              AGT. RICHARDS:  So let me just --
15              MR. COUNCIL:  From the beginning.
16              AGT. RICHARDS:  Let me just -- let
17  me just --
18              MR. COUNCIL:  Because y'all are very
19  intelligent people, and I consider myself slightly
20  intelligent.  Not as intelligent as y'all.  Y'all
21  level, but I need to speak, man.
22              AGT. RICHARDS:  Okay.  Let me just
23  -- before we get started, Brandon.  Let me just
24  read you your rights.  Okay?  Please.
25              MR. COUNCIL:  Okay.
```

4

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  Okay.  I understand all

 3    my rights.

 4                    AGT. RICHARDS:  All right.  Let me

 5    just read them to you anyway.  Okay?

 6                    MR. COUNCIL:  All right.

 7                    AGT. RICHARDS:  Before we ask you any

 8    questions you must understand your rights.  You

 9    have the right to remain silent.  Anything you say

10    can be used against you in court.  You have the

11    right to talk to an lawyer for advice before we ask

12    you any questions.  You have the right to have a

13    lawyer with you during the questioning.  If you

14    cannot afford a lawyer, one will be appointed for

15    you before any questioning, if you wish.  If you

16    decide to answer any questions, without a lawyer

17    present, you have the right to stop answering at

18    any time.

19                    MR. COUNCIL:  Mmm-hmm.

20                    AGT. RICHARDS:  I have read these

21    rights to you, you understand your rights, and you

22    wish to answer questions, without a lawyer present?

23                    MR. COUNCIL:  That's correct.

24                    AGT. RICHARDS:  Okay.  I need you to

25    sign right there.  Okay.  Brandon -- all right.  We
```

5

```
1   are at the Greenville PD.  It is 8-23-17, and the

2   time is 3:00 p.m.  Okay.  Brandon, so why don't you

3   -- why don't you start where you want to start.

4   You tell me what -- tell me what you're thinking.

5   Start from the beginning.

6                MR. COUNCIL:  Well, you cut me off,

7   man.  (Inaudible)-- try that.  We're going to try

8   it your way.  Ask me -- ask your questions.

9                AGT. RICHARDS:  What's that?

10               MR. COUNCIL:  I said, you cut me off

11  from the beginning, so --

12               AGT. RICHARDS:  No, no, no.  I just

13  -- this -- I had to do that.  I have to do that.

14  That's the law.

15               MR. COUNCIL:  So I'll let you go

16  first.  I'll answer your questions.

17               AGT. RICHARDS:  Okay.  So -- so

18  Brandon, where did we -- where are you from?

19               MR. COUNCIL:  Wilson, North Carolina.

20               AGT. RICHARDS:  You were born and

21  raised in Wilson.  That's in North Carolina?

22               MR. COUNCIL:  That's correct.

23               AGT. RICHARDS:  Okay.  And so tell us

24  about -- tell us about the bank robbery up in

25  Wilson, North Carolina.
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

6

```
 1                MR. COUNCIL:  Mmm-hmm.

 2                AGT. RICHARDS:  What happened with

 3   that?  Why --

 4                MR. COUNCIL:  Why or what --

 5                AGT. RICHARDS:  Go ahead.  Tell us

 6   what happened.

 7                MR. COUNCIL:  (Inaudible)

 8                AGT. RICHARDS:  Did you do it alone?

 9                MR. COUNCIL:  Yes.

10                AGT. RICHARDS:  Okay.  Do you know

11   what the bank was?

12                MR. COUNCIL:  BB&T.

13                AGT. RICHARDS:  Okay.  And do you

14   know where it was located?

15                MR. COUNCIL:  On Tarboro Street.

16                AGT. RICHARDS:  On Tarboro Street?

17                MR. COUNCIL:  Yes.

18                AGT. RICHARDS:  Okay.  And how much

19   did you get from the bank robbery?

20                MR. COUNCIL:  I want to say close to

21   $2,000.

22                AGT. RICHARDS:  Okay.  Tell me, what

23   was the reasoning for that, Brandon?  Why did you

24   do that robbery?

25                MR. COUNCIL:  I just recently did six
```

7

```
1    years in prison.

2                  AGT. RICHARDS:  When did you get out?

3                  MR. COUNCIL:  November 24, 2016.

4                  AGT. RICHARDS:  November twenty --

5                  MR. COUNCIL:  No.  November 4th.

6    November 4, 2016.

7                  AGT. RICHARDS:  All right.  You were

8    released from a North Carolina prison?

9                  MR. COUNCIL:  That's correct.

10                  AGT. RICHARDS:  Okay.

11                  MR. COUNCIL:  And now, what was your

12   last question?

13                  AGT. RICHARDS:  You -- I said, why

14   did you -- why did you do it?  Why did you do the

15   bank robbery?

16                  MR. COUNCIL:  I was desperate.  I was

17   homeless.  I was unemployed.  And I don't know how

18   you terminize [sic] it, but I got thrown out of my

19   parent's house.  Out on -- when I first got out of

20   prison -- well, right at the end of your term

21   sentences, they normally, you know, try to set you

22   up with a place to live and everything.  We set

23   that up for me to live with my mother and my

24   step-father.

25                  I went through, and I got off on
```

8

```
1   parole, and not to long after that, maybe a day or
2   two after that, my family -- they were conspiring
3   against me to get me -- my step-father -- I don't
4   know if you are familiar with this step-father and
5   step-son beef/turmoil type --
6                   AGT. RICHARDS:  Well, I'm familiar
7   with your mom, and your -- and you have a
8   step-father.
9                   MR. COUNCIL:  Yes.
10                  AGT. RICHARDS:  And you live with
11  them, right from prison?
12                  MR. COUNCIL:  Yes.  Like --
13                  AGT. RICHARDS:  Okay.
14                  MR. COUNCIL:  -- I said, this is what
15  it's -- the chaos came in, and started to play with
16  -- they told the people in prison that I could come
17  stay with them, I mean, and eventually, at the last
18  moment, they -- they recanted.  They -- they said
19  that they couldn't help me.  So at the last moment,
20  I got out of prison, went to jail, got out of jail
21  the next day, lived with them for nine months --
22                  AGT. RICHARDS:  Okay.
23                  MR. COUNCIL:  -- and during that time
24  it was very, very -- I want to --(inaudible)-- it
25  was crazy as hell in their house.  You know --
```

In Re: FBI Interview of Brandon Council  Brandon Council Audio Transcription
July 27, 2018

9

```
 1                    AGT. RICHARDS:  What's your

 2    mom's name?

 3                    MR. COUNCIL:  Beth Joyner.

 4                    AGT. RICHARDS:  Beth?

 5                    MR. COUNCIL:  Mmm-hmm.

 6                    AGT. RICHARDS:  Beth what?

 7                    MR. COUNCIL:  Joyner.

 8                    AGT. RICHARDS:  Okay.  And what's

 9    your step-father's name?

10                    MR. COUNCIL:  James Joyner.

11                    AGT. RICHARDS:  Okay.  But you did

12    -- you did stay with them for about nine months?

13                    MR. COUNCIL:  That's correct.

14                    AGT. RICHARDS:  And you stayed out

15    of trouble?

16                    MR. COUNCIL:  That's correct,

17    officer.

18                    AGT. RICHARDS:  Were you working?

19                    MR. COUNCIL:  That's correct,

20    officer.

21                    AGT. RICHARDS:  Where were you

22    working?

23                    MR. COUNCIL:  I was working at

24    Wendy's in Wilson, North Carolina.

25                    AGT. RICHARDS:  And did -- did you
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

10

```
 1    have a car or a vehicle?  How did you get

 2    to Wendy's?

 3                  MR. COUNCIL:  I lived down the road.

 4                  AGT. RICHARDS:  So --

 5                  MR. COUNCIL:  I walked to work,

 6    primarily.

 7                  AGT. RICHARDS:  So your parent's

 8    home is --

 9                  MR. COUNCIL:  Well, I wasn't a

10    welcome party at their house, and my step-father

11    was doing things to get me thrown out of the house.

12    And eventually I got thrown out of the house.  I

13    quit my job.  Didn't have a vehicle at the time.

14    Didn't have --

15                  AGT. RICHARDS:  Okay.

16                  MR. COUNCIL:  -- a source of income,

17    and the stress of being, you know, unemployed and

18    homeless at the same time.  I said, hell, I don't

19    have shit to lose right now.  I don't have any

20    other close relatives.  My mother -- she's

21    basically like my sister.  She's really not

22    -- we're not really a mother-son type situation.

23                  AGT. RICHARDS:  Yeah.

24                  MR. COUNCIL:  She's my biological

25    mother.
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

11

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  But emotionally, you

 3    know what I'm saying?  She really didn't -- she

 4    wasn't there for me.  So --

 5                    AGT. RICHARDS:  Okay.

 6                    MR. COUNCIL:  -- I've learned to cope

 7    with that, but at the same time it's like

 8    this, man.

 9                    AGT. RICHARDS:  So -- go ahead.  So

10    -- go ahead.  So then you left or they threw you

11    out or --

12                    MR. COUNCIL:  Yeah, they threw me out

13    in the middle of the night.  I don't -- because

14    -- my girlfriend, she was a manager at Wendy's.

15                    AGT. RICHARDS:  Who was your

16    girlfriend?

17                    MR. COUNCIL:  Her name is

18    Linda Parker.

19                    AGT. RICHARDS:  And she was also

20    a manager?

21                    MR. COUNCIL:  No.  I wasn't a

22    manager.  She -- she was my manager.

23                    AGT. RICHARDS:  She was a manager at

24    Wendy's?

25                    MR. COUNCIL:  That's correct.
```

JA0322

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

12

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  And --

 3                    AGT. RICHARDS:  Do you remember when

 4    your parents threw you out?

 5                    MR. COUNCIL:  Honestly, I want to say

 6    -- I can get you exact dates.  I don't --

 7                    AGT. RICHARDS:  You know, just

 8    -- just generally speaking.

 9                    MR. COUNCIL:  Right before the big NC

10    bank robbery.

11                    AGT. RICHARDS:  Oh, really?  Okay.

12                    MR. COUNCIL:  Like, I'm not exactly

13    certain the exact -- shoot.

14                    AGT. RICHARDS:  Do you remember

15    when --

16                    MR. COUNCIL:  I don't know the

17    accurate date, is what I'm trying to say.  I don't

18    know an accurate date.

19                    AGT. RICHARDS:  Do you know when you

20    did the BB&T robbery?

21                    MR. COUNCIL:  It was -- it was

22    -- what's today's date, the 23rd?

23                    AGT. RICHARDS:  Yes.

24                    MR. COUNCIL:  If I'm not mistaken, I

25    believe it was on a Friday.
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

13

```
 1                    AGT. RICHARDS:  On a Friday?
 2                    MR. COUNCIL:  Yes.  About a week ago,
 3   two weeks ago, maybe.
 4                    AGT. RICHARDS:  Would -- would
 5   -- August 11th -- Friday, August 11th seem right?
 6                    MR. COUNCIL:  That'll -- that'll
 7   work.
 8                    AGT. RICHARDS:  Okay.  And so you got
 9   a quantity of cash from there, about $2,000.
10                    MR. COUNCIL:  Mmm-hmm.
11                    AGT. RICHARDS:  And did -- you did
12   it alone?
13                    MR. COUNCIL:  Yes.
14                    AGT. RICHARDS:  Okay.  Did you talk
15   to anybody about doing it?
16                    MR. COUNCIL:  No.
17                    AGT. RICHARDS:  No one.  You just
18   decided to do it?
19                    MR. COUNCIL:  That's correct.
20                    AGT. RICHARDS:  Okay.
21                    MR. COUNCIL:  I'm -- I'm not going to
22   lie to you, man.  I -- I watch a lot of those, you
23   know, what-you-call-it shows and...
24                    AGT. RICHARDS:  You watch the shows?
25                    MR. COUNCIL:  Yeah.
```

AWR

JA0324

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018
14

1              AGT. RICHARDS:  Okay.

2              MR. COUNCIL:  I almost got away with

3   it.  That's the -- that's the point.  I almost got

4   away with it.

5              AGT. RICHARDS:  So did you -- what

6   type of robbery was it?

7              MR. COUNCIL:  It was -- in my

8   opinion?

9              AGT. RICHARDS:  Yeah.

10             MR. COUNCIL:  I handed her a note

11  demanding money.

12             AGT. RICHARDS:  Oh, okay.  You handed

13  her a note.

14             MR. COUNCIL:  That's correct.

15             AGT. RICHARDS:  And what did the note

16  say; do you remember?

17             MR. COUNCIL:  Verbatim?  No.

18             AGT. RICHARDS:  Say it again?

19             MR. COUNCIL:  Verbatim.  Verbatim?

20  I can't --

21             AGT. RICHARDS:  Roughly.

22             MR. COUNCIL:  -- recall.

23             AGT. RICHARDS:  You know, roughly.

24             MR. COUNCIL:  This is a robbery.

25  Give me the money or I will hurt you.  Let's say

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                                July 27, 2018

                                                                                            15

```
 1   -- let's use that as an example.

 2               AGT. RICHARDS:  A robbery --

 3               MR. COUNCIL:  Or something to --

 4               AGT. RICHARDS:  -- give --

 5               MR. COUNCIL:  -- that extent.

 6               AGT. RICHARDS:  -- me -- yeah, and

 7   that's fine.  Okay.  And she complied.

 8               MR. COUNCIL:  She did.

 9               AGT. RICHARDS:  And gave you the

10   money, and --

11               MR. COUNCIL:  And I walked out.

12               AGT. RICHARDS:  -- you left.

13               MR. COUNCIL:  I walked out the door,

14   and then I ran maybe -- approximately 50 yards.

15               AGT. RICHARDS:  Yeah.

16               MR. COUNCIL:  To the awaiting vehicle

17   that I had.

18               AGT. RICHARDS:  To a what?

19               MR. COUNCIL:  Awaiting vehicle.

20               AGT. RICHARDS:  Who was waiting

21   for you?

22               MR. COUNCIL:  To an awaiting vehicle.

23   No one was waiting for me.  I drove by myself.

24               AGT. RICHARDS:  Oh, okay.  To an

25   awaiting -- an awaiting vehicle.
```

A│W│R

16

```
 1                    MR. COUNCIL:  Yes.

 2                    AGT. COATES:  What kind of car

 3    was it?

 4                    MR. COUNCIL:  '70 Impala.

 5                    AGT. RICHARDS:  A Chevy --

 6                    MR. COUNCIL:  A gray Chevy Impala.

 7                    AGT. RICHARDS:  Whose car was it?

 8                    MR. COUNCIL:  My ex-girlfriend's.

 9                    AGT. RICHARDS:  Is that Linda Parker?

10                    MR. COUNCIL:  That's correct.

11                    AGT. RICHARDS:  Okay.  And where did

12    you go?

13                    MR. COUNCIL:  When I left Wilson?

14                    AGT. RICHARDS:  Well, after the bank

15    robbery.  You have Linda's car --

16                    MR. COUNCIL:  Mmm-hmm.

17                    AGT. RICHARDS:  Did you go back to

18    her house?

19                    MR. COUNCIL:  Yes.

20                    AGT. RICHARDS:  Okay.

21                    MR. COUNCIL:  But I didn't tell her

22    what I did.

23                    AGT. RICHARDS:  Okay.

24                    MR. COUNCIL:  I did give her a small

25    portion of the money.  I gave her, like, $200.
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                               July 27, 2018

17

1                     AGT. RICHARDS:  You gave her $200?

2                     MR. COUNCIL:  If I'm not mistaken.

3     Close to it.

4                     AGT. RICHARDS:  Okay.

5                     MR. COUNCIL:  Maybe $150-200.

6                     AGT. RICHARDS:  Yep.  Yeah.

7                     MR. COUNCIL:  After that, where did

8     we go?  She went and bought another car.

9                     AGT. RICHARDS:  She went and bought

10    a car?

11                    MR. COUNCIL:  Mmm-hmm.

12                    AGT. RICHARDS:  Okay.

13                    MR. COUNCIL:  But actually -- it's

14    -- it's a private sell.  She traded her Impala in,

15    and got a gray Toyota Camry.

16                    AGT. RICHARDS:  Okay.  And then what

17    happened?

18                    MR. COUNCIL:  Mmm --

19                    AGT. RICHARDS:  So you're on the --

20                    MR. COUNCIL:  We went to the DMV

21    insurance place and got the tags and --

22                    AGT. RICHARDS:  Is that on Monday?

23                    MR. COUNCIL:  That's on Monday.

24                    AGT. RICHARDS:  Okay, because you

25    robbed the bank on Friday.

18

```
 1                  MR. COUNCIL:  Right.

 2                  AGT. RICHARDS:  And now you have the

 3     weekend, and so Monday or -- Monday you go get tags

 4     for the new car?

 5                  MR. COUNCIL:  I guess it was Monday.

 6                  AGT. RICHARDS:  Okay.

 7                  MR. COUNCIL:  I don't want to mislead

 8     you, sir.  I --

 9                  AGT. RICHARDS:  No.  It's fine.  Just

10     do the -- you don't -- just to the best of

11     your memory.

12                  MR. COUNCIL:  All right.

13                  AGT. RICHARDS:  Just to the best of

14     your memory is fine.

15                  MR. COUNCIL:  Like, right now I'm not

16     under the influence, but I have been, you know

17     -- I'm a -- I can -- okay.  Where we at now?

18                  AGT. RICHARDS:  So you went to get

19     -- you went and registered the car.

20                  MR. COUNCIL:  We -- yeah, she got

21     -- she got the car registered.  She went to work

22     that afternoon, and I bought a car.  I pretty much

23     drove it around, and pretty much just, you know,

24     mingled with my friends that evening.

25                  AGT. RICHARDS:  Who -- who did you
```

19

1  mingle with?

2              MR. COUNCIL:  Let me think.  Give me

3  a few seconds.  Who the hell was it with.  Mmm.  I

4  can't remember.

5              AGT. RICHARDS:  Okay.  But you just

6  hung around?

7              MR. COUNCIL:  Right.  I was -- I was

8  in the city.  I was in Wilson driving around, going

9  different places, you know.

10             AGT. RICHARDS:  Okay.

11             MR. COUNCIL:  So that's pretty

12  much...

13             AGT. RICHARDS:  So what -- what

14  happens?

15             MR. COUNCIL:  Well, of course, I

16  believe that Monday or Tuesday morning, I get a

17  text message from my mother saying that the

18  sheriff's office had came to her house looking for

19  me, and I --

20             AGT. RICHARDS:  All right.  A text

21  -- a text from your mom?

22             MR. COUNCIL:  Yeah.  Mmm-hmm.  Said

23  that the sheriff's office -- it's in my phone.

24             AGT. RICHARDS:  Okay.

25             MR. COUNCIL:  She sent me a -- said

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                July 27, 2018

20

```
 1   the sheriff's office had came by her house that

 2   morning.  They were looking for me for a bank

 3   robbery.

 4                 AGT. RICHARDS:  Okay.  And so what

 5   did you do?

 6                 MR. COUNCIL:  When I got the text

 7   message?

 8                 AGT. RICHARDS:  Yeah.

 9                 MR. COUNCIL:  Oh, I packed my shit

10   and got -- I got ghost.  I got missing.

11                 AGT. RICHARDS:  You packed up

12   your bags.

13                 MR. COUNCIL:  That's when -- yeah.

14   I left Linda that day.

15                 AGT. RICHARDS:  And now, did you take

16   her car?

17                 MR. COUNCIL:  No.

18                 AGT. RICHARDS:  You walked.

19                 MR. COUNCIL:  No.

20                 AGT. RICHARDS:  You -- what happened?

21                 MR. COUNCIL:  I got a cab.

22                 AGT. RICHARDS:  You got a cab.  Where

23   did you go?

24                 MR. COUNCIL:  To Wilson.  From

25   Rocky Mount to Wilson.
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                                       July 27, 2018

                                                                                              21

```
 1                    AGT. RICHARDS:  To where?

 2                    MR. COUNCIL:  To Wilson.

 3                    AGT. RICHARDS:  Whereabouts?

 4                    MR. COUNCIL:  Because -- well, the

 5      night that they threw me out --

 6                    AGT. RICHARDS:  Yeah.

 7                    MR. COUNCIL:  -- was because Linda

 8      had came over to our house really, really late, but

 9      Wendy's closes, like, 12:00-1:00 on the weekends --

10                    AGT. RICHARDS:  Yeah.

11                    MR. COUNCIL:  -- so it takes her

12      approximately an hour-and-a-half to two hours to

13      clean up.  My step-dad went outside, spoke with her

14      for about an hour -- this was before all the

15      robberies and stuff.  This is what led up to

16      everything.  This is where the turmoil in my life

17      -- where I feel like I lost my point of focus in

18      life, period.  Because I felt like I only had two

19      people to depend on.  Two-and-a-half people, my

20      mother and my step-father.  I'm an only child.  And

21      my girlfriend -- but we're in a -- we were in a

22      relatively new relationship. We don't know very

23      much about each other.  We had only been dating

24      since February.

25                    AGT. RICHARDS:  Okay.
```

AWR

JA0332

In Re: FBI Interview of Brandon Council  Brandon Council Audio Transcription
July 27, 2018

22

```
 1              MR. COUNCIL:  So long story short,
 2   they throw me out.  I had moved in with her -- this
 3   is background, this is background.
 4              AGT. RICHARDS:  Yeah.  No, it's fine.
 5   Yeah.  Yeah.
 6              MR. COUNCIL:  I'm dealing with her
 7   because my step-father accused me of selling drugs
 8   inside the -- in and out the house.  He was just
 9   making up shit, because I didn't have a car, so all
10   my friends had to come see me.  So I'm pretty
11   popular in Wilson, and the surrounding areas, so I
12   had, kind of, a lot of traffic.  But it wasn't
13   constant, like, every day, all day.  You know what
14   I'm saying?  Like --
15              AGT. COATES:  Which is why everybody
16   was coming by the house.
17              MR. COUNCIL:  Right.  And it wasn't
18   like all my company was coming at late night.  The
19   only person that came to see me, late night, was my
20   girlfriend.
21              AGT. RICHARDS:  He -- he thought you
22   were dealing.
23              MR. COUNCIL:  Right.  Exactly.  He
24   -- he thought I was dealing, and he kept putting
25   these doubtful thoughts out.  I'm like, mom, I just
```

JA0333

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                                    July 27, 2018

23

1 | got off of parole for probation.  You said I've

2 | been using.  You claim -- he accused me of using

3 | drugs and I got off parole so you know that's not

4 | true.  I got off parole so I had to be passing my

5 | drug tests.  I had the job the whole time I was

6 | with them -- living with them.

7 |            I got frustrated with my job

8 | situation, guys.  I was promised a promotion, and

9 | my general manager got transferred to another

10 | store, so I never got the promotion when it got the

11 | new general manager.  She never had time to really

12 | sit down and focus in.  And I was trying to get

13 | myself together, guys.  I -- I know y'all don't

14 | want to hear this shit, but damn.

15 |            AGT. RICHARDS:  I want to hear it

16 | all, Brandon, so keep going.

17 |            MR. COUNCIL:  Well, it's -- it's --

18 |            AGT. RICHARDS:  So when was your

19 | -- when was the turning point, though.  You were

20 | going to say you had a turning point.

21 |            MR. COUNCIL:  I -- I think the next

22 | morning, because we got into a big argument and --

23 |            AGT. RICHARDS:  You and Linda?

24 |            MR. COUNCIL:  No, no, no.  Me and my

25 | step-father, and my mother.

JA0334

24

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  This is the night that

 3    I got thrown out of the house.

 4                    AGT. RICHARDS:  Okay.

 5                    MR. COUNCIL:  We got into a big

 6    argument and everything and we were about to get

 7    physically violent and I, like -- are you

 8    threatening me?  Are you -- because he was -- black

 9    people talk with their hands a lot and very, you

10    know, animated --

11                    AGT. RICHARDS:  Yeah.

12                    MR. COUNCIL:  We get hyper and

13    aggressive and I seen -- he's very, very, very,

14    very red.  Like, he -- if I hadn't have told you,

15    you probably would've thought he was an Indian.

16                    AGT. RICHARDS:  Really.

17                    MR. COUNCIL:  He's that -- but he's

18    an African-American.  Long story short, they were,

19    like, okay, well, who the fuck are you talking to?

20    I said, I'm talking to you.  And that was -- that

21    was the draw.  He felt -- you know, he's the type

22    man -- king of the castle.  I'm the prince.  My

23    momma is the queen.  So with that being said, we

24    were about to fight.  I got thrown out of

25    the house.
```

25

```
 1                  I tell him I wasn't selling drugs,

 2    that my girlfriend just came, but he was, like,

 3    well, if that's your girlfriend call her back.  She

 4    came right back and picked me right up, and I took

 5    right off.  So, right now, at this point, I'm

 6    homeless, I'm jobless, and with a woman that I

 7    don't trust and doesn't really, you know what I'm

 8    saying, fit the criteria for an appropriate

 9    relationship.  You know what I'm saying.  We get

10    high together, have sex, crazy parties and shit, go

11    to casinos, and gamble and shit.  But long story

12    short, man, after that money ran out --

13                  AGT. RICHARDS:  This is the bank

14    robbery money?

15                  MR. COUNCIL:  We skipped the whole

16    thing, man.  There is --

17                  AGT. RICHARDS:  What's that?

18                  MR. COUNCIL:  We skipped Raleigh.

19    Raleigh came first.

20                  AGT. RICHARDS:  Yeah.  No.  I just

21    -- I just wanted to -- to start.  Raleigh was the

22    -- the Food Lion?

23                  MR. COUNCIL:  Yeah.  That was, like

24    -- I didn't use a knife or a gun or anything.  I

25    just walked in there, and asked the cashier for two
```

JA0336

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

26

1   packs of cigarettes, and when she came back with

2   the cigarettes I told her to give me all the money

3   in the cash register, hurry up, and don't scream.

4              AGT. RICHARDS:  Now, how -- and

5   -- and did you use a knife?

6              MR. COUNCIL:  No.

7              AGT. RICHARDS:  And how much did you

8   get in that robbery?

9              MR. COUNCIL:  Maybe 250, $200-300.

10  It wasn't much.

11             AGT. RICHARDS:  All right.  And was

12  that -- did you do that -- was that, like, the day

13  before the bank robbery?

14             MR. COUNCIL:  No, no.  Absolutely

15  not.  No.

16             AGT. RICHARDS:  When was that?

17             MR. COUNCIL:  That was about two or

18  three days before.

19             AGT. RICHARDS:  Two or three days

20  before the bank robbery.

21             MR. COUNCIL:  Because after I ran out

22  of that money, that's when I got BB&T.

23             AGT. RICHARDS:  Did you do that

24  alone?

25             MR. COUNCIL:  Yes.

JA0337

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

27

1              AGT. RICHARDS:  And -- and how did

2    you get to the -- the Food Lion robbery?

3              MR. COUNCIL:  I used the -- my

4    girlfriend gave me access to a car.  She don't --

5              AGT. RICHARDS:  That was -- that was

6    the Impala?

7              MR. COUNCIL:  Mmm-hmm.  Yeah.

8              AGT. RICHARDS:  Okay.

9              MR. COUNCIL:  She didn't know the

10   -- what the hell I was doing.  She -- she works

11   second shift from four to twelve so, in the

12   morning, she would be sleeping and I would have

13   access to her car easily.  It wasn't like I was

14   stealing it.  It's just that, you know, she didn't

15   know what I was doing with it.

16             AGT. RICHARDS:  What time was -- what

17   time was the Food --

18             MR. COUNCIL:  It had to be early.  It

19   had to be in the morning.  I can't give you the

20   exact time.

21             AGT. RICHARDS:  Okay.  That's okay.

22             MR. COUNCIL:  It was in the morning.

23             AGT. COATES:  Do you remember which

24   Food Lion it was?

25             MR. COUNCIL:  Mmm-hmm.

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                       July 27, 2018
                                                                                    28

1                    AGT. COATES:  Where was it?

2                    MR. COUNCIL:  The one on -- in

3    Mini City on Capital Boulevard.

4                    AGT. COATES:  Which end of Capital?

5                    MR. COUNCIL:  It's right there on the

6    -- on the -- Mini City is located off the -- off of

7    New Hope Road.

8                    AGT. COATES:  Okay.

9                    MR. COUNCIL:  And Capital Boulevard.

10                   AGT. RICHARDS:  Is it Mindy City?

11                   MR. COUNCIL:  M-I-N-I.

12                   AGT. COATES:  Mini.

13                   AGT. RICHARDS:  Mini City.

14                   AGT. COATES:  It's close to New Hope

15   and Capital.

16                   AGT. RICHARDS:  Okay.

17                   AGT. COATES:  Okay.

18                   AGT. RICHARDS:  And so when that

19   money runs out --

20                   MR. COUNCIL:  That's when I go

21   to BB&T.

22                   AGT. RICHARDS:  And then you did the

23   BB&T.  You got about $2,000.

24                   MR. COUNCIL:  Mmm-hmm.

25                   AGT. RICHARDS:  And then you get

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

29

1   -- then you get thrown out.  You get -- for a

2   couple hundred bucks, you said?

3                    MR. COUNCIL:  Yes.  This -- I don't

4   -- the exact chain of events, no.  I don't know if

5   that's the way that it -- that you wrote it down or

6   not but --

7                    AGT. RICHARDS:  No.  That's okay.

8                    MR. COUNCIL:  Okay.

9                    AGT. RICHARDS:  All right.  So now

10  you -- you get thrown out of your -- your parent's

11  home.  Okay.  And you packed your stuff --

12                   MR. COUNCIL:  Mmm-hmm.

13                   AGT. RICHARDS:  You pack your stuff.

14                   MR. COUNCIL:  Mmm.

15                   AGT. RICHARDS:  You take a cab.

16  Where do you go?

17                   MR. COUNCIL:  No.  I don't take a

18  cab.  Me and my step-father was arguing, and he

19  didn't believe that I was just outside with my

20  girlfriend --

21                   AGT. RICHARDS:  Oh, yeah.  That's

22  right.

23                   MR. COUNCIL:  He called my bluff, so

24  I called it right back.  She came to pick me up in,

25  like, two minutes.

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

30

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  Because she lives in

 3   Rocky Mount.  We live in Wilson.

 4                    AGT. RICHARDS:  Okay.  The girl lives

 5   in Rocky Mount.

 6                    MR. COUNCIL:  Mmm-hmm.

 7                    AGT. RICHARDS:  And where did you go?

 8                    MR. COUNCIL:  That night that they

 9   threw me out?

10                    AGT. RICHARDS:  Yeah.

11                    MR. COUNCIL:  She picked me up.  She

12   hadn't even got all the way down the street.

13                    AGT. RICHARDS:  Okay.  And you went

14   -- did you go back to her house?

15                    MR. COUNCIL:  Yeah.  Yeah.  I moved

16   in with her that night.

17                    AGT. RICHARDS:  Okay.  You moved in

18   with her?

19                    MR. COUNCIL:  Mmm-hmm.

20                    AGT. RICHARDS:  Okay.  And then what

21   happens?

22                    MR. COUNCIL:  During this whole

23   process, me and my girlfriend -- we going through,

24   kind of, you know, bad times and everything.  She

25   -- since we had started -- been dating she -- had
```

31

```
1    been padlocked, and her lights had been cut off,

2    insurance was damn being cancelled.  She had been

3    having financial problems, but that has a lot to do

4    with her drug habit, and gambling habits as well.

5    And I felt the pressure of that piling on me, and I

6    don't have a job, and I then moved in -- this one

7    minute -- she's got these kids and --

8              AGT. RICHARDS:  Does she have kids?

9              MR. COUNCIL:  Mmm-hmm.

10             AGT. RICHARDS:  How many kids?

11             MR. COUNCIL:  She has a total of

12   four.  She has one grown, and three in -- the three

13   minors in her house.

14             AGT. RICHARDS:  Okay.  So the three

15   minors are in her house?

16             MR. COUNCIL:  Mmm-hmm.

17             AGT. RICHARDS:  And what type of

18   -- what -- are they boys, girls?

19             MR. COUNCIL:  One boy, two girls.

20             AGT. RICHARDS:  Okay.  So you go back

21   to -- you go back to her house?

22             MR. COUNCIL:  Mmm-hmm.

23             AGT. RICHARDS:  Okay.

24             MR. COUNCIL:  And, you know, two or

25   three days pass, and I take the car -- I need -- I
```

In Re: FBI Interview of Brandon Council    Brandon Council Audio Transcription
July 27, 2018

32

```
1   borrowed the car, really.  I didn't take it.  I
2   borrowed the car, and told her I was going to do
3   something, and I went to Raleigh and got -- ran out
4   of gas, and that's when the damn Food Lion thing
5   happened.
6              AGT. RICHARDS:  Okay.
7              MR. COUNCIL:  Okay.  Come back to
8   Rocky Mount.  She don't know nothing about what's
9   going on or -- is this a couple of hundred dollars
10  -- I don't know what the hell happened, really.  We
11  just -- that money didn't last a damn day, I don't
12  believe.  Okay.  So we're -- we're past the BB&T
13  robbery now or --
14             AGT. RICHARDS:  Yeah.  Well, yeah.
15  We went -- then, right after that you did the BB&T?
16             MR. COUNCIL:  Mmm-hmm.
17             AGT. RICHARDS:  You went back.  You
18  gave her a couple hundred bucks.  Did you tell her
19  you did the robbery?
20             MR. COUNCIL:  No.
21             AGT. RICHARDS:  Okay.  So why did
22  you leave?
23             MR. COUNCIL:  Because I got the phone
24  call from my mother --
25             AGT. RICHARDS:  Okay.  Right.  You
```

33

```
1   got your phone call from your mom.

2               MR. COUNCIL:  She said that the

3   police had been to her house --

4               AGT. RICHARDS:  And they were looking

5   for you for the BB&T robbery?

6               MR. COUNCIL:  That's correct.

7               AGT. RICHARDS:  Okay.  Do you

8   remember when that was, Brandon?

9               MR. COUNCIL:  It's in my phone.  I

10  can't -- I don't want to give you --

11              AGT. RICHARDS:  Yeah.  No, it's okay.

12              MR. COUNCIL:  -- any --

13              AGT. RICHARDS:  It's okay.

14              MR. COUNCIL:  -- incorrect

15  information.

16              AGT. RICHARDS:  So you -- you're

17  leaving.  What are you going to -- what did you do?

18              MR. COUNCIL:  I got in the cab.

19              AGT. RICHARDS:  Yeah.

20              MR. COUNCIL:  I think I went to

21  Wilson.  I got -- matter-of-fact, the Wilson Police

22  can verify this too.  I walked around town the

23  whole damn night.

24              AGT. RICHARDS:  Where did they drop

25  you off?
```

34

1          MR. COUNCIL:  No, they didn't -- they

2    didn't stop me, like, harass me then.

3          AGT. RICHARDS:  No, I mean, where did

4    -- when the cab took you to Wilson, where did you

5    -- where did you go to?

6          MR. COUNCIL:  McDonalds.

7          AGT. RICHARDS:  McDonalds.  Okay.

8          MR. COUNCIL:  Yeah.  I got dropped

9    off at McDonalds on 301 Highway.

10          AGT. RICHARDS:  Okay.  And so, then

11    what happened?

12          MR. COUNCIL:  Okay.  Let's see -- in

13    Wilson -- after BB&T.  Oh, you asked me what

14    happened after I got -- when I got to Wilson, when

15    I left Rocky Mount -- when I got to Wilson, right?

16          AGT. RICHARDS:  Right.

17          MR. COUNCIL:  What events led up to

18    BB&T, correct?

19          AGT. RICHARDS:  No.  We're already

20    past the BB&T.

21          MR. COUNCIL:  Okay.  Well, I was just

22    backtracking.  I'm trying to make sure --

23          AGT. RICHARDS:  No.  Go ahead, yeah.

24          MR. COUNCIL:  -- that I'm at the same

25    spot that you are.  Okay.  I get the call from

35

1   my mother --

2                   AGT. RICHARDS:  Yep.

3                   MR. COUNCIL:  She said that the

4   sheriff's office had been to her house looking for

5   me.  I get in the cab.  I called Rocky Mount Cab.

6   They take me from Rocky Mount to Wilson, and they

7   drop me off at Wilson McDonalds on 301 Highway.

8   And I think I ran into somebody I know.  A black

9   guy, older black guy I know, and I caught a ride

10  across town.  I stayed at my homeboy's house

11  that night.

12                  AGT. RICHARDS:  Who -- whose house?

13                  MR. COUNCIL:  I don't want to get him

14  in trouble, man.  So --

15                  AGT. RICHARDS:  He's not in trouble.

16                  MR. COUNCIL:  I don't want -- I'd

17  rather leave him out of this.

18                  AGT. RICHARDS:  And that's fine,

19  Brandon.  That's fine.  You stayed at your

20  homeboy's house.

21                  MR. COUNCIL:  Yeah, I stayed at my

22  homeboy's house that night.

23                  AGT. RICHARDS:  We're just trying to

24  get it all down right.  You know --

25                  MR. COUNCIL:  Yeah.

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

36

1          AGT. RICHARDS:  Brandon, you

2    -- you're doing the right thing.  So it -- we're

3    not looking to, you know, hurt anybody else.  So

4    that's fine.  So you stayed -- you stayed with a

5    friend, some type of a friend.

6          MR. COUNCIL:  That's right.

7          AGT. RICHARDS:  Okay.

8          MR. COUNCIL:  Okay.  This same friend

9    takes me -- where did we go that day.  Because I

10   was trying to find a five or six hundred dollar

11   car.  I think we went to Stantonsburg.  We went to

12   Stantonsburg.  We checked on a car.  The man said

13   he -- the car wasn't registered, so we went back to

14   Wilson.  Pretty much stayed at his house.

15          AGT. RICHARDS:  Mmm-hmm.  So you

16   stayed at his house.

17          MR. COUNCIL:  Yeah.  I stayed at his

18   house, and --

19          AGT. RICHARDS:  Then what happened?

20          MR. COUNCIL:  I went to

21   South Carolina.

22          AGT. RICHARDS:  How did you get to

23   South Carolina?

24          MR. COUNCIL:  My friend drove me.

25          AGT. RICHARDS:  The same friend whose

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

37

1    house you stayed at?

2                    MR. COUNCIL:  Mmm-hmm.

3                    AGT. RICHARDS:  Okay.  Why

4    South Carolina?

5                    MR. COUNCIL:  Because I just robbed a

6    bank in North Carolina.

7                    AGT. RICHARDS:  Okay.

8                    MR. COUNCIL:  I mean -- it is -- what

9    I could get -- get to at the time, basically.  It

10   wasn't --

11                   AGT. RICHARDS:  Did you know any --

12                   MR. COUNCIL:  -- no specific reason.

13   No.  I don't have any family or relatives --

14                   AGT. RICHARDS:  You have nobody in

15   South Carolina?

16                   MR. COUNCIL:  No.  The only reason I

17   went to South Carolina, basically, was because my

18   friend was going somewhere else, and I was like,

19   well, shit, drop me off in South Carolina.

20                   AGT. RICHARDS:  Where was your

21   friend going?

22                   MR. COUNCIL:  If I'm not mistaken he

23   was going to Georgia, which is where he's at right

24   now, I believe.

25                   AGT. RICHARDS:  Now, you -- now, you

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

38

```
 1   -- and I know who your friend is.  Your friend
 2   -- your friend wasn't alone.
 3                MR. COUNCIL:  I beg your pardon?
 4                AGT. RICHARDS:  You didn't -- you
 5   didn't get -- the -- you didn't get taken to
 6   South Carolina by just your friend.
 7                MR. COUNCIL:  That's correct.
 8                AGT. RICHARDS:  There was someone
 9   else in the car.
10                MR. COUNCIL:  That's correct.
11                AGT. RICHARDS:  Okay.  Who was in
12   the car?
13                MR. COUNCIL:  I don't know.
14                AGT. RICHARDS:  You don't know who
15   was in the car?  Who was your friend?  Is it male
16   or female?  So I know -- I know -- I know both
17   people, Brandon.
18                MR. COUNCIL:  You already know that
19   this is a sensitive issue and --
20                AGT. RICHARDS:  I do.
21                MR. COUNCIL:  -- I try to avoid these
22   people and --
23                AGT. RICHARDS:  I do --
24                MR. COUNCIL:  -- and he's --
25                AGT. RICHARDS:  -- but here's
```

In Re: FBI Interview of Brandon Council    Brandon Council Audio Transcription
July 27, 2018

39

```
 1  the thing --
 2              MR. COUNCIL:  -- already circled
 3  around and --
 4              AGT. RICHARDS:  I've got to know who
 5  your friend is.  So who is your friend?  Is your
 6  friend --
 7              MR. COUNCIL:  It's irrelevant.  Can
 8  we keep it moving?  I'm not going to disclose that
 9  information.
10              AGT. RICHARDS:  Okay.  But is the
11  friend -- is the friend the male or the female?
12              MR. COUNCIL:  Both.
13              AGT. RICHARDS:  They're both
14  your friends?
15              MR. COUNCIL:  Both of them.
16              AGT. RICHARDS:  Okay.  You're
17  both friends.
18              MR. COUNCIL:  Both of them.
19              AGT. RICHARDS:  Okay.  Good enough.
20  And what kind of car did they take you to the
21  -- what kind of car did they take you to
22  South Carolina in?
23              MR. COUNCIL:  If I'm not mistaken, I
24  want to say it's a white Chrysler Town and Country.
25              AGT. RICHARDS:  Yeah.  It was a white
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

40

```
 1   -- white Chrysler Town and Country.

 2              MR. COUNCIL:  Mmm-hmm.

 3              AGT. RICHARDS:  Okay.  Did you have

 4   to -- did you pay your friends any money to

 5   take you?

 6              MR. COUNCIL:  Very little.  Some

 7   gas money.

 8              AGT. RICHARDS:  You gave them

 9   gas money.

10              MR. COUNCIL:  Some drug money.

11              AGT. RICHARDS:  Some drug money.

12   Okay.  Do -- do you have -- did you have any drugs?

13              MR. COUNCIL:  Yeah.

14              AGT. RICHARDS:  Okay.  What kind of

15   drugs?

16              MR. COUNCIL:  Cocaine and marijuana.

17              AGT. RICHARDS:  And did you give

18   -- did you give them cocaine, and marijuana, and

19   gas money?

20              MR. COUNCIL:  That's correct.

21              AGT. RICHARDS:  To take you.

22              MR. COUNCIL:  That's correct.

23              AGT. RICHARDS:  Were they aware that

24   you had -- were -- were leaving because you had

25   done a bank robbery in North Carolina?
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                          July 27, 2018

41

```
 1                    MR. COUNCIL:  One of them was.

 2                    AGT. RICHARDS:  Which --

 3                    MR. COUNCIL:  One of my friends.

 4                    AGT. RICHARDS:  Which friend?  The

 5   male or the female?

 6                    MR. COUNCIL:  You might as well say

 7   both knew.

 8                    AGT. RICHARDS:  Both of them knew.

 9                    MR. COUNCIL:  Might as well say.

10                    AGT. RICHARDS:  So they both --

11                    MR. COUNCIL:  So the one that I told,

12   told the other, so --

13                    AGT. RICHARDS:  Yeah.

14                    MR. COUNCIL:  -- that's --

15                    AGT. RICHARDS:  Who did you tell?

16                    MR. COUNCIL:  I told the female

17   friend.

18                    AGT. RICHARDS:  All right.  You told

19   the female.

20                    MR. COUNCIL:  Yeah.

21                    AGT. RICHARDS:  And you -- you're

22   fairly certain that -- that --

23                    MR. COUNCIL:  She told the male.

24                    AGT. RICHARDS:  -- she told the male.

25                    MR. COUNCIL:  Yeah.  Because she
```

JA0352

In Re: FBI Interview of Brandon Council    Brandon Council Audio Transcription
July 27, 2018

42

```
 1   didn't want to go.  I guess she felt like I was on

 2   the edge.  She didn't know if I would do anything

 3   crazy or anything, so...

 4               AGT. RICHARDS:  Okay.  And were they

 5   -- did you use -- did you use cocaine or marijuana

 6   with both of them on the way?

 7               MR. COUNCIL:  Yeah.  We got -- yeah.

 8               AGT. RICHARDS:  You got high on

 9   the way.

10               MR. COUNCIL:  Yeah.

11               AGT. RICHARDS:  Okay.

12               MR. COUNCIL:  Before and -- before,

13   during, and there.

14               AGT. RICHARDS:  Did -- and you --

15               MR. COUNCIL:  In South Carolina I met

16   the -- if I'm not mistaken the name of it is The

17   Conway Inn Express.

18               AGT. RICHARDS:  Yep.

19               MR. COUNCIL:  (Inaudible)-- my friend

20   got the room for a week for me.

21               AGT. RICHARDS:  The friend got -- got

22   you the room?

23               MR. COUNCIL:  That's correct.

24               AGT. RICHARDS:  The -- the male or

25   the female?
```

43

```
1              MR. COUNCIL:  The male.

2              AGT. RICHARDS:  The -- I didn't hear

3   you, Brandon.

4              MR. COUNCIL:  The male.

5              AGT. RICHARDS:  The male.  Okay.  So

6   the male got the room.

7              MR. COUNCIL:  Mmm-hmm.

8              AGT. RICHARDS:  For a week.

9              MR. COUNCIL:  That's correct.

10             AGT. RICHARDS:  Do you know how much

11  he paid?

12             MR. COUNCIL:  Yeah.

13             AGT. RICHARDS:  How much?

14             MR. COUNCIL:  350.

15             AGT. RICHARDS:  And was that -- was

16  that his money or your money?

17             MR. COUNCIL:  That was my money.

18             AGT. RICHARDS:  And was that the

19  money from the bank robbery?

20             MR. COUNCIL:  Yes, it was.

21             AGT. RICHARDS:  Okay.  All right.

22  And did they stay the night?  Did they leave?

23             MR. COUNCIL:  They left immediately.

24             AGT. RICHARDS:  So they -- they got

25  high -- you got high with them and --
```

JA0354

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

44

```
 1                    MR. COUNCIL:  And they stayed, maybe,
 2   30, 40, 50 -- maybe an hour.
 3                    AGT. RICHARDS:  Okay.  They stayed an
 4   hour, and you got high, and then they took off.
 5                    MR. COUNCIL:  That's right.
 6                    AGT. RICHARDS:  Do you remember what
 7   room it was?  The number.
 8                    MR. COUNCIL:  It was next to the last
 9   on the right.  It was one -- 110.
10                    AGT. RICHARDS:  Room 110.
11                    MR. COUNCIL:  I think so.  Yeah.
12                    AGT. RICHARDS:  Yeah?
13                    MR. COUNCIL:  Because 210 was right
14   on top.
15                    AGT. RICHARDS:  And 210 was on top?
16                    MR. COUNCIL:  Mmm-hmm.
17                    AGT. RICHARDS:  And what did you do
18   when you were there?
19                    MR. COUNCIL:  Watched TV.
20                    AGT. RICHARDS:  Just hung out.
21                    MR. COUNCIL:  Yeah.  Watched TV.
22   Walked around.
23                    AGT. RICHARDS:  And you walked
24   around?
25                    MR. COUNCIL:  Pretty much.  That's
```

45

```
 1  the word I'm looking for, pretty much tried to, you

 2  know -- what's it called when you go to a new place

 3  and you just -- explore.  I was trying to explore.

 4              AGT. RICHARDS:  Okay.  Exploring,

 5  on foot?

 6              MR. COUNCIL:  Mmm-hmm.

 7              AGT. RICHARDS:  Okay.

 8              MR. COUNCIL:  Yeah, I do a lot

 9  of walking.

10              AGT. RICHARDS:  Did you meet anybody?

11              MR. COUNCIL:  Mmm, from where?

12              AGT. RICHARDS:  Anywhere.  Did you

13  have anybody there?  Were you there alone?  Did

14  you --

15              MR. COUNCIL:  I was there alone.

16  Yeah.

17              AGT. RICHARDS:  Did your friends come

18  back or --

19              MR. COUNCIL:  They never came back.

20  No.

21              AGT. RICHARDS:  Okay.  Did you make

22  any friends or did you talk to anybody?

23              MR. COUNCIL:  No.  I was on the run.

24              AGT. RICHARDS:  Okay.  You were on

25  the run.
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

46

1                      MR. COUNCIL:  Yeah.

2                      AGT. RICHARDS:  Okay.

3                      MR. COUNCIL:  So I -- you know, I

4    wasn't trying to mingle too much down there.  Just

5    trying to get to go where I got to go.

6                      AGT. RICHARDS:  Okay.  Did you

7    -- where did you eat?  What did you --

8                      MR. COUNCIL:  There was a Hardee's

9    next door.

10                     AGT. RICHARDS:  And you ate -- you

11   ate at Hardee's a lot or --

12                     MR. COUNCIL:  Yeah.  Yeah.

13                     AGT. RICHARDS:  Okay.

14                     MR. COUNCIL:  You'll see on the

15   camera, if you all get them.  I pretty much ate

16   there every day.

17                     AGT. RICHARDS:  Okay.

18                     MR. COUNCIL:  Twice a day.

19                     AGT. RICHARDS:  Okay.  Did -- did you

20   buy any alcohol?

21                     MR. COUNCIL:  Yes.

22                     AGT. RICHARDS:  Where did you go to

23   get that?

24                     MR. COUNCIL:  That was down the

25   street at the ABC store.

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

47

1          AGT. RICHARDS:  Okay.  What kind of

2    -- what did you buy, Brandon?  What kind of

3    alcohol?

4          MR. COUNCIL:  Amsterdam vodka.  New

5    Amsterdam vodka.

6          AGT. RICHARDS:  Okay.  Did you -- did

7    you go to that -- did you go to that ABC store more

8    than once?

9          MR. COUNCIL:  No.

10          AGT. RICHARDS:  You only went

11    there once?

12          MR. COUNCIL:  That's correct.

13          AGT. RICHARDS:  Okay.

14          MR. COUNCIL:  Couldn't find one.  And

15    it's so hidden.  It's like part of a big, big -- it

16    reminds you of, like, a -- a complex, Sheetz-like.

17    It's like one big gas station and a --

18          AGT. RICHARDS:  Oh, a Sheetz --

19          MR. COUNCIL:  -- bunch of -- no.

20    That's not the name of it.

21          AGT. RICHARDS:  But it reminded you

22    of a Sheetz?

23          MR. COUNCIL:  Right.

24          AGT. RICHARDS:  Yeah, okay.

25          MR. COUNCIL:  It's -- it's really

A|W|R

48

```
 1   nice, and it's really, you know -- got a whole
 2   bunch of other little, bitty, kind of, like store,
 3   boutiques and shit, in it.
 4                 AGT. RICHARDS:  Yeah.  Did you ever
 5   go in that store?
 6                 MR. COUNCIL:  No.
 7                 AGT. RICHARDS:  You never went in the
 8   -- the --
 9                 MR. COUNCIL:  The boutique store --
10                 AGT. RICHARDS:  The Sheetz-type
11   store.
12                 MR. COUNCIL:  Yeah.  That's the gas
13   station.
14                 AGT. RICHARDS:  Oh, you went into the
15   gas station.  Okay.  What did you -- did you get
16   anything in there?
17                 MR. COUNCIL:  Yeah.  I bought a -- I
18   bought a soda.
19                 AGT. RICHARDS:  Okay.  And did you
20   ever share that alcohol with anybody?
21                 MR. COUNCIL:  No.
22                 AGT. RICHARDS:  No.  Okay.
23                 MR. COUNCIL:  No.
24     (The proceedings were interrupted -- cell phone
25                   ringing.)
```

AWR

JA0359

49

```
1              AGT. RICHARDS:  I'm sorry about that.
2   I thought I turned that off.  I don't know why
3   that --
4              AGT. COATES:  Might be --(inaudible).
5              AGT. RICHARDS:  Did not -- okay.  And
6   you didn't -- didn't share with anyone.  If you
7   could handle all that stuff, Greg, if you don't
8   mind.  I appreciate it.
9              AGT. COATES:  Yeah.
10             AGT. RICHARDS:  Anything you need to
11  -- okay?
12             AGT. COATES:  Yeah.
13             AGT. RICHARDS:  So you didn't -- you
14  didn't share with anybody, but you -- but you did
15  buy a --
16             MR. COUNCIL:  I bought --
17             AGT. RICHARDS:  -- a soda -- a soda
18  in there, right?  And what else?  What else did
19  you do?
20             MR. COUNCIL:  I walked back to the
21  hotel room, after I got the liquor.
22             AGT. RICHARDS:  Yeah.  And you just
23  -- you just hung out?
24             MR. COUNCIL:  Yeah.  Because I was
25  down to nothing then, at this point.
```

JA0360

50

```
 1                   AGT. RICHARDS:  Okay.  And what did
 2   -- what did you have?  What type of -- what did you
 3   have?  Did you have all your clothes?  All your
 4   belongings?  Everything you owned?
 5                   MR. COUNCIL:  Everything.  Everything
 6   that I left with from -- everything that I packed
 7   up from my mother's house to my ex-girlfriend's
 8   house, and everything that I packed up from my
 9   ex-girlfriend's house.
10                   AGT. RICHARDS:  Okay.  And what did
11   you have?  How many bags?
12                   MR. COUNCIL:  One.
13                   AGT. RICHARDS:  You only had one bag?
14                   MR. COUNCIL:  (Inaudible)
15                   AGT. RICHARDS:  Okay.
16                   MR. COUNCIL:  It's a luggage bag,
17   though.  It's --
18                   AGT. RICHARDS:  A good size?
19                   MR. COUNCIL:  -- quite big.  Yeah.
20                   AGT. RICHARDS:  Yeah.  Okay.
21                   MR. COUNCIL:  Just, like, twice the
22   size of a regular duffel bag.  Maybe three times.
23                   AGT. RICHARDS:  Okay.  And you were
24   down -- you were getting down on your money, down
25   on your --
```

In Re: FBI Interview of Brandon Council                 Brandon Council Audio Transcription
                                                                          July 27, 2018

                                                                          51

1                     MR. COUNCIL:  I was down to my last

2    -- I think I spent next to my last on that bottle.

3                     AGT. RICHARDS:  Okay.

4                     MR. COUNCIL:  The room was going -- I

5    had to check out that Tuesday morning, so this

6    brings us to the bank in South Carolina.

7                     AGT. RICHARDS:  You had to check out

8    Tuesday morning.

9                     MR. COUNCIL:  Mmm-hmm.

10                    AGT. RICHARDS:  And so, we're on

11   -- we're at Monday?

12                    MR. COUNCIL:  We're at Monday.

13                    AGT. RICHARDS:  Monday morning?

14                    MR. COUNCIL:  We're at Monday

15   morning.

16                    AGT. RICHARDS:  Okay.

17                    MR. COUNCIL:  It's the day of the

18   eclipse shit.  Right.

19                    AGT. RICHARDS:  The day of the

20   eclipse.  Yeah.

21                    MR. COUNCIL:  Mmm-hmm.

22                    AGT. RICHARDS:  Okay.  And tell us

23   -- why don't you start -- how did -- what did you

24   do, Brandon?  What did you do that day?

25                    MR. COUNCIL:  I hurt some people that

In Re: FBI Interview of Brandon Council                     Brandon Council Audio Transcription
July 27, 2018

52

1   didn't deserve it.

2               AGT. RICHARDS:  You hurt some people

3   that didn't deserve it?

4               MR. COUNCIL:  That's correct.  Not

5   that I know of anyway.

6               AGT. RICHARDS:  Okay.  And so how did

7   you -- what did you do?

8               MR. COUNCIL:  I walked in the bank.

9   I had a 22 pistol under my shirt.  I spoke with the

10  counter lady.  I said, I'd like to cash a check.

11  However, she was, you know, reluctant to give me

12  any attention at the time, and she was doing

13  something with the computer.  She wasn't rude or,

14  you know, unprofessional or anything, but it took

15  quite a while -- maybe close to 30, 40, 50 -- maybe

16  a minute before she even, you know, really gave me

17  any kind of attention.

18               She asked me -- as soon as I came in,

19  could she help me, and I told her what I wanted.

20  That I wanted to cash a check but -- however, she

21  was just, you know -- seemed like she was

22  preoccupied with her computer duties at that time.

23  So after I'll say 10, 20 seconds, I'd rather --

24               AGT. RICHARDS:  What did you do?

25               MR. COUNCIL:  I did it.

53

```
 1                    AGT. RICHARDS:  What did you do,

 2   Brandon?

 3                    MR. COUNCIL:  I did it.  I don't even

 4   know if I can bring my words out my mouth to even

 5   say it.

 6                    AGT. RICHARDS:  Okay.

 7                    MR. COUNCIL:  But I did it.

 8                    AGT. RICHARDS:  Okay.  But, so you

 9   have this 22.

10                    MR. COUNCIL:  Yes.

11                    AGT. RICHARDS:  Where did you

12   get that?

13                    MR. COUNCIL:  You know what -- when I

14   -- I think I left out a part of Rocky Mount,

15   because this is a very interesting question.  I was

16   walking to the store, not far from where my

17   girlfriend lives at, and a guy asked me -- he had a

18   backpack -- he asked me did I know anybody that

19   wanted to buy a gun?  And I said, sure, everybody

20   in the damn hood wants a gun.  Just -- shit, if it

21   ain't just to re-sell it, its just to protect your

22   house or anything.  So but he was like, man, I got

23   a gun for you, man.  You got one for $65.

24                    I was, like, man, I ain't got no $65.

25   He was like, what can you give me?  I was like,
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

54

1    man, shit, I got about $40, and I gave him $40

2    for it.

3                    AGT. RICHARDS:  In Rocky Mount --

4                    MR. COUNCIL:  Mmm-hmm.

5                    AGT. RICHARDS:  -- North Carolina?

6                    MR. COUNCIL:  Yeah.  A complete

7    stranger.

8                    AGT. RICHARDS:  Okay.

9                    MR. COUNCIL:  I have no clue --

10                   AGT. RICHARDS:  White male or black

11   male?

12                   MR. COUNCIL:  Black guy.  Young guy.

13   Probably no more than 17, 18, 19.

14                   AGT. RICHARDS:  17 to 19?

15                   MR. COUNCIL:  Yeah.

16                   AGT. RICHARDS:  And what -- do you

17   remember what the store was, Brandon?

18                   MR. COUNCIL:  I can give you a

19   general location, I believe.  Let's -- I'm not

20   -- I'm not good with Rocky Mount area, so I -- I

21   only lived there less than two weeks.  So I --

22                   AGT. RICHARDS:  Yeah.

23                   MR. COUNCIL:  -- can't really --

24                   AGT. RICHARDS:  Was it in walking

25   distance of your girl's house?

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

55

```
 1              MR. COUNCIL:  Hell, no.

 2              AGT. RICHARDS:  Hell -- okay, so you

 3    took the car?

 4              MR. COUNCIL:  No.  But it wasn't -- I

 5    -- I walked there, but when you say walking

 6    distance, I think of -- you know, local, like

 7    around the corner.  This was maybe two and half,

 8    three, miles down the road.

 9              AGT. RICHARDS:  Oh, okay.

10              MR. COUNCIL:  That's why I say, it

11    wasn't walking --

12              AGT. RICHARDS:  But it was -- so it

13    was two or three miles from your girl's house?

14              MR. COUNCIL:  Mmm-hmm.  I could tell

15    you this, it's -- I don't know the exact name of

16    it.  A hotel room.  But it's a -- it's two hotel

17    rooms on the same side of the road.  Across the

18    street it's a car lot, and a gas station.  And when

19    I was leaving, around the corner of the gas

20    station, I bumped into him.

21              AGT. RICHARDS:  Had you seen him

22    before?

23              MR. COUNCIL:  Never.  Complete

24    stranger.

25              AGT. RICHARDS:  No idea what his
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                                July 27, 2018

                                                                                          56

```
 1   name is?

 2               MR. COUNCIL:  No.  I don't know -- I

 3   know you going to hang in the hood, but you meet

 4   new people, sometimes every day.  Just stumbling

 5   upon -- you know what I'm saying, so.

 6               AGT. RICHARDS:  Yeah.  And what kind

 7   of weapon was it?

 8               MR. COUNCIL:  Twenty-two.

 9               AGT. RICHARDS:  Twenty-two pistol or

10   revolver?

11               MR. COUNCIL:  It was a pistol.

12               AGT. RICHARDS:  It was a pistol?

13               MR. COUNCIL:  Revolver.

14               AGT. RICHARDS:  Pistol or revolver?

15               MR. COUNCIL:  Revolver.

16               AGT. RICHARDS:  Okay.  Twenty-two

17   revolver.

18               MR. COUNCIL:  Mmm-hmm.  That's a

19   pistol, right?

20               AGT. RICHARDS:  Well, the --

21               MR. COUNCIL:  You called it a -- any

22   handgun is a --

23               AGT. RICHARDS:  Well, a pistol is

24   kind of semi-automatic.  It can -- can keep firing,

25   firing, firing, firing, and it ejects a round.
```

JA0367

57

```
 1                    MR. COUNCIL:  Oh.

 2                    AGT. RICHARDS:  And a pistol is a

 3   little -- is a little different.

 4                    MR. COUNCIL:  Oh, well I call all

 5   handguns pistols.

 6                    AGT. RICHARDS:  You call all handguns

 7   pistols.  Okay.  How how -- did he -- did he give

 8   you ammunition with it?

 9                    MR. COUNCIL:  It was loaded when I

10   bought it.

11                    AGT. RICHARDS:  It was loaded when

12   you bought it?

13                    MR. COUNCIL:  Yes, it was.

14                    AGT. RICHARDS:  Do you know how many

15   rounds were in it?

16                    MR. COUNCIL:  Yes, sir.

17                    AGT. RICHARDS:  How many rounds?

18                    MR. COUNCIL:  I want to say, I

19   guess, six.

20                    AGT. RICHARDS:  Did you ever

21   unload it?

22                    MR. COUNCIL:  Like, just to

23   unload it?

24                    AGT. RICHARDS:  Yeah.  Just to

25   unload it?
```

JA0368

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
                                                                          July 27, 2018

58

1               MR. COUNCIL:  No.

2               AGT. RICHARDS:  You just -- you

3   -- you knew that it was fully loaded?

4               MR. COUNCIL:  No.  He showed me that.

5               AGT. RICHARDS:  He did?

6               MR. COUNCIL:  When -- when I bought

7   it.  Yeah.  I --

8               AGT. RICHARDS:  Oh --

9               MR. COUNCIL:  -- I gave him $45 for

10  it.  Yeah.  Yeah.  He -- yeah.

11              AGT. RICHARDS:  All right.  Okay.  So

12  we're inside the bank --

13              MR. COUNCIL:  Mmm-hmm.

14              AGT. RICHARDS:  You have the gun.

15              MR. COUNCIL:  Mmm-hmm.

16              AGT. RICHARDS:  What are you wearing

17  that day?

18              MR. COUNCIL:  Blue and white.

19              AGT. RICHARDS:  Blue and white golf

20  shirt?

21              MR. COUNCIL:  Blue and white golf

22  shirt.  Mmm-hmm.

23              AGT. RICHARDS:  Okay.  And wearing

24  those sneakers?

25              MR. COUNCIL:  That's correct.

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

59

```
 1                 AGT. RICHARDS:  White sneakers?

 2                 MR. COUNCIL:  Mmm.  These.

 3                 AGT. RICHARDS:  Okay.  And what

 4    pants?

 5                 MR. COUNCIL:  Blue jeans.

 6                 AGT. RICHARDS:  Blue jeans.  And you

 7    have --

 8                 MR. COUNCIL:  Light blue jeans.

 9                 AGT. RICHARDS:  Light blue jeans,

10    yeah.  And where is the -- where is the gun when

11    you walk in the bank, Brandon?  Is it in the front

12    of your pants or the back of your pants?

13                 MR. COUNCIL:  The front.

14                 AGT. RICHARDS:  Okay.  Okay.  And so

15    you're -- you're sitting there, and she's not

16    paying attention to you, and you're working on a

17    -- and she's working on her computer, and --

18                 MR. COUNCIL:  I get impatient and I

19    -- I'm not going to lie to you, man.  I knew what I

20    was going do when I went there, man.  And I knew

21    how I had to do it to stand a chance of getting

22    away, because of the location and the response

23    times of the local law enforcement agencies in

24    that area.

25                 AGT. RICHARDS:  How did you
```

JA0370

60

```
 1   know that?

 2                MR. COUNCIL:  I watch almost -- I get

 3   -- I almost get away with it every day.

 4                AGT. RICHARDS:  Did you -- did you do

 5   counter-surveillance?  Did you --

 6                MR. COUNCIL:  No.

 7                AGT. RICHARDS:  Did you look at the

 8   bank at all beforehand?

 9                MR. COUNCIL:  I mean, the bank was

10   right across the street from the --

11                AGT. RICHARDS:  Sure.  I know exactly

12   where it is.

13                MR. COUNCIL:  The relativity to the

14   -- the interstate was -- it's no more than

15   30 seconds from the front door.

16                AGT. RICHARDS:  But you're on foot.

17                MR. COUNCIL:  No.  No.  That's not

18   -- it's not accurate.  That's not correct.  I never

19   said that I left the bank on foot.

20                AGT. RICHARDS:  No.  I know you

21   didn't.  No.  I know you didn't.  I -- but you left

22   the -- you left the hotel --

23                MR. COUNCIL:  On foot, that's

24   correct.

25                AGT. RICHARDS:  -- on foot.  And --
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

61

```
 1                    MR. COUNCIL:  But I left the bank

 2    driving.

 3                    AGT. RICHARDS:  Say that again.

 4                    MR. COUNCIL:  I left the bank

 5    driving.

 6                    AGT. RICHARDS:  Right.  Okay.  But

 7    before you go to do the bank, did you -- you packed

 8    all your gear?

 9                    MR. COUNCIL:  Yes.  I told you I

10    -- that I knew what I was going to do.

11                    AGT. RICHARDS:  Did you know you were

12    going to shoot somebody, Brandon?

13                    MR. COUNCIL:  I hate to admit it,

14    but yes.

15                    AGT. RICHARDS:  You did know you were

16    going to shoot somebody.

17                    MR. COUNCIL:  Unfortunately.

18                    AGT. RICHARDS:  Okay.  Why did you do

19    -- why did you decide that -- why did you

20    pre-decide that you were going to shoot somebody?

21                    MR. COUNCIL:  First of all, my

22    decision-making pattern, if you can't tell, is

23    extremely fucked up.  I don't handle stress very

24    well.  I tend to don't give a fuck -- it

25    -- sometimes because I feel like I'm the only
```

In Re: FBI Interview of Brandon Council        Brandon Council Audio Transcription
July 27, 2018

62

1  person in the world that cares about me, and I

2  can't get any help.  It's a whole -- it's a whole

3  lot of conflicts, layers, to this story.  It's

4  -- I'm going to write a book.  I hope y'all read it

5  one day.

6              AGT. RICHARDS:  Okay.

7              MR. COUNCIL:  And I'm going to

8  divulge everything in that.

9              AGT. RICHARDS:  Okay.

10             MR. COUNCIL:  There are some details

11  that -- like, the part about the gun, you know, and

12  some of the characters that I bumped into and

13  -- let's get back to the bank.

14             AGT. RICHARDS:  Yeah, so -- so you're

15  -- so you're --

16             MR. COUNCIL:  In the bank, the lady

17  is taking too long.

18             AGT. RICHARDS:  Right.

19             MR. COUNCIL:  I'm irritated.  I did

20  intentionally know that I was going to do that,

21  because it increases your chances of escape.

22             AGT. RICHARDS:  When you say: Do

23  that.  You mean shoot her?

24             MR. COUNCIL:  Yes --(inaudible)--

25             AGT. RICHARDS:  Okay.  So -- so

63

1    you're sitting there, you're irritated, you know

2    you're going to shoot her before you go in

3    the bank.

4                    MR. COUNCIL:  May I state this?  Just

5    for the --

6                    AGT. RICHARDS:  Yes.  Please.

7                    MR. COUNCIL:  -- record.  Just

8    because we're on camera and recording.

9                    AGT. RICHARDS:  Absolutely.  Please.

10                    MR. COUNCIL:  It's not that I was

11   irritated.  That I was -- it was not the point that

12   I was irritated.  I'm just really giving you the

13   real -- my real feelings at that time.  But that's

14   not the reason why I did what I did.  I was going

15   to shoot the woman or whoever was in there

16   regardless, because at that time, and my thought

17   process, I felt like -- not -- it wasn't even about

18   witnesses.  It was about them calling that

19   -- pushing that button or whatever they do to alert

20   the authorities.

21                    AGT. RICHARDS:  Pushing the alarm.

22                    MR. COUNCIL:  Yeah.  That's the only

23   reason why I did that.  And I felt that if I was to

24   -- because when I went to them, I didn't have a way

25   to get away.

64

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  It was pretty much spur

 3   -- not -- not spur of the moment, but what do you

 4   call it?  It's called a -- winging it.

 5                    AGT. RICHARDS:  Winging -- yeah,

 6   winging it.  Yeah.  Yeah.

 7                    MR. COUNCIL:  Yeah, I kind of

 8   winged it.

 9                    AGT. RICHARDS:  Okay.

10                    MR. COUNCIL:  And I saw that there

11   was a second woman in there, and --

12                    AGT. RICHARDS:  Where was she when

13   you saw her?  The second woman?

14                    MR. COUNCIL:  I think she was the

15   manager.

16                    AGT. RICHARDS:  Where was she though,

17   Brandon?

18                    MR. COUNCIL:  She was in her office.

19                    AGT. RICHARDS:  Okay.

20                    MR. COUNCIL:  But I know you people

21   didn't deserve that but, man, I got to tell y'all

22   guys the truth, man.

23                    AGT. RICHARDS:  Yeah.

24                    MR. COUNCIL:  This is where I am.

25   This is where I am.  It's -- it's -- I don't know
```

65

```
 1   if you're religious or spiritual people but, man,

 2   this really is some shit out there that's demonic

 3   man.  I swear to God to you, man.  This shit is

 4   demonic, man.  It's nothing that nobody can do

 5   about it.  Just like when soldiers go across in

 6   other countries and shit, I know that they're

 7   fighting for a great cause, but at the same time,

 8   man, it's collateral damage, man.  I didn't -- I

 9   pray to God that these people are still alive, but

10   at the same time, man.

11              I knew that it was going -- somebody

12   was going to get hurt that day because of the

13   circumstances that I placed myself in.  You know.

14   I did this shit because I didn't -- my mother

15   turned my -- her back on me.  My father is dead.  I

16   don't have any brothers and sisters.  My girlfriend

17   can't be trusted.  I'm unemployed.  I just said, to

18   hell with it.  I mean, shit.  I -- I'm going to

19   tell you the damn truth.  If the situation had

20   -- had gone out my way, I'd be dead right now

21   today, because me and the police would've shot

22   it out.

23              Because I don't -- this is -- shit is

24   crazy, man.  It's -- it's so many demons out here,

25   man.  Y'all just don't know.  These demons out
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

66

1   there -- you got to control the people's minds and

2   shit.  They don't control my mind.  I -- I

3   willingly went with the demons.  I knew what the

4   hell I was doing.  I didn't sell my soul to the

5   devil.  I don't believe in the illuminati or none

6   of that stupid shit.

7            I -- I -- I made some bad decisions

8   and it's time for me to pay the consequences.  I

9   just hope them women know, and their family know,

10  that it wasn't nothing personal.  It wasn't that

11  the lady was being rude or that I was mad that she

12  was taking too long, because if she could've

13  immediately served me I still would've did the

14  same thing.

15           AGT. RICHARDS:  You were going to

16  shoot her no matter what.

17           MR. COUNCIL:  Because that's the only

18  way I knew that I could get away with -- from the

19  start -- the location and not have -- and not have

20  a -- please tell me, are those ladies dead?

21           AGT. RICHARDS:  They're hurt.

22  They're hurt.

23           MR. COUNCIL:  They're not dead?

24           AGT. RICHARDS:  They're hurt.  Okay.

25           MR. COUNCIL:  Are they dead?

67

```
1                    AGT. RICHARDS:  Brandon, you know,
2    you just told me -- you told me the story.  Did you
3    -- have you not heard --
4                    MR. COUNCIL:  I asked you a question.
5    You ask me any question you want, and I'll answer
6    that too.  I want to know, are they dead?
7                    AGT. RICHARDS:  They are.
8                    MR. COUNCIL:  And it's not even about
9    the time.  I can do the time.  They can keep --
10                   AGT. RICHARDS:  And you knew that.
11                   MR. COUNCIL:  I did not know that.  I
12   -- I honestly -- the reason -- I didn't overkill
13   them or nothing.  I just had to make sure that they
14   could not call authorities or -- and the fact that
15   it's -- that I'm a piece of shit, man.  I can
16   admit it.
17                   AGT. RICHARDS:  So Brandon, but you
18   -- the thing is, you go in there, and you know
19   you're going to shoot them --
20                   MR. COUNCIL:  Yeah.
21                   AGT. RICHARDS:  -- and -- and you
22   shoot the woman.  You shoot the -- the first woman.
23   How many times did you shoot her?
24                   MR. COUNCIL:  Twice.
25                   AGT. RICHARDS:  Okay.  So you shot
```

JA0378

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                                    July 27, 2018

68

```
 1   her twice.
 2              MR. COUNCIL:  I think I shot the
 3   other lady twice.
 4              AGT. RICHARDS:  Okay, but -- so why
 5   did you -- what made you decide to shoot the second
 6   lady, though?
 7              MR. COUNCIL:  Because she --
 8              AGT. RICHARDS:  She heard
 9   something or --
10              MR. COUNCIL:  No.  No.  She could
11   call the police or press a button or whatever, how
12   the hell they would alert the situation.  I don't
13   know, computers.  I don't know.  Whatever it is
14   that they do.  I just seen her, after I saw this
15   first lady, and I know that she was going to call
16   the police on me, so I had to do the same thing,
17   and her -- she was at her desk and she --
18              AGT. RICHARDS:  Where was she at
19   her desk?
20              MR. COUNCIL:  Huh?
21              AGT. RICHARDS:  Where was she at
22   her desk?
23              MR. COUNCIL:  Behind her desk.  She
24   was behind her desk.
25              AGT. RICHARDS:  Okay.
```

69

```
 1                    MR. COUNCIL:  And she -- she didn't

 2    beg for her life.  She just -- you know, she -- I

 3    -- I told her I was sorry, but --

 4                    AGT. RICHARDS:  You said you

 5    were sorry?

 6                    MR. COUNCIL:  I -- I said, I'm sorry,

 7    and I shot her twice.

 8                    AGT. RICHARDS:  Okay.  Did you shoot

 9    her -- did you -- did you specifically shoot her

10    anywhere or --

11                    MR. COUNCIL:  I don't remember.

12                    AGT. RICHARDS:  You just fired

13    that weapon?

14                    MR. COUNCIL:  I know she -- she

15    -- she was under the desk.  I shot at her because I

16    didn't want her to call the police on me, because I

17    didn't have a way to get away.

18                    AGT. RICHARDS:  Okay.  So what did

19    you do?

20                    MR. COUNCIL:  I took her keys out of

21    her pocketbook, and I took her car.

22                    AGT. RICHARDS:  Where was her

23    pocketbook?

24                    MR. COUNCIL:  She was at her desk.

25                    AGT. RICHARDS:  So -- so --
```

70

```
1                    MR. COUNCIL:  Her pocketbook -- her

2    drawer, at the bottom, was open.  That's how I saw

3    her car keys.

4                    AGT. RICHARDS:  Okay.  So you heard

5    -- you saw her car keys in the open drawer when you

6    were shooting her?

7                    MR. COUNCIL:  No.

8                    AGT. RICHARDS:  Okay.  Tell me

9    -- tell me -- tell me the story.  I wasn't there.

10                   MR. COUNCIL:  I don't want to give

11   you any false leadings about the --

12                   AGT. RICHARDS:  No.  Absolutely not.

13                   MR. COUNCIL:  That -- that train of

14   thought right there.  All I know is that after I

15   shot the first lady, I ran into her office, because

16   I saw her or she screamed or whatever that --

17                   AGT. RICHARDS:  Yeah.  Okay.

18                   MR. COUNCIL:  I mean, it's -- I shot

19   her, and I told her I was sorry.

20                   AGT. RICHARDS:  Yep.

21                   MR. COUNCIL:  That I had to get her

22   keys, and I got her keys, and I got away.

23                   AGT. RICHARDS:  Did she say anything

24   to you?

25                   MR. COUNCIL:  (Inaudible)
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                           July 27, 2018

                                                                                      71

```
 1                    AGT. RICHARDS:  And how did you know
 2     -- how did you know -- so did you take only one set
 3     of keys?
 4                    MR. COUNCIL:  I got the keys off the
 5     counter too.
 6                    AGT. RICHARDS:  You took the keys off
 7     the counter when you -- when you jumped the
 8     counter?
 9                    MR. COUNCIL:  Mmm.
10                    AGT. RICHARDS:  Okay.  So you took
11     two sets of keys?
12                    MR. COUNCIL:  I took -- I took two
13     sets of keys.
14                    AGT. RICHARDS:  Okay.  How did you
15     find the car that you got away in?
16                    MR. COUNCIL:  It's a very, very, very
17     small bank.  There's only -- maybe five or six
18     -- maybe -- no more than ten parking spaces, and
19     there was only two cars in the --
20                    AGT. RICHARDS:  Oh, okay.
21                    MR. COUNCIL:  Both of them were
22     white, so --
23                    AGT. RICHARDS:  They were both white.
24     And -- and do you know what kind they were?
25                    MR. COUNCIL:  Yeah.  One is a Honda,
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

72

1    the other was a Chrysler.

2              AGT. RICHARDS:  Okay.  And those keys

3    -- what made you decide to take the Chrysler, as

4    opposed to the Honda?

5              MR. COUNCIL:  I don't know.  It was

6    the closest one.

7              AGT. RICHARDS:  It was the closest

8    one.  And were you -- were you physically -- were

9    you -- were you clicking the -- the -- the key fobs

10   to open it or did you know that one was a Chrysler,

11   one was a Honda, and you just took the Chrysler?

12             MR. COUNCIL:  I took both keys, and

13   when I got there the first one that I pressed, that

14   the lights blinked, I got to it.

15             AGT. RICHARDS:  Okay.

16             MR. COUNCIL:  And that was the

17   Chrysler, which was the closet to the door.

18             AGT. RICHARDS:  Okay.  And did you

19   take anything else from them?

20             MR. COUNCIL:  Yes.

21             AGT. RICHARDS:  What did you take?

22             MR. COUNCIL:  I took their wallets.

23             AGT. RICHARDS:  Okay.  And -- and

24   -- and did you use --

25             MR. COUNCIL:  No.  I didn't use any

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

73

```
1   credit cards or -- no.

2              AGT. RICHARDS:  And where are the

3   wallets now?

4              MR. COUNCIL:  I have no idea.

5              AGT. RICHARDS:  Well, what did

6   -- what did you do with them?

7              MR. COUNCIL:  Before I left

8   South Carolina, in the lady's car, I took it to the

9   car wash, and I think I dumped all the contents out

10  at the car wash, in the trash can by the vacuum.

11             AGT. RICHARDS:  And whereabouts?

12             MR. COUNCIL:  I don't know anything

13  about South Carolina so --

14             AGT. RICHARDS:  All right.  So when

15  you came out of the bank, you made a right-hand

16  turn.  I mean when you came out of the hotel.  So

17  -- we -- we're getting ahead of ourselves.  So you

18  leave the bank.  What do you do after you leave the

19  bank, in the car?

20             MR. COUNCIL:  After I leave the bank,

21  I get in the car, I take off, and I leave the

22  county.  I think I got two or three counties over

23  or north.  I -- I left the city.  I left Conway,

24  North Carolina [sic].

25             AGT. RICHARDS:  But you went back to
```

JA0384

74

```
1    the hotel.
2              MR. COUNCIL:  Yeah, because I went
3    and got my stuff.
4              AGT. RICHARDS:  Okay.  So you left
5    the bank, and you went back to the hotel?
6              MR. COUNCIL:  Yeah.
7              AGT. RICHARDS:  Okay.
8              MR. COUNCIL:  Then I left Conway.
9              AGT. RICHARDS:  Okay.  Now, where did
10   you -- you went two or three counties away before
11   you dumped the wallets?
12             MR. COUNCIL:  That's correct.
13             AGT. RICHARDS:  In South Carolina?
14             MR. COUNCIL:  Yes.  Not sure what
15   city.  It might have been Marion or one other of
16   them little cities right there, before you get to
17   North Carolina.
18             AGT. RICHARDS:  Do you know what
19   -- do you know what road you were on?
20             MR. COUNCIL:  I actually got lost
21   before I got back to North Carolina, so I'm not
22   exactly sure.  I had to -- I had to stop and
23   -- because it was raining like --(inaudible)-- that
24   day.  I had to stop one time, and I drove on 501
25   the wrong way.  I was going south.  I was trying to
```

JA0385

75

```
 1   go north, is what I mean when I say the wrong way.

 2                   AGT. RICHARDS:  Okay.  But you were

 3   on 501; you remember that?

 4                   MR. COUNCIL:  If I'm not mistaken.

 5   Yes.

 6                   AGT. RICHARDS:  Okay.  How about 701?

 7                   MR. COUNCIL:  It might have been.

 8   I don't --

 9                   AGT. RICHARDS:  You don't know

10   whether it --

11                   MR. COUNCIL:  They both run north and

12   south so --

13                   AGT. RICHARDS:  That's right.

14                   MR. COUNCIL:  -- I do know that it

15   was one of those.  I --

16                   AGT. RICHARDS:  And it was -- do

17   you know --

18                   MR. COUNCIL:  -- can't swear to it,

19   that --

20                   AGT. RICHARDS:  -- know --

21                   MR. COUNCIL:  -- it's 501, but I do

22   know it was one of them.

23                   AGT. RICHARDS:  Do you know what car

24   wash it was?  Any idea the name of it?

25                   MR. COUNCIL:  That's the first time
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

76

1   I've ever seen it in my life.

2              AGT. RICHARDS:  How far away?  Do you

3   know how far away it was?

4              MR. COUNCIL:  Oh, when I got lost

5   -- I want to tell you that -- maybe 25, 30 minutes

6   out of -- outside of Conway.

7              AGT. RICHARDS:  Twenty-five to

8   30 minutes --

9              MR. COUNCIL:  Yeah.

10             AGT. RICHARDS:  -- from Conway.  And

11  you got rid of the wallets?

12             MR. COUNCIL:  I -- I got rid of it.

13  Yeah.

14             AGT. RICHARDS:  And did -- where is

15  the gun?

16             MR. COUNCIL:  The gun is in the car.

17             AGT. RICHARDS:  And -- and -- you

18  have the Mercedes?

19             MR. COUNCIL:  Mmm-hmm.

20             AGT. RICHARDS:  Okay.

21             MR. COUNCIL:  And the rest of

22  the money.

23             AGT. RICHARDS:  Say that again.

24             MR. COUNCIL:  And the rest of

25  the money.

77

```
 1                    AGT. RICHARDS:  Okay.  Do you have
 2   any idea -- do you have any idea how much money you
 3   got in the robbery?
 4                    MR. COUNCIL:  I would say -- I heard
 5   a guy say $15,000.
 6                    AGT. RICHARDS:  You heard what guy?
 7                    MR. COUNCIL:  Oh, man.  I been
 8   hearing him talk about me all day, since I've
 9   been here.
10                    AGT. RICHARDS:  Out here?
11                    MR. COUNCIL:  Mmm-hmm.
12                    AGT. RICHARDS:  Okay.
13                    MR. COUNCIL:  Mmm.
14                    AGT. RICHARDS:  Okay.  And -- and
15   when -- when did you -- when did you buy the
16   Mercedes?
17                    MR. COUNCIL:  Yesterday.
18                    AGT. RICHARDS:  Okay.  Where is
19   -- where is the white car?
20                    MR. COUNCIL:  The Chrysler?
21                    AGT. RICHARDS:  Yeah, where is the
22   Chrysler?
23                    MR. COUNCIL:  Economy Lodge.
24                    AGT. RICHARDS:  Where?
25                    MR. COUNCIL:  In Greenville.
```

78

```
 1                    AGT. RICHARDS:  Okay.

 2                    AGT. COATES:  Which one?  Where at?

 3                    MR. COUNCIL: I only know of one.

 4                    AGT. COATES:  Do you remember --

 5                    MR. COUNCIL: Off of

 6   Stantonsburg Road.

 7                    AGT. COATES:  Oh, right by the

 8   hospital?

 9                    MR. COUNCIL:  Mmm-hmm.

10                    AGT. RICHARDS:  Statesboro Road?

11                    MR. COUNCIL:  Stantonsburg.

12                    AGT. COATES:  Stantonsburg.

13                    AGT. RICHARDS:  Okay.  And when did

14   you leave it there?

15                    MR. COUNCIL:  The day that I got

16   there.

17                    AGT. RICHARDS:  The day of the -- is

18   that the same day as the robbery?

19                    MR. COUNCIL:  Excuse me.  Hold on

20   one second.  Let me think.  Give me a second.  Same

21   day as the robbery.  Where did I stay that night.

22   Damn, this shit is crazy.

23                    AGT. RICHARDS:  So the robbery

24   was Monday.

25                    MR. COUNCIL:  Right.
```

79

1            AGT. RICHARDS:  And today is

2   Wednesday.

3            MR. COUNCIL:  That's correct.  I

4   bought the car yesterday.

5            AGT. RICHARDS:  You bought the car

6   yesterday.

7            MR. COUNCIL:  You know, the brain

8   fart.  It's just a brain fart.  I'm not trying to

9   mislead you or any --

10            AGT. RICHARDS:  No.  It's okay.  No.

11            MR. COUNCIL:  It's just --

12            AGT. RICHARDS:  I know that.  I know

13   that, Brandon.

14            MR. COUNCIL:  Uhh.

15            AGT. RICHARDS:  I know that, Brandon.

16            MR. COUNCIL:  But the car is there.

17   Back to your other question.

18            AGT. RICHARDS:  Okay.  So -- so you

19   come -- so from the bank you -- you drive

20   25-30 minutes, you pull over -- you --

21            MR. COUNCIL:  Because of the rain,

22   yeah.

23            AGT. RICHARDS:  Because of the rain.

24            MR. COUNCIL:  Yeah.

25            AGT. RICHARDS:  At a car wash, you

AWR

JA0390

80

1  get rid of the wallet.

2                    MR. COUNCIL:  Mmm-hmm.

3                    AGT. RICHARDS:  Right?  You never use

4  them.

5                    MR. COUNCIL:  Well, people were

6  pulling over there, because it was -- the rain

7  was --

8                    AGT. RICHARDS:  It was raining that

9  bad?

10                    MR. COUNCIL:  Yeah.

11                    AGT. RICHARDS:  Okay.  So you pulled

12  over.  You never ever used the credit cards or any

13  of that.

14                    MR. COUNCIL:  No.

15                    AGT. RICHARDS:  Okay.  You threw the

16  wallets away.  Did you throw anything else away?

17                    MR. COUNCIL:  The things that the

18  credit cards were in, yeah.

19                    AGT. RICHARDS:  Yeah.

20                    MR. COUNCIL:  The wallets.

21                    AGT. RICHARDS:  But -- you --

22                    MR. COUNCIL:  That's it.

23                    AGT. RICHARDS:  -- threw the wallets.

24  Okay.

25                    MR. COUNCIL:  Yeah.  That's

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                       July 27, 2018

                                                                            81

```
 1   basically -- that's it.

 2              AGT. RICHARDS:  Then you keep going

 3   and you go straight to the Econo Lodge?  Do you

 4   pick anybody up?

 5              MR. COUNCIL:  Yeah.  That's how I

 6   met Jamie.

 7              AGT. RICHARDS:  So you're on your way

 8   back to South Carolina.  What do you do?  Excuse

 9   me, North Carolina.

10              MR. COUNCIL:  I'm on my way back to

11   North Carolina, what do I do?

12              AGT. RICHARDS:  Yeah.  You're on your

13   way back to North Carolina. You're in this car --

14              MR. COUNCIL:  (Inaudible)-- yeah.

15              AGT. RICHARDS:  -- from

16   South Carolina.

17              MR. COUNCIL:  That's right.

18              AGT. RICHARDS:  Do you have a phone?

19              MR. COUNCIL:  No.

20              AGT. RICHARDS:  No phone.  So you're

21   not calling anybody.

22              MR. COUNCIL:  No.

23              AGT. RICHARDS:  Okay.

24              MR. COUNCIL:  You can check my

25   phone.  You know, I --(inaudible).
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

82

1                    AGT. RICHARDS:  Okay.  Did you bring

2    a phone into the bank with you?

3                    MR. COUNCIL:  No.

4                    AGT. RICHARDS:  Okay.

5                    MR. COUNCIL:  I'm absolutely certain

6    of that.

7                    AGT. RICHARDS:  Okay.  So you

8    -- you're --you're driving home.  You got no phone.

9    You're in the car.  Where do you go?

10                    MR. COUNCIL:  Okay.  When I get in

11   the -- give me a second.  Let me think.  I'm in the

12   Chrysler -- okay.  Okay.  I stayed at The Heart of

13   Wilson that night.

14                    AGT. RICHARDS:  The what?

15                    MR. COUNCIL:  The Heart of Wilson.

16                    AGT. RICHARDS:  Heart of Wilson Inn?

17                    MR. COUNCIL:  Mmm-hmm.

18                    AGT. RICHARDS:  So you go right from

19   the bank -- bank robbery to The Heart of

20   Wilson Inn.

21                    MR. COUNCIL:  I stayed there

22   one night.

23                    AGT. RICHARDS:  Where is that?

24                    MR. COUNCIL:  I didn't even stay the

25   night, to tell you the truth.  I got the room --

AWR

JA0393

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

83

```
 1                AGT. RICHARDS:  What room was it?

 2                MR. COUNCIL:  131.

 3                AGT. RICHARDS:  Number 131.  Where is

 4   The Heart of Wilson Inn?

 5                MR. COUNCIL:  Wilson,

 6   North Carolina, about 30 minutes west of

 7   Greenville.

 8                AGT. RICHARDS:  And you drove

 9   straight there?

10                MR. COUNCIL:  I believe so.

11                AGT. RICHARDS:  What time did you get

12   there?  Any idea?  Night time?

13                MR. COUNCIL:  I -- I -- let me say

14   this, I'm misleading you, unintentionally, because

15   it's -- it's a whole lot to put together.

16                AGT. RICHARDS:  Yeah.  Absolutely.

17                MR. COUNCIL:  I drove around in

18   Wilson before I did anything.  I seen an old

19   girlfriend, and she got the -- I wanted her to get

20   the room for me.  She couldn't get it because she

21   didn't have --

22                AGT. RICHARDS:  Who?  What was

23   her name?

24                MR. COUNCIL:  Her name is Liddy.

25                AGT. RICHARDS:  What is it?
```

JA0394

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

84

```
 1                    MR. COUNCIL:  Liddy.

 2                    AGT. RICHARDS:  Liddy?

 3                    MR. COUNCIL:  Mmm-hmm.

 4                    AGT. RICHARDS:  Do you remember --

 5                    MR. COUNCIL:  L-I-D-D-Y.

 6                    AGT. RICHARDS:  L-I-D-D-Y.

 7                    MR. COUNCIL:  D-D-Y.

 8                    AGT. RICHARDS:  Liddy.

 9                    MR. COUNCIL:  Mmm-hmm.

10                    AGT. RICHARDS:  Do you know her

11   last name?

12                    MR. COUNCIL:  Yeah.

13                    AGT. RICHARDS:  What is it?

14                    MR. COUNCIL:  Barnes.

15                    AGT. RICHARDS:  Barnes.  Black

16   female?

17                    MR. COUNCIL:  Yes.

18                    AGT. RICHARDS:  How old is she?

19                    MR. COUNCIL:  She's a little older

20   than me.  She might be about 36, 37.  She's a known

21   hooker, prostitute, in Wilson, so...

22                    AGT. RICHARDS:  Where does she live?

23                    MR. COUNCIL:  Everywhere.

24                    AGT. RICHARDS:  So where -- how did

25   you find her?
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

85

```
1                    MR. COUNCIL:  I bumped into her.  I
2   told you I was riding around.
3                    AGT. RICHARDS:  Yeah.
4                    MR. COUNCIL:  I seen her on the
5   street, and I asked her, could she get us a room,
6   and she said she didn't have no ID, so she asked a
7   guy, one of her neighbors.  One of the young guys.
8   She was, like, you give him $10, he'll get the room
9   for us. Went in the room with her, we had sex, and
10  I took her back to the same neighborhood where I
11  found her at.  Came back to the room.  I want to
12  say I watched --
13                   AGT. RICHARDS:  In the -- in the car?
14                   MR. COUNCIL:  Say that again.
15                   AGT. RICHARDS:  In the white
16  Chrysler?  Okay.
17                   MR. COUNCIL:  Yeah.
18                   AGT. RICHARDS:  Yep.
19                   MR. COUNCIL:  I took her, dropped
20  her off, went and came back to the room.  Stayed in
21  and watched maybe two episodes of Big Bang Theory
22  and Modern Guy -- Modern Family, something like
23  that, but I didn't stay the night is what I'm
24  saying.
25                   AGT. RICHARDS:  Yep.
```

86

1           MR. COUNCIL:  Okay.  And I got the

2  Economy -- that's when I came out here.

3           AGT. RICHARDS:  So that's -- that

4  -- so Monday -- so Monday night --

5           MR. COUNCIL:  Yeah.

6           AGT. RICHARDS:  -- you went --

7           MR. COUNCIL:  I got it.

8           AGT. RICHARDS:  You got the

9  Econo Lodge --

10          MR. COUNCIL:  That's correct.

11          AGT. RICHARDS:  -- in Greenville.

12          MR. COUNCIL:  That's correct.

13          AGT. RICHARDS:  Okay.  And -- and how

14  did you get that room?

15          MR. COUNCIL:  With my own ID.

16          AGT. RICHARDS:  You show an ID there?

17          MR. COUNCIL:  No, no, no.  The guy

18  -- remember I told you -- just told you the

19  -- Liddy, she got one of her neighbors, the guy

20  that lived across the street.

21          AGT. RICHARDS:  Yeah.

22          MR. COUNCIL:  Well, and I guess she

23  lived there, man.  I don't know --

24          AGT. RICHARDS:  But he got the -- he

25  got the room for you at The Heart of Wilson Inn.

JA0397

In Re: FBI Interview of Brandon Council
Brandon Council Audio Transcription
July 27, 2018

87

```
 1                    MR. COUNCIL:  That's correct.

 2                    AGT. RICHARDS:  And then --

 3                    MR. COUNCIL:  I dropped them off --

 4                    AGT. RICHARDS:  Yeah.

 5                    MR. COUNCIL:  -- come back, watched

 6    two or three episodes of sitcoms.

 7                    AGT. RICHARDS:  Yeah.

 8                    MR. COUNCIL:  Modern Family and

 9    then, Big Bang Theory.

10                    AGT. RICHARDS:  Yep.

11                    MR. COUNCIL:  And I leave.

12                    AGT. RICHARDS:  Yep.

13                    MR. COUNCIL:  I come down here to

14    Greenville.

15                    AGT. RICHARDS:  Yep.

16                    MR. COUNCIL:  I check into the

17    Economy Lodge.

18                    AGT. RICHARDS:  How did you check in?

19                    MR. COUNCIL:  With my ID.

20                    AGT. RICHARDS:  Okay.  You checked in

21    with your own ID.

22                    MR. COUNCIL:  That's correct.

23                    AGT. RICHARDS:  Okay.

24                    MR. COUNCIL:  I pretty much stayed

25    in the room that night.
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                                     July 27, 2018

88

```
 1                   AGT. RICHARDS:  You alone?

 2                   MR. COUNCIL:  Yep.  And I met

 3   Jaelynn yesterday at the BPL Plasma Center.

 4                   AGT. RICHARDS:  You met Jae at the

 5   plasma center?

 6                   MR. COUNCIL:  Mmm.

 7                   AGT. RICHARDS:  Do you know his

 8   last name?

 9                   MR. COUNCIL:  I just met him

10   yesterday.

11                   AGT. RICHARDS:  Okay.

12                   MR. COUNCIL:  That's the guy that --

13                   AGT. RICHARDS:  Yeah.

14                   MR. COUNCIL:  -- put the car in his

15   name for me.  I paid him to put the car in his name

16   for me.

17                   AGT. RICHARDS:  You paid him to put

18   the car in the name?

19                   MR. COUNCIL:  Mmm-hmm.  Because I

20   tried to buy the car cash, and they wouldn't --

21                   AGT. RICHARDS:  Hang on.  Hang on.

22   Is he -- what time did you get to the plasma

23   center?

24                   MR. COUNCIL:  8:00.

25                   AGT. RICHARDS:  8:00?
```

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

89

1                    MR. COUNCIL:  Before 8:00,

2   probably 10.

3                    AGT. RICHARDS:  Is that on Tuesday?

4                    MR. COUNCIL:  I rode a bus --

5                    AGT. RICHARDS:  That's yesterday.

6                    MR. COUNCIL:  I rode the bus, right.

7   I didn't drive there.  I rode the bus.  I called

8   the transits.

9                    AGT. RICHARDS:  You rode the bus

10  -- bus to the plasma center?

11                   MR. COUNCIL:  Mmm-hmm.  Yeah.

12                   AGT. RICHARDS:  Where is it?

13                   MR. COUNCIL:  I want to say it's

14  either 10th or 14th Street, one of the two.  I'm

15  not familiar with the --

16                   AGT. RICHARDS:  In Greenville?

17                   MR. COUNCIL:  Yes.

18                   AGT. RICHARDS:  And did you give

19  -- and did you give plasma?

20                   MR. COUNCIL:  No.  No.

21                   AGT. RICHARDS:  Okay.

22                   MR. COUNCIL:  I was over there

23  waiting for the car lot to open.  The car lot

24  wasn't open when I got to the --

25                   AGT. RICHARDS:  Is the car lot across

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

90

```
 1    the street?

 2                 MR. COUNCIL:  Yes.

 3                 AGT. RICHARDS:  Okay.

 4                 MR. COUNCIL:  Directly across the

 5    street.  A lot of people, you know, urban people

 6    who hang out around there.  You know, it's a place

 7    that --

 8                 AGT. RICHARDS:  Okay.  And you met

 9    -- but you met Jae at the -- at the plasma center.

10                 MR. COUNCIL:  Right.  He was just

11    coming in with his brother.  I actually offered his

12    brother the job.  His brother was reluctant to

13    accept, so --

14                 AGT. RICHARDS:  How much did you pay

15    him to register the car?

16                 MR. COUNCIL:  A hundred dollars.

17                 AGT. RICHARDS:  How much did you

18    -- how much did the car cost you?

19                 MR. COUNCIL:  Thirty-four.

20                 AGT. RICHARDS:  Hundred?

21                 MR. COUNCIL:  Mmm-hmm.

22                 AGT. RICHARDS:  What is it?

23                 MR. COUNCIL:  1996 Mercedes 300E.

24                 AGT. RICHARDS:  Did you -- did you

25    -- so you paid cash?
```

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

91

```
 1                    MR. COUNCIL:  Yes.

 2                    AGT. RICHARDS:  Okay.  And -- and

 3    -- so Jae did all the paperwork at the place

 4    for you?

 5                    MR. COUNCIL:  Yes.  Yes.

 6                    AGT. RICHARDS:  Okay.

 7                    MR. COUNCIL:  And he became

 8    my driver.

 9                    AGT. RICHARDS:  He became your

10    driver?

11                    MR. COUNCIL:  Right.  For the day

12    anyway.  Okay.  So me and Jae get up, we go

13    -- after we get the car situated --

14                    AGT. RICHARDS:  He -- he -- he went

15    back to the hotel with you?

16                    MR. COUNCIL:  After we got the car

17    situated --

18                    AGT. RICHARDS:  Yeah.

19                    MR. COUNCIL:  Yeah.  We did a lot of

20    -- a lot of traveling yesterday trying to get the

21    insurance on the car.  We went to two insurance

22    companies.

23                    AGT. RICHARDS:  Where did you go to

24    get the insurance?

25                    MR. COUNCIL:  Cade Insurance.
```

JA0402

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

92

```
 1                AGT. RICHARDS:  Say that --

 2                MR. COUNCIL:  Cade, C-A-D-E.

 3                AGT. RICHARDS:  C-A-D-E?

 4                MR. COUNCIL:  Yeah.

 5                AGT. RICHARDS:  Where was that?

 6                MR. COUNCIL:  It's in Greenville.  I

 7    don't even know.  It's in Greenville.

 8                AGT. RICHARDS:  Did -- and did he go

 9    inside to do it all?

10                MR. COUNCIL:  We both went inside.

11                AGT. RICHARDS:  Both --

12                MR. COUNCIL:  Actually, he was

13    -- his last insurance had elapsed.  He had canceled

14    it, so we put -- I paid that to get that

15    reinstated.  We thought we as adding that insurance

16    -- we thought we was adding the Mercedes to his

17    insurance, but actually we weren't.  All we did was

18    paid off his previous balance.

19                AGT. RICHARDS:  Okay.  And did he

20    know that you had committed a bank robbery?

21                MR. COUNCIL:  He has no idea about

22    any crime.

23                AGT. RICHARDS:  Where did he think

24    you got all that money?

25                MR. COUNCIL:  He has no idea.  I
```

93

1    just told him that I didn't have a license.  That I

2    was trying to buy a car for cash, and he was like:

3    For real, bro?  I was, like, yeah.  I was like, the

4    man won't sell me the car because I don't have a

5    drivers license.  And I was, like, I thought you

6    could buy a car with cash with no drivers license,

7    and drive off, but I -- he said -- I -- like, I

8    -- he explained it to me.  He was, like, something

9    about being a private owner -- when you sell to a

10   private owner, they might let you do it but a car

11   lot won't.

12                  AGT. RICHARDS:  Yeah.

13                  MR. COUNCIL:  So with that being

14   said, I hadn't purchased the car at the time,

15   because he wasn't going to allow me to drive off

16   without insurance and everything.

17                  AGT. RICHARDS:  Oh, the guy at the

18   car lot.

19                  MR. COUNCIL:  That's correct.

20                  AGT. RICHARDS:  Right.

21                  MR. COUNCIL:  Even though the car

22   was paid for.

23                  AGT. RICHARDS:  Right.  So you had to

24   go -- did you go to the car lot first?

25                  MR. COUNCIL:  Because, you know, you

JA0404

94

```
 1   got tags.  You know, you got to put tags on

 2   the car --

 3               AGT. RICHARDS:  Yeah.

 4               MR. COUNCIL:  -- and everything.

 5               AGT. RICHARDS:  Did you go to the car

 6   lot first?

 7               MR. COUNCIL:  After we left BPL?

 8               AGT. RICHARDS:  Well --

 9               MR. COUNCIL:  I met him at BPL.

10               AGT. RICHARDS:  The plasma center,

11   right.

12               MR. COUNCIL:  I explained my

13   situation to his brother.  His brother was, you

14   know, reluctant to accept the offer, so after his

15   brother went in the BPL station, we elaborated on

16   the situation a little further.  I told him he

17   wasn't doing anything illegal.  I told him it was

18   not like we were committing a crime.  So that

19   pretty much sealed the fact.  He went and jumped on

20   it.  He's young.  He's --

21               AGT. RICHARDS:  Yeah.

22               MR. COUNCIL:  -- nothing but 18.

23   He --

24               AGT. RICHARDS:  Yep.  So from -- so

25   from the plasma place you went to the car lot?
```

JA0405

                                                                95
1                    MR. COUNCIL:  Yeah.  It's right

2     across the street.

3                    AGT. RICHARDS:  Okay.

4                    MR. COUNCIL:  We walked over there.

5                    AGT. RICHARDS:  And you -- and you --

6                    MR. COUNCIL:  We conducted the

7     business.

8                    AGT. RICHARDS:  Yeah.

9                    MR. COUNCIL:  And we got all the way

10    to the point of the paperwork and everything was

11    fine, until we got to the insurance issues, and the

12    tag, putting the tags on the car.  So he took us

13    -- as a matter of fact, the guy at the lot took me

14    to go pick the money up.

15                   AGT. RICHARDS:  Where did you go?

16                   MR. COUNCIL:  Economy Lodge.

17                   AGT. RICHARDS:  Do you remember the

18    guy's name?

19                   MR. COUNCIL:  Bill Tripp.

20                   AGT. RICHARDS:  Bill Tripp?

21                   MR. COUNCIL:  Yeah.  He's a sales

22    manager at Pirate Auto Sales.

23                   AGT. RICHARDS:  Pirate Auto Sales?

24                   MR. COUNCIL:  Mmm-hmm.

25                   AGT. RICHARDS:  Okay.  And do you

JA0406

96

```
 1  remember what kind of car you went over to your
 2  hotel in?  What kind of car he was driving?
 3              MR. COUNCIL:  Yeah, we drove the
 4  Mercedes, yeah.  He --
 5              AGT. RICHARDS:  Oh --
 6              MR. COUNCIL:  -- put a dealer's tag
 7  on it.  Yeah.
 8              AGT. RICHARDS:  Okay.
 9              MR. COUNCIL:  Yeah.  He put dealer's
10  tags on it for us.
11              AGT. RICHARDS:  Okay.  So once you
12  got the money for the car, how did you get the
13  insurance?
14              MR. COUNCIL:  We go back -- we go
15  -- we leave the Economy Lodge.  Me, Jaelynn,
16  and Bill.
17              AGT. RICHARDS:  Yeah.
18              MR. COUNCIL:  We leave the
19  Economy Lodge.  We go back to his office, and we
20  call the people.  He called the insurance people.
21  They were busy, so we had to actually go there.  So
22  he gave us this ticket that says, you know
23  -- basically giving you permission to drive the car
24  under the dealer's insurance for purposes --
25              AGT. RICHARDS:  Yeah.
```

JA0407

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

97

1          MR. COUNCIL:  -- relating to getting

2    the car sold.  Okay.

3          AGT. RICHARDS:  Did you -- did you

4    drive or did Jae?

5          MR. COUNCIL:  No.  Jae was driving.

6          AGT. RICHARDS:  Jae drove to the

7    -- you -- you and Jae drove to the insurance

8    company?

9          MR. COUNCIL:  He drove to the

10   insurance company.

11         AGT. RICHARDS:  Yeah.  Yeah.  Yeah.

12         MR. COUNCIL:  Not us.

13         AGT. RICHARDS:  Okay.

14         MR. COUNCIL:  I was with him though.

15         AGT. RICHARDS:  Yeah.  Okay.  And you

16   got the insurance?

17         MR. COUNCIL:  Yes.

18         AGT. RICHARDS:  And you returned?

19         MR. COUNCIL:  So we returned, he

20   placed the 30-day tags on it.

21         AGT. RICHARDS:  Okay.  And where did

22   you stay last night?

23         MR. COUNCIL:  Where did I stay last

24   night?

25         AGT. RICHARDS:  Yeah.  Yeah.

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018
98
1              MR. COUNCIL:  I stayed at the

2    Economy.

3              AGT. RICHARDS:  You stayed at the

4    Economy Lodge that night?

5              MR. COUNCIL:  Right.

6              AGT. RICHARDS:  Okay.

7              MR. COUNCIL:  With me and Shamyra.

8              AGT. RICHARDS:  And where did Shamyra

9    come in?

10             MR. COUNCIL:  Shamyra is Jaylynn's

11   girlfriend's best friend.  During our -- after we

12   got the car, and settled in and everything, we went

13   back to the Economy Lodge, and two guys in a room

14   is not cool.  So of course, we trying to get some

15   women involved, and he called his girlfriend, and

16   she was at work at Wendy's.  She's like -- she

17   knows somebody.  They got a friend for you.  I was,

18   like, well, okay.  Bit.

19             So we wait until his girlfriend gets

20   off work, a little after nine last night, and we

21   drive somewhere in Greenville, to a small apartment

22   complex, and we pick up Shamyra.  Yeah, I've only

23   known her less than 24-hours.  And she agrees to

24   join us at the hotel room.  Me, Jaelynn, his

25   girlfriend and --(inaudible).  So we get in there,

JA0409

99

1  drinking, and --

2          AGT. RICHARDS:  What are you

3  drinking?

4          MR. COUNCIL:  -- playing cards.

5  Hennessy.

6          AGT. RICHARDS:  And doing any drugs?

7          MR. COUNCIL:  Marijuana.

8          AGT. RICHARDS:  Smoked some -- smoked

9  a little dope?  Smoked a little marijuana?

10          MR. COUNCIL:  Oh, yeah.

11          AGT. RICHARDS:  Yeah.

12          MR. COUNCIL:  Marijuana.

13          AGT. RICHARDS:  Okay.

14          MR. COUNCIL:  I say, close to two

15  maybe one or two -- I'm trying to get everybody to

16  leave, so I can score, so I kick everybody else

17  out.  Jaelynn goes with his brother.

18          AGT. RICHARDS:  Is brother came over?

19          MR. COUNCIL:  Mmm-hmm.

20          AGT. RICHARDS:  Okay.  Is -- is the

21  girlfriend there?

22          MR. COUNCIL:  Shamyra's girlfriend?

23          AGT. RICHARDS:  Yeah.  Yes.

24          MR. COUNCIL:  Yeah, she's there.

25          AGT. RICHARDS:  Okay.  What's his

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

100

```
 1   brother's name?

 2             MR. COUNCIL:  Brandon.

 3             AGT. RICHARDS:  Okay.  So that makes

 4   five of you.

 5             MR. COUNCIL:  That's it, at this

 6   time, yeah.

 7             AGT. RICHARDS:  All right.  That

 8   doesn't -- that doesn't work, does it?

 9             MR. COUNCIL:  Oh, yeah.  I told you

10   I kicked everybody out so I could score.  Exactly.

11             AGT. RICHARDS:  Okay.  Okay.  So what

12   happened?

13             MR. COUNCIL:  I kicked everybody

14   else out so I could score.

15             AGT. RICHARDS:  So it's just you and

16   Shamyra?

17             MR. COUNCIL:  That's right.  We

18   spent the night together.

19             AGT. RICHARDS:  Okay.

20             MR. COUNCIL:  We left this morning

21   before check out.  We left about nine something.

22   No.  We was close to ten.  I -- check the -- it was

23   close to ten.  We get up with Jaelynn again today.

24   Matter of fact, we go to his girlfriend's house,

25   and he meets us over there.  He got dropped off
```

101

 1  | this morning.

 2  |             We take his girlfriend to work at

 3  | Wendy's and -- the Economy Lodge -- either I have

 4  | to pay again or get another hotel room, and I

 5  | wasn't satisfied, so I went to get another hotel

 6  | room.  So I said, let's go until we get a hotel

 7  | room with a pool and Super 8 was, you know,

 8  | relatively close so we went to --

 9  |   (The proceedings were interrupted -- cell phone

10  |                   ringing.)

11  | -- I was in -- we walked in there together.  We

12  | walked in there together --

13  |             AGT. RICHARDS:  (Inaudible) You went

14  | to the Super 8?

15  |             MR. COUNCIL:  Me and -- yeah.  Me

16  | and Jaylynn walked in there together, and he sees

17  | the sign on the thing that says:  Must be 21-years

18  | old, and Jaelynn is only 18, so he couldn't rent.

19  | So I tried to give the lady my card --

20  |             AGT. RICHARDS:  Was he driving?

21  |             MR. COUNCIL:  At this time, no.

22  |             AGT. RICHARDS:  Okay.  You had -- you

23  | drove --

24  |             MR. COUNCIL:  I drove to the

25  | Super 8.

102

```
 1                    AGT. RICHARDS:  You drove to the

 2       Super 8.  Okay.  Okay.

 3                    MR. COUNCIL:  I drove to the

 4       Super 8, we go in, we see the sign.  That -- the

 5       man says must be 21-years old to -- to rent a room,

 6       and so I was, like, well, I got my ID in the car.

 7       So I went and got my ID, and when I presented it to

 8       them, she says, we're on a no rent -- I'm on the no

 9       rent list.  And I was, like, I've never rented from

10       you before.  And she was, like, I don't know.  She

11       was, like, try some smaller hotel that don't have

12       no computer.  That's what she told me.

13                    And we left.  I was, like, y'all know

14       another hotel room that might have good prices,

15       that got a pool in it, that's in Greenville?  So

16       Shamyra was, like, the Baymont.  And I was, like,

17       how much is the Baymont?  So we go to the Baymont

18       to find out, and no sooner than we get there I see

19       the police everywhere.  As soon as I got out of the

20       car, before I even made it to the front door, I

21       seen the police on the highway and he was looking

22       at me real hard, so I knew it was that time.

23                    But I said -- I got -- at the same

24       time, man.  You know, I'm a dufus.  I'm an idiot.

25       I don't deserve to live.  I'm in a bad, bad spot,
```

JA0413

103

```
 1   man, you know.  They ain't no excuse and what I did
 2   can't be taken back, man.  But I do know this, if I
 3   was under the same circumstances again, sober, we
 4   wouldn't be having this conversation today.  But
 5   because the turmoil and chaos that I created in my
 6   own life, and the ridiculous attitude that I -- I
 7   have, it's just -- it seems -- I -- I don't know,
 8   man.
 9              What I'm trying to say is, man, I'm
10   sorry for what I did, but at the same time I -- I
11   -- it's hard to apologize to anyone on that kind of
12   situation.  Because they didn't deserve that, but
13   just like the people that fighting over wars, it's
14   collateral damage everywhere.  And I hate to be
15   rude or sound insensitive, but that's -- that's
16   basically the mind frame that I had when I walked
17   in that bank.  That I wasn't going to let anything
18   deter me from, you know, successfully pulling this
19   off, because I didn't have a dime when I went in
20   that damn bank.
21              I didn't have a car to get away -- go
22   home with.  I'm already on the run for one bank on
23   a robbery.  And the reason why I bought the gun was
24   not to actually commit more robberies, it's because
25   I like jewelry.  I wear a lot of jewelry, bulky
```

JA0414

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

104

1  jewelry.  It's all fake as hell, but it looks real,

2  because I keep buying new fake jewelry so people

3  think, when they see, constantly -- you got nice

4  clothes or name-brand clothes and jewelry on that's

5  -- and I knew I was going to be living in the

6  streets, so that's why I bought that gun from that

7  guy that day.

8             AGT. RICHARDS:  But why?  To protect

9  your jewelry?

10            MR. COUNCIL:  I beg your pardon?

11            AGT. RICHARDS:  Why did you buy the

12  gun?  To protect your jewelry?

13            MR. COUNCIL:  To protect myself.

14            AGT. RICHARDS:  Oh, because of the

15  jewelry.

16            MR. COUNCIL:  Not the jewelry.

17            AGT. RICHARDS:  Because of the

18  jewelry that you --

19            MR. COUNCIL:  Because people will

20  -- yeah.

21            AGT. RICHARDS:  Yeah.  People will

22  try to rob you for the jewelry.

23            MR. COUNCIL:  When you living in the

24  street life, you're only dealing with pretty much

25  97-8 percent of street people.  You're not going to

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
                                                                July 27, 2018

105

1   be dealing with -- what would you say, productive

2   class citizens.

3                  AGT. RICHARDS:  Right.

4                  MR. COUNCIL:  You're going to be

5   dealing with the people that, you know, deal in the

6   streets.  Y'all know.  Y'all -- y'all -- y'all

7   know.  Y'all know what I'm talking about.

8                  AGT. RICHARDS:  Right.  Right.

9                  MR. COUNCIL:  But man, I'm sorry

10  them women died, man.  I -- I swear I wasn't trying

11  -- I was -- I did -- I will be a man and say I did

12  know that I was going to shoot whoever was in there

13  that was going to try to stop me from -- because I

14  felt like I was dead, at that point in time.

15  Because if a man don't have a house, a job.  I hope

16  you gentleman never feel that pain that I felt this

17  past week, and this past month, because if you

18  don't have a job -- of someone that -- that you can

19  fall back on, and see pride -- and like I said,

20  when we first started talking about the Bible, and

21  when we first started this interview -- them demons

22  is real, man.

23                  And I can't make you believe.  I'm

24  not going to try to use that as no stupid defense,

25  but I believe in God, and I believe in it.  You

106

```
1    know what I'm saying -- justice, and I don't

2    believe in trying to excuse your behavior.  And I

3    just want people to hear my side.  At least they

4    have an explanation.

5                    AGT. RICHARDS:  Yep.

6                    MR. COUNCIL:  It's not a good one.

7    It's not a -- a -- a get away from your problems,

8    and I probably could've sucked is up harder, but I

9    just felt like I was at the bottom, and there was

10   nothing to lose.

11                   AGT. RICHARDS:  Brandon, what -- did

12   -- did you know there was only going to be two

13   people in the bank?

14                   MR. COUNCIL:  No.

15                   AGT. RICHARDS:  So it was --

16                   MR. COUNCIL:  I told you, this --

17                   AGT. RICHARDS:  Everybody is getting

18   shot if you --

19                   MR. COUNCIL:  Well, first of

20   all, no.

21                   AGT. RICHARDS:  You know what I mean?

22                   MR. COUNCIL:  When I -- well, let me

23   -- let me take that back.

24                   AGT. RICHARDS:  Yeah.

25                   MR. COUNCIL:  I mean -- I'm not
```

AWR

JA0417

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

107

```
 1   answering that question.  I'm speaking --
 2               AGT. RICHARDS:  Yeah.  Yeah.
 3               MR. COUNCIL:  Did I know -- your
 4   question was: Did I know --
 5               AGT. RICHARDS:  That there was only
 6   two people in the bank?
 7               MR. COUNCIL:  No.
 8               AGT. RICHARDS:  Okay.  But you -- you
 9   said you had a --
10               MR. COUNCIL:  That is -- you know,
11   who would ever thought you would have just two
12   people in a bank, period?
13               AGT. RICHARDS:  Right.
14               MR. COUNCIL:  In the middle of the
15   day.  I think I went in there at 1:00.
16               AGT. RICHARDS:  Right.  You went in
17   there about 1:00?
18               MR. COUNCIL:  That's correct.
19               AGT. RICHARDS:  How do you know that?
20               MR. COUNCIL:  Because I'm -- I'm
21   -- I'm a hundred percent sure it was 1:00 on
22   my watch.
23               AGT. RICHARDS:  How do you know what
24   time?  You have -- is your watch on?
25               MR. COUNCIL:  Yes.  This is --
```

108

```
 1                    AGT. RICHARDS:  Yeah.  Can I see it?

 2                    MR. COUNCIL:  Sure.

 3                    AGT. RICHARDS:  That's -- yeah.  The

 4     gold -- that gold watch.  Yeah.  Now, do you have

 5     -- so you knew it was about 1:00.

 6                    MR. COUNCIL:  Mmm.  I know it

 7     was 1:00.

 8                    AGT. RICHARDS:  Okay.  It was 1:00,

 9     and you said you were going to -- were you going to

10     shoot -- what if there was five people in there?

11                    MR. COUNCIL:  I would have shot

12     -- because I was going to try -- this is -- there

13     is a movie in my -- in my possession, that I own,

14     that's called: Get Rich or Die Trying, but it

15     wasn't my intentions to get rich at this point, it

16     was to survive or die trying.  That's where my

17     mentality was when I went in that bank.  That I was

18     going to successfully get away with this or die

19     trying.  And I was not going to allow any

20     circumstances, persons, places or things to, you

21     know, come between me and that goal, because I have

22     a determination that's, you know, unparalleled to

23     the average persons, but I felt so stupid because I

24     quit my job --

25                    AGT. RICHARDS:  At Wendy's?
```

JA0419

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

109

```
1              MR. COUNCIL:  -- and right after I
2    quit my job, my parents fussed at me, and then the
3    night of the turmoil with my girlfriend, she
4    visited me too late.  She wasn't in the house or
5    nothing, but they want to throw me out of the house
6    at my most weakest, vulnerable point.  I'm already
7    having a beef with my mother, because my
8    step-father is trying to put a wedge between us.  I
9    had only been out of prison nine or ten months.
10             You count from November to now.  You
11   know what I'm saying?  I was doing extremely well,
12   and then it seemed like life want to hit me with
13   all this bullshit.  The lady is supposed to be
14   giving me a raise and a promotion.  She
15   disappeared, and the new boss lady, she don't want
16   to talk to me.  She playing with my hours making --
17   I'm making less money.  And my step-dad, he trying
18   to get me thrown out of the house, and my momma,
19   she wishy-washy -- like, when she with me she on my
20   side, when she with him, she on his side.
21             That's that two-faced shit.  So I
22   know I can't depend on them.  The only other person
23   I got, really, in my life, is my girlfriend and she
24   ain't right for me.  I know she ain't right for me.
25   She know I ain't right for her.
```

110

```
 1                AGT. RICHARDS:  Yeah.

 2                MR. COUNCIL:  We both knew this

 3    entering the relationship.

 4                AGT. RICHARDS:  Yep.

 5                MR. COUNCIL:  And I just felt like I

 6    -- I feel like I'm trying to explain myself to

 7    y'all to get y'all to understand me, but --

 8                AGT. RICHARDS:  No.  I -- you

 9    don't --

10                MR. COUNCIL:  -- I'm just --

11                AGT. RICHARDS:  -- we're listening.

12                MR. COUNCIL:  Naa --

13                AGT. RICHARDS:  It's important.

14                MR. COUNCIL:  What I did was so

15    stupid, man.  It's so, so ignorant.  I should've

16    just been a homeless bum, but my pride wouldn't

17    never let me do that.

18                AGT. RICHARDS:  Yep.

19                MR. COUNCIL:  I'd rather -- I know

20    from the way I was raised to this point, the very

21    minute, to this day, that the Bible say pride comes

22    before a fall, so something like that.  Similar to

23    it.  I might misquoted, but I know what the Bible

24    talks about is pride, and proverbs, and everything,

25    and that was -- that was my main -- that's always
```

JA0421

111

1  been my main -- I'm too prideful.  I won't allow

2  -- if I can't handle the situation, I will try to

3  maneuver around it, and create an even worse

4  situation than the one I was in.

5            Because even if I hadn't done those

6  robberies before this last one in South Carolina, I

7  could've stood a chance.  I probably would've got

8  another chance at life, but the pain that I feel

9  right now.  You know, I don't have no family.  No

10  one -- when my six years -- no one wrote me,

11  hardly, or came to see me.  My mother is my only

12  living relative.  I do have a son, but he -- he's a

13  minor.  He can't really produce a -- a --

14            AGT. RICHARDS:  What is your son --

15            MR. COUNCIL:  -- a regular family

16  relationship at his age.

17            AGT. RICHARDS:  What's your son's

18  name?

19            MR. COUNCIL:  Brandon Michael

20  Council, Junior.

21            AGT. RICHARDS:  Where is he?

22            MR. COUNCIL:  In Wilson,

23  North Carolina.

24            AGT. RICHARDS:  How old is he?

25            MR. COUNCIL:  12.

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                                 July 27, 2018

112

1          AGT. RICHARDS:  And who is -- who is

2    the mom?

3          MR. COUNCIL:  She doesn't have

4    custody of him.  His grandmother has legal custody

5    of him.

6          AGT. RICHARDS:  Okay.  Where is --

7          MR. COUNCIL:  Her name is

8    Gracie Saddler.

9          AGT. RICHARDS:  Gracie?

10         MR. COUNCIL:  Sadler.

11         AGT. RICHARDS:  Could you spell that?

12         MR. COUNCIL:  S-A-D-D-L-E-R.

13         AGT. RICHARDS:  Gracie Saddler.

14         MR. COUNCIL:  Mmm-hmm.

15         AGT. RICHARDS:  And where doe

16   she live?

17         MR. COUNCIL:  Wilson,

18   North Carolina.

19         AGT. RICHARDS:  Do you know the

20   street?

21         MR. COUNCIL:  Snowden Drive.

22         AGT. RICHARDS:  Snow?

23         MR. COUNCIL:  Snowden.

24         AGT. RICHARDS:  Snowden.

25         MR. COUNCIL:  S-N-O-W --

JA0423

In Re: FBI Interview of Brandon Council      Brandon Council Audio Transcription
July 27, 2018

113

```
1              AGT. RICHARDS:  Yep.

2              MR. COUNCIL:  D-E-N.

3              AGT. RICHARDS:  Do you know her

4   number?

5              MR. COUNCIL:  I want to say 1406.

6              AGT. RICHARDS:  And who -- and that's

7   your -- your -- the mother's grandmother?

8              MR. COUNCIL:  No.  My son's mother's

9   mother.

10             AGT. RICHARDS:  Yeah.  Yeah.  What's

11  your -- what's the mother's name?

12             MR. COUNCIL:  Carrie Saddler.

13             AGT. RICHARDS:  Carrie Saddler?

14  Where does she live?

15             MR. COUNCIL:  Somewhere in

16  Goldsboro.

17             AGT. RICHARDS:  In -- in Goldsboro?

18             MR. COUNCIL:  Mmm-hmm.

19             AGT. RICHARDS:  And that's your

20  -- that's your only child?

21             MR. COUNCIL:  That's my only child.

22             AGT. RICHARDS:  Okay.  Is there any

23  other crimes that you want to tell us about,

24  Brandon?

25             MR. COUNCIL:  That's it.
```

In Re: FBI Interview of Brandon Council                      Brandon Council Audio Transcription
                                                                             July 27, 2018

114

```
1                    AGT. RICHARDS:  That you did.

2                    MR. COUNCIL:  Let's keep it 100.

3    First thing I did, when I broke the law, was the

4    Food Lion.  The second thing I did was the BB&T,

5    then the bank, and I stole the lady's car.

6    That's all.

7                    AGT. RICHARDS:  That's it?

8                    MR. COUNCIL:  That's it.

9                    AGT. RICHARDS:  Okay.  You had -- the

10   phone that you had with you.

11                   MR. COUNCIL:  The white one?

12                   AGT. RICHARDS:  Yeah.  The white one.

13                   MR. COUNCIL:  That's mine.

14                   AGT. RICHARDS:  That's your phone?

15                   MR. COUNCIL: That's correct.

16                   AGT. RICHARDS:  Does it work?

17                   MR. COUNCIL:  No.  It wasn't -- it

18   hasn't been on for -- what's today's date?  The

19   23rd.  My bill was due the 17th, but a lost the

20   battery to it, maybe, a few days before then.  So

21   no, it hasn't been operational until today.  I just

22   bought a battery today.  I went and bought a

23   battery from Bulbs and -- y'all not from here so

24   y'all wouldn't --

25                   AGT. COATES:  I am.
```

JA0425

In Re: FBI Interview of Brandon Council        Brandon Council Audio Transcription
July 27, 2018

115

| 1 | AGT. RICHARDS:  Bob's? |
|---|---|

```
 1                  AGT. RICHARDS:  Bob's?

 2                  AGT. COATES:  The one here?

 3                  MR. COUNCIL:  Yes.

 4                  AGT. COATES:  The bulb place over

 5   by the --

 6                  MR. COUNCIL:  It's a -- it's a

 7   battery and bulb place.

 8                  AGT. COATES:  Battery and Bulbs by --

 9                  MR. COUNCIL:  Yeah.  It's right

10   beside the UPS -- yep.  I just put a battery in it

11   today.

12                  AGT. COATES:  On Greenville

13   Boulevard.

14                  MR. COUNCIL:  Mmm-hmm.

15                  AGT. RICHARDS:  What -- what is it,

16   Greg?

17                  AGT. COATES:  It's a Battery and

18   Bulbs.  It's just a shop that sells batteries and

19   bulbs.

20                  AGT. RICHARDS:  How much did that

21   cost you?

22                  MR. COUNCIL:  Forty.

23                  AGT. RICHARDS:  Forty bucks?

24                  MR. COUNCIL:  Mmm-hmm.

25                  AGT. COATES:  What time were you
```

116

```
 1   -- what time did you go by there?
 2              MR. COUNCIL:  I want to say a little
 3   after 12.
 4              AGT. COATES:  Today?
 5              MR. COUNCIL:  Mmm-hmm.
 6              AGT. COATES:  It's on Charles -- the
 7   intersection of Charles and Greenville Boulevard.
 8   Charles Street and Greenville Boulevard.  That's
 9   the one you're talking about, right?
10              MR. COUNCIL:  Mmm-hmm.
11              AGT. COATES:  Yep.
12              AGT. RICHARDS:  Okay.  Brandon, would
13   you -- do you give us consent to look into that
14   phone?
15              MR. COUNCIL:  Why not.  There's
16   nothing to hide in it.
17              AGT. RICHARDS:  Okay.  We just want
18   to get -- you know -- you -- you were texting or
19   something you said, right?  You got a text from
20   your --
21              MR. COUNCIL:  My mother.  Mmm-hmm.
22              AGT. RICHARDS:  Text from your mom.
23   Yeah.  Let's see if I can find a consent form here.
24              MR. COUNCIL:  May I save you some
25   time though?
```

JA0427

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

117

```
 1                    AGT. RICHARDS:  Yeah, please.
 2                    MR. COUNCIL:  Since you know I've
 3   been extremely honest as far as I'm --
 4                    AGT. RICHARDS:  Sure.
 5                    MR. COUNCIL:  There's nothing that
 6   the phone can help you with.  I mean, it's not --
 7                    AGT. RICHARDS:  We just -- we just
 8   have a bunch of procedures anyway, Brandon.
 9                    MR. COUNCIL:  Oh, okay.  Sure.
10   That's what -- what I thought.  You know, I -- I
11   was --
12                    AGT. RICHARDS:  You know, so if -- if
13   you're okay with it --
14                    MR. COUNCIL:  Yeah.
15                    AGT. RICHARDS:  -- we'll just go
16   ahead and take a peek at it and --
17                    MR. COUNCIL:  Yeah.  That ain't no
18   problem.
19                    AGT. RICHARDS:  That way we'll --
20                    MR. COUNCIL:  I -- I bought another
21   phone today.
22                    AGT. RICHARDS:  You bought another
23   phone?
24                    MR. COUNCIL:  Never used it.
25   Never --
```

In Re: FBI Interview of Brandon Council        Brandon Council Audio Transcription
July 27, 2018

118

1                    AGT. RICHARDS:  When did you buy

2  the phone?

3                    MR. COUNCIL:  This morning.

4                    AGT. RICHARDS:  Oh.

5                    AGT. COATES:  Is that one -- was that

6  with you?  Was it in the car?

7                    MR. COUNCIL:  Yeah.

8                    AGT. COATES:  Did you --

9                    MR. COUNCIL:  It was in the bag.

10                 AGT. COATES:  Oh, it was in the bag.

11  The police took it from you?

12                 MR. COUNCIL:  I don't know what they

13  did with it.  I didn't see --

14                 AGT. COATES:  But they -- you had it

15  with you?

16                 MR. COUNCIL:  No.  It was actually

17  in the store -- bought bag.  Like --

18                 AGT. COATES:  Oh, you never took it

19  out of the bag?

20                 MR. COUNCIL:  Yeah.  Yeah.  I took

21  it out but, I mean, like, when you go get the phone

22  from the place -- they take it out of the box.

23                 AGT. COATES:  Right.  Right.  Right.

24                 MR. COUNCIL:  They give you a bag.

25                 AGT. COATES:  Yeah.  I'm with you.

JA0429

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

119

```
 1                    MR. COUNCIL:  Yeah.  I put the phone
 2   back in the bag.
 3                    AGT. COATES:  Okay.
 4                    MR. COUNCIL:  Because I didn't know
 5   -- actually I left the store with the phone in the
 6   store.  The lady came out of the store and said she
 7   was charging it, because the batteries that they
 8   give you are only charged to, like, 50 percent or
 9   something like that, she said.
10                    AGT. RICHARDS:  Okay.
11                    AGT. COATES:  (Inaudible)-- I'll get
12   you one.  Do you want me to get you one?
13                    AGT. RICHARDS:  No.  I have it.  I
14   just -- I just have to look through it, you know
15   what I mean.  I've got to get my -- my stuff in
16   order here, Greg.  Brandon, we'd also like to
17   search that -- that -- that car.
18                    MR. COUNCIL:  Sure.
19                    AGT. RICHARDS:  So you give us
20   permission to search the car?
21                    MR. COUNCIL:  No.  I don't have a
22   car -- I'm not the owner of any vehicle, but sure.
23                    AGT. RICHARDS:  Yeah.  Well, the car
24   that -- if we go that way.  We -- you know, just in
25   case.  I just -- you know, you're okay with it.
```

120

```
 1              MR. COUNCIL:  Sure.

 2              AGT. RICHARDS:  Okay.  And what is

 3   that?  It's a white -- a white Samsung phone?

 4              MR. COUNCIL:  Mmm-hmm.  Samsung

 5   Galaxy Core.

 6              AGT. RICHARDS:  White Samsung --

 7              MR. COUNCIL:  Mmm-hmm.

 8              AGT. RICHARDS:  -- Galaxy --

 9              MR. COUNCIL:  Mmm-hmm.

10              AGT. RICHARDS:  What did you say,

11   four?

12              MR. COUNCIL:  Core.

13              AGT. RICHARDS:  Core.

14              MR. COUNCIL:  Mmm-hmm.

15              AGT. RICHARDS:  Do you remember the

16   telephone number?

17              MR. COUNCIL:  (252) --

18              AGT. RICHARDS:  (252) --

19              MR. COUNCIL:  371 --

20              AGT. RICHARDS:  371 --

21              MR. COUNCIL:  5337.

22              AGT. RICHARDS:  5337.

23              MR. COUNCIL:  Mmm-hmm.

24              AGT. RICHARDS:  Okay.  And I'm going

25   to put down and a 1999 --
```

121

```
 1              MR. COUNCIL:  '96.

 2              AGT. RICHARDS:  Is it '96?

 3              MR. COUNCIL:  Yeah.  '96 Mercedes.

 4              AGT. RICHARDS:  Mercedes E300

 5    vehicle.  I have been advised of my right to

 6    refuse.  I give this permission voluntarily.  I

 7    authorize these agents to take any items, which

 8    they determine may be related to the investigation.

 9              MR. COUNCIL:  Sure.

10              AGT. RICHARDS:  You -- okay.  Just

11    going to have you sign right there.  Just sign

12    right there.

13              MR. COUNCIL:  Signature.

14              AGT. RICHARDS:  Yeah.  Okay.  Let's

15    see here.  Set the file here.  Thank you.  Okay.

16    I'm just going to put the -- okay.  Where are those

17    -- where are the clothes that are from the bank

18    robbery that you were wearing, Brandon?  Are those

19    in your luggage?

20              MR. COUNCIL:  Mmm-hmm.

21              AGT. RICHARDS:  Is that luggage in

22    the car?

23              MR. COUNCIL:  Mmm-hmm.

24              AGT. RICHARDS:  Okay.

25              MR. COUNCIL:  The luggage, the
```

122

```
 1    money, and the gun.  It's in the car.

 2                AGT. RICHARDS:  Okay.  Is there

 3    anything else that you -- you -- you'd like to talk

 4    to us about about, Brandon?  Is there anything you

 5    want to get off your chest?

 6                MR. COUNCIL:  I pretty much said --

 7                AGT. RICHARDS:  You think you told

 8    the whole story?

 9                MR. COUNCIL:  There may be some

10    black spots, but I think I gave you more than

11    enough that I feel like I sufficiently cooperated.

12                AGT. RICHARDS:  Right.  And I -- and

13    I feel that way too.  Okay.  Can you just hang in

14    there for a -- you know, a couple of minutes and

15    we'll -- we'll be back in here momentarily, and I'm

16    going to -- we'll go -- end up finger -- we're

17    going to fingerprint you, and I've got to get some

18    DNA, you know.

19                MR. COUNCIL:  Sure.

20                AGT. RICHARDS:  Yeah.  Can you think

21    of anything else, Greg?

22                AGT. COATES:  Huh-uh.

23                AGT. RICHARDS:  I'm just going to

24    -- I'm just going to step out for a minute --

25                AGT. COATES:  That's fine.
```

JA0433

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                              July 27, 2018

                                                                            123
1                    AGT. RICHARDS:  -- if you don't mind.

2                    AGT. COATES:  Yeah.

3                    AGT. RICHARDS:  I just want to -- you

4    know, because there may be a couple of, you know,

5    things that we -- I want to talk about.

6                    AGT. COATES:  Yeah.

7                    AGT. RICHARDS:  You got a minute?

8                    AGT. COATES:  Yeah.  Yeah.  Yeah.

9                    AGT. RICHARDS:  Yeah.  I'll be right

10   back with you, Brandon.  Okay?

11                   MR. COUNCIL:  Mmm-hmm.

12              (A brief recess transpired.

13              Both agents leave the room.)

14                   UNKNOWN SPEAKER 1:  Hey man.

15                   MR. COUNCIL:  Thank you.

16                   UNKNOWN SPEAKER 1:  Here you go.

17                   MR. COUNCIL:  I appreciate it.

18                   UNKNOWN SPEAKER 1:  Yeah, man.

19                   AGT. RICHARDS:  He -- he didn't

20   --(inaudible).  He didn't --(inaudible).  Well

21   -- well, some -- some --(inaudible)-- after the

22   bank robbery he doesn't know --(inaudible)-- said

23   he ended up going to --(inaudible)-- but it sounds

24   to me like he was going to --(inaudible)-- but

25   sometime he got --(inaudible)-- pulled over at a

124

1  car wash and dumped the wallets.  (Inaudible)--

2  over at the car wash and dumped the wallets.  No.

3              He's not from --(inaudible).  So he

4  said he didn't have anybody down here.  He didn't

5  know anybody in South Carolina, and he didn't

6  --(inaudible).  He acknowledged --(inaudible)--

7  wouldn't --(inaudible).  No, I didn't -- I didn't

8  get the full story, and he didn't know anybody in

9  --(inaudible).  Right.  We had two other -- two

10  other people in custody that helped him.  We have

11  another guy that --(inaudible).

12              You know --(inaudible)-- nothing that

13  --(inaudible)-- go back in there, but I just wanted

14  to check with you and --(inaudible).  He -- he

15  didn't -- he says he didn't know anybody here.  He

16  just -- he said that those people were coming from

17  --(inaudible)-- he said they were coming into South

18  Carolina, and they brought him --(inaudible)-- I

19  get --(inaudible).  He did.  He said right next

20  -- right next to the place.  He said he

21  --(inaudible)-- he said he was --(inaudible)-- he

22  had no idea how he was going to --(inaudible)-- and

23  that's what it is.

24              He said --(inaudible)-- he said

25  --(inaudible)-- he didn't talk about that, but I

125

1    will.  We haven't --(inaudible)-- you know, we

2    haven't pressured him so --(inaudible)-- yep.  What

3    do you mean --(inaudible)-- oh, yeah, yeah.  Good

4    one.  Yep.  Yep.  Yep.  Yep.  And --(inaudible)--

5    yeah.  All right.  All right.  All right.  Bye-bye.

6    (Inaudible)

7                    (Agents re-enter room.)

8                    AGT. COATES:  -- both of them.

9                    AGT. RICHARDS:  Hey, Brandon.  Hey,

10   Brandon, we're going -- we're going to do some of

11   the logistical stuff.  It -- it's 4:42.  I'm back

12   in with Greg.  We're going to do some logistical

13   stuff in a couple of minutes, if you don't mind.

14   You know, like the -- it's this electronic

15   fingerprint kit, and then this -- this DNA kit, but

16   before we -- before we start that, when you went

17   into the bank, you had no mask or -- or anything

18   like that.

19                    MR. COUNCIL:  I told you I was

20   winging it.

21                    AGT. RICHARDS:  Yeah.  No.  I

22   remember.  I know you were winging it, but did you

23   -- did you give any thought about it?  Did you know

24   there was cameras?

25                    MR. COUNCIL:  Yeah.

126

```
 1                 AGT. RICHARDS:  You knew --
 2                 MR. COUNCIL:  I was so desperate.  I
 3    was so hurt.  I was so distraught that I didn't
 4    care.  That's -- and I -- I -- the only thing that
 5    I care about now is the people that I hurt, and
 6    their families because, I mean, as far as, you
 7    know, making a way out of no way --
 8                 AGT. RICHARDS:  Right.
 9                 MR. COUNCIL:  -- there is no right
10    way to do wrong.
11                 AGT. RICHARDS:  Right.
12                 MR. COUNCIL:  So with that being
13    said.  I heard y'all gentleman.  You should tell
14    the Pitt County people that -- that -- they should
15    do something about the acoustics in --
16                 AGT. RICHARDS:  Yeah.  No.  It's
17    fine.  It's fine.
18                 AGT. COATES:  It's fine, man.
19                 AGT. RICHARDS:  I -- you know, we
20    -- I -- I would never say anything unprofessional
21    anyway.
22                 AGT. COATES:  Oh, no.  No, no, no.
23                 AGT. RICHARDS:  You know, so it's
24    fine.  Whatever --
25                 MR. COUNCIL:  (Inaudible)-- was
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                              July 27, 2018

127

1   talking about y'all anyway.

2              AGT. RICHARDS:  No.  It's -- it's

3   fine.  It's -- it's okay.  I understand.  Thank

4   you.  I appreciate that.  But, Brandon, when you

5   were in the bank, did you do anything that you

6   wouldn't normally have done when you shot those

7   two gals?

8              MR. COUNCIL:  Everything is on

9   camera, man.  Y'all seen the tape.

10             AGT. RICHARDS:  Right.  But something

11  happened.  What happened?

12             MR. COUNCIL:  No shit.

13             AGT. RICHARDS:  No.  Something

14  happened.

15             MR. COUNCIL:  Doing something

16  unusual.  What does that mean?

17             AGT. RICHARDS:  Did you pick up

18  the phone?

19             MR. COUNCIL:  Oh, hell, no.

20             AGT. RICHARDS:  You didn't answer

21  the phone?

22             MR. COUNCIL:  Hell, no.  For what?

23             AGT. RICHARDS:  In the bank --

24             MR. COUNCIL:  In South Carolina?

25             AGT. RICHARDS:  In South Carolina.

128

```
 1   Think about this, okay.  So --
 2                 MR. COUNCIL:  Why would I pick up
 3   a phone?
 4                 AGT. RICHARDS:  Because the -- the
 5   bank -- the security company calls the bank --
 6                 MR. COUNCIL:  Mmm-hmm.  Well, no.  I
 7   didn't touch the phone.
 8                 AGT. RICHARDS:  You didn't touch the
 9   phone?  You didn't speak into the phone at all?
10                 MR. COUNCIL:  Absolutely not.  Why
11   would I?
12                 AGT. RICHARDS:  I don't know.
13                 MR. COUNCIL:  I'm trying to see what
14   -- I'm trying to --
15                 AGT. RICHARDS:  That was one of the
16   -- that was one of the questions that --
17                 MR. COUNCIL:  Then shut up and
18   listen.  So I -- the question -- can you repeat the
19   question one more time?
20                 AGT. RICHARDS:  So --
21                 MR. COUNCIL:  Did I pick up a
22   phone, no.
23                 AGT. RICHARDS:  Did you -- did you
24   answer the tele --
25                 MR. COUNCIL:  No.
```

129

```
 1              AGT. RICHARDS:  -- a phone ringing in

 2   the bank?

 3              MR. COUNCIL:  No.

 4              AGT. RICHARDS:  You never answered

 5   the telephone?

 6              MR. COUNCIL:  I never heard a phone

 7   ring.

 8              AGT. RICHARDS:  Perfect.  I -- I was

 9   just asking.

10              MR. COUNCIL:  Yeah.

11              AGT. RICHARDS:  I was just asking.

12   How many times did you jump up and over --

13              MR. COUNCIL:  (Inaudible)

14              AGT. RICHARDS:  -- the -- and why?

15              MR. COUNCIL:  Well -- well, the

16   amount of time that I was in there, I was freaking

17   out.  I was trying to find a way to goddamn get out

18   of that motherfucker.  Have you seen the camera?

19   You can, kind of, see that I was goddamn --

20              AGT. RICHARDS:  I have.  I have

21   seen it.

22              MR. COUNCIL:  Pretty much goddamn on

23   this type of shit, like, with the cocaine, and the

24   reefer high.  That's a -- and the weed that they

25   got out there now, with the cocaine and shit is
```

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

130

```
 1    goddamn --

 2                 AGT. RICHARDS:  Had you done reefer

 3    and cocaine?

 4                 MR. COUNCIL:  Not that day.  No.

 5                 AGT. RICHARDS:  Yeah.

 6                 MR. COUNCIL:  I was broke.

 7                 AGT. RICHARDS:  Yeah.  Yeah.

 8                 MR. COUNCIL:  Broke as hell.

 9                 AGT. RICHARDS:  Yeah.

10                 MR. COUNCIL:  Hell, no.  No, I

11    was sober.

12                 AGT. RICHARDS:  So, again --

13                 MR. COUNCIL:  Desperate.

14                 AGT. RICHARDS:  You were desperate,

15    right.

16                 MR. COUNCIL:  Desperate.

17                 AGT. RICHARDS:  And so you don't

18    think -- you didn't --

19                 MR. COUNCIL:  Desperate and demonic.

20                 AGT. RICHARDS:  You don't think you

21    heard the bank being called, and you don't remember

22    picking up the phone?

23                 MR. COUNCIL:  I did not hear the

24    phone ring, and I did not answer the phone.

25                 AGT. RICHARDS:  Okay.
```

131

1           MR. COUNCIL:  So those are two things

2    that I'm most --

3           AGT. RICHARDS:  That's for sure of?

4           MR. COUNCIL:  -- definitely sure of.

5           AGT. RICHARDS:  Okay.  And tell me

6    again, why Conway, South Carolina?

7           MR. COUNCIL:  It was the furtherest

8    [sic] I could get at the moment.

9           AGT. RICHARDS:  But how -- why -- but

10   why there?

11          MR. COUNCIL:  That's the direction my

12   friend wanted to go.  He was traveling south so --

13          AGT. RICHARDS:  He was going to

14   Georgia.

15          MR. COUNCIL:  That's according what

16   he told me.  I don't know if they went -- ever made

17   it or not.

18          AGT. RICHARDS:  That's what he did.

19   And --

20          MR. COUNCIL:  Because, like I said,

21   they didn't stay long --

22          AGT. RICHARDS:  Yeah.

23          MR. COUNCIL:  -- after they left, and

24   I had no more contact with these people.

25          AGT. RICHARDS:  Right.  And you gave

JA0442

132

```
 1   -- but you gave them --

 2              MR. COUNCIL:  That's why I was

 3   telling you the cell phone thing.  Like, that angle

 4   right there is -- none of these people are

 5   involved --

 6              AGT. RICHARDS:  Well, it's -- we're

 7   going to do it anyway.  You know.

 8              MR. COUNCIL:  I understand that.

 9   I'm just --

10              AGT. RICHARDS:  Yeah.

11              MR. COUNCIL:  -- you know.

12              AGT. RICHARDS:  Yeah.

13              MR. COUNCIL:  I'm trying to be

14   cooperative.

15              AGT. RICHARDS:  And you are

16   cooperative.  By all -- by all -- absolutely.  I'm

17   just trying -- so now -- so we've had a chance to,

18   kind of, think --

19              MR. COUNCIL:  What's up with the

20   phone?  I got a question.  What was up with the

21   phone?  What did the people say about the phone?

22   They said they called there and spoke to me?

23              AGT. RICHARDS:  No.  The policy is

24   -- so it's like you said, when you come in -- when

25   that alarm gets hit -- so they hit the alarm --
```

133

```
 1                    MR. COUNCIL:  No.  I don't believe

 2   they ever had a chance.

 3                    AGT. RICHARDS:  They didn't.

 4                    MR. COUNCIL:  That's -- that's

 5   -- that was the point of --

 6                    AGT. RICHARDS:  So the alarm

 7   -- the --

 8                    MR. COUNCIL:  I don't know.

 9                    AGT. RICHARDS:  Okay.  It did.  So

10   the alarm got hit.

11                    MR. COUNCIL:  Okay.

12                    AGT. RICHARDS:  And then they called

13   the bank.  Somebody -- so -- so the security

14   company called the bank.

15                    MR. COUNCIL:  Mmm-hmm.

16                    AGT. RICHARDS:  And --

17                    MR. COUNCIL:  But they didn't speak

18   with me.  I didn't --

19                    AGT. RICHARDS:  Did not speak to you?

20                    MR. COUNCIL:  No.

21                    AGT. RICHARDS:  Okay.  Perfect.

22                    MR. COUNCIL:  I didn't hear a phone

23   ring, and didn't answer one.

24                    AGT. RICHARDS:  Okay.  You didn't

25   answer the phone.
```

JA0444

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
July 27, 2018

134

```
 1              MR. COUNCIL:  That's correct.

 2              AGT. RICHARDS:  The other thing

 3   was --

 4              MR. COUNCIL:  What, did they say that

 5   I answered the phone?  What did they say they said

 6   to me?  Uh, sir, are you in here robbing the bank,

 7   and stay there until you --

 8              AGT. RICHARDS:  I know.  I --

 9              MR. COUNCIL:  I'm just wondering.

10              AGT. RICHARDS:  Brandon, this is

11   just so --

12              MR. COUNCIL:  I mean, this is very

13   serious and Lord forgive me for, you know -- I'm

14   ready to bear my cross.

15              AGT. RICHARDS:  And you have.  And

16   you have.

17              MR. COUNCIL:  No.  I mean, really.

18   Like -- like -- really, really bear my cross,

19   because -- I'm going to reiterate something I said

20   to you earlier.  I wish that this situation had

21   actually ended differently.  I wish that I was

22   actually dead.  That's -- because forethought or

23   afterthought, whichever way it came to me when I

24   had this idea about, you know, going in and going

25   all out, one way or another, do or die type shit.
```

JA0445

135

```
1              When I -- when I got to that point,
2    it's like, okay.  I don't care if I live anymore.
3    I do care, but I don't care, because I feel like
4    I'm -- I'm out here in the world by myself.  That's
5    the horriblest [sic] feeling in the world.  I hope
6    you guys never have to feel that way in your life.
7    No one that you know.  No one that you ever thought
8    about knowing, because it brings you to such a -- I
9    can't even describe the word.  I don't even think a
10   word exists for that feeling that I have -- had.
11             I don't feel that way no more,
12   because surprisingly enough, you know, the truth,
13   it cleanses the soul.  So I don't feel good about
14   what I did.  I wish that the women had survived my
15   gruesome attack, but at the same time I knew that
16   there was going to be collateral damage when I went
17   in there.
18             AGT. RICHARDS:  Okay.
19             MR. COUNCIL:  Now, what's up with the
20   DNA test?  Why -- you said -- you asked me why did
21   I do something that I don't normally do, and you
22   did like that --
23             AGT. RICHARDS:  No.  That was the
24   phone.
25             MR. COUNCIL:  Oh.
```

136

```
 1                    AGT. RICHARDS:  Pick up the phone.
 2                    MR. COUNCIL:  Oh.  I thought you were
 3      trying to -- that's a boner --
 4                    AGT. RICHARDS:  No.
 5                    MR. COUNCIL:  Like -- I didn't rape
 6      nobody.  I don't have to rape no women.  I'm a
 7      handsome guy.  That's what I thought you
 8      -- because DNA.
 9                    AGT. RICHARDS:  No.  That -- no, no,
10      no.  I was picking up a -- everybody gets -- we
11      take samples of DNA from everybody.
12                    MR. COUNCIL:  Sure.  I understand.
13                    AGT. RICHARDS:  All right.  So -- so
14      -- the other -- so the other thing is, did these
15      -- the two people that brought you there -- okay --
16                    MR. COUNCIL:  Yes.
17                    AGT. RICHARDS:  Did they know you
18      were going to do the bank robbery?
19                    MR. COUNCIL:  Absolutely not.
20                    AGT. RICHARDS:  Okay.  Who are they?
21                    MR. COUNCIL:  Because at that
22      -- that's irrelevant.  But I will --
23                    AGT. RICHARDS:  It is --
24                    MR. COUNCIL:  We'll revisit that
25      -- we'll revisit that.
```

JA0447

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018
137

```
 1                    AGT. RICHARDS:  Okay.

 2                    MR. COUNCIL:  I'll revisit that.  Let

 3       me answer the first question, and just hold on --

 4                    AGT. RICHARDS:  Yes, go ahead.

 5                    MR. COUNCIL:  -- to that.

 6                    AGT. RICHARDS:  Please.

 7                    MR. COUNCIL:  You said -- you asked

 8       me who the people are.

 9                    AGT. RICHARDS:  Yes.

10                    MR. COUNCIL:  I don't want to

11       disclose that information.  But you ask me, did

12       they know that I was going up there to commit

13       another crime?

14                    AGT. RICHARDS:  Yes.

15                    MR. COUNCIL:  No.

16                    AGT. RICHARDS:  Okay.

17                    MR. COUNCIL:  Absolutely not.

18                    AGT. RICHARDS:  Okay.

19                    MR. COUNCIL:  And to my knowledge,

20       only one of them knew that I was absconding.

21                    AGT. RICHARDS:  And that was

22       the woman.

23                    MR. COUNCIL:  That's correct.

24                    AGT. RICHARDS:  And what was

25       her name?
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                                              July 27, 2018

138

```
 1                 MR. COUNCIL:  Why?

 2                 AGT. RICHARDS:  It just -- I've got

 3   to close the loop on it, Brandon.  You've given us

 4   -- you're so cooperative on everything.

 5                 MR. COUNCIL:  I know.  And I --

 6                 AGT. RICHARDS:  You know, we've

 7   already talked to her.

 8                 MR. COUNCIL:  Well, what do you need

 9   me for?

10                 AGT. COATES:  We just need to hear it

11   from you.

12                 AGT. RICHARDS:  We need to hear it

13   from you.

14                 MR. COUNCIL:  I have nothing to say

15   on that.

16                 AGT. RICHARDS:  Okay.  And how about

17   the guy?  Same thing?

18                 MR. COUNCIL:  Same on that.

19                 AGT. RICHARDS:  Okay.  Those -- those

20   two points you -- those two points you don't want

21   to reveal.

22                 MR. COUNCIL:  Because, I mean, I -- I

23   really don't know the guy's name, to be honest with

24   you.  I know -- I know -- I know him because I

25   lived in Wilson so long, and I've been in --
```

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

139

```
 1                    AGT. RICHARDS:  Yeah.

 2                    MR. COUNCIL:  -- circles that --

 3                    AGT. RICHARDS:  Yeah.

 4                    MR. COUNCIL:  -- you know, so I

 5    really can't give you his name, even if I

 6    wanted to.

 7                    AGT. COATES:  Do you know a street

 8    -- do you know his street name?

 9                    MR. COUNCIL:  Donnie, Daryl, some

10    shit like that.

11                    AGT. RICHARDS:  Yeah, Daryl.

12                    MR. COUNCIL:  Okay.  We call him Don.

13                    AGT. RICHARDS:  You call him, Don?

14                    MR. COUNCIL:  Mmm-hmm.

15                    AGT. RICHARDS:  You call Daryl, Don?

16                    MR. COUNCIL:  Donnie.

17                    AGT. RICHARDS:  You call him Donnie.

18                    MR. COUNCIL:  Yeah.  Yeah.

19                    AGT. RICHARDS:  Okay.  And -- and is

20    that his girlfriend?

21                    MR. COUNCIL:  Damn if I know.  I

22    don't know what the hell they got going --

23                    AGT. RICHARDS:  Was she ever your

24    girlfriend?

25                    MR. COUNCIL:  Once -- we've -- we've
```

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

140

```
 1   had sex before.

 2              AGT. RICHARDS:  Okay.

 3              MR. COUNCIL:  I messed around, so.

 4              AGT. RICHARDS:  Did you ever stay

 5   with her?

 6              MR. COUNCIL:  Like, during this --

 7              AGT. RICHARDS:  Yeah.

 8              MR. COUNCIL:  Series of events?

 9              AGT. RICHARDS:  Yeah.

10              MR. COUNCIL:  No.

11              AGT. RICHARDS:  How did you -- how

12   did you get -- how did you -- how did you find them

13   to get a ride?

14              MR. COUNCIL:  You know what, I'm not

15   100 percent certain or sure.  Ahh, oh, I do know.

16   I remember now.  I was in the white car -- no, no,

17   I was in --

18              AGT. RICHARDS:  This is before you

19   went to South Carolina.

20              MR. COUNCIL:  When I -- when I got

21   back to -- when I got from Rocky Mount to Wilson

22   -- when I got to McDonalds and dropped off, I

23   stashed my bag, I walked around, bumped into some

24   people I knew, caught a ride across town.  I just

25   bumped into her, basically.
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
July 27, 2018

141

1                    AGT. RICHARDS:  You bumped into her?

2                    MR. COUNCIL:  Yeah.  Yeah.  Several

3    chains of events later I -- long story short, I

4    bumped into her.  I didn't -- it was no -- that's

5    why I was saying, like, there is no phone dialogue

6    for y'all to --

7                    AGT. RICHARDS:  Yeah.

8                    MR. COUNCIL:  -- really follow,

9    because I haven't used the phone.  That's why

10   -- hell, you can search the phone or do whatever

11   you need to pull up or --

12                   AGT. RICHARDS:  Brandon, where did

13   you -- where did you leave the -- what did you put

14   the money in when you left the bank?

15                   MR. COUNCIL:  A Goody's bag.

16                   AGT. RICHARDS:  A Goody's bag?

17                   MR. COUNCIL:  Yes.

18                   AGT. RICHARDS:  Where did you get it?

19                   MR. COUNCIL:  From Goody's.

20                   AGT. RICHARDS:  Goody's?

21                   MR. COUNCIL:  Mmm-hmm.

22                   AGT. RICHARDS:  Did you, like

23   -- where -- what's that?  What's Goody's?

24                   MR. COUNCIL:  That's a clothing

25   store.  Retail store.

142

1          AGT. RICHARDS:  Where did you get
2    the bag?
3          MR. COUNCIL:  Mmm, Goody's.
4          AGT. RICHARDS:  Yeah.  What -- what's
5    with the --
6          MR. COUNCIL:  In Conway,
7    South Carolina.  I'm sorry.
8          AGT. RICHARDS:  Oh, okay.  What it
9    white plastic?
10          MR. COUNCIL:  Yes.  White and red.
11          AGT. RICHARDS:  White and red?
12          MR. COUNCIL:  Mmm-hmm.  White
13    -- white bag with red letters.
14          AGT. RICHARDS:  Is that bag still in
15    the car?
16          MR. COUNCIL:  No.
17          AGT. RICHARDS:  Where's that bag?
18          MR. COUNCIL:  If I'm not mistaken,
19    it's with the -- matter of fact, the purses and the
20    stuff.  I took the money out of that bag, and it's
21    at the car wash or it was.  I think it's still
22    there.  It might be.
23          AGT. COATES:  Hey, so when you were
24    at that car wash, was there anything around you
25    that you noticed?  Like a store or anything that

143

1    can help us?

2                MR. COUNCIL:  No, because

3    -- actually, on -- on one side of that road it

4    seems like ain't nothing on it, but on the other

5    side of the road, all the stores are on that side.

6                AGT. COATES:  But, like, what's

7    beside it?  Do you remember?

8                MR. COUNCIL:  I can't really tell --

9                AGT. COATES:  Is it right off the

10   interstate?

11               MR. COUNCIL:  I swear, it was cloudy

12   as hell that day.  Y'all know the damn eclipse was

13   shit --

14               AGT. RICHARDS:  Yeah.  Yeah.  It

15   was dark.

16               MR. COUNCIL:  And it rained like

17   hell --

18               AGT. RICHARDS:  It was dark.  Yeah.

19               MR. COUNCIL:  -- on and off.  So --

20               AGT. COATES:  But you said, earlier,

21   you thought it was, like, around Marion somewhere?

22               MR. COUNCIL:  I want to say, because

23   that's the only other little town --

24               AGT. COATES:  Right.

25               MR. COUNCIL:  -- that I remember.

In Re: FBI Interview of Brandon Council                Brandon Council Audio Transcription
                                                                        July 27, 2018

                                                                                    144

```
 1                    AGT. COATES:  But, I'm --

 2                    MR. COUNCIL:  I can't tell you for

 3    certain that I was there though.

 4                    AGT. COATES:  Because that's like

 5    Florence.  Marion, that -- that area.

 6                    MR. COUNCIL:  I'm not familiar

 7    with it.

 8                    AGT. COATES:  Okay.

 9                    MR. COUNCIL:  I -- like -- like if I

10    had --

11                    AGT. COATES:  But you don't remember,

12    like, a specific store or --

13                    MR. COUNCIL:  I could tell you -- I

14    could tell --

15                    AGT. COATES:  -- like a --

16                    MR. COUNCIL:  -- you the colors that

17    was on the car wash.  If that would help.

18                    AGT. RICHARDS:  Yeah.  Sure.

19                    MR. COUNCIL:  If I'm not mistaken it

20    was blue and yellow.  Blue, yellow and white.  And

21    I heard what y'all was saying about 501 and 701.  I

22    -- I can't tell you which highway I was on.  I just

23    know I --

24                    AGT. RICHARDS:  Right.  Well, you

25    said you got lost.
```

145

1            MR. COUNCIL:  -- got turned around.

2    Yeah.  I know I got turned around.

3            AGT. RICHARDS:  You were going south,

4    and I couldn't remember what -- and I don't know if

5    you were going south on 701 or south on 501.

6            MR. COUNCIL:  I don't know, but I got

7    back on 501.

8            AGT. RICHARDS:  You definitely got

9    on 501.

10           MR. COUNCIL:  I know that that's the

11   -- yeah.  Because --

12           AGT. RICHARDS:  And you took 501 --

13           MR. COUNCIL:  I took 501 to 95.

14           AGT. RICHARDS:  You took 501 to 95.

15           MR. COUNCIL:  That's correct.

16           AGT. RICHARDS:  Really?  That is

17   amazing.  Hmm.  And 501 to 95 --

18           MR. COUNCIL:  Mmm-hmm.

19           AGT. RICHARDS:  -- to Wilson.

20           MR. COUNCIL:  Yeah.  Well, no.  I

21   didn't come back to Wilson.  I came to Greenville.

22           AGT. RICHARDS:  Oh.  To Greenville.

23           MR. COUNCIL:  Mmm-hmm.

24           AGT. COATES:  So when you -- how did

25   you come into Greenville?

146

1                    MR. COUNCIL:  On the car, the

2    Chrysler.

3                    AGT. COATES:  No.  I know that, but I

4    mean, you came, what -- 95 to 264?

5                    AGT. RICHARDS:  Man, that's so much

6    -- blurry.  Man, I'm not trying to defraud

7    -- mislead y'all, but I -- I feel like I done

8    pretty much --

9                    AGT. COATES:  Did you take highways

10   all the way in?

11                   MR. COUNCIL:  Yeah.  Yeah.

12                   AGT. COATES:  Instead of taking the

13   back roads.

14                   AGT. RICHARDS:  No.  I took highways

15   all the way in.

16                   AGT. COATES:  Because you had to

17   go by --

18                   MR. COUNCIL:  Because I go -- the

19   -- I went through Fayetteville, so that's -- I know

20   I got on 95, because I came through Fayetteville.

21                   AGT. COATES:  Mmm-hmm.  But you had

22   -- you went through Wilson to get to Greenville.

23                   MR. COUNCIL:  Oh.  Oh.  That's what

24   you mean?

25                   AGT. COATES:  Yeah.  Yeah.

JA0457

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

147

```
 1                    MR. COUNCIL:  That's what y'all were
 2    asking me.
 3                    AGT. COATES:  Like, how -- how did
 4    you drive it?
 5                    MR. COUNCIL:  Yeah.  I -- I drove
 6    through and got on 264.
 7                    AGT. COATES:  264.  Okay.  So 95
 8    to 264 --
 9                    MR. COUNCIL:  Yeah.
10                    AGT. COATES:  -- and then all the way
11    in to --
12                    MR. COUNCIL:  Yeah.  501 or 701 or --
13                    AGT. RICHARDS:  So the -- so where
14    you dropped the purses, it was not on 95.  You
15    hadn't got to 95 yet.
16                    MR. COUNCIL:  Oh.  Oh, no.  It's in
17    South Carolina.
18                    AGT. RICHARDS:  In South Carolina.
19                    MR. COUNCIL:  Yeah.
20                    AGT. RICHARDS:  Okay.  Okay.  So you
21    had no idea about going to South Carolina to rob a
22    bank.  You didn't have nobody here that you knew?
23                    MR. COUNCIL:  You say you talked to
24    my home girl, right?
25                    AGT. RICHARDS:  We did.
```

148

```
 1                    MR. COUNCIL:  I don't know what she
 2    told you, but I do know this -- I was trying to get
 3    away from North Carolina as quickly as possible.
 4    She was the first reliable source that I know was
 5    going --(inaudible)-- do whatever she could to
 6    goddamn get me away, so...
 7                    AGT. RICHARDS:  Okay.
 8                    AGT. COATES:  (Inaudible)
 9                    AGT. RICHARDS:  You want -- you want
10    to get Mike?
11                    AGT. COATES:  Yeah.  Let me
12    grab Mike.
13                    AGT. RICHARDS:  If he wants to do the
14    --(inaudible).
15                    AGT. COATES:  The -- back to the car
16    wash.  Like, I'm really trying to figure this out.
17    Is it -- was it a residential area?  Were houses
18    around?  Was it a commercial area?
19                    MR. COUNCIL:  It was a commercial
20    area.
21                    AGT. COATES:  Was there, like, a
22    Wal-mart close by or a Texaco or something?
23                    MR. COUNCIL:  I'll tell you, those
24    roads are so freaking long, man, and they, like,
25    plain -- like -- like -- nothing on them.
```

149

```
 1              AGT. COATES:  No.  I know man.  I

 2   work out here.  It's like that here.

 3              MR. COUNCIL:  So I really can't

 4   recall exactly --

 5              AGT. COATES:  This is Agent Soden.

 6   He's going to do your fingerprints.  You want to

 7   -- I don't have a key with me.  It's on my key ring

 8   from my --

 9              AGT. SODEN:  This will be okay.

10              AGT. COATES:  You sure?

11              AGT. SODEN:  Yeah.

12              AGT. COATES:  All right.

13              AGT. RICHARDS:  I have one if --

14              AGT. SODEN:  No.  We're good

15   without it.

16              AGT. COATES:  I am going to step

17   out and --

18              AGT. RICHARDS:  Yeah.

19              AGT. COATES:  -- make sure this other

20   stuff is --

21              AGT. RICHARDS:  Okay.  Hey, Greg --

22              AGT. COATES:  Yes.

23              AGT. RICHARDS:  Will you -- will you

24   -- call about that car wash?

25              AGT. COATES:  Yeah.  Do you want me
```

AWR

```
                                                    150
 1   -- I'll call --

 2               AGT. RICHARDS:  Yeah.  Mike.

 3               AGT. COATES:  Yep.  Yep.

 4               AGT. RICHARDS:  Thank you.

 5               AGT. COATES:  I got it.

 6               AGT. SODEN:  Let me get over there,

 7   to your left hand.  Thanks.  I'm sorry.

 8               MR. COUNCIL:  You all right.

 9               AGT. SODEN:  Like, turning them like

10   their not connected to anything.  I'll tell you

11   what, I want you to bend your ring a little bit,

12   because I need to get both your ring and your

13   pinkie on there.  There we go.  Let me have your

14   right.  Just -- just -- just your pinkie.

15               MR. COUNCIL:  Okay.

16               AGT. SODEN:  I'll get some pictures

17   of him real quick, too.

18               MR. COUNCIL:  You want me to

19   stand up?

20               AGT. SODEN:  No.  You're fine, just

21   the way you are.  Can you look right at me?

22               MR. COUNCIL:  Mmm-hmm.

23               AGT. SODEN:  Any personal

24   --(inaudible).  Yep.  You got it.  I'll tell you

25   what -- there you go -- let me get up here.  Look
```

151

1    away -- look away.

2              AGT. RICHARDS:  Mike, you got a DNA

3    guy?  Kit guy?

4              AGT. SODEN:  Do you need another kit?

5              AGT. RICHARDS:  Do you do this stuff?

6              AGT. SODEN:  I can.

7              AGT. RICHARDS:  Yeah.

8              AGT. SODEN:  Yeah.  Let me just take

9    this off.

10             AGT. RICHARDS:  I want to get -- is

11   there -- is it only the one?  You just do the --

12             AGT. SODEN:  So, yeah.  Just

13   take it --

14             AGT. RICHARDS:  No, I -- I got that.

15   All right.

16             AGT. SODEN:  Okay.  Yeah.  So if you

17   just take it -- you're going to swab real hard on

18   his cheek --

19             AGT. RICHARDS:  Left and then

20   the right?

21             AGT. SODEN:  Do both, yep.

22             AGT. RICHARDS:  All right.  Brandon,

23   just open your mouth a minute.  I'm no expert at

24   this, so don't let me --

25             AGT. SODEN:  Yeah, get a -- rub it

152

1   back and forth four or five times.

2               AGT. RICHARDS:  Okay.

3               AGT. SODEN:  Now, as long as it's

4   good and wet.

5               AGT. RICHARDS:  Can you do me a

6   favor, Mike?

7               AGT. SODEN:  Mmm-hmm.

8               AGT. RICHARDS:  Can I get another

9   one?

10              AGT. SODEN:  Absolutely.  Sure.

11              AGT. RICHARDS:  And then I just close

12  this up?

13              AGT. SODEN:  Mmm-hmm.

14              AGT. RICHARDS:  And I put it in

15  this bag?

16              AGT. SODEN:  Yep.  Well, you'll need

17  to fill out all this --

18              AGT. RICHARDS:  Yep.  Yep.

19              AGT. SODEN:  We'll --(inaudible).

20              AGT. RICHARDS:  (Inaudible)-- yeah,

21  and I'm going to take -- I'm going to take one, but

22  I'd like to get --

23              AGT. SODEN:  A second one.

24              AGT. RICHARDS:  -- have you -- yeah.

25              AGT. SODEN:  Okay.

JA0463

153

```
 1              AGT. RICHARDS:  Okay.  Now, we've got
 2   a ink packet here, Brandon.  Okay.  Okay.  Is there
 3   -- completely have -- all right.  Let me have your
 4   right index.  Yeah, just this one.  Okay.  And
 5   then, let's put that -- just -- no.  Yeah.  Get rid
 6   of those three fingers, like you just did.  Yeah,
 7   there you go.  Looks good to me.  And then we have
 8   your left one.  And we are going to try to do this
 9   here.  Okay.  I'll try to get this here, Brandon.
10   (Inaudible)-- okay.  Okay.  That looks good to me.
11              All right.  Now, I'm going to give
12   you a -- a wipe here.  Actually, let's just
13   -- we're going -- we're going to do it again, so do
14   you have another one, Mike?
15              AGT. SODEN:  Yeah.  He's getting
16   it, sir.
17              AGT. RICHARDS:  Awesome.
18              AGT. COATES:  Sorry.
19              AGT. RICHARDS:  Oh, yeah.  No, I just
20   need one like this.  Yeah.  Thanks.  Thanks.  Now
21   there are two.
22              AGT. COATES:  Hmm.
23              AGT. RICHARDS:  Now I've got two.
24   Now there is two in a package.
25              AGT. COATES:  What, did you only get
```

154

1  one in this pack?

2              AGT. RICHARDS:  Yeah.  But I'm going

3  to keep that.  Yeah.  Let's just do it --

4              AGT. COATES:  Okay.

5              AGT. RICHARDS:  This will be -- this

6  will be the -- like a -- you know the

7  --(inaudible)-- stuff.  Yeah.

8              AGT. COATES:  Yeah.  I was going to

9  say if you want to do the one to send to -- in the

10 packet, and then one for you to keep, right.  Isn't

11 that what you were doing?

12             AGT. RICHARDS:  Yeah.  So I'll just

13 send -- I'll just give you the two.

14             AGT. COATES:  Okay.

15             AGT. RICHARDS:  Because I already did

16 the -- I already did the -- the one.

17             AGT. COATES:  Okay.  I got you.

18             AGT. RICHARDS:  Yeah.  I'm good to

19 go.  You might want to call Mike, too.  He wouldn't

20 answer.  I don't know if it's because he saw my 202

21 number or --

22             AGT. RICHARDS:  Yeah, probably.

23             AGT. COATES:  So --

24             AGT. RICHARDS:  Okay.  Yeah.  I'll

25 get to that in a minute.  Right.  I don't want to

155

```
 1   mix that up.  Okay.

 2               AGT. COATES:  Okay.

 3               AGT. RICHARDS:  Okay.  Here you go,

 4   buddy.  Let me do this again for you --(inaudible).

 5   Thanks, Brandon.

 6               MR. COUNCIL:  Mmm-hmm.

 7               AGT. RICHARDS:  So that one is going

 8   to -- that one is going in there.  Let me give you

 9   another one.  That's going to be a -- that -- you

10   know, that we're going to send.  Okay, Mike?

11               AGT. SODEN:  Greg?

12               AGT. COATES:  Mmm-hmm.

13               AGT. RICHARDS:  One more time, pal.

14   It's going to be like going to the dentist.  You

15   all right?

16               MR. COUNCIL:  Mmm-hmm.

17               AGT. RICHARDS:  Thank you.  Okay.

18   Okay.  All right.  Now I just need your

19   fingerprints.  Sorry.

20               AGT. COATES:  (Inaudible)

21               AGT. RICHARDS:  Okay.  Let's try this

22   again, Brandon.  Okay, your right.  Let's do the

23   right one, it's easier for me.  That one comes up

24   good.  This one here, for some reason -- it's

25   probably cause of where it is, right?
```

156

1                    MR. COUNCIL:  Mmm-hmm.

2                    AGT. RICHARDS:  Let me try -- okay.

3    I want to give you a -- I'm going to give you the

4    wipe.  Wipe off your -- there for you.  There you

5    go.  You got that.  Can you use it?

6                    AGT. SODEN:  Yeah.  Thanks.

7                    AGT. RICHARDS:  This is

8    --(inaudible)-- Greg.

9                    AGT. COATES:  Do you want to -- do

10   you want me to --

11                   AGT. RICHARDS:  Yeah.

12                   AGT. COATES:  (Inaudible)

13                   AGT. RICHARDS:  Yeah.  Yeah.  No,

14   I'll do it.  I'll do it.  Yeah, sure.  Yeah.

15                   AGT. SODEN:  I'll fill it out for

16   you, but I was just -- I didn't know if you

17   wanted --

18                   AGT. RICHARDS:  No, it's okay.  I can

19   fill it out.  I just was trying to clean this

20   thing up.

21                   AGT. SODEN:  (Inaudible)

22                   AGT. RICHARDS:  Because that one

23   -- do you need another one?  I got another one,

24   Brandon.

25                   MR. COUNCIL:  No.  No.  This is fine.

JA0467

157

```
 1                   AGT. RICHARDS:  Yeah.  Are you okay?

 2                   MR. COUNCIL:  Mmm-hmm --(inaudible).

 3                   AGT. COATES:  Council is

 4   C-O-U-N-C-I-L, right?

 5                   MR. COUNCIL:  Mmm-hmm.

 6                   AGT. COATES:  Brandon, spelled

 7   B-R-A-N-D-O-N?

 8                   MR. COUNCIL:  That's correct.

 9                   AGT. RICHARDS:  C-O-U-N --

10                   MR. COUNCIL:  N-C-I-L.

11                   AGT. RICHARDS:  -- N-C-I-L.  What is

12   your date of birth, Brandon?

13                   MR. COUNCIL:  07/11/1985.

14                   AGT. RICHARDS:  Do you have a middle

15   initial?

16                   MR. COUNCIL:  Michael.

17                   AGT. RICHARDS:  Do you know your

18   Social?

19                   MR. COUNCIL:  239-

20                   AGT. RICHARDS:  239 --

21                   MR. COUNCIL:  -- 65 --

22                   AGT. RICHARDS:   65 --

23                   MR. COUNCIL:  -- 56 --

24                   AGT. RICHARDS:  -- 56 --

25                   MR. COUNCIL:  -- 86.
```

JA0468

In Re: FBI Interview of Brandon Council          Brandon Council Audio Transcription
July 27, 2018

158

1                    AGT. RICHARDS:  -- 86.  What else do

2     you got to put on there?

3                    AGT. COATES:  I need y'all's --

4                    AGT. RICHARDS:  Okay.  I'll -- I'll

5     do it.

6                    AGT. COATES:  All right.

7                    AGT. RICHARDS:  Yeah.  I got the --

8                    AGT. COATES:  And then your -- just

9     your contact information.

10                    AGT. RICHARDS:  Okay.

11                    AGT. COATES:  Then sign it and I'll

12    -- if you want I can get this dropped in the mail

13    today.

14                    AGT. RICHARDS:  Yep.  Okay.

15                    AGT. COATES:  Then I -- you don't

16    know your -- do you know y'all's ORI number?

17                    AGT. RICHARDS:  No.  But -- it

18    -- it's not going to -- I wanted to -- do you use

19    the Columbia office or do you use the RA --

20                    AGT. COATES:  For the address?

21                    AGT. RICHARDS:  Yeah.  Does it

22    matter?

23                    AGT. COATES:  No.  I just -- I just

24    use the --

25                    AGT. RICHARDS:  RA?

JA0469

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

159

```
 1                    AGT. COATES:  Yeah, the RA office.

 2                    AGT. RICHARDS:  Appreciate it.  Yeah.

 3                    AGT. COATES:  Because that's where

 4    -- if it doesn't -- if something doesn't jive with

 5    it, they're going to send it back to you anyway.

 6    Yeah, I just put to the RA.  And then, let's see

 7    -- yeah.  They'll -- they'll kick it back without

 8    this -- the ORI number for Columbia.  And I think

 9    you're --

10                    AGT. RICHARDS:  Okay.

11                    AGT. COATES:  If you want, I can

12    call --

13                    AGT. RICHARDS:  Yeah.  I'll --

14                    AGT. COATES:  I can get it for you --

15                    AGT. RICHARDS:  Yeah.

16                    AGT. COATES:  -- and fill it in.

17                    AGT. RICHARDS:  We'll get it.  I'm

18    going to -- I'm going to be out in a minute.

19                    AGT. COATES:  Okay.

20                    AGT. RICHARDS:  I'm coming out,

21    right now --

22                    AGT. COATES:  Okay.

23                    AGT. RICHARDS:  -- anyway.  Okay.

24    Brandon, is there anything else that you want

25    -- want us to know?
```

In Re: FBI Interview of Brandon Council                    Brandon Council Audio Transcription
                                                           July 27, 2018

160

```
 1              AGT. COATES:  I'm sorry, buddy.

 2              MR. COUNCIL:  Yes.

 3              AGT. RICHARDS:  Excuse me?

 4              MR. COUNCIL:  Yes.

 5              AGT. RICHARDS:  What would you like

 6   us to know?

 7              MR. COUNCIL:  I swear to God I wish

 8   them women hadn't -- hadn't --

 9              AGT. RICHARDS:  Say it again.  Say it

10   -- speak up.

11              MR. COUNCIL:  I wish those women

12   hadn't --(inaudible)-- they didn't deserve what

13   they got.  They was just in the wrong place at the

14   wrong time, in the wrong field, and -- it's just

15   -- I wish I had made a better decision

16   --(inaudible)-- put those people and their families

17   in that type of, you know, situation because, you

18   never know what people deserve, but you don't

19   -- you don't get to decide what they do deserve and

20   what they don't deserve, you know.

21              I had no right to play God.  I won't

22   intentionally trying to murder.  I was trying to

23   wound and injure to the point of where I felt like

24   I had a better chance of, you know, successfully

25   getting away.  But it's -- what I did is horrible.
```

161

```
 1   I wish -- I'll be regretting it for the rest of my
 2   life.  That's what I want you to know.
 3               AGT. RICHARDS:  Okay.  Well, you
 4   know, thank you, Brandon.  You've been very
 5   cooperative.  I'm going to turn that recorder off
 6   now.  If there's anything else that we need to come
 7   talk to you about, do you have any problem with us
 8   coming to to talk to you?
 9               MR. COUNCIL:  Sure.
10               AGT. RICHARDS:  Okay.  I'm -- my name
11   is Todd Richards.  I'm with the FBI out of
12   Myrtle Beach, and this is Special Agent
13   Greg Coates, and he's out of the FBI in this area,
14   which is --
15               AGT. COATES:  Greenville.
16               AGT. RICHARDS:  -- Greenville,
17   South Carolina.  Okay?
18               AGT. COATES:  North.
19               AGT. RICHARDS:  Excuse me.  I'm
20   -- North Carolina.
21               AGT. COATES:  Different.
22               AGT. RICHARDS:  So if there's
23   anything we'll -- we'll come and address it with
24   you.  Okay?
25               MR. COUNCIL:  Sure.
```

AWR

JA0472

162

1          AGT. RICHARDS:  All right, sir.

2   Thank you very much.   The time is 5:12 p.m., and

3   I'm turning off the recorder.

4

5

6          (Recorded interview ended at 5:12 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA0473

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

163

```
 1                 CERTIFICATE OF REPORTER

 2

 3         I, Tia Shean, Professional Reporter and

 4    Notary Public for the State of South Carolina at

 5    Large, do hereby certify that the foregoing tape

 6    transcription was produced to the best of my

 7    ability and may include inaudible sections.

 8         I further certify that I am neither related

 9    to nor counsel for any party to the cause pending

10    or interested in the events thereof.

11         Witness my hand, I have hereunto affixed my

12    official seal this 27th day of July 2018, at

13    Myrtle Beach, Horry County, South Carolina.

14

15

16

17

18

19

20

21

22

23    _____

24    Tia Shean, Court Reporter
      Commission Expires: 02/10/2024
25
```

164

```
 1              I N D E X

 2

 3                                    Page      Line

 4   INTERVIEW OF BRANDON COUNCIL ......... 02        03

 5   AGT. TODD RICHARDS ................... 02        02

 6   AGT. GREG COATES .................... 16        02

 7   CERTIFICATE OF REPORTER ............. 163       01

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JA0475

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

**$**

**$10**
85:8
**$15,000**
77:5
**$150-200**
17:5
**$2,000**
6:21 13:9 28:23
**$200**
16:25 17:1
**$200-300**
26:9
**$40**
54:1
**$45**
58:9
**$65**
53:23,24

**(**

**(252)**
120:17,18
**(inaudible)--**
5:7 42:19 81:14
119:11 124:1
126:25 152:20
153:10

**-**

**--(inaudible)**
49:4 81:25 98:25
123:20 124:3,6,7,
9,11,14,19 148:14
150:24 152:19
155:4 157:2
**--(inaudible)--**
8:24 62:24 74:23
123:21,22,23,24,
25 124:6,12,13,17,
18,21,22,24,25
125:1,2,3,4 148:5
154:7 156:8
160:12,16
**--you're**
82:8

**0**

**02/10/2024**
163:24

**07/11/1985**
157:13

**1**

**1**
123:14,16,18
**10**
52:23 89:2
**100**
114:2 140:15
**10th**
89:14
**110**
44:9,10
**11th**
13:5
**12**
111:25 116:3
**12:00-1:00**
21:9
**131**
83:2,3
**1406**
113:5
**14th**
89:14
**17**
54:13,14
**17th**
114:19
**18**
54:13 94:22
101:18
**19**
54:13,14
**1996**
90:23
**1999**
120:25
**1:00**
107:15,17,21
108:5,7,8

**2**

**20**
52:23
**2016**
7:3,6
**2018**
163:12
**202**
154:20

**21-years**
101:17 102:5
**210**
44:13,15
**22**
52:9 53:9
**239**
157:20
**239-**
157:19
**23rd**
12:22 114:19
**24**
7:3
**24-hours**
98:23
**25**
76:5
**25-30**
79:20
**250**
26:9
**264**
146:4 147:6,7,8
**27th**
163:12

**3**

**30**
44:2 52:15 60:15
76:5,8 83:6
**30-day**
97:20
**300E**
90:23
**301**
34:9 35:7
**350**
43:14
**36**
84:20
**37**
84:20
**371**
120:19,20
**3:00**
5:2

**4**

**4**
7:6

**40**
44:2 52:15
**4:42**
125:11
**4th**
7:5

**5**

**50**
15:14 44:2 52:15
119:8
**501**
74:24 75:3,21
144:21 145:5,7,9,
12,13,14,17
147:12
**5337**
120:21,22
**56**
157:23,24
**5:12**
162:2,6

**6**

**65**
157:21,22

**7**

**70**
16:4
**701**
75:6 144:21 145:5
147:12

**8**

**8**
101:7,14,25 102:2,
4
**8-23-17**
5:1
**86**
157:25 158:1
**8:00**
88:24,25 89:1

**9**

**95**
145:13,14,17
146:4,20 147:7,14,
15

**96**
121:1,2,3
**97-8**
104:25

**A**

**ABC**
46:25 47:7
**ability**
163:7
**absconding**
137:20
**absolutely**
26:14 63:9 70:12
82:5 83:16 128:10
132:16 136:19
137:17 152:10
**accept**
90:13 94:14
**access**
27:4,13
**accurate**
12:17,18 60:18
**accused**
22:7 23:2
**acknowledged**
124:6
**acoustics**
126:15
**adding**
92:15,16
**address**
158:20 161:23
**admit**
61:13 67:16
**advice**
4:11
**advised**
121:5
**affixed**
163:11
**afford**
4:14
**African-american**
24:18
**afternoon**
18:22
**afterthought**
134:23
**age**
111:16
**agencies**
59:23

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

**agent**
2:10,13 149:5
161:12
**agents**
121:7 123:13
125:7
**aggressive**
24:13
**agrees**
98:23
**AGT**
2:2,4,6,9,12,15,18,
21,25 3:5,8,11,14,
16,22 4:1,4,7,20,
24 5:9,12,17,20,23
6:2,5,8,10,13,16,
18,22 7:2,4,7,10,
13 8:6,10,13,22
9:1,4,6,8,11,14,18,
21,25 10:4,7,15,23
11:1,5,9,15,19,23
12:1,3,7,11,14,19,
23 13:1,4,8,11,14,
17,20,24 14:1,5,9,
12,15,18,21,23
15:2,4,6,9,12,15,
18,20,24 16:2,5,7,
9,11,14,17,20,23
17:1,4,6,9,12,16,
19,22,24 18:2,6,9,
13,18,25 19:5,10,
13,20,24 20:4,8,
11,15,18,20,22
21:1,3,6,10,25
22:4,15,21 23:15,
18,23 24:1,4,11,16
25:13,17,20 26:4,
7,11,16,19,23
27:1,5,8,16,21,23
28:1,4,8,10,12,13,
14,16,17,18,22,25
29:7,9,13,15,21
30:1,4,7,10,13,17,
20 31:8,10,14,17,
20,23 32:6,14,17,
21,25 33:4,7,11,
13,16,19,24 34:3,
7,10,16,19,23
35:2,12,15,18,23
36:1,7,15,19,22,25
37:3,7,11,14,20,25
38:4,8,11,14,20,
23,25 39:4,10,13,
16,19,25 40:3,8,
11,14,17,21,23
41:2,4,8,10,13,15,
18,21,24 42:4,8,
11,14,18,21,24
43:2,5,8,10,13,15,
18,21,24 44:3,6,

10,12,15,17,20,23
45:4,7,10,12,17,
21,24 46:2,6,10,
13,17,19,22 47:1,
6,10,13,18,21,24
48:4,7,10,14,19,22
49:1,4,5,9,10,12,
13,17,22 50:1,10,
13,15,18,20,23
51:3,7,10,13,16,
19,22 52:2,6,24
53:1,6,8,11 54:3,5,
8,10,14,16,22,24
55:2,9,12,21,25
56:6,9,12,14,16,
20,23 57:2,6,11,
14,17,20,24 58:2,
5,8,11,14,16,19,23
59:1,3,6,9,14,25
60:4,7,11,16,20,25
61:3,6,11,15,18
62:6,9,14,18,22,25
63:6,9,21 64:1,5,9,
12,16,19,23 66:15,
21,24 67:1,7,10,
17,21,25 68:4,8,
18,21,25 69:4,8,
12,18,22,25 70:4,
8,12,17,20,23
71:1,6,10,14,20,23
72:2,7,15,18,21,23
73:2,5,11,14,25
74:4,7,9,13,18
75:2,6,9,13,16,20,
23 76:2,7,10,14,
17,20,23 77:1,6,
10,12,14,18,21,24
78:1,2,4,7,10,12,
13,17,23 79:1,5,
10,12,15,18,23,25
80:3,8,11,15,19,
21,23 81:2,7,12,
15,18,20,23 82:1,
4,7,14,16,18,23
83:1,3,8,11,16,22,
25 84:2,4,6,8,10,
13,15,18,22,24
85:3,13,15,18,25
86:3,6,8,11,13,16,
21,24 87:2,4,7,10,
12,15,18,20,23
88:1,4,7,11,13,17,
21,25 89:3,5,9,12,
16,18,21,25 90:3,
8,14,17,20,22,24
91:2,6,9,14,18,23
92:1,3,5,8,11,19,
23 93:12,17,20,23
94:3,5,8,10,21,24
95:3,5,8,15,17,20,
23,25 96:5,8,11,
17,25 97:3,6,11,

13,15,18,21,25
98:3,6,8 99:2,6,8,
11,13,18,20,23,25
100:3,7,11,15,19
101:13,20,22
102:1 104:8,11,14,
17,21 105:3,8
106:5,11,15,17,21,
24 107:2,5,8,13,
16,19,23 108:1,3,
8,25 110:1,4,8,11,
13,18 111:14,17,
21,24 112:1,6,9,
11,13,15,19,22,24
113:1,3,6,10,13,
17,19,22 114:1,7,
9,12,14,16,25
115:1,2,4,8,12,15,
17,20,23,25 116:4,
6,11,12,17,22
117:1,4,7,12,15,
19,22 118:1,4,5,8,
10,14,18,23,25
119:3,10,11,13,19,
23 120:2,6,8,10,
13,15,18,20,22,24
121:2,4,10,14,21,
24 122:2,7,12,20,
22,23,25 123:1,2,
3,6,7,8,9,19 125:8,
9,21 126:1,8,11,
16,18,19,22,23
127:2,10,13,17,20,
23,25 128:4,8,12,
15,20,23 129:1,4,
8,11,14,20 130:2,
5,7,9,12,14,17,20,
25 131:3,5,9,13,
18,22,25 132:6,10,
12,15,23 133:3,6,
9,12,16,19,21,24
134:2,8,10,15
135:18,23 136:1,4,
9,13,17,20,23
137:1,4,6,9,14,16,
18,21,24 138:2,6,
10,12,16,19 139:1,
3,7,11,13,15,19,
23 140:2,4,7,9,
11,18 141:1,7,12,
16,18,20,22 142:1,
4,8,11,14,17,23
143:6,9,14,18,20,
24 144:1,4,8,11,
15,18,24 145:3,8,
12,14,16,19,22,24
146:3,5,9,12,14,
16,21,25 147:3,7,
10,13,18,20,25
148:7,8,9,11,13,
15,21 149:1,5,9,
10,11,12,13,14,16,

18,19,21,22,23,25
150:2,3,4,5,6,9,16,
20,23 151:2,4,5,6,
7,8,10,12,14,16,
19,21,22,25 152:2,
3,5,7,8,10,11,13,
14,16,18,19,20,23,
24,25 153:1,15,17,
18,19,22,23,25
154:2,4,5,8,12,14,
15,17,18,22,23,24
155:2,3,7,11,12,
13,17,20,21 156:2,
6,7,9,11,12,13,15,
18,21,22 157:1,3,
6,9,11,14,17,20,
22,24 158:1,3,4,6,
7,8,10,11,14,15,
17,20,21,23,25
159:1,2,3,10,11,
13,14,15,16,17,19,
20,22,23 160:1,3,
5,9 161:3,10,15,
16,18,19,21,22
162:1
**ahead**
6:5 11:9,10 34:23
73:17 117:16
137:4
**Ahh**
140:15
**alarm**
63:21 132:25
133:6,10
**alcohol**
2:22 46:20 47:3
48:20
**alert**
63:19 68:12
**alive**
65:9
**amazing**
145:17
**ammunition**
57:8
**amount**
129:16
**Amsterdam**
47:4,5
**angle**
132:3
**animated**
24:10
**answering**
4:17 107:1
**anymore**
135:2

**apartment**
98:21
**apologize**
103:11
**appointed**
4:14
**approximately**
15:14 21:12
**area**
54:20 59:24 144:5
148:17,18,20
161:13
**areas**
22:11
**arguing**
29:18
**argument**
23:22 24:6
**ate**
46:10,11,15
**attack**
135:15
**attention**
52:12,17 59:16
**attitude**
103:6
**AUDIO**
2:1
**August**
13:5
**authorities**
63:20 67:14
**authorize**
121:7
**Auto**
95:22,23
**average**
108:23
**avoid**
38:21
**awaiting**
15:16,19,22,25
**aware**
40:23
**Awesome**
153:17

---

**B**

**B-r-a-n-d-o-n**
157:7
**back**
16:17 25:3,4 26:1
29:24 30:14 31:20,



21 32:7,17 36:13
45:18,19 49:20
59:12 62:13 65:15
73:25 74:5,21
79:17 81:8,10,13
85:10,11,20 87:5
91:15 96:14,19
98:13 103:2
105:19 106:23
119:2 122:15
123:10 124:13
125:11 140:21
145:7,21 146:13
148:15 152:1
159:5,7

**background**
22:3

**backpack**
53:18

**backtracking**
34:22

**bad**
30:24 66:7 80:9
102:25

**bag**
50:13,16,22 118:9,
10,17,19,24 119:2
140:23 141:15,16
142:2,13,14,17,20
152:15

**bags**
20:12 50:11

**balance**
92:18

**Bang**
85:21 87:9

**bank**
5:24 6:11,19 7:15
12:10 16:14 17:25
20:2 25:13 26:13,
20 37:6 40:25
43:19 51:6 52:8
58:12 59:11 60:8,
9,19 61:1,4,7
62:13,16 63:3
71:17 73:15,18,19,
20 74:5 79:19
82:2,19 92:20
103:17,20,22
106:13 107:6,12
108:17 114:5
121:17 123:22
125:17 127:5,23
128:5 129:2
130:21 133:13,14
134:6 136:18
141:14 147:22

**Barnes**

84:14,15

**basically**
10:21 37:9,17 81:1
96:23 103:16
140:25

**batteries**
115:18 119:7

**battery**
114:20,22,23
115:7,8,10,17

**Baymont**
102:16,17

**BB&T**
6:12 12:20 26:22
28:21,23 32:12,15
33:5 34:13,18,20
114:4

**Beach**
161:12 163:13

**bear**
134:14,18

**beef**
109:7

**beef/turmoil**
8:5

**beg**
38:3 69:2 104:10

**beginning**
3:15 5:5,11

**behavior**
106:2

**belongings**
50:4

**bend**
150:11

**Beth**
9:3,4,6

**Bible**
105:20 110:21,23

**big**
12:9 23:22 24:5
47:15,17 50:19
85:21 87:9

**bill**
95:19,20 96:16
114:19

**biological**
10:24

**birth**
157:12

**bit**
98:18 150:11

**bitty**
48:2

**black**
24:8 35:8,9 54:10,
12 84:15 122:10

**blinked**
72:14

**blue**
58:18,19,21 59:5,
6,8,9 144:20

**bluff**
29:23

**blurry**
146:6

**Bob's**
115:1

**boner**
136:3

**book**
62:4

**born**
5:20

**borrowed**
32:1,2

**boss**
109:15

**bottle**
51:2

**bottom**
70:2 106:9

**bought**
17:8,9 18:22
48:17,18 49:16
57:10,12 58:6
79:4,5 103:23
104:6 114:22
117:20,22 118:17

**Boulevard**
28:3,9 115:13
116:7,8

**boutique**
48:9

**boutiques**
48:3

**box**
118:22

**boy**
31:19

**boys**
31:18

**BPL**
88:3 94:7,9,15

**brain**
79:7,8

**Brandon**
3:23 4:25 5:2,18

**black**

6:23 23:16 33:8
35:19 36:1 38:17
43:3 47:2 51:24
53:2 54:17 59:11
61:12 64:17 67:1,
17 79:13,15 100:2
106:11 111:19
113:24 116:12
117:8 119:16
121:18 122:4
123:10 125:9,10
127:4 134:10
138:3 141:12
151:22 153:2,9
155:5,22 156:24
157:6,12 159:24
161:4

**bring**
53:4 82:1

**brings**
51:6 135:8

**bro**
93:3

**broke**
114:3 130:6,8

**brother**
90:11,12 94:13,15
99:17,18

**brother's**
100:1

**brothers**
65:16

**brought**
124:18 136:15

**bucks**
29:2 32:18 115:23

**buddy**
155:4 160:1

**bulb**
115:4,7

**bulbs**
114:23 115:8,18,
19

**bulky**
103:25

**bullshit**
109:13

**bum**
110:16

**bumped**
55:20 62:12 85:1
140:23,25 141:1,4

**bunch**
47:19 48:2 117:8

**bus**
89:4,6,7,9,10

**business**
95:7

**busy**
96:21

**button**
63:19 68:11

**buy**
46:20 47:2 49:15
53:19 77:15 88:20
93:2,6 104:11
118:1

**buying**
104:2

**Bye-bye**
125:5

───────────

**C**

**C-a-d-e**
92:2,3

**C-o-u-n**
157:9

**C-o-u-n-c-i-l**
157:4

**cab**
20:21,22 29:15,18
33:18 34:4 35:5

**Cade**
91:25 92:2

**call**
25:3 32:24 33:1
34:25 57:4,6 64:4
67:14 68:11,15
69:16 96:20
139:12,13,15,17
149:24 150:1
154:19 159:12

**called**
29:23,24 35:5 45:2
56:21 64:4 89:7
96:20 98:15
108:14 130:21
132:22 133:12,14

**calling**
63:18 81:21

**calls**
128:5

**camera**
46:15 63:8 127:9
129:18

**cameras**
125:24

**Camry**
17:15

**canceled**


JA0478

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

92:13

**cancelled**
31:2

**Capital**
28:3,4,9,15

**car**
10:1 16:2,7,15
17:8,10 18:4,19,
21,22 20:16 22:9
27:4,13 31:25
32:1,2 36:11,12,13
38:9,12,15 39:20,
21 55:3,18 69:21
70:3,5 71:15 73:8,
9,10,19,21 75:23
76:16 77:19 79:4,
5,16,25 81:13 82:9
85:13 88:14,15,18,
20 89:23,25 90:15,
18 91:13,16,21
93:2,4,6,10,14,18,
21,24 94:2,5,25
95:12 96:1,2,12,23
97:2 98:12 102:6,
20 103:21 114:5
118:6 119:17,20,
22,23 121:22
122:1 124:1,2
140:16 142:15,21,
24 144:17 146:1
148:15 149:24

**card**
101:19

**cards**
73:1 80:12,18 99:4

**care**
126:4,5 135:2,3

**cares**
62:1

**Carolina**
5:19,21,25 7:8
9:24 36:21,23
37:4,6,15,17,19
38:6 39:22 40:25
42:15 51:6 54:5
73:8,13,24 74:13,
17,21 81:8,9,11,
13,16 83:6 111:6,
23 112:18 124:5,
18 127:24,25
131:6 140:19
142:7 147:17,18,
21 148:3 161:17,
20 163:4,13

**Carrie**
113:12,13

**cars**
71:19

**case**
119:25

**cash**
13:9 26:3 52:10,20
88:20 90:25 93:2,6

**cashier**
25:25

**casinos**
25:11

**castle**
24:22

**caught**
35:9 140:24

**cell**
48:24 101:9 132:3

**center**
88:3,5,23 89:10
90:9 94:10

**CERTIFICATE**
163:1

**certify**
163:5,8

**chain**
29:4

**chains**
141:3

**chance**
59:21 111:7,8
132:17 133:2
160:24

**chances**
62:21

**chaos**
8:15 103:5

**characters**
62:12

**charged**
119:8

**charging**
119:7

**Charles**
116:6,7,8

**check**
51:5,7 52:10,20
81:24 87:16,18
100:21,22 124:14

**checked**
36:12 87:20

**cheek**
151:18

**chest**
122:5

**Chevy**
16:5,6

**child**
21:20 113:20,21

**Chrysler**
39:24 40:1 72:1,3,
10,11,17 77:20,22
82:12 85:16 146:2

**cigarettes**
26:1,2

**circled**
39:2

**circles**
139:2

**circumstances**
65:13 103:3
108:20

**cities**
74:16

**citizens**
105:2

**city**
19:8 28:3,6,10,13
73:23 74:15

**claim**
23:2

**class**
105:2

**clean**
21:13 156:19

**cleanses**
135:13

**clicking**
72:9

**close**
6:20 10:20 17:3
28:14 52:15 99:14
100:22,23 101:8
138:3 148:22
152:11

**closes**
21:9

**closest**
72:6,7

**closet**
72:17

**clothes**
50:3 104:4 121:17

**clothing**
141:24

**cloudy**
143:11

**clue**
54:9

**Coates**
2:12 16:2 22:15

27:23 28:1,4,8,12,
14,17 49:4,9,12
78:2,4,7,12 114:25
115:2,4,8,12,17,25
116:4,6,11 118:5,
8,10,14,18,23,25
119:3,11 122:22,
25 123:2,6,8 125:8
126:18,22 138:10
139:7 142:23
143:6,9,20,24
144:1,4,8,11,15
145:24 146:3,9,12,
16,21,25 147:3,7,
10 148:8,11,15,21
149:1,5,10,12,16,
19,22,25 150:3,5
153:18,22,25
154:4,8,14,17,23
155:2,12,20 156:9,
12 157:3,6 158:3,
6,8,11,15,20,23
159:1,3,11,14,16,
19,22 160:1
161:13,15,18,21

**cocaine**
40:16,18 42:5
129:23,25 130:3

**collateral**
65:8 103:14
135:16

**colors**
144:16

**Columbia**
158:19 159:8

**commercial**
148:18,19

**Commission**
163:24

**commit**
103:24 137:12

**committed**
92:20

**committing**
94:18

**companies**
91:22

**company**
22:18 97:8,10
128:5 133:14

**complete**
54:6 55:23

**completely**
153:3

**complex**
47:16 98:22

**complied**
15:7

**computer**
52:13,22 59:17
102:12

**computers**
68:13

**conducted**
95:6

**conflicts**
62:3

**connected**
150:10

**consent**
116:13,23

**consequences**
66:8

**conspiring**
8:2

**constant**
22:13

**constantly**
104:3

**contact**
131:24 158:9

**contents**
73:9

**control**
66:1,2

**conversation**
103:4

**Conway**
42:17 73:23 74:8
76:6,10 131:6
142:6

**cool**
3:11 98:14

**cooperated**
122:11

**cooperative**
132:14,16 138:4
161:5

**cope**
11:6

**Core**
120:5,12,13

**corner**
55:7,19

**correct**
4:23 5:22 7:9 9:13,
16,19 11:25 13:19
14:14 16:10 33:6
34:18 38:7,10
40:20,22 42:23

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

43:9 47:12 52:4 58:25 60:18,24 74:12 79:3 86:10,12 87:1,22 93:19 107:18 114:15 134:1 137:23 145:15 157:8

**cost**
90:18 115:21

**could've**
66:12 106:8 111:7

**Council**
2:2,3,5,8,11,14,17, 20,24 3:1,3,6,9,13, 15,18,25 4:2,6,19, 23 5:6,10,15,19,22 6:1,4,7,9,12,15,17, 20,25 7:3,5,9,11, 16 8:9,12,14,23 9:3,5,7,10,13,16, 19,23 10:3,5,9,16, 24 11:2,6,12,17, 21,25 12:2,5,9,12, 16,21,24 13:2,6, 10,13,16,19,21,25 14:2,7,10,14,17, 19,22,24 15:3,5,8, 11,13,16,19,22 16:1,4,6,8,10,13, 16,19,21,24 17:2, 5,7,11,13,18,20,23 18:1,5,7,12,15,20 19:2,7,11,15,22,25 20:6,9,13,17,19, 21,24 21:2,4,7,11 22:1,6,17,23 23:17,21,24 24:2, 5,12,17 25:15,18, 23 26:6,9,14,17, 21,25 27:3,7,9,18, 22,25 28:2,5,9,11, 20,24 29:3,8,12, 14,17,23 30:2,6,8, 11,15,19,22 31:9, 11,16,19,22,24 32:7,16,20,23 33:2,6,9,12,14,18, 20 34:1,6,8,12,17, 21,24 35:3,13,16, 21,25 36:6,8,17, 20,24 37:2,5,8,12, 16,22 38:3,7,10, 13,18,21,24 39:2, 7,12,15,18,23 40:2,6,10,13,16, 20,22 41:1,3,6,9, 11,14,16,20,23,25 42:7,10,12,15,19, 23 43:1,4,7,9,12, 14,17,20,23 44:1, 5,8,11,13,16,19,

21,25 45:6,8,11, 15,19,23 46:1,3,8, 12,14,18,21,24 47:4,9,12,14,19, 23,25 48:6,9,12, 17,21,23 49:16,20, 24 50:5,12,14,16, 19,21 51:1,4,9,12, 14,17,21,25 52:4, 8,25 53:3,7,10,13 54:4,6,9,12,15,18, 23 55:1,4,10,14,23 56:2,8,11,13,15, 18,21 57:1,4,9,13, 16,18,22 58:1,4,6, 9,13,15,18,21,25 59:2,5,8,13,18 60:2,6,9,13,17,23 61:1,4,9,13,17,21 62:7,10,16,19,24 63:4,7,10,22 64:2, 7,10,14,18,20,24 66:17,23,25 67:4, 8,11,20,24 68:2,7, 10,20,23 69:1,6, 11,14,20,24 70:1, 7,10,13,18,21,25 71:4,9,12,16,21,25 72:5,12,16,20,22, 25 73:4,7,12,20 74:2,6,8,12,14,20 75:4,7,11,14,18, 21,25 76:4,9,12, 16,19,21,24 77:4, 7,11,13,17,20,23, 25 78:3,5,9,11,15, 19,25 79:3,7,11, 14,16,21,24 80:2, 5,10,14,17,20,22, 25 81:5,10,14,17, 19,22,24 82:3,5, 10,15,17,21,24 83:2,5,10,13,17,24 84:1,3,5,7,9,12,14, 17,19,23 85:1,4, 14,17,19 86:1,5,7, 10,12,15,17,22 87:1,3,5,8,11,13, 16,19,22,24 88:2, 6,9,12,14,19,24 89:1,4,6,11,13,17, 20,22 90:2,4,10, 16,19,21,23 91:1, 5,7,11,16,19,25 92:2,4,6,10,12,21, 25 93:13,19,21,25 94:4,7,9,12,22 95:1,4,6,9,16,19, 21,24 96:3,6,9,14, 18 97:1,5,9,12,14, 17,19,23 98:1,5,7, 10 99:4,7,10,12,

14,19,22,24 100:2, 5,9,13,17,20 101:15,21,24 102:3 104:10,13, 16,19,23 105:4,9 106:6,14,16,19,22, 25 107:3,7,10,14, 18,20,25 108:2,6, 11 109:1 110:2,5, 10,12,14,19 111:15,19,20,22, 25 112:3,7,10,12, 14,17,21,23,25 113:2,5,8,12,15, 18,21,25 114:2,8, 11,13,15,17 115:3, 6,9,14,22,24 116:2,5,10,15,21, 24 117:2,5,9,14, 17,20,24 118:3,7, 9,12,16,20,24 119:1,4,18,21 120:1,4,7,9,12,14, 17,19,21,23 121:1, 3,9,13,20,23,25 122:6,9,19 123:11, 15,17 125:19,25 126:2,9,12,25 127:8,12,15,19,22, 24 128:2,6,10,13, 17,21,25 129:3,6, 10,13,15,22 130:4, 6,8,10,13,16,19,23 131:1,4,7,11,15, 20,23 132:2,8,11, 13,19 133:1,4,8, 11,15,17,20,22 134:1,4,9,12,17 135:19,25 136:2,5, 12,16,19,21,24 137:2,5,7,10,15, 17,19,23 138:1,5, 8,14,18,22 139:2, 4,9,12,14,16,18, 21,25 140:3,6,8, 10,14,20 141:2,8, 15,17,19,21,24 142:3,6,10,12,16, 18 143:2,8,11,16, 19,22,25 144:2,6, 9,13,16,19 145:1, 6,10,13,15,18,20, 23 146:1,11,18,23 147:1,5,9,12,16, 19,23 148:1,19,23 149:3 150:8,15,18, 22 155:6,16 156:1, 25 157:2,3,5,8,10, 13,16,19,21,23,25 160:2,4,7,11 161:9,25

**counsel**
163:9

**count**
109:10

**counter**
52:10 71:5,7,8

**counter-surveillance**
60:5

**counties**
73:22 74:10

**countries**
65:6

**Country**
39:24 40:1

**county**
73:22 126:14 163:13

**couple**
29:2 32:9,18 122:14 123:4 125:13

**court**
4:10 163:24

**crazy**
8:25 25:10 42:3 65:24 78:22

**create**
111:3

**created**
103:5

**credit**
73:1 80:12,18

**crime**
92:22 94:18 137:13

**crimes**
113:23

**criteria**
25:8

**cross**
134:14,18

**custody**
112:4 124:10

**cut**
5:6,10 31:1

---

**D**

**D-d-y**
84:7

**D-e-n**
113:2

**damage**
65:8 103:14 135:16

**damn**
23:14 31:2 32:4,11 33:23 53:20 65:19 78:22 103:20 139:21 143:12

**dark**
143:15,18

**Daryl**
139:9,11,15

**date**
12:17,18,22 114:18 157:12

**dates**
12:6

**dating**
21:23 30:25

**day**
8:1,21 20:14 22:13 26:12 32:11 36:9 46:16,18 51:17,19, 24 56:4 58:17 60:3 62:5 65:12 74:24 77:8 78:15,17,18, 21 91:11 104:7 107:15 110:21 130:4 143:12 163:12

**days**
26:18,19 31:25 114:20

**dead**
65:15,20 66:20,23, 25 67:6 105:14 134:22

**deal**
105:5

**dealer's**
96:6,9,24

**dealing**
22:6,22,24 104:24 105:1,5

**decide**
4:16 61:19 68:5 72:3 160:19

**decided**
13:18

**decision**
160:15

**decision-making**
61:22

**decisions**
66:7



In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

defense
105:24

defraud
146:6

demanding
14:11

demonic
65:2,4 130:19

demons
65:24,25 66:3
105:21

dentist
155:14

depend
21:19 109:22

describe
135:9

deserve
52:1,3 64:21
102:25 103:12
160:12,18,19,20

desk
68:17,19,22,23,24
69:15,24

desperate
7:16 126:2 130:13,
14,16,19

details
62:10

deter
103:18

determination
108:22

determine
121:8

devil
66:5

dialogue
141:5

die
108:14,16,18
134:25

died
105:10

differently
134:21

dime
103:19

direction
131:11

Directly
90:4

disappeared
109:15

disclose
39:8 137:11

distance
54:25 55:6

distraught
126:3

divulge
62:8

DMV
17:20

DNA
122:18 125:15
135:20 136:8,11
151:2

doe
112:15

dollar
36:10

dollars
32:9 90:16

Don
139:12,13,15

Donnie
139:9,16,17

door
15:13 46:9 60:15
72:17 102:20

dope
99:9

doubtful
22:25

draw
24:21

drawer
70:2,5

drinking
99:1,3

drive
79:19 89:7 93:7,15
96:23 97:4 98:21
112:21 147:4

driver
91:8,10

drivers
93:5,6

driving
19:8 61:2,5 82:8
96:2 97:5 101:20

drop
33:24 35:7 37:19

dropped
34:8 85:19 87:3
100:25 140:22
147:14 158:12

drove
15:23 18:23 36:24
74:24 83:8,17 96:3
97:6,7,9 101:23,24
102:1,3 147:5

drug
23:5 31:4 40:10,11

drugs
2:23 22:7 23:3
25:1 40:12,15 99:6

due
114:19

duffel
50:22

dufus
102:24

dumped
73:9 74:11 124:1,2

duties
52:22

_____

E

E300
121:4

earlier
134:20 143:20

early
27:18

easier
155:23

easily
27:13

eat
46:7

eclipse
51:18,20 143:12

Econo
81:3 86:9

Economy
77:23 86:2 87:17
95:16 96:15,19
98:2,4,13 101:3

edge
42:2

ejects
56:25

elaborated
94:15

elapsed
92:13

electronic
125:14

emotionally
11:2

end
7:20 28:4 122:16

ended
123:23 134:21
162:6

enforcement
59:23

entering
110:3

episodes
85:21 87:6

escape
62:21

evening
18:24

events
29:4 34:17 140:8
141:3 163:10

eventually
8:17 10:12

ex-girlfriend's
16:8 50:7,9

exact
12:6,13 27:20 29:4
55:15

excuse
78:19 81:8 103:1
106:2 160:3
161:19

exists
135:10

expert
151:23

Expires
163:24

explain
110:6

explained
93:8 94:12

explanation
106:4

explore
45:3

Exploring
45:4

Express
42:17

extent
15:5

extremely
61:23 109:11
117:3

_____

F

fact
67:14 94:19 95:13
100:24 142:19

fairly
41:22

fake
104:1,2

fall
105:19 110:22

false
70:11

familiar
8:4,6 89:15 144:6

families
126:6 160:16

family
8:2 37:13 66:9
85:22 87:8 111:9,
15

fart
79:8

father
65:15

favor
152:6

Fayetteville
146:19,20

FBI
2:10,13 161:11,13

February
21:24

feel
21:17 61:25
105:16 110:6
111:8 122:11,13
135:3,6,11,13
146:7

feeling
135:5,10

feelings
63:13

felt
21:18 24:21 31:5
42:1 63:17,23
105:14,16 106:9
108:23 110:5
160:23

female
38:16 39:11 41:5,
16,19 42:25 84:16

field
160:14

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

**fight**
24:24

**fighting**
65:7 103:13

**figure**
148:16

**file**
121:15

**fill**
152:17 156:15,19
159:16

**financial**
31:3

**find**
36:10 47:14 71:15
84:25 102:18
116:23 129:17
140:12

**fine**
15:7 18:9,14 22:4
35:18,19 36:4
95:11 122:25
126:17,18,24
127:3 150:20
156:25

**finger**
122:16

**fingerprint**
122:17 125:15

**fingerprints**
149:6 155:19

**fingers**
153:6

**fired**
69:12

**firing**
56:24,25

**fit**
25:8

**Florence**
144:5

**fobs**
72:9

**focus**
21:17 23:12

**follow**
141:8

**Food**
25:22 27:2,17,24
32:4 114:4

**foot**
45:5 60:16,19,23,
25

**foregoing**

163:5

**forethought**
134:22

**forgive**
134:13

**form**
116:23

**Forty**
115:22,23

**found**
85:11

**frame**
103:16

**freaking**
129:16 148:24

**Friday**
12:25 13:1,5 17:25

**friend**
36:5,8,24,25
37:18,21 38:1,2,6,
15 39:5,6,11 41:4,
17 42:19,21 98:11,
17 131:12

**friends**
18:24 22:10 39:14,
17 40:4 41:3
45:17,22

**front**
59:11,13 60:15
102:20

**frustrated**
23:7

**fuck**
24:19 61:24

**fucked**
61:23

**full**
124:8

**fully**
58:3

**furtherest**
131:7

**fussed**
109:2

**G**

**Galaxy**
120:5,8

**gals**
127:7

**gamble**
25:11

**gambling**
31:4

**gas**
32:4 40:7,9,19
47:17 48:12,15
55:18,19

**gave**
15:9 16:25 17:1
27:4 32:18 40:8
52:16 54:1 58:9
96:22 122:10
131:25 132:1

**gear**
61:8

**general**
23:9,11 54:19

**generally**
12:8

**gentleman**
105:16 126:13

**Georgia**
37:23 131:14

**ghost**
20:10

**girl**
30:4 147:24

**girl's**
54:25 55:13

**girlfriend**
11:14,16 21:21
22:20 25:2,3 27:4
29:20 30:23 53:17
65:16 83:19 98:15,
19,25 99:21,22
101:2 109:3,23
139:20,24

**girlfriend's**
98:11 100:24

**girls**
31:18,19

**give**
14:25 15:4 16:24
19:2 26:2 27:19
33:10 40:17,18
52:11 53:25 54:18
57:7 61:24 70:10
78:20 82:11 85:8
89:18,19 101:19
116:13 118:24
119:8,19 121:6
125:23 139:5
153:11 154:13
155:8 156:3

**giving**
63:12 96:23
109:14

**goal**
108:21

**God**
65:3,9 105:25
160:7,21

**goddamn**
129:17,19,22
130:1 148:6

**gold**
108:4

**Goldsboro**
113:16,17

**golf**
58:19,21

**good**
39:19 50:18 54:20
102:14 106:6
125:3 135:13
149:14 152:4
153:7,10 154:18
155:24

**Goody's**
141:15,16,19,20,
23 142:3

**grab**
148:12

**Gracie**
112:8,9,13

**grandmother**
112:4 113:7

**gray**
16:6 17:15

**great**
65:7

**Greenville**
5:1 77:25 83:7
86:11 87:14 89:16
92:6,7 98:21
102:15 115:12
116:7,8 145:21,22,
25 146:22 161:15,
16

**Greg**
49:7 115:16
119:16 122:21
125:12 149:21
155:11 156:8
161:13

**grown**
31:12

**gruesome**
135:15

**guess**
18:5 42:1 57:19
86:22

**gun**
25:24 53:19,20,23
58:14 59:10 62:11
76:15,16 103:23
104:6,12 122:1

**guy**
35:9 53:17 54:12
77:5,6 85:7,22
86:17,19 88:12
93:17 95:13 104:7
124:11 136:7
138:17 151:3

**guy's**
95:18 138:23

**guys**
23:8,13 64:22 85:7
98:13 135:6

**H**

**habit**
31:4

**habits**
31:4

**half**
55:7

**hand**
150:7 163:11

**handed**
14:10,12

**handgun**
56:22

**handguns**
57:5,6

**handle**
49:7 61:23 111:2

**hands**
24:9

**handsome**
136:7

**hang**
56:3 88:21 90:6
122:13

**happened**
6:2,6 17:17 20:20
32:5,10 34:11,14
36:19 100:12
127:11,14

**harass**
34:2

**hard**
102:22 103:11
151:17

**Hardee's**
46:8,11

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

harder
106:8

hate
61:13 103:14

he'll
85:8

hear
3:10 23:14,15 43:2
106:3 130:23
133:22 138:10,12

heard
67:3 68:8 70:4
77:4,6 126:13
129:6 130:21
144:21

hearing
77:8

Heart
82:12,15,16,19
83:4 86:25

hell
8:25 10:18 19:3
27:10 32:10 55:1,2
65:18 66:4 68:12
104:1 127:19,22
130:8,10 139:22
141:10 143:12,17

helped
124:10

Hennessy
99:5

hereunto
163:11

Hey
123:14 125:9
142:23 149:21

hidden
47:15

hide
116:16

high
25:10 42:8 43:25
44:4 129:24

highway
34:9 35:7 102:21
144:22

highways
146:9,14

hit
109:12 132:25
133:10

Hmm
145:17 153:22

hold
78:19 137:3

home
10:8 29:11 82:8
103:22 147:24

homeboy's
35:10,20,22

homeless
7:17 10:18 25:6
110:16

Honda
71:25 72:4,11

honest
117:3 138:23

honestly
12:5 67:12

hood
53:20 56:3

hooker
84:21

hope
28:7,14 62:4 66:9
105:15 135:5

horrible
160:25

horriblest
135:5

Horry
163:13

hospital
78:8

hotel
49:21 55:16 60:22
73:16 74:1,5 91:15
96:2 98:24 101:4,
5,6 102:11,14

hour
21:14 44:2,4

hour-and-a-half
21:12

hours
21:12 109:16

house
7:19 8:25 10:10,
11,12 16:18 19:18
20:1 21:8 22:8,16
24:3,25 30:14
31:13,15,21 33:3
35:4,10,12,20,22
36:14,16,18 37:1
50:7,8,9 53:22
54:25 55:13
100:24 105:15
109:4,5,18

houses
148:17

How's
2:6

Huh-uh
122:22

hundred
29:2 32:9,18 36:10
90:16,20 107:21

hung
19:6 44:20 49:23

hurry
26:3

hurt
14:25 36:3 51:25
52:2 65:12 66:21,
22,24 126:3,5

hyper
24:12

I

ID
85:6 86:15,16
87:19,21 102:6,7

idea
55:25 73:4 75:24
77:2 83:12 92:21,
25 124:22 134:24
147:21

idiot
102:24

ignorant
110:15

illegal
94:17

illuminati
66:5

immediately
43:23 66:13

Impala
16:4,6 17:14 27:6

impatient
59:18

important
110:13

inaudible
2:17 6:7 50:14
70:25 101:13
125:6 129:13
148:8 155:20
156:12,21 163:7

include
163:7

income
10:16

incorrect
33:14

increases
62:21

index
153:4

Indian
24:15

influence
2:22 18:16

information
33:15 39:9 137:11
158:9

initial
157:15

injure
160:23

ink
153:2

Inn
42:17 82:16,20
83:4 86:25

insensitive
103:15

inside
22:8 58:12 92:9,10

insurance
17:21 31:2 91:21,
24,25 92:13,15,17
93:16 95:11 96:13,
20,24 97:7,10,16

intelligent
3:19,20

intentionally
62:20 160:22

intentions
108:15

interested
163:10

interesting
53:15

interrupted
48:24 101:9

intersection
116:7

interstate
60:14 143:10

interview
105:21 162:6

investigation
121:8

involved
98:15 132:5

irrelevant
39:7 136:22

irritated
62:19 63:1,11,12

issue
38:19

issues
95:11

items
121:7

J

Jae
88:4 90:9 91:3,12
97:4,5,6,7

Jaelynn
88:3 96:15 98:24
99:17 100:23
101:18

jail
8:20

James
9:10

Jamie
81:6

Jaylynn
101:16

Jaylynn's
98:10

jeans
59:5,6,8,9

jewelry
103:25 104:1,2,4,
9,12,15,16,18,22

jive
159:4

job
10:13 23:5,7 31:6
90:12 105:15,18
108:24 109:2

jobless
25:6

join
98:24

Joyner
9:3,7,10

July
163:12

jump
129:12

jumped
71:7 94:19



In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

**Junior**
111:20

**justice**
106:1

---
**K**
---

**key**
72:9 149:7

**keys**
69:20 70:3,5,22
71:3,4,6,11,13
72:2,12

**kick**
99:16 159:7

**kicked**
100:10,13

**kids**
31:7,8,10

**kind**
16:2 22:12 30:24
39:20,21 40:14
47:1,2 48:2 52:17
56:6,24 64:7 71:24
96:1,2 103:11
129:19 132:18

**king**
24:22

**kit**
125:15 151:3,4

**knew**
41:7,8 58:3 59:19,
20 61:10 65:11
66:3,18 67:10
102:22 104:5
108:5 110:2 126:1
135:15 137:20
140:24 147:22

**knife**
25:24 26:5

**knowing**
135:8

**knowledge**
137:19

---
**L**
---

**L-i-d-d-y**
84:5,6

**ladies**
66:20

**lady**
52:10 62:16 66:11
68:3,6,15 70:15
101:19 109:13,15
119:6

**lady's**
73:8 114:5

**Large**
163:5

**late**
21:8 22:18,19
109:4

**law**
5:14 59:23 114:3

**lawyer**
4:11,13,14,16,22

**layers**
62:3

**leadings**
70:11

**learned**
11:6

**leave**
32:22 35:17 43:22
73:18,20,21 78:14
87:11 96:15,18
99:16 123:13
141:13

**leaving**
33:17 40:24 55:19

**led**
21:15 34:17

**left**
11:10 15:12 16:13
20:14 34:15 43:23
50:6 53:14 60:19,
21,22 61:1,4 73:7,
23 74:4,8 94:7
100:20,21 102:13
119:5 131:23
141:14 150:7
151:19 153:8

**legal**
112:4

**letters**
142:13

**level**
3:21

**license**
93:1,5,6

**Liddy**
83:24 84:1,2,8
86:19

**lie**
13:22 59:19

**life**
21:16,18 69:2 76:1
103:6 104:24
109:12,23 111:8
135:6 161:2

**Light**
59:8,9

**lights**
31:1 72:14

**Linda**
11:18 16:9 20:14
21:7 23:23

**Linda's**
16:15

**Lion**
25:22 27:2,24 32:4
114:4

**liquor**
49:21

**list**
102:9

**listen**
128:18

**listening**
110:11

**live**
7:22,23 8:10 30:3
84:22 102:25
112:16 113:14
135:2

**lived**
8:21 10:3 54:21
86:20,23 138:25

**lives**
30:2,4 53:17

**living**
23:6 104:5,23
111:12

**loaded**
57:9,11 58:3

**local**
55:6 59:23

**located**
6:14 28:6

**location**
54:19 59:22 66:19

**Lodge**
77:23 81:3 86:9
87:17 95:16 96:15,
19 98:4,13 101:3

**logistical**
125:11,12

**long**
8:1 22:1 24:18
25:11 62:17 66:12
131:21 138:25
141:3 148:24
152:3

**loop**
138:3

**Lord**
134:13

**lose**
10:19 106:10

**lost**
21:17 74:20 76:4
114:19 144:25

**lot**
13:22 22:12 24:9
31:3 45:8 46:11
55:18 62:3 83:15
89:23,25 90:5
91:19,20 93:11,18,
24 94:6,25 95:13
103:25

**luggage**
50:16 121:19,21,
25

---
**M**
---

**M-i-n-i**
28:11

**mad**
66:11

**made**
66:7 68:5 72:3
73:15 102:20
131:16 160:15

**mail**
158:12

**main**
110:25 111:1

**make**
34:22 45:21 67:13
105:23 149:19

**makes**
100:3

**making**
22:9 109:16,17
126:7

**male**
38:15 39:11 41:5,
23,24 42:24 43:1,
4,5,6 54:10,11

**man**
3:4,7,21 5:7 11:8
13:22 24:22 25:12,
16 35:14 36:12
53:22,23,24 54:1
59:19,20 64:21,22
65:1,3,4,8,10,24,
25 67:15 77:7
86:23 93:4 102:5,
24 103:1,2,8,9
105:9,10,11,15,22
110:15 123:14,18

**126:18 127:9
146:5,6 148:24
149:1**

**manager**
11:14,20,22,23
23:9,11 64:15
95:22

**maneuver**
111:3

**marijuana**
40:16,18 42:5
99:7,9,12

**Marion**
74:15 143:21
144:5

**mask**
125:17

**matter**
66:16 95:13
100:24 142:19
158:22

**matter-of-fact**
33:21

**Mcdonalds**
34:6,7,9 35:7
140:22

**meet**
45:10 56:3

**meets**
100:25

**memory**
18:11,14

**mentality**
108:17

**Mercedes**
76:18 77:16 90:23
92:16 96:4 121:3,4

**message**
19:17 20:7

**messed**
140:3

**met**
42:15 81:6 88:2,4,
9 90:8,9 94:9

**Michael**
111:19 157:16

**middle**
11:13 107:14
157:14

**Mike**
148:10,12 150:2
151:2 152:6
153:14 154:11
155:10

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

miles
55:8,13

mind
49:8 66:2 103:16
123:1 125:13

minds
66:1

Mindy
28:10

mine
114:13

mingle
19:1 46:4

mingled
18:24

Mini
28:3,6,12,13

minor
111:13

minors
31:13,15

minute
31:7 52:16 110:21
122:24 123:7
151:23 154:25
159:18

minutes
29:25 76:5,8 79:20
83:6 122:14
125:13

mislead
18:7 79:9 146:7

misleading
83:14

misquoted
110:23

missing
20:10

mistaken
12:24 17:2 37:22
39:23 42:16 75:4
142:18 144:19

mix
155:1

Mmm
17:18 19:3 29:14
45:11 59:2 71:9
77:13 88:6 108:6
142:3

Mmm-hmm
2:3,8 4:19 6:1 9:5
13:10 16:16 17:11
19:22 27:7,25
28:24 29:12 30:6,
19 31:9,16,22

32:16 36:15 37:2
40:2 43:7 44:16
45:6 51:9,21 54:4
55:14 56:18 58:13,
15,22 76:19 77:11
78:9 80:2 82:17
84:3,9 88:19 89:11
90:21 95:24 99:19
112:14 113:18
115:14,24 116:5,
10,21 120:4,7,9,
14,23 121:20,23
123:11 128:6
133:15 139:14
141:21 142:12
145:18,23 146:21
150:22 152:7,13
155:6,12,16 156:1
157:2,5

Modern
85:22 87:8

mom
8:7 19:21 22:25
33:1 112:2 116:22

mom's
9:2

moment
8:18,19 64:3 131:8

momentarily
122:15

momma
24:23 109:18

Monday
17:22,23 18:3,5
19:16 51:11,12,13,
14 78:24 86:4

money
14:11,25 15:10
16:25 25:12,14
26:2,22 28:19
32:11 40:4,7,9,10,
11,19 43:16,17,19
50:24 76:22,25
77:2 92:24 95:14
96:12 109:17
122:1 141:14
142:20

month
105:17

months
8:21 9:12 109:9

morning
19:16 20:2 23:22
27:12,19,22 51:5,
8,13,15 100:20
101:1 118:3

mother
7:23 10:20,25

19:17 21:20 23:25
32:24 35:1 65:14
109:7 111:11
113:9 116:21

mother's
50:7 113:7,8,11

mother-son
10:22

motherfucker
129:18

Mount
20:25 30:3,5 32:8
34:15 35:5,6 53:14
54:3,20 140:21

mouth
53:4 151:23

moved
22:2 30:15,17 31:6

movie
108:13

moving
39:8

murder
160:22

Myrtle
161:12 163:13

N

N-c-i-l
157:10,11

Naa
110:12

name-brand
104:4

NC
12:9

neighborhood
85:10

neighbors
85:7 86:19

nice
48:1 104:3

night
11:13 21:5 22:18,
19 24:2 30:8,16
33:23 35:11,22
43:22 78:21 82:13,
22,25 83:12 85:23
86:4 87:25 97:22,
24 98:4,20 100:18
109:3

north
5:19,21,25 7:8
9:24 37:6 40:25

54:5 73:23,24
74:17,21 75:1,11
81:9,11,13 83:6
111:23 112:18
148:3 161:18,20

Notary
163:4

note
14:10,13,15

noticed
142:25

November
7:3,4,5,6 109:10

number
44:7 83:3 113:4
120:16 154:21
158:16 159:8

O

offer
94:14

offered
90:11

office
19:18,23 20:1 35:4
64:18 70:15 96:19
158:19 159:1

officer
9:17,20

official
163:12

older
35:9 84:19

open
70:2,5 72:10
89:23,24 151:23

operational
114:21

opinion
14:8

opposed
72:4

order
119:16

ORI
158:16 159:8

overkill
67:12

owned
50:4

owner
93:9,10 119:22

P

p.m.
5:2 162:2,6

pack
29:13 154:1

package
153:24

packed
20:9,11 29:11
50:6,8 61:7

packet
153:2 154:10

packs
26:1

padlocked
31:1

paid
43:11 88:15,17
90:25 92:14,18
93:22

pain
105:16 111:8

pal
155:13

pants
59:4,12

paperwork
91:3 95:10

pardon
38:3 104:10

parent's
7:19 10:7 29:10

parents
12:4 109:2

Parker
11:18 16:9

parking
71:18

parole
8:1 23:1,3,4

part
47:15 53:14 62:11

parties
25:10

party
10:10 163:9

pass
31:25

passing
23:4

past
32:12 34:20

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

105:17

**pattern**
61:22

**pay**
40:4 66:8 90:14
101:4

**paying**
59:16

**PD**
5:1

**peek**
117:16

**pending**
163:9

**people**
3:19 8:16 21:19
24:9 38:17,22
51:25 52:2 56:4
64:20 65:1,9 80:5
90:5 96:20 103:13
104:2,19,21,25
105:5 106:3,13
107:6,12 108:10
124:10,16 126:5,
14 131:24 132:4,
21 136:15 137:8
140:24 160:16,18

**people's**
66:1

**percent**
104:25 107:21
119:8 140:15

**Perfect**
129:8 133:21

**period**
21:18 107:12

**permission**
96:23 119:20
121:6

**person**
22:19 62:1 109:22

**personal**
66:10 150:23

**persons**
108:20,23

**phone**
19:23 32:23 33:1,9
48:24 81:18,20,25
82:2,8 101:9
114:10,14 116:14
117:6,21,23 118:2,
21 119:1,5 120:3
127:18,21 128:3,7,
9,22 129:1,6
130:22,24 132:3,
20,21 133:22,25

134:5 135:24
136:1 141:5,9,10

**physically**
24:7 72:8

**pick**
29:24 81:4 95:14
98:22 127:17
128:2,21 136:1

**picked**
25:4 30:11

**picking**
130:22 136:10

**pictures**
150:16

**piece**
67:15

**piling**
31:5

**pinkie**
150:13,14

**Pirate**
95:22,23

**pistol**
52:9 56:9,11,12,
14,19,23 57:2

**pistols**
57:5,7

**Pitt**
126:14

**place**
7:22 17:21 45:2
90:6 91:3 94:25
115:4,7 118:22
124:20 160:13

**places**
19:9 108:20

**plain**
148:25

**plasma**
88:3,5,22 89:10,19
90:9 94:10,25

**plastic**
142:9

**play**
8:15 160:21

**playing**
99:4 109:16

**pocketbook**
69:21,23 70:1

**point**
14:3 21:17 23:19,
20 25:5 49:25
63:11 95:10
105:14 108:15

109:6 110:20
133:5 135:1
160:23

**points**
138:20

**police**
33:3,21 65:21
68:11,16 69:16
102:19,21 118:11

**policy**
132:23

**pool**
101:7 102:15

**popular**
22:11

**portion**
16:25

**possession**
108:13

**pray**
65:9

**pre-decide**
61:20

**preoccupied**
52:22

**present**
4:17,22

**presented**
102:7

**press**
68:11

**pressed**
72:13

**pressure**
31:5

**pressured**
125:2

**pretty**
18:22,23 19:11
22:10 36:14 44:25
45:1 46:15 64:2
87:24 94:19
104:24 122:6
129:22 146:8

**previous**
92:18

**prices**
102:14

**pride**
105:19 110:16,21,
24

**prideful**
111:1

**primarily**
10:6

**prince**
24:22

**prison**
7:1,8,20 8:11,16,
20 109:9

**private**
17:14 93:9,10

**probation**
23:1

**problem**
117:18 161:7

**problems**
31:3 106:7

**procedures**
117:8

**proceedings**
48:24 101:9

**process**
30:23 63:17

**produce**
111:13

**produced**
163:6

**productive**
105:1

**Professional**
163:3

**promised**
23:8

**promotion**
23:8,10 109:14

**prostitute**
84:21

**protect**
53:21 104:8,12,13

**proverbs**
110:24

**Public**
163:4

**pull**
79:20 141:11

**pulled**
80:11 123:25

**pulling**
80:6 103:18

**purchased**
93:14

**purposes**
96:24

**purses**
142:19 147:14

**pushing**
63:19,21

**put**
83:15 88:14,15,17
92:14 94:1 96:6,9
109:8 115:10
119:1 120:25
121:16 141:13
152:14 153:5
158:2 159:6
160:16

**putting**
22:24 95:12

---

**Q**

**quantity**
13:9

**queen**
24:23

**question**
7:12 53:15 67:4,5
79:17 107:1,4
128:18,19 132:20
137:3

**questioning**
4:13,15

**questions**
4:8,12,16,22 5:8,
16 128:16

**quick**
150:17

**quickly**
148:3

**quit**
10:13 108:24
109:2

---

**R**

**RA**
158:19,25 159:1,6

**rain**
79:21,23 80:6

**rained**
143:16

**raining**
74:23 80:8

**raise**
109:14

**raised**
5:21 110:20

**Raleigh**
25:18,19,21 32:3

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

ran
15:14 25:12 26:21
32:3 35:8 70:15
rape
136:5,6
re-enter
125:7
re-sell
53:21
read
3:24 4:5,20 62:4
ready
134:14
real
3:3 63:13 93:3
102:22 104:1
105:22 150:17
151:17
reason
37:12,16 63:14,23
67:12 103:23
155:24
reasoning
6:23
recall
14:22 149:4
recanted
8:18
recently
6:25
recess
123:12
record
63:7
recorded
162:6
recorder
161:5 162:3
recording
63:8
red
24:14 142:10,11,
13
reefer
129:24 130:2
refuse
121:6
register
26:3 90:15
registered
18:19,21 36:13
regretting
161:1

regular
50:22 111:15
reinstated
92:15
reiterate
134:19
related
121:8 163:8
relating
97:1
relationship
21:22 25:9 110:3
111:16
relative
111:12
relatives
10:20 37:13
relativity
60:13
released
7:8
reliable
148:4
religious
65:1
reluctant
52:11 90:12 94:14
remain
4:9
remember
12:3,14 14:16 19:4
27:23 33:8 44:6
54:17 69:11 75:3
78:4 84:4 86:18
95:17 96:1 120:15
125:22 130:21
140:16 143:7,25
144:11 145:4
reminded
47:21
reminds
47:16
rent
101:18 102:5,8,9
rented
102:9
repeat
128:18
Reporter
163:1,3,24
residential
148:17
response
59:22

rest
76:21,24 161:1
Retail
141:25
returned
97:18,19
reveal
138:21
revisit
136:24,25 137:2
revolver
56:10,13,14,15,17
rich
108:14,15
Richards
2:2,4,6,9,10,12,15,
18,21,25 3:5,8,11,
14,16,22 4:1,4,7,
20,24 5:9,12,17,
20,23 6:2,5,8,10,
13,16,18,22 7:2,4,
7,10,13 8:6,10,13,
22 9:1,4,6,8,11,14,
18,21,25 10:4,7,
15,23 11:1,5,9,15,
19,23 12:1,3,7,11,
14,19,23 13:1,4,8,
11,14,17,20,24
14:1,5,9,12,15,18,
21,23 15:2,4,6,9,
12,15,18,20,24
16:5,7,9,11,14,17,
20,23 17:1,4,6,9,
12,16,19,22,24
18:2,6,9,13,18,25
19:5,10,13,20,24
20:4,8,11,15,18,
20,22 21:1,3,6,10,
25 22:4,21 23:15,
18,23 24:1,4,11,16
25:13,17,20 26:4,
7,11,16,19,23
27:1,5,8,16,21
28:10,13,16,18,22,
25 29:7,9,13,15,21
30:1,4,7,10,13,17,
20 31:8,10,14,17,
20,23 32:6,14,17,
21,25 33:4,7,11,
13,16,19,24 34:3,
7,10,16,19,23
35:2,12,15,18,23
36:1,7,15,19,22,25
37:3,7,11,14,20,25
38:4,8,11,14,20,
23,25 39:4,10,13,
16,19,25 40:3,8,
11,14,17,21,23
41:2,4,8,10,13,15,

18,21,24 42:4,8,
11,14,18,21,24
43:2,5,8,10,13,15,
18,21,24 44:3,6,
10,12,15,17,20,23
45:4,7,10,12,17,
21,24 46:2,6,10,
13,17,19,22 47:1,
6,10,13,18,21,24
48:4,7,10,14,19,22
49:1,5,10,13,17,22
50:1,10,13,15,18,
20,23 51:3,7,10,
13,16,19,22 52:2,
6,24 53:1,6,8,11
54:3,5,8,10,14,16,
22,24 55:2,9,12,
21,25 56:6,9,12,
14,16,20,23 57:2,
6,11,14,17,20,24
58:2,5,8,11,14,16,
19,23 59:1,3,6,9,
14,25 60:4,7,11,
16,20,25 61:3,6,
11,15,18 62:6,9,
14,18,22,25 63:6,
9,21 64:1,5,9,12,
16,19,23 66:15,21,
24 67:1,7,10,17,
21,25 68:4,8,18,
21,25 69:4,8,12,
18,22,25 70:4,8,
12,17,20,23 71:1,
6,10,14,20,23
72:2,7,15,18,21,23
73:2,5,11,14,25
74:4,7,9,13,18
75:2,6,9,13,16,20,
23 76:2,7,10,14,
17,20,23 77:1,6,
10,12,14,18,21,24
78:1,10,13,17,23
79:1,5,10,12,15,
18,23,25 80:3,8,
11,15,19,21,23
81:2,7,12,15,18,
20,23 82:1,4,7,14,
16,18,23 83:1,3,8,
11,16,22,25 84:2,
4,6,8,10,13,15,18,
22,24 85:3,13,15,
18,25 86:3,6,8,11,
13,16,21,24 87:2,
4,7,10,12,15,18,
20,23 88:1,4,7,11,
13,17,21,25 89:3,
5,9,12,16,18,21,25
90:3,8,14,17,20,
22,24 91:2,6,9,14,
18,23 92:1,3,5,8,
11,19,23 93:12,17,
20,23 94:3,5,8,10,

21,24 95:3,5,8,15,
17,20,23,25 96:5,
8,11,17,25 97:3,6,
11,13,15,18,21,25
98:3,6,8 99:2,6,8,
11,13,18,20,23,25
100:3,7,11,15,19
101:13,20,22
102:1 104:8,11,14,
17,21 105:3,8
106:5,11,15,17,21,
24 107:2,5,8,13,
16,19,23 108:1,3,
8,25 110:1,4,8,11,
13,18 111:14,17,
21,24 112:1,6,9,
11,13,15,19,22,24
113:1,3,6,10,13,
17,19,22 114:1,7,
9,12,14,16 115:1,
15,20,23 116:12,
17,22 117:1,4,7,
9,12,14,18,21 118:1,
4 119:10,13,19,23
120:2,6,8,10,13,
15,18,20,22,24
121:2,4,10,14,21,
24 122:2,7,12,20,
23 123:1,3,7,9,19
125:9,21 126:1,8,
11,16,19,23 127:2,
10,13,17,20,23,25
128:4,8,12,15,20,
23 129:1,4,8,11,
14,20 130:2,5,7,9,
12,14,17,20,25
131:3,5,9,13,18,
22,25 132:6,10,12,
15,23 133:3,6,9,
12,16,19,21,24
134:2,8,10,15
135:18,23 136:1,4,
9,13,17,20,23
137:1,4,6,9,14,16,
18,21,24 138:2,6,
12,16,19 139:1,3,
11,13,15,17,19,23
140:2,4,7,9,11,18
141:1,7,12,16,18,
20,22 142:1,4,8,
11,14,17 143:14,
18 144:18,24
145:3,8,12,14,16,
19,22 146:5,14
147:13,18,20,25
148:7,9,13 149:13,
18,21,23 150:2,4
151:2,5,7,10,14,
19,22 152:2,5,8,
11,14,18,20,24
153:1,17,19,23
154:2,5,12,15,18,



In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

22,24 155:3,7,13, 17,21 156:2,7,11, 13,18,22 157:1,9, 11,14,17,20,22,24 158:1,4,7,10,14, 17,21,25 159:2,10, 13,15,17,20,23 160:3,5,9 161:3, 10,11,16,19,22 162:1

**rid**
76:11,12 80:1 153:5

**ride**
35:9 140:13,24

**ridiculous**
103:6

**riding**
85:2

**right-hand**
73:15

**rights**
3:24 4:3,8,21

**ring**
129:7 130:24 133:23 149:7 150:11,12

**ringing**
48:25 101:10 129:1

**road**
10:3 28:7 55:8,17 74:19 78:6,10 143:3,5

**roads**
146:13 148:24

**rob**
104:22 147:21

**robbed**
17:25 37:5

**robberies**
21:15 103:24 111:6

**robbery**
5:24 6:19,24 7:15 12:10,20 14:6,24 15:2 16:15 20:3 25:14 26:8,13,20 27:2 32:13,19 33:5 40:25 43:19 77:3 78:18,21,23 82:19 92:20 103:23 121:18 123:22 136:18

**robbing**
134:6

**Rocky**
20:25 30:3,5 32:8 34:15 35:5,6 53:14 54:3,20 140:21

**rode**
89:4,6,7,9

**room**
42:20,22 43:6 44:7,10 49:21 51:4 55:16 82:25 83:1, 20 85:5,8,9,11,20 86:14,25 87:25 98:13,24 101:4,6,7 102:5,14 123:13 125:7

**rooms**
55:17

**roughly**
14:21,23

**round**
56:25

**rounds**
57:15,17

**rub**
151:25

**rude**
52:13 66:11 103:15

**run**
45:23,25 75:11 103:22

**runs**
28:19

_____

**S**

**S-a-d-d-l-e-r**
112:12

**S-n-o-w**
112:25

**Saddler**
112:8,13 113:12, 13

**Sadler**
112:10

**sales**
95:21,22,23

**samples**
136:11

**Samsung**
120:3,4,6

**satisfied**
101:5

**save**
116:24

**score**
99:16 100:10,14

**scream**
26:3

**screamed**
70:16

**seal**
163:12

**sealed**
94:19

**search**
119:17,20 141:10

**seconds**
19:3 52:23 60:15

**sections**
163:7

**security**
128:5 133:13

**sees**
101:16

**sell**
17:14 66:4 93:4,9

**selling**
22:7 25:1

**sells**
115:18

**semi-automatic**
56:24

**send**
154:9,13 155:10 159:5

**sensitive**
38:19

**sentences**
7:21

**Series**
140:8

**served**
66:13

**set**
7:21,22 71:2 121:15

**sets**
71:11,13

**settled**
98:12

**sex**
25:10 85:9 140:1

**Shamyra**
98:7,8,10,22 100:16 102:16

**Shamyra's**
99:22

**share**
48:20 49:6,14

**Shean**
163:3,24

**Sheetz**
47:18,22

**Sheetz-like**
47:16

**Sheetz-type**
48:10

**sheriff's**
19:18,23 20:1 35:4

**shift**
27:11

**shirt**
52:9 58:20,22

**shit**
10:19 20:9 22:9 23:14 25:10,11 37:19 48:3 51:18 53:20 54:1 65:2,3, 6,14,18,23 66:2,6 67:15 78:22 109:21 127:12 129:23,25 134:25 139:10 143:13

**shoot**
12:13 61:12,16,20 62:23 63:2,15 66:16 67:19,22,23 68:5 69:8,9 105:12 108:10

**shooting**
70:6

**shop**
115:18

**short**
22:1 24:18 25:12 141:3

**shot**
65:21 67:25 68:2 69:7,15 70:15,18 106:18 108:11 127:6

**should've**
110:15

**show**
86:16

**showed**
58:4

**shows**
13:23,24

**shut**
128:17

**sic**
7:18 73:24 131:8 135:5

**side**
55:17 106:3 109:20 143:3,5

**sign**
4:25 101:17 102:4 121:11 158:11

**Signature**
121:13

**silent**
4:9

**Similar**
110:22

**sir**
2:4,11 18:8 57:16 134:6 153:16 162:1

**sister**
10:21

**sisters**
65:16

**sit**
23:12

**sitcoms**
87:6

**sitting**
59:15 63:1

**situated**
91:13,17

**situation**
10:22 23:8 65:19 68:12 94:13,16 103:12 111:2,4 134:20 160:17

**size**
50:18,22

**skipped**
25:15,18

**sleeping**
27:12

**slightly**
3:19

**small**
16:24 71:17 98:21

**smaller**
102:11

**smoked**
99:8,9

**sneakers**
58:24 59:1

**Snow**
112:22



In Re: FBI Interview of Brandon Council                         Brandon Council Audio Transcription
July 27, 2018

**Snowden**
112:21,23,24
**sober**
103:3 130:11
**Social**
157:18
**soda**
48:18 49:17
**Soden**
149:5,9,11,14
150:6,9,16,20,23
151:4,6,8,12,16,
21,25 152:3,7,10,
13,16,19,23,25
153:15 155:11
156:6,15,21
**sold**
97:2
**soldiers**
65:5
**son**
111:12,14
**son's**
111:17 113:8
**sooner**
102:18
**soul**
66:4 135:13
**sound**
103:15
**sounds**
123:23
**source**
10:16 148:4
**south**
36:21,23 37:4,15,
17,19 38:6 39:22
42:15 51:6 73:8,13
74:13,25 75:12
81:8,16 111:6
124:5,17 127:24,
25 131:6,12
140:19 142:7
145:3,5 147:17,18,
21 161:17 163:4,
13
**spaces**
71:18
**speak**
3:21 128:9 133:17,
19 160:10
**SPEAKER**
123:14,16,18
**speaking**
12:8 107:1

**Special**
161:12
**specific**
37:12 144:12
**specifically**
69:9
**spell**
112:11
**spelled**
157:6
**spent**
51:2 100:18
**spiritual**
65:1
**spoke**
21:13 52:9 132:22
**spot**
34:25 102:25
**spots**
122:10
**spur**
64:2,3
**stand**
59:21 150:19
**Stantonsburg**
36:11,12 78:6,11,
12
**start**
5:3,5 25:21 51:23
66:19 125:16
**started**
3:1,23 8:15 30:25
105:20,21
**stashed**
140:23
**state**
63:4 163:4
**Statesboro**
78:10
**station**
47:17 48:13,15
55:18,20 94:15
**stay**
8:17 9:12 43:22
78:21 82:24 85:23
97:22,23 131:21
134:7 140:4
**stayed**
9:14 35:10,19,21
36:4,14,16,17 37:1
44:1,3 82:12,21
85:20 87:24 98:1,3
**stealing**
27:14

**step**
122:24 149:16
**step-dad**
21:13 109:17
**step-father**
7:24 8:3,4,8 10:10
21:20 22:7 23:25
29:18 109:8
**step-father's**
9:9
**step-son**
8:5
**stole**
114:5
**stood**
111:7
**stop**
4:17 34:2 74:22,24
105:13
**store**
23:10 46:25 47:7
48:2,5,9,11 53:16
54:17 118:17
119:5,6 141:25
142:25 144:12
**stores**
143:5
**story**
22:1 24:18 25:11
62:3 67:2 70:9
122:8 124:8 141:3
**straight**
81:3 83:9
**stranger**
54:7 55:24
**street**
6:15,16 30:12
46:25 55:18 60:10
85:5 86:20 89:14
90:1,5 95:2
104:24,25 112:20
116:8 139:7,8
**streets**
104:6 105:6
**stress**
10:17 61:23
**stuff**
21:15 29:11,13
49:7 74:3 119:15
125:11,13 142:20
149:20 151:5
154:7
**stumbling**
56:4
**stupid**

66:6 105:24
108:23 110:15
**successfully**
103:18 108:18
160:24
**sucked**
106:8
**sufficiently**
122:11
**Super**
101:7,14,25 102:2,
4
**supposed**
109:13
**surprisingly**
135:12
**surrounding**
22:11
**survive**
108:16
**survived**
135:14
**swab**
151:17
**swear**
65:3 75:18 105:10
143:11 160:7

___

**T**

**tag**
95:12 96:6
**tags**
17:21 18:3 94:1
95:12 96:10 97:20
**takes**
21:11 36:9
**taking**
62:17 66:12
146:12
**talk**
3:7,10 4:11 13:14
24:9 45:22 77:8
109:16 123:3
123:5 124:25
161:7,8
**talked**
138:7 147:23
**talking**
24:19,20 105:7,20
116:9 127:1
**talks**
110:24
**tape**
127:9 163:5

**Tarboro**
6:15,16
**tele**
128:24
**telephone**
120:16 129:5
**telling**
132:3
**ten**
71:18 100:22,23
109:9
**tend**
61:24
**term**
7:20
**terminize**
7:18
**test**
135:20
**tests**
23:5
**Texaco**
148:22
**text**
19:17,20,21 20:6
116:19,21
**texting**
116:18
**that'll**
13:6
**Theory**
85:21 87:9
**thereof**
163:10
**thing**
25:16 32:4 36:2
39:1 66:14 67:18
68:16 101:17
114:3,4 126:4
132:3 134:2
136:14 138:17
156:20
**things**
10:11 80:17
108:20 123:5
131:1
**thinking**
5:4
**Thirty-four**
90:19
**thought**
22:21,24 24:15
49:2 63:16 70:14
92:15,16 93:5
107:11 117:10

In Re: FBI Interview of Brandon Council

Brandon Council Audio Transcription
July 27, 2018

125:23 135:7
136:2,7 143:21

**thoughts**
22:25

**threatening**
24:8

**threw**
11:10,12 12:4 21:5
30:9 80:15,23

**throw**
22:2 80:16 109:5

**thrown**
7:18 10:11,12
24:3,24 29:1,10
109:18

**Tia**
163:3,24

**ticket**
96:22

**time**
4:18 5:2 8:23
10:13,18 11:7
23:5,11 27:16,17,
20 37:9 52:12,22
63:13,16 65:7,10
66:8 67:9 74:24
75:25 83:11,12
88:22 93:14 100:6
101:21 102:22,24
103:10 105:14
107:24 115:25
116:1,25 128:19
129:16 135:15
155:13 160:14
162:2

**times**
30:24 50:22 59:23
67:23 129:12
152:1

**today**
2:16,19 65:21 79:1
100:23 103:4
114:21,22 115:11
116:4 117:21
158:13

**today's**
12:22 114:18

**Todd**
2:10 161:11

**told**
8:16 24:14 26:2
32:2 41:11,12,16,
18,23,24 52:19
61:9 67:2 69:3
70:19 85:2 86:18
93:1 94:16,17
100:9 102:12

106:16 122:7
125:19 131:16
148:2

**top**
44:14,15

**total**
31:11

**touch**
128:7,8

**town**
33:22 35:10 39:24
40:1 140:24
143:23

**Toyota**
17:15

**traded**
17:14

**traffic**
22:12

**train**
70:13

**TRANSCRIPT**
2:1

**transcription**
163:6

**transferred**
23:9

**transits**
89:8

**transpired**
123:12

**trash**
73:10

**traveling**
91:20 131:12

**Tripp**
95:19,20

**trouble**
9:15 35:14,15

**true**
23:4

**trust**
25:7

**trusted**
65:17

**truth**
64:22 65:19 82:25
135:12

**Tuesday**
19:16 51:5,8 89:3

**turmoil**
21:16 103:5 109:3

**turn**

73:16 161:5

**turned**
49:2 65:15 145:1,2

**turning**
23:19,20 150:9
162:3

**TV**
44:19,21

**twelve**
27:11

**twenty**
7:4

**Twenty-five**
76:7

**Twenty-two**
56:8,9,16

**Two-and-a-half**
21:19

**two-faced**
109:21

**type**
8:5 10:22 14:6
24:21 31:17 36:5
50:2 129:23
134:25 160:17

___

**U**

**Uhh**
79:14

**understand**
4:2,8,21 110:7
127:3 132:8
136:12

**unemployed**
7:17 10:17 65:17

**unintentionally**
83:14

**UNKNOWN**
123:14,16,18

**unload**
57:21,23,25

**unparalleled**
108:22

**unprofessional**
52:14 126:20

**unusual**
127:16

**UPS**
115:10

**urban**
90:5

___

**V**

**vacuum**
73:10

**vehicle**
10:1,13 15:16,19,
22,25 119:22
121:5

**Verbatim**
14:17,19

**verify**
33:22

**violent**
24:7

**visited**
109:4

**vodka**
47:4,5

**voluntarily**
121:6

**vulnerable**
109:6

___

**W**

**wait**
98:19

**waiting**
15:20,23 89:23

**Wal-mart**
148:22

**walk**
59:11

**walked**
10:5 15:11,13
20:18 25:25 33:22
44:22,23 49:20
52:8 55:5 95:4
101:11,12,16
103:16 140:23

**walking**
45:9 53:16 54:24
55:5,11

**wallet**
80:1

**wallets**
72:22 73:3 74:11
76:11 80:16,20,23
124:1,2

**wanted**
25:21 52:19,20
53:19 83:19
124:13 131:12
139:6 156:17

158:18

**wars**
103:13

**wash**
73:9,10 75:24
79:25 124:1,2
142:21,24 144:17
148:16 149:24

**watch**
13:22,24 60:2
107:22,24 108:4

**watched**
44:19,21 85:12,21
87:5

**weakest**
109:6

**weapon**
56:7 69:13

**wear**
103:25

**wearing**
58:16,23 121:18

**wedge**
109:8

**Wednesday**
79:2

**weed**
129:24

**week**
13:2 42:20 43:8
105:17

**weekend**
18:3

**weekends**
21:9

**weeks**
13:3 54:21

**Wendy's**
9:24 10:2 11:14,24
21:9 98:16 101:3
108:25

**west**
83:6

**wet**
152:4

**what-you-call-it**
13:23

**whereabouts**
21:3 73:11

**whichever**
134:23

**white**
39:24,25 40:1
54:10 58:18,19,21



59:1 71:22,23
77:19 85:15
114:11,12 120:3,6
140:16 142:9,10,
11,12,13 144:20

**willingly**
  66:3

**Wilson**
  5:19,21,25 9:24
  16:13 19:8 20:24,
  25 21:2 22:11 30:3
  33:21 34:4,13,14,
  15 35:6,7 36:14
  82:13,15,16,20
  83:4,5,18 84:21
  86:25 111:22
  112:17 138:25
  140:21 145:19,21
  146:22

**winged**
  64:8

**winging**
  64:4,5,6 125:20,22

**wipe**
  153:12 156:4

**wishy-washy**
  109:19

**witnesses**
  63:18

**woman**
  25:6 63:15 64:11,
  13 67:22 137:22

**women**
  66:9 98:15 105:10
  135:14 136:6
  160:8,11

**wondering**
  134:9

**word**
  45:1 135:9,10

**words**
  53:4

**work**
  10:5 13:7 18:21
  98:16,20 100:8
  101:2 114:16
  149:2

**working**
  9:18,22,23 59:16,
  17

**works**
  27:10

**world**
  62:1 135:4,5

**worse**
  111:3

**would've**
  24:15 65:21 66:13
  111:7

**wound**
  160:23

**write**
  62:4

**wrong**
  74:25 75:1 126:10
  160:13,14

**wrote**
  29:5 111:10

---

**Y**

**y'all**
  3:18,20 23:13 62:4
  64:21 65:25
  102:13 105:6,7
  110:7 114:23,24
  126:13 127:1,9
  141:6 143:12
  144:21 146:7
  147:1

**y'all's**
  158:3,16

**yards**
  15:14

**years**
  7:1 111:10

**yellow**
  144:20

**yesterday**
  77:17 79:4,6 88:3,
  10 89:5 91:20

**young**
  54:12 85:7 94:20



IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 4:17-00866-RBH |
| | ) | |
| vs. | ) | **MOTION TO STRIKE** |
| | ) | **NON-STATUTORY AGGRAVATING** |
| BRANDON MICHAEL COUNCIL | ) | **FACTORS OR IN THE ALERNATIVE** |
| | ) | **FOR OTHER RELIEF** |
| _____ | ) | |

COMES NOW the defendant, Brandon Michael Council, who, by and through his attorneys, moves this Honorable Court to strike, either completely or in part, the non-statutory aggravating factors listed in the Notice of Intent to Seek the Death Penalty which the government filed on March 21, 2018, or in the alternative for other relief. As more fully set forth below, the non-statutory aggravating factors in the notice of intent are unconstitutional pursuant to the Eighth and Fourteenth Amendments of the United States Constitution.

## <u>GENERAL PRINCIPLES</u>

In this case, the government's notice of intent contains four non-statutory aggravating factors. These factors are victim impact, continuing and escalating pattern of criminal activity, targeting innocent victims, and lack of remorse. These factors must be valid in order for the jury to consider them in the weighing process. The Supreme Court has said that "this weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor." *Stringer v. Slack*, 503 U.S. 222, 232 (1992). In the years since *Furman (full cite)*, several legal standards have emerged which help determine whether non-statutory aggravating factors are

1

constitutional and may be submitted to the sentencing jury, or whether they are unconstitutional in whole or in part and must be stricken from the notice of intent.

## LEGAL STANDARDS FOR NON-STATUTORY AGGRAVATING FACTORS

The right to due process and the Eighth Amendment's protection against cruel and unusual punishment, are the constitutional provisions at the heart of all capital cases. These constitutional provisions serve as the guide to ensure that the death penalty cannot be imposed in an arbitrary and capricious manner in which the jury's decision is based on emotion rather than reason. In order for non-statutory aggravating factors to be constitutional, they must satisfy the following criteria.

First, the factor may not be overly broad. The factor must serve a narrowing function to qualify as a constitutional aggravator. The factor must apply only to a subclass of defendants convicted of murder and not to every defendant convicted of murder. *Tuilaepa v. California*, 512 U.S. 967, 972 (1994), citing *Arave v. Creech*, 507 U.S. 463, 474 (1993), which recognized that "if the sentencer fairly could conclude that an aggravating factor applies to every defendant eligible for the death penalty, the factor is constitutionally infirm."

Second, the aggravating factor must not be unconstitutionally vague. *Tuilaepa,* 512 U.S. at 472, citing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). To withstand constitutional scrutiny, the circumstances cannot be too vague to provide any guidance to the sentencer. *Walton v. Arizona*, 497 U.S. 639, 654 (1990). The factor must have some "common sense" core of meaning that criminal juries should

be capable of understanding. *Tuilaepa* at 973, citing *Jurek v. Texas*, 428 U.S. 262, 279 (1976).

Third, the aggravating factor must be "particularly relevant to the sentencing decision, not merely relevant, in some generalized sense, to whether the defendant might be considered a bad person." *Gregg v. Georgia*, 428 U.S. 153, at 192 (1976).

Fourth, an aggravating factor must meet the "heightened standard of reliability" that the Supreme Court requires in the fact-finding procedures in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

Additionally, courts have held that an aggravating factor may not be put before the jury if it is impermissibly duplicative of another aggravating factor. *United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996).

Finally, when addressing the admissibility of information relevant to both mitigating and aggravating factors, 18 U.S.C. § 3593(c) provides that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

## NON-STUTORY AGGRAVATING FACTORS:

### VICTIM IMPACT

Brandon Michael Council caused injury, harm, and loss to the individuals that he killed as well as to the family, friends and co-workers of those individuals. The injury, harm, and loss caused by Brandon Michael Council with respect to each victim is evidenced by each victim's personal characteristics and by the impact of the victim's death upon her family, friends, and co-workers.

### THE VICTIM IMPACT ALLEGATION IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD:

The allegation that members of the victim's family, the victim's friends, and the victim's co-workers suffered "injury, harm and loss" violates due process. This allegation fails to provide adequate notice to the defendant, because the allegation fails to identify who the family members, friends, and co-workers are and to adequately identify the nature of the alleged "injury, harm, or loss" to these individuals. The only "injury, harm, and loss" which can be determined from this allegation is the death of the victims which is obviously true in every murder case. As written, this allegation does not put the defendant on notice of what evidence the government intends to present. The defendant is left to guess what may actually be presented which gives him essentially no way to prepare to respond. This allegation sets the stage for a virtually unlimited presentation of victim impact evidence which would greatly increase the chance that improper evidence would reach the sentencing jury and unconstitutionally influence their decision.

> "An oblique reference to victim's 'injury, harm, and loss,' without more, does nothing to guide defendant's vital task of preparing for the penalty phase of trial." *United States v. Bin Laden*, 126 F. Supp. 2d 290, 304 (SDNY 2001).

This alleged non-statutory aggravating factor is also unconstitutionally vague and overbroad in violation of the Eight Amendment. This alleged aggravating factor fails to provide any notice to the sentencer, and it fails to provide any narrowing function whatsoever in violation of *Arave* and *Tuilaepa*. When the Notice alleges only that there has been injury, harm and loss to the victim and victim's family, etc, the notice merely re-states what is true in every murder case. This factor is unconstitutional, because it fails to narrow in any meaningful way the class of murders deserving of

death or to channel the jury's discretion by clear and objective criteria and should be stricken. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Further, the government seeks to introduce victim impact evidence from the victim's friends and co-workers. Neither *Payne* nor the federal death penalty act specifically authorize this type of victim impact evidence, and courts do not agree as to when this type of evidence may be admitted. In *United States v. Fields*, 516 F.3d 923 (10th Cir 2008) the court recognized that the loss of a co-worker in the sense of the loss of contribution to the office, unit or team is far afield from the personal loss discussed in cases following *Payne*.

As written, this non-statutory aggravating factor would allow the government to present evidence which would go far beyond the "glimpse into the life" of the victim that *Payne* references, and include evidence from friends and co-workers which exceeds the scope of victim impact evidence authorized by *Payne* and the Federal Death Penalty Act. As written, this alleged non-statutory aggravating factor would allow the government to make a virtually unlimited presentation of evidence on an issue that is of critical importance in a death penalty case. After all, the entire body of law in capital cases after *Furman* has been geared toward preventing a death sentence being imposed arbitrarily or capriciously when the jury's decision is based on emotion rather than reason. It is beyond dispute that victim impact evidence is the most emotionally charged evidence in capital cases. It is here that a defendant's constitutional rights to due process and against cruel and unusual punishment hang in the balance between what evidence should and should not be presented. While

some courts may dance around the issue and offer limiting instructions as a refuge, the fact remains that victim impact evidence generates the most risk that a jury's decision to impose the death sentence will be based unconstitutionally on emotion. One district court noted the unsurpassed emotional power of victim impact evidence when observed first hand,

> "I can say, without hesitation, that the "victim impact" testimony. . .was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind or proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. . . To pretend that such evidence is not potentially unfairly prejudicial. . .is simply not realistic. . . *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005).

Therefore, the court should be hyper-vigilant in its determination of whether or not certain evidence or information is unduly prejudicial. Due process is violated when victim impact evidence is introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne* at 582.

Based on the foregoing, this non-statutory aggravating factor is unconstitutional as written and should be stricken from the notice.

Alternatively, the defense requests that the government provide a more definite statement as to the specific victim impact evidence the government intends to offer in the event a penalty phase is necessary. Specifically, the defense requests that the government provide an informational outline to the defendant which contains the names of all of the individuals that the government will present as witnesses on the victim impact issue, and the particularized injury, harm, and loss that it intends to present with regard to each victim impact witness, and the specific "personal characteristics" of each victim that it intends to prove, along with any other

information the defense would need to adequately prepare a response. This approach is consistent with those taken by other courts. *United States v. Bin Laden*, 126 F. Supp. 2d 290, at 304 (S.D.N.Y. 2001), and *United States v. Cooper*, 91 F. Supp. 2d 90 at 111 (D.D.C. 2000).

## TARGETING INNOCENT VICTIMS

Brandon Michael Council displayed particular cruelty and callous disregard for human life by shooting both victims, who were unknown to him, multiple times at close range without warning and without provocation or resistance from the victims, in spite of the fact that such violence was not necessary to successfully complete the robbery of the CresCom bank.

First, this alleged aggravator is another attempt by the government to put victim impact evidence before the jury and is an example of unconstitutional double-counting of aggravating factors. "Under a weighing death penalty scheme such as the FDPA, an aggravator that is entirely a subset of another 'has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996). Such skewing occurs because the jury will be presented with an extra aggravating factor on death's side of the coin. Though trial courts may appropriately instruct juries to avoid simply counting the number of aggravators, merely finding an aggravating factor necessarily implies that it will have some weight assigned to it. *United States v. McCullah*, 76 F.3d 1087, 1112 (10th Cir. 1996). Because this danger of double-counting is inherent in any sentencing framework that seeks to channel a jury's discretion by confining its decision-making to a comparative evaluation of formalized categories, the district court for the Southern District of New

York held that "an aggravating factor that is necessarily and wholly subsumed by a different aggravator within the same death penalty notice is invalid per se and should not be submitted to the penalty jury for sentencing consideration. *United States v. Bin Laden*, 126 F.Supp. at 299. Clearly, this alleged aggravator is a subset of the victim impact aggravator. This alleged aggravator amounts to textbook unconstitutional double-counting and should be stricken.

Second, the defendant moves to strike this aggravating factor, because it fails to serve the narrowing function in order to qualify as a constitutional aggravator. The core of this alleged aggravator is that the defendant targeted innocent victims. This is a classic example of an alleged aggravator which could apply to every defendant in a capital murder case. As such, this aggravator is overbroad and is unconstitutional pursuant to *Tuilaepa v. California* and *Arave v. Creech*. Any victim in a capital case can be considered an "innocent victim." Of course, there is no provision in the Federal Death Penalty Act which states this explicitly, but it does so implicitly. For example, there is no such statutory aggravating factor regarding an "innocent victim" but there is a statutory mitigating factor for "victim's consent". 18 U.S.C. § 3592(a)(7). This mitigating factor may be alleged if "the victim consented to the criminal conduct that resulted in the victim's death. It can be inferred from the existence of this statutory mitigating factor that all victims are considered "innocent" unless they have affirmatively removed themselves from this category. If a defendant does not raise the 18 U.S.C. § 3592(a)(7) mitigating factor of "victim's consent, it can be fairly said that all victims in a capital case are "innocent victims."

Third, the defendant objects to this alleged aggravating circumstance, because the language is both argumentative and vague.    As previously stated, the circumstances cannot be too vague in order to survive constitutional scrutiny. *Godfrey v. Georgia*, 446 U.S. 420, 428, (1980). It must be able to provide some guidance to the sentencer. *Walton v. Arizona*, 497 U.S. 639, 654, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). The factor must have some "common sense" core of meaning that criminal juries should be capable of understanding. *Tuilaepa* at 973, citing *Jurek v. Texas*, 428 U.S. 262, 279, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976).    The allegations of "particular cruelty," "callous disregard," "without provocation," "without resistance," "without warning," and "unnecessary" are the specific examples of vagueness which renders this alleged aggravating factor unconstitutional.    The terminology within this alleged aggravator renders this aggravating factor unconstitutionally vague, because the allegations create confusion and open-endedness about what the jury would need to find unanimously and beyond a reasonable doubt. For example, would the jury need to find unanimously and beyond a reasonable doubt all of these allegations or merely some of them?    Additionally, the vague and argumentative terms referenced above are not defined in the Federal Death Penalty Act or elsewhere, and this creates a problem about how these terms would be defined by the Court.    There is a statutory aggravating factor under 18 U.S.C. § 3592(c)(6) which applies if the defendant committed the offense in an especially heinous, cruel, or depraved manner.    The government knows that this statutory aggravating factor is inapplicable in this case. As a result, the government

JA0500

has attempted to cobble together enough similar language such as "particular cruelty" to fashion this non-statutory aggravating circumstance which is nothing more than an attempt to prove that this defendant is a bad person.   Aggravating factors must be "particularly relevant to the sentencing decision, not merely relevant, in some generalized sense, to whether the defendant might be considered a bad person. *Gregg v. Georgia*, 428 U.S. 153, 192 (1976).

Fourth, this defendant is informed and believes that this non-statutory aggravating factor is presently in conflict with the statutory aggravating factor "pecuniary gain" which the government has also alleged against this defendant. Pursuant to 18 U.S.C. § 3592(c)(8), "pecuniary gain" applies when the defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. With regard to the "pecuniary gain" factor, courts have emphasized that this factor requires that the defendant must have committed the actual killing for pecuniary gain. In *United States v. Barnette*, 390 F.3d 775, 784-785, (4th Cir. 2004) <u>vacated on other grounds</u>, 546 U.S. 803 (2005), the Fourth Circuit Court of Appeals determined that the pecuniary gain jury instruction adequately conveyed that the aggravator required proof the defendant committed the killings, not just robberies, for pecuniary gain.   Despite the legal standard required for the government to prove the "pecuniary gain" aggravating factor, the government alleges in this non-statutory aggravating factor that the defendant shot the victims "in spite of the fact that such violence was not necessary to successfully complete the robbery" By including this language in this non-statutory factor, the government

concedes that the statutory aggravating factor "pecuniary gain" does not apply in this case.  The government cannot have it both ways, either the "pecuniary gain" factor applies or it does not.   While the defendant does not concede in any way that this non-statutory aggravating circumstance is constitutional, if this particular part of it survives, this court must strike the statutory aggravating circumstance of "pecuniary gain."

In essence, the Government has set forth a closing argument in this non-statutory aggravating factor, not careful narrowing guidance.

**CONTINUING AND ESCALATING PATTERN OF CRIMINAL ACTIVITY**

Brandon Michael Council engaged in a continuing and escalating pattern of criminal activity – including a robbery of a Food Lion grocery store in Wilson, North Carolina on or about August 10, 2017, and a robbery of a Branch Bank and Trust (BB&T) bank located in Wilson, North Carolina on or about August 11, 2017 – culminating with the armed robbery of the CresCom bank located in Conway, South Carolina on August 21, 2017.

Generally, admitting evidence of the defendant's unadjudicated conduct in the penalty phase of a capital case violates the defendant's constitutional rights under the Fifth, Sixth, and Eighth Amendments.

As previously stated, an aggravating factor must meet the "heightened standard of reliability" that the Supreme Court requires in the fact-finding procedures in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

A criminal conviction meets this exacting standard of reliability by establishing that the underlying criminal activity was proved under the rules of

JA0502

evidence beyond a reasonable doubt to the satisfaction of an unbiased jury in conformity with constitutional safeguards. A finding of other criminal acts that have not resulted in convictions does not involve the same indicia of reliability.

There is simply no way that a sentencing jury, having just found the defendant guilty of a death penalty eligible murder, can be fair and impartial and objectively evaluate allegations of unadjudicated conduct. Obviously, this situation deprives the defendant of a fair and impartial sentencing determination.

This aggravator is also specifically unconstitutional, because the factor is argumentative and it creates confusion and open-endedness about what the jury would need to find unanimously and beyond a reasonable doubt. As alleged in the Notice, it is impossible to tell if the jury would have to find that the defendant committed all three priors, only one of them, or some combination of the offenses. Further, would the jury also have to find that the defendant committed one or more of these crimes and that these crimes represented an "escalating" and "continuing" pattern? Also, the word "including" suggests that the government could appear at sentencing with evidence of other crimes, thus injecting further confusion into the proceeding, and creating notice issue in probable violation of the Due Process Clause. 18 U.S.C. § 3593(c) allows the court to exclude any evidence such as this where the probative value of the evidence is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Finally, the "continuing and escalating pattern" language renders this non-statutory aggravating factor overbroad.   It is true for all capital defendants that their last criminal act is the most serious

It seems that the Government is attempting to argue that BC is a continuing danger.  This type of argument is impermissible since the government has not alleged future dangerousness as a non-statutory aggravating factor.

Based on the foregoing, the court should strike this aggravating factor.

## LACK OF REMORSE

Brandon Michael Council's actions from the commission of the offenses on August 21,2017, until his arrest on August 23, 2017, demonstrated lack of remorse.

The court should strike this aggravating factor, because lack of remorse as an aggravating factor is inherently unreliable and violates the Eighth Amendment.

> "lack of remorse is a subjective state of mind, difficult to gauge objectively since behavior and words don't necessarily correlate with internal feelings.  In a criminal context, it is particularly ambiguous since guilty persons have a constitutional right to be silent, to rest on a presumption of innocence and to require the government to prove guilt beyond a reasonable doubt. To allow the government to highlight an offender 'lack of remorse' undermines those safeguards.  *United States v. Davis*, 912 F. Supp. 938, 946 (EDLA 1996).

In *Davis*, the court disallowed "lack of remorse" as an independent aggravating factor where the only proposed information to sustain the factor was that the defendant was jubilant when he learned of the victim's death.

13

JA0504

Finally, based on *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010), if the court declines to strike this factor, the government should not be allowed to offer any evidence that the defendant's silence shows a lack of remorse. Moreover, the Government should be limited to arguing a lack of remorse during the specific two-day time period alleged due to specific actions on the part of the defendant. The Government should not be allowed to make any argument that would lead the jury to infer that the defendant lacked remorse after his arrest on August 23, 2017.

## CONCLUSION

Based on all of the foregoing, this defendant respectfully requests that this Honorable Court grant all of the relief requested herein.

Respectfully submitted,

**/s/ DUANE K. BRYANT**
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ AKIN ADEPOJU**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

**/s/ MICHAEL A. MEETZE**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

14

**/s/ WILLIAM F. NETTLES, IV**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935

Florence, South Carolina

September 12, 2018