Nos. 20-1, 21-8

# In the United States Court of Appeals for the Fourth Circuit

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRANDON MICHAEL COUNCIL,

Defendant-Appellant.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA, D. CT. NO. 4:17-CR-866 (HON. R. BRYAN HARWELL)

———————

## FINAL RESPONSE BRIEF FOR THE UNITED STATES

———————

ADAIR FORD BOROUGHS
United States Attorney

KATHLEEN STOUGHTON
Appellate Chief

EVERETT E. MCMILLIAN
Assistant United States Attorney
District of South Carolina

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

ANN O'CONNELL ADAMS
JOSHUA K. HANDELL
Attorneys, Appellate Section
Criminal Division, Ste. 1515
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 305-4244
joshua.handell@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

Given the number of issues controverted between the parties and the gravity of the penalty imposed below, the United States respectfully suggests that oral argument may be helpful to the Court in resolving this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF AUTHORITIES ...................................................................................ix

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION .......................................................................2

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF THE CASE ................................................................................4

    I.     The Federal Death Penalty Act ...............................................4

    II.    Procedural History ...................................................................5

    III.   Factual Background ..................................................................6

        A.    The North Carolina Robberies .....................................6

        B.    The CresCom Bank Robbery and Murders ...................7

        C.    The Aftermath and Apprehension ............................. 11

    IV.   Rulings Under Review .......................................................... 15

SUMMARY OF ARGUMENT...............................................................................16

ARGUMENT ........................................................................................................21

    I.     The District Court Did Not Err in Evaluating Council's Competency to Stand Trial................................................... 21

        A.    Background ................................................................ 21

            1.    The Pretrial Conference .......................................21

            2.    The Parties' Submissions and the District Court's Pretrial Determination ..............................................24

            3.    The Midtrial Competency Motion and Hearing.................27

B.     Standard of Review ........................................................ 32

C.     Discussion ..................................................................... 33

     1.     The District Court Complied with Every Applicable Statutory Requirement When Evaluating Council's Competency................................................................34

          a.     The District Court Did Not Abuse Its Discretion by Designating Drs. Maddox and Hilkey as Examiners..................................................36

          b.     Council's Attack on the Adequacy of the Examiners' Declaration Misapprehends the Relevant Statutory and Constitutional Requirements...............................................41

          c.     The District Court Held the Requisite Hearing and Provided Council an Opportunity to Present Evidence. ...........................45

     2.     The District Court Did Not Clearly Err in Determining That Council Was Competent to Stand Trial....................................................................47

II.     The District Court Did Not Abuse Its Discretion by Denying Council's Final Continuance Motion. ......................................... 53

     A.     Background ................................................................. 53

          1.     Pretrial Scheduling Motions...................................54

          2.     Council's Final Continuance Motion ....................56

     B.     Standard of Review ...................................................... 60

     C.     Discussion .................................................................. 60

          1.     The District Court's Denial of Council's Final Continuance Motion Was Neither "Unreasoning" Nor "Arbitrary." ......................................................61

a.    The Two-Year Timeline from Indictment to Trial in Council's Case Was Not Unduly Accelerated. .............................................................62

b.    The District Court Was Not Improperly Influenced by the Wishes of the Skeen and Major Families............................................................64

c.    Substantial and Legitimate Reasons Justified the Court's Denial of Council's Motion...................68

2.    Council Cannot Demonstrate That the Denial of a 90-Day Continuance "Specifically Prejudiced" His Defense. ...............................................................70

III.    The District Court Did Not Abuse Its Discretion When Questioning Prospective Jurors on Racial Bias..........................................75

A.    Background ............................................................. 75

B.    Standard of Review ................................................ 79

C.    Discussion .............................................................. 79

1.    The Six "Racial Attitudes" Questions on the Supplemental Questionnaire Sufficiently Assessed the Jurors' Capacity to Decide the Case Without Regard to Council's Race. ......................................80

2.    The District Court Did Not Abuse Its Discretion by Declining to Pose the Numerous, Extraneous, and Potentially Inflammatory Questions That Council Proposed. ..............................................................83

3.    Any Shortcoming in the Supplemental Questionnaire Was Rectified by Council's Opportunity to Conduct In-Court Questioning of Prospective Jurors During *Voir Dire.*................................................................87

IV.    The District Court Did Not Err in Permitting Defense Counsel the Opportunity to Raise a *Batson* Claim Following the Exhaustion of Peremptory Challenges. .......................................................... 89

A.    Background ................................................................ 89

B.    Standard of Review ................................................... 92

C.    Discussion ................................................................ 93

    1.    Council's Failure to Raise a *Batson* Claim or to Request Additional Time Within Which to Develop Such a Claim Does Not Constitute Reversible Error by the District Court. ................................................93

    2.    Even If He Had Not Waived It, Council Has Not Shown That a *Batson* Claim Would Be Meritorious. ...........98

V.    The Aggravating Factors Proposed by the Government and Found by the Jury Were Appropriate. ....................................... 102

A.    Background ................................................................ 102

B.    Standard of Review ................................................... 104

C.    Discussion ................................................................ 105

    1.    There Is No Tension Between the Innocent-Victims Factor and the Pecuniary-Gain Factor. ............................. 105

    2.    Sufficient and Appropriate Evidence Supported the Aggravating Factors. ............................................... 107

    3.    The Aggravating Factors Were Not Duplicative. ............. 111

VI.    The Government's Victim-Impact Evidence Was Permissible. ............ 116

A.    Background ................................................................ 116

B.    Standard of Review ................................................... 118

C.    Discussion ................................................................ 119

    1.    The Victim-Impact Testimony Was Not Unduly Lengthy or Voluminous. ....................................... 120

2.      The Penalty-Phase Witnesses Appropriately Contextualized Their Relationships with the Victims. .... 122

3.      The District Court Correctly Bounded the Substantive Scope of the Victim-Impact Testimony. ...... 124

a.      Victim-Impact Testimony Need Not Be Limited to the Time Period and Circumstances Immediately Surrounding the Crime. ........................................................ 125

b.      The Government Did Not Elicit Testimony Beyond the Pool of Cognizable Victims, and Any Testimony Offered to That Effect Was Not Prejudicial. ......................................... 125

c.      Witnesses Permissibly Testified About the Religious Faith That Was Central to Major's and Skeen's Lives, Relationships, and Charitable Activities. ................................. 128

4.      The Victim-Impact Testimony Was Not Overly Emotional. ........................................................... 130

VII.    When Instructing the Jury, the District Court Appropriately Adhered to Congress's Statutory Precaution Against Racial Discrimination. ................................................................... 133

A.      Background ......................................................... 133

B.      Standards of Review .......................................... 137

C.      Discussion .......................................................... 138

1.      The District Court's Instruction Correctly Encompassed the Statutory Directive. ............... 139

2.      The District Court Repeatedly Communicated a Correct and Comprehensive Instruction to the Jury. ...... 144

VIII. The District Court Correctly Determined That Application of the Federal Death Penalty Act in Council's Case Passes Constitutional Muster. ................................................................................... 147

    A.    Background ................................................................... 147

    B.    Standard of Review ..................................................... 150

    C.    Discussion ................................................................... 150

        1.    The District Court Appropriately Denied Council's Untimely Rule 33 Motion.................................................. 150

        2.    Council's *Ex Post Facto* Claim Lacks Merit. ...................... 152

            a.    The Punishment Imposed for Council's Offenses—Death—Has Not Changed Since the Time of His Offense Conduct. ........................ 153

            b.    In Any Event, the Change in South Carolina Law Does Not Affect the Manner in Which Council's Sentence Will Be Carried Out. ............... 158

        3.    Council's Eighth Amendment Challenge to Electrocution Is Neither Relevant to His Case nor Ripe for Adjudication. ......................................... 160

        4.    The FDPA Does Not Effect an Impermissible Delegation of Legislative Power. ........................................ 164

IX. Council's Contentions About the Conditions of His Confinement Do Not Identify a Plain Error in the District Court's Judgment. ......... 167

    A.    Background ................................................................... 167

    B.    Standard of Review ..................................................... 168

    C.    Discussion ................................................................... 168

        1.    Council's Direct Appeal of His Criminal Judgment Is Not the Appropriate Vehicle in Which to Challenge the Conditions of His Confinement.................................. 168

2.      No Court Has Held That the Conditions Imposed on Federal Capital Prisoners Violate the Eighth Amendment............................................................................. 170

X.    Binding Precedent Holds That Capital Punishment Is Constitutional. ................................................................... 172

        A.    Background ..................................................................... 172

        B.    Standard of Review ....................................................... 172

        C.    Discussion ....................................................................... 173

CONCLUSION ................................................................................. 175

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Aldridge* v. *United States,*
283 U.S. 308 (1931) ...............................................................84

*Allen* v. *Lee,*
366 F.3d 319 (4th Cir. 2004) ...................................... 94-95, 100

*Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co. Ltd.,*
138 S. Ct. 1865 (2018) ........................................................ 162

*Batson* v. *Kentucky,*
476 U.S. 79 (1986) .......................................2, 15, 17-18, 89-101

*Baze* v. *Rees,*
553 U.S. 35 (2008) ............................................................... 174

*Bell* v. *Evatt,*
72 F.3d 421 (4th Cir. 1995) ............................................. 47, 53

*Bell* v. *Wolfish,*
441 U.S. 520 (1979) ............................................................. 169

*Booth* v. *Maryland,*
482 U.S. 496 (1987) ............................................................. 119

*Bucklew* v. *Precythe,*
139 S. Ct. 1112 (2019) ...............................................160-161, 174

*Burket* v. *Angelone,*
208 F.3d 172 (4th Cir. 2000) ................................................52

*California* v. *Brown,*
475 U.S. 1301 (1986) ........................................................... 139

*Coulter* v. *McCann,*
484 F.3d 459 (7th Cir. 2007) .............................................. 100

*Davis* v. *Ayala,*
576 U.S. 257 (2015) ............................................................. 171

*Dobbert* v. *Florida*,
432 U.S. 282 (1977) .................................................................. 153, 155-156

*Dusky* v. *United States*,
362 U.S. 402 (1960) ................................................................................47

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
955 F.3d 106 (D.C. Cir.), cert. denied, 141 S. Ct. 180 (2020) ................................ 159

*Ferguson* v. *Sec'y, Fla. Dep't of Corr.*,
716 F.3d 1315 (11th Cir. 2013) ..............................................................49

*Flowers* v. *Mississippi*,
139 S. Ct. 2228 (2019) .............................................................................97

*Glossip* v. *Gross*,
576 U.S. 863 (2015) ...................................................................171, 174

*Godfrey* v. *Georgia*,
446 U.S. 420 (1980) ............................................................................. 139

*Golphin* v. *Branker*,
519 F.3d 168 (4th Cir. 2008) ...............................................................99

*In re Grand Jury Subpoena*,
870 F.3d 312 (4th Cir. 2017) .............................................................. 173

*Grayson O Co.* v. *Agadir Int'l LLC*,
856 F.3d 307 (4th Cir. 2017) ...............................................................46

*Gundy* v. *United States*,
139 S. Ct. 2116 (2019) .................................................................164, 166-167

*Ham* v. *South Carolina*,
409 U.S. 524 (1973) ..............................................................................86

*In re Harmon*,
425 F.2d 916 (1st Cir. 1970) ..............................................................40

*Harris* v. *Hardy*,
680 F.3d 942 (7th Cir. 2012) ...............................................................99

*Humphries* v. *Ozmint*,
   397 F.3d 206 (4th Cir. 2005) (en banc) ...................................................... 120, 130, 133

*Jones* v. *United States*,
   527 U.S. 373 (1999) .............................................................. 111-112, 114-115

*Kennedy* v. *Block*,
   784 F.2d 1220 (4th Cir. 1986) ................................................................ 161

*Lackey* v. *Texas*,
   514 U.S. 1045 (1995) ............................................................................. 171

*Leslie* v. *Warden*,
   59 P.3d 440 (Nev. 2002) ........................................................................ 107

*Mahdi* v. *Stirling*,
   20 F.4th 846 (4th Cir. 2021), cert. denied,
   No. 22-5536, 2023 WL 124121 (Jan. 9, 2023) ...................................... 167

*Malloy* v. *South Carolina*,
   237 U.S. 180 (1915) .........................................................................154-156

*Medlock* v. *Ward*,
   200 F.3d 1314 (10th Cir. 2000) .............................................................. 114

*Mu'Min* v. *Virginia*,
   500 U.S. 415 (1991) .........................................................................81, 98, 141

*Nickelson* v. *Davis*,
   315 F.2d 782 (4th Cir. 1963) .............................................................79-80

*Parisi* v. *Davidson*,
   405 U.S. 34 (1972) ................................................................................. 165

*Pate* v. *Robinson*,
   383 U.S. 375 (1966) ...........................................................................44-45

*Payne* v. *Tennessee*,
   501 U.S. 808 (1991) ...............................................................3, 119-120, 125

*Peña-Rodriguez* v. *Colorado*,
   137 S. Ct. 855 (2017) ............................................................................86

*Peugh* v. *United States,*
    569 U.S. 530 (2013) ................................................................ 153

*Porter* v. *Clarke,*
    923 F.3d 348 (4th Cir. 2019) ................................................. 170

*Preiser* v. *Rodriguez,*
    411 U.S. 475 (1973) ................................................................ 169

*Rosales-Lopez* v. *United States,*
    451 U.S. 182 (1981) ............................................................ 85-86

*State Oil Co.* v. *Khan,*
    522 U.S. 3 (1997) .................................................................. 173

*State* v. *Cooper,*
    700 A.2d 306 (N.J. 1997) ....................................................... 107

*Texas* v. *United States,*
    523 U.S. 296 (1998) ............................................................... 161

*Turner* v. *Murray,*
    476 U.S. 28 (1986) .............................................................. 80-82

*United States* v. *Badwan,*
    624 F.2d 1228 (4th Cir. 1980) .................................................. 74

*United States* v. *Bakker,*
    925 F.2d 728 (4th Cir. 1991) ............................................... 62, 70

*United States* v. *Banks,*
    482 F.3d 733 (4th Cir. 2007) .................................................... 33

*United States* v. *Barnes,*
    532 F. Supp. 2d 625 (S.D.N.Y. 2008) ..................................... 173

*United States* v. *Barnette,*
    211 F.3d 803 (4th Cir. 2000) ............................................120-121

*United States* v. *Barnette,*
    390 F.3d 775 (4th Cir. 2004), cert. granted, judgment vacated on other
    grounds, 546 U.S. 803 (2005) ..........................................110, 120

*United States* v. *Barrett,*
496 F.3d 1079 (10th Cir. 2007) ....................................................... 121

*United States* v. *Battle,*
173 F.3d 1343 (11th Cir. 1999) ....................................................... 164

*United States* v. *Beasley,*
495 F.3d 142 (4th Cir. 2007) .......................................................... 170

*United States* v. *Benton,*
523 F.3d 424 (4th Cir. 2008) ........................................................... 41

*United States* v. *Bernard,*
299 F.3d 467 (5th Cir. 2002) ................................................... 109, 129

*United States* v. *Bernard,*
708 F.3d 583 (4th Cir. 2013) ..................................................... 33, 43

*United States* v. *Blackwell,*
436 F. App'x 192 (4th Cir. 2011) ............................................. 150-151

*United States* v. *Bourgeois,*
423 F.3d 501 (5th Cir. 2005) .......................................................... 166

*United States* v. *Chandler,*
996 F.2d 1073 (11th Cir. 1993) ...................................................... 157

*United States* v. *Chanthadara,*
230 F.3d 1237 (10th Cir. 2000) ...................................................... 130

*United States* v. *Childress,*
26 F.3d 498 (4th Cir. 1994) ........................................................... 138

*United States* v. *Christy,*
3 F.3d 765 (4th Cir. 1993) ............................................................. 151

*United States* v. *Collins,*
982 F.3d 236 (4th Cir. 2020) ........................................................... 53

*United States* v. *Colon,*
975 F.2d 128 (4th Cir. 1992) ........................................................... 67

*United States* v. *Coonce,*
    932 F.3d 623 (8th Cir. 2019) ........................................................ 104

*United States* v. *Cowan,*
    96 F.3d 1439 (Tbl.) (4th Cir. 1996) ..............................................84

*United States* v. *Cowden,*
    882 F.3d 464 (4th Cir. 2018) ........................................................ 137

*United States* v. *Crump,*
    120 F.3d 462 (4th Cir. 1997) ..........................................................33

*United States* v. *Day,*
    700 F.3d 713 (4th Cir. 2012) ..........................................................39

*United States* v. *Dennis,*
    19 F.4th 656 (4th Cir. 2021) ............................................... 92-93, 102

*United States* v. *Diaz,*
    437 F. App'x 207 (4th Cir. 2011) ................................................. 139

*United States* v. *Fell,*
    224 F. Supp. 3d 327 (D. Vt. 2016) .............................................. 171

*United States* v. *Fell,*
    531 F.3d 197 (2d Cir. 2008) ......................................................... 114

*United States* v. *Fernandez,*
    231 F.3d 1240 (9th Cir. 2000) ........................................................62

*United States* v. *Fulks,*
    454 F.3d 410 (4th Cir. 2006) ................................................125, 130

*United States* v. *General,*
    278 F.3d 389 (4th Cir. 2002) ..........................................................37

*United States* v. *Green,*
    407 F.3d 434 (1st Cir. 2005) ....................................................... 138

*United States* v. *Hanno,*
    21 F.3d 42 (4th Cir. 1994) ..............................................................92

*United States* v. *Hedgepeth*,
  418 F.3d 411 (4th Cir. 2005) ........................................................ 60, 69

*United States* v. *Higgs*,
  353 F.3d 281 (4th Cir. 2003) ....................................................172-173

*United States* v. *Higgs*,
  711 F. Supp. 2d 479 (D. Md. 2011) .......................................... 161

*United States* v. *Jackson*,
  327 F.3d 273 (4th Cir. 2003) ..................................................104, 114

*United States* v. *LaRouche*,
  896 F.2d 815 (4th Cir. 1990) ..........................................60, 69-70, 75

*United States* v. *Lawrence*,
  735 F.3d 385 (6th Cir. 2013) ......................................... 106, 140, 145

*United States* v. *Lee*,
  274 F.3d 485 (8th Cir. 2001) ....................................................... 151

*United States* v. *Lincoln*,
  542 F.2d 746 (8th Cir. 1976) .........................................................38

*United States* v. *Little*,
  392 F.3d 671 (4th Cir. 2004) ....................................................... 170

*United States* v. *Lorick*,
  753 F.2d 1295 (4th Cir. 1985) .......................................................75

*United States* v. *Mason*,
  52 F.3d 1286 (4th Cir. 1995) .........................................................43

*United States* v. *McCullah*,
  76 F.3d 1087 (10th Cir. 1996) .................................................... 113

*United States* v. *McVeigh*,
  153 F.3d 1166 (10th Cir. 1998)................................................... 131

*United States* v. *Mitchell*,
  502 F.3d 931 (9th Cir. 2007) ................................................141, 146

*United States* v. *Nelson*,
347 F.3d 701 (8th Cir. 2003) ................................................................121, 130

*United States* v. *Passaro*,
577 F.3d 207 (4th Cir. 2009) .............................................................. 145

*United States* v. *Perry*,
335 F.3d 316 (4th Cir. 2003) .............................................................. 150

*United States* v. *Pogany*,
465 F.2d 72 (3d Cir. 1972).................................................................41

*United States* v. *Purkey*,
428 F.3d 738 (8th Cir. 2005) ............................................................. 113

*United States* v. *Robinson*,
404 F.3d 850 (4th Cir. 2005) ........................................................ 33, 47

*United States* v. *Roof*,
10 F.4th 314 (4th Cir. 2021),
cert. denied, 143 S. Ct. 303 (2022) ..............37, 39, 46, 63, 70, 121, 124, 127-128, 134

*United States* v. *Runyon*,
707 F.3d 475 (4th Cir. 2013) ....................................118, 120, 125-126, 140

*United States* v. *Sampson*,
12 F. Supp. 3d 214 (D. Mass. 2014) ...............................................40

*United States* v. *Sampson*,
486 F.3d 13 (1st Cir. 2007)............................................................... 140

*United States* v. *Sharpnack*,
355 U.S. 286 (1958) .......................................................................165-166

*United States* v. *Smith*,
62 F.3d 641 (4th Cir. 1995) ............................................................. 151

*United States* v. *Smith*,
451 F.3d 209 (4th Cir. 2006) ............................................................ 150

*United States* v. *Smith*,
640 F.3d 580 (4th Cir. 2011) ......................................................92, 96

*United States* v. *Taylor*,
   92 F.3d 1313 (2d Cir. 1996) ................................................................... 97, 99

*United States* v. *Tipton*,
   90 F.3d 861 (4th Cir. 1996) ..............................................113, 115, 157, 164

*United States* v. *Tsarnaev*,
   142 S. Ct. 1024 (2022) ...........................................................................79, 80, 87

*United States* v. *Umana*,
   707 F. Supp. 2d 621 (W.D.N.C. 2010) ....................................................... 115

*United States* v. *Whitten*,
   610 F.3d 168 (2d Cir. 2010) ...................................................................... 122

*United States* v. *Williams*,
   819 F.3d 1026 (7th Cir. 2016) ....................................................................96

*United States* v. *Wingate*,
   113 F. App'x 522 (4th Cir. 2004) ...............................................................93

*United States* v. *Young*,
   424 F.3d 499 (6th Cir. 2005) ...................................................................... 138

*United States* v. *Young*,
   989 F.3d 253 (4th Cir.), cert. denied, 141 S. Ct. 2876 (2021)................... 42, 137, 143

*United States* v. *Ziegler*,
   1 F.4th 219 (4th Cir. 2021) ..............................................................43, 50, 52

*In re Vial*,
   115 F.3d 1192 (4th Cir. 1997) (en banc) .................................................. 170

*Weeks* v. *Angelone*,
   528 U.S. 225 (2000) .................................................................................... 128

*Wiggins* v. *Smith*,
   539 U.S. 510 (2003) ....................................................................................74

*Ziglar* v. *Abbasi*,
   137 S. Ct. 1843 (2017) ............................................................................... 169

**Statutes**

18 U.S.C. § 13 ........................................................................ 165

18 U.S.C. § 848 ...................................................................... 113

18 U.S.C. § 922 .......................................................................... 5

18 U.S.C. § 924 ................................................................... 5, 153

18 U.S.C. § 2113 ................................................................. 5, 153

18 U.S.C. § 3231 ........................................................................ 2

18 U.S.C. § 3591 ........................................................................ 4

18 U.S.C. § 3592 .................................................... 4, 102, 111-112

18 U.S.C. § 3593 ................................. 4, 16, 19, 119, 133, 140, 145

18 U.S.C. § 3594 ........................................................................ 4

18 U.S.C. § 3595 ........................................................................ 2

18 U.S.C. § 3596 ..................... 16, 147, 149, 152, 154, 157, 159, 161, 163, 169

18 U.S.C. § 3771 ................................................................ 58, 65-67

18 U.S.C. § 4241 .............................................................. 34-35, 41, 45

18 U.S.C. § 4247 ............................................................. 24, 35-36, 45

28 U.S.C. § 1291 ........................................................................ 2

28 U.S.C. § 2241 .................................................................... 170

S.C. Code § 24-3-530 (1995) ............................................... 148, 158

S.C. Code § 24-3-530 (2021) ............................................... 148, 158

## Rules and Regulations

28 C.F.R. § 26.3.................................................................................... 147

Fed. R. App. P. 32.1 .............................................................................93

Fed. R. Crim. P. 24 ..............................................................................90

Fed. R. Crim. P. 30 ............................................................................ 137

Fed. R. Crim. P. 33 ............................................................................ 148

Fed. R. Crim. P. 51 ..............................................................................92

Fed. R. Crim. P. 52 ............................................................................ 168

Fourth Circuit Local Rule 32.1 ...........................................................93

## Other Authorities

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*
(5th ed. 2013)...............................................................................49

Attorney General Merrick Garland, *Moratorium on Federal Executions Pending
Review of Policies and Procedures* (July 1, 2021) ................................. 163

"Background" and "Reverse," *Merriam-Webster Dictionary*,
https://www.merriam-webster.com/dictionary/ .................................. 143

Federal Bureau of Prisons, *Capital Punishment Historical Information*,
https://www.bop.gov/about/history/federal_executions.jsp........................... 164

Eighth Circuit Model Crim. Jury Instr. 12.13 (2021) ........................................ 141

Nat'l Institute of Mental Health, *Bipolar Disorder*,
https://www.nimh.nih.gov/health/statistics/ ...........................................52

Order Granting Declaratory and Injunctive Relief, *Owens et al.* v. *Stirling et al.*,
Civ. No. 2021CP4002306 (S.C. Ct. Common Pleas Sept. 6, 2022) ....................... 162

Order, *State* v. *Sigmon*, No. 2021-024388 (S.C. June 16, 2021) ...................... 162

## INTRODUCTION

On August 21, 2017, armed with a .22-caliber handgun, Brandon Michael Council entered the CresCom Bank in Conway, South Carolina, and fired multiple shots at the lone teller working the front counter, Donna Major.  Upon hearing a scream from a nearby office, Council sprinted through the bank and discovered the branch manager, Katie Skeen, cowering for her life.  He shot Skeen twice before returning to Major to ensure she was dead.  After incapacitating his victims, Council stole over $15,000 and fled the scene.  Both women succumbed to their injuries.

Over the next few days, Council bought a car, jewelry, and ammunition; provided drugs and alcohol to a group of teenagers; and had sex with one of them. He was apprehended after a brief chase outside a hotel in Greenville, North Carolina. During his ensuing interview with the Federal Bureau of Investigation, Council confessed to the robbery and murders at the CresCom Bank.  He also confessed to two other (non-fatal) robberies in North Carolina over the preceding two weeks.

In September 2017, a federal grand jury in the District of South Carolina indicted Council on one count of bank robbery resulting in death and one count of murder resulting from the use of a firearm during and in relation to a crime of violence.  Following multiple continuances, Council stood trial two years later, and the jury convicted on both charges.  Jurors then heard six days of penalty-phase evidence before voting unanimously to impose a capital sentence as to each of the counts of conviction, and the district court entered judgment accordingly.  This appeal follows.

## STATEMENT OF JURISDICTION

Defendant-appellant Brandon Michael Council appeals from a judgment of conviction and capital sentence in a criminal case.  The district court (Harwell, C.J.) had jurisdiction under 18 U.S.C. § 3231.  The judgment was entered on October 7, 2019.  J.A.2343-2347.  The court denied Council's new-trial motion on December 17, 2019.  J.A.2364-2372.  Council filed a timely notice of appeal on December 30, 2019.  J.A.2374.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3595.

## STATEMENT OF THE ISSUES

1.    Whether the midtrial competency determination reached by the district court, urged by Council's defense attorneys, and supported by Council's evaluators was procedurally deficient or clearly erroneous.

2.    Whether the district court abused its discretion by denying Council's request for a further continuance after jurors had been summoned and he had already received an eight-month continuance of the trial date.

3.    Whether the district court abused its discretion by declining to ask prospective jurors the full battery of racial-bias questions proposed by Council.

4.    Whether the judgment should be vacated on the basis of a claim under *Batson* v. *Kentucky*, 476 U.S. 79 (1986), that Council never raised below.

5.    Whether the district court erred by permitting the government to base its pecuniary-gain, particular-cruelty, multiple-victims, and escalating-pattern-of-criminal-

activity aggravating factors on Council's string of robberies culminating in the double murder of two complete strangers during a bank heist.

6. Whether the victim-impact testimony of the decedents' relatives, friends, and coworkers was consistent with the Supreme Court's directive in *Payne* v. *Tennessee*, 501 U.S. 808, 824 (1991), that a capital jury be permitted to consider evidence showing each victim's "'uniqueness as an individual human being.'"

7. Whether the district court plainly and prejudicially abused its discretion by using verbatim statutory language to instruct jurors that they must reach their sentencing determination without discriminating on the basis of Council's or his victims' demographic characteristics.

8. Whether the revised South Carolina statute permitting condemned state prisoners a choice among electrocution, lethal injection, and the firing squad constitutes an *ex post facto* or otherwise unconstitutional punishment as to Council, whose sentence will be carried out by the federal government pursuant to the federal death-penalty protocol.

9. Whether the length or conditions of confinement imposed on federal capital prisoners plainly qualify as "cruel and unusual punishments," in violation of the Eighth Amendment.

10. Whether, contrary to recent and binding Supreme Court precedent, capital punishment categorically violates the Eighth Amendment.

## STATEMENT OF THE CASE

**I.    The Federal Death Penalty Act**

The Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3599, imposes substantial procedural requirements in cases in which the government seeks the death penalty.  Most significantly, the jury's task is not complete at the rendering of a guilty verdict; instead, the district court must convene a separate sentencing proceeding before the same jury that convicted the defendant of a capital offense.  *Id.* § 3593(b)(1).  The jury must then decide, first, whether the government has established beyond a reasonable doubt at least one mental state specified in 18 U.S.C. § 3591(a)(2) and at least one aggravating factor enumerated in 18 U.S.C. § 3592(c).  *See id.* § 3593(d).  If the jury unanimously finds at least one mental-state factor and at least one statutory aggravating factor, the defendant is death-eligible.  *Id.* § 3593(e).

The jury next considers whether the aggravating factors found to exist "sufficiently outweigh" any mitigating factors "to justify a sentence of death."  18 U.S.C. § 3593(e).  The jury can consider any non-statutory aggravating factors that it finds unanimously and beyond a reasonable doubt.  *Id.* § 3593(d).  The jury must also consider any mitigating factors, which each panel member may find based on a mere preponderance of the evidence.  *Id.* § 3592(a).  The jury must unanimously recommend a sentence of death, life imprisonment without the possibility of release, or some other lesser sentence.  *Id.* § 3593(e).  A jury recommendation of death or life without the possibility of release is binding on the sentencing court.  *Id.* 3594.

## II.    Procedural History

On September 20, 2017, a federal grand jury in the District of South Carolina returned a three-count indictment charging Council with offenses arising from the double homicide at the CresCom Bank.  J.A.69-77.  Specifically, Council was charged with bank robbery resulting in death, in violation of 18 U.S.C. § 2113(a) and (e) (Count 1); murder resulting from the use or carrying of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1), (c)(1)(A)(iii), and (j)(1) (Count 2); and possessing a firearm following a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 3).  *Ibid.*  With the government's consent, *see* J.A.2118-2122, the district court later dismissed Count 3 of the indictment, *see* J.A.34 (DE.733).

Congress has authorized death as a permissible punishment for violations of Section 2113 resulting in death (Count 1) and of Section 924(c) and (j)(1) (Count 2). Consistent with the FDPA, the government filed a Notice of Intent to Seek the Death Penalty (Notice) as to both of the death-eligible counts against Council.  J.A.138-143. The government's Notice identified four mental-state factors applicable under Section 3591(a)(2)—"Intentional Killing," "Intentional Infliction of Serious Bodily Injury," "Intentional Participation in Acts Resulting in Death," and "Intentional Engagement in Acts of Violence, Knowing that the Acts Created a Grave Risk of Death to a Person," J.A.139-140—and two statutory aggravating factors applicable under Section 3592(c)—"Multiple Killings" and "Pecuniary Gain," J.A.140.  The government also

noticed its intent to prove four non-statutory aggravating factors: "Victim Impact," "Continuing and Escalating Pattern of Criminal Activity," "Targeting Innocent Victims," and "Lack of Remorse." J.A.141-142.

Following a four-day guilt-phase trial, the jury convicted Council on Counts 1 and 2. J.A.2208. After a six-day penalty hearing, the jury unanimously recommended that Council be sentenced to death on both counts. J.A.2305-2318; J.A.2319-2332. As required by law, the district court imposed a capital sentence on each count and entered a judgment to that effect on October 7, 2019. J.A.2343-2347.

## III. Factual Background

Over the course of three weeks in August 2017, Brandon Council went on an escalating crime spree across the Carolinas that included three robberies, two murders, a vehicle theft, and an interstate manhunt culminating in his apprehension.

### A. The North Carolina Robberies

On August 8, 2017, Council robbed a Food Lion grocery store in Raleigh, North Carolina. That morning, Council drove his then-girlfriend's car to the Food Lion with the intent to rob the store. J.A.338. As he later admitted to law enforcement, he "walked in there, and asked the cashier for two packs of cigarettes, and when she came back with the cigarettes [he] told her to give [him] all the money in the cash register, hurry up, and don't scream." J.A.336-337; *see also* J.A.5046-5054 (employee testifying about robbery); GX.222 (video recording). He obtained just over $345. J.A.5053; J.A.6559 (cash-register loss tabulation).

6

On August 11, 2017, Council robbed a BB&T bank in his hometown of Wilson, North Carolina. Council walked into the bank, approached the counter, and handed the teller a note reading: "This is a robbery give me the money with no security devices or I will hurt you." J.A.6562; *see also* J.A.325; J.A.5059-5060; GX.224 (video recording of BB&T robbery). As instructed, the teller emptied her top drawer and handed Council the cash, J.A.5060-5061, which totaled $2,676, *see* J.A.5066; J.A.6560 (drawer balance sheet). Council later explained that he robbed the BB&T because he "d[id]n't have shit to lose right now," J.A.321, and had depleted the money he had stolen from the Food Lion three days earlier, *see* J.A.337 ("Because after I ran out of that money, that's when I got BB&T.").

A few days later, local police visited Council's mother's home to inquire as to his whereabouts in connection with the BB&T robbery. J.A.330-331. Council's mother texted him about the police encounter, at which point he left town. J.A.331. He spent the night with a friend in Wilson before having the same friend "drop [him] off in South Carolina" in exchange for "[s]ome gas money" and "[s]ome drug money." J.A.347-351. Council then gave his friend money to rent a room for the week (in the friend's name, but for Council to occupy) at the Conway Inn Express in Conway, South Carolina. J.A.353-354.

## B. The CresCom Bank Robbery and Murders

Council spent the next several days drinking liquor, watching TV, and walking around town, J.A.355-360, but—running out of time and money—soon set his sights

7

on new targets. *See* J.A.362 ("I think I spent next to my last on that bottle. . . . I had to check out that Tuesday morning, so this brings us to the bank in South Carolina."). Around midday on August 21, he went to Auto Money Title Loans and "inquired about a title loan," ostensibly "for his girlfriend." J.A.5070-5071. Based on his questions, Council appeared to be interested in how loans were provided at that establishment—and specifically, whether they "put the money on a debit card, or did [they] do cash." J.A.5073. When he was told that the business operated by check rather than cash, Council promptly left. J.A.5073.

Shortly after 1:00 p.m. on August 21, 2017, Council robbed the CresCom Bank in Conway and murdered the two women working inside.[1] Although he had completed his previous robberies through a verbal demand (Food Lion) and a threatening note (BB&T), Council had a different plan for CresCom: As he would later acknowledge—repeatedly—to law enforcement, he "kn[e]w [he] w[as] going to shoot somebody" that day. J.A.372; *see also* J.A.370 ("I'm not going to lie to you, man.

---

[1] A third employee, Khristi Johnson, was also on teller duty at CresCom on August 21. J.A.4147-4148. She went on her lunch break around 12:45 p.m. and did not return for "[a]bout an hour," by which point the robbery had concluded. J.A.4151-4152; J.A.4158. Johnson's timing proved fortuitous, as Council later indicated that he was prepared to shoot everyone he encountered in the bank that day, regardless of how many were present. *See* J.A.416 ("I will be a man and say I did know that I was going to shoot whoever was in there that was going to try to stop me."); J.A.419 (Q: "Okay. It was 1:00, and you said you were going to—were you going to shoot—what if there was five people in there?" A: "I would have shot— because I was going to try . . . I was going to successfully get away with this or die trying. And I was not going to allow any circumstances, persons, places or things to, you know, come between me and that goal[.]").

I knew what I was going to do when I went there, man.  And I knew how I had to do it to stand a chance of getting away, because of the location and the response times of the local law enforcement agencies in that area."); J.A.374 ("I was going to shoot the woman or whoever was in there regardless . . . It was about them calling that— pushing that button or whatever they do to alert the authorities.").

Council effectuated his plan by entering the bank with "a 22[-caliber] pistol under [his] shirt." J.A.363.  He approached the counter, where Donna Major was the lone teller, and asked her to cash a check.  J.A.363; GX.28j.  Major, like all CresCom employees, had been trained to "remain calm, do as the robber asks, give them the money they ask for, try to keep your hands visible and basically to be safe"—in short, "to give the robber the money and get them out."  J.A.4218.  But on the afternoon of August 21, she was never given that chance: Less than a minute after entering the bank, Council pulled out his gun and shot Major multiple times, without having first communicated any verbal or written demand.  *See* J.A.363-364; GX.28j (00:03-00:55).

Council then "ran into [Katie Skeen's] office, because [he] saw her or she screamed."  J.A.381; GX.28j (00:55-00:57); GX.28i (00:58-01:09).  He found Skeen hiding "under the desk" and "shot at her because [he] didn't want her to call the police on [him]."  J.A.380.  He "took [Skeen's] keys out of her pocketbook," J.A.380,

and returned to the counter area to complete the robbery, GX.28i (01:09-4:44). Less than five minutes after he entered, Council left CresCom with a bag full of cash.[2]

In total, Council stole $15,294 from the registers. J.A.4226; J.A.6418. He also took both of his victims' wallets. J.A.383. And he drove off in Skeen's Chrysler 200. J.A.383; J.A.4311-4312.

Both women died at the scene. The first person to respond to the scene, a patrol officer with the Conway Police Department, found Major lying face down on the floor. J.A.4176; *see also* J.A.7876 (photograph of area behind counter); J.A.7877 (photograph depicting how Major was found). The forensic pathologist who performed her autopsy concluded that "Major died as a result of multiple gunshot wounds with associated extensive tissue damage and hemorrhage or bleeding." J.A.4723. Specifically, Major suffered "three discrete injuries" that collectively proved fatal: "a gunshot wound through . . . the right upper arm"; "a gunshot wound that came through her left upper arm" and "penetrated the chest cavity"; and "a gunshot

---

[2] In addition to his ransacking the registers behind the counter, a surveillance video shows that Council returned to both Major's and Skeen's bodies after having shot them. *See* GX.28i:02:25-03:08 (appearing to linger over Major's body for roughly 40 seconds); GX.28i:03:39-04:13 (returning to Skeen's office for roughly 30 seconds). Based on these clips and the forensic evidence, the government contended that Council returned to inflict the final gunshot wound on Major after he had shot Skeen and started removing cash from the registers. *See, e.g.*, J.A.5951 ("[T]he circumstantial evidence shows you what he did. . . . You can debate all day. He shot her on the ground, but you can't debate that he went back there to finish her."). On appeal, Council has not contested that understanding of the evidence. *See* Br. 17-18.

wound to the posterior left head just behind the ear." J.A.4720-4721. At the time of

her death, Major was 59 years old. J.A.4097.

A crime-scene investigator with the Horry County Police Department found

Skeen "up under the desk, partly on her right side, kind of folded at the waist" and

"deceased." J.A.4241; *see also* J.A.7878 (photograph depicting how Skeen was found).

Skeen was later determined to have died of a "gunshot wound to [her] head and

abdomen with extensive cerebral trauma, brain trauma." J.A.4729. Her injuries

consisted of "a superficial wound that traversed her left abdomen" and "a second

gunshot wound in the anterior aspect of her head, close to the midline" that

"penetrated the anterior skull . . . [and] traversed . . . through the midbrain area,

causing extensive traumatic injury to the brain and death." J.A.4725-4726; *see also*

J.A.7879 (photograph depicting Skeen's cranial and facial injuries). Around Skeen's

head wound, the pathologist identified "stippling"—a pattern of small dots caused by

"the actual burning powder that comes out of the end of the weapon being used"—

which "indicates that the wound came from a fairly close range." J.A.4727. At the

time of her death, Skeen was 36 years old. J.A.4097.

C.    **The Aftermath and Apprehension**

After exiting the bank, Council returned to the Conway Inn Express, retrieved

his bags from his room, and left town in Skeen's Chrysler 200. J.A.4311-4312. He

later told law enforcement that his next stop was Wilson, North Carolina. J.A.393-

394. Upon reaching Wilson, Council encountered a prostitute he knew, had her

11

arrange to rent a hotel room for them, and had sex with her. J.A.394-396. The same night, he drove Skeen's car to Greenville and rented a room under the name "Michael Council" at the Economy Inn, where he paid cash for two nights. J.A.397-398; J.A.5086-5088; J.A.6564 (hotel paperwork); J.A.6526-6527 (photographs of Skeen's Chrysler 200 parked at the Economy Inn).

Early the next morning (August 22, 2017), Council took the bus to Pirate Auto Sales, a car dealership where, "[a]pproximately two weeks" earlier, he had "honed into a Mercedes-Benz" that he wanted to buy. J.A.400-401; J.A.4343-4345. Newly flush with cash from the CresCom Bank robbery, Council returned to the dealership to complete the purchase but—now a fugitive—needed someone else to sign the paperwork. He walked to the plasma-donation center across the street and offered 18-year-old Jalen Vines $100 to straw-purchase the Mercedes on his behalf. J.A.401; J.A.5118-5119 *see also* J.A.5153 (Jalen's age at the time). The pair proceeded to the dealership and took a test-drive back to the Economy Inn, where Council retrieved $3,400 cash from his room. J.A.401; J.A.406-407; J.A.5120-5121. After Vines filled out the paperwork back at the dealership and paid the money Council had given him, he and Council drove off in the Mercedes. J.A.401; J.A.5121-5122; J.A.6565.

Over the next day, Council enjoyed himself with Vines and Vines's friends. Council and Vines shopped for guns and ammunition at a local pawn shop, J.A.5128-5129, and for jewelry at a mall, J.A.5131, where Council had Vines snap a photograph of him flashing his cash in front of the Mercedes, J.A.6582. Council restocked on .22-

caliber ammunition at a sporting-goods store. J.A.5132; J.A.6583. Later that night, the 32-year-old Council had sex with a minor whom he had met through Vines. J.A.5151; *see also* J.A.5238 (Council's age); J.A.5187 ("At the time [the minor girl] was 16, 15."). Council also hosted his new teenage friends at his hotel room, furnishing them with marijuana and alcohol, J.A.409-411; J.A.5103-5104; J.A.5192, and regaling them with his dream of buying "a trap house where he could sell drugs and stuff," J.A.5141; *see also* J.A.5149 (Council wanted to sell "[h]eroin, cocaine, [and] weed" at the trap house). All the while, Council remained "cool," "laid back," and even "talkative"—not once breaking down emotionally or betraying any sign that he was not "having a good time." J.A.5159; J.A.5199.

That serenity was interrupted the next day, when the interstate manhunt triggered by Council's crime spree caught up to him. On the morning of August 23, Council decided to check out of the Economy Inn and "get a hotel room with a pool," J.A.412, so he accompanied Vines to a local Super 8 motel and had him attempt to rent a room. J.A.4369-4370; J.A.5152-5153. Because the Super 8 refused to rent to an 18-year-old, J.A.413, Council and Vines moved on to the nearby Baymont Inn. J.A.5154-5155. Unbeknownst to them, however, the front-desk attendant at the Super 8 had recognized Council from a local news report and reported him—as well as details of his vehicle—to the police. J.A.4370-4372; GX.91 (9-1-1 call recording).

13

By the time Council and Vines exited the Baymont, multiple law-enforcement officers had swarmed the parking lot. J.A.4386; J.A.5156. Vines immediately complied with police orders to put his hands up, J.A.4408; J.A.5156, but Council—after placing "his hands . . . towards his waistband," J.A.4441-4442—"said no, and took off running," J.A.5156. Following a brief foot pursuit, officers caught up to Council and "tackled him to the ground." J.A.5157; *see also* J.A.4394; J.A.4408-4410. Council later admitted that he had been willing to engage police in a shoot-out rather than submit to arrest. J.A.376 ("I'm going to tell you the damn truth. If the situation had—had gone out my way, I'd be dead right now today, because me and the police would've shot it out.").

During a search of Council's Mercedes, police found numerous incriminating items. *See* J.A.4549-4565 (describing evidence recovered from vehicle). In the trunk, officers recovered $10,065 in cash stuffed in a pillowcase, J.A.6532-6535, and a loaded .22-caliber handgun, J.A.6528-6531. In a wallet located on the driver's-side floorboard, officers found a note reading: "This is a robbery. Give me the money, $20,000, and no security devices. 10s, 20s, 50s, 100s. Cooperate and you will live. Don't try any[ alarms] . . . cuz I will kill you. I want your car keys too." J.A.4559.

Council was transported to the Greenville Police Department, where local police surrendered him to the FBI. J.A.4415-4417. After waiving his *Miranda* rights, *see* J.A.315-316; J.A.6524 (signed advice-of-rights form), Council spoke at length with FBI Agents Todd Richards and Greg Coates. *See generally* J.A.312-473 (transcript);

14

GX.93 (video).    During that conversation, Council confessed to the Food Lion,

BB&T, and CresCom Bank robberies and to the murders of Major and Skeen during

the latter.  *See, e.g.*, J.A.425 ("First thing I did, when I broke the law, was the Food

Lion.  The second thing I did was the BB&T, then the bank, and I stole the lady's

car."); J.A.416 ("I will be a man and say I did know that I was going to shoot whoever

was in there that was going to try to stop me").

## IV.    Rulings Under Review

On appeal, Council challenges nearly every aspect of the proceedings below.

With respect to competency, Council challenges (Br. 44-90) the adequacy of the

district court's uncontroverted assessment at his midtrial competency hearing,

J.A.4782.  With respect to scheduling, Council challenges (Br. 90-115) the district

court's denial of his final 90-day continuance motion, J.A.1913-1915.  With respect to

jury *voir dire*, Council challenges (Br. 115-133) the selection of racial-attitudes

questions that the district court posed to prospective jurors on a supplemental jury

questionnaire, J.A.2100-2101.  With respect to jury empanelment, Council challenges

(Br. 133-153) the district court's purported failure to allow a more generous delay in

proceedings to facilitate a claim under *Batson*, J.A.4082-4083.  With respect to the

penalty-phase presentations, Council challenges both the aggravating factors alleged

by the government (Br. 153-173) and the victim-impact testimony adduced for the

jury (Br. 173-205).  With respect to the penalty-phase jury instructions, Council

challenges (Br. 206-222) the district court's formulation of the nondiscrimination

15

charge required by 18 U.S.C. § 3593(f), J.A.2276-2304.  With respect to his capital sentence, Council challenges (Br. 222-236) the FDPA's incorporation of "the manner [of execution] prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a).  With respect to his pre-execution imprisonment, Council challenges (Br. 236-243) the length and conditions of confinement imposed on federal capital prisoners.  And with respect to capital punishment generally, Council challenges (Br. 243-246) the constitutionality of the death penalty.

## SUMMARY OF ARGUMENT

I.    There was no error in the competency proceedings or the competency determination in Council's case.  When alerted to defense counsel's concerns about their client, the district court promptly and appropriately ordered a psychological evaluation and convened a competency hearing, thereby satisfying its statutory obligations.  That hearing revealed that every relevant party—defense counsel, government counsel, and each psychological expert to have examined Council at any point during the proceedings below—agreed that he was competent to stand trial. The district court did not clearly or procedurally err by entering a finding consistent with that consensus view, which was robustly supported by the record.

II.    The district court did not abuse its ample calendar-setting discretion by denying Council's final continuance motion, which was filed after the court had already granted an eight-month continuance (over the government's objection) and jury summonses had already issued.  The resulting two-year timeline from indictment

16

to trial in Council's case was well within the mainstream of recent capital prosecutions in this Circuit—particularly because Council did not contest guilt, thereby freeing his defense team to focus the entirety of their preparation on developing his mitigation case. That Council was able to identify numerous witnesses and marshal significant evidence in support of his proposed mitigating factors both demonstrates the reasonableness of the district court's scheduling decisions and precludes any showing of specific prejudice to the defense case.

III.    The race-related questions that the district court posed to prospective jurors included an appropriate mix of direct and indirect queries that proved effective at eliciting candid responses, identifying unqualified jurors, and supplying critical information for follow-up questioning. The court did not abuse its discretion by declining to ask Council's full battery of proposed questions, which raised such extraneous and controversial issues as affirmative action, the Black Lives Matter movement, and the removal of Confederate symbols. Regardless, because both sides were permitted to pose additional questions during in-court *voir dire*—a procedure requested by the defense—Council had an opportunity to ask any further questions he felt were necessary to make informed jury-selection decisions.

IV.    Council's failure to raise a *Batson* claim in the district court forecloses relief in this Court. Contrary to his contentions on appeal, Council was given multiple meaningful opportunities to assert a *Batson* challenge to the government's exercise of its peremptory strikes or to request a lengthier delay in which to develop such a

17

contention.  He did neither, instead informing the court that he had no objection to the empaneled jury.  This Court should not countenance Council's belated efforts to speculate into existence an appellate *Batson* claim based on a cold record that was circumscribed by his own litigation choices below.

**V.**     Each aggravating factor alleged by the government and found by the jury reflected a distinct, logical, and sufficiently evidenced aspect of Council's offense conduct exacerbating his culpability.  Council's arguments to the contrary do not withstand scrutiny.  First, no tension existed between the pecuniary-gain factor (which described *why* Council murdered his victims) and the particular-cruelty factor (which described *how* Council killed them).   Second, the penalty-phase evidence and argument—including Council's own admissions—demonstrated that he killed the bank employees to facilitate his pecuniary gain.  Third, while the uncontroverted reality that Council murdered two victims in cold blood at the culmination of an escalating robbery spree was relevant to multiple factors, different aspects of that narrative appropriately informed different aggravators such that no factor was impermissibly duplicative of another.

**VI.**   The victim-impact testimony adduced by the government during the penalty phase adhered to the principles and constraints articulated by the Supreme Court and this Court in other capital cases.  That testimony covered a reasonable period and portion of the penalty-phase case.  It focused appropriately on the unique characteristics of Council's victims, as exemplified through their contributions to their

communities and their relationships with their families, friends, and colleagues. Although some witnesses understandably grew emotional when testifying about the decedents, this Court has recognized that the emotional impact of the loss is a permissible subject of victim-impact testimony, and both the district court and the government took affirmative steps to structure and pause the testimony so as to maintain a sober and dispassionate presentation.

**VII.**   The nondiscrimination instruction delivered in Council's case correctly and comprehensively communicated to the jurors their responsibilities under 18 U.S.C. § 3593(f).   Council's proposed instruction, by contrast, would have both exceeded the statutory mandate and confused the jurors by requiring that they mentally swap any and all "background" characteristics of any and all persons "involved" in the case.   The district court did not abuse its discretion—and certainly not plainly and prejudicially so—by declining to deliver that flawed instruction and hewing instead to the unambiguous statutory language that Congress enacted.

**VIII.**   The district court did not abuse its discretion by denying Council's untimely new-trial motion under Federal Rule of Criminal Procedure 33.   As Council concedes, that motion—filed 21 months after entry of judgment in his case—did not fall within the 14-day window permitted by the rule.   And because his motion set forth legal challenges to the FDPA rather than "new evidence" or previously unavailable authority constituting "excusable neglect," the court appropriately held him to the consequences of his delay in seeking relief.

19

Moreover, each of the grounds that Council asserted in that motion fails on the merits. Because the punishment for Council's offenses was and remains death, the *Ex Post Facto* Clause is not implicated by an intervening change in South Carolina's death-penalty statute—which, in any event, continues to permit both electrocution and lethal injection at the election of a capital prisoner, just as the preexisting statute did. The fact that lethal injection remains available—and there is thus no likelihood that Council's sentence will be implemented by electrocution—renders his Eighth Amendment objection to the latter method of execution both irrelevant to his case and unripe for adjudication. Finally, Council's nondelegation challenge to the FDPA overlooks the routine and sensible practice of harmonizing the parallel federal and state criminal-justice systems where feasible—an objective that the Supreme Court and the courts of appeals have expressly approved.

**IX.** This Court should reject Council's forfeited objection to the length and conditions of his confinement while awaiting implementation of his capital sentence. A direct appeal of a criminal judgment is not the appropriate vehicle in which to litigate the defendant's generalized complaints about aspects of his imprisonment. Moreover, Council has identified no error—much less a plain and prejudicial one—in the proceedings below or the judgment produced thereby, which does not, by its terms, impose any of the conditions of confinement to which he belatedly objects.

**X.** Council's categorical challenge to the constitutionality of the death penalty is foreclosed by binding decisions of the Supreme Court. He offers no

support for his contention that the lower courts can ignore or contravene Supreme Court precedent that they deem to be out of step with modern societal standards. In any event, the Supreme Court has recently and repeatedly reiterated that capital punishment remains constitutional.

## ARGUMENT

### I. The District Court Did Not Err in Evaluating Council's Competency to Stand Trial.

#### A.    Background

##### 1.    The Pretrial Conference

At the time that the district court convened a pretrial conference on April 6, 2018, J.A.965, neither the government nor the defense had raised any question as to Council's competency. In advance of the conference, however, the court ordered the parties to "be prepared to discuss the Court's consideration of a Section 4241 competency evaluation." J.A.10 (DE.83). And at the conference, the court directed counsel "to address, before we talk about the scheduling[,] . . . the Court's consideration of a [Section] 4241 examination of Mr. Council." J.A.967.

In response, defense counsel assured the court that they were "aware of [their] duties to have the defendant evaluated through appropriate mental health professionals" but stated that they did not believe there was any reason to discuss competency at that time. J.A.968. Nonetheless, defense counsel sought "a time period of June 1st[, 2018]" in which either to "file a motion" for a competency evaluation or to "file a declaration" stating that counsel "d[id] not believe an

21

evaluation is appropriate," along with "the reasons for that" determination. J.A.968. The government agreed that the process suggested by defense counsel was appropriate. J.A.968-969.

The district court expressed "concern" that pushing off an evaluation of Council's competency "could delay the case." J.A.969. The government acknowledged that possibility but noted that "[t]here are other avenues that the [c]ourt and the government could take to do [the evaluation] here." J.A.969. The government specifically pointed to "the *Roof* matter," in which "the district judge . . . appointed his own expert who was a local expert in Charleston who performed [a] competency evaluation" in a manner that "didn't interfere with the preparations that were required." J.A.969 (discussing *United States* v. *Dylann Roof*, No. 2:15-cr-472 (D.S.C.)). Council's attorney agreed that "any sort of competency evaluation in the future[,] if that were to ever arise[,]" would not "unduly delay" the case. J.A.970.

Notwithstanding the parties' consensus that no competency evaluation was necessary, the district court continued to press for one out of an abundance of caution. The court explained that "there are a few statements in this criminal complaint, the affidavit in support of [the] criminal complaint[,] that I think would give me reasonable cause to order a competency evaluation as a precautionary measure." J.A.972. The court expressly identified Council's statements to the FBI that "he was desperate, needed money, and he knew he was going to shoot someone," that "he knew he was going to hurt somebody that day," and "that he did not deserve

to live." J.A.972. The court reminded the parties that it had "an independent duty aside from [counsel's] duties" to ensure Council's competency to stand trial. J.A.972.

Defense counsel again reassured the court that they would "be engaging certain experts to review all aspects of" Council's "background[,] including his education, physical health, his mental health, his social standing, all of that kind of stuff." J.A.972. Because those efforts were ongoing, defense counsel suggested that "the [c]ourt's concerns, while valid, are probably a little overblown at this point." J.A.973. The court responded that it did not "think [such concerns] can ever be overblown in a death penalty case." J.A.973.

For its part, the government asserted that the excerpts of Council's confession identified by the district court "actually help[] show that we don't have a competency problem" because Council was "able to think, plan, and understand what he was doing and what was going to happen." J.A.973. The government also expressed confidence that Council's attorneys "are in a very good position to evaluate" whether a competency issue exists and noted, "based on all of the investigation that [the government had] done[,] that there's not a competency problem." J.A.974. Accordingly, the government agreed with the defense that there was no "need to preemptively order such an evaluation." J.A.974.

Defense counsel reiterated that, "if [a competency] concern were apparent today, we would surely send up a signal. We wouldn't be having this conversation. It would have been attached to our [scheduling] proposal, a 4241 motion, that suggested

that something further would happen." J.A.975. When the court nevertheless suggested that it was "inclined to order" an evaluation "at Butner" (the Federal Medical Center operated by the Bureau of Prisons), J.A.975, defense counsel stated that "th[e] Court would need to seal that report and make sure that the government does not get a copy," J.A.976. Counsel also repeated that any such concern was premature while their own investigation and evaluations continued:

> We're working towards that end. We believe that we can deliver to the [c]ourt and to the government a satisfactory statement that allays the fears of 4241. . . . So rather than us get into whether or not we're concerned with what the government gets and does not get, then let me propose then that you permit us to do that work, you permit us to supply this [c]ourt with an affirmative statement one way or the other.

J.A.978. The district court ultimately ordered supplemental submissions from the parties on "any authority that says if [the court] order[s] a competency evaluation under 4241[,] that the government is or is not entitled to [the evaluation] under that statute in these circumstances." J.A.979. The court otherwise "defer[red] decision on the competency evaluation for right now." J.A.980.

## 2.    The Parties' Submissions and the District Court's Pretrial Determination

Following the pretrial conference, the government filed a Motion to Permit Disclosure of the Competency Evaluation, which "request[ed] that it be provided a copy of any competency evaluation" the court might order. J.A.183. In support of that request, the government cited 18 U.S.C. § 4247(c), which provides that "[a] psychiatric or psychological report ordered pursuant to this chapter . . . shall be filed

24

with the court with copies provided to the counsel for the person examined and to the attorney for the Government." The government's motion did not address the threshold question whether a competency evaluation was warranted.

Council filed a "Motion in Opposition to Mental Competency Examination and Premature Disclosure of Pretrial Psychiatric or Psychological Examination Report to the Government." J.A.196. He reiterated that "[t]he defense has neither argued nor suggested that Mr. Council is incompetent to stand trial, and he has not introduced evidence of incompetence," and made clear that the defense continued to "object[] to such an examination as unwarranted" at that juncture. J.A.196; *see also* J.A.207 ("Mr. Council has not placed his competence or mental health at issue in this case, and the court has before it no reason to doubt his present competency to stand trial. For this reason, the court should not order a competency examination."). In the event the court ordered an examination over Council's opposition, he urged that "it should not provide the prosecution with a [copy of the] report." J.A.207. In support of that request, Council principally cited (J.A.197-198; J.A.201-203) Federal Rule of Criminal Procedure 12.2—which pertains to defendants who "intend[] to assert a defense of insanity" or "intend[] to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either (1) the issue of guilt or (2) the issue of punishment in a capital case"; and provides that, where a court orders a competency examination after a capital defendant states his intent to introduce evidence of mental condition at the penalty phase, the results

25

of the examination must not be disclosed to the parties until after the defendant is found guilty and confirms that he will offer mental-capacity evidence.

The district court ordered the government to respond to the component of Council's motion opposing a competency hearing. J.A.11 (DE.101). In its responsive filing, the government stated that, "[w]hile the Government has not sought a competency evaluation at this time, it defers to the [c]ourt's own evaluation of the record in determining whether the dictates of Section 4241(a) require this [c]ourt to order such an evaluation." J.A.212. The government also contended that "the notion that any prejudice would result from such an evaluation is unfounded and should not inform the [c]ourt's decision." J.A.211.

Defense counsel filed a declaration further attesting to Council's competency to stand trial. J.A.215. In pertinent part, Council's attorney averred that:

> In this case, I have met with Brandon Council, both in and out of court. To date, Brandon Counsel [sic] has been appropriately cooperative with counsel. Brandon Council has present ability to consult with counsel to a reasonable degree of rational understanding, and has a rational and factual understanding of the proceedings against him. . . .

> To make doubly sure that Brandon Council is competent, I had a board certified forensic psychologist, Dr. Geoffrey R. McKee, Ph.D., ABPP, conduct a competency evaluation of Brandon Council on Monday, April 9, 2018. On April 10, 2018, Dr. McKee advised me that in his opinion Brandon Council was competent to stand trial.

J.A.215.

On April 30, 2018, the district court granted Council's motion to forgo a pretrial competency evaluation. J.A.216-219. The court recounted that, at the pretrial

conference, it had—"out of an abundance of caution—expressed its initial concerns regarding whether Defendant's competency would be an issue in this case, and if so, whether to promptly order a mental (i.e., psychiatric o[r] psychological) evaluation of Defendant pursuant to 18 U.S.C. § 4241." J.A.216; *see also* J.A.219 n.3 (emphasizing that the court's "initial consideration of a mental evaluation was simply a precautionary measure to avoid the issue of competency being raised at the eleventh hour"). Since that time, however, "counsel for both parties have continuously represented that in their opinion a mental evaluation bearing on the issue of competency was unnecessary." J.A.218. The court observed that Council's representations to that effect were buttressed by "a declaration of defense counsel" attesting to the conclusions of a forensic psychologist who had examined Council. J.A.218. And the court noted that it "has not noticed any unusual behavior by Mr. Council at any hearing" and was "unaware of any unusual behavior before any magistrate judge." J.A.218. Accordingly, "[b]ased on the record, including the submissions and representations of counsel," the district court determined that it did "not have reasonable cause under 18 U.S.C. § 4241(a) to doubt Defendant's mental competency to stand trial." J.A.219.

### 3. The Midtrial Competency Motion and Hearing

a. The ensuing sixteen months of trial preparation, pretrial hearings, and jury selection passed without any further questions about Council's competency, as did the three days of testimony and evidence constituting the government's guilt-

phase case-in-chief.  After the government rested on the afternoon of September 19, 2019, the court advised Council of his right to testify and took a brief recess. J.A.4740.  Once proceedings resumed, defense counsel announced that Council had "informed [them] that he would like to testify," and they requested a further recess "because up until just a moment ago, he was not going to testify."  J.A.4741.  The court excused the jury for the day to permit the defense time to address their client's decision to testify.  J.A.4741-4742.

     **b.**     That evening, defense counsel filed a "Motion for Competency Evaluation and Motion for Continuance of Trial Proceedings."   J.A.2176-2182. Specifically, Council's attorneys requested "a brief continuance until Monday morning, September 23, 2019, in order to conduct a competency evaluation" of their client.   J.A.2176.   Defense counsel represented that, "[f]ollowing today's trial proceedings," they were "of the firm view that a competency evaluation is necessary" because, they contended, "Brandon Council is unable to understand the nature and consequences of the proceedings against him and is not assisting properly in his defense."  J.A.2181; *see also* J.A.2182 ("Further details can be provided to the Court in an *ex parte* discussion as to why counsel hold this belief.").   Defense counsel additionally advised the court that they had "immediately contacted an expert after today's proceedings to conduct such an examination," and "[t]he expert agreed to conduct the hearing at the earliest possible time, the next day—Friday, September 20, 2019."  J.A.2181.

28

**c.**     The next day, the district court convened a partially *ex parte* hearing on Council's motion.     *See* J.A.4743 (hearing transcript); J.A.4767 (*ex parte* hearing transcript).   During the open portion of the hearing, defense counsel informed the court that they "have a doctor on his way here"; that the "doctor has a relationship with Mr. Council"; and that, "if further testing is needed," the attorneys had "spoken to a second doctor . . . [who] is familiar with both the prosecution and the defense[.]" J.A.4748.  Defense counsel identified the second doctor as Donna Schwartz-Maddox. J.A.4753.

During the *ex parte* hearing, defense counsel went into greater detail in explaining why they had suddenly changed their minds as to Council's competency. One of Council's defense attorneys noted that he had "been meeting with Mr. Council since he came into this district . . . and at no time ha[d he] ever thought that [Council] was incompetent."   J.A.4769.   More specifically, "[a]t all times when [defense counsel had] talked to Mr. Council about his desire to testify," Council had been lucid and engaged: "he has always asked . . . good questions"; "[h]e's made points to us"; "[h]e seems to have understood what we said, and he seems to have grasped that and moved on in a rational, reasonable basis"; and he told his attorneys "I don't want to testify."  J.A.4770.  However, after the district court advised him of his rights at the close of the government's case-in-chief, Council changed his mind—a decision that defense counsel felt they "had to investigate."  J.A.4770.

29

Defense counsel further represented that, when they met with Council after the court recessed, "[h]e was not able to stay on topic"; "ha[d] adopted views that are irrational about what this jury would accept"; and "does not seem to grasp the concept that th[e district c]ourt has to—would determine what is relevant and he can't just say whatever he wants to on the witness stand." J.A.4771. On the basis of those comments, Council's attorneys concluded "that he may possibly be having a break with reality," and they "ask[ed] th[e] Court to have him evaluated." J.A.4771-4772. In response to the court's questions, defense counsel elaborated that Council expressed his "belie[f] that even in firing the weapon he did not kill these people because only God can give life and only God can give death and, therefore, God is somehow responsible for that." J.A.4772; *see also* J.A.4773 ("I think he will admit to shooting Mrs. Kathryn Skeen and Ms. Donna Major, but he will say that he disagrees that he killed two people; that he only injured them and that it was God who decided to take their lives."). The district court then attempted to question Council directly, but he refused to answer. J.A.4774.

Once the government returned, the district court stated that, "[b]ased on what [it] observed and heard and the motion that's filed, . . . there's reasonable cause to order an examination." J.A.4754. The court then informed the parties that it had contacted Dr. James Ballenger, who "could see the defendant th[at] weekend." J.A.4755. The government noted that "Dr. Ballenger is one of the three [experts] the government just reached out to," and accordingly would not object to his performing

the evaluation. J.A.4756. The defense indicated that it was "still hoping" and expecting that Dr. Maddox could evaluate Council. J.A.4757. The court put off appointing an expert pending more information on various candidates' availability and dismissed the jury until the following week to allow time for the competency evaluation to take place. J.A.4758-4763.

Later the same morning, one of Council's attorneys emailed the court and the government to inform them "that James . . . Hilkey, Phd and Donna Schwartz-Maddox, MD, will see [Council] on Sunday at 1-6 pm. In addition, [Hilkey] will see Brandon today. They can generate a report by Monday at 8 pm." J.A.2185. Early that afternoon, another of Council's attorneys emailed the court and the government to register an objection to the potential appointment of Dr. Ballenger on the basis "that he lacks the experience at Competency Evaluations in capital cases." J.A.2186.

**d.**     On the morning of Monday, September 23, defense counsel filed a declaration attesting that Council was competent to stand trial. J.A.2188. The declaration read:

> Based on a three-hour interview with Brandon Michael Council on Sunday, September 22, 2019, we believe, to a reasonable degree of medical certainty, that Brandon Michael Council is competent to stand trial as defined in 18 U.S.C. Section 4241(a), to wit: Brandon Michael Council is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, if he chooses to do so.
>
> As the Court is well aware, competency is a fluid issue. As of this date, the undersigned find that he is competent to proceed. Mr. Council is experiencing extreme anxiety and some sleep deprivation. As of this

> date, the undersigned find he is competent to proceed.  Nevertheless,
> the possibility of decompensation as the trial proceeds cannot be ruled
> out.  We recommend that counsel monitor his status and advise the
> court should there be a change.  If Mr. Council exhibits signs of stress, a
> short break in the proceedings could be beneficial.

J.A.2188.  It was signed by Drs. Maddox and Hilkey—the two experts proposed by

the defense—and dated Sunday, September 22, 2019.  J.A.2188.

With the doctors' declaration in hand, the district court convened the

competency hearing it had ordered the previous Friday.  J.A.4779.  At the outset,

defense counsel explained that, "over the weekend[,] Mr. Council was seen by a

forensic psychologist and forensic psychiatrist and they have opined to a reasonable

degree of medical certainty that Mr. Council is competent to proceed."  J.A.4781.  In

light of that evaluation, defense counsel stated that they "no longer believe that Mr.

Council is incompetent, to the contrary, we believe that he is competent to proceed in

this case."  J.A.4781.  The government concurred.  J.A.4782 ("[B]ased on what's been

presented, the government does not oppose Your Honor moving forward in this

fashion.").  And the district court found it "clear based on what's been presented"

that Council was "competent to proceed.  He understands the nature and

consequences of the proceedings against him and he's able to assist properly in his

defense."  J.A.4782.

## B.     Standard of Review

"Whether . . . reasonable cause exists" to doubt the defendant's competency to

stand trial "is left to the discretion of the district court."  *United States* v. *Banks*, 482

F.3d 733, 742 (4th Cir. 2007). Similarly, the procedural course undertaken by the district court in adjudicating a competency motion—a so-called "'procedural competency claim'"—is "review[ed] . . . for abuse of discretion, under which standard 'this Court may not substitute its judgment for that of the district court; rather, [it] must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious.'" *Id.* at 742-743.

When the district court has held such a hearing and reached a finding, this Court "review[s] the district court's competency determination for clear error." *United States* v. *Robinson*, 404 F.3d 850, 856 (4th Cir. 2005). "[B]ecause district courts are in the best position to make competency determinations, which at bottom rely not only on a defendant's behavioral history and relevant medical opinions, but also on the district court's first-hand interactions with, and observations of, the defendant and the attorneys at bar, [this Court] appropriately afford[s] them wide latitude." *United States* v. *Bernard*, 708 F.3d 583, 593 (4th Cir. 2013). Accordingly, the district court's competency finding must be affirmed unless it is "clearly arbitrary or unwarranted." *United States* v. *Crump*, 120 F.3d 462, 467 (4th Cir. 1997) (quotation marks omitted).

## C.    Discussion

As Council's trial attorneys recognized, the district court "demonstrated its knowledge and sensitivity to th[e competency] issue" throughout the proceedings below, including by "rais[ing] issues *sua sponte* regarding Mr. Council's competency" even when the parties had consistently agreed that no competency question existed.

J.A.2178. When, at the close of the government's case-in-chief, defense counsel abruptly reversed course and concluded that their client was "presently mentally ill and unable to proceed," J.A.2182, the district court granted each of their resulting requests: It "excused [the jury] until further notice," J.A.39 (DE.808); permitted an indefinite continuance of the trial, *see* J.A.4741; J.A.4758-4761; ordered a competency evaluation, *see* J.A.4754; acquiesced to defense objections to the court's suggested expert, *see* J.A.2186-2187; accepted Council's proposed experts as evaluators, *see* J.A.2185; and held a hearing to resolve any ongoing disputes as to his competency, *see* J.A.4779. Ultimately, the government, the defense, and all three experts who evaluated Council before and during trial agreed that he was competent. The district court did not err, clearly or otherwise, in finding the same.

### 1.    The District Court Complied with Every Applicable Statutory Requirement When Evaluating Council's Competency.

Federal law provides that, "[a]t any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, . . . the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant." 18 U.S.C. § 4241(a). The district court "shall grant [such a] motion, or shall order such a hearing on its own motion," if it determines that "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and

consequences of the proceedings against him or to assist properly in his defense." *Ibid.* "Prior to the date of the hearing" ordered pursuant to Section 4241(a), the district court "may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court." *Id.* § 4241(b). At the hearing, "the person whose mental condition is the subject of the hearing shall be represented by counsel and . . . afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* § 4247(d).

Read in concert, Sections 4241 and 4247 impose a single fact-contingent **mandate** on the district court and describe various discretionary **options** for carrying out that mandate. The lone statutory mandate is that the district court "**shall** order . . . a hearing . . . if there is reasonable cause to believe that the defendant" lacks competency to stand trial. 18 U.S.C. § 4241(a) (emphasis added). The court is then afforded discretion in its manner of satisfying that mandate: it "**may** order that a psychiatric or psychological examination of the defendant be conducted" and "**may** order . . . that a psychiatric or psychological report be filed with the court." *Id.* § 4241(b) (emphases added). If the court opts to order such an examination, Section 4247(b) provides further discretion, including that, "if the court finds it appropriate," it may designate "more than one . . . examiner" to evaluate the defendant; and that "the court may commit the person to be examined for a reasonable period." And if the court opts to order "that a psychiatric or psychological report be filed with the

court," that report must address various aspects of the defendant's background and condition and be shared with defense and government counsel. *Id.* § 4247(c).

As described *supra* pp. 29-32, the district court in this case found reasonable cause to believe that Council had become incompetent, ordered the requisite hearing, provided the represented defendant an opportunity to present his case at that hearing, and reached a determination that he was competent. It thus satisfied every statutory requirement imposed by Sections 4241 and 4247. Council's complaints about the procedural adequacy of this course amount to a disagreement with the statutory scheme, which affords the district court discretion in its manner of assessing competency once the triggering condition for a hearing—the reasonable-cause finding—has been met. Because the court's designation of Council's proposed examiners and conduct of the competency hearing were reasonable under the circumstances—and, in any event, could not possibly have prejudiced Council—no reason exists to disturb its competency finding.

<blockquote>

a.   **The District Court Did Not Abuse Its Discretion by Designating Drs. Maddox and Hilkey as Examiners.**

</blockquote>

Council's first complaint about the competency proceedings (Br. 69-75) concerns the district court's reliance on the very examiners Council's attorneys proposed: Dr. Donna Maddox and Dr. James Hilkey. To begin, no party below or on appeal has contested either examiner's qualifications to opine on Council's competency. As reflected in the curricula vitae attached to the examiners' declaration,

J.A.2188, Dr. Maddox is a board-certified forensic psychiatrist with a medical degree and significant academic and clinical experience, J.A.2189-2198; and Dr. Hilkey is a licensed practicing psychologist with a doctorate and substantial professional experience, including two decades of employment at the Federal Medical Center at Butner, J.A.2199-2206. Indeed, this Court has repeatedly reviewed trial records that included evaluations by both examiners and has never suggested that the district courts in those cases erred in designating them. *See, e.g.*, *United States* v. *Roof*, 10 F.4th 314, 336 (4th Cir. 2021) (per curiam) (discussing multiple competency evaluations undertaken by Dr. Maddox), cert. denied, 143 S. Ct. 303 (2022); *United States* v. *General*, 278 F.3d 389, 397 (4th Cir. 2002) (same as to Dr. Hilkey).

Council instead contends (Br. 69) that the district court "erred by delegating the competency inquiry to the defense team rather than designating a neutral, independent expert to evaluate Council and report directly to the court." But aside from the fact that the court selected, from among its options, the examiners proposed by the defense, Council offers no support for the notion that the district court "delegat[ed]" its responsibility. The record reveals otherwise: The district court's selection comprised three stages, none of which evinced an abuse of its discretion.

First, the district court solicited proposals from counsel as to available and appropriate examiners. *See* J.A.4750 (noting that the defense has "indicated that [they]'ve got somebody coming in to see [Council]" and the court "want[s] to hear from the government whether or not they want him examined by a particular

37

individual as well"). Council does not appear to contend that such a solicitation constitutes per se error. Although there is no "per se rule requiring the appointment of a psychiatrist of defendant's choosing when so requested," *United States* v. *Lincoln*, 542 F.2d 746, 749 (8th Cir. 1976), there is likewise no per se rule prohibiting the district court from seeking the parties' input as to an appropriate examiner. And, notwithstanding its openness to the parties' proposals, the district court made clear that whichever examiner(s) ended up evaluating Council would be appointed by and responsible to the court, not to any party. *See* J.A.4759-4760 (Gov't counsel: "Should we be telling folks . . . that the Court may be appointing someone, or would you envision this being someone that the government is funding for this evaluation?" Court: "Well, the Court would appoint the individual.").

Second, the district court acceded to Council's objection to Dr. James Ballenger, the examiner whom the court had contacted on its own initiative. *See* J.A.4755 (district court suggesting Dr. Ballenger); J.A.4756 (government "would defer to the [c]ourt and believe[s] that Dr. Ballenger is the appropriate choice if we can't find someone to do it more quickly"); J.A.2186-2187 (defense email objecting to designation of Dr. Ballenger). Specifically, the defense contended that Dr. Ballenger "lacks the experience at Competency Evaluations in capital cases," pointing out that the Dylann Roof prosecution "was his first-ever pretrial competency evaluation in a criminal case." J.A.2186. On appeal, Council implies that the district court's accession to *his own* objection was error. *See* Br. 75 (emphasizing that "'an

independent mental health expert' . . . had already been contacted by the court and begun work"). As a threshold matter, any defect occasioned by the court's granting of a defendant's own objection is invited error for which no relief is available on appeal. *See United States* v. *Day*, 700 F.3d 713, 727 n.1 (4th Cir. 2012) ("[A] 'defendant in a criminal case cannot complain of error which he himself has invited.'").[3] And on the merits—although the government maintains that Dr. Ballenger would have been a qualified and appropriate examiner—the district court acted within its ample discretion in accommodating the defense's objection and declining to designate him.[4]

Third, the district court accepted as evidence of Council's competency the declaration of the two defense-proposed doctors who examined him. As noted *infra* p. 45, the Supreme Court has recognized that even a partisan witness's declaration may serve as evidence at a competency hearing. Nevertheless, Council contends (Br. 74) that the district court's reliance on the declaration was error because "[o]ne of the two defense experts who saw Council was already a member of the defense team, and

---

[3] Although Council contends (Br. 44) that the district court's "independent duty to determine [his] competency" was "unwaivable," he cites no authority for the proposition that every procedural determination ancillary to the competency finding—*e.g.*, granting a defense objection to the selection of a particular examiner—is similarly "unwaivable" or falls outside the scope of the invited-error doctrine.

[4] Two years later, this Court would hold that Dr. Ballenger "was qualified [to opine on Roof's competency] and the district court was well within its discretion to rely upon his testimony." *Roof*, 10 F.4th at 344; *see also ibid.* ("Every qualified expert has a first case and Dr. Ballenger, an experienced psychologist, had performed numerous similar evaluations in other phases of criminal proceedings."). Neither the defense nor the district court had the benefit of this Court's opinion at the time that the former filed its objection and the latter accepted it.

the other was also identified, retained, and paid by counsel." But the fact that an examiner may have had some prior—or even ongoing—relationship with one side of the case does not categorically preclude her from offering a neutral and detached opinion as to competency. *See, e.g.*, *United States* v. *Sampson*, 12 F. Supp. 3d 214, 217 (D. Mass. 2014) (declining to "order[] that an independent competency examination be performed" but instead entrusting that task to the federal Bureau of Prisons, which "has experience and expertise in the evaluation of competency," and expressing the court's "expect[ation] that the BOP's Examiner will remain, as required, 'neutral and detached'"); *see also In re Harmon*, 425 F.2d 916, 918 (1st Cir. 1970) (per curiam) (recognizing that an examiner may act as "an officer of the court, not responsible to prosecution or defense," "even if he may have hitherto acted in a personal relationship" with the examinee). Council offers no basis to conclude that either Dr. Maddox or Dr. Hilkey—both amply qualified and credentialed clinicians with extensive experience conducting competency evaluations, *see supra* p. 37—abdicated their professional ethics in order to render a slanted opinion on his competency.

In any event, Council does not even attempt to demonstrate how he might have suffered prejudice from the hypothetical possibility that his examiners were *too* favorably disposed toward his interests. Council broadly contends (Br. 71) that "it was error for the matter of competency to be exclusively 'placed in the hands' of counsel for one party to retain and direct the party's own expert." But the authority he invokes for that proposition considered a situation in which the district court had

committed the competency examination of the defendant entirely to the *government*. *See United States* v. *Pogany*, 465 F.2d 72, 77 (3d Cir. 1972) ("[R]ather than appointing an examining psychiatrist and ordering him to report directly to the Court, the entire matter was placed in the hands of the Assistant United States Attorney."). For self-evident reasons, Council cites no precedent—and the government is aware of none—standing for the proposition that a defendant can establish reversible error in the court's relying on a competency examiner that he himself proposed.[5]

> **b.    Council's Attack on the Adequacy of the Examiners' Declaration Misapprehends the Relevant Statutory and Constitutional Requirements.**

As noted *supra* pp. 35-36, federal competency law *permits* the district court to order the filing of a formal "psychiatric or psychological report," but it does not *obligate* the court to do so. *See* 18 U.S.C. § 4241(b). The district court never ordered that such a report be filed in this case.[6] Because no formal report was ordered, the

---

[5] At various points in his appellate brief, Council appears to assign error not to controverted determinations by the district court but instead to the tactical decisions of his trial counsel. Such contentions should be raised, if at all, in future postconviction proceedings. In this Circuit, "[i]neffective assistance claims are generally not cognizable on direct appeal . . . 'unless it conclusively appears from the record that defense counsel did not provide effective representation.'" *United States* v. *Benton*, 523 F.3d 424, 435 (4th Cir. 2008). Because Council has not expressly argued—much less "'conclusively'" demonstrated—that he received ineffective assistance below, this Court should not reach that issue or unsettle the judgment on that basis.

[6] To be sure, the *government* repeatedly maintained that, to the extent any report was produced, "the government is entitled to receive a copy of any report that is completed at the same time such copy is provided to the [c]ourt." J.A.4746; *see also* J.A.4752 ("I sort of believe that goes without saying, Your Honor, that in turning over

41

specifications that Section 4247(c) sets out for such a report—that it include, *e.g.*, "the person's history and present symptoms" and "a description of the psychiatric, psychological, and medical tests that were employed and their results"—are not relevant here. Accordingly, Council's complaint (Br. 80-82)—essentially, that the examiners' declaration does not enumerate with particularity the factors required of a report that the district court never ordered them to produce—lacks merit.

Council does not separately contend that the district court abused its discretion by declining to order a report pursuant to Section 4241(b); any contention to that effect is thus waived. *See United States* v. *Young*, 989 F.3d 253, 258 n.1 (4th Cir.) ("[A]rguments not raised in [an] opening brief are waived[.]"), cert. denied, 141 S. Ct. 2876 (2021). Nor, in any event, was a full, formal report meeting the specifications outlined in Section 4247(c) necessary in these circumstances. As recounted *supra* pp. 25-27, both parties (and the district court) agreed that Council was competent as of April 2018, and neither suggested that Council evinced any indicia of decompensation over the ensuing sixteen months—up until the final day of the guilt-phase trial, when Council informed his attorneys that he wished to testify. The record reflects that the district court's determination of reasonable cause to question Council's competency at that point arose from two factors: (1) defense counsel's representations as to their

_____

the report, all of the underlying information would have to be turned over for purposes of the . . . 4241 hearing."). But the government's preservation of its inspection right with respect to a hypothetical report does not indicate that the district court in fact ordered the production of such a report from Council's examiners.

communications with their client, and (2) the court's own interactions with Council during the *ex parte* portion of the motion hearing. And just as the court's and counsel's observations of Council's behavior permissibly raised a preliminary concern that he had lost competency, the court's and counsel's further observations of Council's behavior permissibly informed their subsequent determination that he was competent. *See Bernard*, 708 F.3d at 593 ("The district court was in the best position to observe Appellant and its determinations [respecting competency] during trial are entitled to deference, especially where, as here, the district court was acutely alert throughout trial to Appellant's condition."); *United States* v. *Ziegler*, 1 F.4th 219, 230 (4th Cir. 2021) ("[I]t is well within a district court's discretion to consider, or not, defense counsel's opinion on the competency and mental health of his client," and "the district court c[an] rely on the public defender as someone with firsthand experience with the defendant."); *cf. United States* v. *Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (holding that the "[o]utright rejection" of counsel's observations in a competency determination was unwarranted). That "defense counsel's opinion" and the court's "firsthand experience" were consistent with the views expressed by qualified psychological examiners does not imply that the court was required to order a full biographical and methodological write-up before determining competency.

In the alternative, Council contends (Br. 77-83) that the general command of the Due Process Clause imposes more onerous evidentiary obligations on the district court than the specific requirements embodied in applicable federal statutes. In

support of this contention, Council principally invokes the Supreme Court's decision in *Pate* v. *Robinson*, 383 U.S. 375 (1966). There, the Court determined "that the evidence introduced on [defendant Theodore] Robinson's behalf entitled him to a hearing on" his competency to stand trial and that the trial "court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial." *Id.* at 385. Specifically, the Court recounted that "[f]our defense witnesses expressed the opinion that Robinson was insane," *id.* at 383, and it concluded that this "uncontradicted testimony of Robinson's history of pronounced irrational behavior," *id.* at 385-386, outweighed the government's rebuttal "stipulation that Dr. William H. Haines, Director of the Behavior Clinic of the Criminal Court of Cook County would, if present, testify that in his opinion Robinson knew the nature of the charges against him and was able to cooperate with counsel when he examined him two or three months before trial," *id.* at 383.

Even setting aside the numerous material distinctions between *Pate* and the proceedings below—during which the district court *did* order and hold a competency hearing, *no* witness testified to the defendant's incompetency, and the declaration supporting competency was offered by the *defense* rather than the government—*Pate* is inapposite here. Contrary to Council's framing, *Pate* did not articulate any categorical rule as to the propriety or sufficiency of declarations from competency examiners. To the contrary, the Supreme Court affirmatively recognized that "the stipulation of Dr. Haines' testimony was some evidence of Robinson's ability to assist in his defense"; it

simply concluded, "*on the facts presented to the trial court* it could not properly have been deemed dispositive on the issue of Robinson's competence." *Pate*, 383 U.S. at 386 (emphasis added). In Council's case, by contrast, *all* evidence before the district court—including the pretrial attestation that Council had been deemed competent by a forensic psychologist, J.A.215; and the unanimous conclusion in the examiners' declaration that he remained competent as of the time of the competency hearing, J.A.2188—pointed in the same direction. Accordingly, "on the facts presented to the trial court" here, the court appropriately found Council competent to stand trial, and nothing in *Pate* undermines that determination.

> ### c. The District Court Held the Requisite Hearing and Provided Council an Opportunity to Present Evidence.

Finally, the district court satisfied the lone statutory requirement triggered by its reasonable-cause finding, *see supra* pp. 35-36, by holding a competency hearing, J.A.4779. Pursuant to Section 4241(c), that "hearing shall be conducted pursuant to the provisions of section 4247(d)." The latter subsection provides:

> At a hearing ordered pursuant to this chapter the person whose mental condition is the subject of the hearing shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to section 3006A. The person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing.

18 U.S.C. § 4247(d). Council does not dispute that he was represented at the competency hearing and that his attorneys were afforded the opportunity to adduce

whatever evidence they wished. Indeed, they did so, providing the court with "statements by th[e] two individuals [who examined Council] along with their CVs" to support their "belie[f] that [Council] is competent to proceed in this case." J.A.4781.

To be sure, both the parties' presentations and the court's discussion of competency were brief. *See* J.A.4781-4782. Contrary to Council's implications, however, that brevity is attributable not to defense counsel's insouciance or the court's impatience, but instead to the unanimity of all participants' views that Council was competent to proceed. For the reasons summarized in the next section, the district court's determination that Council was competent to stand trial is amply supported by the record. And as a strictly procedural matter, the court need not have belabored the issue further—and potentially prolonged the interruption of the ongoing jury trial—by attempting to incite adversarial proceedings over a question on which all parties agreed. If, as this Court has held, a "court d[oes] not clearly err in crediting one conflicting expert finding [as to competency] over another," *Roof*, 10 F.4th at 343, then a court may *a fortiori* credit the unanimous view of all participants in the hearing without derogating its responsibilities under Sections 4241 and 4247.

### 2. The District Court Did Not Clearly Err in Determining That Council Was Competent to Stand Trial.

Aside from his procedural complaints, Council does not appear to contest the district court's bottom-line determination that he was competent to stand trial.[7] Nevertheless, to the extent disparate comments in his brief are intended to cast doubt on that finding,[8] he has failed to show that the court clearly erred. In fact, the voluminous (and largely uncontroverted) record evidence supporting Council's competency was so compelling that any technical shortcoming this Court might identify in the midtrial competency proceeding was assuredly harmless.

**a.** A defendant is competent to stand trial when "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and [when] he has a rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402, 402 (1960) (per curiam) (quotation marks omitted). The trial court is "only required to ensure that [a defendant] had the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel." *Bell* v. *Evatt*, 72 F.3d 421, 432 (4th Cir. 1995). "Under federal law[,] the

---

[7] Because he does not meaningfully develop that contention in his opening brief, any such claim is waived. *See Grayson O Co.* v. *Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (brackets and quotation marks omitted)).

[8] *Compare, e.g.*, Br. 1 (Council's appellate attorneys describing Council as "an evidently mentally-ill defendant"), *with, e.g.*, J.A.1939 (Council's trial attorneys acknowledging to the district court that "[w]e don't have a mental health defense").

defendant has the burden, 'by a preponderance of the evidence,'" to show mental incompetency—that is, "that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *Robinson*, 404 F.3d at 856.

      **b.**    Council identifies (Br. 49-54) four aspects of the proceedings below that purportedly evidence his incompetency to stand trial: the statements Council made during his post-arrest interview with the FBI; Council's changing his mind with respect to testifying in his own defense; the statements he made to his counsel and the court following this change of heart; and the opinion of a defense psychiatrist that Council "'may be suffering from a major mood disorder such as Bipolar Disorder that is genetically transmitted.'"  Evaluated in context, however, none of those grounds supports Council's contention that he was incompetent—and several, in fact, support the court's uncontroverted determination that Council *was* competent to stand trial.

      First, Council's FBI interview confirmed, rather than undermined, the conclusion that he understood the nature and consequences of his actions.  The transcript demonstrates that Council cogently explained his decision-making process to the agents, including the reasons that he targeted the bank and his rationale for shooting whomever he found inside.  *See* J.A.370 ("I'm not going to lie to you, man.  I knew what I was going to do when I went there, man.  And I knew how I had to do it to stand a chance of getting away, because of the location and the response times of

the local law enforcement agencies in that area."); J.A.374 ("I was going to shoot the woman or whoever was in there regardless . . . It was about them calling that—pushing that button or whatever they do to alert the authorities."). On appeal, Council cherry-picks references to "demons" in that interview, but the context made clear that Council—while perhaps espousing an unremarkable belief in supernatural forces—did not attribute his actions to demonic influence. *See* J.A.376-377 ("These demons out there—you got to control the people's minds and shit. They don't control my mind. I—I willingly went with the demons. I knew what the hell I was doing. I didn't sell my soul to the devil. I don't believe in the illuminati or none of that stupid shit. I—I—I made some bad decisions and it's time for me to pay the consequences."). At most, Council's fleeting mentions of "demons" evince a "belief in [the spiritual realm that] may differ in degree, but . . . does not necessarily differ in kind, from the beliefs of millions of Americans." *Ferguson* v. *Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1342 (11th Cir. 2013) (rejecting proposition "that a belief in resurrection or other forms of life after death is inconsistent with the rational understanding of death that is required for mental competence to be executed" and noting that, "[i]f it did mean that, most Americans would be mentally incompetent to be executed."); *cf.* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) 103 ("Ideas that appear to be delusional in one culture (e.g., witchcraft) may be commonly held in another. In some cultures, visual or auditory hallucinations with a religious content (e.g., hearing God's voice) are a normal part of

religious experience."). Council offers no basis for deeming such widespread beliefs categorically inconsistent with competency to stand trial.

Second, Council's fleeting change of heart with respect to taking the stand does not suggest that he was incompetent. It is not at all surprising that a capital defendant—having heard several consecutive days of incriminating testimony and perhaps newly appreciating both the certainty of conviction and the gravity of the potential penalty—would change his mind about presenting his rendition of events to the jury. *Cf.* J.A.417 (Council earlier telling the FBI agents, "I just want people to hear my side. At least they have an explanation."). And the fact that such a ploy might have redounded to his tactical detriment—that, in his trial attorneys' opinion, he had "adopted views that are irrational about what this jury would accept," J.A.4771—is no reason to question Council's competency to decide whether he wished to testify. Rather, as this Court has observed, "'persons of unquestioned competence have espoused ludicrous legal positions,'" and "Section 4241(a) does not require a competency hearing any time a defendant is combative, conceited, or committed to a 'frivolous legal strategy.'" *Ziegler*, 1 F.4th at 231.[9]

Third, Council's statements to the court and counsel attempting to absolve himself of moral culpability for the murders suggest self-interest, not incompetency.

---

[9] Likewise, the fact that Council, in his attorneys' telling, "d[id] not seem to grasp the concept that th[e district c]ourt . . . would determine what is relevant and he just can't say whatever he wants to on the witness stand," J.A.4771, indicates only that Council lacked a sophisticated understanding of evidentiary rules—not that he (or similarly situated lay defendants) fell below the competency threshold.

During the *ex parte* portion of the hearing on Council's midtrial competency motion,

his attorneys proffered that he would testify that "[a] gun can[not] kill a person.  A

gun cannot decide a person's life or death.  It's all God's decision."  J.A.4773.

Defense counsel then elaborated:

> I think he will admit to robbing the bank.  I think he will admit to taking
> a gun into the bank.  I think he will admit to shooting Mrs. Kathryn
> Skeen and Ms. Donna Major, but he will say that he disagrees that he
> killed two people; that he only injured them and that it was God who
> decided to take their lives.

J.A.4773.  That proffered testimony was corroborated by Council's statements to the

court at the same hearing: "I did not kill those women.  I did not kill those women.  I

am not the person that killed them.  I did not.  I don't know who did it.  God did it.  I

did not kill them."  J.A.4777.  Council's faulting God for his victims' deaths—while

perhaps not a winning argument to the jury—reflects a recognizable exonerative

theory: namely, that Council intentionally shot Major and Skeen but neither intended

nor directly precipitated their deaths.  Indeed, Council had previously expressed

similar self-serving sentiments in his FBI interview, admitting that he intended to *shoot*

any occupants of the bank but not that he intended to *kill* them.  *See, e.g.*, J.A.376

(Council stating that he "pray[s] to God that these people are still alive" but describing

them as "collateral damage" and acknowledging that he "knew that it was going—

somebody was going to get hurt that day because of the circumstances that [he]

placed [him]self in"); J.A.377-378 (After inquiring of officers whether "those ladies

[are] dead," Council stated, "I didn't overkill them or nothing.  I just had to make sure

51

that they could not call authorities[.]"); J.A.416 ("I'm sorry them women died, man. I—I swear I wasn't trying—I was—I did—I will be a man and say I did know that I was going to shoot whoever was in there that was going to try to stop me[.]"). Although Council's attorneys correctly recognized that, in all likelihood, the "jury would [not have] accept[ed]" that theory, J.A.4771, Council's desire to propound it anyway better reflects the absence of preferable avenues for Council to avoid conviction than any "'unhinged,' 'delusional' 'break with reality'" (Br. 58).

Finally, the "'susp[i]c[ion]'" of a defense-retained psychiatrist that Council "'may be suffering from'" bipolar disorder (Br. 50) does not provide an adequate foundation to doubt his competency. Council's attorneys—who had extensive "firsthand experience with the defendant," *Ziegler*, 1 F.4th at 230, and were thus best positioned to evaluate Council's capacity to assist with his defense—were aware of the psychiatrist's opinion yet repeatedly reassured the court that Council was competent to stand trial. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Burket* v. *Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (quotation marks omitted). "Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Ibid.* Council offers no reason to conclude that a tentative diagnosis of possible bipolar disorder—an extraordinarily common condition estimated to affect one out of every 23 Americans at some point in their lives, *see* Nat'l Institute of

52

Mental Health, *Bipolar Disorder*, https://www.nimh.nih.gov/health/statistics/bipolar-disorder—would incapacitate him from "understand[ing], . . . assist[ing], and . . . communicat[ing] with his counsel." *Bell*, 72 F.3d at 432.[10]

As noted *supra* p. 47, Council has not expressly asserted or meaningfully developed a claim that the district court clearly erred in its competency determination. Because he has limited his appellate contention to the procedural sufficiency of the competency proceedings, this Court need not reach that question. But for the foregoing reasons, the district court's bottom-line disposition of Council's midtrial competency motion was amply supported by the record, and any procedural shortcoming in arriving at that outcome was, accordingly, harmless.

## II.  The District Court Did Not Abuse Its Discretion by Denying Council's Final Continuance Motion.

### A.    Background

Over two years elapsed between Council's apprehension (in August 2017) and the commencement of his trial (in September 2019). During that period, Council's

---

[10] Council's cited authority is not to the contrary. He invokes (Br. 50 n.15) *United States* v. *Collins*, 982 F.3d 236 (4th Cir. 2020), but that decision simply recognized, as a factual matter, that a state court had deemed a bipolar defendant incompetent after he "threatened to kill a state court judge and the prosecuting attorney" "[w]hile in custody," *id.* at 240. The Court did not have occasion to consider or decide whether the facts of that case—which are plainly distinct from and more severe than any circumstance presented here—warranted such an incompetency determination. And the Court certainly did not hold that a bipolar diagnosis—or, as relevant here, a psychiatrist's "'*susp[i]c[ion]* that [the defendant] *may* be suffering from a major mood disorder such as Bipolar Disorder,'" Br. 50 (emphases added)—categorically renders that defendant incompetent.

attorneys—who were appointed in September, J.A.6096-6100, and October, J.A.6101-6106, of 2017—sought and received several continuances of both pretrial deadlines and the trial date itself. *See* J.A.79-80; J.A.82-83; J.A.109-111; J.A.113-114; J.A.132-133; J.A.136-137; J.A.145-146; J.A.10 (DE.89); J.A.643-657; J.A.678-703; J.A.1046-1053. Indeed, of the half-dozen continuance motions filed by the defense, only one was denied in full: a final request to delay the trial by three months, filed after jury summonses had been issued and just weeks before jury selection was to begin. *See* J.A.1428-1433; J.A.26 (DE.512).

### 1. Pretrial Scheduling Motions

**a.** Council was indicted in September 2017. J.A.69-77. On March 21, 2018, the government notified the district court and defense counsel that it would seek the death penalty. J.A.138-143. Shortly before the pretrial conference the following month, the parties submitted proposed scheduling orders. *See* J.A.150-155 (government proposal); J.A.156-180 (defense proposal). The government—"based upon the schedule successfully used in" the Dylann Roof prosecution[11]—proposed that the court "begin jury selection, with trial to follow, on or about November 5, 2018." J.A.150, J.A.155. Council proposed what he characterized as "a quick but realistic trial date of April 1, 2019." J.A.156; *see also* J.A.165 (describing "a trial date of

---

[11] As set out in an email from the government to the court, the time between the government's notice of intent to seek the death penalty and the beginning of jury selection in *Roof* was approximately 24 weeks; the time between the government's notice in Council's case and its proposed trial date would have been approximately 33 weeks. *See* J.A.103-104 (comparing schedules).

April 1, 2019" as "a quick but realistic time frame to accomplish what needs to be done on Mr. Council's behalf").

**b.**     The parties reiterated their scheduling dispute at the pretrial conference in April 2018.  There, the defense argued that the *Roof* timetable was "a complete aberration"; pointed to three other capital prosecutions from the same district—of Eric Hans, Chadrick Fulks, and Brandon Basham—that had lasted, "from indictment to trial, 20 months," "18 months," and "21 months," respectively; and contended that the April 2019 trial date proposed by the defense was "a time that we believe gets us to where we need to be."  J.A.983.  The government then suggested that it would "be appropriate . . . to let [the court] hear from the family members of the victims" with respect to scheduling, but Council objected.  J.A.985.  After "review[ing] the Crime Victims' Rights Act," the district court concluded that the victims' families have a right "to reasonably be heard at a plea or sentencing," but not at "status conferences or [with respect to] scheduling orders."  J.A.989.  Instead, the district court permitted the government to "summarize [the family members'] statements," and defense counsel agreed that the prosecutor "can represent what the victims' position is."  J.A.990.  After briefly summarizing the wishes of the Skeen and Major families, J.A.994-995, the government reiterated that the Roof case was an appropriate comparator as "this district's most recent example of how a capital case, a serious capital case can be tried without unnecessary delay," and emphasized that "there is a

strong, strong reason for [the court] to consider [the government's proposed] November date," J.A.996-997.

The district court stated that it was considering January 14, 2019—which, it noted, was "somewhere in the middle between" the government's November 2018 target date and Council's April 2019 proposal. J.A.1001. The court later issued an amended scheduling order setting jury selection for January 14, 2019. J.A.225.

**c.**     In September 2018, Council moved to continue the trial, representing that "the defense cannot meet the deadlines and be ready for trial in January 2019" and requesting an "additional nine months" to finish pretrial work. *See* J.A.657. In response, the government consented to a 90-day continuance but requested that the court not delay the trial date past that window. J.A.675. Following a partially *ex parte* hearing in October 2018, *see* J.A.2393, the court issued an order "grant[ing] Defendant's continuance request in substantial part," J.A.1046. Specifically, the court continued jury selection by eight months, "envision[ing] individual voir dire beginning the week of September 9, 2019, with the trial beginning in mid to late September 2019, depending on the length of individual voir dire/jury selection." J.A.1051. The court noted that "[t]hese dates fall within weeks of [Council]'s request to start the trial the end of September/beginning of October." J.A.1051.

### 2.     Council's Final Continuance Motion

**a.**     In July 2019, Council filed a "Motion for Additional Time to Complete the Defense Investigation." J.A.1428-1433. In that motion, he asked the court to

"continue this case to allow approximately 90 additional days in which to prepare the mitigation phase" and suggested that "this relief can be granted in any of three ways":

1. continuing the start of jury selection until December 1, 2019,

2. adjourning proceedings until January 2, 2020 after a sufficient number of jurors have been questioned and qualified, but before the trial jury is selected and sworn, or

3. adjourning proceedings for a reasonable period after the jury's verdicts are returned following the guilt-or-innocence phase of the proceedings.

J.A.1428-1429. Although Council did not specify the length of the "reasonable period" he envisioned between the guilt and penalty phases, his request for a 90-day continuance indicates that he envisioned at least a three-month break in proceedings.

In opposition to Council's motion, the government offered several reasons that the requested continuance was unwarranted. J.A.1439-1440. First, it pointed out that Council had already had a significant period of time to conduct the mitigation investigation, and that "approximately three more months remain before [Council] will have to divulge [his] mitigation case to the Government." J.A.1439. Second, in response to Council's assertion that a continuance was necessary because "several witnesses cannot be located," the government contended that, "[i]f the Defense team has been unable to locate a witness in nearly two years, an additional ninety days is not likely to lead to their discovery." J.A.1439. Third, the government argued that the fact "[t]hat the request has been made so late in the proceedings also counsels denial," noting that "2,000 jury questionnaires were sent to prospective jurors" two months

57

earlier, that "jurors [we]re scheduled to begin filling out supplemental case questionnaires" imminently, and thus that a 90-day continuance may require "a new or supplemented jury pool." J.A.1438-1441 (citing DE.309). Fourth, quoting 18 U.S.C. § 3771(a)(7), the government argued that "the families of [Council]'s victims . . . have a 'right to proceedings free from unreasonable delay,'" and it noted that "[a]ll of the family members" and "additional witnesses for the Government" had "made plans centered around the trial as scheduled." J.A.1440 & n.1. Finally, Council's alternative suggestion of a 90-day interruption between the guilt-phase and penalty-phase proceedings was, in the government's view, "[un]tenable" because, *inter alia*, "it would be unduly burdensome to require potential jurors to serve a term that effectively begins in August and ends five months later in January"; "the substantial breaks in the proceedings" would introduce "a greater risk the jurors could be impacted by outside information or discuss the case with others"; and "none of the current jurors ha[d] been asked about the very likely scheduling conflicts that exist around December and January." J.A.1441.

**b.** The district court held a hearing on Council's continuance motion, J.A.1896, part of which proceeded *ex parte*, J.A.1918. During the *ex parte* portion, defense counsel represented that, in April 2019, Council had divulged a "sexual encounter" that occurred when he was a minor enrolled at the Dobbs Youth Development Center. J.A.1926. Since that time, Council's attorneys explained, the defense's "biopsychosocial expert, Ms. Deborah Gray," J.A.1920, had been engaged in

identifying other former Dobbs students who could corroborate Council's narrative with experiences of their own. *See* J.A.1930 ("[T]he biopsychosocial historian needs, you know, she needs multiple people saying similar things so that it's a credible allegation and that's where we are with all of that."). Council's attorneys agreed with the court that they had "been exploring this thing, to some extent, about any abuse of Dobbs' residents for a good while," but maintained that they needed additional time for repeat interviews "so that they can gain [the interviewees'] trust." J.A.1934; *see also ibid.* ("[G]enerally on the second interview, we get more information and . . . that's just normal human behavior.").

After bringing the government back into the courtroom, the district court denied the requested continuance. J.A.1913. The court explained that Council "ha[d] not shown that a further delay [wa]s necessary for a just determination of the case," particularly in light of the "generous continuance previously" granted, which the court found to have conferred "[s]ufficient time . . . to conduct a reasonable investigation and discover all reasonably available mitigating evidence." J.A.1913-1914. The court also noted the logistical difficulties that the revised schedule would pose, including "the fact that the jury summons[es] have already gone out" and that "[m]any people, witnesses, jurors, . . . victims' families, [and] this Court ha[ve] made plans regarding the schedule of this case." J.A.1914. Taking all those interests into account, the court "agree[d] with the government's arguments that a continuance is not warranted" and denied Council's motion. J.A.1915.

B.    **Standard of Review**

"The denial of a continuance" violates a defendant's rights "only when there has been 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" *United States* v. *Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005). "In order to prevail on this point, [the defendant] is obliged to show, first, that the district court abused its discretion in denying the continuance motion, and second, that the ruling 'specifically prejudiced' [his] case." *Ibid.* "[T]he test for whether a trial judge has 'abused his discretion' in denying a continuance is not mechanical; it depends mainly on the reasons presented to the district judge at the time the request is denied." *United States* v. *LaRouche*, 896 F.2d 815, 823 (4th Cir. 1990). "[A] broad and deferential standard is to be afforded to district courts in granting or denying continuances," as "the burdensome task of assembling a trial counsels against continuances." *Ibid.*

C.    **Discussion**

In hearing argument on Council's final continuance motion, the district court characterized its approach in the pretrial proceedings as having "done everything [it] c[ould] to make sure this man gets super due process," and defense counsel agreed that "no one can take issue with [the court's] approach to this case." J.A.1919-1920; *see also* J.A.1914-1915 ("In any death penalty case, a defendant is afforded, in essence, super due process, and I have tried to fulfill that."). The district court's "super due process" approach included granting—over the government's objection—an eight-

60

month continuance the preceding fall, pushing the trial to a date *six months beyond* what defense counsel had initially represented to be a "realistic time frame to accomplish what needs to be done on Mr. Council's behalf." J.A.165. Only when a full 22 months had passed since the indictment—and potential witnesses had been notified, and prospective jurors summoned—did the court deny Council's final continuance motion just weeks before trial.

Council now contends that the district court abused its ample calendar-setting discretion by denying him a further 90-day extension of the trial date. But the district court's order—which appropriately contemplated Council's interest in "conduct[ing] a reasonable investigation and discover[ing] all reasonably available mitigating evidence" alongside the interests of the court, the government, potential witnesses, prospective jurors, and victims' families in adhering to the established trial schedule, J.A.1914-1915—was neither unreasoned nor arbitrary. And the adequacy of the timetable adopted by the district court was borne out by the extensive mitigation evidence that defense counsel discovered and presented at the sentencing phase—which likewise defeats any suggestion that Council was prejudiced by the denial of his motion.

### 1. The District Court's Denial of Council's Final Continuance Motion Was Neither "Unreasoning" Nor "Arbitrary."

On appeal, Council selectively excerpts proceedings well predating the relevant hearing to suggest that the district court shortchanged the defense's mitigation efforts in deference to the wishes of grieving families. Any fair assessment of the full record

belies that characterization. As demonstrated by both the overall timeline of the litigation and the specific considerations that informed the court's determination on Council's final continuance motion, "the trial court balanced the interests of all parties and reached a well-considered decision to proceed." *United States* v. *Bakker*, 925 F.2d 728, 735 (4th Cir. 1991).

### a. The Two-Year Timeline from Indictment to Trial in Council's Case Was Not Unduly Accelerated.

Council repeatedly characterizes the trial calendar in his case as inordinately hurried at every juncture. *See, e.g.*, Br. 101 ("[S]peed remained the watchword throughout."). But his first complaint in that vein—that the government "'rush[ed]' the process" of "decid[ing] whether to 'authorize' . . . the death penalty" (Br. 91-92)— is both unfounded and irrelevant. *See United States* v. *Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (holding that the government's process for determining whether to seek the death penalty does not create substantive or procedural rights enforceable by individuals). Council offers no substantive basis for concluding that the authorization process in his case fell short of Department of Justice standards, nor does he level a standalone claim of error relating to that aspect of the proceedings below.

In any event, any alacrity on the government's part in determining whether to proceed with capital charges could only have benefited the defense by providing early resolution of a critical threshold question and permitting counsel to allocate efforts to

the special requirements of a capital case. Indeed, Council's trial attorneys acknowledged as much to the district court:

> For purposes of defense trial preparation, the period of time between the Notice of Intent to Seek the Death Penalty and trial is the most significant, for it is only upon notice of the prosecution's case for death that the defense knows with certainty the kind of case it will confront.

J.A.166. Accordingly, the fact that Council was able to spend a full 17 months focusing on this "most critical" post-notice stage of trial preparation—by contrast to the 10.5 months afforded to the district's most recent capital defendant, Dylann Roof, *see* J.A.103—could not have impaired Council's defense or justified an even lengthier period between notice and trial.

Nor was the 23-month period between the indictment and commencement of Council's trial unusual or unwarranted. As the government pointed out below, the last capital sentence affirmed by this Court was imposed on a much more constrained timeline: Roof was indicted in July 2015 and went to trial 17 months later, in December 2016. *See Roof*, 10 F.4th at 332-334. In contending that *Roof* was an "aberration," Council directed the district court to three other capital prosecutions—*Hans*, *Fulks*, and *Basham*—in which the period between indictment and trial lasted between 18 and 21 months. J.A.983. In other words, every prior prosecution that either party brought to the court's attention operated on a more compressed schedule than the 23 months that ultimately elapsed between indictment and trial in Council's case. And in their initial scheduling proposal, Council's own attorneys characterized a

63

prospective trial date of April 1, 2019—24 weeks before the first day of Council's actual jury trial, *see* J.A.4086—as affording a "realistic time frame to accomplish what needs to be done on Mr. Council's behalf," J.A.165.  Thus, Council's assertion on appeal (Br. 90) that he was subjected to "an unrealistically quick trial schedule" cannot be squared with either the set of comparator cases or the scheduling request that his own attorneys raised to the district court.[12]

### b.    The District Court Was Not Improperly Influenced by the Wishes of the Skeen and Major Families.

Council broadly asserts (Br. 90) that the district court "prioritiz[ed]" the Skeen and Major families' "desire for the swiftest trial" over Council's "right to prepare a defense."  Although it would not have been error for the court to heed the views of the victims' families when setting the trial calendar, the record here is devoid of any indication that their wishes predominated in the court's scheduling decisions.  To the contrary, the court conscientiously limited the families' involvement at the relevant

---

[12] Nor does Council's extensive statistical discussion (Br. 109-111) about the average length of capital prosecutions strengthen his argument.  He cites no authority for the arithmetically illogical proposition that any prosecution shorter than the average is somehow procedurally defective.  And he ignores the most obvious explanation for the relative alacrity of the proceedings in his case: Council never contested that he committed the crimes at issue, and he declined to mount a defense at the guilt stage of his trial.  *See, e.g.*, J.A.2129 ("Mr. Council's guilt is not seriously contested at this trial"); *accord* Br. 133 n.58 ("Council acknowledges that his attorneys essentially conceded his guilt at trial.").  Accordingly, unlike in capital cases where both guilt and punishment are controverted, Council's attorneys were able to devote the entirety of their preparatory efforts to developing mitigation evidence.

pretrial proceedings and offered no reason to conclude that their interests were accorded undue weight in its analysis.

In contending (Br. 94) that the district court "largely accepted the government's entreaties on behalf of the victims' families" when setting the trial date, Council principally cites a single proceeding at which the government requested that the court permit the victims' family members to be heard on the trial schedule. *See supra* pp. 55-56 (summarizing discussion at April 2018 pretrial conference). But he sidesteps three critical details undermining any inference that the court was improperly influenced by the families' wishes—either at that preliminary conference or at the relevant hearing 15 months later when the court rejected Council's final continuance motion.

First, a district court may permissibly consider the views of the victims' families in structuring the trial schedule. In the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, Congress conferred a set of legal entitlements on "crime victim[s]," which it defined to include the "family members" of persons "incapacitated[] or deceased" as the result of a criminal offense, *id.* § 3771(e)(2). Among those entitlements are "[t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding," *id.* § 3771(a)(4); and "[t]he right to proceedings free from unreasonable delay," *id.* § 3771(a)(7). Although pretrial conferences relating to scheduling are not among the proceedings at which Section 3771(a)(4) guarantees crime victims "[t]he right to be reasonably heard," a calendaring discussion is an appropriate juncture for the district court to ensure it is complying

65

with Section 3771(a)(7)'s separate mandate to conduct "proceedings free from unreasonable delay." Neither below nor on appeal has Council cited any authority suggesting that the victims' preferences and availability are categorically irrelevant to the "unreasonable delay" inquiry. Quite the opposite, in fact: Council's attorneys acknowledged at the pretrial conference that the victims' families had relevant interests in the scheduling of proceedings, and they proposed that the prosecutor convey the families' position to the court. *See* J.A.990 ("[H]e can represent what the victims' position is."); J.A.983-984 ("[W]e understand and I've signaled [to] the government that we're sensitive to the victims in this case. We're very sensitive to them and that needs to be in quotes.").[13]

Second, the district court *denied* the government's request that it "hear from the family members of the victims" at the pretrial conference. J.A.985. The court initially suggested, as an "acceptable compromise," that the prosecutor read the families' statements into the record rather than having the relatives directly address the court. J.A.987. But when Council objected even to that course, the court acceded to that objection and accepted instead *defense counsel*'s alternative proposal that the prosecutor "summarize what they have to say." J.A.989-990.[14] The court thus deliberately

[13] On appeal, Council appears to fault (Br. 94) the district court for expressing "'sensitiv[ity] to the victims'" in language virtually identical to defense counsel's expression of the same sentiment at the same hearing.

[14] Council now asserts (Br. 94) that, "[e]ven when the court instructed the prosecutor not to read the relatives' written statements aloud, he did just that." The

circumscribed the involvement of the victims' families at the April 2018 pretrial conference, and the government did not attempt to adduce testimony from the families at any subsequent scheduling proceeding, including the July 2019 hearing at which the court ultimately denied Council's final continuance motion.

Third, the district court repeatedly explained that the preferences of the family members could *not* overcome Council's right to adequate time in which to prepare his defense. For example, in its order granting an eight-month continuance of the trial date, the court acknowledged the rights conferred by the CVRA but explained that its primary responsibility was ensuring that Council had effective representation:

> The [c]ourt is sensitive to and mindful of crime victims' "right to proceedings free from *unreasonable* delay." 18 U.S.C. § 3771(a)(7) (emphasis added). However, "[w]hile timely resolutions of disputes are important, there cannot be an unreasoning and arbitrary insistence on expeditiousness in the face of a justifiable request for delay." *United States* v. *Colon*, 975 F.2d 128, 130 (4th Cir. 1992) . . . . While the [c]ourt (and the Government) may prefer to dispose of the case sooner, the [c]ourt recognizes based on the information presented to it that, without a sufficient continuance, Defendant faces the very real possibility of having his Sixth Amendment right to the effective assistance of counsel infringed. This the [c]ourt cannot countenance. It would be unreasonable to deny Defendant some continuance based upon the arguments and evidence presented by his counsel.

J.A.1052. Similarly, at the July 2019 motion hearing, the district court "note[d] the government's arguments that the victims have rights as well" as an afterthought,

---

record indicates otherwise: Although defense counsel raised an objection during the summary of the Skeen family's position, the district court recognized that the prosecutor was "trying to summarize [the statements]" and reiterated the court's directive that he "try to summarize them" rather than reading verbatim. J.A.995.

following its discussion of the time defense counsel had already been afforded, the jury summonses that had issued, and the plans that numerous participants had made in reliance on the trial date. J.A.1913-1914; *see infra* pp. 68-70. The record thus reflects that the court appropriately balanced the interests of multiple stakeholders— not that it was inordinately solicitous of the wishes expressed by the victims' families.

### c. Substantial and Legitimate Reasons Justified the Court's Denial of Council's Motion.

Moving past Council's generalized grievances about the purported "undue haste" (Br. 36) of his trial, the specific order that he contests on appeal—the district court's denial of his final continuance motion—was both reasoned and reasonable.

After concluding the *ex parte* portion of the motion hearing, the court offered three reasons for denying Council's requested 90-day extension. First, it found that "the defendant has had sufficient time to consult with counsel and prepare a defense," and moreover "still ha[d] . . . over a couple of months" left before the defense would need to present its mitigation case; in so finding, the court pointed out that it had given "a generous continuance previously," which afforded Council "[s]ufficient time . . . to conduct a reasonable investigation and discover all reasonably available mitigating evidence." J.A.1913-1914. Second, the court noted that Council made the continuance request only after "the jury summons[es] ha[d] already gone out," resulting in a situation where "[s]everal hundred people will be coming in in a little over a month to complete the supplemental case questionnaires." J.A.1914. Third,

68

the court observed that "[m]any people, witnesses, jurors, as the government has noted, victims' families, [and] this [c]ourt ha[ve] made plans regarding the schedule of this case." J.A.1914. The denial was thus not "'unreasoning'" so as to exclude it from the ambit of the district court's ample discretion. *Hedgepeth*, 418 F.3d at 423.

Nor was the reasoning supplied by the district court "'arbitrary,'" *Hedgepeth*, 418 F.3d at 423, or otherwise inappropriate. To the contrary, each of the rationales that the court adopted—the sufficiency of time already allotted, the belatedness of the continuance request, and the reliance of other trial participants on the established schedule—has won this Court's approval as a legitimate consideration in denying a continuance motion. For instance, this Court has explained that "[d]efense counsel's prolonged silence" before seeking a continuance can "lead[] to the reasonable inference that [the allotted time] was not a clearly insufficient period of time between arraignment and trial." *LaRouche*, 896 F.2d at 824. The timing of the defense request plainly weighed on the district court here: It noted, during the *ex parte* portion of the hearing, that defense counsel had recognized the array of issues to be investigated when the trial date was set—largely at their request—the preceding April. *See, e.g.*, J.A.1936-1937 ("And a lot of these things, Mr. Bryant, with all due respect, were all present the last time I heard from you all ex parte in a hearing on the continuance."). As the government argued in opposition, "[t]hat the request [was] made so late in the proceedings . . . counsels denial," as "th[e] additional continuance request [came] just over 30 days before jurors [we]re scheduled to begin filling out supplemental case

questionnaires."[15]  And even aside from the lateness of the request, this Court has recognized that a district court may take account of the inconvenience that a continuance would pose to participants in the upcoming trial.  *See, e.g.*, *Bakker*, 925 F.2d at 735 (affirming the denial of a continuance on the basis that, *inter alia*, "the court properly factored into its decision the interests of some twenty government witnesses").  The district court did not abuse its discretion by taking stock of those same factors and determining that they weighed against a further continuance here.

### 2.  Council Cannot Demonstrate That the Denial of a 90-Day Continuance "Specifically Prejudiced" His Defense.

Even if this Court concludes that the district court ought to have granted the requested continuance, Council has not shown, as he must, that the denial "undermine[d] confidence in the outcome of the trial."  *LaRouche*, 896 F.2d at 823. He has failed to "show that the denial of a continuance 'specifically prejudiced [his] case,'" *Roof*, 10 F.4th at 345, for a simple reason: He was able to—and did—adduce abundant mitigation evidence of the precise type that he requested the continuance in order to develop.

During the *ex parte* portion of the July 2019 motion hearing, Council repeatedly represented that he required a 90-day continuance for one purpose in particular:

---

[15] Had the defense moved for a continuance promptly after Council disclosed to them, in April, his childhood sexual abuse at Dobbs, *see* J.A.1926—rather than waiting over two months to do so, *see* J.A.1428—they may have been able to preempt the sending of jury questionnaires on May 15, and would certainly have avoided the work that the parties and the court devoted to reviewing the jury pool during the ensuing weeks.  *See* J.A.1438 (describing jury-selection efforts through mid-July).

identifying and interviewing former Dobbs students who could testify to their own experience of sexual predation at the school and thereby circumstantially corroborate Council's allegations of the same. *See, e.g.*, J.A.1928 ("The only thing we can try to do is try to find young men who can say that similar things happened to them or that might circumstantially corroborate what Brandon says."); J.A.1929 ("[T]he only way we can corroborate that is talking to these individuals. As well we can corroborate Brandon's version of what happened by other people who were sexually molested by other staffers who were there and we're starting to get information about that."); J.A.1930 ("[T]hey're inherently impeachable people and the only way to corroborate what those people say is to have multiple people come in and say the same or similar things."); J.A.1934 ("Imagine trying to ask someone did you have—were you raped at Dobbs? And they got to yell back, yes, I was raped at Dobbs."). Indeed, Council's attorneys described their entire "mitigation strategy" as being "based on people speaking about unspeakable acts to a large part." J.A.1936. And on appeal, Council acknowledges (Br. 90-91) that the principal purpose of the continuance was "to finish investigating Council's early teenage years at a brutal juvenile institution, particularly his report that he was sexually abused there." Br. 90-91; *see also* Br. 105 (describing the "paramount importance" of the "inquiry into Council's time at Dobbs").

Council ended up calling seven witnesses to testify about their firsthand experience at Dobbs: James Green Jr., whose son attempted suicide while at the school, J.A.5522-5523; and former Dobbs students Kenneth Cox, J.A.5589-5590;

71

Anthony Tindall, J.A.5611-5612; Demetrius McMillian, J.A.5630-5633; Demetrius Thacker, J.A.5645-5646; Larry Johnson, J.A.5664; and Tyquan Hynes, J.A.5676. Of these Dobbs-connected witnesses, three testified that they knew Council personally during his time there. *See* J.A.5641-5642 (McMillian); J.A.5646-5647 (Thacker); J.A.5676-5677 (Hynes). And all six former Dobbs students corroborated Council's allegation that the school's staff both engaged in and permitted sexual predation on students. *See* J.A.5599-5600; J.A.5619-5621; J.A.5640-5641; J.A.5648-5657; J.A.5667-5668; J.A.5678-5684. Dr. Grey, the defense-retained biopsychosocial historian, relayed additional stories about Dobbs from non-testifying former students with whom she had spoken, many of whom confirmed that sexual misconduct was rampant at the institution. *See* J.A.5767 (recounting having "talk[ed] to around 30 individuals who went to Dobbs and around five staff members who were at Dobbs" and characterizing those conversations as "rais[ing] considerable concerns about safety for children, physical safety and sexual safety"); J.A.5773-5777 (summarizing her "investigat[ion into] sexual abuse allegations at Dobbs"); J.A.5805-5808 (describing Council's claims of sexual abuse at Dobbs).

If, as Council's attorneys represented to the district court in support of their final continuance motion, their aim was to corroborate his account of having experienced abuse at Dobbs by "hav[ing] multiple people come in and say the same or similar things," J.A.1930, they succeeded in spades. Indeed, even Council acknowledges on appeal (Br. 108-109) that "[t]he defense successfully presented a

picture of the toxic environment at Dobbs where [he] was confined as a young teenager." But he claims (Br. 109) that, "without the additional time they had requested, Council's lawyers could not offer witnesses to the specific harms he endured at Dobbs, including corroboration of his reports of having suffered sexual abuse on several occasions from multiple different staff members."

That contention is wrong twice over. First, as noted *supra* p. 72, the defense *did* uncover multiple former Dobbs students who knew Council and testified to their observations of his experience at the school. Second, when requesting the additional 90 days from the district court, Council's attorneys explained that their focus was on finding former Dobbs students who could testify to *their own* experiences of sexual abuse at the school and thereby *inferentially* buttress Council's account—not on locating hypothetical eyewitnesses who might have firsthand knowledge of particular instances of Council's alleged victimization. *See, e.g.*, J.A.1928 ("The only thing we can try to do is try to find young men who can say that similar things happened to them or that might circumstantially corroborate what [Council] says."). Only now does Council attempt to conjure prejudice by pointing to the lack of *direct* confirmation— "witnesses to the specific harms he endured at Dobbs," Br. 109—as some critical lacuna in his mitigation case. This Court should reject Council's attempt to shift the goalposts on appeal—both because his theory of prejudice is inconsistent with the representations his attorneys made below as to the scope of their investigative efforts and because he has made no showing that such hypothetical eyewitnesses even exist,

much less would have been "reasonably available" to testify on his behalf had the court granted his requested continuance.[16]  *See Wiggins* v. *Smith*, 539 U.S. 510, 524 (2003) ("[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence[.]'" (emphasis in original)); *United States* v. *Badwan*, 624 F.2d 1228, 1231 (4th Cir. 1980) ("We must be reluctant to find arbitrariness in the exercise of trial court discretion [to grant or deny a continuance] based upon no more than post-hoc assertions by counsel that given more time something might have turned up.").

Moreover, the jury's findings at the penalty phase conclusively obviate any showing of specific prejudice attributable to the district court's calendaring decision. While Council points out (Br. 109) that "only a minority of jurors found the mitigating factor that Council was 'sexually exploited . . . at Dobbs,'" he fails to mention that not a single one of the five jurors who found that Council had suffered sexual abuse at Dobbs and concluded that such abuse mitigated his culpability subsequently deemed that factor sufficiently weighty to preclude a capital sentence.

---

[16] In fact, Dr. Grey's testimony relaying Council's recollection of sexual abuse at Dobbs indicated that, due to the nature of the three alleged encounters, no direct witnesses likely existed.  *See* J.A.5805-5806 (first incident: "[W]hen [Council] went back for the search it was Mr. Lawson *by himself*"); J.A.5806-5807 (second incident: "Whitfield, according to Brandon, pulled him out of line for a search, and the other students went off to lunch.  Brandon was taken back to a small room *by himself*[.]"); J.A.5808 (third incident: "What [Council] described was that [his social worker] would take him to her office *by himself* . . . It was usually just him and her in the office by themselves."); J.A.5808 (Defense counsel: "[W]ere there any witnesses to that that you're aware of?"  Dr. Grey: "No, there were not.") (emphases added).

74

Similarly, of the majority of jurors who found that "Dobbs was a violent and corrupting place for young teenage boys like Brandon," J.A.6078, none ultimately voted against death. Because "the defendant must point to specific errors . . . that undermine confidence in *the outcome of the trial*," *LaRouche*, 896 F.2d at 823 (emphasis added), the mere suggestion that some additional jurors might have joined the group who found a particular mitigating factor *while still voting to impose a capital sentence* cannot meet the threshold for a reversible abuse of discretion. In short, Council's "speculation and conclusory allegations of prejudice are insufficient to establish abuse of discretion by the trial court in denying a continuance." *United States* v. *Lorick*, 753 F.2d 1295, 1297 (4th Cir. 1985).

## III. The District Court Did Not Abuse Its Discretion When Questioning Prospective Jurors on Racial Bias.

### A.     Background

In June 2019, the government and the defense proposed questions to be included on a supplemental questionnaire for prospective jurors. *See* J.A.1337. As relevant here, both parties proposed questions assessing whether prospective jurors could decide the case without prejudice based on Council's race. The government proposed two questions on that topic:

> 32.     Have you, or any member of your immediate family ever been a member of a private club, professional, fraternal or social organization that limits or restricts membership on the basis of race, ethnic origin or religion?

43.   Can you be fair and impartial in a case involving an African American defendant and a Caucasian victim(s)?

J.A.1348; J.A.1350. Council accepted Proposed Question 32, J.A.1394, but objected to Proposed Question 43, contending that the latter "simply will not elicit genuine and useful responses from prospective jurors about either the nature or the intensity of whatever racial biases they may hold," J.A.1395 n.2.

Council proposed 25 "Questions on Racial and Race-Related Attitudes." *See* J.A.1392 (identifying Proposed Questions 33-43, 47-53, 74-82, and 113-115 as such). Among the inquiries he asked the court to pose to prospective jurors were:

40.   What are your feelings about the 2015 decision to remove the Confederate Flag from the State Capitol?

47.   [H]ow familiar [are you] with "rap" or "hip hop" music?

48.   What is your opinion of "rap" or "hip hop" music?

51.   Do you believe certain types of male dress and hairstyle, such as wearing low hung pants or "dreadlocks," are indicators of a criminal lifestyle?

52.   Do you think media coverage in recent months of groups seeking racial justice, such as the group Black Lives Matter ("BLM"), and other groups that seek to have Confederate War statues removed from public grounds has had a generally positive, generally negative or no impact on race relations in our country?

82.   [Do you agree that a]ffirmative action programs unfairly discriminate against white people[?]

J.A.1350-1353; J.A.1361. The government objected to all of Council's proposed race-related questions, contending that they "improperly delve[d] into unnecessary issues

76

surrounding race or culture" and/or were otherwise "redundant, excessive, or overly broad." J.A.1416-1417.

The district court ultimately omitted several of the questions proposed by each side. *See* J.A.1435-1436. The court explained that the proposed supplemental questionnaire submitted by the parties "is simply too long and cannot realistically be completed in a timely fashion by the prospective jurors who will be arriving in multiple eighty-member groups each day." J.A.1435. The court also pointed out that, "unlike some other death penalty cases, the attorneys themselves will have an opportunity to voir dire the prospective jurors in this case," permitting them to cover any issues left out of the various written questionnaires. J.A.1435 (footnote omitted).

With respect to the race-related questions, the court accepted the parties' agreed-upon question (Proposed Question 32), the government's proposed racial-bias question (Proposed Question 43) and four of the questions proposed by Council (Proposed Questions 33, 36, 37, and, in substantial part, 113).[17] The "racial attitudes" section of the supplemental questionnaire thus posed six questions:

14.     Have you, or any member of your immediate family ever been a member of a private club, professional, fraternal or social organization that limits or restricts membership on the basis of race, ethnic origin or religion?

---

[17] Council's contention (Br. 119) that "the court finalized a questionnaire that included none of these defense questions and no inquiry about jurors' racial attitudes or opinions" cannot be squared with this record.

15.   Do you ever socialize with people of different races, or belong or participate in any clubs, groups or organizations with members from diverse racial backgrounds?

16.   Is there any racial group you feel uncomfortable being around?

17.   Have you, or a member of your family or household, or close friend ever had a conflict, physical confrontation or any other type of very bad experience involving a person of a different race?

18.   Can you be fair and impartial in a case involving an African-American defendant and a Caucasian victim(s)?

19.   The Defendant, Brandon Council, is African-American.  The victims, Donna Major and Kathryn "Katie" Skeen, are white/Caucasian.  Will these facts prejudice you against the Defendant, Brandon Council, or affect your ability to render a fair and impartial verdict?

J.A.2100-2101.  After each of Questions 14-18, prospective jurors were offered space to expand upon their answers.  J.A.2100.  The supplemental questionnaire also posed a catch-all question asking prospective jurors whether there were "particular questions contained in the questionnaire, or any other issues that [they] want to bring to the attention and discuss privately with the Court or attorneys."  J.A.2111.

The district court subsequently held five days of individualized *voir dire* proceedings.  *See* J.A.2666; J.A.2902; J.A.3197; J.A.3514; J.A.3804.  Per Council's request, *see* J.A.236-237, government and defense counsel posed questions directly to the prospective jurors rather than routing them through the court.  A dozen prospective jurors were questioned on their attitudes toward and experiences with persons of other races.  *See* J.A.2860; J.A.3030-3031; J.A.3252; J.A.3289-3298;

J.A.3329-3340; J.A.3658; J.A.3692; J.A.3765; J.A.3817; J.A.3960; J.A.3985; J.A.4018. And all prospective jurors were instructed that, if selected to serve, they "shall not consider the race . . . of the defendant or of any victim" when "considering whether a sentence of death is justified" and "cannot select a sentence of death unless [they] conclude[] that [they] would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or of any victim may be." *E.g.*, J.A.2672.

## B.    Standard of Review

"A court of appeals reviews the district court's questioning of prospective jurors only for abuse of discretion." *United States* v. *Tsarnaev*, 142 S. Ct. 1024, 1034 (2022). "A trial court's broad discretion in this area includes deciding what questions to ask prospective jurors." *Ibid.*

## C.    Discussion

This Court has long counseled that, "[w]hen the adverse parties are of different races, it may be appropriate to inquire of prospective jurors upon their voir dire as to the existence of racial prejudice and their capacity to fairly try the issues without regard to the races of the parties." *Nickelson* v. *Davis*, 315 F.2d 782, 783 (4th Cir. 1963). At the same time, the Supreme Court "ha[s] repeatedly said that jury selection falls particularly within the province of the trial judge," and has declined to impose "blanket constitutional requirement[s]" as to which questions the court must pose when "conducting *voir dire* . . . [in its] sound discretion." *Tsarnaev*, 142 S. Ct. at 1034 (quotation marks omitted); *cf. id.* at 1036 ("[A] court of appeals cannot supplant the

79

district court's broad discretion to manage *voir dire* by prescribing specific lines of questioning, and thereby circumvent a well-established standard of review."). Here, the district court adhered to this Court's guidance to "inquire of prospective jurors . . . as to the existence of racial prejudice and their capacity to fairly try the issues without regard to the races of the parties," *Nickelson*, 315 F.2d at 783, and it did not abuse its "broad discretion in . . . deciding what questions to ask prospective jurors," *Tsarnaev*, 142 S. Ct. at 1034, in order to effectuate that inquiry.

Moreover, because his attorneys were permitted ample leeway to question prospective jurors during the weeklong individualized *voir dire* proceeding that followed, Council cannot demonstrate that he was prejudiced by his inability to pose additional questions in writing rather than in court. Indeed, both sides asked probing questions about prospective jurors' cross-racial experiences and attitudes. And to the extent Council opted *not* to ask certain of the questions he had proposed for the supplemental questionnaire, he cannot now complain that he lacked information he could have obtained during *voir dire*.

### 1. The Six "Racial Attitudes" Questions on the Supplemental Questionnaire Sufficiently Assessed the Jurors' Capacity to Decide the Case Without Regard to Council's Race.

The Supreme Court has "h[e]ld that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Turner* v. *Murray*, 476 U.S. 28, 36-37 (1986) (plurality opinion). Since *Turner*, the Court has crystallized that requirement

into two benchmarks for the questioning of prospective jurors in cross-racial violent-crime cases: "First, the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice; second, the trial court retains great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min* v. *Virginia*, 500 U.S. 415, 424 (1991). Under *Turner* and *Mu'Min*, a district court would thus abuse its discretion by failing to pose *any* racial-prejudice inquiry at the jury-selection stage in a capital case; but once the district court has cleared that threshold, a reviewing court should broadly defer to the form and extent of questioning deemed sufficient by the trial judge.

There is no dispute that the district court cleared the *Turner-Mu'Min* threshold in Council's case. In Questions 18 and 19, the court both (1) "informed [prospective jurors] of the race of the victim[s]" and of the defendant, and (2) directly "questioned [them] on the issue of racial bias." *Turner*, 476 U.S. at 36-37; *see* J.A.2100-2101 ("Can you be fair and impartial in a case involving an African-American defendant and a Caucasian victim(s)? . . . The Defendant, Brandon Council, is African-American. The victims, Donna Major and Kathryn 'Katie' Skeen, are white/Caucasian. Will these facts prejudice you against the Defendant, Brandon Council, or affect your ability to render a fair and impartial verdict?"). As the *Turner* plurality said, that threshold

hurdle "is minimally intrusive," and "the trial judge retains discretion as to the form and number of questions on the subject." *Turner*, 476 U.S. at 37.[18]

But the district court here went beyond its minimal burden and posed a half-dozen "racial attitudes" questions, several of which were proposed by Council and designed to tease out unconscious bias. For example, by asking prospective jurors the objective question whether "[they], or a member of [their] family or household, or close friend ever had a conflict, physical confrontation or any other type of very bad experience involving a person of a different race," J.A.2100 (Question 17), the court ensured that even a prospective juror who might subjectively self-assess as unbiased—aware of, as Council puts it (Br. 126-127), the "'socially acceptable negative response'" to such queries—would nevertheless offer insight into an experience that could give rise to unconscious biases. The same is true of Questions 14 and 15, which likewise sought to identify potential racial discomfort or animus through objective criteria—a prospective juror's membership in restrictive organizations and the diversity of her social circle, respectively—that would be less susceptible to social-desirability bias than simply asking a prospective juror to subjectively measure her own views.

And, as Council points out, those questions proved effective at identifying a substantial subset of the venire that might warrant further examination. *See* Br. 121

---

[18] Nor did those questions represent an empty formality. To the contrary—as Council points out (Br. 120-121)—"six [prospective jurors] acknowledged they were uncomfortable around Black people or other racial groups" and "16 others said the interracial nature of the murder would affect their ability to be impartial"—causing all such prospective jurors to be excluded from the eligible pool.

(noting that "[e]leven [prospective] jurors said they or their family had belonged to a restrictive organization," "one out of five (106 of 482) said they did not socialize with people of other races," and "about one in eight (61 of 482) acknowledged that they or someone close to them had a bad experience with someone of a different race"). In particular, Question 17 ("bad [cross-racial] experience") provided important information for individualized questioning during *voir dire*, with either the court or counsel delving more deeply into those experiences with a dozen prospective jurors. *See supra* pp. 78-79. For example, Juror No. 475 described an experience in which "an African-American man broke into [her] parents' home," "stabbed [her] father several times," and was ultimately shot dead. J.A.3658. Under questioning by the court, the prospective juror candidly acknowledged that this experience "would affect [her] ability to be fair and impartial in this case[.]" J.A.3658. With the parties' agreement, the court excused her from the jury pool. J.A.3659.

**2.    The District Court Did Not Abuse Its Discretion by Declining to Pose the Numerous, Extraneous, and Potentially Inflammatory Questions That Council Proposed.**

Alongside his contention that the questions posed by the district court were insufficient to safeguard his Sixth Amendment rights, Council also asserts (Br. 131) that the court abused its discretion by declining to ask the specific racial-prejudice questions that he proposed.[19] As this Court has held, however, "[a] trial court is not

---

[19] Again, Council ignores that the district court *did* include multiple of his proposed questions in the supplemental questionnaire. *Compare* Br. 131 ("The court

required to ask questions in any particular form or to ask any particular number of questions on a subject simply because a defendant asks for them." *United States* v. *Cowan*, 96 F.3d 1439 (Tbl.) (4th Cir. 1996) (per curiam) (unpublished). And the Supreme Court has long counseled that the racial-prejudice inquiry required in cross-racial capital cases should not be directed "to immaterial matters, but to such a prejudice as would disqualify a juror because [it would] preclud[e] an impartial verdict." *Aldridge* v. *United States*, 283 U.S. 308, 311 (1931).

a.    Council has not demonstrated that his proposed battery of two dozen ostensibly race-related interrogatories, *see supra* pp. 76-77, would have more effectively identified a disqualifying prejudice than the mix of objective and subjective questions ultimately posed in the supplemental questionnaire. On appeal, he focuses (Br. 132) on the fact that the district court did not expressly ask "whether any jurors believe certain races are inherently more prone to violence." But elsewhere, Council denigrates (Br. 126-127) the idea that prospective jurors will answer honestly when asked directly about their own racial viewpoints—relying on social-science literature suggesting that "'ask[ing] the juror to announce publicly that she or he is a racist'" is likely to "'elicit[] a socially acceptable negative response'" rather than a genuine, critical self-assessment. Council offers no reason to believe that a self-conscious prospective juror willing to abandon his oath of truthfulness to provide a socially

---

easily could have added some of Council's questions to the questionnaire."), *with* pp. 77-78, *supra* (explaining that the district court adopted Council's Proposed Questions 33, 36, 37, and, in substantial part, 113).

84

acceptable answer when asked about his prejudice against or discomfort with other racial groups would not also conceal that, *e.g.*, he views Black people as categorically violent or prone to criminality. At a minimum, the district court permissibly exercised its discretion to favor a mix of viewpoint-based and experiential questions to identify racial prejudice over Council's preferred line of inquiry oriented primarily around racial stereotypes.

**b.** Moreover, many of the questions Council proposed below could well have done more harm than good to the objective of impaneling an unbiased jury. The Supreme Court has counseled that intensive questioning on racial prejudice is warranted only where "racial issues were 'inextricably bound up with the conduct of the trial,'" creating a "consequent need, under all the circumstances, specifically to inquire into possible racial prejudice in order to assure an impartial jury." *Rosales-Lopez* v. *United States*, 451 U.S. 182, 189 (1981) (plurality opinion). But as the government pointed out below, "outside of the fact that the Defendant is an African American and the victims were Caucasian, there is not a single other circumstance present that suggests a significant likelihood that racial prejudice might infect Defendant's trial." J.A.1420; *see also* J.A.5989 (defense counsel penalty-phase closing argument: "This is not a story about some poor black boy, and do not let race get into the middle of this. This is not a racial case. I refuse to make it a racial case. This ain't about white versus black. This is about a guy that killed two innocent women and it's

now about your decision about what to do with it.").[20]   Under the circumstances here—where Council has never "argued that the matters at issue in his trial involved allegations of racial or ethnic prejudice," and "neither the Government's case nor his defense involved any such allegations," *Rosales-Lopez*, 451 U.S. at 192—the district court appropriately declined to inject into the jury-selection process questions on such controversial and extraneous issues as affirmative action, the removal of Confederate historical symbols, and the Black Lives Matter movement.

That determination was consistent with the Supreme Court's recognition that a district court must balance competing risks when questioning jurors on sensitive racial topics in *voir dire*.  For instance, while Council invokes (Br. 128) the Court's decision in *Peña-Rodriguez* v. *Colorado*, 137 S. Ct. 855 (2017), for the proposition that "[g]eneric questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations," *id.* at 869, he omits the remainder of that paragraph: "Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'"  *Ibid.* (noting "the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*").  In the circumstances presented here, the district court did not abuse its discretion by

---

[20] By contrast, the authority on which Council primarily relies (*e.g.*, Br. 123-124) involved a defense theory explicitly premised on racial discrimination.  *See Rosales-Lopez*, 451 U.S. at 189 (explaining that "*Ham* [v. *South Carolina*, 409 U.S. 524 (1973),] involved a black defendant charged with a drug offense," whose "defense was that the law enforcement officers had 'framed' him in retaliation for his active, and widely known, participation in civil rights activities.").

declining to engage in a lengthy interrogation of prospective jurors' views on numerous hot-button political, social, and cultural topics bearing no conceivable relevance to Council's case.

> ### 3. Any Shortcoming in the Supplemental Questionnaire Was Rectified by Council's Opportunity to Conduct In-Court Questioning of Prospective Jurors During *Voir Dire*.

Finally, even if the district court had been overly parsimonious in selecting race-related questions for the supplemental questionnaire, Council's opportunity to question prospective jurors individually during the weeklong *voir dire* proceedings that followed obviates any claim of prejudice. *Cf. Tsarnaev*, 142 S. Ct. at 1035 (finding no reversible abuse of discretion where the district court facilitated "individualized *voir dire* in which the court and both parties had the opportunity to ask additional questions and probe for bias"). Although the court began by asking each prospective juror a set of follow-up questions based on her responses to the standard and supplemental questionnaires, it then permitted attorneys for the government and the defense to engage the prospective juror on topics of their choosing. *See, e.g.*, J.A.2684-2697. As noted *supra* pp. 78-79, that approach yielded several extended colloquies on prospective jurors' racial attitudes and experiences, which then informed the parties' and court's decisions as to juror qualification and removal.

On appeal, Council asserts that the district court "announc[ed] that voir dire would be confined to death-penalty inquiries and follow-ups to questionnaire answers." Br. 154 (citing J.A.2680-2681). But the portion of the record to which he

cites for that purported "announc[ement]" contains nothing of the sort. Rather, the trial judge explained at the outset of *voir dire* that *the court* would not be posing any of the additional "27 questions from the defense and . . . 8 or 9 questions from the government" that the parties had proposed *after* the supplemental questionnaire had issued, because "[i]t wasn't [the court's] intention to allow, basically, a third supplemental questionnaire." J.A.2680. The court reiterated, however, that "[t]he lawyers certainly are free to spend their limited time asking some of their questions," and—beyond a general reminder that the questions must be "appropriate"—it did not impose any subject-matter limitation or other restriction on individualized questioning by the parties. J.A.2681.

Council's argument on appeal thus boils down to a complaint that the district court declined to ask all of his proposed questions and instead afforded his attorneys the time and opportunity to pose those questions themselves. Council offers no reason to conclude that such an approach was procedurally improper. Nor could he obtain relief based on this division of labor at *voir dire*, as the district court adopted the very process that defense counsel urged (over the government's opposition):

> The defense proposes that the [c]ourt conduct the initial questioning of individual prospective jurors based upon follow-up to answers on the questionnaire or any other relevant issues. If the prospective juror is not disqualified at that point, the [c]ourt allows counsel for both parties (if they so choose) to ask questions of the prospective juror on the topic of capital punishment, bias, mental health, and other related, relevant issues. . . .

> The prosecution, however, proposes that all questioning be done by the [c]ourt. And then once individual, sequestered voir dire occurs, "the prospective juror will then be escorted out of the courtroom, and the parties may propose additional voir dire questions to the [c]ourt." . . . After the [c]ourt review[s] the questions, follow-up "questioning on private or sensitive topics may be conducted." . . . There is no need for the relatively cumbersome and inefficient [process] compared to the benefits of limited and focused direct inquiry by counsel for the parties.

J.A.236-237. Having won the right to question prospective jurors individually and availed himself of that opportunity, Council cannot plausibly establish that he was left without necessary insight into the racial attitudes of the jury pool. And the fact that, notwithstanding this opportunity, he opted not to question prospective jurors on racial stereotypes, affirmative action, Confederate war monuments, Black Lives Matter, and various other topics he had floated at earlier junctures undercuts any contention that the district court abused its substantial discretion by omitting those questions from the supplemental questionnaire.

## IV. The District Court Did Not Err in Permitting Defense Counsel the Opportunity to Raise a *Batson* Claim Following the Exhaustion of Peremptory Challenges.

### A. Background

Three days of initial jury selection, J.A. J.A.2433-2664, and five days of individualized *voir dire*, J.A.2666-4066, yielded a pool of 68 qualified prospective jurors, J.A.4061-4063. On September 16, 2019 (the Monday following the end of *voir dire*), the court convened the final jury-selection hearing, during which each side was

allotted 20 peremptory strikes for the main jury pool, plus an additional two each for the alternates. J.A.4070; *see* Fed. R. Crim. P. 24(b)(1).

After both sides had exhausted their strikes, J.A.4076, the district court invited objections from both parties:

| | |
|---|---|
| Court: | All right. Any objection regarding the method of the selection of the jury by the government? |
| Gov't: | No, Your Honor. |
| Court: | By the defense? |
| Defense: | No, sir. |

J.A.4076-4077. The court then read the numbers of the non-stricken jurors, informed them they had "been selected as jurors in this case," and advised them that trial would begin the following morning. J.A.4077. After providing some further instructions, the court asked if there was "[a]nything from the lawyers before" it allowed the jurors to be taken back to the jury room. J.A.4079.

At that point, Council's attorney asked if "the Court [could] give us a couple of minutes," and the court obliged. J.A.4079. After roughly 30 seconds, defense counsel asked to approach the bench. J.A.4079; *see* J.A.6723. The court removed the jury and engaged in the following colloquy with counsel:

| | |
|---|---|
| Court: | What's the problem? |
| Defense: | I would ask the rest of the panel not be— |
| Court: | I'm just going to let them go. |
| Defense: | Well, we would like to analyze the strikes for any issues in regard to the exercise of peremptory strikes if the Court |

|  | would give us a little bit of time to do that.  I would ask that you not release the jury at this time. |
|---|---|
| Court: | Well, I asked if there were any objections. |
| Defense: | I was talking about the procedure—I thought you were talking about the method, 1 through 20 and the alternate.  I didn't think you were talking about *Batson* issues or anything like that. |
| Court: | Yes, yes.  Well, I need to bring them back out then, you're telling me— |
| Defense: | I'm just telling you we need to go look at it.  I thought you were going to bring them out and do that, but not swear them.  I didn't know it had anything to do—I just thought it had to do with the exercise of peremptories in that fashion, that's all I thought it was. |

J.A.4080.  Following a brief pause, the court then clarified with defense counsel, "what you're telling me is that you want time to review any potential *Batson* issues," to which Council's attorney responded, "That's all.  That's all we're doing."  J.A.4081.  Defense counsel subsequently reiterated, "All we need is just a couple of minutes just to review and then we can report right back to you, Your Honor."  J.A.4082.

The court acceded to that request and, following an approximately minute-long pause in the proceedings, defense counsel stated, "We are fine.  We have no objection to the selection process."  J.A.4082; *see* J.A.6723.  The court then asked the parties if they had "[a]ny objection to me going ahead and thanking these people for being a part of the process and letting them go"; both sides agreed to that course.  J.A.4082-4083.  The court excused the prospective jury panel and turned to discussing other aspects of the trial with the attorneys.  J.A.4083.

**B.     Standard of Review**

When a defendant has raised a *Batson* challenge during jury selection, this Court "sustain[s] the trial court's ruling [on that challenge] unless clearly erroneous." *United States* v. *Dennis*, 19 F.4th 656, 662 (4th Cir. 2021). "This 'highly deferential' standard affords appropriate weight to the trial court's evaluations of whether the prosecutor's conduct 'belies a discriminatory intent' and whether the juror's demeanor 'exhibited the basis for the strike attributed to the juror by the prosecutor.'" *Ibid.*

Where a defendant had the opportunity to raise such a challenge in the district court and declined to do so, however, his decision precludes this Court from entering relief on appeal. *See infra* pp. 93-98. The only narrow carve-out for appellate review of a categorically waived claim exists where "a party d[id] not have an opportunity to object to a ruling or order," and therefore "the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). Council asserts that "[t]his Court decides *de novo* whether, under Rule 51(b), the district court denied such an opportunity to the defendant." Br. 135 (citing *United States* v. *Hanno*, 21 F.3d 42, 45 n.2 (4th Cir. 1994); *United States* v. *Smith*, 640 F.3d 580, 586 (4th Cir. 2011)). Although neither of the cases he cites expressly held as much, the government assumes that *de novo* review applies because Council's claim fails even under that standard.

### C.    Discussion

### 1.    Council's Failure to Raise a *Batson* Claim or to Request Additional Time Within Which to Develop Such a Claim Does Not Constitute Reversible Error by the District Court.

**a.**    Normally, "*Batson* challenges proceed along a familiar three-step inquiry." *Dennis*, 19 F.4th at 662. First, "[a] defendant must . . . make a prima facie showing that a peremptory challenge was based on racial considerations." *Ibid.* Second, "the burden . . . shifts to the prosecution to offer a racially neutral reason for the strike." *Ibid.* Third and "finally, the trial court determines whether a defendant has shown purposeful discrimination." *Ibid.*

In the instant case, however, there is no dispute that Council declined to raise a *Batson* claim in the district court. He has thus categorically waived appellate review of any such claim, and this Court need proceed no further. *See United States* v. *Wingate*, 113 F. App'x 522, 524 (4th Cir. 2004) (per curiam) (unpublished)[21] ("We find that Wingate has waived appellate review of this issue because he did not raise a *Batson* claim after the district court invited an objection following jury selection."). As this Court has held, a defendant "is denied any remedy on [a *Batson*] claim" where "he expressly relinquished his right to a remedy at trial by, in effect, consenting to be tried

---

[21] Although an unpublished decision, *Wingate* "has precedential value in relation to a material issue in [this] case"—namely, the unavailability of a forgone *Batson* challenge on direct appeal of a criminal conviction—and thus satisfies the citation requirements of Federal Rule of Appellate Procedure 32.1 and Fourth Circuit Local Rule 32.1.

by the jury as constituted.  He cannot rescind that consent now." *Allen* v. *Lee*, 366

F.3d 319, 328 (4th Cir. 2004).

**b.**    Apparently recognizing the preclusive effect of his decision to forgo a

*Batson* claim in the district court, Council contends on appeal (Br. 133) that he should

avoid the consequences of that waiver because "[t]he court denied Council a

meaningful opportunity to present a *Batson* claim."  For three reasons, the record does

not support that contention.

First, the district court—expressly and repeatedly—provided Council an

opening to raise a *Batson* challenge.  This Court's decision in *Allen*, *supra*, is instructive.

There, as here, the district court surveyed counsel at the conclusion of jury selection

with a general request for any objections.  *Compare Allen*, 366 F.3d at 327 ("The judge

stated, 'Before we impanel the jury I wanted to make certain after conferring with all

lawyers that there was nothing that needed to be brought to my attention or if there

was any problem that existed.'"), *with* J.A.4076-4077 ("Any objection regarding the

method of the selection of the jury by the government? . . . By the defense?"*), and*

J.A.4081 ("Let me ask you something.  Lawyers, come here for a second.  So what

you're telling me is that you want time to review any potential *Batson* issues[?]").

There, as here, despite multiple invitations to raise such a claim, defense counsel

demurred.  *Compare Allen*, 366 F.3d at 327-328 ("After Allen's counsel voiced an

objection to the courtroom placement of certain evidence, the judge again asked, 'Is

there anything that needs to go on the record before the jury is impaneled for the

defense?' Allen's counsel responded, 'No, Your Honor.'"), *with* J.A.4082 (Defense counsel: "May we approach, Your Honor?" Court: "Yes." Defense counsel: "We are fine. We have no objection to the selection process." Court: "Okay. Very good. Thank you. Yes, sir." Defense counsel: "Thank you."). There, as here, the surrounding context made clear that defense counsel was aware of any possible *Batson* issues yet declined to develop or press them when afforded an opportunity to do so. *Compare Allen*, 366 F.3d at 328 ("Thus, even though Allen's July 1985 motion might otherwise have been sufficient to raise a *Batson* objection . . . Allen's silence after the trial judge's repeated calls for objections after the actual jury selection amounted to an abandonment of his anticipatory *Batson* objection."), *with* J.A.4080 (defense counsel requesting and receiving a break in proceedings "to analyze the strikes for any issues in regard to the exercise of peremptory strikes"). And there, as here, "[i]t would be an odd result to allow a defendant who twice rejected a trial judge's explicit invitation to object contemporaneously to the jury selection process to exploit the faded memory of the prosecutors by raising such an objection years later." *Allen*, 366 F.3d at 328.

Second, the district court provided Council all the time he requested to develop any *Batson* claim that he wished to raise. From the moment Council's attorneys first asserted their need "to analyze the strikes," they requested only "a little bit of time to do that." J.A.4080; *see also* J.A.4082 (Counsel: "All we need is just a couple of minutes to review and then we can report right back to you, Your Honor." Court: "Okay. All right."). Defense counsel never sought a formal recess or continuance; to the

95

contrary, they asked only for a brief break in the proceedings before the district court dismissed the non-stricken jurors. And contrary to Council's characterization on appeal (Br. 149), the district court did not "den[y] Council's request for a needed recess." Rather, when asked by defense counsel for an opportunity "to review and . . . report right back," the court acceded to that plan, concluded the sidebar, and paused the proceedings to allow Council's attorneys to determine their next steps.

Although the pause ended up lasting only a minute, *see* J.A.6723, it was defense counsel—not the government or the court—who terminated it, requesting to approach the bench and informing the court that they were satisfied with their review and "ha[d] no objection to the selection process." J.A.4082. Even setting aside the abundant discretion vested in district judges to manage their own trial calendars, *see generally supra* p. 60, it is nonsensical to suggest that the district court violated Rule 51(b)—which this Court has "characterized as a '*contemporaneous*-objection rule,'" *Smith*, 640 F.3d at 586 (emphasis added)—by failing to grant *sua sponte* a lengthier recess or continuance that Council never requested. And although Council cites (Br. 150) two out-of-Circuit cases deeming adjournment *permissible* before the invitation for a *Batson* challenge, neither authority stands for the proposition that such an adjournment is *necessary* to provide a meaningful opportunity for such an objection. *See United States* v. *Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016) (treating as "acceptable alternatives" *either* "a break . . . after strikes are exercised, giving the attorneys time to analyze the strikes" *or* "explicitly ask[ing] the parties whether they

96

have any *Batson* challenges" before excusing the venire); *United States* v. *Taylor*, 92 F.3d 1313, 1321 (2d Cir. 1996) (reciting—without comment—that "[t]he proceeding was adjourned and the parties were invited to make written submissions" *after* both sides had already raised *Batson* challenges, placed on the record their race-neutral explanations, and engaged in oral argument before the magistrate judge).[22]

Third, the presence of the jury in the courtroom during Council's deliberation over raising a *Batson* challenge did not deny him the opportunity to assert such a claim. As with many of the other issues addressed in his brief, Council's contentions on appeal are inconsistent with his attorneys' assertions and conduct in the district court. Here, he asserts (Br. 151) that the district court "deprived Council of a meaningful opportunity to present his *Batson* claim by requiring him to do so in the courtroom in front of the selected and struck jurors." But the record reveals that Council's attorneys expected that the court would bring the venire back into the courtroom, raised no objection to the court's doing so, and did not seek an opportunity to raise their claim outside the presence of the jury. *See* J.A.4080 (Court:

---

[22] In any event, it is unclear how additional time would have advanced Council's litigating position. With the benefit of over two years to develop his appellate arguments, Council hinges (Br. 140-144) his waived *Batson* claim primarily on two factors—the number of Black jurors stricken by the government and the order in which it exercised those strikes—that would have been readily apparent to defense counsel at the conclusion of jury selection. *See Flowers* v. *Mississippi*, 139 S. Ct. 2228, 2243 (2019) (enumerating factors that can carry the defendant's *prima facie* burden on a timely *Batson* challenge, including "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case" and "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case").

"Well, I need to bring them back out then, you're telling me—" Defense counsel: "I'm just telling you we need to go look at it. I thought you were going to bring them out and do that, but not swear them."); J.A.4081-4082 (Court: "Now, you all want me to ask these people to take a seat back out there." Defense counsel: "I don't think you need to do that." Defense counsel: "I don't think you need to do that, Judge. All we need is just a couple of minutes just to review and then we can report right back to you, Your Honor."). Because the record contains no indication that Council's trial attorneys were cowed by having the jurors in the room—and, to the extent it has anything to say on the topic, suggests the opposite—the jury's presence cannot explain away Council's decision to forgo a *Batson* challenge.[23]

### 2. Even If He Had Not Waived It, Council Has Not Shown That a *Batson* Claim Would Be Meritorious.

Recognizing the impossibility of recreating on appeal *Batson* proceedings that were forgone in the district court, Council never suggests that vacatur and remand would be appropriate if this Court declines to identify a Rule 51(b) violation. Because, as discussed above, Council had a meaningful opportunity to present such a challenge below and expressly declined to do so, this Court should treat his claim as

---

[23] Aside from the fact that Council's trial attorneys appear to have invited the procedure about which he now complains, Council cites no case holding that a court *must* order the jury out before soliciting *Batson* challenges—much less that the court's failure to do so *sua sponte* constitutes denial of an opportunity to object under Rule 51(b). And while he points (Br. 151-152) to one secondary source for the proposition that the better practice is to hold *Batson* discussions outside the presence of the jury, "[t]he fact that a particular rule may be thought to be the 'better' view does not mean that it is incorporated into the [Constitution]." *Mu'Min*, 500 U.S. at 430-431.

waived. Nevertheless, because he comments extensively on the manner in which the prosecution exercised its peremptory strikes in his case, the government briefly responds to that discussion.

    **a.** Council's primary basis for his belated *Batson* claim is statistical. He acknowledges (Br. 140-141) that the empaneled jury included multiple Black members and that the government struck as many non-Black veniremembers as Black veniremembers. He insists (Br. 143), however, that the government's use of half its peremptory strikes against Black veniremembers—combined with the "ordering of its challenges"[24]—gives rise to a "suspicion [the strikes] were animated by race." Although quantitative disparities can be relevant to the defendant's burden of putting forward a *prima facie* racial-discrimination case that triggers the government's right of response, "statistical evidence . . . alone cannot carry the day" under *Batson*. *Golphin* v. *Branker*, 519 F.3d 168, 187 (4th Cir. 2008) (collecting authorities). Accordingly, Council could not prevail on this ground even if he could show a much greater disparate impact than he has asserted here. *Cf. Coulter* v. *McCann*, 484 F.3d 459, 468

---

[24] Specifically, Council is troubled that the government exercised its strikes as follows (where B=Black and W=White): BBWWWWBWWWBWBBBBBBWW. But even if modest clustering of prospective jurors in the same racial group were sufficient to establish a *Batson* violation—as noted above, it is not—the sequence of strikes here evinces nothing like the implications apparent in cases where courts have found a *prima facie* case of racial discrimination on that basis. *See, e.g.*, *Harris* v. *Hardy*, 680 F.3d 942, 951 (7th Cir. 2012) ("[T]he State used 15 of its 20 peremptory challenges on African Americans"); *Taylor*, 92 F.3d at 1320 ("Defendants used their first eight challenges to remove White jurors, and the government objected pursuant to *Batson*").

(7th Cir. 2007) (denying relief notwithstanding the defendant's showing that "the state used 90% of its strikes against the 29% of the pool that was African-American").

**b.**      With respect to particular Black veniremembers who were the subject of peremptory strikes, it would be inappropriate for the government to conduct after-the-fact *Batson*-by-briefing through extra-record recollections of the trial prosecutors' contemporaneous observations and motivations.   As this Court noted in denying another waived *Batson* challenge, that outcome would "exploit the faded memory of the prosecutors by [permitting a defendant to] rais[e] such an objection years later." *Allen*, 366 F.3d at 328.   But even confined to the jury-selection transcripts, substantial race-neutral reasons support the government's exercise of its peremptory strikes.

For example, Prospective Juror 544 ("PJ-544") (discussed by Council at Br. 145-146) left multiple questions on the supplemental questionnaire blank, including when asked to "describe [his] views . . . about the death penalty as a punishment for someone convicted of intentional murder."   J.A.3836.   And although he initially circled a 7 (indicating a high favorability toward imposition of the death penalty) on his questionnaire, PJ-544 stated during *voir dire* that "that [score] doesn't really reflect the way [he] feel[s]," and indicated that he "would probably circle a four."   J.A.3839. The government also could have reasonably understood other answers that PJ-544 provided during *voir dire* to evince either ambivalence toward the death penalty or, at minimum, reticence to disclose his true feelings.   *See* J.A.3840 (Court: "Could you vote for the death penalty if the facts and the law supported it?"   PJ-544: "I would have to,

yes, sir."); J.A.3842 (Gov't counsel: "I want to ask you about one of the answers that you gave the judge. I think he asked if, he said could you vote for the death penalty if the facts and the law supported it, and I believe your answer was if I have to."); J.A.3841 (PJ-544 bringing up "the term mitigating" on his own, expressing a desire to "look into the background, you know, the upbringing and things that happened in life along with the trial itself").

Similarly, Prospective Juror 573 ("PJ-573") (discussed at Br. 146-147) did not answer the portion of the questionnaire soliciting her views about the death penalty. J.A.3914-3915. When asked during *voir dire* if she could "vote for the death penalty if the facts and the law supported it," PJ-573 added a qualifier, stating that she could do so "[i]f the facts and the law supported it *and the evidence was clear*." J.A.3917-3918 (emphasis added). The government attempted to follow up on that comment during its examination, asking PJ-573 whether she "would . . . require more proof than beyond a reasonable doubt to impose the death penalty," but the defense's successful objection prevented that question from being answered. J.A.3920. In light of her answers during *voir dire*, the government took no position as to whether she was qualified to serve on the jury. J.A.3924. It is unsurprising, then, that the government exercised one of its peremptory strikes to remove PJ-573 from the pool.

Again, the absence of a *Batson* challenge below circumscribes the record in a manner that precludes any holistic "evaluations of whether the prosecutor's conduct 'belies a discriminatory intent' and whether the juror's demeanor 'exhibited the basis

for the strike attributed to the juror by the prosecutor.'" *Dennis*, 19 F.4th at 662. The government offers these observations as illustrative examples of the types of race-neutral concerns—apparent from a cold appellate record—that the prosecutors might have asserted below had they been afforded an opportunity to explain and defend their peremptory strikes on a racially neutral rationale.[25] Because Council denied them that opportunity by declining to raise a challenge despite the court's repeated and explicit invitations, he cannot now rely on *Batson* to obtain relief from this Court.

## V. The Aggravating Factors Proposed by the Government and Found by the Jury Were Appropriate.

### A. Background

In its Notice of Intent to Seek the Death Penalty, the government identified two statutory aggravating factors applicable under 18 U.S.C. § 3592(c)—"Multiple Killings" and "Pecuniary Gain," J.A.140—and four non-statutory aggravating factors: "Victim Impact," "Continuing and Escalating Pattern of Criminal Activity," "Lack of Remorse," and "Targeting Innocent Victims." J.A.141-142. In support of the last factor, the government alleged, *inter alia*, that Council had "displayed particular cruelty and callous disregard for human life . . . in spite of the fact that such violence was not necessary to successfully complete the robbery." J.A.142.

---

[25] To be clear, the trial prosecutors might have given additional or alternative rationales for these and other peremptory strikes if they had been asked, and nothing in this brief should be understood to constrain the explanations that they might provide on a hypothetical remand. We offer these observations from the record only to rebut Council's contention (Br. 144) that "the government lacked plausible race-neutral reasons" for its peremptory strikes against Black veniremembers.

Roughly a year before trial, Council filed a Motion to Strike Non-Statutory Aggravating Factors, in which he argued, *inter alia*, that the targeting-innocent-victims aggravating factor was "presently in conflict with the statutory aggravating factor 'pecuniary gain.'" J.A.501. Specifically, Council contended that one aspect of the government's innocent-victims theory—that he "shot the victims 'in spite of the fact that such violence was not necessary to successfully complete the robbery'"—was in tension with its pecuniary-gain theory, which required a finding that Council "committed the killings, not just robberies, for pecuniary gain." J.A.501-502. Council also briefly challenged the remaining factors on vagueness and overbreadth grounds that he does not renew here.

The district court denied Council's motion. J.A.1057-1069. The court found his assertion of a conflict between the pecuniary-gain and innocent-victims aggravating factors to be "somewhat confusing" and, "in any event, . . . meritless because [Council did] not present any constitutional or statutory basis for striking either" factor. J.A.1065-1066 (emphasis omitted). Accordingly, the court instructed the jury on both of the government's proposed statutory aggravating factors and all four of its non-statutory aggravating factors, J.A.6022-6025, along with 50 mitigating factors proposed by the defense, J.A.6034-6039. The jury unanimously found each of the aggravators to apply in this case. *See* J.A.6073-6074; J.A.6081-6082.

B.     **Standard of Review**

When preserved below, appellate courts "review[] challenges to the validity of an aggravating factor de novo," *United States* v. *Coonce*, 932 F.3d 623, 642 (8th Cir. 2019), and to the particular formulation of that factor in the jury instructions for abuse of discretion, *id.* at 638. Where the defendant "did not preserve []his claim for appellate review," however, this Court's "review is for plain error," which requires the defendant to show "(1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *United States* v. *Jackson*, 327 F.3d 273, 304 (4th Cir. 2003) (additional quotation marks omitted).

The government agrees that Council preserved his objection to the asserted tension between the innocent-victims and pecuniary-gain factors in the district court; that issue is appropriately reviewed *de novo*. While he arguably preserved *some* claim that the government's aggravating factors are duplicative, he limited that contention in the district court solely to the purported overlap between the innocent-victims and victim-impact factors. *See* J.A.498 (arguing that the innocent-victims factor "is another attempt by the government to put victim impact evidence before the jury and is an example of unconstitutional double-counting of aggravating factors"). Accordingly, his distinct contention on appeal—that the multiple-killings, innocent-victims, and escalating-violence factors are redundant because each turns on the unnecessary nature of the murders—should be reviewed for plain error. He also did

104

not argue below that the pecuniary-gain factor lacked sufficient evidence to go to the jury; that contention too should be reviewed only for plain error.

### C.    Discussion

The district court correctly permitted the jury to consider all of the government's proposed aggravating factors.  Each of those factors focused on a different aspect of the offense conduct rendering it aggravated and deserving of a capital sentence, and none of them were in tension with the others.  To the contrary, those factors collectively told a consistent story: that Council knew how to steal money without killing but opted to kill Major and Skeen anyway, representing an escalation in violence from his previous offenses.  There was no error in the court's allowing the government to present this coherent and correct theory to the jury, and no error in the jury's acceptance of it.

### 1.    There Is No Tension Between the Innocent-Victims Factor and the Pecuniary-Gain Factor.

Council first renews (Br. 162-165) the contention that the district court found "confusing" and "meritless," J.A.1065-1066: that a crime cannot be committed both for "pecuniary gain" and against "innocent victims."  The straightforward pecuniary-gain factor asked the jury to find "that the defendant committed the offense in the expectation of the receipt of anything of pecuniary value."  J.A.6024.  The innocent-victims factor, by contrast, required the jury to reach a multifaceted qualitative assessment of the offense conduct—specifically, that Council

105

> displayed particular cruelty and callous disregard for human life by
> shooting both victims who were unknown to him multiple times at close
> range without warning and without provocation or resistance from the
> victims, in spite of the fact that such violence was not necessary to
> successfully complete the robbery of the CresCom Bank.

J.A.6028-6029. There is no merit to Council's suggestion that these clearly distinct

aspects of his offense overlap—much less that they overlap in a conflicting manner.

The most obvious distinction between the two factors is familiar in criminal

law: One concerns motive, and the other method. The pecuniary-gain factor asks *why*

the defendant did what he did—and, in particular, requires the jury to decide if

Council's purpose was to obtain something of value. The innocent-victims factor

asks *how* the defendant committed his crimes—encompassing constituent questions

about Council's election of a "particular[ly] cruel[]" means of achieving his ends. As

the government pointed out below, the fact "[t]hat the Defendant *could have*

successfully robbed the CresCom bank [without killing anyone] does not relieve his

culpability for choosing to murder two of its employees to ensure he received the

pecuniary gain he sought." J.A.954-955.

For some theoretical tension to exist between the innocent-victims and

pecuniary-gain factors, the latter would have to require a showing that the defendant

needed to use lethal force to effect a taking. The factor, however, requires only that a

robber "expected" the murder to result in pecuniary gain. *United States* v. *Lawrence*,

735 F.3d 385, 412 (6th Cir. 2013). Council therefore contrives a conflict between

these aggravators only by pretending that the innocent-victims factor said something

it did not—specifically, that it amounted to a "without motive" factor. Indeed, both of the cases on which he relies (Br. 163-164) identified tension between aggravating factors when one expressly stated that the killing had an aggravated motivation and another that the killing had "no motive." *See State* v. *Cooper*, 700 A.2d 306, 382-383 (N.J. 1997) ("jury cannot rationally find . . . both" aggravators that killing had "no motive" and that it was committed to "escape detection"); *Leslie* v. *Warden*, 59 P.3d 440, 445-446 (Nev. 2002) (jury could not rationally find that killing was committed both "without apparent motive" and "to complete the robbery").

But the government never suggested that Council lacked a motive for the murders; it simply argued that killing Major and Skeen was not strictly necessary to achieving Council's desired ends. The government's theory was clearly presented to the jury: Council knew how to steal money without ending lives, but he elected to take the more efficient—and more brutal—route by killing the people standing in his way. *See* J.A.6004-6005 ("Why didn't he use a note? He said that he was worried they might hit the alarm so he killed them. Why didn't he use the note? The gun was more effective."). There was no contradiction between that method of committing the offense and the pecuniary motive that the jury found independently aggravating.

### 2. Sufficient and Appropriate Evidence Supported the Aggravating Factors.

**a.** Council next asserts (Br. 165-168) that "the evidence . . . did not fit the established legal definition" of pecuniary gain because, although the robbery was

undoubtedly oriented toward pecuniary gain, the murders themselves were not.[26]  He is asking this Court to substitute its assessment of the evidence for that of the jury, which heard and adopted the government's theory that the murders *were* committed for pecuniary gain.  Specifically, the government argued to the jury that Council murdered Major and Skeen because he was "was worried they might hit the alarm" and thereby prevent him from walking out of the bank with the money he intended to take.  J.A.6004-6005.  That theory was amply supported by the evidence, including Council's own description of his motive for the murders:

> Council:    I was going to shoot the woman or whoever was in there regardless, because at that time, and my thought process, I felt like—not—it wasn't even about witnesses.  It was about them calling that—pushing that button or whatever they do to alert the authorities.
>
> Richards:   Pushing the alarm.
>
> Council:    Yeah.  That's the only reason why I did that.

J.A.374.  To be sure, there were less violent means of keeping the victims from alerting police and thereby preventing Council from robbing the bank.  But as discussed above, purpose does not require necessity; rather, it is enough that Council

---

[26] Council raises the same contention as to the innocent-victims factor, but his argument there is less clear.  He appears to be contending (Br. 166-167) that the murders of Skeen and Major were necessary for Council to escape the scene without being intercepted by police.  But as demonstrated by his previous robberies— including, notably, of the BB&T Bank, which he was able to flee without killing anyone or being apprehended—there is no reason to believe that committing murder was necessary to a successful escape.

committed the murders in order to obtain the money, even if he had available other, less lethal means of achieving the same end.

**b.**     Council's reliance (Br. 165-166) on the Fifth Circuit's decision in *United States* v. *Bernard*, 299 F.3d 467 (5th Cir. 2002), is misplaced.  Admittedly, there are superficial similarities: In that case, as in this one, the defendants "sought to prevent [the victims] from reporting their crimes to the police." *Id.* at 483.  Because "no pecuniary gain was expected to flow directly from the homicide," the Fifth Circuit in *Bernard* deemed the evidence "insufficient to support application of the 'pecuniary gain' factor on the basis of the facts presented by this case." *Id.* at 483-484.

But "the facts presented by [Council's] case" are materially different from *Bernard*.  There, the defendants had "locked [the victims] in the trunk" of their car and "dr[i]ve[n] them] to an isolated spot," where the defendants were planning to burn the vehicle, *Bernard*, 299 F.3d at 472; accordingly, the victims were in no position to prevent the defendants from obtaining the pecuniary gain they had set out to achieve, and the murders were committed to eliminate witnesses who might inculpate the defendants in a future investigation or prosecution.  Here, by contrast, Major and Skeen were not murdered because they might serve as witnesses at some indefinite point in the future; they were killed because they were in a position to immediately prevent Council from achieving his desired pecuniary gain at all—by triggering an alarm that resulted in his interdiction before he could walk away with any cash. *See* J.A.374 (Council: "*[I]t wasn't even about witnesses.*  It was about them calling that—

pushing that button[.]" (emphasis added)).  That is exactly the eventuality that, in the government's telling, Council aimed to avert through these killings, and there was no error in permitting that theory to go to the jury.

c.    Council also invokes (Br. 165-166) this Court's decision in *United States* v. *Barnette*, 390 F.3d 775, 808 (4th Cir. 2004), cert. granted, judgment vacated on other grounds, 546 U.S. 803 (2005), but that case in fact favors the government.  There, the Court upheld the jury's application of the pecuniary-gain aggravator where the defendant testified that he had murdered a vehicle owner in order to obtain his car. *Ibid.*  Much like Council's murders, Barnette's was unnecessary: When asked "why [he had] not just tie[d] this young man to a tree" instead of killing him, Barnette acknowledged that his conduct "doesn't make sense" and that he "shot [the victim] for no damn reason." *Id.* at 807-808.  But because Barnette thought the vehicle owner was "going to stop [him]," he opted for the more efficient—and more brutal—course of murdering the victim. *Id.* at 808.  That motive was sufficient, in this Court's view, to sustain the pecuniary-gain factor.

The government's theory in Council's case was substantively indistinguishable from *Barnette*.  Here, as there, Council indisputably engaged in the overall offense to achieve pecuniary gain.  Here, as there, Council had less lethal options available to achieve that gain.  Here, as there, the government contended to the jury that, notwithstanding those less lethal options, the defendant elected to murder his victims during the course of the robbery in order to prevent interdiction before he could

110

achieve the pecuniary gain.  Here, as there, the jurors adopted that theory; and, as it did in *Barnette*, this Court should respect their judgment.[27]

### 3.    The Aggravating Factors Were Not Duplicative.

**a.**    Shifting gears from mistakenly claiming that the aggravating factors were mutually irreconcilable, *see supra* pp. 105-107, Council next contends (Br. 168-169) that they were also "redundant[.]"  This argument likewise misses the mark.  Each factor submitted by the government corresponded to a distinct aggravating aspect of the offense.  That the government wove those factors into a coherent theory of culpability—and that the unnecessary nature of the killings was a central component of that narrative—does not render erroneous the government's distillation of offense attributes into separate aggravating factors.

Council specifically contends (Br. 168) that "three different aggravating factors[,] 'innocent victims,' 'escalating violence,' and 'multiple killings,'" had the effect of "triple-counting" the unnecessariness of the murders.  Not so.  Each of those factors, as framed by the district court for the jury, reflects a characteristic of

---

[27] Council also faults (Br. 160 n.66) the district court for "instruct[ing] jurors they only had to find that Council committed '*the offense*' for something of pecuniary value."  But the court's instruction on this factor appropriately replicated the statutory language from the FDPA—including, notably, framing the pecuniary gain as a function of "the offense."  *Compare* J.A.6024 ("[T]he defendant committed the offense in the expectation of the receipt of anything of pecuniary value")*, with* 18 U.S.C. § 3592(c)(8) ("The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.").  In any event, "[t]o the extent that there was any ambiguity arising from how the factors were drafted, the Government's argument to the jury made clear" the permissible aggravating theory.  *Jones* v. *United States*, 527 U.S. 373, 399 (1999) (plurality opinion).

the crime that independently enhanced Council's culpability. As discussed above, the innocent-victims factor inquired into the **method** of committing the offense, and specifically whether it "displayed particular cruelty and callous disregard for human life." J.A.6028. "Multiple killings," as the label would suggest, required a straightforward **quantification** whether "[t]he defendant intentionally killed or attempted to kill more than one person in a single criminal episode," 18 U.S.C. § 3592(c)(16); it had nothing to do with either the motive for or the method of carrying out those killings. Finally, the escalating-violence factor required the jury to evaluate the two other robberies that the government alleged Council had committed in the days leading up to the CresCom Bank robbery and to judge whether Council's behavior reflected a "continuing and escalating pattern of criminal activity," J.A.6027; unlike the innocent-victims and multiple-killings aggravators—which focused solely on factual characteristics of a single episode—this factor required a **comparison** of behavior over a period of time.

Of course, the overall fact pattern here—that Council murdered two victims in cold blood at the culmination of an escalating robbery spree—is relevant to multiple aggravating factors. But as discussed above, different aspects of that narrative—and distinct inferences the jury was asked to draw—permissibly informed each of those factors. As the Supreme Court has explained, the fact that "certain evidence was relevant to [multiple] different aggravating factors" does not render "the factors as a whole . . . duplicative." *Jones*, 527 U.S. at 399; *see also United States* v. *Purkey*, 428 F.3d

112

738, 762 (8th Cir. 2005) ("[T]he same facts can support different inferences that form different aggravators. Otherwise the government would either have to choose one out of several possible aggravating factors for each instance of a defendant's misconduct or pack into a single aggravator multiple negative inferences that could be drawn from the misconduct[.]" (citation omitted)).

   **b.**    For the contrary proposition, Council principally relies (Br. 168-169) on this Court's decision in *United States* v. *Tipton*, 90 F.3d 861 (4th Cir. 1996), and the Tenth Circuit's decision in *United States* v. *McCullah*, 76 F.3d 1087 (10th Cir. 1996). Neither case supports his contentions here. Both *Tipton* and *McCullah* identified error in the jury's treatment of all four statutory "intent" factors—*e.g.*, that the defendant "intentionally engaged in conduct intending that the victim be killed," that he "intentionally engage[d] in conduct which he knows creates a grave risk of death," etc., *McCullah*, 76 F.3d at 1111 (quotation marks omitted)—as separate aggravators. As this Court concluded, the submission of four different—but essentially concentric—intent factors to the jury for consideration as aggravating factors "runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally." *Tipton*, 90 F.3d at 899.

   Those holdings are inapposite to Council's case. Both *Tipton* and *McCullah* considered a statutory regime not applicable here: 18 U.S.C. § 848, "under which the jury is to consider the type of intent [involved in the crime] *as an aggravating factor* during the penalty phase of the trial"—not, as required by the FDPA, "find[ing] one

of the four types of intent *as a threshold matter*" before "reach[ing] the weighing of aggravating and mitigating factors." *Jackson*, 327 F.3d at 300-301. That distinction is critical, because this Court was correct that the statutory intent factors overlap such that an affirmative finding on a more serious intent factor (*e.g.*, "intend[ed] that the victim be killed") logically requires an affirmative finding on a less serious factor (*e.g.*, "know[ingly] creates a grave risk of death"). But Council does not contend that any of the aggravating factors found by the jury in his case was a lesser-included factor of any other aggravator so as to run afoul of *Tipton* and *McCullah*.[28]

Indeed, confirming that *McCullah* did not sweep as broadly as Council claims, the Tenth Circuit later held that "[i]t is not impermissible for 'certain evidence [to be] relevant to [multiple] aggravators,'" so long as "one aggravating circumstance [does not] 'necessarily subsume' another." *Medlock* v. *Ward*, 200 F.3d 1314, 1319 (10th Cir. 2000) (per curiam); *accord United States* v. *Fell*, 531 F.3d 197, 236 (2d Cir. 2008) ("[A]ggravating factors are duplicative when one necessarily subsumes the other, or, in other words, when a jury would necessarily have to find one in order to find the other." (cleaned up)). Council does not contend—nor can he, given the pronounced

---

[28] It also bears mentioning that both cases predated the Supreme Court's decision in *Jones*, in which a plurality of the Court took note of *McCullah*'s holding but expressly declined to endorse the double-counting theory that the Tenth Circuit had adopted. *See Jones*, 527 U.S. at 398 ("We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid"); *see also* J.A.1063 n.8 ("[T]he plurality in *Jones* 'accept[ed], for the sake of argument, petitioner's "double counting" theory' and addressed the petitioner's argument. . . . The Court does likewise here with [Council]'s 'double counting' argument.").

distinctions between these factors, *see supra* pp. 111-112—that any of the aggravators the jury found in his case "necessarily subsumes" any other.[29]

    **c.**    Finally, even if this Court were to identify some impermissible overlap among the aggravating factors found by the jury, that conclusion would not compel vacatur of Council's capital sentence. As the Supreme Court recognized in *Jones*, "any risk that the weighing process would be skewed [by the submission of duplicative aggravators] was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater [but rather] should consider the weight and value of each factor.'" *Jones*, 527 U.S. at 399-400. Because the district court delivered an identical instruction here, Council cannot establish that any duplication was prejudicial. *See* J.A.6041 ("You should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You should consider the weight and value of each factor.").

---

[29] Although this Court has not expressly framed the duplicative-factors analysis using the "necessarily subsumes" language adopted by its sibling circuits, it did quote that phrase in *Tipton*, 90 F.3d at 899, and "several district courts within the Fourth Circuit . . . have held that aggravating factors are impermissibly duplicative if they 'necessarily subsume[]' each other." *United States* v. *Umana*, 707 F. Supp. 2d 621, 637-638 (W.D.N.C. 2010) (collecting cases).

115

## VI.    The Government's Victim-Impact Evidence Was Permissible.

### A.    Background

During the penalty phase of the trial, the government called 20 witnesses over the course of three days, and Council called 18 over two days.  Of the government's witnesses, four were family or close friends of Major; four were family or close friends of Skeen; and two were coworkers and friends of both victims.

The first two government witnesses testified to their relationships with both Major and Skeen.  Cathy Lambert, a colleague of the victims at the CresCom Bank, J.A.4914-4915, testified to, *inter alia*, the personal characteristics of each woman and the contributions each made to their office setting.  *See, e.g.*, J.A.4920 ("Donna was very organized and Katie might have been kind of the dreamer").  Gracie McClary, an assistant security officer at CresCom, J.A.4926, testified, *inter alia*, that "Donna was a joy" who "talked a lot about her family," and that "Katie was so bubbly[,] . . . always smiling, laughing.  She was the life of the party." J.A.4929.[30]

The government next called four victim-impact witnesses with respect to Skeen.  First, Skeen's husband Tracy testified to, *inter alia*, what Skeen was like as a

---

[30] In addition to their victim-impact testimony, both Lambert and McClary were also called as fact witnesses who could comment on the bank's security protocols, in support of the government's aggravating contention that Council's murders were gratuitous.  Lambert was asked about the bank's "policies regarding what to do during the bank robbery," and she testified that bank employees were instructed "[t]o give th[e robbers] what they wanted."  J.A.4914-4915.  McClary was likewise questioned whether she "ha[d] advised [Major and Skeen] of any security procedures regarding their jobs . . . at the CresCom in Conway," and she testified that those "procedures were pretty well set in the policy."  J.A.4928.

mother, J.A.4959; her relationship with her parents, J.A.4960; her relationships with "friends at the bank," J.A.4960-4961; and her charitable work, J.A.4961-4962. Skeen's mother Betty Davis testified about, *inter alia*, Skeen's relationship with her father, J.A.4971-4973; Davis's own relationship with Skeen, J.A.4973-4976; Skeen's relationship with her husband Tracy, J.A.4976-4977; and Skeen's relationship with her children, J.A.4977-4978. Patty Floyd, a neighbor and friend of the Skeen family, J.A.4995-4997, recounted that she had introduced Skeen to banking and discussed Skeen's professional skillset, J.A.4999-5001, while also testifying about Skeen's relationship with Tracy, J.A.5002, and their children, J.A.5002-5003. Finally, Laura Davis, a close friend of the Skeens, J.A.5011-5012, recounted how, after Davis's son was killed in a firearm accident, Skeen reentered Davis's life and helped set up a foundation and scholarship in her late son's memory, J.A.5014-5017.

Rather than moving directly into victim-impact testimony about Major, the government pivoted to nine fact witnesses who testified to Council's conduct during the lead-up to and aftermath of the CresCom Bank robbery. *See* J.A.5042-5043 (Martena Armston, cashier at the Food Lion that Council robbed); J.A.5055 (Daisy Munoz-Alvarez, former employee of the BB&T Bank that Council robbed); J.A.5070-5071 (Diane Jones, former employee at Auto Money Title Loans); J.A.5083-5084 (Mohan Patel, owner of the Economy Inn in Greenville, North Carolina); J.A.5096-5097 (Brandon Black, one of the teenagers with whom Council partied after the murders); J.A.5114-5115 (Jalen Vines, Black's younger brother); J.A.5180-5181

117

(Tmyah Brown, Vines's then-girlfriend); J.A.5208 (William Wingfield, a Dunham's Sports employee who sold Council ammunition following the CresCom robbery); J.A.5220 (Mike Connelly, an FBI agent involved in Council's apprehension).

The government then called four victim-impact witnesses with respect to Major. Heather Turner, one of Major's daughters, J.A.5258, testified about Major's caretaker relationship with her sister, J.A.5261-5262, as well as Major's role as a mother, J.A.5263-5264, and a grandmother, J.A.5264-5266. Bonnie Reed, who considered Major her "closest and dearest friend," J.A.5274-5276, testified about the impact of the murder on Major's family, J.A.5282-5283, and on her, J.A.5283. Doug McCrea, Major's son, J.A.5285-5286, described Major's role as a mother, J.A.5286-5291. Katie McCrea, Major's other daughter, J.A.5298-5299, testified about her relationship with her mother, J.A.5300-5305, and how Major's death had affected her, J.A.5308-5309, and the rest of their family, J.A.5305-5306.

Following this testimony, the government rested. J.A.5309.[31]

## B.    Standard of Review

This Court "review[s] the district court's decision to admit certain evidence on th[e victim-impact] factor for abuse of discretion." *United States* v. *Runyon*, 707 F.3d 475, 499 (4th Cir. 2013).

---

[31] The government did subsequently call one rebuttal witness—Anthony Hargett, the former head of Junior ROTC at the Dobbs school—to counter some of the allegations of rampant abuse that Council had raised during his mitigation case. J.A.5882-5885. That testimony did not relate to victim impact.

## C.    Discussion

In *Payne* v. *Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that States may, consistent with the Eighth Amendment, permit the introduction of evidence showing a crime's impact on the victim and the victim's family during the penalty phase of a capital trial.  *Id.* at 827.  In doing so, the Court overruled its prior decision in *Booth* v. *Maryland*, 482 U.S. 496 (1987), which had held that victim-impact testimony was "per se inadmissible in the sentencing phase of a capital case except to the extent that it 'relate[d] directly to the circumstances of the crime.'"  *Payne*, 501 U.S. at 818 (quoting *Booth*, 482 U.S. at 507 n.10).

The defendant in *Payne* was convicted of stabbing to death a mother and her daughter, and he challenged sentencing-phase testimony about the effect of the crimes on a surviving child.  501 U.S. at 811-813.  The Court held that such evidence was admissible because "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it . . . evidence of the specific harm caused by the defendant."  *Id.* at 825.  The Court recognized that victim-impact evidence "serves [the] entirely legitimate purpose[]" of "allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant."  *Id.* at 826.  Consistent with *Payne*, Congress specified in the FDPA that the government may introduce victim-impact evidence as a non-statutory aggravating factor.  18 U.S.C. § 3593(a) and (c).

119

Under *Payne*, the government's presentation of victim-impact evidence here was appropriate. As this Court has observed, the government is "[u]nquestionably" entitled to ask jurors to consider the victims' "uniqueness" and the magnitude of the loss when those unique victims are killed. *Humphries* v. *Ozmint*, 397 F.3d 206, 222 (4th Cir. 2005) (en banc); *Payne*, 501 U.S. at 825 (government can "remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society and in particular to [her] family" (quotation marks omitted)). And this Court has held that such evidence can include the impact of the victim's death on co-workers—a consequence of the loss that necessarily permits some evidence of the victim's professional life. *Runyon*, 707 F.3d at 500-501. This Court has also counseled a wide berth for victim-impact testimony, allowing witnesses to deliver poems reflecting their sadness and regret over their loss, *United States* v. *Barnette*, 211 F.3d 803, 818 (4th Cir. 2000); and permitting the government to introduce photos "to give context to the loss inflicted on the [victim's] family by the murder," *Barnette*, 390 F.3d at 799-800. No aspect of the government's presentation transgressed those bounds in Council's case.

## 1.    The Victim-Impact Testimony Was Not Unduly Lengthy or Voluminous.

Council first contends (Br. 178-180) that the government's evidence on this aggravating factor was quantitatively excessive because "[m]ore than half of the government's sentencing case (10 of 19 witnesses and 136 of 252 transcript pages) consisted of victim impact." He identifies no bright-line rule for the appropriate

number of affected victims who are permitted to testify at the sentencing stage. Nor does Council articulate a reasoned basis that the percentage of witness testimony devoted to any particular sentencing factor bears on his due-process rights.

Instead, he compares this case to other recent capital cases from this Circuit—pointing principally to *Barnette*, 211 F.3d at 818, in which "seven of the government's 23 sentencing witnesses gave victim-impact testimony" (Br. 179). Even accepting *Barnette* as a rule of thumb, Council does not explain why this Court should treat seven victim-impact witnesses as a reasonable number but deem categorically erroneous a presentation consisting of ten such witnesses—two of whom were called not exclusively for victim-impact testimony but also as fact witnesses to the bank's security procedures, *see supra* p. 116 n.30. Indeed, although the circumstances of the offense were certainly different, this Court recently affirmed a capital sentence imposed after "the government presented victim-impact testimony from twenty-three witnesses." *Roof*, 10 F.4th at 366. And this Court's sibling circuits have likewise approved extensive victim-impact testimony even in single-victim or dual-victim cases. *See, e.g.*, *United States* v. *Nelson*, 347 F.3d 701, 713 (8th Cir. 2003) (noting that the Eighth Circuit has identified "no undue prejudice . . . where eleven witnesses, including the victim's mother, sister, brother, three coworkers, former spouse, three sons, and widow testified and that testimony comprised 88 pages of transcript"); *United States* v. *Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007) (approving the introduction of victim-impact testimony from five witnesses in a single-victim case);

*United States* v. *Whitten*, 610 F.3d 168, 187 (2d Cir. 2010) (finding no error where the victim-impact presentation in a double-homicide case consisted of "ten witnesses: seven family members of the murdered detectives (including in-laws); and three police officers who testified that the murders caused them anguish and had a profound influence on other officers who worked with [the victims]").

In any event, the district court took affirmative steps to ensure that the victim-impact testimony was not excessive. For instance, before the government began its penalty-phase case, the district court inquired into how long the government anticipated spending on the first two victim-impact witnesses (*i.e.*, the only two witnesses who could testify to their relationships with both Major and Skeen). J.A.4908. The government indicated that, "[a]ssuming no cross[-examination]," it anticipated spending "[a]n hour and a half total" questioning the witnesses. J.A.4908. The district court pared that back, directing that, "with regard to any short witnesses on victim impact, [the government should] try and keep it no longer than 15 to 20 minutes [per witness]. On the longer ones, keep it within the 30-minute range." J.A.4910. Council did not contemporaneously object to those timeframes, and he does not contend that the government violated the court's directive.

**2.    The Penalty-Phase Witnesses Appropriately Contextualized Their Relationships with the Victims.**

Council next contends (Br. 183-184) that the district court abused its discretion by permitting the government to elicit witness testimony that went beyond the unique

characteristics of Skeen and Major and instead concerned the witnesses' "*own* sympathetic life stories." That claim is unsupported by the record. To the contrary, while each witness necessarily shared some details of her own life to lay a foundation for her victim-impact testimony, that evidence was appropriately oriented toward contextualizing the witness's relationship with Skeen, Major, or both.

The principal evidence that Council propounds on this point illustrates the flaws in his argument. He asserts (Br. 184) that Laura Davis's testimony about "the terrible death of [her] son" impermissibly "foster[ed] a sense of familiarity and derivative empathy for the witness[.]" But Davis's testimony about her son's death— far from being an extraneous detail designed to manipulate the jury into "derivative empathy"—was integral to her relationship with Skeen and to the unique aspects of Skeen's character about which Davis testified. Davis explained that she met Skeen in 2010 at her husband's 20-year class reunion, J.A.5012-5013, but that "years did pass" before she and Skeen "reconnected in October 2016," J.A.5014. The impetus for their reconnection was Davis's loss of her 16-year-old son in a firearm accident the same month. J.A.5014. Davis recounted how, "[f]rom that day forward, the day of the funeral of [her] son, from that moment forward and to the day she left[, Skeen] was a part of [Davis's] life every day." J.A.5015. Davis testified that Skeen and her husband "were the forerunners of this foundation in memory of [Davis's] son," and that Skeen "created not only the fund-raiser and the foundation" but also "an annual scholarship." J.A.5016-5017. Council offers no reason that Skeen's charitable work

123

should not be considered one of her "exemplary qualities . . . [that] are part of [her] 'uniqueness' that *Payne* allows a jury to consider." *Roof*, 10 F.4th at 377. And Davis could only sensibly testify to that aspect of Skeen's uniqueness by reference to the circumstances under which Skeen undertook that work. There was no error in admitting that testimony.[32]

### 3. The District Court Correctly Bounded the Substantive Scope of the Victim-Impact Testimony.

Council raises three primary complaints as to the subject matter of the victim-impact testimony: first, that certain witnesses exceeded some putative chronological limitation on their recollections of the victims by adducing "[t]estimony and photographs about the victims' childhoods, adolescence, weddings, and early years of parenting" (Br. 180-183); second, that the testimony "improperly extended to the impact on the victims' church, work, and local communities" (Br. 184-189); and third, that the government impermissibly "made Major's and Skeen's religious faith a through-line" in the victim-impact testimony (Br. 190-193). None of these claims presents a ground for vacating Council's sentence.

---

[32] The other victim-impact testimony that Council flags in this section of his brief (Br. 183-184) was equally permissible. Although Skeen's friend Patricia Floyd briefly recounted having cared for Skeen's children, that testimony was adduced for the purpose of telling the jury "a little bit about Katie as a mother," with Floyd commenting that Skeen "was great about sharing her children, she wasn't one of these helicopter moms." J.A.5002. And Major's friend Bonnie Reed testified at length about Major's personality and hobbies, including her love of motorcycling, painting, quilting, and travel. J.A.5275-5278.

### a. Victim-Impact Testimony Need Not Be Limited to the Time Period and Circumstances Immediately Surrounding the Crime.

To begin, there was no error in the witnesses' description of Major's and Skeen's lives before the CresCom Bank robbery. The fact that victim-impact testimony will sometimes cover aspects of the victims' lives predating the defendant's offense conduct is neither remarkable nor problematic. Indeed, demonstrating the "victim's 'uniqueness as an individual human being,'" *Payne*, 501 U.S. at 823, necessarily requires an understanding of who the victim was well before she was murdered. Accordingly, this Court has expressly *approved* the introduction of "victim impact evidence form[ing] a substantial portion of the prosecution's case at sentencing [that] included evidence relating as far back as the victims' childhood." *United States* v. *Fulks*, 454 F.3d 410, 436 (4th Cir. 2006). Council offers no reason to depart from that precedent here.

### b. The Government Did Not Elicit Testimony Beyond the Pool of Cognizable Victims, and Any Testimony Offered to That Effect Was Not Prejudicial.

The admission of testimony about the impact of Council's crimes on Major's and Skeen's friends and colleagues was consistent with this Court's precedent. As discussed above, the Supreme Court in *Payne* held that victim-impact evidence permissibly includes "evidence about the victim and about the impact of the murder on the victim's family." 501 U.S. at 827. And as this Court recognized in *Runyon*, *Payne*'s mention of "the victim's family" did not represent "an exhaustive definition"

of permissible victim-impact evidence "that implicitly prohibits the introduction of evidence concerning the impact of the victim's death on any individuals other than 'the victim's family.'" 707 F.3d at 500. To the contrary, "the *Payne* Court expressly countenanced the introduction of evidence concerning the impact of the victim's death on society at large." *Ibid.* This Court explained that

> limiting victim-impact evidence to family would be an exceedingly artificial line to draw. While the most devastating sense of loss from a murder may well be felt by immediate family, the deceased's friends and colleagues may suffer too. Just as individuals may touch many people during life, so too may their death be widely mourned.

*Ibid.* In light of *Runyon*'s interpretation of *Payne*, it was not an abuse of the district court's discretion to permit testimony about Skeen's and Major's impact on their community while both were alive—and the concomitant loss experienced by that community following the murders. *Cf., e.g.*, Br. 189-190 (criticizing the government for discussing charitable work that Skeen had undertaken).

On appeal, Council levels his principal objection (Br. 186-188) to the government's request that Gracie McClary "describe Katie and Donna's relationship[,] to the extent you know it[,] with other coworkers or the bigger coworker community within CresCom." J.A.4931. There was no error in that line of questioning. Rather, as this Court recognized in *Runyon*, the government may permissibly introduce "evidence regarding the impact of the victim's death on h[er] friends *and colleagues* as well as h[er] family." 707 F.3d at 500 (emphasis added). Here, the government's inquiry was most naturally understood in context to refer to the "coworker

126

community" with which Major and Skeen were personally acquainted—staying well within the limits imposed by this Court in *Runyon*.

In any event, McClary's brief testimony about the effect of the crimes on the victims' workplace, even if improper, could not have prejudiced Council. Although Council raised no contemporaneous objection to this line of questioning, the defense commented, the following morning, that "we're going a little far afield when we're starting to talk about community and the effect o[n] the bank and things of that nature." J.A.4941. The district court offered to give a curative instruction:

> This is what I intend to do and this is why, aside from the *Payne* case and the scope of *Payne* and everything, I'm going to give them an instruction to tell them that to the extent there was any testimony regarding the effect on the community as a whole or the banking community or CresCom Bank as a whole as a result of these deaths, I'm asking them and instructing them to disregard that.

J.A.4943. Although, on appeal, Council deems (Br. 188-189) this instruction insufficiently categorical, his trial attorneys did not request any modification before the court delivered it in the same form to the jury.[33] *See* J.A.4949 ("To the extent there was any testimony yesterday regarding the effect on the community as a whole or the banking community as a whole or CresCom Bank as a whole as a result of

---

[33] Council's assertions of deficiency in the curative instruction—*e.g.*, that it was "tepid" (Br. 177 n.70)—lack merit. District courts in this Circuit have offered far less specific instructions that nevertheless cured any prejudice that a defendant might have suffered from fleeting lapses in penalty-phase testimony. *See, e.g.*, *Roof*, 10 F.4th at 366 ("[T]he court reminded the jury that 'victim testimony is limited to . . . personal characteristics of the victims and the emotional impact on the family. You should disregard any other comments other than those.'").

these victims' deaths, you should disregard it.  You can only consider the impacts of the victims' deaths on family, friends and coworkers.").  And this Court can presume that the jury followed that instruction and disregarded any improper testimony as to the impact of Major's and Skeen's deaths on anyone beyond "family, friends[,] and coworkers"—precisely coterminous with the pool of cognizable victims under *Runyon*. *See Weeks* v. *Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").  Accordingly, no prejudicial error occurred here.[34]

> ### c. Witnesses Permissibly Testified About the Religious Faith That Was Central to Major's and Skeen's Lives, Relationships, and Charitable Activities.

Council further asserts (Br. 190-193) that the government impermissibly "made Major's and Skeen's religious faith a through-line [of the victim-impact presentation]" by "taking pains to have other witnesses testify about the Christian identities, prayers, and beliefs they shared with the victims."  That contention lacks merit.  To be sure, the record indicates that both Major and Skeen were deeply religious, and that aspect of their character naturally arose during testimony about their lives, personalities, and relationships.  But the victims' involvement in their congregations—and, particularly,

---

[34] Moreover, even absent this instruction, it beggars belief that jurors who heard testimony from grieving children, parents, spouses, and friends of the victims would have been materially swayed by the impact of these murders on the local financial-services sector.  *Cf. Roof*, 10 F.4th at 375 (finding "improper remark[s]" harmless where "[t]hey totaled just eight transcript lines out of forty-one pages of [the witness]'s eyewitness testimony, which included powerful descriptions of lying in her aunt's and son's blood, holding and fearing for her terrified granddaughter, and hearing her son say that he loved her before watching him take his last breath.").

their charitable work through religious organizations—are indisputably among the unique attributes of these human beings that are now lost to the community because of Council's offense conduct. *See Bernard*, 299 F.3d at 479 ("[T]he fact that [the victims] were 'deeply religious and harmless individual[s] who exhibited [their] care for [their] community by religious proselytization . . . was relevant to the community's loss at [their] demise.' . . . Because religion played a vital role in [the victims]' lives, it would be impossible to describe their 'uniqueness as individual human beings' without reference to their faith.").

Moreover, the government did not contend, as Council suggests (Br. 192-193), "that, because of their Christian devotion, Major and Skeen were more 'worthy' victims," nor did it ever argue for a "violat[ion of] the FDPA's directive that jurors 'shall not consider' the 'religious beliefs' of 'the defendant or any victim'" when determining whether death was warranted. To the contrary, jurors were instructed—repeatedly—that they "shall not consider the race, color, religious beliefs, national origin or sex of the defendant or of any victim" and that they could not vote for death unless they "conclude[d] that [they] would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or of any victim may be." J.A.4866 (first day of penalty phase); *accord* J.A.6040 (final jury instructions). As noted *supra* p. 128, the jury is presumed to have followed its instructions—especially where, as here, each juror signed a certification attesting that they followed it. *See* J.A.6089; *cf. Bernard*, 299 F.3d at 480

(finding no effect on substantial rights from a significant amount of explicitly religious testimony because "the court's instructions to the jury sufficiently addressed the risk of prejudice" and "[t]he jurors also signed a certification, as required by the FDPA, that religion played no part in their sentencing decision").

### 4.    The Victim-Impact Testimony Was Not Overly Emotional.

Finally, Council asserts reversible error (Br. 194-202) on the basis that certain witnesses became emotional at times when testifying about the murder victims. That contention too lacks merit. As this Court has recognized, "'the emotional impact of the crimes'" is among the permissible topics covered by victim-impact testimony in a capital case. *Humphries*, 397 F.3d at 240. It stands to reason that testimony about emotional impact will, on occasion, prove emotional, and Council cites no authority of this Court or the Supreme Court indicating that crying or pausing by grieving witnesses violates a defendant's due-process rights. Indeed, the fact that a victim-impact statement was delivered with "much emotion," far from being unduly prejudicial, "cuts towards [its] reliability." *Fulks*, 454 F.3d at 436; *see also United States* v. *Nelson*, 347 F.3d 701, 713 (8th Cir. 2003)) (finding no undue prejudice where "[a] fair summation of [the witnesses'] collective testimony is that the witnesses provided emotional and, on occasion, tearful testimony about [the victim] and the impact of her murder on their lives"; this included testimony from the victim's sister, who broke down on the stand and was unable to continue testifying); *United States* v. *Chanthadara*, 230 F.3d 1237, 1274 (10th Cir. 2000) (allowing young children to testify in tears about

130

their murdered mother); *United States* v. *McVeigh*, 153 F.3d 1166, 1219-1222 (10th Cir. 1998) (allowing intensely emotional testimony from numerous witnesses).

Moreover—contrary to Council's unfounded allegation (Br. 201) that "[t]he prosecutors . . . planned their questioning to climax with [emotional] displays"—the record reflects that the government endeavored to keep this testimony on an even keel. As noted above, the government bifurcated the victim-impact testimony, with Skeen's family and friends testifying first, followed by nine fact witnesses who testified to Council's conduct, and only then returning to victim-impact testimony relating to Major on the latter half of the final day of the government's penalty-phase case. Had the government been attempting to build to a sentimental crescendo, it could easily have backloaded the victim-impact evidence and left the jury with consecutive days of emotional testimony shortly before they entered deliberations.

Aside from its structuring of the evidence to avoid overwhelming the jury with emotional displays, the government also sought (and the district court granted) breaks in testimony when necessary to maintain a sober and dispassionate presentation. For instance, after Skeen's mother finished her testimony, the government requested a sidebar, during which it informed the court that it would be seeking either a brief recess or a reordering of witnesses. *See* J.A.4981 (Gov't: "I guess our perception is that it's getting emotional. We have another emotional witness. We would like to either take a quick break or call a witness out of order to dilute some of that. . . . That's in everyone's interest."). The court excused the jury for a brief recess.

J.A.4981-4982. The government then attempted to call Council's probation officer—obviously, not a victim-impact witness—but Council objected to the relevance of her testimony. J.A.4982-4992. The district court reserved ruling on that objection, and the government instead called another victim-impact witness, Skeen's friend Patricia Floyd. J.A.4992-4994. The government's affirmative request to recess and its attempt to call a non-victim-impact witness, however, evidence its commitment to avoiding an overly emotional penalty-phase case.

Council also faults (Br. 201) the government for fleeting displays of human empathy toward the witnesses. That criticism is likewise meritless. At the end of Lambert's testimony, the prosecutor said, "Thank you, Cathy. I know this is very difficult for you. I appreciate it. Thank you." J.A.4924. Council requested a sidebar, at which he stated that "it's appropriate that when a lawyer finishes with a witness that they, you know, don't make statements like, 'I know how difficult this is for you,' or anything like that." J.A.4925. The court began to respond with "I think it's an honest—" but the government interjected, "That's fine," and thereafter desisted from closing its questioning in that manner. J.A.4925. Council acknowledged, "I don't think he did it on purpose at all." J.A.4925. There was no error in that sequence; but to the extent the prosecutor's brief and inadvertent remark was improper, it was harmless, as no reasonable juror could have concluded that the prosecutor was vouching for the "difficult[y]" of testifying.

In sum, although certain witnesses became emotional during their testimony, Council has not demonstrated that any aspect of the government's penalty-phase case transgressed established bounds on victim-impact testimony, which can permissibly extend to "'the emotional impact of the crimes'" on the victims' loved ones. *Humphries*, 397 F.3d at 240. Accordingly, the district court did not abuse its ample discretion in admitting and delimiting this evidence, and no reason exists to set aside the jury's penalty-phase determination.

## VII. When Instructing the Jury, the District Court Appropriately Adhered to Congress's Statutory Precaution Against Racial Discrimination.

### A. Background

**1.** Congress has enacted a "[s]pecial precaution to ensure against discrimination" in the imposition of the death penalty, which provides:

> In a hearing held before a jury, the court . . . shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

18 U.S.C. § 3593(f).

**2.**     Before trial, the parties proposed conflicting instructions on the Section 3593(f) mandate.   The government's proposed instruction—which replicated the corresponding instruction delivered in this Circuit's last cross-racial capital case, *United States* v. *Roof, supra*—mirrored the statutory language without embellishment. J.A.1617.

For his part, Council requested a much more extensive and granular Section 3593(f) instruction.  The first part of his proposed instruction (like the government's) replicated the statutory language essentially verbatim, directing jurors that they "must not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victim(s)" and that they "are not to return a sentence of death unless [they] would return a sentence of death . . . without regard to the race, color, religious beliefs, national origin, or sex of either the defendant [and] [or any] victim."  J.A.1670. Council then went beyond the statutory language and asked that the district court instruct the jury on the legislative history and purpose of Section 3593(f).  J.A.1670-1671 ("When it passed the federal death penalty statute, Congress considered the instruction I have just given you so important that it created a special procedure. . . . Congress included [the certification form] in this process in order to ensure that each of you would stop and think deeply about how you are making this sentencing decision. . . . Congress wanted to make sure that no one is sentenced to death because of actual racial, ethnic, religious or gender bias.").   Finally—and most relevantly here—Council requested a lengthy instruction educating jurors on the concept of

implicit bias and directing them to engage in a thought experiment transposing the "backgrounds" of Council, his victims, and even the witnesses who testified in his case:

> Human beings have a natural tendency to identify with, and to respond to, people like ourselves. That is not bigotry or bias; it's just the way most people are. But the law requires more of jurors who are entrusted with making a life and death decision. It requires that each of you look deep inside to see if the way you are responding to the evidence and testimony of various witnesses or parties differs depending on the backgrounds of the various people involved. And if you are responding differently—more able, for example, to see the point of view or understand the emotions of someone whose background is more like your own—the law requires that you think through your responses again, imagining this time that everyone's backgrounds were reversed from what they actually are.

J.A.1671-1672. Although not pellucid on the face of the instruction, Council explained in his supporting memorandum that this exercise would, *inter alia*, "require[] the jurors to imagine what they would do if Mr. Council were not black and male or his victims not white and female." J.A.1653.

The district court adopted the government's proposed instruction, hewing close to the language of Section 3593(f) and declining either to expound for the jury the legislative history of that statutory provision or to require jurors to undertake a thought experiment switching the "backgrounds" of all involved parties. J.A.2300. At the charge conference, Council's defense attorney mentioned the Section 3593(f) instruction obliquely, noting that the parties and the court had "had conversations . . .

135

about the provisions of 3593(f), the implicit bias discussion," but stating that he would "leave it at that," without making a more robust objection.  J.A.5345.

**3.**      On the first day of the sentencing phase, the district court instructed the jury that, "[i]n considering whether a sentence of death is justified, a jury shall not consider the race, color, religious beliefs, national origin or sex of the defendant or of any victim" and that "[t]he jury cannot select a sentence of death unless it concludes that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or of any victim may be."  J.A.4866.  The court then called back to that earlier admonition when reiterating its instructions to the jury before their penalty-phase deliberations:

> In engaging in the weighing process, you must avoid any influence of passion or prejudice.  As I instructed earlier, in your consideration of whether the death sentence is justified, you must not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victims.  To emphasize the importance of this consideration, the federal law requires each juror to read and sign a certification statement attesting to the fact that they did not consider race, color, religious beliefs, national origin or sex of either the defendant or the victims. Each of you should therefore carefully reflect on the statement found in the special verdict form in Section 7 and sign in the appropriate place.

J.A.6040.  And it reiterated that instruction when explaining the form that each juror would sign to attest that he had reached his sentencing determination free of any impermissible prejudice:

> The last page, ladies and gentlemen, is the certification page.  Section 7, it says, by signing below[,] each juror certifies that consideration of the race, color, religious beliefs, national origin or sex of the defendant or the victims was not involved in reaching his or her individual decision,

136

and that the individual juror would have made the same recommendation regarding a sentence for their crime or crimes in question regardless of the race, color, religious beliefs, national origin or sex of the defendant or either of the victims.

J.A.6063. Neither the government nor Council raised a contemporaneous objection to any of these instructions.

Upon returning their sentencing recommendations as to both counts of conviction, each juror signed a form containing the language of Section 3593(f). *See* J.A.2318; J.A.2332.

### B.    Standards of Review

**1.**    Where a request for a particular instruction was preserved below, this Court "review[s] a 'district court's denial of a proposed jury instruction for abuse of discretion.'" *Young*, 989 F.3d at 265. To effectively preserve a claim of error related to that denial, however, the defendant must object contemporaneously to the instruction that the court delivers and clearly state the grounds for the objection before the jury retires to deliberate. *See* Fed. R. Crim. P. 30(d). A defendant who fails to do so has forfeited his claim, which this Court may review only for plain error. *See United States* v. *Cowden*, 882 F.3d 464, 475 (4th Cir. 2018) ("We note at the outset that although [the defendant] submitted a proposed instruction on this legal principle, he did not object contemporaneously to the jury instructions that the district court ultimately gave. Accordingly, we review [his] challenge to the jury instructions for plain error."). Because Council concededly (Br. 207) failed to object during the

delivery of jury instructions, his assertion that the district court abused its discretion

by declining to deliver his proposed instruction is reviewable only for plain error.

    **2.**    As a general matter, this Court would also review "oral modifications

[the district court] made when it read the instructions to the jury" for abuse of

discretion. *United States* v. *Childress*, 26 F.3d 498, 502 n.2 (4th Cir. 1994). Council

acknowledges (Br. 207), however, that he "did not specifically object to the court's

charge as delivered to the jury." Accordingly, the court's delivery of the Section

3593(f) jury instruction, to the extent it differed from the written charge, should

likewise be reviewed for plain error.[35]

## C.    Discussion

    Council asserts (Br. 216-222) that the district court abused its discretion in two

respects when delivering the nondiscrimination instruction mandated by Section

3593(f): first, by refusing to require that the jury engage in an elaborate thought

experiment transposing the race (and, presumably, other demographic characteristics)

_____

[35] To evade the consequences of his forfeiture, Council contends (Br. 207) that
"the omission of the mandatory race-switching step from the sentencing process is a
non-waivable error." That contention is inapplicable here for two reasons. First, the
government does not assert that Council's claim is "waived" and thus categorically
unavailable on appeal; rather, the claim was—concededly—*forfeited* in the district
court, and is thus reviewable only for plain error on appeal. Second, the authorities
on which Council relies concern the statutory requirement of a unitary jury sitting at
both the guilt and penalty phases of a capital prosecution; they have nothing to do
with Section 3593(f) or the scrutiny with which a court's instruction on that provision
should be evaluated on appeal. *See United States* v. *Green*, 407 F.3d 434, 443 (1st Cir.
2005) (holding that "[a] federal capital defendant can [not] waive the default rule of a
unitary jury"); *United States* v. *Young*, 424 F.3d 499, 508-509 (6th Cir. 2005) (quoting
*Green* without additional analysis).

of Council and his victims; and second, by modestly truncating the statutory language

on two of the five occasions on which the court delivered this instruction to the jury.

Neither contention has merit.

### 1.     The District Court's Instruction Correctly Encompassed the Statutory Directive.

**a.**     Council claims (Br. 206) that the district court acted "[c]ontrary to

Congress's mandate" by "refus[ing] to properly instruct jurors to consider what

sentence they would choose if Council's and the victims' races were reversed."  In

fact, the district court executed Congress's mandate by relaying the statutory directive

to the jurors in the precise terms that Congress enacted.  *See supra* pp. 136-137.  Jury

instructions that track the relevant statutory language are generally sufficient unless

"the bare words of the statute . . . are hopelessly ambiguous" so as to confer

"unbridled discretion to impose the death penalty."  *Godfrey* v. *Georgia*, 446 U.S. 420,

437 (1980) (Marshall, J., concurring); *see, e.g.*, *United States* v. *Diaz*, 437 F. App'x 207,

210 (4th Cir. 2011) (per curiam) (unpublished) (finding no impairment of substantial

rights where "the district court's instructions . . . simply tracked [the relevant]

statutory language"); *cf. California* v. *Brown*, 475 U.S. 1301, 1303 (1986) ("A portion of

the jury instructions given at the sentencing phase of [a capital defendant]'s trial

tracked the . . . statutory language, thus clearly informing the jury of its constitutional

duty to consider in mitigation all relevant aspects of the defendant's character and the

circumstances of his crime.").   No such ambiguity exists here: The statute clearly

directs jurors (1) that they may "not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim" in arriving at a death recommendation, and (2) that they must "conclude[] that [they] would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." That statutory language is unambiguous, unembellished by interpretive caselaw, and intelligible to lay jurors.

Accordingly, the instruction that the district court adopted in Council's case was consistent with the corresponding instruction delivered in capital prosecutions that this Court has recently affirmed. As the government noted in support of its proposed instruction, *see* J.A.1617, the jury in *Roof* received an instruction that appropriately mirrored the statutory language, just as Council's jury did. And in *Runyon*, this Court reviewed a virtually identical formulation of the nondiscrimination instruction as that delivered in Council's case and characterized it as being "in accordance with the directive stated in 18 U.S.C. § 3593(f)." 707 F.3d at 497.

The decisions of this Court's sibling circuits have also uniformly concluded that a jury instruction mirroring the statutory language satisfies the requirements of Section 3593(f). *See, e.g., United States* v. *Sampson*, 486 F.3d 13, 25 (1st Cir. 2007) ("18 U.S.C. § 3593(f) . . . requires a jury instruction that the race of the defendant and victim not enter into the sentencing determination and a certification signed by the jurors that they were not influenced by these factors."); *United States* v. *Lawrence*, 735 F.3d 385,

403 (6th Cir. 2013) ("The jury was clearly instructed, in accordance with § 3593[(f)],
that they were prohibited from considering race in their sentencing deliberations. The
jury was also correctly instructed that each juror had to be convinced that he or she
would have reached the same sentencing decision regardless of race."); *United States* v.
*Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) ("accept[ing] the jurors' assurance that no
impermissible considerations of race or religion factored into the verdict" based on
their Section 3593(f) certification). Indeed, the lone circuit to have promulgated a
pattern jury instruction on this point adopted Section 3593(f) verbatim into its model
charge. *See* Eighth Circuit Model Crim. Jury Instr. 12.13 (2021).

Against this substantial authority, Council cites no case holding that a district
court abuses its discretion by adhering to the statutory language that Congress enacted
in Section 3593(f). Instead, Council's "[m]ost prominent[]" evidence for his
contention that the district court acted "[c]ontrary to Congress's mandate" is that the
American Bar Association has promulgated "a model charge . . . advis[ing] jurors to
engage in" a more explicit race-switching exercise. Br. 206, 211-212. The ABA,
however, is not Congress. And even if the ABA's model charge represents some
practitioners' view of the optimal jury instruction, "[t]he fact that a particular rule may
be thought to be the 'better' view does not mean that it is incorporated into the
[relevant law]." *Mu'Min*, 500 U.S. at 430-431.

**b.** Even if Council could identify some defect in the instruction delivered
by the district court, he cannot show that his proposed instruction—which would

have introduced substantial ambiguity for jurors while eclipsing the targeted scope of Section 3593(f)—was an appropriate replacement.

Although Council contends on appeal (Br. 206) that the district court should have devised "a 'race-switching' exercise'" requiring "that jurors be instructed to pause and consider whether they would recommend a death sentence if the defendant's and victim's races were different than they are," his request in the district court was significantly less focused than that. Specifically, Council's proposed instruction would have obligated jurors to pretend "that *everyone's* backgrounds were reversed from what they actually are"—including "various witnesses or parties" and "the various people involved" in the case. J.A.1671-1672 (emphasis added). The inclusion of "witnesses" and other "involved" persons vastly exceeds the mandate imposed by Section 3593(f), which expressly limits the "special precaution" to "the defendant or any victim."

Nor did Council's proposed instruction elaborate on the scope of a person's relevant "background," leaving jurors to decide how granularly they should assess a victim's, witness's, or defendant's biography and personal characteristics for purposes of their cognitive transposition. *See* J.A.1671-1672 (defense instruction discussing "the backgrounds of the various people involved," "the emotions of someone whose background is more like your own," and "imagining . . . that everyone's backgrounds were reversed"). Section 3593(f) requires jurors to set aside only five enumerated characteristics—"race, color, religious beliefs, national origin, or sex"—when reaching

142

their sentencing determination.  But the plain meaning of "background" does not encompass innate characteristics (such as race and gender) as much as a person's lived experience, including such statutorily irrelevant facts as that person's vocational, educational, or familial history.  *See* "Background," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/background (defining "background" to mean, *inter alia*, "the total of a person's experience, knowledge, and education").  At a minimum, instructing jurors to evaluate and transpose an "involved" person's "background" would not obviously communicate to them that they should engage in the kind of narrow "'race-switching' exercise" that Council now contends the district court ought to have ordered.[36]

Notably, Council declines to defend on appeal the proposal that his attorneys actually put forward in the district court—preferring instead to rehabilitate their claims into something with a patina of legal cognizability.  But this Court "review[s] a 'district court's denial of a *proposed jury instruction*,'" *Young*, 989 F.3d at 265 (emphasis added), and the district court did not abuse its discretion—much less plainly and prejudicially so—by denying a capacious and confusing instruction untethered from the underlying statutory mandate.

---

[36] Moreover, even if jurors could have gleaned the concept of race from the term "background," they could not have applied the plain meaning of the term "reverse."  *See* "Reverse," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/reverse (defining "reverse" as "something directly contrary to something else: OPPOSITE").  Race, religious belief, and national origin do not have "opposite[s]," a fact that rendered Council's proposed instruction meaningless.

## 2. The District Court Repeatedly Communicated a Correct and Comprehensive Instruction to the Jury.

Finally, Council contends (Br. 214-215) that the district court prejudicially erred by "mention[ing] only the first step [of the Section 3593(f) mandate], saying jurors 'must not consider the race' of Council or the victims" without also directing them to ascertain whether they would have imposed the same sentence "no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be." As noted *supra* pp. 137-138, Council forfeited this objection by failing to raise it contemporaneously. In any event, his claim lacks merit, as a complete and contextualized review of the record demonstrates that the jury was instructed on multiple occasions consistently with the entirety of the Section 3593(f) mandate.

The district court instructed the jury as to its obligations under Section 3593(f) on five occasions: (1) orally during the initial instructions on the opening day of the penalty phase, J.A.4866; (2) orally during final jury instructions, when discussing jurors' obligation to reach their determination without discriminating on the basis of any characteristic enumerated in the statute, J.A.6040; (3) orally again during final jury instructions, when explaining the written certification that jurors would need to sign to validate their penalty recommendation, J.A.6063; (4) in writing on the instructional guide provided to the jurors, J.A.2300; and (5) in writing on the certification form itself, J.A.2318; J.A.2332. Although, as discussed *supra* pp. 138-143, Council generally takes issue with the manner in which the district court instructed the jurors with

144

respect to their obligation on the second half of the Section 3593(f) mandate, he does not appear to dispute that the first, third, and fifth instances addressed that component of the statutory requirement.

His contention on appeal (Br. 214-216) focuses on the second and fourth instances, when the district court "mentioned only the first step, saying jurors 'must not consider the race' of Council or the victims" without also directing them to consider whether they would have imposed the same sentence "no matter what the race . . . of the defendant or any victim may be." As a threshold matter, it is doubtful that even the entire omission of the latter language from the jury charge would have affected Council's substantial rights. As the Sixth Circuit has held in the context of a certification form that omitted the "no matter" component of the statutory mandate, the "omission of the second component from the jury's § 3593(f) certification, substantially duplicative of the first component, can hardly be deemed to have created . . . an unacceptable risk of racial prejudice." *Lawrence*, 735 F.3d at 403.

But this Court need not reach the question addressed by the Sixth Circuit in *Lawrence* because, here, the district court's repeated delivery of a complete and correct charge obviated any conceivable prejudice from the two instances on which the court modestly truncated the statutory language. It is axiomatic that this Court ""do[es] not view a single instruction in isolation; rather [it] consider[s] whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law."" *United States* v. *Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). In

Council's case, while one oral and one written instruction failed to include the "no matter" prong of the Section 3593(f) mandate, *see* J.A.2300; J.A.6040, two other oral instructions and the written certification form included the entirety of the relevant statutory language, *see* J.A.2318; J.A.2332; J.A.4866; J.A.6063. The latter aspect—that jurors were required to read, consider, and certify that they "would have made the same recommendation regarding a sentence . . . regardless of the race . . . of the defendant, or either of the victims," J.A.2318; J.A.2332—is particularly salient evidence that jurors were aware of the entirety of their statutory mandate. *See, e.g.*, *Mitchell*, 502 F.3d at 990 ("Absent a substantial indication to the contrary, we accept the jurors' assurance that no impermissible considerations of race or religion factored into the verdict.").

The district court correctly communicated the requirements of Section 3593(f) in its entirety, on multiple occasions, using the unambiguous language Congress enacted. Council has not demonstrated that the jury instructions—to which he raised no contemporaneous objection—were plainly erroneous or prejudicial to his substantial rights. No basis thus exists to set aside the jury's considered and unanimous recommendation of a capital sentence.

146

VIII.   **The District Court Correctly Determined That Application of the Federal Death Penalty Act in Council's Case Passes Constitutional Muster.**

A.   **Background**

1.     Pursuant to the FDPA, a United States marshal "shall supervise implementation of the [capital] sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). If that State's law "does not provide for implementation of a [capital] sentence," the sentencing court "shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." *Ibid.* Between 1993 and 2020, federal regulations provided that "a sentence of death shall be executed . . . [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death . . . to be determined by the Director of the Federal Bureau of Prisons." 28 C.F.R. § 26.3(a)(4) (Nov. 27, 2020). In December 2020, that regulation was revised to permit the federal government to use "any other manner prescribed by the law of the State in which the sentence was imposed." 28 C.F.R. § 26.3(a)(4) (Dec. 28, 2020).

2.     At all times relevant to Council's case, South Carolina law has designated electrocution as the default method of execution in the State but provided capital prisoners the option of electing lethal injection instead. In 1995, South Carolina enacted a death-penalty statute providing that "[a] person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by

147

electrocution or, at the election of the person, lethal injection under the direction of the Director of the Department of Corrections." S.C. Code § 24-3-530(A) (1995). In May 2021, South Carolina amended the relevant provision to offer the firing squad as an available method of execution in addition to electrocution and lethal injection. *See* S.C. Code § 24-3-530(A) (2021) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the convicted person, by firing squad or lethal injection, if it is available at the time of election, under the direction of the Director of the Department of Corrections.").

3.      In July 2021—roughly two months after South Carolina revised its death-penalty statute—Council moved, under Federal Rule of Criminal Procedure 33, for vacatur of his death sentences. J.A.6170-6214. Rule 33 permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The rule stipulates, however, that a new-trial motion "must be filed within 14 days after the verdict," unless the motion is "grounded on newly discovered evidence." *Ibid.* Council asserted two alternative grounds on which his motion—filed 21 months after judgment was entered in his case, *see* J.A.2343—was nevertheless timely: first, that his delay was the product of "excusable neglect" so as to suspend the time limit pursuant to Federal Rule of Criminal Procedure 45(b)(1)(B), J.A.6177-6178; and second, that "the new South Carolina statute is considered a new fact rather than new law" and should thus be deemed "'newly discovered evidence,'" J.A.6178-6179.

148

On the merits, Council asserted that 18 U.S.C. § 3596(a), which mandates "implementation of the [federal capital] sentence in the manner prescribed by the law of the State in which the sentence is imposed," violated the *Ex Post Facto* Clause, J.A.6191-6197; the Eighth Amendment, J.A.6197-6205; the Equal Protection and Due Process Clauses, J.A.6205-6207; and the nondelegation doctrine, J.A.6207-6211.

The district court denied Council's motion. J.A.6374-6386. The court first determined that Council's "motion does not identify any 'newly discovered evidence'" but instead only "various legal arguments challenging the constitutionality of" the FDPA's incorporation of state law. J.A.6380-6381. The court then rejected Council's contention that his delay was the product of "excusable neglect," pointing out that he had "clearly recognized"—as early as two years prior—that "electrocution was a possible manner of execution, but he made no argument challenging its constitutionality." J.A.6382. Even aside from untimeliness, the court concluded that "[t]he interest of justice does not require a new trial—of either the guilt or penalty phase—because [Council]'s arguments and proffered evidence are irrelevant to the jury's determination of his guilt and sentence." J.A.6383. Finally, the court addressed and rejected each of Council's contentions on the merits, determining that his "*ex post facto* challenge fails under binding precedent, . . . as does his Eighth Amendment challenge," J.A.6384-6385; denying his "nondelegation challenge for the reasons discussed in [a] prior order," J.A.6386 (citing J.A.2368-2372); and identifying no "authority for his equal protection/due process argument," J.A.6386.

149

### B.    Standard of Review

This Court "review[s] for abuse of discretion a district court's denial of a motion, made pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial." *United States* v. *Smith*, 451 F.3d 209, 216 (4th Cir. 2006). This Court has cautioned that relief under Rule 33 should be granted "'sparingly,' and . . . 'only when the evidence weighs heavily against the verdict.'" *United States* v. *Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (additional quotation marks omitted).

### C.    Discussion

#### 1.    The District Court Appropriately Denied Council's Untimely Rule 33 Motion.

As a threshold matter, this Court need not reach the merits of any of the challenges Council now attempts to renew (Br. 222-236) from his Rule 33 motion because the district court correctly denied that motion as time-barred. As Council conceded below, J.A.6177, he did not file his motion within the 14-day window provided by Rule 33(b)(1). And neither the "newly discovered evidence" prong of Rule 33(b)(2) nor the "excusable neglect" standard of Rule 45 salvages his belated legal challenge to the FDPA.

First, the district court correctly determined that Council had failed to identify any "newly discovered evidence" within the meaning of Rule 33(b)(2). "Newly discovered evidence" means "evidence relat[ing] to the elements of the crime charged," *United States* v. *Blackwell*, 436 F. App'x 192, 198 (4th Cir. 2011) (per curiam)

150

(unpublished) (quotation marks omitted); or, in the capital context, "information" presented at a penalty hearing where mitigating and aggravating factors are weighed, *cf. United States* v. *Lee*, 274 F.3d 485, 493-494 (8th Cir. 2001) (addressing a Rule 33 motion and discussing "evidence at capital-sentencing hearings").  In keeping with Rule 33's contemplated relief of "grant[ing] a new trial," the only new evidence cognizable under that rule is "that which . . . would be admissible were a new trial to be granted."  *See United States* v. *Smith*, 62 F.3d 641, 649 (4th Cir. 1995).  Council's legal arguments about the constitutionality of Section 3596(a), however, would not be admissible—or relevant—in any "new trial" at either the guilt or penalty phases.  *See Blackwell*, 436 F. App'x at 198 ("[A] Rule 33 motion is designed to rectify factual injustice, not to correct legal error." (quotation marks omitted)).  Indeed, "[t]he fundamental problem with [Council]'s argument is that there is no new 'evidence.' . . . [Council]'s motion is a legal argument—not a motion based on new evidence."  *United States* v. *Christy*, 3 F.3d 765, 768-769 (4th Cir. 1993).

Second, the district court correctly recognized that, because the relevant legal landscape had not materially changed since Council was sentenced, he could not demonstrate "excusable neglect" for his failure to assert his claims in a timely fashion. To the extent Council's arguments were—in his own words (Br. 232 n.98)— "challenging the constitutionality of the FDPA," there was no reason to wait 21 months after imposition of the FDPA-compliant judgment; after all, Council pointed to no changes in that federal statute that newly justified a Rule 33 motion.  And to the

extent Council's objections lay not solely with the structure of the FDPA but with the particular method of execution permitted by the incorporated state law, he had acknowledged—in his original motion to vacate his sentence—that "[p]resently, South Carolina provides for execution by lethal injection or electrocution, at the election of the condemned prisoner." J.A.2356. He was thus on notice that the State had "prescribed by [its] law" electrocution as a permissible manner of execution, 18 U.S.C. § 3596(a), and could have asserted a challenge to that method nearly two years before he ultimately did so.

Accordingly, the district court did not abuse its ample discretion in denying Council's untimely Rule 33 motion. This Court thus need not reach the merits of Council's *ex post facto*, Eighth Amendment, or nondelegation challenges to the FDPA's incorporation of state-law methods of execution. Nevertheless, for the sake of completeness, the government briefly addresses each of those claims below.

### 2. Council's *Ex Post Facto* Claim Lacks Merit.

For two independent reasons, Council's *ex post facto* claim based on the intervening amendment of South Carolina's death-penalty statute lacks merit. First, the Supreme Court has consistently held that a change in the manner of imposing a capital sentence—even a change that is inimical to the defendant's interests—does not violate the *Ex Post Facto* Clause so long as the defendant was on notice at the time of his offense conduct that his crimes were punishable by death. Second, even assuming that a change in the manner of imposing a capital sentence could constitute an *ex post*

*facto* punishment, the relevant South Carolina law continues to authorize the same methods of execution that were available at the time of Council's offenses.

>    **a.    The Punishment Imposed for Council's Offenses—Death—Has Not Changed Since the Time of His Offense Conduct.**

The *Ex Post Facto* Clause forbids retroactive application of a "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Peugh* v. *United States*, 569 U.S. 530, 532-533 (2013) (quotation marks omitted). In the death-penalty context, the Supreme Court has examined whether existing statutes at the time of the crime "provide[d] sufficient warning" regarding the possibility of the punishment of death "so as to make the application" of any intervening statutory changes "consistent with the Ex Post Facto Clause of the United States Constitution." *Dobbert* v. *Florida*, 432 U.S. 282, 301 (1977). Here, the application of the FDPA to Council is not retroactive, and any intervening change in the incorporated state law that could affect the details of the method of execution in no way inflicts any greater punishment for Council's capital crimes.

First, the application of the FDPA to Council is plainly not retroactive. When Council murdered Major and Skeen during his robbery of the CresCom Bank in August 2017, those crimes carried a possible punishment of death. *See* 18 U.S.C. §§ 924(j)(1), 2113(e). And since 1994—well before Council was convicted and sentenced—the FDPA has required that federal capital sentences like Council's be implemented "in the manner prescribed by the law of the State in which the sentence

is imposed," or, if "the State does not provide for the implementation of a sentence of death," the manner prescribed by the law of another State that does have a death-penalty statute pursuant to court designation. 18 U.S.C. § 3596(a). The FDPA has not changed since Council committed his crimes or was sentenced under it. Rather, both at the time of his offense conduct and today, federal law clearly warned that Council's crimes could lead to execution in whatever manner the relevant State set out at the time of execution.

Nor do any intervening changes in the state law incorporated by the FDPA and governing the "manner" of "implement[ing]" a death sentence impose any greater punishment on Council. The Supreme Court has long held that a change in the "mode of producing" death does "not change the penalty—death—for murder," and therefore cannot provide a basis for sustaining an *ex post facto* challenge. *Malloy* v. *South Carolina*, 237 U.S. 180, 185 (1915). In *Malloy*, the Court rejected an *ex post facto* challenge where state law changed the method of execution from hanging to electrocution between the time the crime was committed and the sentence was imposed. *Ibid.* As the Court explained, "[t]he constitutional inhibition of ex post facto laws was intended to secure substantial personal rights against arbitrary and oppressive legislative action, and not to obstruct mere alteration in conditions deemed necessary for the orderly infliction of humane punishment." *Id.* at 183.[37]

_____

[37] Although the Court also observed that "some of the odious features incident to the old method were abated," and that there existed "a well grounded belief that

In *Dobbert*, the Supreme Court reiterated that the *Ex Post Facto* Clause is satisfied where an inmate was on notice at the time of the crime that the sovereign could "seek to impose" death as the penalty, even if procedural changes regarding its imposition had since changed. 432 U.S. at 298. Thus, even though a state statute had changed between the commission of the crime and the trial—altering the role of the jury in the selection of a capital sentence—the Court concluded that no *ex post facto* problem existed. *See id.* at 292-297; *see also id.* at 293 (observing that the Clause was not designed to "limit the legislative control of remedies and modes of procedure which do not affect matters of substance," even where the intervening change in procedure disadvantages the defendant (quotation marks omitted)). And *Dobbert* made clear that such changes need not be "ameliorative" to the defendant in order to fall outside the scope of the *Ex Post Facto* Clause. *Id.* at 292 & n.6 (explaining that the Court's determinations that "changes in the law are procedural, and on the whole ameliorative" form "independent bases" for its decision).

Similarly, even though *Dobbert* concerned an instance in which the death-penalty statute in effect at the time of the crime was declared unconstitutional before the defendant's trial, the Court rejected the argument that the *Ex Post Facto* Clause prohibited the application of the new statute because "there was no 'valid' death penalty in effect in Florida as of the date" of the crime. 432 U.S. at 297. The Court

---

electrocution is less painful and more humane than hanging," the Court did not indicate that these features were essential to its holding regarding the "mode" of inflicting a "humane punishment." *Malloy*, 237 U.S. at 183-185.

concluded that this "highly technical" and "sophistic" argument "mocks the substance of the Ex Post Facto Clause," as the since-invalidated law had "clearly indicated Florida's view of . . . the degree of punishment which the legislature wished to impose upon murderers," and "its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder." *Ibid.*

These principles foreclose Council's contention that any arguable distinction between South Carolina's array of execution options at the time of Council's crimes and its current offerings runs afoul of the *Ex Post Facto* Clause. Council's theory— essentially, that lethal injection is preferable to electrocution, and thus a regime that newly favors the latter is unconstitutional—defies the Supreme Court's distinction between the punishment relevant for *ex post facto* purposes—"death"—and the "mode of producing" that punishment. *Malloy*, 237 U.S. at 185. Just as the change between hanging and electrocution caused no *ex post facto* problem, a change between lethal injection and electrocution would likewise alter only the "mode of producing" the same ultimate punishment.

Nor can Council's argument be reconciled with *Dobbert*'s reasoning that whatever "highly technical" arguments capital defendants may devise, the key inquiry is whether the defendant received "fair warning" that the government intended death to be among the punishments for their crime. 432 U.S. at 297. Indeed, even beyond the fact that death was clearly among the punishments attached to Council's crimes in 2018, the FDPA clearly provided notice that the method of implementing a death

sentence could vary among any method that might be chosen by the State in which the defendant elected to commit his offenses—or by any other State that might be designated by the sentencing court in the absence of a death-penalty statute in the place of the crime. *See* 18 U.S.C. § 3596(a).

Accordingly, multiple courts of appeals—including this one—have found that a change in the method of execution does not increase a condemned inmate's punishment. In *United States* v. *Chandler*, 996 F.2d 1073 (11th Cir. 1993), the condemned inmate was convicted under the Anti-Drug Abuse Act of 1988. *Id.* at 1079. At the time, there was "no federal statute prescribing a method for carrying out federal death sentences." *Id.* at 1095. The Eleventh Circuit rejected the defendant's argument that, if Congress were to enact such a statute, it would "increase" his punishment from a "sentence [of] . . . life imprisonment under a sentence of death" to "death." *Id.* at 1095-1096. The Eleventh Circuit concluded that *Dobbert* foreclosed this argument because "there was clear notice that a violator of the law might be sentenced to death," and "[f]uture legislation would not increase the punishment, but would only provide for the method by which the punishment would be carried out; a change in procedure, not the sentence." *Id.* at 1096. And three years later, this Court likewise concluded that *Dobbert* foreclosed a claim that federal method-of-execution regulations promulgated after the crime violated the *Ex Post Facto* Clause because federal law had not previously specified any method of execution. *Tipton*, 90 F.3d at 903. If the government can adopt a method of execution where previously none was

expressly authorized without raising *ex post facto* concerns, it follows *a fortiori* that a shift between methods of execution implicates no such concerns.

> **b.    In Any Event, the Change in South Carolina Law Does Not Affect the Manner in Which Council's Sentence Will Be Carried Out.**

As noted above, both the 1995 version of the South Carolina death-penalty statute (in effect at the time of Council's sentencing) and the 2021 version (in effect now) permit a condemned prisoner to elect between implementation of his sentence by electrocution or lethal injection.  (The latter also permits death by firing squad, but Council does not contend that the addition of this third option causes him any harm.)  Council asserts (Br. 223-224) two distinctions between the statutes that, in his view, violate the *Ex Post Facto* Clause: first, that the new law "mak[es] electrocution the default method of execution"; and second, that electrocution is now the *only* method of execution designated by state law because "the alternative methods are neither now nor expected to become available."  Neither contention withstands scrutiny.

First, the plain statutory language rendered electrocution among the "default method[s] of execution" under *both* the 1995 and 2021 versions of South Carolina law. *Compare* S.C. Code § 24-3-530(A) (1995) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection"), *with* S.C. Code § 24-3-530(A) (2021) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the

convicted person, by firing squad or lethal injection").[38]  There has thus been no

change to that framework that would support an *ex post facto* challenge.

Second, the current *practical unavailability* of lethal injection and the firing squad

in executions *carried out by the State* does not affect "the manner *prescribed by the law of the*

*State*" and *implemented* by "a United States marshal."  18 U.S.C. § 3596(a) (emphasis

added).  Rather, lethal injection remains "prescribed by the law of the State" even if

state officials are, at present, unable to implement death sentences in that manner

because, *e.g.*, the State lacks access to the necessary ingredients.  *See In re Fed. Bureau of*

*Prisons' Execution Protocol Cases*, 955 F.3d 106, 108 (D.C. Cir.) (per curiam) (holding that

"18 U.S.C. § 3596(a) . . . requires the federal government to adhere . . . to a State's

choice among execution methods such as hanging, electrocution, or lethal injection,"

but rejecting the view "that the FDPA also requires the federal government to follow

all the subsidiary details set forth in state execution protocols"), cert. denied, 141 S.

Ct. 180 (2020).   Council's contrary contention—that any transient logistical

obstructions inhibiting state officials from implementing statutorily authorized

methods of execution must categorically tie the hands of the federal government as

well—cannot be squared with the text of the FDPA, which speaks to whether a

"manner" is "prescribed by . . . law," not whether it is presently "available,"

"obtainable," "practicable," "convenient," or "administrable" by state officials.

---

[38] If a prisoner "waives the right of election," the 1995 law provided that "the penalty must be administered by lethal injection," while the 2021 law substitutes "electrocution."  But any such waiver is attributable to the prisoner, not to the State.

Accordingly, even if such a procedural change in the method of implementing his sentence implicated the *Ex Post Facto* Clause, Council has not established that the revised South Carolina death-penalty statute constrains the "manner[s]" of execution "prescribed by . . . law" and thus permissible under the FDPA.

### 3. Council's Eighth Amendment Challenge to Electrocution Is Neither Relevant to His Case nor Ripe for Adjudication.

Council devoted a significant portion of his Rule 33 motion to describing the various aspects of electrocution that assertedly render it a "cruel and unusual punishment[]" in violation of the Eighth Amendment. *See* J.A.6182-6187. But because he has failed to satisfy his threshold burden on an Eighth Amendment method-of-execution challenge, the constitutional permissibility of electrocution is neither ripe nor relevant to this case, and this Court need not reach that question.

**a.** In *Bucklew* v. *Precythe*, 139 S. Ct. 1112 (2019), the Supreme Court set out the test to determine whether a capital prisoner has articulated a cognizable Eighth Amendment challenge to the government's method of executing him: "Has he identified a feasible and readily implemented alternative method of execution the State refused to adopt without a legitimate reason, even though it would significantly reduce a substantial risk of severe pain?" *Id.* at 1129. Nowhere in his brief does Council clearly articulate "a feasible and readily implemented alternative method of execution" that he would find preferable to electrocution.

Reading between the lines of his *ex post facto* claim, it seems that Council's preferred method of execution would be lethal injection. *See* Br. 228 ("Because the facts pled and supported by Council show that electrocution is substantially *less* humane than lethal injection, the district court should not have summarily dismissed his *ex post facto* claim."). But as discussed above, lethal injection *is* a "manner [of execution] prescribed by the law of the State" of South Carolina. 18 U.S.C. § 3596(a). Accordingly, Council cannot demonstrate that lethal injection is an "alternative method of execution the State *refused* to adopt without a legitimate reason," *Bucklew*, 139 S. Ct. at 1129 (emphasis added), because the State *has* adopted it.

**b.**    Moreover, even if Council's reading of the FDPA turns out to be correct—such that the federal government is limited by whatever transient logistical constraints presently burden state officials—Council's Eighth Amendment claim is not ripe because he cannot demonstrate that he faces any realistic or imminent prospect of execution by electrocution. *See Texas* v. *United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotation marks omitted)); *United States* v. *Higgs*, 711 F. Supp. 2d 479, 553 (D. Md. 2011) ("This claim is not yet ripe for review because the instant Petition and appeals from it remain and Higgs has not yet been given an execution date. . . . Moreover, litigation may modify the Maryland Protocol prior to Higgs' actual execution." (citing, *inter alia*, *Kennedy* v. *Block*, 784 F.2d 1220, 1222 (4th Cir. 1986))).

To begin, South Carolina's courts have precluded the State from implementing any capital sentences by means of electrocution. As Council acknowledges (Br. 224 n.93), "the South Carolina Supreme Court [has] stayed two state prisoners' executions based on their challenges to electrocution." *See, e.g.*, Order, *State* v. *Sigmon*, No. 2021-024388 (S.C. June 16, 2021). In so doing, the state Supreme Court expressly recognized a "statutory right of inmates to elect the manner of their execution"—an authoritative statement of state law by the State's highest court that forecloses Council's argument that South Carolina prescribes *only one* form of execution (*i.e.*, electrocution). *Id.* at 2. ("Under these circumstances, in which electrocution is the only method of execution available, and due to the statutory right of inmates to elect the manner of their execution, we vacate the execution notice."); *see generally Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1874 (2018) ("If the relevant state law is established by a decision of 'the State's highest court,' that decision is 'binding on the federal courts.'"). And just three months ago, a South Carolina judge ruled unconstitutional both electrocution and the firing squad and permanently enjoined the State from implementing either. *See* Order Granting Declaratory and Injunctive Relief, *Owens et al.* v. *Stirling et al.*, Civ. No. 2021CP4002306 (S.C. Ct. Common Pleas Sept. 6, 2022), at 37-38.

Moreover, even assuming *arguendo* that South Carolina's present incapacity to obtain lethal-injection materials constrains the methods of execution legally available to the federal government *and* that the State's courts will reverse course and permit

state officials to carry out executions by electrocution, Council cannot establish that the present situation is likely to reflect the State's capacity (or, accordingly, state prisoners' options) on the indeterminate date of his eventual execution. Council's execution has not been scheduled, nor is it likely to be scheduled at any point in the near future. Both federal law, *see* 18 U.S.C. § 3596(a), and the terms of Council's judgment, *see* J.A.2345, preclude the Attorney General from setting an execution date until the capital judgment has become final following "exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." Moreover, the Attorney General has imposed a moratorium on all federal executions pending completion of three separate reviews of departmental policies and procedures relating to the implementation of capital sentences. *See* Attorney General Merrick Garland, *Moratorium on Federal Executions Pending Review of Policies and Procedures* (July 1, 2021), https://www.justice.gov/opa/page/file/1408636/download. Council is thus in no jeopardy of execution while (1) his avenues to judicial relief from his conviction and sentence remain open, and (2) the Attorney General's reviews remain ongoing.

Given the decisions of state courts precluding the use of electrocution and absent a foreseeable execution date in Council's case, any decision by this Court as to the constitutionality of that method of execution would constitute an advisory opinion resting on predictive guesswork rather than a concrete dispute ripe for judicial resolution. South Carolina has not imposed electrocution on any state prisoner pursuant to its revised statute. No such executions are imminent. The federal

163

government has not imposed electrocution—or any means of execution other than lethal injection—since 1957. *See* Federal Bureau of Prisons, *Capital Punishment Historical Information*, https://www.bop.gov/about/history/federal_executions.jsp. No such executions are contemplated. Council's Eighth Amendment challenge to electrocution is thus neither ripe nor relevant here, and it provides no basis for disturbing the judgment below.

### 4. The FDPA Does Not Effect an Impermissible Delegation of Legislative Power.

Finally, there is no merit to Council's contention (Br. 229-230) that Congress has impermissibly delegated the selection of execution method. "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion). The only court to have directly decided the question (at least before the district court in Council's case) held that Section 3596(a) "is a constitutional delegation of federal power" because it sets outs such "'an intelligible principle.'" *United States* v. *Battle*, 173 F.3d 1343, 1350 (11th Cir. 1999). In reaching that determination, the Eleventh Circuit relied in part on this Court's decision in *Tipton*, 90 F.3d at 901-903, which, it noted, had held that "a federal death penalty statute did not violate [the] anti-delegation doctrine even though, at that time, it provided *no* mode of execution," *Battle*, 173 F.3d at 1350.

The district court correctly relied on those authorities, as conforming certain aspects of federal criminal law to the parallel criminal-justice system operating in the State where the conduct took place represents an "'intelligible principle'" informing any delegation implicated here.[39]   *Cf. Parisi* v. *Davidson*, 405 U.S. 34, 50-51 (1972) (Douglas, J., concurring) ("Th[e] principle of comity is important in the operation of our federal system, for both the States and the Federal Government are administering programs relating to criminal justice.").   Indeed, federal incorporation of state laws and procedures is a ubiquitous and unremarkable hallmark of cooperative federalism. In the Assimilative Crimes Act, for instance, Congress provided that federal enclaves would be governed by the criminal laws "of the State . . . in which such [an enclave] is situated," whenever the conduct in question is not separately "made punishable by any enactment of Congress."   18 U.S.C. § 13.   The Supreme Court expressly blessed that delegation in *United States* v. *Sharpnack*, 355 U.S. 286 (1958), which recognized

---

[39] The exact scope of Council's nondelegation challenge has been a moving target across his various filings.   The first time he raised such an argument, he asserted that "the FDPA work[s] an unconstitutional delegation of Congressional authority to another branch [*i.e.*, the judiciary] to set the available form of punishment to be inflicted for Mr. Council[']s crimes," and that the district court (by operation of the judgment) further "work[ed] an unconstitutional delegation of federal authority to the State of South Carolina."   J.A.2356.   The district court understood Council to be "argu[ing that] *both legislative and judicial* power have been unconstitutionally delegated."   J.A.2370.   The second time, he "maintain[ed] th[e] claim" that "§ 3596 constituted an impermissible delegation of Congressional power to th[e district c]ourt," but principally focused on Congress's purported "delegation of authority to set the terms of Council's punishment to South Carolina lawmakers and corrections officials."   J.A.6211.   On appeal, he appears to renew only the latter ground and to have abandoned any contention that either Congress or the district court impermissibly delegated judicial authority.   *See* Br. 229.

both Congress's power "to assimilate the state laws" and the "practical" reality that the federal government "has to proceed largely on a wholesale basis" by "assimilat[ing state laws] by reference" rather than "set[ting] forth the assimilated laws in full," *id.* at 293. If Congress can permissibly delegate the *substantive* bounds of criminal law to the States in areas of federal jurisdiction, then *a fortiori* Congress can permissibly incorporate state *procedures* for carrying out federal criminal sentences. The district court appropriately declined to displace that rational legislative judgment.

Moreover, the principal interest served by the nondelegation doctrine—"ensur[ing] that the lines of accountability would be clear" so that the "people would know, without ambiguity, whom to hold accountable for the laws they would have to follow," *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting)—has no relevance here. Without dispute, Council's execution will be carried out at the direction of the federal government pursuant to federal protocol by federal officials using federal resources in a federal facility. *Cf. United States* v. *Bourgeois*, 423 F.3d 501, 509-510 (5th Cir. 2005) ("[T]he district court . . . acknowledged the authority of the Attorney General, through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise Bourgeois's lethal injection . . . [and] recognized Congress's delegation to the Department of Justice when the court turned over Bourgeois to the Director of the Federal Bureau of Prisons and not to the Director of the Institutional Division of the Texas Department of Criminal Justice."). Council thus cannot seriously contend that the FDPA obscures federal responsibility.

Invoking as authority the dissenting opinion in *Gundy*, *see* 139 S. Ct. at 2134-2135 (Gorsuch, J., dissenting), Council also asserts (Br. 229-230) that the district court erred by applying the "'intelligible principle'" standard at all—which, he contends, "is not the correct test for evaluating an irrational, continuing delegation of constitutionally federal authority to *state* officials." He never articulates what, in his view, the correct test would be. In any event, the plurality opinion in *Gundy* reiterated that "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. The district court did not err by adhering to binding precedent of the Supreme Court.[40]

## IX. Council's Contentions About the Conditions of His Confinement Do Not Identify a Plain Error in the District Court's Judgment.

### A. Background

The judgment entered by the district court, J.A.2345, stated that

> Defendant is committed to the custody of the Attorney General until the exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences. See 18 U.S.C. Sec. 3596(a). When the sentence of death is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. See 18 U.S.C. Sec. 3596(a).

---

[40] In a footnote (Br. 229 n.96), Council "maintains"—without supporting argument or elaboration—that "the FDPA violates his Fifth Amendment rights to due process and equal protection." That perfunctory assertion does not adequately present or preserve a claim for relief. As this Court has repeatedly held, "an issue raised in a footnote and addressed with only a single declarative sentence asserting error is waived." *Mahdi* v. *Stirling*, 20 F.4th 846, 897 n.36 (4th Cir. 2021) (collecting cases), cert. denied, No. 22-5536, 2023 WL 124121 (Jan. 9, 2023).

Council is presently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. *See* Fed. Reg. No. 63961-056, Federal Bureau of Prisons (BOP) Inmate Locator, https://www.bop.gov/inmateloc//. No date has been set for his execution.

### B.     Standard of Review

As Council acknowledges (Br. 236), he did not raise an Eighth Amendment challenge to his conditions of confinement in the district court. Accordingly, his claim is reviewable only for plain error. *See* Fed. R. Crim. P. 52(b).

### C.     Discussion

For two reasons, this Court should reject Council's forfeited challenge (Br. 236-243) to the conditions of confinement imposed on federal capital prisoners. First, such a challenge presents no basis on direct appeal to vacate his criminal judgment—which does not, by its own terms, impose any of the conditions to which Council now objects. Second, because no authority holds that either the length or restrictions attendant upon federal capital sentences violate the Eighth Amendment, Council could not demonstrate plain error even if his challenge were appropriately before this Court in this posture.

### 1.     Council's Direct Appeal of His Criminal Judgment Is Not the Appropriate Vehicle in Which to Challenge the Conditions of His Confinement.

Council contends that both the indefinite length and purportedly solitary conditions of his pre-execution incarceration violate the Eighth Amendment. *See, e.g.*, Br. 236 (complaining of "permanent isolation . . . probably for decades, under the

looming threat of execution"). The judgment entered by the district court, however, does not require that Council be held in solitary confinement. *See* J.A.2343-2347. And the lone temporal restriction that the court placed on the timing of his execution—that it cannot precede the "exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences," J.A.2345—reflects a statutory entitlement of which Council is currently availing himself and thus cannot complain, *see* 18 U.S.C. § 3596(a). Accordingly, Council cannot establish that the district court plainly and prejudicially erred, because his claims about the conditions and length of his confinement do not identify any error—much less a plain one—in any aspect of the proceedings below or the judgment produced thereby.

Instead, Council "challenge[s] large-scale policy decisions concerning the conditions of confinement imposed on [numerous] prisoners. To address those kinds of decisions, [he] may seek injunctive relief" against the Bureau of Prisons or another responsible party—not vacatur of a lawful judgment that does not impose any of the purported conditions that Council finds objectionable. *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1862-1863 (2017). Moreover, the Supreme Court has "left open the question whether [federal prisoners] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ibid.*; *see Bell* v. *Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser* v. *Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and

unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal"). This Court likewise "ha[s] previously noted that challenges to the execution of a federal sentence are properly brought under 28 U.S.C. § 2241." *United States* v. *Little*, 392 F.3d 671, 679 (4th Cir. 2004) (citing *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997) (en banc)). Indeed, even the authority on which Council attempts to rely (Br. 240)—*Porter* v. *Clarke*, 923 F.3d 348 (4th Cir. 2019), in which a group of Virginia capital inmates filed a *civil action* against state officials "alleg[ing] that the then-existing conditions of confinement on Virginia's death row violated the Eighth Amendment" and obtained "injunctive and declaratory relief," *id.* at 354—confirms that the appropriate avenue for challenging conditions of confinement lies elsewhere.

> ### 2. No Court Has Held That the Conditions Imposed on Federal Capital Prisoners Violate the Eighth Amendment.

Even if his conditions-of-confinement claims were appropriately adjudicated on direct appeal of his criminal judgment, Council could not meet the demanding burdens of plain-error review. "'[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.'" *United States* v. *Beasley*, 495 F.3d 142, 149 (4th Cir. 2007). Council points to no authority holding that either the length or conditions of confinement imposed on federal capital prisoners constitute "cruel and unusual punishments" in violation of the Eighth Amendment.

To the contrary, his lone cited case engaging in any substantive discussion of those conditions—*United States* v. *Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016)—*denied* the defendant's motions to dismiss the death penalty as a punishment, to strike the death notice, and to declare the FDPA unconstitutional, *id.* at 359.

At a more general level, Council cites (Br. 240-243) a number of dissenting and concurring opinions questioning whether isolated conditions and extended duration of custody prior to execution are consistent with constitutional guarantees. None of those opinions, however, reaches a clear determination of the question. For example, Justice Kennedy's concurrence in *Davis* v. *Ayala*, 576 U.S. 257 (2015), observed that "the condition in which prisoners are kept simply has not been a matter of sufficient public inquiry or interest," *id.* at 288, and counseled that further "consideration of these issues is needed," *id.* at 289—while recognizing that the issue had "no direct bearing on the precise legal questions presented by this case," *id.* at 286. *See also Glossip* v. *Gross*, 576 U.S. 863, 946 (2015) (Breyer, J., dissenting) (deeming it "highly likely that the death penalty violates the Eighth Amendment" but suggesting only that "the Court . . . call for full briefing on th[at] basic question"); *Lackey* v. *Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting the denial of certiorari) ("Petitioner's claim, with its legal complexity and its potential for far-reaching consequences, seems an ideal example of one which would benefit from such further study."). And even if those dissents and concurrences had expressed a more definitive view on the constitutional

questions, they remain *dissents* and *concurrences*; none represents an authoritative (or even persuasive) holding of this Court, its sibling circuits, or the Supreme Court.

In short, Council faults the district court for entering a judgment consistent with statutory directives, silent as to any of the conditions of confinement to which he now objects, and undisturbed by any authoritative holding of any court. Because he has not identified any error—much less a plain one—committed by the district court in the proceedings below, this Court should reject his forfeited challenge.

## X.    Binding Precedent Holds That Capital Punishment Is Constitutional.

### A.    Background

A year before his trial commenced, Council filed a "Motion to Strike the Federal Death Penalty Act Allegations from the Indictment and as a Possible Punishment in [H]is Case." J.A.507. Among the arguments he put forward was that "[t]here is a national consensus against the death penalty marking the maturing and evolving standards of decency in our society." J.A.532.

The district court denied his motion, determining, in pertinent part, that it "must adhere to binding Supreme Court precedent holding that '[t]he Constitution allows capital punishment.'" J.A.1071.

### B.    Standard of Review

This Court "review[s] de novo [the] claim that the district court violated the Eighth Amendment" by imposing a capital sentence. *United States* v. *Higgs*, 353 F.3d 281, 328 (4th Cir. 2003).

## C.     Discussion

Council's categorical challenge (Br. 243-246) to the constitutionality of capital punishment is foreclosed by binding precedent of the Supreme Court.  In *Higgs*, this Court recognized that the "argument that the death penalty is cruel and unusual punishment under all circumstances and, therefore, violates the Eight[h] Amendment . . . is foreclosed by Supreme Court precedent."  353 F.3d at 333 (collecting cases). And within the federal judicial hierarchy, "courts of appeals cannot overrule Supreme Court precedents."  *In re Grand Jury Subpoena*, 870 F.3d 312, 319 n.3 (4th Cir. 2017).

Council appears to suggest (Br. 244-246) that a claim arising under the Eighth Amendment is excepted from this Court's duty to heed Supreme Court precedent— or, at least, Supreme Court precedent of a certain vintage—because such a claim implicates an "'evolving'" standard.  He cites no authority for the proposition that the lower courts can decide when societal standards of decency have abrogated decisions of the Supreme Court.  *Cf. State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying [*stare decisis*] despite disagreement with [Supreme Court precedent], for it is this Court's prerogative alone to overrule one of its precedents."); *United States* v. *Barnes*, 532 F. Supp. 2d 625, 641 (S.D.N.Y. 2008) ("[If the Supreme Court's decisions upholding the death penalty] are to be reevaluated in light of evolving standards of decency under the Eighth Amendment, as defendants urge, they must be reevaluated by the Supreme Court, not us." (quotation marks omitted)).  In any event, *recent* Supreme Court precedent—substantially postdating this

Court's decision in *Higgs*—has reiterated that the "Constitution allows capital punishment." *Bucklew*, 139 S. Ct. at 1122; *see also Glossip*, 576 U.S. at 869 ("[I]t is settled that capital punishment is constitutional").[41]  Accordingly, Council's challenge to the constitutionality of the death penalty remains foreclosed.

*    *    *

Throughout his brief, Council advances compelling ethical, practical, and sociological arguments against the death penalty.  As the Supreme Court has recognized, "[r]easonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable." *Baze* v. *Rees*, 553 U.S. 35, 61 (2008) (plurality opinion).  Congress, however, has duly enacted legislation authorizing the death penalty for certain serious federal offenses. *See Bucklew*, 139 S. Ct. at 1122.  Here, Council was accorded every constitutional, statutory, and procedural protection to which he was entitled; was found guilty of two senseless and reprehensible murders; and was sentenced to death by a jury of his peers.  This Court should respect their lawful verdict.

---

[41] Council characterizes (Br. 244 n.108) these statements as "dicta," but they were, in fact, essential to the disposition and therefore part of the Court's holding.  In *Glossip*, for instance, the Court reasoned that "*because* it is settled that capital punishment is constitutional, '[i]t *necessarily follows* that there must be a [constitutional] means of carrying it out.'"  576 U.S. at 869 (emphases added).  The Court's approval in that case of a State's lethal-injection protocol thus rested, at least in part, on the necessary premise that capital punishment is both constitutional in the abstract and capable of being administered in a constitutional manner.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

Respectfully submitted,

ADAIR FORD BOROUGHS
    United States Attorney

KATHLEEN STOUGHTON
    Appellate Chief

EVERETT E. MCMILLIAN
    Assistant United States Attorney
    District of South Carolina

KENNETH A. POLITE, JR.
    Assistant Attorney General

LISA H. MILLER
    Deputy Assistant Attorney General

ANN O'CONNELL ADAMS

*s/Joshua K. Handell*
JOSHUA K. HANDELL
    Attorneys, Appellate Section
    Criminal Division, Ste. 1515
    United States Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530
    (202) 305-4244
    joshua.handell@usdoj.gov

March 27, 2023

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as modified by this Court's December 5, 2022 order, *see* C.A. Doc. 99, because it contains 46,180 words (excluding those portions exempted by Rule 32(f)), as verified by the word-count feature of Microsoft Word.

2.      This brief complies with the type-size and type-face requirements of Rules 32(a)(5) and (6) because it has been prepared in 14-point Garamond font.

3.      This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.50, which is continuously updated, and according to that program, is free of viruses.

*s/Joshua K. Handell*
JOSHUA K. HANDELL
    Attorney, Appellate Section
    Criminal Division, Ste. 1515
    United States Department of Justice
    950 Pennsylvania Avenue N.W.
    Washington, DC 20530
    (202) 305-4244
    joshua.handell@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on March 27, 2023, I caused the foregoing brief to be served upon

the filing users identified below through the Court's CM/ECF system:

> Barry Fisher
> Office of the Federal Public Defender
> 54 State Street, Ste. 310
> Albany, NY 12207
> (518) 242-4010
> barry_fisher@fd.org
>
> Jaclyn L. Tarlton
> Office of the Federal Public Defender
> 150 Fayetteville Street, Ste. 450
> Raleigh, NC 27601
> (919) 856-4236
> jackie_tarlton@fd.org
>
> Jerome Del Pino
> Office of the Federal Public Defender
> 810 Broadway, Ste. 200
> Nashville, TN 37203
> (615) 695-6921
> jerome_delpino@fd.org
>
> *Counsel for Defendant-Appellant Brandon Council*

s/ *Joshua K. Handell*

JOSHUA K. HANDELL
    Attorney, Appellate Section
    Criminal Division, Ste. 1515
    United States Department of Justice
    950 Pennsylvania Avenue N.W.
    Washington, DC 20530
    (202) 305-4244
    joshua.handell@usdoj.gov