Nos. 20-1, 21-8

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
| v. | ) |
| BRANDON COUNCIL, | ) |
| Defendant-Appellant. | ) |

On Appeal from the United States District Court
for the District of South Carolina
No. 4:17-cr-866-RBH

# APPELLANT'S FINAL OPENING BRIEF

Jaclyn L. Tarlton
Federal Defender Office, EDNC
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236 tel.
jackie_tarlton@fd.org

Barry J. Fisher
Jerome C. Del Pino
Federal Defender Office, NDNY
54 State Street, 3rd Floor
Albany, NY 12207
(518) 242-4010 tel.
barry_fisher@fd.org

*Attorneys for Defendant-Appellant Brandon Council*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    The Pretrial Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  The Guilt-Innocence Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   The Competency Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    The Capital-Sentencing Hearing . . . . . . . . . . . . . . . . . . . . . . . 25

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I.    The district court abdicated its unwaivable, independent
      duty to determine Council's competency after he
      experienced a "delusional" "break with reality" during
      the trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      A.    Introduction and Standard of Review  . . . . . . . . . . . . . . . 44

      B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      C.    Legal Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

i

1. The court had an independent, *sua sponte* obligation to follow the steps mandated by due process and the IDRA to protect Council from being tried while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2. The court's finding of "reasonable cause" to believe Council may have been incompetent, which triggered a series of procedural protections, was well supported and not questioned by the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

3. The court first erred by delegating the competency inquiry to the defense team rather than designating a neutral, independent expert to evaluate Council and report directly to the court . . . . . . . . . . . . . . . . . 69

4. The court next erred by accepting a conclusory statement relayed from defense experts that Council was competent, in lieu of the comprehensive evaluation and report required by federal law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

5. Finally, the court also erred by rubber-stamping the defense experts' statement that Council was competent, rather than conducting an evidentiary hearing and making an independent determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

D. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

II. Bowing to government pressure to accommodate the victims' families, the court erroneously denied a defense request for a short continuance to complete critical mitigation investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A. Introduction and Standard of Review . . . . . . . . . . . . . . . . . 90

B.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

  1.  The government accelerated its decision to seek the death penalty, then had the victims' families personally press for a quick trial date . . . . . . . . . . . . . 91

  2.  The court yielded to the government's insistence on a tight schedule and denied the defense's request for a 90-day continuance to complete important mitigation investigation . . . . . . . . . . . . . . 94

  3.  Resisting needed adjournments to address other critical issues, the court sped Council's case to trial and verdict almost twice as fast as other federal capital prosecutions nationwide . . . . . . . . . 100

C.  The court abused its discretion in denying Council's motion for a brief continuance . . . . . . . . . . . . . . . . . . . . . . 103

D.  The error prejudiced Council's defense at his capital-sentencing hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

III. By refusing to ask if prospective jurors held racially prejudiced opinions about Black people, the court deprived Council of a voir dire adequate to identify those with disqualifying biases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

A.  Introduction and Standard of Review . . . . . . . . . . . . . . . . 115

B.  The court asked jurors only about their interactions with people of other races and whether they would self-assess as unable to be "fair" to a Black defendant . . . 116

C.  The court's perfunctory questioning on racial bias deprived Council of his right to "an adequate voir dire to identify disqualified jurors." . . . . . . . . . . . . . . . . . . . . . . . 122

iii

D.    Council's convictions or at least his death sentences
should be set aside. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

IV.    The court denied Council a meaningful opportunity to
present a *Batson* claim after the government struck Black
jurors at two and a half times the rate of others in this
cross-racial case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

A.    Introduction and Standard of Review  . . . . . . . . . . . . . . . 133

B.    Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

C.    Legal Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

1.    Had the court granted a brief recess, allowing
time to analyze the strikes, questionnaires, and
voir-dire transcripts, trial counsel could have
presented Council's substantial *Batson* claim  . . . . . 139

a.    The government engaged in a markedly
disproportionate pattern of strikes against
Black jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

b.    The government accepted White jurors who
were materially indistinguishable from many
of the Black ones it struck  . . . . . . . . . . . . . . . 144

2.    By forcing the defense to litigate any *Batson*
claim without a brief recess and in front of the
jurors, the court deprived Council of a realistic
opportunity to present the claim. . . . . . . . . . . . . . . . 148

3.    The Court should remand for a *Batson* hearing . . . . 152

iv

V.  The court erroneously let the government twist Council's
    motive, to support four different aggravating factors in ways
    contradictory, unsupported, and redundant . . . . . . . . . . . . . . . 153

    A.  Introduction and Standard of Review  . . . . . . . . . . . . . . . 153

    B.  The evidence was that Council shot the bank
        employees to prevent them from summoning police so
        he could flee the area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

    C.  With the court's approval, the government presented
        four aggravating factors, each relying on Council's
        motive for the killings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

        1.  The aggravating factors noticed by the
            government, and Council's pretrial challenges
            to them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

            a.  "Pecuniary Gain". . . . . . . . . . . . . . . . . . . . . . . . 156

            b.  "Innocent Victims". . . . . . . . . . . . . . . . . . . . . . 156

            c.  "Escalating Violence" . . . . . . . . . . . . . . . . . . . 158

            d.  "Multiple Killings". . . . . . . . . . . . . . . . . . . . . . 159

        2.  The government's presentation of the aggravating
            factors at Council's capital-sentencing hearing . . . . 159

            a.  The government urged jurors to find both
                the "pecuniary gain" and "innocent victims"
                aggravators . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

            b.  The government urged jurors to triple-count
                the supposedly "unnecessary" nature of the
                murders to support two more aggravators . . . 161

v

D.   The government's deployment of these four
aggravating factors violated Council's rights to due
process and a non-arbitrary sentencing decision under
the Fifth and Eighth Amendments and the FDPA . . . . . . 162

1.   The inherent conflict between the "pecuniary gain"
and "innocent victims" aggravators invalidated
the jury's finding of one, if not both. . . . . . . . . . . . . 162

2.   The "pecuniary gain" and innocent victims"
factors each lacked legally sufficient supporting
evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

3.   It was improper for the government to have the
jury redundantly weigh the "unnecessary" nature
of the killings to support three different
aggravating factors. . . . . . . . . . . . . . . . . . . . . . . . . . 168

E.   This cascading series of errors, which tainted four of
the aggravating factors the jury relied on, requires
vacatur of Council's death sentences . . . . . . . . . . . . . . . . 169

VI.   The government's "victim impact" presentation outstripped
constitutional and statutory limits, injecting passion,
prejudice, and arbitrary factors into the jury's sentencing
decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

A.   Introduction and Standard of Review  . . . . . . . . . . . . . . . 173

B.   The court rebuffed repeated defense efforts to
set boundaries on the government's evidence . . . . . . . . . 174

C.   The government's extensive presentation transgressed
almost every boundary on victim impact set by the
Supreme Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

1.   The presentation covered the victims' entire lives and even biographical information about their friends, becoming like the memorial service the defense had feared . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

2.   The evidence improperly extended to the impact on the victims' church, work, and local communities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

3.   By bringing each victim-impact witness to the point of emotional breakdown, the government likely inflamed the jurors . . . . . . . . . . . . . . . . . . . . . 194

D.   The government's improper presentation was highly prejudicial, especially in this cross-racial case with a predominantly White jury . . . . . . . . . . . . . . . . . . . . . . . . . 202

VII.  Contrary to Congress's mandate, the court refused to properly instruct jurors to consider what sentence they would choose if Council's and the victims' races were reversed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

A.   Introduction and Standard of Review . . . . . . . . . . . . . . . . 206

B.   To identify and avoid racial bias, the FDPA required the court to instruct Council's jurors to engage in a race-switching exercise before deciding his sentence . . . . 208

C.   The court refused to explain the statutory race-switching step to jurors, and failed even to include it in the process for deciding Council's sentence . . . . . . . . 212

D.   The court erred in its deficient charge and abused its discretion by refusing Council's clear, complete, and correct instruction.  These errors require resentencing . . 216

VIII. The FDPA's incorporation of South Carolina's new execution
statute and Council's resulting sentence of death by
electrocution are *ex post facto* and otherwise violate the
Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

    A.    Introduction and Standard of Review  . . . . . . . . . . . . . . . 222

    B.    Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

    C.    Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

        1.    The court erred in holding Council's claims
               foreclosed by precedent  . . . . . . . . . . . . . . . . . . . . . . . 225

        2.    The court erred in holding Council's
               claims incognizable and untimely . . . . . . . . . . . . . . 231

    D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

IX.  Condemning Council to automatic, indefinite solitary
confinement on federal death row constitutes cruel and
unusual punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

    A.    Council will be tormented and scarred by permanent
        isolation in a cell the size of a parking spot, probably
        for decades, under the looming threat of execution . . . . . . 236

    B.    Such prolonged, isolated, and debilitating confinement
        under a death sentence would have been unthinkable
        to the Framers.  And neither this Court nor the
        Supreme Court have ever determined its
        constitutionality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

X.   The growing abandonment of capital punishment in law
and practice reflects an evolved of standard of decency
that makes Council's death sentences unconstitutional. . . . . . 243

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

# TABLE OF AUTHORITIES

## CASES

*Advocate Health Care Network v. Stapleton*,
137 S. Ct. 1652 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143
(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Aldridge v. United States*, 283 U.S. 308 (1931) . . . . . . . . . . . . . . . . 123

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) . . . . . . . . . . . . . . . 105

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) . . . . . . . . . . . . . . 104, 111, 172

*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . 134, 137, 138, 139, 140, 152

*Baze v. Rees*, 553 U.S. 35 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 227

*Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008) . . . . . . . . . . . . . . . . . . . 142

*Boyde v. California*, 494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . 193

*Brogdon v. Abbott*, 524 U.S. 624 (1998) . . . . . . . . . . . . . . . . . . . . . . 72

*Brown & Pipkins, LLC v. Service Employees Int'l Union*,
846 F.3d 716 (4th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

*Bryan v. Moore*, 528 U.S. 1133 (2000) . . . . . . . . . . . . . . . . . . . . . . . 235

*Buck v. Davis*, 137 S. Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . 118, 132

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) . . . . . . . . . . . . . . . . . . . 244

*Calder v. Bull*, 3 U.S. 386 (1798) . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

*Carmell v. Texas*, 529 U.S. 513 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 226

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . 170

*Clemons v. Mississippi*, 494 U.S. 738 (1990) . . . . . . . . . . . . . . . 172, 217

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) . . . . . . . . . . . . . 63, 69, 78, 85

*Davis v. Ayala*, 576 U.S. 257 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*Dawson v. State*, 554 S.E.2d 137 (Ga. 2001) . . . . . . . . . . . . . . . . 224, 228

*Dietz v. Bouldin*, 579 U.S. 40 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*Dolphy v. Mantello*, 552 F.3d 236 (2d Cir. 2009) . . . . . . . . . . . . . . . . 151

*Drope v. Missouri*, 420 U.S. 162 (1975) . . . . . . . . . . . 63, 64, 65, 68, 78, 89

*Dusky v. United States*, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . 62, 68

*Eagle v. Linahan*, 279 F.3d 926 (11th Cir. 2001) . . . . . . . . . . . . . . . . 151

*Fernandez v. Roe*, 286 F.3d 1073 (9th Cir. 2002) . . . . . . . . . . . . . . . 142

*Flowers v. Mississippi*, 139 S. Ct. 2228 (2019) . . . . . . . 139, 140, 143, 152

*Floyd v. Filson*, 949 F.3d 1128 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . 184

*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . 103

*Georgia v. McCollum*, 505 U.S. 42 (1992) . . . . . . . . . . . . . . . . . . 123, 206

*Glossip v. Gross*, 576 U.S. 863 (2015) . . . . . . . . . . . . . 228, 240, 241, 242

*Gomez v. Fierro*, 519 U.S. 918 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 241

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Gundy v. United States*, 139 S. Ct. 2116 (2019) . . . . . . . . . . . . . . . . 230

*Ham v. South Carolina*, 409 U.S. 524 (1973) . . . . . . . . . . . . . . . 124, 133

*Harris v. Hardy*, 680 F.3d 942 (7th Cir. 2012) . . . . . . . . . . . . . 142, 143

*Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) . . . . . . . . . . . . . 186

*In re Harmon*, 425 F.2d 916 (1st Cir. 1970) . . . . . . . . . . . . . . . . . . . 71, 74

*In re Kemmler*, 136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . 228

*In re Medley*, 134 U.S. 160 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

*In re Vial*, 115 F.3d 1192 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 232

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) . . . . . 229

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . 167

*Jells v. Mitchell*, 538 F.3d 478 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . 104

*Johnson v. California*, 545 U.S. 162 (2005) . . . . . . . . . . . . 139, 142, 152

*Johnson v. Mississippi*, 486 U.S. 578 (1988) . . . . . . . . . . . . . . . 164, 172

*Jones v. Chappell*, 31 F. Supp. 3d 1050 (C.D. Cal. 2014) . . . . . . . . . 243

*Jones v. United States*, 527 U.S. 373 (1999) . . . . 169, 180, 184, 207, 214

*Jordan v. Mississippi*, 138 S. Ct. 2567 (2018) . . . . . . . . . . . . . . . . . . 243

*Kelly v. California*, 129 S. Ct. 564 (2008) . . . . . . . . . . . . . . . . . . . . . 182

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) . . . . . . . . . . . . . . . . . . . . . 244

*Lackey v. Texas*, 514 U.S. 1045 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 242

*Lamon v. Boatwright*, 467 F.3d 1097 (7th Cir. 2006) . . . . . . . . . . . . 151

*Lee v. Winston*, 717 F.2d 888 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . 107

*Leslie v. Warden*, 59 P.3d 440 (Nev. 2002) . . . . . . . . . . . . . . . . . . . . . 163

*Lewis v. Horn*, 581 F.3d 92 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 141

*Lewis v. Jeffers*, 497 U.S. 764 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Lockett v. Ohio*, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Loving v. United States*, 517 U.S. 748 (1996) . . . . . . . . . . . . . . . . . . . 229

*Madison v. Commissioner*, 761 F.3d 1240 (11th Cir. 2014) . . . . 142, 147

*Malloy v. South Carolina*, 237 U.S. 180 (1915) . . . . . . . . . . . . . . 222, 227

*McCleskey v. Kemp*, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . 208

*Medina v. California*, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . 62, 65, 86

*Milanovich v. United States*, 365 U.S. 551 (1961) . . . . . . . . . . . . . . . 164

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . 144

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . 216

*Mitchell v. Genovese*, 974 F.3d 638 (6th Cir. 2020) . . . . . . . . . . . 152, 223

*Moncrieffe v. Holder*, 569 U.S. 184 (2012) . . . . . . . . . . . . . . . . . . . . . 232

*Morgan v. Illinois*, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . 122, 133

*Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213
     (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Morris v. Slappy*, 461 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Musacchio v. United States*, 577 U.S. 237 (2016). . . . . . . . . . . . . . . . 207

*Nelson v. Campbell*, 541 U.S. 637 (2004) . . . . . . . . . . . . . . . . . . . . . 227

*Pate v. Robinson*, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . *passim*

*Payne v. Tennessee*, 501 U.S. 808 (1991). . . . 173, 180, 181, 184, 186, 194

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) . . . 123, 125, 128, 129

*Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . 240

*Powell v. Alabama*, 287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . 90

*Poyner v. Murray*, 508 U.S. 931 (1993) . . . . . . . . . . . . . . . . . . . . . . 228

*Ristiano v. Ross*, 424 U.S. 589 (1976) . . . . . . . . . . . . . . . . . . . . . . . 124

*Roper v. Simmons*, 543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . 245

*Rosales-Lopez v. United States*,
     451 U.S. 182 (1981) . . . . . . . . . . . . . . . . . . 122, 123, 124, 132, 133

*Shirley v. North Carolina*, 528 F.2d 819 (4th Cir. 1975) . . . . . . . 105, 106

*Simpkins v. State*, 486 S.E.2d 833 (Ga. 1997) . . . . . . . . . . . . . . . . . . 200

*Sochor v. Florida*, 504 U.S. 527 (1992). . . . . . . . . . . . . . . . . . . . . . . 168

*South Carolina v. Gathers*, 490 U.S. 805 (1989) . . . . . . . . . . . . . . . . 193

*State v. Mata*, 745 N.W.2d 229 (Neb. 2008) . . . . . . . . . . . . . . . . . 224, 228

*State v. Andjujar*, 254 A.3d 606 (N.J. 2021) . . . . . . . . . . . . . . . . . . . 140

*State v. Cooper*, 700 A.2d 306 (N.J. 1997) . . . . . . . . . . . . . . . . . . . . 163

*State v. Fleming*, 239 A.3d 648 (Me. 2020) . . . . . . . . . . . . . . . . . . . . 129

*State v. Morton*, 715 A.2d 228 (N.J. 1998) . . . . . . . . . . . . . . . . . . . . 129

*State v. Owens & Sigmon*, Nos. 2002-024388, 2006-038802
    (S.C. June 16, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*State v. Plain*, 898 N.W.2d 801 (Iowa 2017) . . . . . . . . . . . . . . . . . . . 212

*Stewart v. LeGrand*, 526 U.S. 115 (1999) . . . . . . . . . . . . . . . . . . . . . 235

*Stokes v. Stirling*, 10 F.4th 236 (4th Cir. 2021) . . . . . . . . . . . . . . . . . 104

*Stringer v. Black*, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . 171

*Tharpe v. Sellers*, 138 S. Ct. 545 (2018) . . . . . . . . . . . . . . . . . . . 129, 130

*Tuilaepa v. California*, 512 U.S. 967, 973 (1994) . . . . . . . . . . . . . . . . 164

*Turner v. Murray*, 476 U.S. 28 (1986) . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006) . . . . . . . . . . . 167

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001) . . . . . . . . . . . . . 170

*United States v. Almendarez*, 179 F. Supp. 3d 498
    (W.D. Pa. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) . . . . . . . . 142

*United States v. Anderton*, 629 F.2d 1044 (5th Cir. 1980) . . . . . . . . 217

*United States v. Arenburg*, 605 F.3d 164 (2d Cir. 2010) . . . . . . 64, 85, 89

*United States v. Augustin*, 2011 WL 294281
    (E.D. Tenn. Jan. 27, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 232, 233

*United States v. Baird*, 134 F.3d 1276 (6th Cir. 1998) . . . . . . . . . . . . 217

*United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991) . . . . . . . . 107, 116

*United States v. Baldovinos*, 434 F.3d 233 (4th Cir. 2006) . . . . . . . . . 82

*United States v. Baller*, 519 F.2d 463 (4th Cir. 1975) . . . . . . . . . . . . . 78

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) . . . . . . . 109, 140

*United States v. Barnette*, 390 F.3d 775
    (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 156, 162, 165, 179, 183

*United States v. Basham*, 561 F.3d 302
    (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 170, 203, 246

*United States v. Bass*, 477 F.2d 723 (9th Cir. 1973) . . . . . . . . . . . . . . 71

*United States v. Bennett*, 986 F.3d 389 (4th Cir. 2021) . . . . . . . . . . . . 91

*United States v. Bentley-Smith*, 2 F.3d 1368 (5th Cir. 1993) . . . . . . . 151

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) . . . . 162, 165, 166

*United States v. Bethea*, 483 F.2d 1024 (4th Cir. 1973) . . . . . . . . 163, 165

*United States v. Beyle*, 782 F.3d 159 (4th Cir. 2015) . . . . . . . . . . . . . 112

xvi

*United States v. Blueford*, 312 F.3d 962 (9th Cir. 2004) . . . . . . . . . . . 150

*United States v. Bobbitt*, 203 F.3d 822, 2000 WL
    102925 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*United States v. Bolden*, 964 F.3d 283 (4th Cir. 2020) . . . . . . . . . 149, 218

*United States v. Bolick*, 917 F.2d 135 (4th Cir. 1990) . . . . . . . . . . . . 189

*United States v. Brandreth-Gibbs*, 2021 WL 764771
    (W.D. Wash. Feb. 26, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006) . . . . . . . . . . . 165

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010). . . . . . . . . . . . 28, 154

*United States v. Chanthadara*, 230 F.3d 1237
    (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 162

*United States v. Collins*, 2019 WL 3432591
    (S.D. W.Va. July 30, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Collins*, 551 F.3d 914 (9th Cir. 2009). . . . . . . . . . . . 144

*United States v. Collins*, 982 F.3d 236 (4th Cir. 2020) . . . . . . . . . . . . 50

*United States v. Cook*, 418 F.2d 321 (9th Cir. 1969) . . . . . . . . . . . . . . 69

*United States v. Curry*, 512 F.2d 1299 (4th Cir. 1975). . . . . . . . . . . . 108

*United States v. Davenport*, 2006 WL 1801659
    (D. Conn. June 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

*United States v. Davis*, 2016 WL 10679065
    (W.D. Tenn. Dec. 5, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . 231, 233

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010) . . . . . . . . . . . . . . 170

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012) . . . . . . . . . . . 113

*United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004) . . . . . . . . . . . . . . 113

*United States v. Ernst*, 488 Fed. Appx. 667 (4th Cir. 2021) . . . . . . 46, 66

*United States v. Esparsen*, 930 F.2d 1461 (10th Cir. 1991) . . . . . . . . 140

*United States v. Fell*, 2017 WL 10940460
(D. Vt. Feb. 24, 2017) . . . . . . . . . . . . . . . . . . . . . . . 91, 108, 177, 180

*United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016) . . . 237, 238, 239

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008) . . . . . . . . . . . 185

*United States v. Fields*, 761 F.3d 443 (5th Cir. 2014) . . . . . . . . . . . . . 104

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) . . . . . . . . . . . . . 183

*United States v. Gaddis*, 424 U.S. 544 (1976) . . . . . . . . . . . . . . . . . . 165

*United States v. General*, 278 F.3d 389
(4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 63, 66, 70, 76

*United States v. Gilmore*, 2018 WL 2905766
(W.D.N.C. June 11, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

*United States v. Giron-Reyes*, 234 F.3d 78 (1st Cir. 2000) . . . . . . . . . 66

*United States v. Gomes*, 2006 WL 2988962
(D. Conn. Oct. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Green*, 407 F.3d 434 (1st Cir. 2005) . . . . . . . . . . . . . 207

xviii

*United States v. Gross*, 961 F.2d 1097 (3d Cir. 1992). . . . . . . . . . . . . . 163

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) . . . . . . . . . . 28, 154

*United States v. Hall*, 989 F.2d 711 (4th Cir. 1993) . . . . . . . . . . . . . 189

*United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012). . . . . . . . . . . 216

*United States v. Hanno*, 21 F.3d 42 (4th Cir. 1994) . . . . . . . . . . . 135, 150

*United States v. Hans*, 332 Fed. Appx. 116 (4th Cir. 2009) . . . . . . . . 112

*United States v. Haywood*, 155 F.3d 674 (3d Cir. 1998). . . . . . . 67, 85, 90

*United States v. Henderson*, 485 F. Supp. 2d 831
    (S.D. Ohio 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

*United States v. Higgs*, 141 S. Ct. 645 (2021) . . . . . . . . . . . . . . . . . . 237

*United States v. Higgs*, 2020 WL 7707165
    (D. Md. Dec. 29, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . 243

*United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003) . . . . . . . . 108, 170

*United States v. Joe*, 928 F.2d 99 (4th Cir. 1991). . . . . . . . . . . . . 140, 153

*United States v. Johnson*, 48 F.3d 806 (4th Cir. 1995). . . . . . . . . . . . . 229

*United States v. Johnson*, 136 F. Supp. 2d 553
    (W.D. Va. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*United States v. Johnson*, 219 F.3d 349 (4th Cir. 2000). . . . . . . . . . . . 112

*United States v. Johnson*, 362 F. Supp. 2d 1043
(N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

*United States v. Johnson*, 583 Fed. Appx. 62 (4th Cir. 2014) . . . . . . . . 76

*United States v. Johnson*, 713 F. Supp. 2d 595
(E.D. La. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 195, 200, 201

*United States v. Kirsch*, 151 F. Supp. 3d 311
(W.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Kosko*, 870 F.2d 162 (4th Cir. 1989) . . . . . . . . . . . . . 107

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) . . . . . . . . . . . 122

*United States v. Larouche*, 896 F.2d 815 (4th Cir. 1990) . . . . . . . . . . . 108

*United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) . . . . . . . . . . . 231

*United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013) . . . . . . . 210, 218

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) . . . . . . . . . . . . . . . . 231

*United States v. Lesane*, 2009 WL 891802
(E.D. Va. Apr. 1, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*United States v. Lewis*, 53 F.3d 29 (4th Cir. 1995) . . . . . . . . . . . 217-219

*United States v. Lighty,* 616 F.3d 321 (4th Cir. 2010) . . . . . . . . . . . . . 244

*United States v. Little*, 392 F.3d 671 (4th Cir. 2004) . . . . . . . . . . . . . . 232

*United States v. Lopez-Hodgson*, 333 Fed. Appx. 347
(10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Loughner*, 770 F. Supp. 2d 1026
  (D. Ariz. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Love*, 219 F.3d 721 (8th Cir. 2000) . . . . . . . . . . . 127, 128

*United States v. Malmstrom*, 967 F.3d 1 (1st Cir. 2020) . . . . . . . . . . . 65

*United States v. Maricle*, 2010 WL 3927570
  (E.D. Ky. Oct. 4, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*United States v. Martinez*, 277 F.3d 517 (4th Cir. 2002) . . . . . . . . . . . 246

*United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995)   . . . . . . . 76, 86, 89

*United States v. Matthews*, 2011 WL 5116587
  (E.D. Pa. Oct. 28, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

*United States v. McCaskill*, 676 F.2d 995 (4th Cir. 1982) . . . . . . . . . . 166

*United States v. McCullah*, 76 F.3d 1087
  (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 169, 171

*United States v. McKoy*, 277 Fed. Appx. 283 (4th Cir. 2008)  . . . . . . . 215

*United States v. McLemore*, 792 F. Supp. 96 (S.D. Ala. 1992) . . . . . . . 232

*United States v. McMath*, 559 F.3d 657 (7th Cir. 2009) . . . . . . . . . . . 144

*United States v. McNeal*, 2018 WL 3023092
  (M.D. Ala. June 18, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Middagh*, 594 F.3d 1291 (10th Cir. 2010) . . . . . . . . . 149

*United States v. Mikhel*, 889 F.3d 1003 (9th Cir. 2018) . . . . . . 73, 79, 172

*United States v. Miller*, 77 F.3d 71 (4th Cir. 1996) . . . . . . . . . . . . . . . 229

*United States v. Mitchell*, 706 F. Supp. 2d 1148
    (D. Utah 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010). . . . . . . . . 112

*United States v. Muhammad*, 948 F.2d 1449 (6th Cir. 1991) . . . . . . . 167

*United States v. Munoz*, 605 F.3d 359 (6th Cir. 2010) . . . . . . . . . . . . 234

*United States v. Olano*, 507 U.S. 725 (1992). . . . . . . . . . . . . . . . . . 236, 243

*United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002) . . . . . . . . . . 127, 132

*United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009) . . . . . . . . . . . 217

*United States v. Phillips*, 907 F.2d 151,
    1990 WL 92625 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Pogany*, 465 F.2d 72 (3d Cir. 1972) . . . . . . . . . . . 71, 75

*United States v. Polizzi*, 549 F. Supp. 2d 308 (E.D.N.Y. 2008) . . . . . . 233

*United States v. Powell*, 469 U.S. 57 (1984) . . . . . . . . . . . . . . . . . . . . 163

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . 130

*United States v. Reason*, 549 F.2d 309 (4th Cir. 1977). . . . . . . . . . . . . 70

*United States v. Reid*, 517 F.2d 953 (2d Cir. 1975) . . . . . . . . . . . . . . . 167

*United States v. Rinchack*, 820 F.2d 1557 (11th Cir. 1987). . . . . . . . . . 71

*United States v. Robinson*, 2019 WL 7985173
    (W.D. Tenn. Nov. 19, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Rodriguez*, 919 F.3d 629 (1st Cir. 2019) . . . . . . . . . . 150

*United States v. Romer*, 148 F.3d 359 (4th Cir. 1998) . . . . . . . . . . . . . 214

*United States v. Roof*, 10 F.4th 314 (4th Cir. 2021) . . . . . . . . . . 1, 64, 86

*United States v. Runyon*, 652 F. Supp. 2d 716
        (E.D. Va. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) . . . . . 28, 180, 185

*United States v. Runyon*, 994 F.3d 192 (4th Cir. 2021) . . . . . . . . 96, 104

*United States v. Sampson*, 2017 WL 402974
        (D. Mass. Jan. 30, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 79

*United States v. Sampson*, 335 F. Supp. 2d 166
        (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*United States v. Shealey*, 641 F.3d 627 (4th Cir. 2011) . . . . . . . . . . . . 46

*United States v. Simmons*, 11 F.4th 239 (4th Cir. 2021) . . . . . . . . . . 207

*United States v. Smith*, 2020 WL 6536208
        (D. Alaska Nov. 5, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011) . . . . . . . . 135, 149

*United States v. Sprouse*, 2011 WL 2414322
        (W.D.N.C. June 10, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Sun*, 278 F.3d 302 (4th Cir. 2002) . . . . . . . . . . . . . . 244

*United States v. Taylor*, 92 F.3d 1313 (2d Cir. 1996) . . . . . . . . . . . . . 150

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) . . . . . 163, 168, 169

*United States v. Tobin*, 2005 WL 1868682
(D.N.H. July 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*United States v. Torrez*, 869 F.3d 291 (4th Cir. 2017) . . . . . . . . . . . . . . 1

*United States v. Trexler*, 2012 WL 3265010
(M.D.N.C. Aug. 9, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020) . . . . . . . . . . . 133

*United States v. Wall*, 389 F.3d 457 (5th Cir. 2004). . . . . . . . . . . . . . . 233

*United States v. Wayda*, 966 F.3d 294 (4th Cir. 2020) . . . . . . . . . . 46, 72

*United States v. Weston*, 36 F. Supp. 2d 7 (D.D.C. 1999) . . . . . . . . . . . 85

*United States v. White*, 887 F.2d 705 (6th Cir. 1989) . . . . . . . . 66, 85, 87

*United States v. Williams*, 113 F.3d 1155 (10th Cir. 1997) . . . . . . . . . 65

*United States v. Williams*, 344 F.3d 365 (3d Cir. 2003) . . . . . . . . . . . 167

*United States v. Williams*, 632 F.3d 129 (4th Cir. 2011) . . . . . . . . . . 174

*United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996) . . . . . . . . . . 202

*United States v. Williams*, 819 F.3d 1026 (7th Cir. 2016) . . . . . . . . . 150

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020) . . . . . . . . . . . 151

*United States v. Woods*, 710 F.3d 195 (4th Cir. 2013) . . . . . . . . . . . . 207

*United States v. Young*, 424 F.3d 499 (6th Cir. 2005) . . . . . . . . . . . . 207

*United States v. Young*, 609 F.3d 348 (4th Cir. 2010) . . . . . . . . . . . . 167

*United States v. Zhou*, 838 F.3d 1007 (9th Cir. 2016) . . . . . . . . . . . . . 207

*Uttecht v. Brown*, 551 U.S. 1 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Wayman v. Southard*, 23 U.S. 1 (1825) . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Weaver v. Graham*, 450 U.S. 24 (1980) . . . . . . . . . . . . . . . . . . . . . . . . 227

*West Virginia v. EPA*, 142 S. Ct. 420 (2021) . . . . . . . . . . . . . . . . . . . . 230

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 103

*Williams v. Chrans*, 945 F.2d 926 (7th Cir. 1991) . . . . . . . . . . . . . . . 143

*Woods v. City of Greensboro*, 855 F.3d 639 (4th Cir. 2017) . . . . . . . . 211

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . 103

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226, 229

U.S. Const. art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . 114, 122, 168, 217, 229

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114, 122

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 2113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

18 U.S.C. § 3142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 155, 156, 159

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3595 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223, 224

18 U.S.C. § 3771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 4244 (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . 71, 77, 84

18 U.S.C. § 4247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Crim. P. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 140

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . 223, 231, 233, 234

Fed. R. Crim. P. 51 . . . . . . . . . . . . . . . . . . . . . . . . 39, 134, 149, 202

Fed. R. Crim. P. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Fed. R. Crim. P. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

S.C. Ann. § 24-3-530 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

S.C. Ann. § 24-3-530 (May 14, 2021) . . . . . . . . . . . . . . . . . . . . . 224

## OTHER AUTHORITIES

134 Cong. Rec. H7259-02, 1988 WL 175612 (Sept. 8, 1988) . . . . . . . . 208

134 Cong. Rec. S15746-01, 1988 WL 181094 (Oct. 13, 1988) . . . 208, 209

134 Cong. Rec. S7472-02, 1988 WL 171042 (June 9, 1988) . . . . 208, 209

134 Cong. Rec. S7556-01, 1988 WL 171191 (June 10, 1988) . . . . . . . 208

A.B.A., *Achieving an Impartial Jury: Removing Bias in Voir Dire
and Deliberations: Toolbox* (2015) . . . . . . . . . . . . . . . . . . . . . . . . 212

A.B.A., *Severe Mental Illness and the Death Penalty* (Dec. 2016) . . . . . 29

A.B.A., *Guidelines for the Appointment and Performance of
Defense Counsel in Death Penalty Cases* (rev. ed. 2003) . . . 104, 105

Allen, *A Dispatch From Federal Death Row*,
The Marshall Project (July 16, 2020). . . . . . . . . . . . . . . . . . . . . . 241

American Academy of Psychiatry and Law, *Practice Resource
for the Forensic Psychiatric Evaluation of Competence
to Stand Trial*, 46 J. of the Am. Acad. of Psych. & L. S59
(2018 Supplement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 77

*AP poll: U.S. majority have prejudice against blacks*,
USA Today (Oct. 27, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 126, 131

Attorney General Memorandum, *Moratorium on Federal
Executions* (July 1, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 245, 246

Blume & Vann, *Forty Years of Death: The Past, Present and
Future of the Death Penalty in South Carolina*,
11 Duke J. Const. L. & Pub. Pol'y 183 (2016) . . . . . . . . . . . . . . . . 9

Bowers, *et al.*, *Crossing Racial Boundaries:  A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black and the Victim is White*, 53 DePaul L. Rev. 1497 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Breunig, *The Man I Saw Them Kill*, N.Y. Times (December 17, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Christianity.com, *What Does It Mean to Be the Hands and Feet of Jesus?*, https://christianity.com . . . . . . . . . . . . . . . . . . . . . . . . . 191

Clancy, *FBI: Double murder suspect caught in Greenville admits to killings, says he was 'desperate,'* WNCT 9 (Aug. 24, 2017) . . . . . 221

Committee on Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (May 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Congressional Research Service, *The Death Penalty: Capital Punishment Legislation in the 110th Congress* (Updated Oct. 15, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

Cramer, *Understanding the Role of Racism in Contemporary U.S. Public Opinion*, 23 Annu. Rev. Polit. Sci. 153 (2020) . . . . . . . . . 126

Dep't of Justice, Office of the Attorney General, *Manner of Federal Executions*, 85 FR 47324 (Aug. 5, 2020) . . . . . . . . . . . . . . . . . . . 225

Death Penalty Information Center, *Death Sentences in the United States Since 1977,* https://deathpenaltyinfo.org/ . . . . . . 245

Death Penalty Information Center, *Federal Death Penalty: Executions Under the Federal Death Penalty* https://deathpenaltyinfo.org/ . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Death Penalty Information Center, *State by State*
https://deathpenaltyinfo.org/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Devine & Kelly, *Life or Death: An Examination of Jury Sentencing
With the Capital Jury Project Database*,
21 Psychol. Pub. Pol'y & L. 393 (2015) . . . . . . . . . . . . . . . . . . . 171

Eberhardt, *et al.*, *Looking Deathworthy: Perceived Stereotypicality
of Black Defendants Predicts Death Penalty Outcomes*,
17 Psychol. Sci. 383 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Eisenberg, *et al.*, *Forecasting Life and Death: Juror Race, Religion,
and Attitude Toward the Death Penalty*,
30 J. Legal Stud. 277 (June 2001). . . . . . . . . . . . . . . . . . . . . . . . . 220

Estrada-Reynolds, *et al.*, *Emotions in the Courtroom: How
Sadness, Fear, Anger and Disgust Affect Jurors' Decisions*,
16 Wyo. L. Rev. 343 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Federal Death Penalty Resource Counsel Project, Declaration,
*Time Between Indictment and Trial For Last Ten Years*
(Jan. 2021), https://fdprc.capdefnet.org . . . . . . . . 92, 101, 102, 110

Federal Death Penalty Resource Counsel Project, *Declaration of
Kevin McNally Regarding Federal Death Penalty Cases
With Two Homicides* (Dec. 2021), https://fdprc.capdefnet.org . . 10

Federal Death Penalty Resource Counsel Project, *Federal Death
Penalty Cases Involving Eligible Bank Robbery Cases*
(Jan. 2021), https://fdprc.capdefnet.org . . . . . . . . . . . . . . . . . . . . 10

Federal Death Penalty Resource Counsel Project,
*Verdict Forms*, https://fdprc.capdefnet.org . . . . . . . . . . . . . 112, 114

Federal Judicial Center, *Benchbook for U.S. District Court Judges*
(6th ed. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 151

Freedman, *When is a capitally charged defendant incompetent to stand trial?* 32 Int'l J. of Law & Psychiatry 127 (2009) . . . . . . . . 64

Gobert *et al.*, *Jury Selection: The Law, Art, and Science of Selecting a Jury* (Nov. 2020 Update) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006) . . . . . . . . . . . . . . . . . . . . . . 240

Guide to Judiciary Policy, Vol. 7, Chap. 3 . . . . . . . . . . . . . . . . . . . . . 74

Hopkins & Washington, *The Rise of Trump, The Fall of Prejudice? Tracking White Americans' Racial Attitudes 2008-2018 via a Panel Survey*, 84 Public Opinion Quarterly 119 (2020) . . . . . . 126

Kahn, *Explainer: How Reuters/Ipsos measured the shift in the way Americans see race*, Reuters (Aug. 19, 2019) . . . . . . . . . . . 126, 131

Karp & Warshaw, *Their Day in Court: The Role of Murder Victims' Families in Capital Juror Decision Making*, 45 Crim. L. Bull. 4 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Lang, *Council trial: CresCom bank robbery victim's family details getting news of her death*, The Sun News https://myrtlebeachonline.com (Sept. 25, 2019) . . . . . 197, 198, 199

Lang, *Teary coworkers speak out during sentencing in death-penalty case: 'We were all family,'* The Sun News https://myrtlebeachonline.com (Sept. 25, 2019) . . . . . . . . . . . . . 195

Lang, *'She was everything to me': Children of CresCom murder victim testify in capital trial*, The Sun News https://myrtlebeachonline.com (Sept. 26, 2019) . . . . . . . . . . . . . 199

Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 218

McCaffery, *Federal Jury Spares Convicted Killer's Life in Double-Murder Case*, Roanoke Times (Feb. 18, 2005) . . . . . . . . 113

Mo. Rev. Stat. Ann., 552.020(3) (1975 Supplement) . . . . . . . . . . . . . . 78

*Murder Suspect Appears to Copy Bomb Fugitive*, N.Y. Times (Aug. 5, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Myers & Greene, *The Prejudicial Nature of Victim Impact Statements*, 10 Psychol. Pub. Pol'y & L. 492 (2004) . . . . . . . . . . 204

Nadler & Rose, *Victim Impact Testimony and the Psychology of Punishment*, 88 Cornell L. Rev. 419 (2003) . . . . . . . . . . . . . . . . 204

Naik, *Loved ones talk about woman killed in CresCom Bank murders during Brandon Council's trial*, MyHorryNews.com (Sept. 25, 2019) . . . . . . . . . . . . . . . . . . . . . 198

National Jury Project, *Jurywork Systematic Techniques* (Dec. 2020 Update) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 212

National Opinion Research Center (Univ. of Chicago), *Ethnic Images*, (Dec. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

N.Y. Criminal Jury Instructions, *Implicit Bias* . . . . . . . . . . . . . 212, 216

Phillips, *Thou Shalt Not Kill Any Nice People: The Problem of Victim-Impact Statements in Capital Sentencing*, 35 Am. Crim. L. Rev. 93 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 204

S. Rep. 98-225, 98th Cong., 1st Sess. 1983, 1983 WL 25404 (Aug. 4, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 69, 72, 79, 87

Salerno, *The Impact of Experienced and Expressed Emotion on Legal Factfinding*, Annu. Rev. Law & Soc. Sci. (2021) . . . . . . . . 204

Schweitzer & Nunez, *Victim Impact Statements: How Victim Social Class Affects Juror Decision Making*, 32 Violence & Victims 521 (2017) . . . . . . . . . . . . . . . . . . . . . . . 204

Segura, *Trump Prepares to Execute Christopher Vialva for a Crime He Committed as a Teenager*, The Intercept (Sept. 20, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Smith, *et al.*, *The Dynamics of Racial Resentment Across the 50 U.S. States*, Amer. Polit. Sci. Ass'n, 18 Perspectives on Politics 527 (June 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Steiker, *Proposed Instruction*, 3 U. Pa. J. Const. L. 276 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Sundby, *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell L. Rev. 343 (2003) . . . . . . . . 204

Tesler, *The Return of Old-Fashioned Racism to White Americans' Partisan Preferences in the Early Obama Era*, 75 J. Politics 110 (Jan. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 126

The Sentencing Project, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies* (Sept. 3, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 126

Thompson, *Race, Gender and the Social Construction of Mental Illness in the Criminal Justice System*, 53 Sociological Perspectives 99 (Spring 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Aquart*, No. 3:06-cr-160, Transcript (D. Conn. Oct. 21, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

*United States v. Fell*, Transcript, No. 2:14-cv-377
    (D. Vt. July 11, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . 238, 239, 241

*United States v. Higgs*, No. 01-03, Gov. Br.
    (4th Cir. Dec. 18, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Stitt*, No. 99-2, Gov. Br.
    (4th Cir. Sept. 27, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Umana*, No. 10-6, App. Br.
    (4th Cir. Sept. 3, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

Wright & Miller, 3 *Federal Practice & Procedure*, § 589
    (4th ed. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

## INTRODUCTION

How did an evidently mentally-ill defendant with a traumatic upbringing and no history of violence end up with a federal death sentence, the rarest and most severe punishment, imposed in this Circuit in only two, exceptionally egregious cases in the last decade?[1]

The answer, as this brief explains, lies in a pressurized cross-racial prosecution with a cascading series of errors on virtually every important issue — including competency, defense preparation time, voir dire, *Batson*, aggravating factors, sentencing evidence, jury instructions, and the method of execution. Indeed, Brandon Council's case could be a poster-child for "arbitrariness in [the] application" of the federal death penalty and its "disparate impact on people of color," over which the Department of Justice itself has now acknowledged "[s]erious concerns." Attorney General Memorandum, *Moratorium on Federal Executions* (July 1, 2021).

---

[1] *See United States v. Roof*, 10 F.4th 314, 331-32 (4th Cir. 2021) (defendant murdered nine parishioners at church bible-study to try to spark a "race war"); *United States v. Torrez*, 869 F.3d 291, 295-97 (4th Cir. 2017) (defendant sexually assaulted and murdered two young girls and later a female naval officer, and kidnapped and attempted to kill other women).

Several errors were structural, and any of the rest could have easily spelled the difference between life and death for Council. His jurors credited substantial mitigating evidence that favored a life sentence. And only one vote was needed to avoid a death sentence, which is why such sentences are so rare in this Circuit, even for crimes more aggravated than Council's, the murders of two bank employees during a robbery.

"[B]ecause the consequences of a death verdict are so final and severe," a "'greater degree of reliability'" is constitutionally required "'when the death sentence is imposed.'" *United States v. Chanthadara*, 230 F.3d 1237, 1267 (10th Cir. 2000) (vacating death sentence), *quoting Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Since that reliability was lacking here, this Court should not let the judgment, and particularly Council's death sentences, stand.

## JURISDICTIONAL STATEMENT

Council appeals from a judgment of convictions and sentences of death entered on October 7, 2019, by the United States District Court for the District of South Carolina (Harwell, J.). JA2343. Following that court's denial on December 17, 2019, of timely-filed motions under

2

Federal Rules of Criminal Procedure 29 and 33, JA2364, Council filed a timely notice of appeal on December 30, 2019. JA2374. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291, and the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3595.

## STATEMENT OF ISSUES

1. **Competency**. Having found "reasonable cause" to believe Council was mentally incompetent to be tried, did the district court violate its independent duties to ensure a neutral expert examination, obtain a comprehensive report, conduct an evidentiary hearing, and thereby make an informed determination of competency?

2. **Continuance**. Did the court err in denying Council's request for a 90-day continuance to complete important mitigation investigation?

## Jury-Selection Issues

3. **Voir Dire.** Did the court err in refusing to ask prospective jurors whether they held racially biased attitudes or opinions about African-Americans?

4. **Batson**. After the government struck Black jurors at two

3

and a half times the rate of others, did the court deny Council a meaningful opportunity to present a *Batson* claim by refusing a brief recess for his counsel to review the voluminous jury questionnaires and voir dire record?

## Sentencing-Hearing Issues

5.    ***Motive***.  Did the court err by allowing the government to twist Council's alleged motive for the killings to support four different aggravating factors in ways that were contradictory, unsupported, and redundant?

6.    ***Victim Impact***.  Did the court allow the government to exceed established limits on "victim impact" evidence by presenting a lifetime retrospective about each victim, covering their value to their professional, church, and local communities, with repeated emotional displays from the witness stand?

7.    ***Anti-Bias Instruction***.  Did the court erroneously refuse to instruct, as the FDPA mandates, that, before deciding to recommend a death sentence, the jurors had to conclude they would choose the same sentence even if the defendant's and victim's races were reversed?

4

### Statutory and Systemic Issues

8. ***Death by Electrocution***.  Does Council's sentence of death by electrocution, under a new South Carolina law retroactively incorporated by the FDPA, constitute an *ex post facto* punishment and otherwise violate the Constitution?

9. ***Death-Row Solitary Confinement***.  Does condemning Council to decades of automatic, indefinite solitary confinement on federal death row constitute cruel and unusual punishment prohibited by the Eighth Amendment?

10. ***Capital Punishment — Evolving Standards.***  Has the steady, significant, and continuing rejection of death statutes and death sentences nationwide now demonstrated that capital punishment violates the Eighth Amendment?

## <u>STATEMENT OF FACTS</u>[2]

### I.   The Pretrial Phase

On August 21, 2017, the CresCom Bank in Conway, South Carolina, was robbed, and two employees, Donna Major and Kathryn

---

[2] Many of the facts relevant to Council's appellate claims are developed in the appropriate argument sections, cross-referenced below.

Skeen, were shot and killed. Within two days, Council, a 32-year-old man with signs of mental illness, a traumatic past, and no history of hurting others, was arrested and confessed to the crime. He was indicted a few weeks later. JA56, JA62, JA68, JA69, GX28, JA6422. Count One charged him with bank robbery resulting in death under 18 U.S.C. § 2113(e). Count Two charged him with murder with a firearm during the bank robbery, under 18 U.S.C. § 924(j). JA69.

Over defense counsel's objection, the government gave them about three months from indictment, just a quarter of the customary time, to investigate mitigating evidence before having to present to the Department of Justice committee that recommends whether to pursue capital punishment. JA69, JA119. *See* Point II.B. Soon after that presentation, in March 2018, the government noticed its intent to seek a death sentence. JA138. *See* 18 U.S.C. § 3593(a). This was just five months after indictment, more than twice as fast as the national average. *See* Point II.B. The government also rejected Council's offer to plead guilty, accept sentences of life imprisonment, and bring the case to a speedy conclusion without the need for a trial. JA87, JA6630.

Soon after the death-penalty notice was filed, the district court

6

questioned Council's competency, identifying signs he might be

mentally ill, JA128-130, JA144, JA969-972, including CJA vouchers

from his lawyer remarking he was "crazy" and spoke of "demons."

JA1025.  At an April 2018 conference, the court told defense counsel it

was inclined to think there was "reasonable cause" under 18 U.S.C.

§ 4241(a) to doubt Council's competency and to order an evaluation by

the Bureau of Prisons at FMC Butner.  JA969-972.  But his lawyers

resisted, fearful the government would use information from such an

evaluation to help obtain a death sentence.  JA969-972, JA196-208.

Three days later, defense counsel filed a terse, *ex parte* declaration

stating that a retained psychologist had evaluated Council and found

him competent. JA215.  So the court dropped the issue.  JA216-219.  *See*

Point I.B.

Also in April 2018, just after the case was authorized, the

government pressed to expedite the pretrial process, citing primarily

the victims' families' wishes.  The prosecutors even brought the families

to a scheduling conference to personally plead to hasten the trial.  In

setting the schedule, the court largely obliged, over continuing defense

objections.  JA103, JA121, JA151, JA155, JA152, JA967, JA984-994,

7

JA1001, JA210, JA213, JA222 n.3.  *See* Point II.B.

Meanwhile, in the ensuing months, the court continued to receive signs that Council was mentally ill.  Council's FBI interview about the killings, received by the court in August 2018, JA311, quoted him repeatedly blaming "demons" who "control the people's minds," and making other odd statements.  *See* Facts-III.  Two months later, in October 2018, the court learned that Council had a documented family history of mental illness, and that a defense psychiatrist who had interviewed him suspected he was suffering from an "organically based" mental disorder "such as Bipolar Disorder that is genetically transmitted."  JA687, JA700, JA903-906, JA924-928; *see also* JA2413, JA2423-2424, JA2431.  But the court made no further inquiry into Council's competency.  *See* Point I.B.

In July 2019, several months before jury selection, defense counsel moved for a short 90-day continuance, or alternatively a break before the sentencing hearing, to complete unfinished mitigation investigation. That included many interviews of witnesses who knew Council at the juvenile prison where he was housed for almost three years as a young teenager.  JA1428, JA1454, JA1921-1940.  At the government's urging,

8

however, the court denied any continuance because it would disrupt the victims' relatives' vacation plans.  JA1440, JA1908-1910, JA1913-1915.  As a result, Council's case would proceed to trial almost a year and a half faster than the norm.  Council's frustrated lawyer described the government's unyielding position as: "Let's get it on, let's go ahead and get him killed.  Get it over with."  JA1924.  *See* Point II.B.

Around that same time, defense counsel began warning the court of circumstances they feared could infect the sentencing hearing with racial bias.  JA1403, JA1445-1453, JA1476-1477, JA1487-1493, JA1651-1659, JA1670-1672, JA1706, JA1712-1714, JA1949-1950.  Council is a Black man who was accused of murdering two White women; in such cases, as his lawyers noted, South Carolina juries had proven almost *ten times* more likely to order execution.[3]  JA1399, JA1452, JA1657-1658, JA2138-2139.  Among federal capital cases nationwide, use of the death penalty was also grossly disproportionate when the victim was a White

---

[3] Blume & Vann, *Forty Years of Death: The Past, Present and Future of the Death Penalty in South Carolina*, 11 Duke J. Const. L. & Pub. Pol'y 183, 204, 215 (2016) (analyzing hundreds of cases over a nearly 40-year period, 1977-2015).

female and in cross-racial cases generally.[4]  *See* JA538, JA541-543,

JA552-553, JA591-598.

Council's lawyers also repeatedly cautioned that his case carried

other potential "racial overtones."  The jury would learn from the

government about his "identification with the clothing and hairstyling

of African-American subculture" as well as his preference for "hip-hop

music" and movies featuring "stereotypical . . . black, inner-city

gangster[s]."  The government also planned an "expansive victim

impact" presentation at the sentencing hearing with a "tidal wave of

positive images of the white victims and their wonderful lives."

Council's mitigation presentation would come mostly from Black

_____

[4] Updated data even more starkly show this.  In bank-robbery cases, the government seeks death against 8% of White defendants, but 40% of Black ones, a figure that jumps to 59% when the victim is White. Indeed, all eight death sentences in bank-robbery cases have involved White victims, and all but one a Black defendant.  *See* Federal Death Penalty Resource Counsel Project, *Federal Death Penalty Cases Involving Eligible Bank Robbery Cases*, https://fdprc.capdefnet.org/project-declarations/bank-robbery (Jan. 2021).  Similarly, in two-victim cases, the odds of authorization increase four-fold (from 16% to 64%), and the odds of a death sentence eight-fold (from 2% to 16%) in cases with Black defendants and at least one White female victim.  *See id.*, *Declaration of Kevin McNally Regarding Federal Death Penalty Cases With Two Homicides*, https://fdprc.capdefnet.org/project-declarations/race-gender (Dec. 2021).

witnesses, testifying about his upbringing in an "enduringly segregated community in North Carolina" and his juvenile experience in a mainly Black youth prison, offered to help explain his descent into crime. JA1395-1404, JA1452, JA1477, JA1487, JA1493, JA1655, JA2129-2139; *see also* Facts-V.

So defense counsel asked the court to implement certain safeguards to diminish the chances racial bias would influence the jury's sentencing decision. These included vetting government evidence likely to stoke racial stereotypes, JA1486, JA2124, JA2133-2139, JA2150, *see* Point VI; instructing jurors on steps the FDPA required they take to avoid being swayed by less-conscious prejudice, JA1402-1403, JA1446-1451, JA1633, JA1651-1659, JA1670-1673, JA1706, JA2134-2136, *see* Point VII; and considering evidence on discrimination against African Americans in administration of the federal death penalty, JA512, JA515, JA519, JA526, JA537. But the government opposed these requests and the court rejected almost all of them. *See* Points VI.B, VII.C; *see also* JA1077-1080.

## II.   Jury Selection

Council also requested that the court's jury questionnaire inquire

directly about certain common anti-Black attitudes and stereotypes implicated by this case. JA1348-1351, JA1358-1359, JA1371, JA2132-2133. That included the bias the Supreme Court flagged as especially relevant for capital voir dire: whether any jurors thought "blacks are violence prone," which could make jurors "less favorably inclined toward" mitigating factors invoking Council's background to explain his path into crime, *Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality). JA1399. But the court refused to include any such questions in the questionnaire or pose them during voir dire. Instead, it only asked veniremembers about their experiences interacting with people of other races (*e.g.*, if they belonged to any racially exclusive clubs, socialized outside their race, *etc.*), then had them self-assess if they could be "fair" to a Black defendant. JA2100-2101. The court rejected Council's prescient warnings that these questions alone could not identify jurors harboring disqualifying racial biases. JA1395 & n.2, JA1400, JA1402-1403, JA2155, JA2680-2681. *See* Point III.B.

Jurors were summoned to complete the questionnaires in August 2019, and returned for in-court questioning a few weeks later. Following five days of voir dire and challenges for cause, the parties

selected the principal jury from among 52 qualified veniremembers seated in the courtroom gallery.  JA2115, JA2116, JA2117, JA2160, JA2161, JA2172, JA2173, JA2174, JA4065.  Almost 30% were Black, but, after peremptory challenges, the resulting jury contained just two Black jurors.  That is because the government used its strikes to eliminate them at two and a half times the rate of others.  *See* JA7810.

Before the jurors were sworn, Council's lawyers told the court they needed a brief recess to review the lengthy jury-selection record — 1,000 pages of questionnaires and eight days of questioning — with an eye toward raising a *Batson* challenge.  JA4079-4080.  But the court insisted any such claim be litigated immediately and in front of all of the jurors.  Faced with these conditions, counsel retreated.  JA4080-4083.  Thus, the court never learned how, for most of the Black jurors the government eliminated, the record suggests no plausible race-neutral reason that did not apply equally to White ones it left on the jury.  And the government was never called on to offer race-neutral explanations for any of its strikes.  *See* Point IV.B.

13

## III. The Guilt-Innocence Trial

The trial lasted less than three and a half days.  Council's lawyers acknowledged he robbed the CresCom bank and killed the victims. JA4109-4114, JA4816-4818.  The jury deliberated for just over half an hour before convicting him on both counts.  JA4847, JA4852; *see* JA2208.

The evidence showed that, until a few weeks before the offense, the 32-year-old Council, JA4685, was staying with his mother and stepfather in his hometown of Wilson, North Carolina, and working at a nearby Wendy's.  He had just successfully completed parole from a state-prison sentence for being an habitual offender.  (He did not hurt anyone in his various prior property crimes.  JA5817-5819, GX93.Video:6:32:39-6:33:57, *see* JA896.)  But Council had a heated argument with his stepfather, who threw him out in the middle of the night.  Soon after, he quit his job, and began staying with his girlfriend, who was also short on money, in her small, crowded apartment, where they used drugs together.  Council would later tell FBI agents he was "desperate" and "in turmoil" during this time.  JA6425-6428, JA6434-6437, JA6485, JA6487-6490, JA6500, JA6503.

A few days after moving in with his girlfriend, Council stole

14

money from two businesses.[5]  First, he went into a Food Lion and, after

demanding the register money from a cashier, reached past her, grabbed

about $200 in bills, and ran out. JA6437-6439, JA6441, JA6492, GX222,

JA6559, JA5048-5054.  Three days later, Council, again unarmed, entered a

BB&T bank in Wilson and used a threatening note to get a teller to hand

over about $2,000 from her drawer.  Both times, Council fled in his

girlfriend's car, then shared the stolen money with her.  JA6423-6425, JA6429-

6432, JA6437-6439, GX224, JA6560, JA6561-6562, JA6563, JA5056-5063.

A few days later, Council heard from his mother that police were

looking for him because of the bank robbery.  After wandering through

Wilson all night, he asked two acquaintances driving to Georgia to give

him a ride.  The three used cocaine and marijuana before and during the

trip.  (Council would later tell the FBI he had drug addictions).  Council

was dropped off at a motel in Conway, South Carolina, about three hours

south of Wilson, where he got a room in his own name and paid cash for

a week. JA6441-6449, GX93.Video:6:27:12-6:27:20, JA6540, JA4330-

4336, JA4630-4634, JA4638-4639.  Over the next few days, Council

---

[5] Council's confession to these crimes was presented at trial, and
an eyewitness to each testified at sentencing.

15

watched television, walked around the small downtown area, and spent the last of his money on fast food and liquor. His room was later found in disarray by the police. GX86A-86Y, JA6449-6453, JA4280, JA4651-4657, JA4702-4708.

On the day before he had to check out of the motel, Council walked to a nearby auto-loan store to ask if title loans were made in cash. When told they were done by check, he departed. JA6421, JA4660-4661, JA5070-5075. A short while later, just after 1 p.m., Council entered the small, downtown CresCom branch, where Major and Skeen were the only two employees working. JA4660-4661, JA5075. Surveillance video showed Council wearing a distinctive blue-and-white striped polo shirt, without a mask or any other disguise. He walked to the teller counter across from Major and told her he wanted to cash a check. Council pulled a note from his pocket. It said: "This is a robbery. Give me the money. $20,000 and no security devices. 10's, 20's, 50's, 100's. Cooperate and you will live. Don't try any alarms cause I will kill you. I want your car keys too." GX28I, GX28J, JA6453-6454, JA6458, GX95B, GX95C, JA6586; *see* JA4802, JA5936, JA5946.

16

Council did not hand Major the note but waited as she turned back to her computer. After standing there almost a minute, he pulled a pistol out of his pocket, and quickly shot at her at least twice; one bullet hit the wall, but another struck her arm, passing through her left lung and her heart. Major staggered a few feet, and collapsed in a corner of the teller area. Council raced into a nearby office, where he had heard someone react to the shots. He found Skeen on the floor behind her desk and shot her twice, including once fatally in the head; he reported to the FBI agents that he told her "I'm sorry." GX28I, GX28J, JA7880, JA6420, JA6453-6454, JA6458, JA6460-6461, JA6463-6465, GX95C-95F, JA4665-4666, JA4725-4728.

Over the next few minutes, the video showed Council doing "the most erratic thing you've ever seen a bank robber do," as his trial counsel described it to the jury. JA4114. He ran scattershot around the bank, and jumped back and forth over the teller counter six times. Council also reentered and exited Skeen's office and dashed to the rear of the building, before rushing back to the lobby. Behind the teller counter, he raced up and down frantically searching for and grabbing money, which he threw in a bag. According to the government, it was in

17

the corner of the teller area, about 15 seconds after he first fired at Major, that he shot her a third time, in the head, as she lay on the ground.  GX28I, GX28J, GX43, JA7878, JA6463-6464, JA6502, GX95F-95I, JA4666-4673, JA4805-4806, JA5949-5951.

After spending less than five minutes in the bank, Council fled with the bag of money and Skeen's car key, which he had taken from her purse.  In the parking lot, he jumped into her car and drove off, stopping briefly at the motel to grab his bag before heading out of town. GX28I, GX28J, GX85, JA6464-6467, JA4314-4318.

Police responded within minutes to the bank's silent alarm and found the victims.  JA4139, JA4166-4190, JA4221-4222, JA4291-4294, GX5, GX28B, GX28I.  In a few hours, they identified Council from surveillance video.  JA4626, JA4630-4631.  A day and a half later, on the afternoon of August 23, he was arrested about 45 minutes from Wilson, in Greenville, North Carolina.  When police confronted him outside a motel, he bolted, but ran in circles and zig-zags around the parking lot, and was quickly apprehended without further resistance. JA4364-4412, JA4423, GX92D, GX92F, GX92G.

Council had Skeen's key in his pocket; her car was discovered a

few miles away.  In the motel lot where he was arrested, police also found a used car he had bought the day before with about $3,000 from the CresCom robbery.  JA4475, JA4518-4519.  Inside a pillowcase on the backseat of the used car was almost all the rest of the stolen money, about $10,000.  In the trunk, police also found a loaded .22 caliber revolver and a box of bullets.  The gun matched the shells recovered from the CresCom shootings.  JA4224-4226, JA4550-4551, JA4604-4606, JA4681, JA6415-6418, JA6528-6531, JA6532, JA6535.

After his arrest, Council was questioned at the local police station for several hours by two FBI agents.  When they entered the room, the agents found him sitting oddly with his face inside his shirt, and he began speaking to them that way.  As they read him his rights, Council interrupted: "I want to talk, I don't even want to hear you talk."  When the agents told him they would ask the questions, Council complained they had "cut me off" from what he wanted to tell them.  JA6422-6426, GX93.Video:1:33:00-1:33:42.  But he complied, and their questioning took him through the timeline described above.

Council initially said he would not have committed the crime had he been "sober," and that he was "high" on cocaine and "reefer"; but

19

then he backed away from that.  JA6485, JA6502-6503.  Asked why he

shot the victims, Council answered there were "a whole lot of . . . layers

to this story.  I'm going to write a book. I hope y'all read it one day."

JA6460.  He also told the agents he "kind of winged it" inside the bank.

Ultimately, though, he said he had planned to shoot the employees to

prevent them from using an alarm to summon police before he could

leave town.  JA6458, JA6460-6464, JA6504-6505, JA6522.  *See* Point

V.A.  He explained he knew to do this from "every day" watching real-

crime TV shows like "I Almost Got Away With It."  JA6429, JA6458.

　　　When he recounted the shootings, Council spoke of demons, mind

control, and soldiers:

> I don't know if you're religious or spiritual people but, man,
> this really is some shit out there that's demonic, man.  I
> swear to God to you, man.  This shit is demonic, man.  It's
> nothing that nobody can do about it.   Just like when soldiers
> go across in other countries and shit, I know that they're
> fighting for a great cause, but at the same time, man, it's
> collateral damage, man.

JA6461-6462, *see also* JA6486.  Moments later, as Council continued to

ramble and began to weep, he returned to the "demons":

> It's — it's so many demons out here, man.  Y'all just don't
> know. These demons out there — you got to control the
> people's minds and shit.  They don't control my mind. I — I

willingly went with the demons.  I knew what the hell I was doing.  I didn't sell my soul to the devil.  I don't believe in the illuminati or none of that stupid shit.

JA6462.  Still later, he reiterated that "them demons is real man . . . . I can't make you believe."  JA6487.  And again, toward the end, Council told the agents he had been "desperate and demonic" at the time of the killings.  JA6503.

But Council also repeatedly voiced regret and sorrow for his actions and the victims' deaths.  When first asked what he did at the bank, Council looked down and almost whispered: "I hurt some people that didn't deserve it."  JA6453.  Pressed for details, Council replied: "I did it.  I don't even know if I can bring my words out of my mouth even to say it."  JA6453-6454.

Moments later, as he recounted Skeen's shooting, he put his face in his shirt and began to cry.  Council again told the agents the women "didn't deserve that."  JA6461.  He asked, "please tell me, are those ladies dead?"  When informed that they were, he returned his face into his shirt and resumed crying, saying: "I'm a piece of shit, I can admit that."  JA6462-6463.  Later, he echoed this: "I'm an idiot, I don't deserve to live."  JA6485.  Council volunteered that what he "care[d] about now

21

is the people that I hurt, and their families." JA6425, JA6500. He also told the agents: "Lord forgive me . . . . I'm ready to bear my cross . . . . I wish that this situation had actually ended differently. I wish that I was actually dead." JA6505.

At the end of the interview, Council repeated that the victims "didn't deserve what they got" and that he "wish[ed]" he had not "put those people and their families in that . . . situation . . . . [W]hat I did is horrible . . . I'll be regretting it for the rest of my life. That's what I want you to know." JA6522-6523.

The lead FBI agent later testified that Council was crying during the interview and, in his estimation, demonstrated remorse. JA6625, JA5696.

## IV.  The Competency Motion

The Thursday after Council's FBI interview was played for the jury, the government rested its case. When, out of the blue, Council told his lawyers he wanted to testify, the court recessed for the day. His attorneys spoke with him afterward in the marshal's lockup and, that evening, for another 90 minutes at the jail. Later that night, just before 11 p.m., they filed a motion stating that Council was mentally ill and

unable to proceed because he could neither understand the proceedings nor rationally assist in his defense.  Since there was "reasonable cause" to doubt his competency, the motion said, 18 U.S.C. § 4241 required an expert evaluation and a hearing.  JA4740-4741, JA2182, JA6148.  *See* Point I.B.

The next morning, his counsel explained to the court, *ex parte,* that Council was "delusional" and appeared to have suffered "a break with reality."  He had "adopted views that are irrational," believing that "God is somehow responsible" for the deaths of Skeen and Major, and that he was "being persecuted" because the court could "not subpoena God."  Counsel had tried to discuss this with him, but his "thought process" just "veer[ed] further and further off topics."[6]  The court then tried to speak directly with Council in the courtroom, but he just sat mute, crying; after several minutes, he suddenly began muttering about how God had killed the victims.  JA4771-4774, JA6734.

The court found, based on the defense motion and its own

_____

[6] During the appeals process, Council has manifested similarly delusional, disordered thinking about his case and an inability to rationally communicate with appellate counsel.  *See* 4th Cir. DE44, DE61, JA6190-6191; Point I.B.

23

observations, there was "reasonable cause" under § 4241(a) to doubt Council's competency to be tried. The government reminded the court that such a finding necessitated an independent expert's evaluation and report addressing Council's history and symptoms, followed by an evidentiary hearing. *See* §§ 4241(a)-(c), 4247(c). The court had already contacted one such examiner who had started to review material, and another who could conduct a full evaluation and provide a detailed report within a week. But the court was determined to avoid any delay, even though the trial was already on pace to finish more than a month ahead of schedule. And defense counsel remained fearful the government might somehow use the results of an independent, comprehensive evaluation to help obtain a death sentence. JA4745-4751, JA4754, JA1831, JA2181, JA2184. *See* Point I.B.

So instead, the court and Council's lawyers agreed that two defense-retained experts would meet with Council in the jail for a few hours that Sunday afternoon, two days later. Right after that meeting, defense counsel e-mailed an 11-line statement, jointly signed by the experts. It said only that Council understood the proceedings, could assist his lawyers, and thus was competent to proceed — adding that he

24

was anxious and short on sleep.  On the following morning, a Monday, the court held what it called a "competency hearing."  In a brief exchange that took up a single transcript page, counsel handed the court the e-mailed statement and said the defense now believed that Council was fit to proceed.  The court immediately declared him competent based on that alone.  The next morning, the jury returned and the trial was completed; guilty verdicts were reached the following day.  JA4757, JA4763, JA4765, JA4781-4782, JA4798, JA4852, JA2185, JA2188, JA2207, JA6130 & n.2, JA6149-6153, JA6156-6157.

Just four minutes after the court read the verdicts, it began the sentencing hearing, JA4852-4855, having previously denied the defense's request for a break to finish preparing its mitigation case.  JA1428, JA1913-1915.  Such a quick transition was highly unusual: Other federal capital defendants have been afforded, on average, more than a week between trial and sentencing.  *See* Point II.B.3.

## V.    The Capital-Sentencing Hearing

At sentencing, the government had to prove to the jury "aggravating factors" that "sufficiently outweigh[ed]" any "mitigating factors," by enough "to justify a sentence of death."  18 U.S.C. § 3593(d).

25

Some potential aggravating factors are listed in the FDPA itself,
§ 3592(c), but the government may add others if they comport with the
Constitution and the statute, § 3593(a).

Here, the government alleged six aggravating factors, which it
listed in its pretrial notice. JA140-142. Four of them, as presented to
the jury, rested on trial evidence about Council's motive for the
homicides. One was "pecuniary gain," § 3592(c)(8), that he murdered the
victims so he could steal money from the bank. JA140. But another,
non-statutory factor said the killings were gratuitous since Council knew
they were wholly unnecessary to the robbery. JA142. The district court,
saying it "disagrees with Defendant's interpretation of these
aggravators," rejected his argument that they inherently contradicted
each other and could not both be found. JA501-502, JA1065-1066,
JA2352-2353, JA2367-2368. Over Council's unsuccessful challenges, the
government also urged the jury to multiply the weight of the killings'
alleged purposelessness by making it the focus of two additional
aggravating factors. JA140-142, JA502-503, JA959, JA1033-1034,
JA1066-1067, JA5941-5942, JA5945-5946. In the end, the jury found
and cumulatively weighed all four factors in support of a death sentence.

26

JA2316, JA2330.  *See* Point V.B-C.

The government devoted most of its three-day presentation to a fifth aggravating factor, "victim impact," *see* § 3593(a), calling ten of the victims' family members, friends, and co-workers, and introducing dozens of photographs and other personal mementos.  Because the district court rebuffed defense requests to vet and limit the presentation, it became a lifetime retrospective about each victim and their value to their professional, church, and local communities, with the witnesses repeatedly sobbing and breaking down on the stand.  This memorial-service-like presentation significantly exceeded the victim-impact evidence admitted at comparable federal capital trials in this Circuit.  JA4913-4936, JA4949-5024, JA5258-5309.  *See* Point VI.C.

The government introduced additional evidence purportedly to prove its sixth and last aggravating factor, that Council had "demonstrated a lack of remorse" for the killings.  JA141-142; *see* JA1864, JA1874-1875, JA2147, JA1979-1983, JA2154.  Prior assertions of such a non-statutory aggravator in this Circuit have rested on the defendant's

bragging about the killing.[7]  But before Council's arrest, he said nothing about the crime to anyone.  In his FBI interview he repeatedly wept and expressed remorse for his actions and sorrow for the victims. *See* Facts-III. And right after he was indicted, he offered to plead guilty to the charges and accept a life sentence.  JA6630.  Still, the government called witnesses to testify that, in the two days following the crime, Council spent $3,000 of the robbery money on a 20-year-old used Mercedes, bought some fake jewelry and a box of bullets, and was photographed displaying some of the money and smiling.  The jury also heard how he partied in his motel room with some people he just met, where he smoked marijuana, drank alcohol, had sex with a teenaged girl (and a prostitute the night before), and watched the movie "Get Rich or Die Tryin'" starring "Curtis '50 Cent' Jackson."[8]  The government introduced a photograph of the DVD, found among Council's

---

[7] *See, e.g., United States v. Hager*, 721 F.3d 167, 206 (4th Cir. 2013); *United States v. Runyon*, 707 F.3d 475, 498 (4th Cir. 2013); *United States v. Caro*, 597 F.3d 608, 631 (4th Cir. 2010).

[8] Council had mentioned the movie in his FBI interview, telling the agents "it wasn't my intention to get rich at this point, it was to survive or die trying." JA6489.

28

possessions, which displayed stereotypical-looking Black gangster-rappers wielding guns.  Council's lawyer would tell jurors it was "a Black movie."[9]  JA1493, JA4118-4119, JA4567, JA5099-5111, JA5117-5157, JA5167-5171, JA5187, JA5225-5226, JA5228-5231, JA6536, GX135, JA6538, JA6539, JA6565, JA6576, JA6577, JA6582-6584, GX238.

As supposed evidence of Council's remorselessness, the government also plucked from his two-hour FBI interview a few of his bizarre comments, about "fighting over wars," "collateral damage" and plans to "write a book" about his life the agents would "read . . . one day."  JA4810, JA5936, JA5953-5954; *see* Facts-III.  The government glossed over how these were interwoven with Council's comments about "demons" that his counsel and the court had flagged as indicative of mental illness.  *See* Facts-I, III; Point I.B.[10]

---

[9] All this evidence and the government's comments about it to the jury (JA4808-4809, JA5943, JA5952-5954) implicated pernicious racial stereotypes about Black men, by advancing themes that Council was lazy and averse to work, just wanted to party with drugs and alcohol, was immersed in violent rap culture, and was oversexed.  *See* Point III (discussing court's refusal to question prospective jurors about such racial biases).

[10] *See* also A.B.A., *Severe Mental Illness and the Death Penalty*, at 23 (Dec. 2016) (defendant's "mental illness . . . may create an

After the government rested, Council's attorneys presented his mitigation case over two days. The witnesses included his aunt, cousin, and two close family friends; two teachers, the principal, and a classmate from middle school; seven African-American men who had been incarcerated in a youth prison in the same time frame as Council; and a juvenile-justice expert on the conditions there. JA5364-5661, JA2389-2390; *see* JA1464. The final witness was a forensic social worker, Deborah Grey. She had interviewed Council and scores of people who knew him, his family, or the youth prison, and reviewed hundreds of records, to construct a social history of his formative years. JA5700-5871.

These witnesses and records painted a grim picture of Council's upbringing. From birth, his father, Charles, abandoned him, but appeared to have passed on a genetic legacy of mental illness: Charles was diagnosed with or reported to have, at various times, psychosis, bipolar disorder, paranoia, and chronic brain syndrome. Other relatives on his side of the family suffered from psychosis, depression, anxiety

---

unwarranted impression of lack of remorse") (quotation omitted).

disorder, mania, and intellectual disability.  JA6608, JA6651, JA5379-5381, JA5383, JA5717-5720.

Council's young mother largely ignored him as a child, even though they lived under the same roof.  Instead, he was raised by his grandmother, who took care of his material needs but was cold and exacting.  She did not let him play with other children or even go past the fence around their house.  Yet early on, he was a "happy" and "fun" child, a "good kid," who would make up songs for his aunt when she visited and was kind to her daughters.  He ushered and sang in the choir of the Baptist church where his grandmother was a deaconess.  And he initially thrived in school.  Two decades later, his sixth grade teacher still remembered Council, from age 11, as "a very happy young man."  And a female classmate vividly recalled him as "[b]right eyed, sweet, tender hearted, just caring . . . he always had a smile on his face."  JA5369-5370, JA5379-5393, JA5396, JA5404-5405, JA5421-5425, JA5428, JA5436, JA5439, JA5451-5453, JA5482-5483, JA5496, JA5583-5585, JA6606-6612, JA6631-6633, JA6651.

But Council's life "cratered" at age 12, when his grandmother died of cancer.  At her funeral, he was visibly "devastated," a relative observed.  He "cried, he was crushed.  He just kept saying that he didn't

know what he was going to do, that his mama was gone." Afterwards, Council stayed with his mother and her new husband, who, for discipline, would punch him in the face and beat him with a belt. He would often escape to a friend's house, crawling in a bedroom window at night with welts on his back and shoulders. Council started talking about killing himself, but a psychiatric hospital sent him home with no follow-up. His grades dropped, and he began to miss school. A neighbor found him sleeping in her garage one winter evening. "He was really young to be homeless and that kind of disturbed me." A member of his grandmother's church later described him as a "lost sheep" who was essentially just "thrown away" after his grandmother's death. JA5374, JA5391, JA5393-5394, JA5399-5403, JA5405, JA5427-5429, JA5436, JA5454, JA5456, JA5461, JA5477-5481, JA5506-5507, JA5509, JA5585-5586, JA5592, JA5632, JA5713-5755, JA6634.

Council soon fell prey to the older boys who sold drugs in his crime-ridden neighborhood. Less than a year after his grandmother's death, when he was just 13, he entered the state juvenile system and was sent to Dobbs Training School, a since-shuttered prison for children near Wilson. Council spent nearly two and a half of his early teenage years at Dobbs. He was supposed to receive grief counseling and

32

substance-abuse treatment, but never did. And nobody visited him there, including his mother.[11] Accounts from former residents and employees, investigations, and lawsuits revealed that Dobbs was a hellish institution where young, isolated teens lived in constant fear of being extorted or assaulted. Employees openly berated children and used excessive force to restrain them, including bending arms or wrists back or "choking" them "up." In dormitories after lights out, many — including Council — were even more seriously abused, physically and sexually, by staff and by older children.[12] Dobbs was known as "terror dome," "evil Hogwarts," and "gladiator school."[13] All but one of the former Dobbs detainees Grey located were now in adult jails or prisons, which matched statistics on its extraordinary recidivism rate.

---

[11] His mother mostly refused to speak with his defense team and did not even attend his trial. JA1456-1457, JA5379, JA5403-5404.

[12] Because the court denied a continuance, the defense could not complete its investigation of Council's experience at Dobbs, including corroborating the sexual abuse that he reported to Grey having suffered on multiple occasions from several staff members. JA5805-5808; *see* Point II.

[13] Even a former ROTC instructor at Dobbs, called by the government in rebuttal, acknowledged he had witnessed some of these terrible conditions and heard about many others. JA5899-5919.

JA5443-5444, JA5463-5464, JA5519-5525, JA5535-5540, JA5775-5580,

JA5591-5608, JA5612-5628, JA5633-5643, JA5645-5659, JA5664-5673,

JA5676-5683, JA5755-5814, JA6613-6615, JA6616-6618, JA6619, JA6620,

JA6621, JA6622-6623, JA6624, JA6635-6637, JA6638-6650, JA6673.

In the years after Council was released from Dobbs, when he was 16,

he had no permanent address and often stayed with friends or slept in their

cars. And he struggled to maintain employment, working a series of fast-

food jobs. But he still displayed some of the sparks of promise others had

observed in him as a child. When, at age 19, he went to live with his aunt,

he acted as a "big brother" to her grandson, teaching him to ride a bicycle

and other "boy things." When his aunt had to move away after a few

months, Council "stood in the yard by himself and he just cried," begging

her, "please don't leave me by myself." In his late teens and early 20s,

Council was convicted of several property offenses, but never hurt anyone.

Following the last of these state convictions, at age 25, he was sentenced to

prison. After serving six years, he was released on parole, several months

before this offense. JA5406-5412, JA5429-5432, JA5817-5819.

Jurors largely accepted the factual validity of Council's mitigation

case. On the verdict sheet, most or all of them found he proved several

substantial factors involving his damaging upbringing. These included that his mother did not love and nurture him (found by 8 jurors); his stepfather abused him (9 jurors); his grandmother, who was his "mother-figure and protector," died when he was only 12 (8 jurors); her death left him "devastated, grief stricken, and alone" at that young age (9 jurors); as a result he lost all "care, love, structure, and guidance" (7 jurors) and "his only effective protection against the dangerous neighborhood that surrounded the family's home" (8 jurors); and afterward he "lacked loving role models" (7 jurors). These mitigators also included that when Council was only 13, and still grieving for his grandmother, he was sent to Dobbs (8 jurors), "a violent and corrupting place" where he "lacked support" and had "few family visits or contacts" (7 jurors) and where he "frequently witnessed violence" (9 jurors). JA2309-2314, JA2323-2328.

But the jurors unanimously concluded these mitigating factors were "sufficiently outweigh[ed]" by the aggravating ones they found "to justify a death sentence" on each count. JA2316, JA2330. The court had refused to explain to jurors what it meant to determine, as the FDPA required, whether they would recommend the same sentence

"for the crime in question no matter what the race . . . of the defendant or of any victim may be." 18 U.S.C. § 3593(f).  The court had also simply failed to instruct them that this race-switching step was part of deciding Council's sentence rather than just a technical post-verdict certification. *See* Point VII.

Before the court formally imposed the required death sentences, Council read aloud a statement of apology to the victims' families.  He told them he was "overwhelmingly . . . sorry for all the pain and suffering and the loss that I have caused your families," and "ashamed of my actions and myself," and would "continue to ask God for forgiveness and that he will open your family's hearts to forgive me." JA2335-2336.

## SUMMARY OF ARGUMENT

In this appeal, Council asserts ten claims for relief spanning every stage of his federal death-penalty case.  They owed in large part to the district court's undue haste, its reluctance to recognize how racial bias threatened to infect the proceedings, and its inattention to well-established constraints on the government's aggravating factors.

First, the court abdicated its independent obligation under due

36

process and a federal statute to reliably determine Council's competency to be tried.  *See* **Point I**.  Before trial, the court noted signs of his mental illness.  During trial, Council's lawyers revealed he had become "delusional" and "unhinged," had suffered a "break with reality," and in their opinion was "presently mentally ill" and not competent to proceed.  Based on this, and Council's bizarre interactions with the court the next morning, the court found "reasonable cause" to doubt his competency.  18 U.S.C. § 4241(a).  That triggered its mandatory, *non-waivable* duties to order an independent expert examination, obtain a comprehensive report, convene an evidentiary hearing, and make an informed determination of competency.  But the court was unwilling to delay the trial even for a few days, so it jettisoned these protections.  It approved a hasty jail meeting between Council and two defense experts on a Sunday afternoon, which produced a bare-bones, e-mailed statement, signed by the experts, that he understood the proceedings and could assist his lawyers.  The court declared Council competent based solely on the statement and defense counsel's unexplained endorsement of it.

The court's determination to expedite proceedings also prompted it to deny a defense request for a 90-day continuance several months

37

before trial. This was an abuse of discretion. *See* **Point II**. Council's lawyers needed this brief period to investigate key mitigation about his teenage years in a brutal juvenile institution, particularly his report that he had been sexually abused there. And the case was already racing to trial at double the ordinary speed after prosecutors brought the victims' relatives to court to personally press to accelerate it. The court acknowledged defense counsel's diligence, and never suggested the continuance request was a dilatory tactic. But it said that even a small adjustment to the trial schedule would disrupt the relatives' vacation plans. This error prejudiced Council's mitigation defense. Further, data show both that such fast-tracking occurs more frequently in cross-racial cases like Council's and that it boosts the likelihood of a death sentence.

Two serious errors during jury selection also opened the door to racial bias. ***See*** **Points III-IV**. Council is a Black man who was facing the death penalty for killing two White women, a circumstance in which South Carolina juries are almost *ten times* more likely to vote for execution. And the defense flagged aspects of the government's presentation that further threatened to activate racial prejudice. These

38

facts obligated the court to question prospective jurors to identify those
with disqualifying biases against African-Americans. But it refused to
ask any questions about racial attitudes or opinions, including the bias
the Supreme Court recognized as critical to identify in such cases, the
view that Black people are inherently more violence-prone. Instead, the
court inquired only about jurors' personal interactions with people of
other races, and had them self-assess if they could be fair to a Black
defendant. *See* **Point III**.

When voir dire finished, the government used its peremptory
strikes to remove Black jurors from the venire at two and a half times
the rate of others, resulting in selection of only two African Americans.
Seeing this, defense counsel explained they needed a brief recess to
review the extensive jury-selection record with an eye toward a *Batson*
claim. But the court indicated they would have to litigate the issue on
the spot and in front of all the jurors. These impossible conditions
deprived Council of a meaningful opportunity to present a *Batson* claim,
and thus, under Federal Rule of Criminal Procedure 51(b), they excuse
his lawyers' retreat from it. Had counsel been allowed time to review
the record, they could have shown that many of the government's

39

strikes of African-Americans lacked any plausible race-neutral reason that did not apply equally to Whites it left on the jury.  *See* **Point IV**.

The errors continued at the capital-sentencing hearing.  *See* **Points V-VII**.  Two of the government's aggravating factors involving Council's motive inherently contradicted each other:  One alleged he killed the victims to steal money from the bank, but the other that the homicides were gratuitous because he knew he did not need to kill anyone to steal money from the bank.  One factor had to be false, but the court let the jury weigh them both.  Further, under established legal definitions narrowing their scope, neither actually rested on legally sufficient evidence.  Two more aggravators, as presented, also redundantly relied on the alleged purposelessness of the murders, thus triple counting it.  These errors artificially inflated the weight on the death side of the jury's sentencing scale, violating Council's Eighth Amendment rights.  *See* **Point V**.

The court also let the government overrun established constraints on another aggravating factor, the harm the killings caused the victims' families.  *See* **Point VI**.  Ten witnesses — more than half the government's sentencing case — accompanied by dozens of family

40

photographs and other mementos, presented lifetime retrospectives of the victims (and of some of the witnesses themselves) that made the sentencing more like a memorial service. The testimony from friends and colleagues also extended well beyond "personal" impact by focusing on the victims' value and the loss to their professional, church, and local communities as reasons to sentence Council to die. All this was punctuated by repeated sobbing and long halts in the testimony when, as the prosecutors seemed to anticipate, the witnesses were emotionally overcome. These tactics also risked stoking less-conscious racial biases that, studies show, can cause White jurors to identify with and be moved more by White victims and their families.

The court allowed racial bias to seep into Council's sentencing in yet another way. Congress was so concerned about this risk, it mandated a special jury instruction in the FDPA: Jurors must be charged to determine, before selecting a sentence, whether they would recommend the same punishment even if the defendant's and victims' races were reversed. But the court omitted this step from its instruction on choosing a punishment, instead casting it as a mere formality after the sentence had been decided and recorded. *See* **Point**

41

**VII**.  The court also gave jurors no way to do anything but affirm the verdict.  Thus, it relegated this statutorily-mandated element of deliberations, critical in a cross-racial case like Council's, to a mere box-checking afterthought.

Finally, several fundamental constitutional defects in Council's death sentence also require relief.  *See* **Points VIII-X**.  At the time of sentencing, South Carolina's death-penalty law provided for lethal injection.  But under a new state statute, electrocution is the default method of execution and, for the indefinite future, the only legally available one.  Because the FDPA and Council's judgment incorporate the state's current method, he now stands sentenced to die by electrocution.  But electrocution is less humane than lethal injection; indeed, it inflicts excruciating suffering and gross mutilation, which is why it has been repudiated by every other jurisdiction and found unconstitutional by two state supreme courts.  Thus, as soon as the new South Carolina law was enacted, Council filed a post-trial motion challenging his sentence as *ex post facto*, cruel and unusual, and an impermissible delegation of federal authority.  But the district court erroneously ruled the motion untimely and incognizable, and misread

42

Supreme Court precedent as foreclosing his claims. *See* **Point VIII**. Even more fundamentally, condemning Council to indefinite solitary confinement on federal death row, potentially for decades, is torturous and constitutes cruel and unusual punishment. *See* **Point IX**. And the widespread and growing national abandonment of capital punishment in recent years reflects an evolved standard of decency that now makes the death penalty unconstitutional. *See* **Point X**.

Several of these errors are structural and require relief *per se*. *See* Points I, III, IV, VIII-X. The remaining sentencing errors that turn on prejudice, Points II, V-VII, cannot be dismissed simply because this was an aggravated crime involving two sympathetic victims. Under the FDPA, the jury could not impose a death sentence if even one juror, confronted with the highly discretionary, individual weighing of aggravators and mitigators, had found life imprisonment harsh enough punishment. That is why two-thirds of federal capital juries in this Circuit have declined to return death verdicts, including in many cases involving multiple murders, sympathetic victims, or both. Here, most jurors credited substantial mitigating factors involving Council's traumatic upbringing. The government cannot meet its heightened

burden under the FDPA to prove beyond a reasonable doubt that none of the asserted errors, individually or together, tipped the balance for even one of those jurors and cost Council his life.

## ARGUMENT

### I.

**The district court abdicated its unwaivable, independent duty to determine Council's competency after he experienced a "delusional" "break with reality" during the trial.**

### A.    Introduction and Standard of Review

Both due process, *see Pate v. Robinson*, 383 U.S. 375 (1966), and the Insanity Defense Reform Act (IDRA), 18 U.S.C. §§ 4241, 4247, require procedural protections to ensure that questions about a defendant's competency are adequately investigated and reliably adjudicated by the district court.  These procedures are non-waivable, and the court is independently obligated to follow them; even if defense counsel considers it disadvantageous or unnecessary, the court must act *sua sponte*.

Thus, when a court finds "reasonable cause" under § 4241 to believe the defendant may be incompetent, whether before or during

44

trial, it must: (1) ensure an *independent expert examination* is or has been conducted; (2) obtain a *comprehensive report* that includes not just a bottom-line conclusion but the defendant's history, symptoms, test results, and the examiner's findings and diagnosis; (3) hold an *evidentiary hearing* to consider the report and other record information about the defendant's mental status, and see if it needs examiner testimony, additional evidence, or another evaluation; and; (4) based on all this, reach its own *independent determination* about whether the defendant meets the legal standard for competency.

Here, Council suffered what his attorneys described as a "delusional" "break with reality" during the trial. After the district court observed this for itself, it agreed there was "reasonable cause" to doubt Council's fitness to proceed. But the court was determined to allow no delay. So it hastily arranged with Council's lawyers for two defense experts to have a Sunday afternoon meeting with him at the jail. Within a half hour of finishing, they signed a terse, boilerplate statement attesting to Council's competency, with which defense counsel concurred and which the court accepted. The court thereby deprived Council of *each and every one* of these four critical protections

45

— reinforcing but independent errors.  It also replicated the essential error in *Pate*: deferring to a summary expert opinion with no consideration of its basis or reliability.

Whether, as the court believed, this was all due process and the IDRA required presents a legal question this Court reviews *de novo*. *See United States v. Shealey*, 641 F.3d 627, 633 (4th Cir. 2011); *United States v. Wayda*, 966 F.3d 294, 296 (4th Cir. 2020).  This standard of review applies even if trial counsel agreed to the court's actions.  *See United States v. General*, 278 F.3d 389, 396 (4th Cir. 2002); *United States v. Ernst*, 488 Fed. Appx. 667, 671 (4th Cir. 2021).

## B.    Factual Background

Council's mid-trial breakdown was not the first time competency concerns arose.  Pretrial, the district court flagged the issue after spotting signs he was mentally ill.  This began shortly after indictment, when the court put "Section 4241 competency issues" on the agenda for a December 2017 conference.  JA84-85.  There, it asked about a competency evaluation, and recognized its independent duty: "I've got to be satisfied that he's competent to stand trial."  Defense counsel requested more time.  They acknowledged competency was an

46

"important issue" but said they were "currently balancing" it with others, in light of the "series of things that must transpire" if "we raise it."  JA128-130.

At the next conference a few months later, in April 2018, the court again reminded defense counsel it had "an independent duty aside from your duties" to address competency, and questioned whether Council was fit to proceed.  It noted the complaint affidavit's description of Council's suicidal impulses, JA971-972, and remarks in his counsel's CJA vouchers "indicating" he was "crazy" along with "an indication of demons."[14]  JA1025. The court was familiar with the "reasonable cause" standard of § 4241 and thought that threshold had probably been crossed, so it was inclined to order a BOP competency evaluation at FMC Butner.  JA969-972; *see also* JA144.

The defense again resisted.  A BOP evaluation, it said, would subject Council to "a wide range" of "personality," "intelligence," and "brain" testing.  For the government to have that and all of his "personal medical and mental health history" at its disposal could, in

---

[14] Counsel confirmed those entries reflected "what my concerns are," but promised to omit such notes from future vouchers.  JA1025-1026.

their view, seriously work to his "legal detriment" at his "penalty phase."  The defense wanted to keep the government from seeing the competency report or talking with the examiners.  But the court said that was not its practice, and the government opposed such measures. The government also reminded the court of the statute's procedural requirements, noting that, once "reasonable cause" under § 4241 is found, "this Court, not the evaluator, must determine" competency. JA181, JA183-185, JA196-208, JA211, JA975-981.

Defense counsel sought to table the issue by promising to have a defense psychologist privately assess Council's competency.  JA1027.  A few weeks later, one of his lawyers filed a one-page, *ex parte* declaration.  It said he thought Council could consult with his attorneys and understand the proceedings.  It also stated that Geoffrey McKee, a forensic psychologist, had evaluated Council three days after the court conference and opined to counsel the next day that Council was competent to stand trial.  JA215.  No other information or material about this psychologist, his evaluation, or his findings was ever provided to the court, and the court had no direct contact with him.

The court acknowledged that, if it found "reasonable cause" to

48

doubt Council's competency, the statute required an examination, report, and hearing. But because of defense counsel's declaration and the absence of noticeably unusual courtroom behavior by Council so far, the court determined that "reasonable cause" did not exist, and dropped the issue. JA216-219.

About a month later, in June 2018, just before the deadline to file or explain why it was not filing a competency motion, *see* JA218, JA172, defense counsel submitted another *ex parte* declaration. It assured the court that two unnamed "mental health consultants, *while not evaluating the defendant for competence*, have separately indicated to counsel that Mr. Council is presently competent to stand trial" (emphasis added). Nor, the declaration asserted, had recent meetings with Council led his lawyers to question that opinion. JA310. Again, the court did not request or receive any documentation or other information about these unnamed consultants or how they had concluded Council was competent without evaluating him for competency.

Despite these assurances, the court continued to receive evidence that Council was mentally ill. A few months later, in August 2018, it

learned that, in Council's FBI interview, he had referred multiple times to "demons" and mind-control in explaining the killings.  JA311.  *See* Facts-III.  Two months after that, in October 2018, the court also learned that a defense psychiatrist, Dr. Richard Dudley, who had clinically interviewed Council and reviewed his records, "suspects that Brandon may be suffering from a major mood disorder such as Bipolar Disorder that is genetically transmitted."[15]  Counsel's investigation had also uncovered documented evidence of mental illness in Council's family.[16]  And Council's own background and pattern of offending further suggested, in Dr. Dudley's view, the possibility of "an organically based mood disorder."  To help confirm the diagnosis, he had recommended psychological testing of Council and focused

---

[15] Bipolar disorder is among the "psychotic disorders . . . that typically call adjudicative competence into question."  American Academy of Psychiatry and Law (AAPL), *Practice Resource for the Forensic Psychiatric Evaluation of Competence to Stand Trial*, 46 J. of the Am. Acad. of Psych. & L. S59 (2018 Supplement); *see, e.g., United States v. Collins*, 982 F.3d 236, 240 (4th Cir. 2020) (defendant with bipolar disorder found incompetent to stand trial).

[16] Sentencing evidence showed Council's father and several other relatives were diagnosed with or reported to suffer from various disorders, including bipolar disorder, psychosis, paranoia, and chronic brain syndrome.  JA6631, JA5717-5720.

reinterviewing of witnesses from his past. JA687, JA700, JA903-906, JA924-928; *see also* JA2412-2413, JA2423-2424, JA2430-2431 (court acknowledges defense expert's concern that Council "may have bipolar").

But Council's lawyers remained apprehensive that government evaluators would use access to him to help secure a death sentence. So in August 2019, they opposed the government's request, *see* JA1507-1509, JA1880, to have its psychiatrist examine Council, claiming the expert would "seize[] on the access" to present him to the jury "as remorseless, manipulative and depraved." Based on counsel's disavowal of any expert mental-health defense, JA1884, JA1888-1893, JA1941; *see also* JA1973-1974, JA2162, the court agreed, JA1984-1986; *see also* JA1990-1991.

So when trial began the following month, concerns about Council's competency had been laid aside and any evidence of mental illness fenced out. But these issues abruptly forced themselves back into the proceedings a few days later when the government rested its guilt case on Thursday, September 19. Defense counsel informed the court at sidebar that, upon entering the courtroom, Council had told them, out of the blue, that he wanted to testify. The court granted a recess until the next morning. JA4740-4741.

Late that evening, just before 11 p.m., the defense filed a motion declaring Council "presently mentally ill and unable to proceed." His attorneys believed he "is unable to understand the nature and consequences of the proceedings against him and is not capable of assisting properly or rationally in his defense, due to mental disease or defect."[17] JA2182, JA6148. Because there was "reasonable cause" to doubt Council's competency to be tried, the motion concluded, § 4241 required a psychological evaluation and a hearing. JA2176-2177, JA2181.

At the *ex parte* portion of a conference the next morning, September 20, Council's Federal Defender attorney told the court that he "seems to be delusional, Your Honor. We think that he may possibly be having a break with reality." His CJA attorney agreed, saying Council had become "unhinged" and that, if the court spoke with him, it too would observe "this break with reality." His Federal Defender attorney elaborated that, when they spoke with Council the previous afternoon, "something seemed to be different about" him. After court

---

[17] The motion also reminded the court of the prior times it had identified indications of possible incompetency and "raised issues *sua sponte*." JA2178.

ended, Council also said things to them in the marshal's lockup that "gave us great pause." Then, during a 90-minute meeting at the jail, they could not communicate with him because "[h]is thought process went from one topic to another topic to another topic" and, despite their efforts to engage him, "veer[ed] further and further off topics." It became clear to them that Council had "adopted views that are irrational about what this jury would accept" and "about . . . what reality would be," believing that "God is somehow responsible" for the victims' deaths, and that "in firing the weapon he did not kill these people."[18] CJA counsel added that Council believed he was "being persecuted" because the court could "not subpoena God."[19] JA4771-4774.

The court then turned to speak with Council directly, but he sat

---

[18] Seemingly concerned the court might be displeased with their raising the issue after having earlier resisted an inquiry, Federal Defender counsel assured it that their earlier experience with Council had led them to think he was competent. JA4769-4770. His CJA attorney was more equivocal, saying this was the first "*complete* shutdown of communications." JA4776 (emphasis added); *see also* JA4774 ("we've stayed away from certain words or topics because we were sensitive to his demand about certain things").

[19] CJA counsel also advised that he was "walking on eggs" about how much he could say because Council was present and "I'm trying to maintain a relationship with my client." JA4773.

mute and unresponsive.  Federal Defender counsel observed that "he is crying as well; there are tears coming out of his eyes," and his CJA lawyer added: "This is all new for us . . . it's progressing, Judge, we believe daily."  Only after several minutes did Council suddenly stand and speak, in a bizarre fashion: "I just want . . . I . . . I did not kill those women.  I did not kill those women.  I did not kill those women.  I am not the person that killed them.  I did not.  I don't know who did it.  God did it.  I did not kill them."  It took several entreaties from the court and his attorneys before Council finally sat down.  JA4776-4777, JA6734.

When the prosecutors reentered the courtroom, the court ruled: "Based on what I've observed and heard and the motion that's filed, I'm going to find that there's reasonable cause to order an examination." JA4754; *see also* JA2184 ("the Court found reasonable cause for a competency hearing under 18 U.S.C. § 4241(a)").

Early in the conference, the government had reminded the court that, should it find "reasonable cause" to doubt Council's competency, there would need to be "an independent examiner selected by the Court . . . rather than simply allowing the defense to select someone of their

own choosing." JA4745-4746. But the court brushed this aside, saying "I don't like delays" and that it wanted an evaluation done as "quickly" as possible. JA4747, JA4749-4751.

CJA counsel accurately noted that the trial was "way ahead of schedule."[20] Nonetheless, to accommodate the court's haste and apparently also to avoid the independent examination and disclosures urged by the government, he said the defense had one expert, who "has a relationship with Council," on the way to the courthouse that morning to examine him, and another available to do so on Sunday. This, he promised the court, would be "most efficient." JA4748-4749; *see also* JA2181. Could the defense really "accomplish all these things by Monday," the court wondered? Counsel promised they would be "aggressive." JA4751.

The government again called the court's attention to the statutory procedures required upon a finding of "reasonable cause," including a "report" by the evaluator, which would address Council's history,

---

[20] It was on pace to finish more than a month earlier than the court had told prospective jurors, JA1831, and twice as fast as the average federal capital trial, *see* Point II.B, D.

symptoms, and any test results. The report and "all of the underlying information" would also need to be shared with the government and the court before the "competency hearing." The court agreed only that the examiner should have the "relevant information." JA4752.

The government also continued to press for an independent, court-supervised expert, including possibly a BOP examiner at FMC Butner. JA4754-4755, JA4760, JA4762-4763. The court responded that it had contacted one potential independent evaluator, Dr. Jimmy Ballenger, who said that he could meet with Council that weekend. He would need the medical, police, and legal records, but could complete a report by "the latter part of the week" and be available to testify at a competency hearing the following Friday.[21] JA4756, JA4759; *see also* JA6130 n.2. Again prioritizing speed, though, the court said that if defense counsel had "somebody who can do this quicker, I sure would like to go that route." JA4757 ("I need to know who . . . can do it on a shorter time frame.")

---

[21] At some point that day, the court also spoke with another potential independent examiner, Dr. Thomas Martin, and the prosecutors e-mailed him some material about Council. JA6130 n.2, JA6145. It also appears he worked over the weekend to review the case. *See* JA6154, JA6156.

Just before the conference adjourned at 10:30 a.m., the court told counsel to "hang around here this morning and today until we line this up . . . we need to be fast tracking this." JA4763, JA4765.

And fast track it they did. A little over an hour later, Federal Defender counsel e-mailed the court and prosecutors that defense psychologist James Hilkey (who apparently had the prior "relationship" with Council) and a psychiatrist newly retained by the defense, Donna Schwartz-Maddox, could meet with Council that Sunday afternoon. Both experts, counsel promised, could produce a "report" by Monday. JA2185. The government responded, 30 minutes later, by e-mailing the court and defense counsel a proposed order ("based upon the court's standard order") for a "court-appointed mental health professional" to conduct a competency examination since the court had found "reasonable cause" under § 4241(a). The order, which the government said was "appropriate for this matter," would have directed a court-appointed expert, per § 4247, to "prepare a full report" for the court reflecting Council's history, symptoms, and test results; the examiner's findings, diagnosis, and prognosis; and his or her ultimate opinion on competency. JA6149-6152.

57

But the court took no action on this. Instead, two days later, just after 5 p.m. on Sunday afternoon, Federal Defender counsel e-mailed the court and prosecutors: "Based on their interview, Hilkey and Maddox will be signing a brief report stating that Council is competent pursuant to 4241." Counsel promised to "send a copy tonight" and "present it in court in the morning." JA6153. About half an hour later, he e-mailed them a two-paragraph, untitled statement, jointly signed by Hilkey and Maddox, which said that Council was competent to proceed, adding that he was anxious and not getting enough sleep. No mention was made, let alone any explanation offered, of Council's "unhinged," "delusional" "break with reality" two days before his meeting with the evaluators; his inability to rationally communicate with his counsel or the court; or any of the other record information suggesting he was mentally ill. In its entirety, the statement read:

> Based on a three-hour interview with Brandon Michael Council on Sunday, September 22, 2019, we believe, to a reasonable degree of medical certainty, that Brandon Michael Council is competent to stand trial as defined in 18 U.S.C. Section 4241(a), to wit: Brandon Michael Council is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, if he chooses to do so.

> As the Court is well aware, competency is a fluid issue. As of this date, the undersigned find that he is competent to proceed. Mr. Council is experiencing extreme anxiety and some sleep deprivation. As of this date, the undersigned find he is competent to proceed. Nevertheless, the possibility of decompensation as the trial proceeds cannot be ruled out. We recommend that counsel monitor his status and advise the court should there be a change. If Mr. Council exhibits signs of stress, a short break in the proceedings could be beneficial.

JA6156-6157; *see also* JA2188.

The next morning, Monday, September 23, the court "convened a competency hearing." But what followed was just a brief exchange that took up a single transcript page. Defense counsel noted the competency motion from the previous Thursday, which "the Court found reasonable cause to grant." Council, he stated, was then seen by defense experts over the weekend, who opined he was competent. Counsel handed the court the two-paragraph statement signed by the experts and their CVs, and said the defense now believed that Council was fit to proceed. JA4781-4782; *see also* JA2207, JA6130 & n.2.

The government noted that it had "not had access to any of the underlying documents or test results," but did not oppose moving forward. The court then found that, "based on what's been presented"

that morning, Council understood the proceedings, could assist his attorneys, and was therefore competent. Council never spoke during this brief exchange, and the court made no effort to question him. The court and counsel then turned to other matters.[22] The following morning the jury returned and the trial resumed. JA4781-4782; *see also* JA6130 n.2.

The court later noted that "its concern . . . was how quickly an evaluation could be performed," and that the Sunday afternoon jail meeting and signed statement from the defense experts meant "it was not necessary . . . to order an evaluation by an independent mental health expert." JA6130 n.2.

While Council's appeal was pending, he wrote two *pro se* letters directly to this Court manifesting the kind of delusional, disordered thinking described by his trial counsel and observed by the district court at the mid-trial conference. The first letter, addressed from "Masterbuilder Brandon Michael Council," castigated his appellate

---

[22] Those included obtaining a "yes, sir" response from Council to the court's question whether he understood his right to testify. JA4793.

counsel for having "refused to reveal to the current P.O.T.U.S. and the
U.S. A.G. the 'Cardinal' and critical concerns pertaining to 'Blind
Justice' malfeasance." The letter accused counsel of being "co-
conspirators to this nation's largest white collar whistleblower case in
the history of U.S. jurisprudence." That is why, he continued, they are
declining his "demand to include this information because it vividly
shines light on the catharsis elements of United States Jurisprudence"
and "because these unprecedented afortiori arguments will inevitably
cause the use of capital punishment . . . to be abolished." Council also
complained of his lawyers' "refus[al] to comply with my request to sue"
the trial judge, prosecutors, and Attorney General civilly for millions of
dollars in damages "and go public."[23] The second letter, sent several

---

[23] Council, in fact, initiated a *pro se* lawsuit that echoes his
irrational, delusional letters to this Court. *See* Complaint, *Council v.
Dep't of Justice*, No. 2:21-cv-302, DE1 (S.D. Ind. Aug. 2, 2021). It
repeatedly invokes "a law concept called Blind Justice," including how
the trial judge "did possess non disclosed Blind Justice aforeknowledge,"
and how "The Blind Justice loophole in the 13th Amendment provides
only vivid and irrefutable proof [of the] Blind Justice practices which I
have extensively addressed." It otherwise jumps disjointedly from one
inscrutable subject to another, *e.g.*, "subjective criminal recklessness,"
"logical inferences and preferential influences," "Customary
International Law," assorted Biblical verses, obscure Latin phrases ("*Et
Facta Est Lux*," "*Rex Non Potest Pecare*"), "Excessive Force Slavery and

weeks later, proceeded in a similar vein. 4th Cir. DE44, DE61; *see also* JA6190-6191. Although not part of the trial record, the letters suggest that Council's "delusional" break with reality" during the trial reflected serious and enduring mental illness, not an isolated episode, let alone one attributable to just a few nights of bad sleep.

**C.    Legal Argument**

**1.    The court had an independent, *sua sponte* obligation to follow the steps mandated by due process and the IDRA to protect Council from being tried while incompetent.**

There is a "longstanding recognition that the criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). A defendant is mentally incompetent if he lacks either "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960). This competency is "rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial,

---

Torture," *etc.* For "relief," the complaint requests "a non disclosure agreement settlement" along with "100 million dollars . . . for willful participation in Blind Justice." *Id.*

including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (cleaned up).

Because "[a]n erroneous determination of competence threatens a fundamental component of our criminal justice system — the basic fairness of the trial itself," *id.* at 364 — "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right." *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Pate*, 383 U.S. at 378. For federal prosecutions like Council's, "Congress has established a statutory framework to protect legally incompetent defendants from due process violations." *General*, 278 F.3d at 396, *citing* §§ 4241 *et seq.* This "'procedural' competency principle" operates to "ensur[e] that the substantive competency principle is not violated." *Id.*

These principles apply whether the issue of competency arises before or during trial. § 4241(a) (competency may be raised "[a]t any time" after commencement of prosecution, before sentencing). "Even when a defendant is competent at the commencement of his trial, a trial

63

court must always be alert to circumstances suggesting a change that
would render the accused unable to meet the standards of competence
to stand trial." *Drope*, 420 U.S. at 181 ("the correct course was to
suspend the trial"); *United States v. Roof*, 10 F.4th 314, 346-47 (4th
2021) ("district court properly considered that Roof's competency might
have changed," and "ordered a second hearing" in midst of capital trial);
*United States v. Arenburg*, 605 F.3d 164, 165 (2d Cir. 2010) ("the
district court erred by failing to revisit defendant's competence to stand
trial in light of his behavior during the trial").

This whole-of-trial competency requirement takes on special
significance in a capital case. The defendant's own life history occupies
so much of the sentencing stage that it is especially critical he be able to
rationally consult with counsel about his defense there.[24] Thus,
although the same legal standard applies throughout the proceedings,

_____

[24] *See* Freedman, *When is a capitally charged defendant
incompetent to stand trial?* 32 Int'l J. of Law & Psychiatry 127, 130-31
(2009) ("Competent defendants cannot simply be reactive to what
happens in court or to documents presented because capital trials
require more than a simple testing of the prosecution's pieces of
evidence; they are also the presentation of . . . how and why the life-
course of the individual brought them to this moment").

the greater demands on a defendant at a capital sentencing mean that he may be incompetent there though he was competent at the guilt stage. *See United States v. Malmstrom*, 967 F.3d 1, 5 (1st Cir. 2020) ("competency to stand trial is a functional concept focusing on the defendant's part in the trial").

The district court must address competency issues not only whenever they arise but *sua sponte*, if necessary. "[I]t is contradictory to argue that a defendant may be incompetent yet knowingly or intelligently 'waive' his right" to due process in the determination of competency. *Pate*, 383 U.S. at 841; *see Medina*, 505 U.S. at 45. So the procedures required for that determination also may not be waived.[25] *Drope*, 420 U.S. at 176; *see United States v. Williams*, 113 F.3d 1155, 1160 (10th Cir. 1997) ("[n]either right" to "procedural" nor "substantive" due process in competency determination "can be waived").

Thus, a district court is independently obligated to follow the prescribed steps in the competency process even if, as here, defense

---

[25] This also reflects that such procedures are "for the benefit of society" as well as "for the benefit of the defendant." S. Rep. 98-225, 98th Cong., 1st Sess. 1983, 1983 WL 25404, at *235 (Aug 4, 1983) ("Senate Report").

counsel fails to request them or agrees to avoid them. For example, if information before the court creates "a bona fide doubt as to [the] defendant's competence" ("reasonable cause," in the statute's terms), the court must undertake an inquiry *sua sponte*, on its "own motion." *Pate*, 385 U.S. at 385; § 4241(a). Its independent "duty" to do so is "in no way dependent upon the tactical decisions of the parties." *United States v. White*, 887 F.2d 705, 707-10 (6th Cir. 1989) (court's "reasonable cause" finding made competency hearing "mandatory" though "White's attorney represented that White was able to assist in his own defense"); *see General*, 278 F.3d at 395-96 (evaluating need for competency hearing though trial counsel had told district court that defendant was competent); *Ernst*, 488 Fed. Appx. at 671 (same, though defense counsel denied defendant was incompetent and withdrew evaluation request). Similarly, if a treatment facility certifies that the defendant has been restored to competency, the court bears a mandatory duty under § 4241(e) to order a hearing on the issue, again *sua sponte* if counsel eschews one. *See United States v. Giron-Reyes*, 234 F.3d 78, 84 (1st Cir. 2000) ("the acquiescence of counsel is no substitute").

The Third Circuit aptly summarized the non-waivable nature of

the statute's core protections: "Section 4241 provides a mandatory process. The steps in that process are intended to culminate in a record-based judicial determination of competence in every case in which there is reason to doubt the defendant's competence to stand trial. The Due Process Clause of the Constitution requires no less." *United States v. Haywood*, 155 F.3d 674, 680 (3d Cir. 1998).

2.    **The court's finding of "reasonable cause" to believe Council may have been incompetent, which triggered a series of procedural protections, was well supported and not questioned by the government.**

With competency, the threshold issue is whether the district court finds "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." § 4241(a). Here, that occurred when defense counsel's mid-trial motion asserted this standard was met and, after a courtroom presentation the next morning, the court made a finding that it was.

That finding was not questioned by the government. And it was amply supported by defense counsel's stated belief that Council was incompetent and by their interactions with him on the day the government rested, as well as by the court's own observations of him

67

the next morning: Counsel were convinced he was "mentally ill," observing that he had become "delusional," "unhinged," and suffered a "break with reality," insisting that God had killed the victims but the court could "not subpoena God." This strongly suggested he lacked a rational understanding of the proceedings. And because his "thought process" continued to "veer further and further off topics" in their conversations with him, his attorneys could not rationally communicate with Council — nor could the court when it tried to do so.[26] *See Dusky*, 362 U.S. at 402; *Drope*, 420 U.S. at 177, 180 (mid-trial competency inquiry necessitated by "defendant's irrational behavior" and counsel's previous statement that he lacked "sound mind" and should receive psychiatric exam). This showing of "reasonable cause" was further bolstered by information the court had received during the pretrial period that Council was mentally ill, which, even alone, it had thought probably established "reasonable cause."

---

[26] Nor has Council been able to communicate rationally about his case with his appellate counsel. *See* JA6190 (informing district court last July that "based on appellate counsel's interactions with Council since their appointment a year and a half ago, they doubt he is mentally competent" under *Dusky* standard). *See also* Point I.B (describing Council's letters to this Court).

**3.    The court first erred by delegating the competency inquiry to the defense team rather than designating a neutral, independent expert to evaluate Council and report directly to the court.**

Because the court's "reasonable cause" finding obligated it to undertake a process sufficient to safeguard against an "erroneous determination" of competency, *Cooper*, 517 U.S. at 364, federal law required, as the next step, that it "order that a psychiatric or psychological examination of the defendant be conducted." § 4241(b). Although the statute says such an examination "may" be ordered, it is difficult to imagine how competency could be adjudicated without one at that point.  The authoritative Congressional report accompanying the IDRA said it "contemplates that a psychiatric examination will be *routine in virtually all cases*" when reasonable cause is found.  Senate Report, *supra*, 1983 WL 25404, at *235 (emphasis added).  To clarify the statutory language, the report invoked a decision under the prior statute that an "initial psychiatric examination . . . is mandatory," but "whether to require a second examination rests in the sound discretion of the trial court."  *United States v. Cook*, 418 F.2d 321, 324 (9th Cir. 1969), *cited in* Senate Report, *supra*, 1983 WL 25404, at *235; *see, e.g.,*

*General*, 278 F.3d at 398 (court that had received "comprehensive evaluation of General's competency" from FMC Butner had discretion not to "grant additional mental examinations"). In other words, Congress intended at least one competency examination would be conducted in every case where reasonable cause is found.

Federal law also governed *the kind* of examination the court had to order for Council at that point. *See* § 4241(b). "Each examiner" was supposed to be "designated by the court," unlike in certain other circumstances in which one "may be selected by the defendant." § 4247(b). It was up to the court to order the place and duration of the examination. And the examiner had to file a report directly "with the court," with copies then provided by the court to counsel. §§ 4241(b), 4247(b), (c).

Just as the court had an independent duty to determine whether "reasonable cause" existed rather than deferring the issue to counsel, so too an expert designated by the court was "expected to be neutral and detached," unlike a "'partisan witness'" who supplies "'expert services'" to the "'defense'" and is compensated along with defense counsel under the Criminal Justice Act, 18 U.S.C. § 3006A. *United States v. Reason*,

549 F.2d 309, 311 (4th Cir. 1977), *quoting United States v. Bass*, 477 F.2d 723, 725-26 (9th Cir. 1973) (defense expert "fills a different role"). In other words, the expert designated by the court had to be one who "consider[s] himself an officer of the court, not responsible to the prosecution or defense." *In re Harmon*, 425 F.2d 916, 918 (1st Cir. 1970); *United States v. Pogany*, 465 F.2d 72, 77-78 (3d Cir. 1972) (same). That is so "even if he may have hitherto acted in a personal relationship" to the defendant or defense team. *Harmon*, 425 F.2d at 918. Thus, as one circuit found, it was error for the matter of competency to be exclusively "placed in the hands" of counsel for one party to retain and direct the party's own expert, making it "impossible . . . to ascertain whether" the expert "submitted his report as an officer of the Court or as the [party's] expert witness." *Pogany*, 465 F.2d at 78-79.

Although those cases were decided under the predecessor statute, 18 U.S.C. § 4244 (repealed), courts have interpreted the current law to include the same mandate. *See, e.g., United States v. Phillips*, 907 F.2d 151, 1990 WL 92625, *1 (6th Cir. 1990) (Table); *United States v. Rinchack*, 820 F.2d 1557, 1564 & n.9 (11th Cir. 1987); *see also United*

71

*States v. Trexler*, 2012 WL 3265010, *2 (M.D.N.C. Aug. 9, 2012) (declining to appoint defense-retained psychologist used in Council's case because § 4241 competency examiner is "expected to be neutral and detached"). That makes sense, since the IDRA carried over the old statute's requirements of a court-ordered exam at a court-selected location with a report to the court, *see Brogdon v. Abbott*, 524 U.S. 624, 645 (1998) ("repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well"), and further added that the competency "examiner" must be "designated by the court," unlike certain other kinds of examiners who "may be selected by the defendant." § 4247(b).

The requirement of a neutral court expert also reflects the overarching purpose of the IDRA to reclaim for courts more authority over how mentally-ill defendants are adjudicated, from the "paid psychiatrists who offer conflicting opinions" for each side. Senate Report, *supra*, 1983 WL 25404, at *223; *see United States v. Loughner*, 770 F. Supp. 2d 1026, 1027 (D. Ariz. 2011) (court's statutory authority over competency examination serves its "interest in facilitating the most thorough, scientific, and reliable examination possible"); *see also*

72

*Wayda*, 966 F.3d at 307 (individual provisions in the IDRA should be interpreted in the "context" of the "overall statutory scheme").

No surprise, then, that in federal capital cases, even when competency is raised mid-trial, other district courts have designated a neutral expert to conduct an independent evaluation, rather than simply delegate it to the defense team. Thus, in *United States v. Mikhel*, when the issue arose "[o]n the eve of opening statements," the district court paused the trial and ordered a BOP psychiatrist to evaluate the defendant. 889 F.3d 1003, 1038 (9th Cir. 2018). Similarly, in *United States v. Sampson*, when the defense moved for a competency determination in the middle of the sentencing trial, the court designated "an independent, court-appointed expert" to conduct the evaluation. 2017 WL 402974, **1-3 (D. Mass. Jan. 30, 2017). And, most recently, in *United States v. Roof*, in the same district where Council was tried, when the capital defendant's competency was questioned for a second time after he was convicted but before the sentencing phase began, the court appointed an independent psychiatrist to conduct a re-evaluation even though it had previously held a full competency hearing. No. 2:15-cr-472 (D.S.C.), DE858 (Jan. 5,

73

2017); *id.*, DE880-1:7-8 (Jan. 17, 2017).

In Council's case, however, and despite the government's reminder of the need for a neutral, court-directed evaluation, the court violated this obligation by simply outsourcing the matter to the defense to avoid having to pause the trial for even a few days. One of the two defense experts who saw Council was already a member of the defense team, and the other was also identified, retained, and paid by counsel. That disqualified them from being "officer[s] of the court, not responsible to the . . . defense." *Harmon*, 425 F.2d at 918. And, in any event, the court made no effort either to re-designate them as such or direct them to conduct an independent examination. On the contrary, it deemed them "[d]efendant's experts." JA6130 n.2. Thus, it did not vet them, had no communication with them, and gave them no directions. *See* Guide to Judiciary Policy, Vol. 7, Chap. 3, § 320.20.10 (IDRA "provides for *court-directed* psychiatric or psychological examination . . . in connection with . . . the mental competency of a defendant to stand trial") (emphasis added). Nor did the court ever learn what defense counsel had told their experts they should or should not address with Council, consider in their evaluation, or disclose to the court. *See*

74

*Pogany*, 465 F.2d at 78-79.  Even after their meeting with Council, the experts had no direct contact with the court; the short statement they signed was e-mailed by defense counsel right after the meeting, and it is not even clear who composed it.  *See* JA6153 (counsel says experts "will be signing" statement).

The court provided no legal authority for its later-expressed view that such a defense examination meant "it was not necessary . . . to order an evaluation by an independent mental health expert" (who had already been contacted by the court and begun work), or that the overriding consideration was "how quickly" the court could dispose of the issue since a jury was sitting.  JA6130 n.2.  And, as discussed, the statute and case law contradict that.  Even assuming a need for expedition, the court also never explained why an adjournment of a few days was not feasible, especially given the gravity of the issue and that the trial was more than a month ahead of schedule.

**4.    The court next erred by accepting a conclusory statement relayed from defense experts that Council was competent, in lieu of the comprehensive evaluation and report required by federal law.**

When "reasonable cause" is found to doubt the defendant's mental

75

fitness to stand trial, the IDRA also directs that, following the independent evaluation, "a psychiatric or psychological report be filed with the court." § 4241(b). The statute mandates that this report detail for the court the grounds for the examiner's ultimate opinion whether the defendant is competent. Specifically, the report "shall include" a range of underlying information: the defendant's "history," his "present symptoms," any "tests" administered to the defendant "and their results," the defendant's "diagnosis," and his "prognosis." § 4247(c)(1)-(4); *see* Federal Judicial Center, *Benchbook for U.S. District Court Judges* at 52 (6th ed. 2013) ("The examiner's report must include all the information required by 18 U.S.C. § 4247(c)(1) through (c)(4)").[27] Of course, this necessarily assumes that the examiner will have obtained and considered this information in conducting the evaluation and

---

[27] The statute's report requirements are followed in this Circuit. *See, e.g., General*, 278 F.3d at 397-98 ("comprehensive" report addressed defendant's symptoms, I.Q., behavioral problems, understanding of the legal process, and prior "indicia of incompetence"); *United States v. Mason*, 52 F.3d 1286, 1290-91 (4th Cir. 1995) (report addressed defendant's symptoms, family interactions, and history of alcohol abuse); *United States v. Johnson*, 583 Fed. Appx. 62, 64 (4th Cir. 2014) (report analyzed defendant's responses to questions, his mental health and prison records, investigative material, and his pretrial behavior).

arriving at opinions.[28] *See also United States v. Lopez-Hodgson*, 333
Fed. Appx. 347, 354 (10th Cir. 2009) (suggesting that "observation
alone" would not be reliable basis for mental-health expert to opine on
competency).

This provision also protects the defendant's due process rights.
The predecessor to § 4241 had required only a "report," without
specifying its contents.  18 U.S.C. § 4244 (repealed).  But the Supreme
Court in *Pate* held that due process mandated more than a mere
"stipulation that Dr. William H. Haines, Director" of the court's
"Behavior Clinic . . . would, if present, testify that in his opinion [the
defendant] knew the nature of the charges against him and was able to
cooperate with counsel."  383 U.S. at 383.  Given record information
that raised "a bona fide doubt" about the defendant's competence, the

---

[28] This also reflects the established standard of practice for
competency examiners.  *See, e.g.*, AAPL, *supra*, at S27, S33-34, S38-39,
S51, S54 (examiners "should . . . obtain any additional information
needed to arrive at an accurate opinion," such as "court orders,"
"discovery materials," "court filings," "collateral records," information
from the defendant's attorney, background information from the
defendant, and testing, and should, in their reports, "provide[] or
reproduce[] the data needed to support the opinions that the
psychiatrist expresses" for "the trial court to make an independent
ruling on a defendant's competence").

stipulation "could not properly have been deemed dispositive on the issue." Thus, it was reversible error for the court not to undertake a further inquiry *sua sponte*. *Id.* at 386; *see also Drope*, 420 U.S. at 173 (trial court erroneously ignored state statute that "prescribes the contents of a report of the psychiatric examination"), *citing* Mo. Rev. Stat. Ann., 552.020(3) (1975 Supplement) (competency report "shall include . . . [d]etailed findings" as well as ultimate opinions).

These report requirements fit hand-in-glove with a court's independent responsibility, recognized in *Pate*, to afford a defendant the procedural protections necessary to avoid an "erroneous determination" of competency, *Cooper*, 517 U.S. at 364. Without access to the underlying information the expert considered, a court cannot determine whether the expert's ultimate conclusions are well-supported or, instead, there is information that cuts in the other direction, flaws or holes in the expert's reasoning or methods, or other reasons why further inquiry of the expert or even another evaluation by a different examiner might be needed. *See United States v. Baller*, 519 F.2d 463, 467 (4th Cir. 1975) (factfinder should not accept expert's opinion if "the reasons supporting it were unsound or if contradictory evidence cast doubt on

78

it").

The report requirements also reflect Congress's overarching concerns with the role of such experts when it enacted the IDRA. One such concern was the "potential for . . . error" created when factfinders over-rely on psychologists and psychiatrists, since their opinions are "inherently imprecise" and the leading experts in these fields "themselves are in disagreement" about many "basic" issues. Senate Report, *supra*, 1983 WL 25404, at **222-23. Another, related concern was that "psychiatrists are experts in medicine, not the law," and their role should be to discuss "the defendant's diagnosis, mental state and motivation . . . so as to permit the jury or judge to reach the ultimate conclusion." *Id*. at *231.

Other district courts have not discarded the report requirements in capital cases just because, as here, the issue of competency arose in the midst of trial. *See, e.g., Mikhel*, 889 F.3d at 1038 (expert completed "full forensic evaluation of Mikhel" — including interviewing his attorneys and reviewing his personal history, prior treatment, medical records, and court records — and "submitted a comprehensive report to the court"); *Sampson*, 2017 WL 402974, at *1-3 (expert observed

meeting between defendant and counsel, interviewed prison officials, reviewed records and prior testing, and spoke with other experts to produce "lengthy, careful, and thorough" report); *Roof*, No. 2:15-cr-472, DE858 (D.S.C. Jan. 5, 2017) (expert submitted 22-page report on mid-trial reevaluation, detailing information from additional interviews and review of additional materials, along with findings and opinions).

In Council's case, however, and though the government specifically reminded the court of the report requirements, it accepted a bare-bones, two-paragraph statement signed by the defense experts that fell far short in every way. This separate and independent error exacerbated the court's prior error in declining to designate an independent expert. The statement the court accepted made no mention of:

· Council's "history" or "symptoms;" any "testing" the experts administered (or their reasons for not conducting any testing); or their "findings," "diagnosis," or "prognosis," § 4247(c);

· The material facts suggesting incompetency, including, most critically, Council's "delusional" "break with reality" in his jail meeting with counsel and interaction with the judge in the

80

courtroom (*e.g.*, saying God had killed the victims but he could not subpoena God) just two days earlier, which had prompted his lawyers to challenge his competency and the court to find "reasonable cause" to doubt it;

- The opinion several months before of the defense psychiatrist, Dr. Dudley, that Council might be suffering from bipolar disorder, a major mental illness and one of the psychotic disorders that can render a defendant incompetent;

- The results of the psychological testing and follow-up interviews that Dr. Dudley had recommended to confirm or rule out that diagnosis;

- Council's documented family history of serious mental disorders; or

- His bizarre statements and behavior following his arrest, including his repeatedly invoking "demons" and mind control in explaining the crime, which had led his counsel to call him "crazy" and the court, *sua sponte*, to repeatedly suggest a competency

evaluation during the pretrial period.[29]

Instead, as in *Pate*, the statement signed by the defense experts simply declared that Council could understand the proceedings and assist his counsel and thus was competent. It added that he was very anxious and short on sleep, but then warned of the "possibility of decompensation as the trial proceeds," which suggested there might be more wrong with Council.[30] With nothing remotely resembling the comprehensive report the court was supposed to receive, it had no assurance the experts had even obtained, let alone considered, the other

---

[29] These glaring omissions were even more concerning because studies show a risk of racial bias clouding forensic mental-health professionals' rushed judgments when, as here, the defendant is Black. *See* Thompson, *Race, Gender and the Social Construction of Mental Illness in the Criminal Justice System*, 53 Sociological Perspectives 99, 100, 102 (Spring 2010) (because of "cultural stereotypes and assumptions" under which "African Americans are perceived to be criminal and violent," the behavior of Black offenders "tends to be interpreted as criminal rather than indicative of mental illness").

[30] The risk of "decompensation" is generally ascribed to defendants suffering some form of mental illness. *See, e.g., United States v. Baldovinos*, 434 F.3d 233, 241 (4th Cir. 2006); *see also, e.g., United States v. Brandreth-Gibbs*, 2021 WL 764771, *1 (W.D. Wash. Feb. 26, 2021); *United States v. McNeal*, 2018 WL 3023092, *2 (M.D. Ala. June 18, 2018); *United States v. Almendarez*, 179 F. Supp. 3d 498, 508 (W.D. Pa. 2016); *United States v. Gomes*, 2006 WL 2988962, *3 (D. Conn. Oct. 19, 2006).

statutorily-specified information in their hurried, Sunday afternoon jail

visit.  And if they had, the conclusory statement did not convey, let

alone assess, any of it.  It thus gave the court, as in *Pate*, no factual

basis to evaluate the experts' methods, data, or reasoning; identify any

areas where questioning of them, more information about Council, or an

additional examination might be needed; or otherwise *independently*

assess his competency, as it was legally obligated to do.  No legal

authority justified undercutting such a fundamental protection because

of either the court's reluctance to delay the trial by a few days or

defense counsel's concerns about disclosing information to the

prosecutors.

> **5.    Finally, the court also erred by rubber-stamping the
> defense experts' statement that Council was
> competent, rather than conducting an evidentiary
> hearing and making an independent determination.**

Once a court, which has found "reasonable cause" to doubt a

defendant's competency, receives a thorough report of an independent

expert's evaluation, it still may not simply defer to the examiner's

bottom-line opinion.  Rather, it must also conduct an evidentiary

hearing, satisfy itself of the necessary facts, and arrive at its own legal

83

conclusion about competency.

In *Pate*, the Supreme Court held the trial court violated due process by failing to order an "*adequate* hearing" when information before it raised a "bona fide doubt" about the defendant's competency. 383 U.S. at 385-86 (emphasis added). A written stipulation that a court psychiatrist would testify the defendant understood the charges and could cooperate with counsel – essentially what the district court relied on in Council's case – "could not properly have been deemed dispositive on the issue." *Id.* Furthermore, said *Pate*, the trial court should have acted *sua sponte*, even though the defense never objected or requested anything further when the court said it thought the stipulation sufficient. *Id.*

Thus, while the federal statute enacted before *Pate* had not required a competency hearing if the court-designated psychiatrist reported the defendant competent, *see* 18 U.S.C. § 4244 (repealed), Congress altered that provision in the IDRA so that a court may no longer simply defer, even to an independent expert. Implementing *Pate*, the law now says the court "shall order a hearing to determine the mental competency of the defendant" whenever it has found "reasonable

cause to believe that the defendant may" be incompetent. § 4241(a); *see Arenburg*, 605 F.3d at 169 ("where 'reasonable cause' exists . . . a district court has but one option: order a hearing"; court's failure to do so *sua sponte* mid-trial was reversible error) (cleaned up); *White*, 887 F.2d at 710 ("the provision for a hearing is mandatory upon a determination of reasonable cause"). The statute does not condition a hearing on the direction of the examiner's opinion, *see United States v. Weston*, 36 F. Supp. 2d 7, 9 (D.D.C. 1999) ("The psychiatric examination itself is not a hearing"), or on whether either party requests one, *compare, e.g.,* 18 U.S.C. § 3142(f)(1) (detention hearing should be ordered "upon motion of the attorney for the government").

An "adequate hearing" on competency, *Pate*, 383 U.S. at 385-86, also means more than a *pro forma* courtroom colloquy where the court rubber-stamps an expert's opinion, even if neither party asks for more. Again, *Pate* made clear that such a perfunctory procedure does not satisfy due process because it risks an "erroneous determination of competence," *Cooper*, 517 U.S. at 364. It also deprives the appellate court of an evidentiary record. *See Haywood*, 155 F.3d at 680

85

(explaining need for a "record-based judicial determination of competence"); *see also Roof*, 10 F.4th at 341-344, 347 (approving competency finding after canvassing extensive record of detailed reports and testimony from two evidentiary hearings). Thus, even if neither party presses the issue, the law demands, at minimum, a "hearing" sufficient to equip the court to reach an independent, informed determination about the defendant's competency, based on "a preponderance *of the evidence*." § 4241(d) (emphasis added); *see Medina*, 505 U.S. at 450 (at a "competency hearing . . . psychiatric evidence is brought to bear on the question of the defendant's mental condition").

That must include, at minimum, "the evidence" on competency the court has before it, including the detailed report the statute requires, any other relevant information it has received, and its observations of the defendant. *See, e.g., Roof*, 10 F.4th at 346-47 (court properly considered all evidence relevant to defendant's possible mid-trial incompetency); *cf. Mason*, 52 F.3d at 1290 ("court must consider all evidence before it" on competency). It also must mean any additional "evidence" the court determines it should consider, such as testimony from the independent examiner to answer questions or fill gaps in the

report, *see, e.g., United States v. Mitchell*, 706 F. Supp. 2d 1148, 1150,
1214 (D. Utah 2010) (upon questioning BOP expert, court found his
diagnosis "flawed," and thus rejected his opinion on competency), and
perhaps additional evaluations, *see, e.g., White*, 887 F.2d at 707-09
(court's independent "duty to search for the truth" about competency
made it proper to order second evaluation).

The independent role of the court at the competency hearing also
follows from the overarching design of the IDRA, which, as discussed,
reflected Congress's concern about the "potential for error" when judges
and juries simply defer to mental-health experts, given the imprecision
and disagreement in that field and the risk of blurring the line between
medical and legal conclusions. Senate Report, *supra*, 1983 WL 25404,
at **222-23.

In Council's case, the court said it was holding a "competency
hearing." But it merely had one of his lawyers put on the record that
their experts had met with Council that weekend and signed an e-
mailed statement saying he was competent, with which counsel
concurred. On that basis alone, the court deemed Council fit to proceed,
and moved on. Nothing suggests the court took account of the other

87

record information suggesting Council's incompetency, particularly his "unhinged," "delusional" "break with reality" three days before. Or that it even paused to consider whether that information coupled with the bare-bones nature of the e-mailed statement called for any further inquiry. This, in short, was not an evidentiary "competency hearing," let alone an adequate one, and it leaves this Court no evidentiary record with which to review the district court's ruling. Nor was that court's automatic acceptance of the e-mailed statement an independent, informed "finding" of competency. Each of these errors compounded, but was also separate and independent from, the court's errors in declining to designate an independent expert or receive a full report.

## D. Conclusion

Once the court found "reasonable cause" to doubt Council's mental competency to stand trial, irrespective of the parties' positions, it was independently obligated by due process and the IDRA to follow a series of steps designed to safeguard defendants against erroneous determinations of this critical issue. But the court seriously misapprehended the law, believing it could ignore *every one* of these requirements simply because defense counsel preferred to do so and the

88

trial was ongoing.  The court thereby abandoned the fundamental protections required by law, and aborted a required process meant to guarantee an independent, informed, record-based determination of competency.

These errors, individually and together, could never be dismissed as non-prejudicial, *see Drope*, 420 U.S. at 182-83; *Pate*, 383 U.S. at 386-87, and certainly the government cannot show they are harmless "beyond a reasonable doubt," 18 U.S.C. § 3595(c)(2)(C), when the defendant suffered a serious mental breakdown that, along with other indications of incompetency, neither the district court nor any expert ever addressed.  That especially holds true in a death-penalty case given the severity of the penalty and how Council's inability to rationally consult and assist in his defense would have inevitably constrained counsel's mitigation presentation.

The appropriate remedy is to vacate the district court's competency order and remand for it to follow the legally mandated procedures for determining whether Council was mentally competent for his trial and also his capital-sentencing hearing, if the district court finds such a determination is possible now.  *See Mason*, 52 F.3d at 1293-

94 (ordering such a remand); *see also Drope*, 420 U.S. at 183; *Arenburg*,

605 F.3d at 171-72; *Haywood*, 155 F.3d at 681-82.

## II.

**Bowing to government pressure to accommodate the victims' families, the court erroneously denied a defense request for a short continuance to complete critical mitigation investigation.**

### A.    Introduction and Standard of Review

A homicide victim's family's desire for the swiftest trial is

understandable.  But a court's prioritizing that over a defendant's right

to prepare a defense is not, especially when his life is at stake.  Almost

a century ago, the Supreme Court warned that, in a cross-racial capital

trial that excited community passions, the trial court must proceed "in

the calm spirit of regulated justice."  *Powell v. Alabama*, 287 U.S. 45, 59

(1932).  Here, however, the government exploited the families' wishes,

and the suffering they said the pretrial process was causing them, to

push this capital prosecution forward with unusual haste.  And the

court acceded, setting an unrealistically quick trial schedule.  Then,

several months before trial, it denied a defense request for just 90 more

days to finish investigating Council's early teenage years at a brutal

juvenile institution, particularly his report that he was sexually abused there. The court acknowledged counsel's diligence and never suggested the request was dilatory. But it said that even such a brief schedule adjustment would disrupt the victims' relatives' vacation plans.

By relying on that and other flawed considerations, and discounting compelling ones supporting a continuance, the court abused its discretion, the standard of review. *United States v. Bennett*, 986 F.3d 389, 396 (4th Cir. 2021); *see also United States v. Fell*, 2017 WL 10940460, *1 (D. Vt. Feb. 24, 2017) (continuance mandated by "credible statement from the mitigation specialist that the defense is significantly unprepared in an important area").

## B.    Factual Background

### 1.    The government accelerated its decision to seek the death penalty, then had the victims' families personally press for a quick trial date.

Within three days of the CresCom robbery, Council was arrested, confessed, and was charged. He was indicted a few weeks later, in September 2017, and arraigned the following week. *See* Facts-I. The court ordered counsel to present a schedule to get the case to trial. JA84-85.

The government promised that, "to move this case along" for "the victims' sake," JA121, it would decide whether to "authorize" (*i.e.*, seek the death penalty) less than six months after indictment.  JA103. Defense counsel protested this was "rushing" the process at almost "unprecedented speed," giving them only a quarter of the customary time to prepare their presentation to the Justice Department committee that would consider mitigating evidence and recommend to the Attorney General whether to authorize (*see DOJ Manual*, § 9-10.130). JA98, JA94; *see also* JA148.[31]  But the government brushed aside this objection.  Following its accelerated schedule, it rejected Council's offer to plead guilty and accept a life sentence — which would have speedily concluded the case— and filed its death-penalty notice in March 2018. JA138.

Upon indictment, the government also urged that jury selection should begin just seven months after the notice was filed.  It derived

---

[31] *See* Federal Death Penalty Resource Counsel Project, Declaration, *Time Between Indictment and Trial For Last Ten Years* (Jan. 2021), Appendix A, https://fdprc.capdefnet.org/ project-declarations/time.  This updated declaration resembles ones submitted by Council and cited here, and reflects data on the time allowed at different stages in federal capital prosecutions nationwide.

that timeline from the capital prosecution of Dylann Roof in the district several years before. JA103. But Council's lawyers explained that *Roof* did not compare because his attorneys had affirmatively requested a compressed schedule.[32] JA86-87, JA94. Nonetheless, on the heels of authorization, the government reiterated its request for a trial seven months hence. JA151, JA155. Again, the defense opposed a trial date "so rushed" compared to the norm, and protested "the government's invocation of the victims' rights as a reason to deny the defense a reasonable amount of pretrial preparation." JA156-158, JA984; *see also* JA145.

At a scheduling conference in April 2018, the government tried bringing several of the victims' family members to the podium to "be heard on the matter of scheduling." JA967. Presenting himself as "their counsel," the prosecutor claimed these relatives should participate in the conference according to the Crime Victims' Rights Act

---

[32] Indeed, in *Roof*, the district court noted that defense counsel was "asking . . . to go to trial far faster than most capital defendants," and questioned whether "he can provide effective and quality representation" under such a schedule. *United States v. Roof*, No. 2:15-472-RMG, DE207:35 (D.S.C. June 7, 2016).

(CVRA), 18 U.S.C. § 3771.  The defense objected and the court correctly noted that the statute only gives victims the right to be heard at plea and sentencing proceedings.  Still, the prosecutor persisted: "They've asked to speak today . . . and have a right to be heard by the Court." After pausing to consult with the relatives, he repeated that they have a "very strong desire to speak to you personally" and "believe that they should have the right to be heard."  Even when the court instructed the prosecutor not to read the relatives' written statements aloud, he did just that.  The statements urged a quick trial so that the families "can begin this Christmas season with healing and not anticipation."  JA984-995.

## 2.    The court yielded to the government's insistence on a tight schedule and denied the defense's request for a 90-day continuance to complete important mitigation investigation.

The court largely accepted the government's entreaties on behalf of the victims' families.  Saying it was "sensitive to the victims who understandably want some closure," the court initially scheduled the trial for January 2019, just ten months after authorization, over the defense's continuing objection.  JA225, JA1001, JA210, JA213, JA222

94

n.3.

A few months later, Council sought to continue the trial by eight months, to October 2019. JA643, JA659, JA678-680.  But the government resisted any continuance of more than 90 days.  JA675. After pressing defense counsel about how long they were requesting, JA2410-2413, JA2418-2419, JA2421, the court granted the motion in part, scheduling voir dire to begin in early September 2019, about 17 months after the authorization decision.  The court accepted that the investigation of Council's background remained "vastly incomplete." But it reiterated that it needed to be "sensitive to and mindful of the crime victims'" rights to avoid "unreasonable delay," and to "balance" those against Council's rights.  JA1050-1052, JA1056.

In early July 2019, two months before voir dire was scheduled to begin, Council's lawyers moved for another, short continuance to finish essential portions of their mitigation investigation.  The defense suggested this could best be accommodated by slightly delaying voir dire, for 90 days, until early December 2019.  Alternatively, the court could allow a comparable break between a guilty verdict and the start of

the sentencing hearing.[33]  JA1428, JA1897-1898.  Council's motion,

JA1428, JA1454, which his lawyers elaborated on at a hearing, JA1896,

JA1918, detailed the serious obstacles the defense confronted despite its

diligent efforts, the specific investigation that remained, and why it was

critical to his defense.

As the defense explained, Council's life had suffered a dramatic

downturn at age 12 with the death of his grandmother, his sole

caretaker.  At just 13, he was arrested and sent to Dobbs "Training

School," an institution for juvenile "delinquents."  Council spent two and

a half of his adolescent years there, through age 16.  And his record of

adult arrests began within four months of his release.  The defense had

gathered information that, rather than providing youthful offenders

with education or therapeutic programs, Dobbs had warehoused them

in a chaotic, dangerous, and criminogenic setting.  It was called a

"gladiator school" because younger children were often assaulted by

---

[33] The defense noted that such breaks were not uncommon in
federal cases, and cited examples, including in this Circuit.  JA1432-
1433.  *See also, e.g., United States v. Runyon*, 994 F.3d 192, 213 (4th
Cir. 2021) (Gregory, C.J., concurring in part and dissenting in part)
(noting four-week recess between guilt and penalty phases).

older ones; abused by staff, sometimes sexually; and lived in nearly
constant fear.  JA1454-1456, JA1460-1462, JA1921-1922, JA1927-1929;
*see also* JA900-901.

Thus, as counsel explained, an accounting of Council's formative
experience at Dobbs was "critical" to his mitigation defense at
sentencing.  JA1429-1431.  And, though diligently pursued, the defense
investigation of that had been hampered and delayed.  The institution
had long since been shuttered by the state, and the records of his
detention destroyed.  So it had been extremely difficult to locate former
detainees or employees from Dobbs who had known Council or what he
personally experienced there, especially people who could corroborate
his report that he had been sexually abused.  JA1431, JA1456-1466,
JA1902-1904, JA1912-1913, JA1920-1922, JA1927-1931, JA1933-1939.

As the motion also explained, Grey had finally located and begun
to interview some former Dobbs detainees, now scattered through
prisons and jails across North Carolina.  But her work had been slowed
by the state's uncooperative corrections bureaucracy and the time
required to build trust to discuss sensitive matters like sexual abuse.
*See also* JA1463 (citing studies showing male survivors are especially

97

reluctant to disclose childhood abuse). Accordingly, many important interviews remained to be conducted, including with 15-20 young men from Council's hometown of Wilson, North Carolina, who had been with him at Dobbs, as well as at least 11 friends or girlfriends from around that time. Counsel explained that Grey's diligent investigative efforts (she had "been in the field . . . almost every day" and was "working her fanny off") were "just now starting to bear fruit . . . . I can only say that when we are able to sit down with folks . . . they talk to us and when we talk to them the second time, they talk to us even more." Council's mitigation case rested largely on Grey's investigation, "and we would like to be able to complete that." JA1432, JA1454-1467, JA1902-1904, JA1907, JA1912-1913, JA1921-1922, JA1925-1939.

The government, however, steadfastly opposed any continuance. It acknowledged defense counsel's "extremely high" degree of "diligence." JA1908. But it protested that delaying the trial "would uniquely prejudice these [victims'] families" because some had vacation plans for late January 2020, and "having to reschedule them" would be "a very practical harm." JA1440, JA1909-1910. The government also claimed, inaccurately, that defense counsel "has had more than two

98

years" to conduct their mitigation investigation. JA1439. In fact, it had

not even been two years since the homicides. Finally, the government

complained that the continuance request came too late because

prospective jurors had been summoned to appear in a month to fill out a

supplemental questionnaire. JA1438, JA1440. But those jurors would

not have been lost from service, or jury selection otherwise disrupted,

had the Court simply directed them to appear 90 days later.[34]

Summons (directing each veniremember to "check your reporting

status" in late August).

The court denied Council's continuance request outright, refusing

to delay the trial by even one day. Acknowledging the defense's

diligence, it still accepted the government's argument, ruling the

victims' families had "made plans regarding the schedule of this case,"

_____

[34] The government also asserted that "many potential jurors were
removed from this jury pool on the basis of scheduling conflicts, and
none of the current jurors have been asked about the very likely
scheduling conflicts that exist around December and January." JA1441.
But neither the summons nor the standard questionnaire that had been
sent to each venireperson had indicated how long the trial was expected
to last or asked about scheduling conflicts for any particular duration.
JA6695, JA6696. And while a relatively small number who had
conflicts with initially appearing in late August had been excused,
hundreds remained.

which weighed against any delay since these relatives "have rights as well." (The court never mentioned obvious alternatives — that the relatives could reschedule their vacations from January or the court could postpone the start of the trial slightly longer than Council had requested, say to February, to avoid a conflict.) The court said the defense had already received "more time than what the government wanted" to investigate mitigating evidence, because it had granted one continuance (from the initial, unrealistic, trial date). As for the remaining witnesses, it saw no "assurances" of finding "these people" or of changing "their attitude about" cooperating. Finally, it noted that jury summonses had been mailed and prospective jurors told they would come in to complete supplemental questionnaires the last week of August, about six weeks later. But the court also did not explain why delaying those appearances and voir dire for 90 days would create a problem, let alone an intractable one. JA1913-1915, JA1930-1931, JA1936.

3. **Resisting needed adjournments to address other critical issues, the court sped Council's case to trial and verdict almost twice as fast as other federal capital prosecutions nationwide.**

Accordingly, the court began voir dire, as scheduled, on September

9, 2019.  That was 719 days after the indictment, just over half the average of 1,316 days that other courts have allowed in federal death-penalty cases.[35]  In other words, Council's case proceeded to trial more than *a year and a half* faster than the norm.  And speed remained the watchword throughout.  After the government peremptorily struck Black veniremembers at two and a half times the rate of others, the court refused to allow the defense a brief recess to review the record to marshal a *Batson* challenge.  *See* Point IV.B.  Then, toward the end of the guilt phase, Council suffered a delusional breakdown and the court agreed there was reasonable cause to doubt his competency.  But rather than adjourning for a few days to obtain a full report from an independent examiner, it hurriedly disposed of the issue based on a boilerplate, 11-line statement signed by two defense experts after a Sunday afternoon jail meeting with Council.  *See* Point I.B.

The next day, not even five minutes after announcing the jury's

---

[35] *See* Resource Counsel Project Declaration, *Time Between Indictment and Trial*, *supra*, Appendix A; *see also* JA98.  The Declaration presents the average for all such cases including Council's, as well as an accompanying chart with the time for each case.  The national averages cited here, to which Council's case is compared, were recalculated with Council's case omitted.

101

guilty verdicts, the court began the sentencing hearing, JA4852-4855, having previously denied the defense's alternative request for a break between phases to finish preparing mitigation. This was also unusually swift: Nationwide, other federal courts have recessed for more than *eight days*, on average, in capital trials.[36] After hearing five days of sentencing evidence, much of it highly emotional "impact" testimony from the victims' relatives, *see* Point VI.C, the jury returned a death verdict. Right after polling the jurors, and hearing further from the victims' families, including about their "deep" hatred for Council, the Court formally sentenced him to die. JA6072-6073, JA6089-6094, JA2335, JA2337-2341.

Council's entire prosecution from indictment to death verdict was unusually compressed — 743 days, almost *two years* faster than the national average of 1,401 days for other federal capital cases.[37]

---

[36] *See* Resource Counsel Project Declaration, *Time Between Indictment and Trial*, *supra*, Appendix A.

[37] See Resource Counsel Project Declaration, *Time Between Indictment and Trial*, *supra*, at 4-5.

Days Between Indictment and Trial

## C. The court abused its discretion in denying Council's motion for a brief continuance.

Death is the "most irremediable and unfathomable of penalties," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), which requires correspondingly heightened reliability in the decision whether to impose it, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Thus, the Supreme Court has recognized that capital defense counsel's "investigations . . . should comprise efforts to discover *all reasonably available* mitigating evidence" to inform the jury. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (cleaned up). So has the Judicial Conference of the United States. *See* Committee on Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, at 7 (May 1998) ("counsel must conduct a broad

investigation of the defendant's life history" and "cast a wide net"). And so do the ethical guidelines governing capital representation. *See United States v. Fields*, 761 F.3d 443, 453 n.4 (5th Cir. 2014) ("'penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history'"), *quoting* A.B.A., *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 10.7, Comment (rev. ed. 2003). This investigation necessarily embraces the defendant's time in a juvenile institution. *See Andrus v. Texas*, 140 S. Ct. 1875, 1877, 1880 (2020) (*per curiam*).

So it is "inexcusable" when counsel does not "complete the mitigation investigation" in a capital case. *Runyon*, 994 F.3d at 215 (Gregory, C.J., concurring in part and dissenting in part); *Stokes v. Stirling*, 10 F.4th 236, 256 (4th Cir. 2021) (mitigation investigation was constitutionally inadequate where "counsel spent too little time" on it). That can occur when the defense does not obtain from the court the time needed to finish the investigation. *Jells v. Mitchell*, 538 F.3d 478, 496 (6th Cir. 2008). Just such a failure occurred here because the court erroneously denied a well-justified continuance.

When the court ruled, it knew the defense needed more time to complete its inquiry into Council's time at Dobbs, and it understood the paramount importance of this subject to his sentencing defense. It also knew from counsel that the task of locating and interviewing the Dobbs witnesses was proving particularly difficult and time consuming. *See also ABA Guidelines*, *supra*, 10.7, Comment ("The collection of corroborating information" on mitigation is "a time-consuming task"); *Allen v. Woodford*, 395 F.3d 979, 1002 (9th Cir. 2005) ("obtaining the cooperation of mitigation witnesses" who may be "reluctant" and require "multiple contacts" is a "time-consuming aspect of penalty phase preparation"). Indeed, the court acknowledged that the defense team had been working long hours on the mitigation investigation.

Yet the court rejected the request anyway. Though the motion specified the progress being made and why further efforts would likely be fruitful, the court thought that witnesses might not be located or cooperate, since counsel had provided "no assurances" otherwise. Such speculation did not justify denying any more time, as this Court recognized in *Shirley v. North Carolina*, 528 F.2d 819 (4th Cir. 1975). There, the trial court refused a continuance because an important

105

witness's release date from out-of-state detention was unknown. This Court found a constitutional violation because "there was no indication that [defense counsel's] efforts" to obtain the witness's presence "would ultimately fail," despite "the trial judge's expressed concern that [the witness] might never be available." *Id.* at 822.

The court here also noted that jury summonses had been mailed. But the initial, questionnaire stage of in-court jury selection was still six weeks away and could readily have been postponed to allow for a short, 90-day continuance. Moreover, as the court had been told, the case was already on an unusually fast track compared with other federal capital prosecutions.

Finally, the court accepted the government's argument that a continuance would disrupt the vacation plans of some of the victims' relatives. While victims' families have a "right to proceedings free from unreasonable delay," 18 U.S.C. § 3771(a)(7), that cannot transform a "reasonable" continuance request into an "unreasonable" one, nor may it be "balanced" by the court against a defendant's constitutional rights, particularly in a capital case. *See United States v. Tobin*, 2005 WL 1868682, *2 (D.N.H. July 22, 2005) ("Congress, in enacting the CVRA

106

did not mean to . . . deprive either criminal defendants or the
government of a full and adequate opportunity to prepare for trial").

None of the court's considerations could eclipse Council's right to
an adequate mitigation investigation. Even if they had any basis in fact
or law, each could have been fully addressed through other means while
protecting that right, especially since the court and the government
were already moving at such an accelerated pace.

"Abuse of discretion" includes an "'unreasoning and arbitrary
insistence on expeditiousness in the face of a justifiable request for
delay.'" *United States v. Bakker*, 925 F.2d 728, 735 (4th Cir. 1991),
*quoting Morris v. Slappy*, 461 U.S. 1, 11-12 (1983); *see also United
States v. Kosko*, 870 F.2d 162, 163 (4th Cir. 1989) (erroneous denial of
continuance may result in "a constitutional violation," including "the
effective denial of counsel"). And the more "important" and "complex"
the issue the defense needs additional time to address, the more
justifiable the continuance request. *Lee v. Winston*, 717 F.2d 888, 896
(4th Cir. 1983). As another district court recognized in granting a
similar motion in a capital case: "In the face of a credible statement
from the mitigation specialist that the defense is significantly

107

unprepared in an important area, the court has little alternative except to continue the trial." *Fell*, 2017 WL 10940460, at *1.

When this Court has affirmed continuance denials, it has often cited indications that the request represented a "dilatory tactic." *United States v. Curry*, 512 F.2d 1299, 1302 (4th Cir. 1975); *see also, e.g., United States v. Larouche*, 896 F.2d 815, 824 (4th Cir. 1990). Here, by contrast, the district court recognized the defense was working diligently, and did not dispute the significance of the witnesses who remained to be interviewed. Moreover, rather than coming out of the blue, this motion aligned with counsel's previous objections to the trial schedule, requests for more time, and warnings about the incomplete state of their preparation.

## D. The error prejudiced Council's defense at his capital-sentencing hearing.

The court's erroneous denial of a continuance was not harmless beyond a reasonable doubt, the standard for all capital-sentencing errors. 18 U.S.C. § 3595(c)(2)(C); *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009); *United States v. Jackson*, 327 F.3d 273, 307 (4th Cir. 2003). The defense successfully presented a picture of the

toxic environment at Dobbs where Council was confined as a young teenager. And each mitigating factor that reflected this was credited by most or all of the jurors. *See* Facts-V. But, without the additional time they had requested, Council's lawyers could not offer witnesses to the specific harms he endured at Dobbs, including corroboration of his reports of having suffered sexual abuse on several occasions from multiple different staff members. JA5805-5808. The government exploited this in cross-examination of defense witnesses and through a former Dobbs teacher it called in rebuttal. *See* JA5802-5804, JA5822, JA5850-5851, JA5898. In summation, it minimized the mitigation as showing merely that "Dobbs was not a good place," which by itself did "not have weight." JA5958, JA6003. And only a minority of jurors found the mitigating factor that Council was "sexually exploited . . . at Dobbs." JA2312. *See United States v. Barnette*, 211 F.3d 803, 825 (4th Cir. 2000) (reversing death sentence given "reasonable possibility that the exclusion of the [defense sentencing] evidence . . . might have contributed to the sentence of death").

This prejudice is further borne out by data showing that quicker processing substantially increases the likelihood of a death sentence.

109

Average Case Timelines by Outcome



Prosecutions ending in life verdicts took an average of 1,664 days from indictment, but those resulting in death sentences were pushed to conclusion in just 946 days — almost *two years* (and two times) faster.[38]

This disparity is even more disturbing because the data also show cases with Black defendants and White victims were concluded a year and a half faster than all cases — 844 versus 1,382 days on average.[39] This suggests that cross-racial capital prosecutions create the greatest pressure for an expedited trial and death sentence, resulting in

---

[38] *See* Resource Counsel Project Declaration, *Time Between Indictment and Trial*, *supra*, at 4-5.

[39] *See* Resource Counsel Project Declaration, *Time Between Indictment and Trial*, *supra*, at 5-6.



Indictment to sentence verdict, by race (days)

defense counsel's having less time than otherwise to prepare. And here, the defendant was a dark-skinned, dreadlocked Black man from out of state, and the victims were two White women with extensive community ties. *See* Point VI.C. A frustrated defense counsel felt the government's unyielding insistence on a quick trial reflected an attitude of "[l]et's get it on, let's go ahead and get him killed. Get it over with." JA1924.

A death sentence was hardly a foregone conclusion for Council. Each capital juror's sentencing decision is a "difficult, individualized judgment" involving a "range of discretion." *Turner v. Murray*, 476 U.S. 28, 34-35 (1986) (plurality). And a life sentence would have resulted even if only one juror perceived enough mitigation to vote against capital punishment. JA6044, JA2317, *see* 18 U.S.C. § 3593(e); *Andrus*, 140 S. Ct. at 1886.

Thus, federal juries in this circuit have often declined to return

111

death verdicts even in highly aggravated capital cases involving

multiple murders, sympathetic victims, or both, because at least one

juror believed life imprisonment provided harsh enough punishment.

Some examples:

- A large-scale drug-supplier responsible for five murders in support of his racketeering enterprise;[40]

- An Al-Qaeda terrorist whose actions enabled the 9/11 plot to go forward undetected, resulting in thousands of deaths;[41]

- A man who intentionally set fire to a hotel room, killing six people, including a 16-month-old baby;[42]

- Somali pirates who kidnapped and killed two couples on their boat;[43]

- A bank robber who killed one teller, shot another along with a customer and a security guard, and engaged in a gun battle with

---

[40] *United States v. Johnson*, 219 F.3d 349, 351 (4th Cir. 2000); Verdict Forms, No. 97-314-A (E.D. Va. Dec. 22, 1998).  This and the other verdict forms cited here are available on the Federal Death Penalty Resource Counsel Project website, https://fdprc.capdefnet.org/verdict-forms.

[41] *United States v. Moussaoui*, 591 F.3d 263, 273-75 (4th Cir. 2010); Verdict Form, No. 01-455-A (E.D. Va. May 3, 2006).

[42] *United States v. Hans*, 332 Fed. Appx. 116, 117-19 (4th Cir. 2009); Verdict Form, DE312, No. 6:05-1227 (D.S.C. Aug. 10, 2007).

[43] *United States v. Beyle*, 782 F.3d 159, 161-62 (4th Cir. 2015); Verdict Forms, DE835-DE837, No. 2:11-cr-34 (E.D. Va. Aug. 2, 2013).

police;[44]

· A man who murdered two campers in a national park during a planned robbery;[45]

· A man who used a pipe-bomb to murder his ex-girlfriend, who was eight-months pregnant, and her unborn child;[46]

· A drug-trafficker who shot to death an associate cooperating with authorities along with his wife and son;[47]

· A man who assaulted, threatened, stalked and finally murdered his estranged girlfriend and her boyfriend, both college students;[48]

· A contract killer who murdered two victims and shot a third, whom he then made plans to "finish . . . off" at the hospital.[49]

---

[44] *United States v. Bobbitt*, 203 F.3d 822, 2000 WL 102925, *1 (4th Cir. 2000) (Table); Verdict Form, No. 3:97-cr-169 (E.D. Va. Mar. 13, 1998).

[45] *United States v. Finley*, Verdict Form, No. 4:98-cr-243 (W.D.N.C. Apr. 15, 1999); *Murder Suspect Appears to Copy Bomb Fugitive*, N.Y. Times, A17 (Aug. 5, 1998).

[46] *United States v. Johnson*, 136 F. Supp. 2d 553, 560-62 (W.D. Va. 2001); Verdict Form, No. 3:00-cr-0026 (W.D. Va. May 25, 2001).

[47] *United States v. Ealy*, 363 F.3d 292, 295 (4th Cir. 2004); Verdict Forms, No. 00-cr-104 (W.D. Va. June 11, 2002).

[48] *United States v. Simmons*, Verdict Forms, No. 5:04-cr-30014 (W.D. Va. Feb. 15, 2005); McCaffery, *Federal Jury Spares Convicted Killer's Life in Double-Murder Case*, Roanoke Times (Feb. 18, 2005).

[49] *United States v. Dinkins*, 691 F.3d 358, 364-65 (4th Cir. 2012); Verdict Form, No. 1:06-cr-309 (D. Md. July 1, 2009).

113

Since the current federal death-penalty statutes were enacted three decades ago, a total of 57 other authorized defendants in this Circuit have been brought to trial and proceeded to a capital-sentencing verdict.  Yet only 19 — one third — received death verdicts.[50]

Here, despite the seriousness of Council's crime, the Court cannot dismiss the possibility that this error deprived his lawyers of mitigating evidence, particularly about sexual abuse he suffered as an adolescent, that would have altered the balance with aggravating factors for at least one juror.  Indeed, even based on the more truncated defense presented with limited preparation time, most or all of the jurors found a number of substantial mitigating factors involving Council's traumatic upbringing, including the sudden death of his grandmother, his sole caretaker, when he was 12, and his early teenage years in a violent and corrupting youth prison.  *See* Facts-V.

Accordingly, because the error violated Council's rights to due process, to present a defense, and to a reliable determination of punishment under the Fifth, Sixth, and Eighth Amendments and the

---

[50] *See* Resource Counsel, *Verdict Forms*, *supra.*

114

FDPA, § 3593(c), his death sentences should be set aside and resentencing ordered.  *See* § 3595(c)(2)(C).

### III.

**By refusing to ask if prospective jurors held racially prejudiced opinions about Black people, the court deprived Council of a voir dire adequate to identify those with disqualifying biases.**

#### A.     Introduction and Standard of Review

Council is an African-American man who was facing the death penalty for murdering two White women.  In such a case, the district court was constitutionally obligated to ask the veniremembers their attitudes and opinions about Black people, to identify those with disqualifying biases.

To do so, Council proposed various queries, including several about the very bias the Supreme Court recognized is crucial to identify among capital jurors: the view that African Americans are inherently more violence-prone.  But the district court refused to include any in its questionnaire or voir dire.  Instead, it asked only about the nature of jurors' personal interactions with other races, and whether they self-assessed they could be "fair" toward a Black defendant.  The court

thereby abused its discretion, the standard of review. *See United States v. Bakker*, 925 F.2d 728, 733-34 (4th Cir. 1991).

## B. The court asked jurors only about their interactions with people of other races and whether they would self-assess as unable to be "fair" to a Black defendant.

Like other federal capital trials, Council's involved a jury-selection process that accommodated sensitive questions without concern for tainting other jurors with the answers. It consisted of a standard questionnaire (JA6696) mailed to each prospective juror, a supplemental in-court questionnaire (JA6704) specific to this case, and several days of individual, sequestered voir dire. JA6696, JA2096, JA2115, JA2116, JA2117, JA2160, JA2161, JA2172, JA2173, JA2174, JA2175.

Before the process began, the defense proposed various questions about racial bias for the supplemental questionnaire. JA1337, JA1387. Some would have asked veniremembers' opinions about whether African-Americans are inherently more violence-prone:

> 78. Do you believe certain racial groups are more predisposed to commit crimes of violence than others? Please explain your answer.

> 79. Do you believe Blacks are more predisposed to commit violence than Whites are? If you answered "Yes," please explain.

116

JA1360-1361.  Other defense questions would have asked if any jurors

thought certain distinctly Black forms of hairstyle, clothing, and

entertainment — which they would learn Council preferred — made

people prone to violence or other criminality:

> 49. Do you think that people who record, produce, write or
> are otherwise involved in "rap" or "hip hop" music are prone
> to violence or criminal activities?

> 50. Do you believe that regularly listening to "rap" and "hip
> hop" music or watching videos and movies about the music
> industry or the drug culture can lead people to commit
> crimes of violence?

> 51. Do you believe certain types of male dress and hair style,
> such as wearing low hung pants or "dreadlocks," are
> indicators of a criminal lifestyle?

JA1352.  Still another catch-all question would have asked how, if at

all, Council's being Black would affect their view of the case:

> 113. In this case, the defendant is an African American man
> and the victims were both White women.  Do you feel that
> this fact would in any way, even slightly, affect how you
> would view this case or the actions of the defendant?

JA1371.

The defense supported these requests by observing that Council

was an African-American defendant accused of interracial murder, a

circumstance in which South Carolina juries had proven almost ten

117

times more likely to impose a death sentence. Furthermore, racial stereotypes could be evoked by some of the anticipated evidence, arguments, and atmospherics at the trial (*e.g.*, the juxtaposing of the dreadlocked Council's fondness for gangster-rap movies with "a tidal wave of positive images of the white victims," JA2138, via testimony and photographs from their families). *See* Facts-I, V; *see also* Points VI.D, VII.D. These facts, the defense explained, made it critical to identify any prospective jurors who held racial biases that would prejudice Council and his sentencing defense. That especially included the "belie[f] that blacks are violence prone," which, as the Supreme Court recognized, could render a juror "less favorably inclined" toward a defendant's mitigating circumstances, and a "[f]ear of Blacks," which also "might incline a juror to favor the death penalty." *Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (plurality), *quoted in* JA1399; *see also Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (view of "black men as 'violence prone'" is "a powerful racial stereotype") (cleaned up). To uncover such jurors, the court could not just rely on "generic" questions that depended on them to "self-identify" as racially "unfair," especially given the "stigma that attends" such admissions in today's society.

118

JA1395 & n.2, JA1400, JA1402-1403.

The government, however, denied that racial prejudice might affect Council's trial. It opposed every one of these questions as "unnecessary" and "invasive," in favor of a more perfunctory inquiry on the subject. JA1415-1420; *see also* JA1338, JA1347-1351, JA1358-1359.

Siding largely with the government, the court finalized a questionnaire that included none of these defense questions and no inquiry about jurors' racial attitudes or opinions. JA2096; *see* JA1435. Instead, it allowed only two narrow proposed inquiries on race. First, it asked about the nature of jurors' personal interactions: whether they or someone close to them ever belonged to a restrictive organization (Q.14) or ever had a bad experience with someone of a different race (Q.17), and whether they themselves socialized or participated in any groups with people of other races (Q.15). JA2100.

Second, the court had jurors self-assess whether they were racist, which the defense had warned would be ineffective standing alone: It asked if there was any racial group they felt "uncomfortable being around" (Q.16), and if the Black-on-White nature of the case would "prejudice" them against Council or affect their ability to be "fair and

impartial." (Q.18, Q.19).  JA2100-2101.

In voir dire, defense counsel again urged the court to inquire directly about racial attitudes and opinions.  JA2132-2133.  They renewed their request to ask: "Do you tend to believe that persons from a certain race or ethnic group tend to be more violent than others," and also, more broadly: "Have you formed, in the course of your own life experiences, any opinions about certain race or ethnic groups?  Please tell us about them."  JA2157.  Again, the court refused, announcing that voir dire would be confined to death-penalty inquiries and follow-ups to questionnaire answers.  JA2680-2681.  In its view, the issue of racial bias had been fully addressed by its questions about social interactions and its request for a racism self-assessment.  JA2155.

Unsurprisingly, extremely few of the 482 White potential jurors (and none of the ten White jurors who were seated) self-assessed as racially biased against African Americans:  Only six acknowledged they were uncomfortable around Black people or other racial groups generally.[51]  And just 16 others said the interracial nature of the

---

[51]JA6954, JA6971, JA7345, JA7379, JA7413, JA7634. Seven additional White veniremembers who said they were

murder would affect their ability to be impartial.[52]

Similarly, the interaction questions elicited virtually no information about racial bias. Eleven jurors said they or their family had belonged to a restrictive organization, but did not specify whether the restriction was racial or, if so, against African-Americans.[53] While one out of five (106 of 482) said they did not socialize with people of other races, they did not specify why and the court did not ask in voir dire. Finally, about one in eight (61 of 482) acknowledged that they or someone close to them had a bad experience with someone of a different race. But in cursory follow-ups, the jurors called for voir dire all said those experiences would not affect their impartiality. JA2860, JA3252, JA3691-3692, JA3765-3766, JA3960-3961, JA3984-3985, JA4018-4019; *see also* JA3290-3291. Those were the only mentions of race during the voir

---

uncomfortable around any "racial group" either appeared to misunderstand the question as referring to racist groups, JA7515, JA7566, or specified they were uncomfortable around Muslims, JA7447, JA7549, JA7617, JA7651, or Asians, JA7430.

[52] JA6801-6802, JA6818-6819, JA7141-7142, JA7158-7159, JA7175-7176, JA7277-7278, JA7328-7329, JA7396-7397, JA7447-7448, JA7481-7482, JA7498-7499, JA7532-7533, JA7600-7601, JA7668-7669, JA7685-7686, JA7719-7720.

[53] JA6988, JA7022, JA7260, JA7277, JA7294, JA7311, JA7362, JA7464, JA7583, JA7702.

dire in this interracial capital case.

### C.    The court's perfunctory questioning on racial bias deprived Council of his right to "an adequate voir dire to identify disqualified jurors."

"[P]art of the guarantee of a defendant's right to an impartial jury" under the Sixth Amendment, and to due process under the Fifth Amendment, "is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *see Rosales-Lopez v. United States*, 451 U.S. 182, 191 (1981) (court should "propound appropriate questions designed to identify" a given "prejudice") (cleaned up).  "A district court abuses its discretion, however, if the voir dire does not provide a reasonable assurance that prejudice would be discovered if present." *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (*en banc*) (cleaned up).   Thus, the Supreme Court has "not hesitated, particularly in capital cases to find that certain inquiries must be made to effectuate constitutional protections." *Morgan*, 504 U.S. at 730.

That includes meaningful questioning about racial bias at a death-penalty trial, like Council's, involving a Black defendant and White victim. *Turner*, 476 U.S. at 36-37.  The constitutional guarantee of equal protection gives a defendant the "right to an impartial jury that

can view him without racial animus," *Georgia v. McCollum*, 505 U.S.
42, 58 (1992), especially since "racial bias implicates unique historical,
constitutional, and institutional concerns," *Pena-Rodriguez v. Colorado*,
137 S. Ct. 855, 868 (2017).  These concerns are heightened in a capital
case not just because of the gravity and finality of the death penalty.
"[T]he range of discretion entrusted to a jury in a capital sentencing"
also means "there is a unique opportunity for racial prejudice to operate
but remain undetected." *Turner*, 476 U.S. at 35.  A juror's belief that
Black people are "violence prone or morally inferior" might influence his
or her "deci[sions]" about "aggravating factors," or make the juror "less
favorably inclined toward . . . evidence of mental disturbance as a
mitigating circumstance."  And "[m]ore subtle, less consciously held
racial attitudes," such as "fear of blacks," also "might incline a juror to
favor the death penalty." *Id*.

Even in non-capital prosecutions, such questioning must be
permitted in any federal trial for a cross-racial violent crime because it
is an "unfortunate fact in our society" that those offenses "often raise" a
"reasonable possibility that racial . . .  prejudice will affect the jury."
*Rosales-Lopez*, 451 U.S. at 192; *Aldridge v. United States*, 283 U.S. 308,

123

313-14 (1931). Likewise, the Constitution mandates such voir dire in cases in which racial issues are "'inextricably bound up with the conduct of the trial.'" *Rosales-Lopez*, 451 U.S. at 189, *quoting Ristiano v. Ross*, 424 U.S. 589, 597 (1976); *Ham v. South Carolina*, 409 U.S. 524, 525-27 (1973). Not only did Council's case involve Black-on-White homicides and a potential death sentence but, as the defense warned, the trial was laced with circumstances that risked activating jurors' racial biases. *See* Facts-I, V.

Although a trial judge maintains discretion over the kind and number of questions to pose about racial bias, *Turner*, 476 U.S. at 36-37, that discretion is bounded by the *functional* requirement that the inquiry must be "adequate to identify unqualified jurors." *Morgan,* 504 U.S. at 729. And while the court's questions here resembled the one the defense originally proposed at Turner's trial (whether the crime's interracial nature would affect any juror's impartiality, 476 U.S. at 30-31), the biases the Supreme Court plurality said need to be identified and eliminated among capital jurors (*e.g.*, that Black people are inherently "violence prone," *id.* at 35) logically require a direct inquiry. Furthermore, Turner's trial took place in 1978, and the Court did not, in

124

that decision or thereafter, endorse any particular question as sufficient to identify racial bias, let alone in all cases and for all time.  For good reason: In the more than four decades since Turner's trial*,* society has changed and, with it, how people reveal racial bias and how social scientists, pollsters, jury experts, and many judges have learned to uncover it.  *See Pena-Rodriguez*, 137 S. Ct. at 871 ("a maturing legal system . . . seeks to understand and to implement the lessons of history" in identifying "racial prejudice" in "the functioning of the jury system").

Modern research does not try to measure explicit prejudice by asking whether respondents regard themselves as "fair" or "impartial" towards people of other races, or are "uncomfortable" around them (*i.e.*, prefer to racially segregate).  "Most white Americans no longer endorse traditional forms of prejudice associated with the era of Jim Crow racism," such as "support for segregation and discrimination" against Blacks.  The Sentencing Project, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies*, at 30 (Sept. 3, 2014).  Instead, social scientists and public opinion surveyors measure racial bias by asking, much as Council requested here, whether respondents hold "negative stereotypes of Blacks" as, for example, "less

125

intelligent, lazier [or] more prone to violence." *Id.*[54]

Modern manuals and experts on voir dire agree. For example, a leading treatise warns against merely asking jurors, as the court did here, if they might be "biased" against the defendant "because he is black," explaining: "This question almost always elicits a socially

---

[54] *See also, e.g.,* Cramer, *Understanding the Role of Racism in Contemporary U.S. Public Opinion*, 23 Annu. Rev. Polit. Sci. 153, 157 (2020) (studies of "explicit racism" measure "racial stereotypes" and beliefs in the "inferiority of Blacks"); Hopkins & Washington, *The Rise of Trump, The Fall of Prejudice? Tracking White Americans' Racial Attitudes 2008-2018 via a Panel Survey*, 84 Public Opinion Quarterly, 119, 123 (2020) ("To measure prejudice," prominent long-term study of 20,000 respondents "follow[ed] extensive prior work, by assessing white respondents' beliefs in stereotypes" for "Blacks, Hispanics/Latinos and Whites"); Kahn, *Explainer: How Reuters/Ipsos measured the shift in the way Americans see race*, Reuters (Aug. 19, 2019) (survey "asked respondents to rate people of different races on a series of personality traits, including their general intelligence, work ethic, manners, peacefulness and lawfulness"); Tesler, *The Return of Old-Fashioned Racism to White Americans' Partisan Preferences in the Early Obama Era*, 75 J. Politics 110, 114 (Jan. 2013) (modern surveys seek to measure racism by gauging respondents' beliefs in "black biological and social inferiority"); *AP poll: U.S. majority have prejudice against blacks*, USA Today (Oct. 27, 2012) ("explicit racism measures asked . . . how well respondents thought certain words, such as 'friendly,' 'hardworking,' 'violent,' and 'lazy,' described blacks, whites, and Hispanics"); National Opinion Research Center (Univ. of Chicago), *Ethnic Images*, (Dec. 1990) (survey measured whether respondents agreed with certain "images" of Blacks and other groups as compared to Whites, such as "poor," "lazy," "violence-prone," and "unintelligent").

acceptable negative response" because it "ask[s] the juror to announce publicly that she or he is a racist."  Instead, trial courts are advised to do as Council requested: inquire directly about veniremembers' attitudes and opinions about race such as, for example: "Do you think blacks are more likely to commit crimes than whites?  Why?"  2 National Jury Project, *Jurywork Systematic Techniques* §§ 17:26, 17:27 (Dec. 2020 Update); *see also, e.g.,* Gobert *et al.*, *Jury Selection: The Law, Art, and Science of Selecting a Jury*, §§ 7:41, 9:18, 12:8 (Nov. 2020 Update) (suggesting "[o]pen-ended questions," such as "[h]ave you ever been afraid of someone of another race," and "[w]hat role do you think race plays in a person's ability to succeed," rather than asking if juror will be prejudiced by party's race).

Courts have responded, too.  The Eighth Circuit has "suggested that the better practice is to ask direct probing questions."  *United States v. Ortiz*, 315 F.3d 873, 889 (8th Cir. 2002) (cleaned up).  Pulling on this thread, one judge, in *United States v. Love*, 219 F.3d 721 (8th Cir. 2000), recognized it was not enough to ask jurors if they could be impartial and not make the Black defendants' race an issue.  Instead, this judge would have required the district court to do what Council

127

requested here: "explore the jurors' feelings on stereotypes about
African-Americans" – such as whether any thought certain racial
groups were "more likely to commit crimes than whites." *Id.* at 728-31
& nn.3-6 (Bennett, J., concurring).

Similarly, in *Pena-Rodriguez*, the Supreme Court unanimously
recognized the pitfalls of "[g]eneric" voir dire about racial impartiality,
with the majority explaining that it "may not expose specific attitudes,"
and the dissenting justices approvingly citing the two practice guides
discussed above and agreeing with another that "instead of asking a
juror if he is 'prejudiced,' the attorney should inquire about his 'feeling,'
'belief' or 'opinion.'" 137 S. Ct. at 868-69; *id.* at 880 & n.8 (Alito &
Thomas, JJ., & Roberts, C.J., dissenting) (cleaned up).

Some state courts have joined the chorus. The Maine Supreme
Court recently held that a questionnaire was "insufficient to uncover
racial biases among potential jurors" even though, like here, it inquired
whether any juror would "find it difficult to be fair, impartial and
objective" toward a defendant of another race, or had experienced
"problems or confrontations" with a person of another race. The trial
court erred by refusing to directly ask jurors for their "explicit views,

opinions, or beliefs" about "groups who share the defendant's race" —
questions similar to those Council proposed, like: "Do you believe that
African Americans are more likely than white Americans to commit
crimes?" *State v. Fleming*, 239 A.3d 648, 652-55 & n.6 (Me. 2020); *see
also State v. Morton*, 715 A.2d 228, 280 (N.J. 1998) (Handler, J.,
dissenting) (questions like whether interracial nature of crime would
affect jurors' ability to be fair and impartial were "not adequate" in
capital case).

The unlikelihood of candid answers is not the only problem with
posing questions like whether a juror cannot be "fair and impartial" or
is "uncomfortable" with people of other races. Even someone harboring
overtly racist opinions could truthfully answer "no" when asked for such
a self-assessment. For example, during deliberations in *Pena-
Rodriguez*, one juror told the others "Mexican men had a bravado that
caused them to believe they could do whatever they wanted with
women," "are physically controlling of women because of their sense of
entitlement," and "take whatever they want." 137 S. Ct. at 862. And in
*Tharpe v. Sellers*, 138 S. Ct. 545 (2018) (*per curiam*), a juror revealed
after trial that he believed "there are two types of black people: 1. Black

129

folks and 2. N_ _ _ _ _ s," that the defendant "wasn't in the 'good' black folks category," and that "after studying the Bible, I have wondered if black people even have souls."  138 S. Ct. at 546.  Both jurors clearly harbored racial animus.  Yet each, in his own mind, may have regarded himself as "fair" toward people of other races and not "uncomfortable" interacting with them, and thus could have truthfully provided qualifying negative answers to the court's cramped questions in Council's case.[55]

To further illustrate the ineffectiveness of the court's "can you be fair"-type inquiries here, compare the venire's answers to the results of public-opinion surveys that reveal a sizable proportion of White respondents — at least 20% — still hold stereotypically prejudiced

---

[55] Nor could the court even evaluate the credibility of such answers since the questions were relegated entirely to the questionnaire; in the courtroom, it refused to ask the seated White jurors anything about race.  *See Uttecht v. Brown*, 551 U.S. 1, 7 (2007) ("judgment as to whether a venireman is biased is based upon determinations of demeanor and credibility") (cleaned up); *United States v. Quinones*, 511 F.3d 289, 301 (2d Cir. 2007) ("bluntness or hesitancy, confidence or discomfort displayed by prospective jurors as they respond to questions . . . often reveals as much about bias as the actual answers given.").

views about Black people.[56]  By contrast, here, only a tiny percentage of

the White veniremembers who completed the supplemental

questionnaire — just 4.5% (22 of 482) — self-assessed that they might

be unable to be fair because Council was Black and the victims White,

or acknowledged they were uncomfortable around Black people or those

of other races generally.

Against this pernicious risk, the cost of directly asking jurors

about their racial prejudices was almost zero.  The court easily could

have added some of Council's questions to the questionnaire.  *Turner,*

476 U.S. at 36 (noting "ease with which" risk of racial bias "could have

---

[56] *See, e.g.*, *AP poll: U.S. majority have prejudice against blacks*,
USA Today (Oct. 27, 2012) (51% of respondents rated Black or Hispanic
people, as a group, generally less "friendly," or "hardworking" or more
"violent" or "lazy" than Whites); Kahn, *Explainer: How Reuters/Ipsos
measured the shift in the way Americans see race*, Reuters (Aug. 19,
2019) (in 2019 poll asking respondents to rate people of different races
on a series of personality traits, including peacefulness and lawfulness,
approximately 21% showed "slight anti-black" bias and 18% "strong
anti-black bias").  The proportion may have been even higher in the
region from which Council's jury was drawn.  *See* Smith, *et al.*, *The
Dynamics of Racial Resentment Across the 50 U.S. States*, Amer. Polit.
Sci. Ass'n, 18 Perspectives on Politics 527, 529, 532-33 (June 2020)
("research suggests that the racial attitudes of Southern Whites,
especially those who have been socialized there, are more anti-Black
than those in other regions").

131

been minimized"); *Rosales-Lopez*, 451 U.S. at 190 ("costs" of including race-bias questions — even in voir dire, where they may occasion "some delay in the trial" — "are likely to be slight," compared with "the occasional discovery of an unqualified juror who would not otherwise be discovered").  Indeed, such inquiries are common in other federal capital questionnaires, especially the critical *Turner*-prompted question whether any jurors believe certain races are inherently more prone to violence — a stereotype the Supreme Court more recently recognized remains "powerful" in society.  *Buck*, 137 S. Ct. at 776.[57]  One appellate decision discussing this question suggests it has proven fruitful.  *Ortiz*, 315 F.3d at 890 (noting that "[s]everal potential jurors" responded affirmatively on their questionnaires when asked whether "they believed that certain races were more violent than others").

### D.   Council's convictions or at least his death sentences should be set aside.

The court's refusal to conduct a constitutionally adequate voir dire

---

[57] *See, e.g., United States v. Williams*, No. 4:08-cr-70, DE712:24-25 (M.D. Pa. Jan. 9, 2013); *United States v. Wilson*, No. 04-cr-1016, DE176:19-20 (E.D.N.Y. Sept. 24, 2006); *United States v. Lujan*, No. 2:05-cr-924, DE762-4:16-17 (D.N.M. Apr. 12, 2011).

on racial prejudice means there is no way to know if any of the ten
White jurors who sentenced Council to death harbored disqualifying
biases against African-Americans.  The error requires setting aside
Council's convictions because this was a trial for a cross-racial crime in
which the evidence and arguments also carried racial undercurrents.
*See Rosales-Lopez*, 451 U.S. at 191; *Ham*, 409 U.S. at 529.
Alternatively, vacatur of his death sentences and a remand for
resentencing, *see* § 3595(c)(2)(C), are *per se* mandated.[58]  *Turner*, 476
U.S. at 37; *see also Morgan*, 504 U.S. at 736, 739.

## IV.

**The court denied Council a meaningful opportunity to
present a *Batson* claim after the government struck
Black jurors at two and a half times the rate of others
in this cross-racial case.**

## A.    Introduction and Standard of Review

In this capital trial of a Black man for the murders of two White

women, the government used its peremptory strikes quite

---

[58] Council acknowledges that his attorneys essentially conceded
his guilt at trial, Facts-III.  *See United States v. Tsarnaev*, 968 F.3d 24,
61-62 (1st Cir. 2020) (reversing death sentence based on structural voir-
dire error but holding it harmless as to convictions given such a
concession).

disproportionately against Black veniremembers. The record reveals no plausible race-neutral reason for most of those strikes that did not apply equally to White venirepersons the government left on the jury.

These facts would have supported an inference that the government eliminated Black jurors based on their race, thus establishing a *prima facie* case under *Batson v. Kentucky*, 476 U.S. 79 (1986), and requiring the prosecutors to present credible, race-neutral reasons for their peremptories. And when the jury was struck, Council's lawyers told the court they needed a brief recess to marshal evidence for such a claim. That break was essential since there were eight days of questioning and thousands of pages of questionnaires to review. The defense request was also timely under this Court's precedent because the defense flagged the *Batson* issue before the court had dismissed the struck jurors.

But rather than grant this modest request, the court indicated the defense would have to litigate any *Batson* claim on the spot, and in front of the entire venire. Counsel's retreat from the claim in response to these impossible conditions should be excused, and this Court should treat the *Batson* claim as preserved. Under Federal Rule of Criminal

134

Procedure 51(b), "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." And this Court and others have said that requires a "meaningful" opportunity.

This Court decides *de novo* whether, under Rule 51(b), the district court denied such an opportunity to the defendant. *See United States v. Hanno*, 21 F.3d 42, 45 n.2 (4th Cir. 1994)*; see also United States v. Smith*, 640 F.3d 580, 586 (4th Cir. 2011). Because it did so here, precedent requires a remand for it to entertain Council's *Batson* claim in the first instance.

## B.    **Factual Background**

Because this was a capital trial, it involved several stages for obtaining information from prospective jurors. When summoned, they each completed a standard questionnaire (JA6696); next, over three days, several hundred appeared in groups to be asked about hardships and to fill out an additional, case-specific questionnaire (JA6704); then the remaining jurors underwent individual voir dire and cause challenges over five days. JA6696, JA2096, JA2115, JA2116, JA2117, JA2160, JA2161, JA2172, JA2173, JA2174.

135

Upon completing this process on a Friday evening, the court convened to strike the jury the following Monday. JA4066. That morning, it distributed a randomized list of the qualified jurors with each assigned a new number. JA4070-4071, JA7810. Because this was a capital case, counsel were allotted 20 peremptory challenges per side. *See* Fed. R. Crim. P. 24(b)(1). When these were exhausted, from among the first 52 qualified jurors, the 12 that remained would become the principal jury. (Two more strikes per side were allowed for the next eight veniremembers to yield the four alternates.) As the prospective jurors sat in the gallery, the parties took turns exercising peremptories two at a time, starting with the government. Though in open court, the veniremembers were referred to by the new random numbers and so had no way of knowing which party removed whom. JA4069-4070, JA4074-4076.

After peremptory challenges were exhausted, the court asked, in front of the venire, if there was "[a]ny objection to the method of the selection of the jury," and counsel for each side answered "no." The court called the selected jurors and alternates to the bench, then had them taken to the assembly room to make logistical arrangements for their jury service. JA4076-4079.

When the court asked if counsel had "[a]nything" before the jurors were escorted out, Council's Federal Defender lawyer requested a pause. After less than 30 seconds, JA6731, he approached the bench and started to ask that the "rest of the panel" not be discharged, but the court cut him off and said it was "going to let them go." Counsel explained they needed a brief recess "to analyze the strikes for any issues in regard to the exercise of peremptory strikes," and thus asked that the court "not release the jury at this time." But the court suggested the request was untimely because it had earlier "asked if there were any objections." Counsel responded that he "thought you were talking about the method, 1 through 20 and the alternate," not "about *Batson* issues or anything like that." JA4079-4080.

In that case, the court retorted, it would "bring" the jurors and alternates "back out" from the assembly room. Council's attorney again clarified they needed a brief recess: "I'm just telling you we need to go and look at it. I thought you were going to bring them out and do that, but not swear them" yet. When the court again chided counsel for not raising the *Batson* issue earlier, the lawyer persisted, indicating the defense first needed some time to review the record: "I haven't even had

137

a chance to look at it yet." But rather than recessing to allow for that, the court again said that, if they wished to pursue a *Batson* issue, "we need to bring" the jurors and alternates "back out then. Bring them back out," right then and there. After about a ten-second pause, JA6731, and counsel's reiterating that the defense needed "time to review any potential *Batson* issues," the court again suggested the request was untimely because the defense had not objected earlier. "Now you all want me to ask these people to take a seat back out there." JA4080-4082.

By this point, counsel had repeated, three times, that they needed a break to review the jury-selection materials to be able to address *Batson*. That included, for the 52 from whom the principal jury was struck, more than 5,000 questionnaire responses spanning more than 1,000 pages, as well as the record of eight days of in-court questioning. Further complicating things were the new numbers the court had just assigned each juror for striking purposes. But rather than agreeing to briefly recess the proceedings, the court had conveyed, also repeatedly, that anything the defense wished to do on *Batson* would require returning the jurors and alternates to the courtroom then and there,

138

and would have to occur in front of the venire.  JA4080-4081.

With that the only permitted course, the defense retreated.  After a pause of less than a minute, JA6731, in which counsel "review[ed]" the matter among themselves, they told the court they had "no objection to the selection process."  JA4082-4083.

## C.    Legal Argument

### 1.    Had the court granted a brief recess, allowing time to analyze the strikes, questionnaires, and voir-dire transcripts, trial counsel could have presented Council's substantial *Batson* claim.

The record that trial counsel had no realistic chance to review supports a substantial inference that the government removed not just one but several African-American jurors because of their race.  That information would have enabled counsel to establish a *prima facie* case of discrimination under *Batson* and require the government to provide credible, race-neutral explanations for its strikes.  *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019); *Batson*, 476 U.S. at 97-98.

A *prima facie* case "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose."  *Johnson v. California*, 545 U.S.

162, 169 (2005); *see United States v. Barnette*, 644 F.3d 192, 203 (4th Cir. 2011). Here, several types of record information would have supported such an inference.

### a. The government engaged in a markedly disproportionate pattern of strikes against Black jurors.

Begin with "statistical evidence" of the government's "'pattern of strikes against black jurors.'" *Flowers*, 139 S. Ct. at 2243, 2246, *quoting Batson*, 476 U.S. at 97; *see also United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991). The government used 10 of its 20 peremptories against African-Americans.[59] Though not enough, "by itself," to establish a *prima facie* case, "[t]he number of challenges used against members of a particular race . . . takes on meaning . . . in the context of other information." *United States v. Esparsen*, 930 F.2d 1461, 1467 (10th Cir. 1991).

The government exercised its peremptories against qualified

---

[59] A capital trial expands the risk of prosecutorial bias because the government receives 20 peremptory strikes, more than triple the usual number, under Rule 24(b)(1). *See State v. Andjujar*, 254 A.3d 606, 631 (N.J. 2021) (state rule affording government 12 peremptory strikes, "twice the national average," exacerbates problem of discrimination).



Black jurors at almost twice their proportion in the panel: It used 50% (10 of 20) of its strikes against African Americans even though they constituted only 29% (15 of 52) of the qualified group from whom the principal jury was struck.[60]  And the government's "exclusion rate" for the Black jurors in the qualified group was 67% (10 of 15), but less than half that, 27% (10 of 37), for the non-Black jurors.  *See, e.g., Lewis v. Horn*, 581 F.3d 92, 103 (3d Cir. 2009) (emphasizing need to consider both "strike rate" and "exclusion rate").  The effect was to reduce by almost half the proportion of Black people on the seated jury, to 17% (2 of the 12) from 29% of the qualified group.  JA7810, JA4074-4076.

---

[60] The 52 consisted of 15 Black, 36 White, and one Hispanic venireperson.  JA7810, JA4074-4076.

141

Other circuits have recognized that such a disproportionate strike pattern supports a *prima facie* case under *Batson*. *See, e.g., Harris v. Hardy*, 680 F.3d 942, 951 (7th Cir. 2012) ("African Americans composed 35% of the prospective jurors" but "state removed at least 71% of them"); *Bond v. Beard*, 539 F.3d 256, 270 (3d Cir. 2008) (prosecutor accepted 83% of White venirepersons but only 41 to 47% of Black ones); *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) ("While Hispanics constituted only about 12% of the venire, 21% . . . of the prospective juror challenges were made against Hispanics"); *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) ("a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*").

That was especially true here, in a trial for two cross-racial murders. *See Johnson*, 545 U.S. at 167 (lower court acknowledged this was "highly relevant" to *Batson* claim) (cleaned up); *Madison v. Commissioner*, 761 F.3d 1240, 1252 & n.13 (11th Cir. 2014) ("the inter-racial nature of the crime (black defendant and white police officer)" was one of the "strong" circumstances supporting *prima facie*

case); *see also Williams v. Chrans*, 945 F.2d 926, 944 (7th Cir. 1991) (in Black-on-White case, "there is a real possibility that the prosecution" will try to use peremptory strikes "to secure as many white jurors as possible") (cleaned up).

Turn next to the government's ordering of its challenges, which further bolsters the suspicion they were animated by race. Among its first ten strikes, the government, perhaps wary of a *Batson* challenge, eliminated just three Black veniremembers, and all for potentially defensible race-neutral reasons. But beginning with its eleventh challenge, and hearing no objection from the defense, the government accelerated the pace, using seven of its next eight peremptories against African-Americans. Only after that, and once it saw the defense had removed three of the remaining five Black venirepersons, did the government employ its last two challenges against White ones. This suggests the government may have decided to allow just two African-Americans onto the jury. JA7810, JA4074-4076. *See Flowers,* 139 S. Ct. at 2246 (prosecution may have accepted one African-American "to obscure the otherwise consistent pattern of opposition to seating black jurors") (cleaned up); *Harris*, 680 F.3d at 953

143

(prosecution's "acceptance of 2 African American jurors" onto the jury did not "overcome the clear evidence" of a "pattern of strikes" against African-Americans).

> **b.    The government accepted White jurors who were materially indistinguishable from many of the Black ones it struck.**

It also appears the government lacked plausible race-neutral reasons for its seven-of-eight run of strikes against Black jurors, and certainly none that did not apply "just as well" to White ones it left on the jury.  This lent support to a *prima facie* case "[m]ore powerful than . . . bare statistics." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *see United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009); *United States v. Collins*, 551 F.3d 914, 922 (9th Cir. 2009).  The government's removal of these African-American jurors cannot be explained by their death-penalty attitudes, the main subject of voir dire.  Almost all had denied any personal opinions against capital punishment, and said they could follow the law and, if called for, vote for a death sentence.

That included Juror #145, a Black man the government eliminated from the jury.  A 51-year-old, married college graduate who

144

had served in the Army, he worked as a teacher's assistant in a public school and lived in Richland County.  He stated in both his questionnaire and voir dire that he could vote for the death penalty and sign a death verdict.  His decision would depend on the "circumstances" and "facts," and he rated himself right in the middle of the scale (a 4, with 1 being "strongly oppose" and 7 "strongly favor") in his opinion on capital punishment.  JA6740-6741, JA6843-6845, JA2971-2982.

Another Black man struck by the government, Juror #261, fell into the same category.  Age 64, he was a semi-retired truck driver for a state agency in Florence, had been married for 24 years, and lived in a house his family had owned for a half century. He expressed no problem with the death penalty, saying that, per the Bible, "everyone must receive a just reward for what they [have] done in life," and that he could vote for a death sentence depending on the facts and law.  He also rated himself as a 4 on the capital-punishment scale.  JA6745-6746, JA6894-6896, JA3187-3196.

So too Juror #544, another African-American the government removed.  He was a 64-year-old retiree from Columbia who had been a paratrooper in the Army, then a U.S. Postal Clerk.  He was married

with an adult daughter, and served as a deacon in his Baptist church. He checked "I am in favor of the death penalty," ultimately rated himself a 4 on the scale, and said he could vote for a death sentence if the facts and law supported it.  JA6770-6771, JA7200-7202, JA3846.

Likewise, Juror #573, a 22-year-old Black woman from Columbia whom the government also struck.  She had a two-year college degree and was about to start work at a physical-therapy clinic; she also volunteered with several civic organizations, including her church.  Her uncle was a police officer, and her father in the Army.  On her questionnaire, she said she had no opinions about the death penalty, and also rated herself a 4 on the 1-to-7 scale.  In voir dire, she said she could be fair, follow the law, and vote for a death sentence if the facts and law supported it and the evidence was clear, and could sign her name to the verdict.[61]   JA6776-6777, JA7234-7236, JA3913-3925.

While sharing the same race, these and the other African-American jurors struck by the government in its seven-of-eight run

_____

[61] The remaining three Black jurors the government struck, #377, #455, and #484, were also relatively middle-of-the-road on the death penalty.  JA6945-6947, JA7064-7066, JA7115-7117, JA3462-3471, JA3612-3621, JA3702-3713.

comprised a diverse group when it came to age, location, occupation, education, background, and other characteristics. *See Madison,* 761 F.3d at 1252 ("heterogeneity of the struck [Black] jurors" supported *prima facie* case). All had been qualified by the court to serve on Council's jury; the government had not even tried to challenge any of them for cause. And all had told the court they were willing to perform that civic duty.

Most important, none voiced any opinion about capital punishment or possessed any other characteristic that marked them as less favorable to the government than several White venirepersons whom the prosecutors allowed onto the jury.[62] That included Jurors #320, a White man; and #399, #441, #481, and #564, four White women.

---

[62] Although two of the African-Americans struck by the government, Jurors #377 and #544, also said they or a family member had been charged with a crime, their responses indicated remote, trivial matters: #377 had a relative with a trespassing conviction, JA6756, and #544 had inadvertently bounced a check at a grocery store 40 years before, JA6773. Moreover, in voir dire, the government never asked them about this. It is not plausible this prompted either strike, especially since the government allowed onto the jury Juror #399, a White woman, even though she had a conviction for underage drinking from a few years earlier, JA6761, as well as Juror #441, another White woman, whose brother had been repeatedly jailed for drug offenses, JA6767.

147

Like the struck African-American jurors described above, they each rated themselves a 4, the midpoint on the 1-to-7 capital-punishment scale, and expressed no opinions or neutral ones on the death penalty.[63] And all said they would consider mitigation and could vote for a life sentence.  JA6901, JA6911-6913, JA7003, JA7013-7015, JA7037, JA7047-7049, JA7088, JA7098-7100, JA7207, JA7217-7219, JA3371-3379, JA3504-3513, JA3586-3594, JA3680-3690, JA3885-3895.

All this information, which trial counsel could have marshalled and presented had the court allowed them a brief recess, would have amply supported a *prima facie* case under *Batson*.

> **2.    By forcing the defense to litigate any *Batson* claim without a brief recess and in front of the jurors, the court deprived Council of a realistic opportunity to present the claim.**

When trial counsel brought up the *Batson* issue just after

---

[63] Juror #399 said it was "situational" and depended on whether "it fits the crime," and considered life imprisonment a worse punishment, an opinion favorable to the defense.  JA7013-7015.  Juror #441 said her "view would depend on the case and evidence."  JA7047-7049.  Juror #481 believed the death penalty "can be an appropriate sentence in certain cases" but that life imprisonment "can also be an appropriate sentence," and thought capital punishment should be available as a punishment, JA7098-7100, as did Juror #564, JA7217-7219.

148

peremptory challenges were finished, it was timely because the court had not yet dismissed the struck jurors and the trial had not yet begun. *See Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997). But the court denied Council's request for a needed recess to review the extensive jury-selection record with an eye toward presenting a *Batson* claim. Instead, the court insisted they do so immediately, and in front of all the jurors. This deprived Council of a fair and meaningful opportunity to harness and present the evidence needed to litigate the *Batson* claim. Thus, this Court should treat it as preserved.

Federal Rule of Criminal Procedure 51(b) states: "If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." In that event, the court of appeals will "review [the issue] as if it had been presented" below. *United States v. Middagh*, 594 F.3d 1291, 1295 (10th Cir. 2010). Because this provision must be interpreted in "practical" terms, *id.*, it requires not just a technical or theoretical opportunity to object, but, as this Court and others have recognized, a "meaningful" one. *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2020); *Smith*, 640 F.3d at

149

586; *Hanno*, 21 F.3d at 45 n.2; *see also United States v. Rodriguez*, 919 F.3d 629, 635 (1st Cir. 2019) (requiring "realistic" opportunity); *United States v. Blueford*, 312 F.3d 962, 974 (9th Cir. 2004) (requiring "fair" opportunity).

Even in ordinary cases, in which jury selection usually takes no more than a few hours, the Seventh Circuit has recommended an adjournment "to ensure that the parties have a fair opportunity" to present *Batson* objections: "To permit reasoned challenges — and avoid unreasoned ones — a break could be taken after strikes are exercised, giving the attorneys time to analyze the strikes." *United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016); *see also, e.g., United States v. Taylor*, 92 F.3d 1313, 1320-21 (2d Cir. 1996) (after *Batson* was raised, "the proceeding was adjourned and the parties were invited to make written submissions").

Here, the jury-selection record far exceeded what is typical in a non-capital case. Even omitting the alternate jurors and strikes, it covered 52 qualified jurors, 20 government peremptories (more than three times the ordinary number), and 12 selected jurors. And it consisted of more than 5,000 written questionnaire responses spanning

more than 1,000 pages, together with eight days of in-court questioning.

No attorney could retain the relevant details of that record well enough

to distill and present a *Batson* claim from memory.  The one-minute

pause the court allowed instead of a recess hardly gave trial counsel

time to analyze the strikes and marshal the information to support the

*prima facie* case that appellate counsel have previewed above.

The court also deprived Council of a meaningful opportunity to

present his *Batson* claim by requiring him to do so in the courtroom in

front of the selected and struck jurors.  There was no reason for this.

*Batson* litigation is generally conducted outside the presence of the

jurors.[64]  Courts do so because it involves discussions that could

seriously prejudice them.  *See* Federal Judicial Center, *Benchbook  for*

*U.S. District Court Judges*, § 2.05, Jury selection — Criminal (Mar.

2013) ("procedures should ensure that prospective jurors are never

aware of *Batson* discussions or arguments about challenges and

---

[64] *See, e.g., United States v. Williams*, 974 F.3d 320, 338 (3d Cir. 2020) (court heard and ruled on *Batson* challenge in chambers); *Eagle v. Linahan*, 279 F.3d 926, 931 (11th Cir. 2001) (same); *Dolphy v. Mantello*, 552 F.3d 236, 237 (2d Cir. 2009) (same); *Lamon v. Boatwright*, 467 F.3d 1097, 1099 (7th Cir.  2006) (same); *United States v. Bentley-Smith*, 2 F.3d 1368, 1374 (5th Cir. 1993) (same).

therefore can draw no adverse inferences").

### 3. The Court should remand for a *Batson* hearing.

If Council's *Batson* claim is not reviewed now on the merits, it may never be. Applying preservation requirements in a hypertechnical way to defeat review would be especially inappropriate for an issue involving potential racial discrimination in the selection of jurors. If the government acts out of racial bias to block Black citizens from jury service, particularly in a high-profile cross-racial capital case, the defendant is not the only one harmed. The excluded jurors themselves are deprived of a basic civil right, the community suffers, and public confidence in the fairness of the criminal justice system is degraded, especially if reviewing courts refuse even to consider the issue. *See Flowers*, 139 S. Ct. at 2242-43; *Johnson*, 545 U.S. at 171-72; *Batson*, 476 U.S. at 87. "Striking black prospective jurors on the basis of race poisons public confidence in the judicial process because it suggests the justice system is complicit in racial discrimination. Denial of the opportunity to seek relief in such situations undermines respect for the courts and the rule of law." *Mitchell v. Genovese*, 974 F.3d 638, 652 (6th Cir. 2020) (cleaned up).

Accordingly, this Court should remand to the district court to determine in the first instance whether Council can establish a *prima facie* case of racial discrimination by the government against any of the struck Black jurors and, if so, to require the government to present credible, race-neutral reasons for those challenges. *See Joe*, 928 F.2d at 103.

## V.

### The court erroneously let the government twist Council's motive, to support four different aggravating factors in ways contradictory, unsupported, and redundant.

### A. Introduction and Standard of Review

The Eighth Amendment requires that aggravating factors in a capital sentencing be carefully defined and presented to ensure they are not counted arbitrarily, redundantly, or without support. But here, four factors the government asked the jury to treat as reasons to execute Council suffered from these fundamental flaws, which the district court failed to remedy when the defense challenged them.

The government framed Council's alleged motive as the centerpiece of all four aggravators. But two of those inherently

153

contradicted each other.  One alleged Council killed the victims for the

purpose of stealing money from the bank.  The other alleged he knew he

could complete the robbery *without* hurting anyone, in other words that

the killings were purposeless.  One factor had to be false, yet the jury

found and weighed them both.  Worse, *neither* was supported under

established case law, even accepting the government's version of the

facts.  Compounding these errors, the government triple-counted the

murders' alleged purposelessness as the core of two *more* aggravating

factors.  These errors added artificial weight to the death side of the

scale, injecting irrationality and arbitrariness into the sentencing

decision.

Constitutional challenges to aggravating factors are reviewed *de

novo*.  *United States v. Hager*, 721 F.3d 167, 199 (4th Cir. 2013); *United

States v. Caro*, 597 F.3d 608, 622 (4th Cir. 2010).

## B.    The evidence was that Council shot the bank employees to prevent them from summoning police so he could flee the area.

Surveillance video from the CresCom Bank showed Council

entered undisguised and walked to Major's teller counter.  After waiting

for a minute, he pulled out a gun, shot her, and she fell to the floor.

154

Then, he ran into Skeen's office and shot her. Next, he raced frantically through the bank tossing money in a bag, and apparently shooting Major once more, before fleeing in Skeen's car. *See* Facts-III.

When FBI agents later questioned Council, he ultimately said he shot the two employees to prevent them from activating an alarm or otherwise summoning authorities, and thus to give himself time to leave town with the robbery proceeds before police responded. JA6458, JA6460-6464, JA6504-6505, JA6522; *see* Facts-III.

## C. With the court's approval, the government presented four aggravating factors, each relying on Council's motive for the killings.

### 1. The aggravating factors noticed by the government, and Council's pretrial challenges to them

The FDPA includes a list of 16 potential "aggravating factors" a sentencing jury may consider in favor of a death sentence. *See* 18 U.S.C. § 3592(c). The government may also ask the jury to weigh other non-statutory aggravating factors crafted by the prosecutors. *See* § 3593(a), (c). To support a death sentence, jurors may not consider anything outside the aggravating factors the government noticed. *See* § 3593(c), (e).

155

### a.    "Pecuniary Gain"

Here, one statutory factor alleged by the government in its death-penalty notice was that Council committed the offense "'in the expectation of the receipt of anything of pecuniary value.'" JA140, JA1562, *quoting* § 3592(c)(8).  Pretrial, the defense noted that jurors could rely on this only if they found that enabling him to acquire money from the bank (the thing "of pecuniary value") was Council's motive for the murders, not just for the robbery.  JA501.  It cited *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005).  In *Barnette*, the Court agreed with other circuits that this factor requires proof "the motivation for the murders" was to acquire something of pecuniary value.  *Id.* at 805; *see also id.* at 806 (not just the robbery but "the actual murder itself must be committed for pecuniary gain").

### b.    "Innocent Victims"

But the government also claimed, as another, non-statutory aggravating factor, that Council killed the victims even though he knew it was "not necessary to successfully complete the robbery."  JA142,

JA1563.[65]  In other words, according to that aggravator (titled "Targeting Innocent Victims"), stealing money was *not* Council's motive for shooting Major and Skeen; rather, the killings were worse because they were purposeless.  Pretrial, the government confirmed that this factor meant the killings were "unnecessary to achieve [Council's] stated objective of robbing the bank and getting away"; in other words, "he knew and very well could have executed this crime in a way that didn't require killing these people."  JA952-953, JA956, JA2008.

Council challenged this aggravator as intrinsically "in conflict with" the pecuniary-gain one.  His pretrial motion noted the obvious: Either he committed the killings because he believed they would enable him to complete the robbery, or he did *not* believe that and thus understood them to be unnecessary.  "The government cannot have it both ways."  JA501-502.  But the government simply denied any contradiction without explaining how both factors could apply.  It also

---

[65] In its entirety, the factor alleged Council had "displayed particular cruelty and callous disregard for human life by shooting both victims, who were unknown to him, multiple times at close range without warning and without provocation or resistance from the victims, in spite of the fact that such violence was not necessary to successfully complete the robbery of the CresCom bank."  JA1563.

insisted that *Barnette* was somehow "inapposite" to the construction of the "pecuniary gain" factor. JA955. The court too "disagree[d] with Defendant's interpretation of these aggravators," and, without mentioning *Barnette*, denied Council's motion, JA1065-1066, allowing him a standing objection to such pretrial rulings, JA4083, JA4089. It also denied his post-trial motion renewing this argument. JA2352-2353, JA2360, JA2367-2368.

### c.    "Escalating Violence"

Pretrial, Council also unsuccessfully challenged another of the government's non-statutory aggravating factors: that the CresCom robbery, which followed a few weeks after his unarmed robberies of a Food Lion and a BB&T bank in North Carolina, reflected "a continuing and escalating pattern of criminal activity." JA141, JA1563. *See* Facts-III. Council argued this language was "overbroad," "creates confusion and open-endedness," and could let the government inject impermissible information. JA502-503; *see also* JA1033-1034. And the government confirmed it intended this factor to embrace that Council "knew how to commit a robbery using means other than murder, but elected not to do so . . . at the CresCom bank" — in other words, the

same allegation about the killings' purposelessness underlying the "innocent victims" aggravator. JA959. But the court determined this factor was "not overbroad." JA1066-1067. It also rejected the defense's theory of "duplicative" aggravators, approving any overlap as long as "no two factors are identical." JA494, JA1064.

### d. "Multiple Killings"

The government's notice also alleged the statutory aggravating factor that Council had "intentionally killed 'more than one person in a single criminal episode.'" JA140, JA1562, *quoting* § 3592(c)(16). The defense never disputed that the jury could rely on this narrow, concrete factor, which simply recognizes it is worse to kill two victims than one. But the government gave no hint it would expand this aggravator to somehow encompass other circumstances of the crime, such as Council's motive.

### 2. The government's presentation of the aggravating factors at Council's capital-sentencing hearing

### a. The government urged jurors to find both the "pecuniary gain" and "innocent victims" aggravators.

At sentencing, armed with the court's pretrial ruling refusing to

159

acknowledge *Barnette* or any constraint on the pecuniary-gain factor, the government asked jurors to find this aggravator based on Council's motive for *the robbery*. In his opening statement, the prosecutor said Council "robbed the bank in order to steal money, that's pecuniary gain." JA4879. Likewise, in closing, he told jurors "pecuniary gain" was "not very complicated" and "easily proven" because Council "wanted money," and "chose to steal" rather than "work for" it.[66] JA5940, JA5942-5943; *see also* JA7858.

With the "pecuniary gain" aggravator thus miscast as Council's motive for the robbery, the prosecutor appealed to jurors to simultaneously find the "innocent victims" aggravator because the killings were pointless: Council "knew that he didn't have to use violence" and that instead he could have passed Major the robbery note and she would "hand you the money and you can walk right out." JA5947. The prosecutor then narrated the remaining details of these

---

[66] Echoing the prosecutor's observation that "pecuniary gain . . . essentially says that he did *this* for money, JA5943 (emphasis added), the court instructed jurors they only had to find that Council committed "*the offense*" for something of pecuniary value, JA6024, JA6050 (emphasis added); *see also* JA4870, and defined "the offenses" to include the "bank robbery," JA6014, JA6047.

murders of victims who posed "no danger" to his robbery plan.

JA5947-5951.

> ### b. The government urged jurors to triple-count the supposedly "unnecessary" nature of the murders to support two more aggravators.

The government also invited jurors to redundantly count Council's purported awareness that the murders were "unnecessary," to support another aggravating factor: that he had "escalated" his "criminal activity" from the Food Lion and BB&T robberies. The prosecutor focused his summation comments about this aggravator on how those successful non-violent thefts showed "[h]e knows you can use a note . . . and they will hand you the money and you can walk right out," and "[h]e knows . . . that violence is not necessary to rob a bank . . . . When you know you don't have to do that and you choose anyway, that makes this crime worse." And he summarized this factor as "an escalating pattern of violence to the point where it results in unnecessary killing." JA5945-5946; *see also* JA4880-4881.

The government did not stop with double-counting: It further urged jurors to *triple*-count the "unnecessary" quality of the killings by portraying it as a key feature of yet another aggravating factor, that

multiple victims were slain.  JA2307, JA2321.  The prosecutor did so by repeatedly telling jurors that this aggravator held greater sway because Council "did not have to kill anyone."  JA5941-5942.

**D.  The government's deployment of these four aggravating factors violated Council's rights to due process and a non-arbitrary sentencing decision under the Fifth and Eighth Amendments and the FDPA.**

**1.  The inherent conflict between the "pecuniary gain" and "innocent victims" aggravators invalidated the jury's finding of one, if not both.**

The "pecuniary gain" aggravating factor fundamentally contradicted the "innocent victims" one.  The jury could only find the former if Council's "motivation for the murders" — not just for the robbery — was to enable him to steal money from the bank.  *Barnette*, 390 F.3d at 805-08; *see also United States v. Chanthadara*, 230 F.3d 1237, 1263-64 (10th Cir. 2000); *United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2002).  Yet the latter rested on the theory that the killings were pointless, rather than committed for any purpose, since "the defendant knew that he didn't have to use violence" to "successfully complete the robbery."  JA5945-5947, JA142, JA1563.  In other words, completing the robbery was *not* Council's motive for the murders.

162

This court has held that dual guilty verdicts on inherently inconsistent charges create error and cannot stand. *United States v. Bethea*, 483 F.2d 1024, 1029-30 (4th Cir. 1973). The Supreme Court has similarly suggested that relief is required if "a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other." *United States v. Powell*, 469 U.S. 57, 69 n.8 (1984).

That makes sense. It "would be patently unjust," and thus violate due process, to allow "mutually exclusive" convictions "because a defendant would be convicted of two crimes, at least one of which he could not have committed." *United States v. Gross*, 961 F.2d 1097, 1107 (3d Cir. 1992). So too with "mutually exclusive" aggravating factors. *See United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996) (error for federal capital-sentencing jury to make "cumulative findings" of "alternative circumstances"). Indeed, state appeals courts have invalidated contradictory aggravator findings quite similar to those here. *See, e.g., State v. Cooper*, 700 A.2d 306, 382-83 (N.J. 1997) ("jury cannot rationally find . . . both" aggravators that killing had "no motive" and that it was committed to "escape detection"); *Leslie v. Warden*, 59

163

P.3d 440, 445-46 (Nev. 2002) (same set of facts cannot support aggravating factors that killing was committed "without apparent motive" and "to complete the robbery").

Because an aggravating factor may tip the balance from life to death, each must be "principled, so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). Here, the sentencing jury's finding of two contradictory aggravators means the jury weighed for death at least one that was simply untrue. That alone injected unconstitutional arbitrariness into the sentencing decision. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (jury's reliance on "materially inaccurate" aggravator created Eighth Amendment error).

Further, *neither* of these two aggravation findings can be salvaged on appeal: Determining Council's motive was the jury's responsibility, not one that this Court can assume by picking and choosing which of the two inconsistent findings to invalidate. *See Milanovich v. United States*, 365 U.S. 551, 554-55 (1961) (reversing both conflicting

164

convictions); *Bethea*, 483 F.2d at 1030-31 (same).[67]

## 2. The "pecuniary gain" and innocent victims" factors each lacked legally sufficient supporting evidence.

The jury's findings of the "pecuniary gain" and "innocent victims" factors also must fall because the evidence, even viewed most favorably for the government, did not fit the established legal definition of either.

The FDPA limits the former to cases in which the defendant's motive was to acquire the "pecuniary gain" as a "direct result of the murder." *Bernard*, 299 F.3d at 483, *cited in Barnette*, 390 F.3d at 808 (factor proven where defendant killed because he thought carjacking victim was "going to stop" him from stealing the car); *see also United States v. Brown*, 441 F.3d 1330, 1370 (11th Cir. 2006) (pecuniary gain applies where defendant killed store employee because he was frustrating the robbery) (citation omitted).  Here, though, the government's own evidence and theory was that Council knew he could have gotten Major to give him money without using violence.  *See*

---

[67] *Cf. United States v. Gaddis*, 424 U.S. 544, 548-49 (1976) (where it is "clearcut" that "the evidence was certainly sufficient to support" one contradictory conviction yet "there was no evidence whatever" for the other, only latter had to be vacated).

JA5945.  He confessed, and the government agreed, that he killed her and Skeen to prevent them from summoning authorities after he had taken the money, before he could escape town with it.  Such a killing "to prevent [the victims] from reporting . . . to police" a pecuniary crime — even if the incident was still ongoing — cannot sustain this factor.  *See Bernard*, 299 F.2d at 483-84 (aggravator wrongly found where killings of carjacked victims in their vehicle were not committed to obtain the car).[68]

Unlike the pecuniary-gain factor, which turned on whether the killings' purpose was to enable Council to *acquire* the money, the "innocent victims" factor crafted by the government required it to prove he knew the murders were "not necessary to successfully *complete the robbery*."  JA142, JA2308 (emphasis added).  By law, the "escape" is "part of the robbery," not "an event occurring after the robbery."  *United States v. McCaskill*, 676 F.2d 995, 1000 (4th Cir. 1982) (cleaned up); *see*

---

[68] In unsuccessfully urging Congress to broaden the FDPA, the government itself "suggested that as now worded" the pecuniary-gain factor "does not include instances where the murder is committed to preserve a defendant's ill-gotten treasure."  Congressional Research Service, *The Death Penalty: Capital Punishment Legislation in the 110th Congress*, at 18 (Updated Oct. 15, 2008).

*United States v. Williams*, 344 F.3d 365, 372 (3d Cir. 2003)*; United States v. Muhammad*, 948 F.2d 1449, 1456 (6th Cir. 1991); *United States v. Reid*, 517 F.2d 953, 965 (2d Cir. 1975). Here, the proof, as presented and argued by the government, was that Council thought the killings *were* necessary to escape and thus "successfully complete" the robbery. JA4803 ("He had to have time to execute his plan before the button was pushed, before an alarm was sounded."), JA6004 ("he was worried they might hit the alarm so he killed them"). Accordingly, this aggravating factor also was negated as a matter of law.

Under due process, a guilty verdict may not survive unless, viewing the evidence in the light most favorable to the prosecution, a "rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010). The same standard applies to aggravating factors at a capital sentencing. *See Lewis v. Jeffers*, 497 U.S. 764, 781 (1990); *United States v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006). Here, neither the "pecuniary gain" nor "innocent victims" finding can withstand such review. And the sentencer's reliance on even one such unsupported aggravator violates

the Eighth Amendment, *Sochor v. Florida*, 504 U.S. 527, 540 (1992), and the FDPA, 18 U.S.C. § 3595(c)(2)(B).

### 3. It was improper for the government to have the jury redundantly weigh the "unnecessary" nature of the killings to support three different aggravating factors.

The government alleged Council knew he did not need to kill Major and Skeen to complete the robbery, then urged jurors to redundantly weigh this "fact" as the centerpiece of three different aggravating factors: "innocent victims," "escalating violence," and "multiple killings." That triple-counting deprived Council of due process and a non-arbitrary sentencing decision and thus violated the Fifth and Eighth Amendments.

This Court has recognized that "cumulative findings" of the same crime circumstance create "constitutional error" when the jury weighs each in favor of death. *Tipton*, 90 F.3d at 899-900. It found "a clear risk of skewing the weighing process" when the jury was asked "to assess the weight . . . on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor." *Id.* The Court agreed with *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), which held that "double counting of aggravating factors, especially under a

168

weighing scheme" like the FDPA, "creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." For when "the defendant is essentially condemned twice for the same culpable act," it "is inherently unfair." *Id.* at 1111 (cleaned up), *cited in Tipton*, 90 F.3d at 899-900.

That is exactly what happened at Council's sentencing: The prosecution used the allegedly "unnecessary" nature of the killings to support three different aggravating factors, and the jury was invited to give "[three]-fold effect to what was essentially a single factor," *Tipton*, 90 F.3d at 899-900. Thus, Council was "essentially condemned" three times for the "same culpable" feature of the crime.[69] *McCullah*, 76 F.3d at 1111.

### E. This cascading series of errors, which tainted four of the aggravating factors the jury relied on, requires vacatur of Council's death sentences.

These errors were preserved by Council's unsuccessful objections

---

[69] This differs from the situation where two factors appear similar but actually reflect distinct reasons for treating a murder as aggravated. *See Jones v. United States*, 527 U.S. 373, 398-399 (1999) (Opinion of Thomas, O'Connor, Kennedy, JJ., & Rehnquist, C.J.) (vulnerable-victim and victim-impact aggravators relied on different "personal characteristics" of the victim).

to the contradictory "pecuniary gain" and "innocent victims" factors and to the overbreadth of the "escalating violence" factor, and by the court's rejection of his "duplicative"-aggravators theory. Moreover, under the FDPA, the insufficiency of the evidence supporting the first two factors must be reviewed regardless of preservation. *See* 18 U.S.C. § 3595(c)(2)(B); *United States v. Davis*, 609 F.3d 663, 674 (5th Cir. 2010); *United States v. Allen*, 247 F.3d 741, 795 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).

The government cannot establish, beyond a reasonable doubt, that these multiple errors were harmless, individually or together, *see* 18 U.S.C. § 3595(c)(2)(C); *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009); *United States v. Jackson*, 327 F.3d 273, 307 (4th Cir. 2003) — in other words, that they "did not contribute to the verdict." *Chapman v. California*, 386 U.S. 18, 24 (1967). By deploying mutually exclusive and legally unsupportable aggravating factors, the government induced jurors to weigh one, if not two, they never even should have considered. And by further inviting them to redundantly count the same aspect of the killings to support three different factors, the government placed additional "thumb[s]" on "death's side of the

170

scale." *Stringer v. Black*, 503 U.S. 222, 232 (1992).

These errors affected all four of the aggravators involving the murders themselves, the majority of those found by the jury. JA2307-2308, JA2321-2322. The result was not just to inflate the number of aggravating factors weighed in favor of death — which alone was prejudicial. *See McCullah*, 76 F.3d at 1112 ("the mere finding of an aggravating factor cannot but imply a qualitative value to that factor"); Devine & Kelly, *Life or Death: An Examination of Jury Sentencing With the Capital Jury Project Database*, 21 Psychol. Pub. Pol'y & L. 393, 395, 401 (2015) (study of almost 1,000 capital jurors from more than 200 trials showed that "each additional aggravating factor increased the odds of a death sentence by 49%"). The errors also led jurors to incorporate government allegations that deserved no place in the sentencing decision in any form.

Nor did these four aggravating factors, as presented by the government, merely stand in the background at Council's sentencing. Determining his motive for the murders shared center stage: In summation, the prosecutor spent 18 transcript pages on these aggravators, almost half of which he devoted to Council's reasons (or

171

lack thereof) for shooting Major and Skeen.  DE906:11-28.  *See Johnson*, 486 U.S. at 590 & n.8 ("plainly justified" for state supreme court to "eschew harmless error . . . because the district attorney argued this particular aggravating circumstance") (cleaned up); *Clemons v. Mississippi*, 494 U.S. 738, 753-54 (1990) ("very difficult to accept" finding that invalidation of aggravating factor was harmless where prosecutor "emphasized and argued" it to jury).

Nor was this a case in which an error on the aggravation side of the scale did not matter because no mitigation was presented.  *See, e.g., United States v. Mikhel*, 889 F.3d 1003, 1058 (9th Cir. 2018).  On the contrary, most jurors credited several substantial mitigating factors involving Council's traumatic upbringing.  JA2309-2314, JA2323-2328.  *See* Facts-V.  And, as they were told, JA6044, JA2317, JA2331, just one vote against death would have resulted in a life sentence.  *See* 18 U.S.C. § 3593(e); *Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) (*per curiam*). Indeed, federal juries in this Circuit have declined to return death verdicts in two thirds of capital cases, including many equally or more aggravated.  *See* Point II.D.

172

Accordingly, this Court should vacate Council's death sentences and remand for resentencing. *See* 18 U.S.C. § 3595(c)(2)(C).

## VI.

**The government's "victim impact" presentation outstripped constitutional and statutory limits, injecting passion, prejudice, and arbitrary factors into the jury's sentencing decision.**

## A.    Introduction and Standard of Review

While the government may introduce evidence of the "injury and loss suffered by the victim and the victim's family" at a capital sentencing, 18 U.S.C. § 3953(a); *Payne v. Tennessee*, 501 U.S. 808, 825-26 (1991), the Fifth and Eighth Amendments and the FDPA circumscribe such evidence. Here, though, the government's presentation overran all of these constraints. It became a lifetime retrospective about each victim starting from childhood and detailing their value to their professional, church, and local communities. And it was highlighted by repeated sobbing and long halts in the testimony when the witnesses were emotionally overcome by questioning prosecutors seemingly knew would bring each to a breaking point. More like a memorial service, this presentation courted a death verdict

based on passion, prejudice, and arbitrary factors. Council's challenge

to it implicates constitutional rights and is reviewed *de novo*. *See*

*United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011).

## B. The court rebuffed repeated defense efforts to set boundaries on the government's evidence.

The government's pretrial notice alleged, as an aggravating factor,

that Council had "caused injury, harm, and loss" to Major and Skeen as

well as to their "family, friends and co-workers," as "evidenced by each

victim's personal characteristics and by the impact of the victim's

death" on those people. JA141.

The defense challenged this as overbroad, citing the failure to

identify the "injury, harm, and loss." It presciently warned the

allegation "sets the stage for a virtually unlimited presentation," in

which "improper evidence would reach the sentencing jury." Council

also objected to impact beyond "personal loss," and evidence so

"emotionally charged" as to be "unduly prejudicial." Alternatively, the

defense asked for a "more definite statement" of the victim impact, so

the court could vet it for improper content, as other courts had done.

JA495-498 (citing decisions). But the government insisted that any

pretrial limitations or even review of this evidence "would be patently unfair to the victims' family members and friends," JA943, and the court agreed, JA1061-1063.

Council's attorneys renewed their requests the month before trial. They explained that "neither the Court nor the defense actually knows what [impacts] the government has in mind," and reiterated their need for an outline of the testimony, lest an unchecked presentation devolve into a "multi-day memorial service – culminating in an appeal for the death penalty as catharsis." JA1836-1839; *see* JA1526. Council also objected to evidence of Major's journal entry the day of the crime because it discussed prayer and her church and because, along with family photos of Skeen and a fundraising wristband she was wearing when she died, it was irrelevant and unduly emotional. JA1479-1483.

At a hearing two weeks before trial, the government identified its anticipated victim-impact witnesses, JA2048-2050, but, as the defense noted, still withheld "the injury and the scope of what they'll be testifying the loss is." So Council's lawyers had no way to know if the testimony "falls within the ambit of victim impact evidence" or "violate[s] *Payne*." They also took issue with non-family witnesses and

evidence of non-personal impact, and repeated that the "courtroom is not an appropriate venue for . . . memorial services." JA2055-2058. Nonetheless, the court licensed victim-impact without additional notice or any of the constraints sought by the defense. JA1978, JA1982 & n.9.

Before voir dire began, the defense objected again, warning that such "expansive victim-impact," with a "tidal wave of positive images of the White victims and their wonderful lives," also would exert a "priming effect" on White jurors' less-conscious racial biases. JA2129, JA2133-2139 (citing research that Black men convicted of killing White women in South Carolina are "much [*i.e.*, ten times] more likely" to receive a death sentence); *see also* Facts-I.

The defense again urged the court to exercise some control over the victim-impact evidence just before the presentation commenced. Council's attorneys complained that it remained "very difficult to figure out what the scope" of it would be, and again objected unsuccessfully to Major's journal entry and to recently disclosed text messages a friend had sent to both victims. JA4910-4911. But the court did nothing except ask the government to "try" to keep each victim-impact witness to "within the 30-minute range." JA4910.

176

After the first day of victim impact, Council's attorneys renewed their objection to testimony "not permitted as a category or because its probative value is outweighed by the danger of creating unfair prejudice." Noting that the government's presentation "appears to far exceed the 'quick glimpse' into the victims' lives" permitted by *Payne*, 501 U.S. at 822, the defense again pleaded with the court to preview and limit the remaining evidence. It also sought to strike testimony about the effects of Skeen's and Major's deaths on other bank employees and the local community.[70] Counsel voiced concern as well about the presentation's becoming "inflammatory" and inviting a "verdict based on emotion," invoking another district court's warning that "'a trial is not the same as a funeral.'" JA2210-2214, *quoting United States v. Fell*, 2017 WL 10809983, *10 (D. Vt. Jan. 20, 2017).

The next day, Council's attorneys again complained about "not knowing what the scope of their testimony is going to be" or "what the exhibits are" as each victim-impact witness took the stand. When the testimony ranged beyond legal boundaries, that put them "in a real

---

[70] The court's tepid instruction in response, which was followed by more community-impact evidence, is discussed below.

bind" because they were reluctant to be "jumping up in front of the jury" to "make objections" and thus "sounding insensitive" to "these witnesses [who] who are suffering."  JA4938, JA4941-4942, JA4944.  Counsel's concern was a valid one.  *See, e.g., United States v. Johnson*, 713 F. Supp. 2d 595, 625 (E.D. La. 2010) (during sidebar objection, victim-impact witness remained on stand and "continue[d] to cry within feet" of jurors, leaving them "totally vested in her plight" and "feel[ing] her misery unattended by counsel and the Court").  The court, however, still refused to preview or limit the government's remaining victim-impact evidence.  JA4944, JA4949; *see also* JA2216-2217.

## C. The government's extensive presentation transgressed almost every boundary on victim impact set by the Supreme Court.

The government's sentencing case lasted three days, with victim-impact testimony on each and book-ending its case for death:

Day 1:     Cathy Lambert - both victims' co-worker
           Gracie McClary - both victims' co-worker

Day 2:     Tracy Skeen - Skeen's husband
           Betty Davis - Skeen's mother
           Patricia Floyd - Skeen's childhood friend
           Laura Davis - Skeen's friend of one year

Day 3:     Heather Turner - Major's daughter

Bonnie Reed - Major's friend
Douglas McCrea - Major's son
Katie McCrea - Major's daughter

More than half of the government's sentencing case (10 of 19 witnesses and 136 of 252 transcript pages) consisted of victim impact. The government also presented 40 photographs from the victims' lives, along with voicemails, journal entries, social-media posts, and text messages. JA2386-2388; *see also* JA7857, JA7872-7875. This far exceeded the presentations at comparable federal death-penalty trials in this Circuit. In *United States v. Barnette*, 211 F.3d 803, 818 (4th Cir. 2000), for two homicide victims, only seven of the government's 23 sentencing witnesses gave victim-impact testimony. All were family members, and their testimony constituted "only a small portion," less than a quarter, of the government's case. *See also, e.g.*, *United States v. Umana*, No. 10-6, App. Br. 16 (4th Cir. Sept. 3, 2013) (four victim-impact witnesses total in two-victim case); *United States v. Higgs*, No. 01-03, Gov. Br. 16-17 (4th Cir. Dec. 18, 2002) (same); *United States v. Stitt*, No. 99-2, Gov. Br. 26, 63 (4th Cir. Sept. 27, 2000) (one family witness for each of two victims with victim-impact testimony occupying just 19 of 1,082 transcript pages).

179

But more than its volume, the main problem with the presentation here lay with its content.

### 1. The presentation covered the victims' entire lives and even biographical information about their friends, becoming like the memorial service the defense had feared.

To prove "the specific harm caused by the defendant to the victim's family" that bears on his "culpability," the government may demonstrate the victim's "personal characteristics" and how she was "an individual whose death represents a unique loss" to her loved ones, as well as the "emotional impact of the crime" on them.  *Payne*, 501 U.S. at 832; *see* 18 U.S.C. § 3953(a); JA141.  The "personal characteristics" of the victim are best understood as "aspects of the victim's character and personality that her family would miss the most."  *Jones v. United States*, 527 U.S 373, 399 (1999).  This means not everything about the victims' lives is admissible.  *See Fell*, 2017 WL 10809983, at *10 ("a trial is not the same as a funeral").  *Payne* only involved brief testimony that a young boy missed his murdered mother and sister, and authorized presenting the jury "a quick glimpse of the life" of the victim.  501 U.S. at 822, 826; *id.* at 830-32 (O'Connor, White & Kennedy, JJ., concurring);

*see also United States v. Runyon*, 707 F.3d 475, 501 (4th Cir. 2013).

And *Payne* cautioned that victim impact is not meant "to encourage

comparative judgments . . . for instance, that the killer of a

hardworking, devoted parent deserves the death penalty" more than

one whose victim is "perceived to be less worthy." *Payne*, 501 U.S. at

819, 823.

Here, the government transgressed the boundaries of those

decisions. It spun out the story of the 36- and 59-year-old victims'

entire "wonderful lives" from birth, effectively immersing the jury in the

"multi-day memorial service" the defense had forecast. JA1836-1839,

JA4097, JA4108.

The prosecutor had Skeen's mother share stories from Skeen's

childhood — about her hair becoming tangled as a baby, buying her first

bra, losing her mother's earrings, and wrecking the car as a teen — and

introduced photos of Skeen as a young child and teenager. JA4971-4976,

JA6546-6549, JA6550. The next witness, Patricia Floyd, a friend,

recalled Skeen as a teenager and how she got Skeen her first banking job

when she was 18, almost 20 years before the homicide. JA4996-4997,

JA4999. Both witnesses, along with Skeen's husband, also testified about

planning and celebrating Skeen's wedding a decade and a half before, and how Skeen had acted and felt that day.  The prosecutor introduced photos from the wedding as well.  JA4976-4977, JA5002, JA6545, JA6551.

The government followed the same pattern for Major.  Through her adult children, the prosecutor presented various stories and photographs of their childhood haircuts, vacations, sports events, and holiday outfits from decades before.  JA5261-5262, JA5287-5288, JA5299-5300, JA5303-5304, JA5314, JA6599, JA6603, JA6604, JA6605. Her daughter, Heather Turner, also described Major's birth and childhood, including Major's difficulties with her own parents. JA5261.

These emotional stories and exhibits of distant memories did not reflect the specific, current loss that *Payne* contemplated.  Testimony and photographs about the victims' childhoods, adolescence, weddings, and early years of parenting did not show the crimes' impact on their loved ones decades later.  Such an account of the victim's entire "life from her infancy until shortly before she was killed" is a "far cry from . . . the brief oral testimony condoned in *Payne*," as it "portray[s] events that occurred long before" the crime "and that b[ear] no direct relation to the effect of [the] crime on the victim's family members."  *Kelly v.*

182

*California*, 129 S. Ct. 564, 567 (2008) (Stevens, J., respecting the denial of certiorari; Souter & Breyer, JJ., would also "grant certiorari"). This Court has only allowed victim impact containing testimony about a victim's childhood when it was directly relevant to the crime's impact, *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006) (victim's childhood sexual abuse affected her response to being raped by the defendant), or when the Court just approved the presentation "on the whole" and mainly because it was "only a small portion" of the sentencing, *Barnette*, 211 F.3d at 818.

Here, moreover, several witnesses also testified about *their own* sympathetic life stories. For example, Laura Davis, who came to know Skeen just ten months before the crime, described her grief at her own son's death from gun violence on every page of her testimony. The government also had her share her own upbringing and marriage. JA5011-5012, JA5015-5023. The prosecutor similarly asked Patricia Floyd, Skeen's friend, to talk about caring for Skeen's children many years before, JA5002-5003, and had Bonnie Reed, Major's friend, testify to her own family's history and challenges, and a quilt she made for Major's husband. Indeed, half of her testimony was about herself and her own

life, and provided no information about Major or the witness's loss from her death.  JA5274-5282, JA6602.

All this, particularly the terrible death of Davis's son, served only to foster a sense of familiarity and derivative empathy for the witnesses.  While they deserved that, Council's sentencing was not the place for it.  Eliciting this evidence "that had nothing to do with the defendant risk[ed] inappropriately affecting jurors who might feel that" the victim-impact witnesses "should be vindicated for all [their] tragedies, not just for the one caused by [the defendant]."  *Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020).

### 2. The evidence improperly extended to the impact on the victims' church, work, and local communities.

In *Payne*, the Supreme Court approved evidence about the *personal* loss suffered by a young boy from the absence of his slain mother and sister, and described in comparable terms the kind of victim-impact the Eighth Amendment allows.  501 U.S. at 816, 817, 827; *id.* at 831 (O'Connor, White & Kennedy, JJ., concurring); *see also Jones*, 527 U.S. at 399 ("personal characteristics" of the victim is best understood as "those aspects of the victim's character and personality

184

that her family would miss the most.").  Similarly, the FDPA authorizes evidence about "the injury and loss suffered by the victim and the victim's family."  18 U.S.C. § 3953(a).

Despite that language, this Court in *Runyon* allowed some evidence about the effects of a Naval officer's death on his shipmates because it likened such close friendships and personal loss to the experience of family members.  707 F.3d at 500 (noting testimony that "everyone on board . . . loved" the victim); *see United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008) (approving evidence of personal impact on "friends who (also) worked with the victim," but not "loss of [victim's] contribution to an office, unit or team").  Similarly, *Runyon* also approved brief evidence about the victim's "position and duties" on the ship as a "quick glimpse" of his "uniqueness as an individual human being."  707 F.3d at 501 (cleaned up).

*Runyon*, however, did not license evidence about the victim's value to the Navy or its loss from his death.  Any such impact on a victim's "community" — whether broad or localized, such as her church, workplace, or neighborhood — would sidestep the Supreme Court's caution against using victim impact to suggest that "defendants whose

185

victims were assets to their community are more deserving of

punishment." *Payne*, 501 U.S. at 809, 823; *see also Humphries v.

Ozmint*, 397 F.3d 206, 219, 224, 225 n.8 (4th Cir. 2005) (*en banc*).  Value

(or loss) to the victim's community also would represent an "arbitrary

factor" on which a death sentence may not rest.  18 U.S.C.

§ 3595(c)(2)(A).

Here, the government repeatedly crossed that line.[71]  Instead of

just recounting the personal impact of the victims' deaths on family or

even close friends who were also colleagues, the government repeatedly

elicited testimony about the effects on employees of other banks,

members of the victims' churches, and residents of the local community.

The prosecutor asked the second witness, Gracie McClary, who

oversaw CresCom security and knew the victims mainly through work,

about their "relationship . . . with other coworkers or the bigger

community within CresCom" and the "reaction or impact" of their

---

[71] To preserve it for future review, Council also maintains his
broader argument, *see* JA496, JA1062, that *Runyon* was wrongly
decided and that non-family victim impact is categorically barred under
the Eighth Amendment and the FDPA, which explicitly licenses only
evidence of "the injury and loss suffered by the victim and the victim's
family," § 3593(a).

deaths on those people.  McClary responded about other branches'
employees: "[I]t was the worst . . . It was very impactful.  I was just
amazed at the people, of course, initially people were really upset and
there was a lot of tears and that was in the local bank."  She added that
some CresCom employees even quit their jobs because of the killings.
JA4931.

She also told the jury how Skeen's and Major's deaths had deeply
affected other banks' employees and local residents.  In "the days that
followed, there was an outpouring from the community" and "a florist
that made up CresCom-colored ribbons and even our competitors had
ribbons on their doors.  And I took pictures of those and . . . there was a
memorial right in front of the door the next day, flowers and cards and
letters were coming from all over the place . . . it wasn't just the fact
that it was our family that was attacked, it was the fact that the
financial community, it was like a stab in the heart, it really was."
JA4931-4932.

Continuing with this theme, McClary testified about a memorial
rock garden outside the bank with "hundreds of rocks that people have
painted in Donna and Katie's memory that's still out there today," two

187

years after the murders.  JA4933.  The government presented pictures of the garden, showing messages written on the rocks by local residents, such as "Rest in paradise," "when angels are near," "heaven has two more angels," and "I'll hold you in my heart until I can hold you in heaven."  JA6542, JA6543, JA6544.  And it elicited that CresCom had created a scholarship fund in the victims' names, and had McClary read aloud the moving inscription on a memorial plaque.  Only then did the prosecutor finally ask how the victims' deaths had impacted her.  Her answer took up just nine lines of transcript.  JA4935.

The next morning, after the defense again renewed its objections to such evidence, the court instructed the jury:  "To the extent there was any testimony from yesterday" about effects on the local or banking "community *as a whole*," jurors should disregard it, but could consider "impacts," presumably of any kind, on family, friends and coworkers. JA4919 (emphasis added).

This could not cure the prejudice created by McClary's testimony. Not only was it too late, especially since the defense had pleaded with the court to vet and limit the testimony before it was given.  But the instruction was also tentative ("[t]o the extent there was"), did not

immediately follow the testimony, and did not even identify the witness it was talking about, let alone specify the testimony to be disregarded. And, at best, it placed out of bounds only generalized impact on the banking or local "community as a whole," not impact on individuals in those communities, whose reactions McClary had specifically described. *See United States v. Hall*, 989 F.2d 711, 717 (4th Cir. 1993) (curative instruction was insufficient where it addressed only some of the improper aspects of the government's cross-examination); *United States v. Bolick*, 917 F.2d 135, 139 (4th Cir. 1990) (limiting instruction on improper testimony was "critically incomplete").

Indeed, even after the instruction, the government continued to introduce evidence about the victims' value and the effects of their deaths far beyond the "personal" — confirming for jurors that testimony on that subject remained fair game. At the prosecutor's urging, Skeen's husband discussed how she ran "fund-raisers" and "a lot of charities to raise moneys for people in the community" for "anything they needed." JA4961-4962. In Laura Davis's testimony, the government focused on how Skeen created a community program to raise funds for a scholarship in memory of Davis's son, displaying photographs of the

189

events and asking Davis to show off her memorial wristband.  The

prosecutor also led Davis through testimony about Skeen's central role

in a youth group at the church Davis and her husband ran, including

organizing a talent show, chaperoning a mission trip, and making plans

to start a teen center for troubled kids.  JA5014-5021, JA6552, JA6553,

JA6554; *see also* JA4098, JA4149.

The government made Major's and Skeen's religious faith a

through-line, taking pains to have other witnesses testify about the

Christian identities, prayers, and beliefs they shared with the victims.

On the first day, the prosecutor read aloud an entry from Major's

personal journal reminiscing about the time "before I became a

Christian."  JA4922.  That entry was introduced along with the

preceding one about how Major told a bank customer of her church and

reminded herself to "pray for" the woman.  JA6600, JA6601.  That same

day, McClary, asked about the impact of Major's death, answered that

the two had "shared our faith," and that her "great faith in the Lord"

had helped her deal with Major's death; she had also prayed for the

families and employees who were impacted.  JA4929, JA4935.

On the second day, Skeen's husband discussed the mission trip

they chaperoned for the church youth group, including how they did "some testifying" and led a church service that was so well received they were asked to do a second one.  JA4962.  The government had Skeen's mother, who testified next, share a moving story of Skeen's asking permission to pray for her.  JA4977-4978.  When the government asked that day's last victim-impact witness, Laura Davis, about a small boat Skeen kept on her desk, she explained it was a reminder of a sermon about Jesus's being in the boat with believers, and that she took the boat after Skeen's death to remind her of the sermon and how Jesus is "with us when we go through deep waters."  JA5017, JA5020-5021, JA5023; *see also* JA6419 (photograph of the boat).  Davis also called Skeen the "hands and feet" of the memorial fundraiser for Davis's son, an allusion to the Christian teaching to "be the hands and feet of Jesus."[72]  And she identified a photograph of Skeen and others at the fundraiser wearing T-shirts emblazoned with a Biblical scripture: "I have fought the good fight, I have finished my course, I have kept my faith.  2 Timothy 4:7."

---

[72] *See, e.g.,* Christianity.com, *What Does It Mean to Be the Hands and Feet of Jesus?*, https://christianity.com/wiki/jesus-christ/what-does-it-mean-to-be-the-hands-and-feet-of-jesus.html.

JA5015-5016, JA6554.

On the third and last day of the government's case, Major's oldest daughter, Heather Turner, reminded jurors of her mother's journal entry and how "she was praying for one of her customers at the bank." JA5272. The next witness, Bonnie Reed, was retired but introduced herself by saying she had opened a Christian counseling center years earlier when she first moved to South Carolina. She then recounted how she had prayed for God to bring her a friend before she met Major at church ("God brought [her] to me"), where they became prayer partners. JA5275-5277, JA5280, JA5283. The photo of the quilt Reed made for Major's husband displayed a large block saying: "I ♥ MY CHURCH." JA6602.

Even if some information, such as about having met or shared activities in church, might have been relevant to establish the context for the victims' close friendships, these repeated, deliberately elicited stories went much further. They suggested that, because of their Christian devotion, Major and Skeen were more "worthy" victims, and their deaths represented a greater loss, particularly for their church

communities.  This evidence also made the faith the witnesses shared

with the two slain women a touchpoint in the priming effect for juror

sympathy that the defense had predicted — especially since most of the

jurors had said on their questionnaires that they considered religion an

"important part" of their lives.  JA6784, JA6852, JA6869, JA6903,

JA6920, JA7073, JA7124, JA7243.

These features of the presentation not only exceeded the

boundaries of *Payne*, they also violated the FDPA's directive that jurors

"shall not consider" the "religious beliefs" of "the defendant or any

victim," 18 U.S.C. § 3593(f), as well as the Eighth Amendment's

prohibition against such arbitrary factors in capital sentencing, *see*

*South Carolina v. Gathers*, 490 U.S. 805, 820 (1989) (O'Connor &

Kennedy, JJ., and Rehnquist, C.J., dissenting) ("It would indeed be

improper for a prosecutor to urge the death penalty be imposed *because*

of the . . . religion . . . of the victim.").[73]

---

[73] Although jurors were instructed on the statutory prohibition
and certified on the verdict form they had followed it, JA6040, JA6063,
JA2318, JA2332, it would have been illogical for them to think that meant
they should ignore all the above-described evidence they had
heard during the government's three-day sentencing case.  *See Boyde v.
California*, 494 U.S. 370, 383-84 (1990).

> **3.** **By bringing each victim-impact witness to the point of emotional breakdown, the government likely inflamed the jurors.**

Skeen's and Major's loved ones were understandably grief-stricken at their devastating and irrevocable loss. But victim-impact evidence presented in a courtroom may not become so emotional or provocative as to be "unduly prejudicial" or "unduly inflammatory." *Payne*, 501 U.S. at 831-32 (O'Connor, White & Kennedy, JJ., concurring); *see also* 18 U.S.C. § 3595(c)(2)(A) (forbidding death sentence based on "passion"). Courts must strictly police such testimony because of its "unsurpassed, emotional power . . . on a jury," including its likelihood of causing jurors "to make a determination . . . on the basis of inflamed emotion and bias." *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005); *see also, e.g., United States v. Smith*, 2020 WL 6536208, at *3 (D. Alaska Nov. 5, 2020) (implementing measures to prevent "an overly emotional" victim-impact "witness whose presentation may become unduly inflammatory").

But here, rather than present this volatile testimony from grieving family members as objectively as possible, the prosecutors, with intimate familiarity, identified the emotional flashpoint for each

194

witness, made that a climactic moment in the testimony, and prompted the witnesses to dwell on how it made them feel. As expected, this led to repeated sobbing and breakdowns from Major's and Skeen's loved ones, in front of the jury.[74] *See Johnson*, 713 F. Supp. 2d at 623 (where several victim-impact witnesses were "breaking down in tears . . . the transcript alone cannot capture the emotional impact that permeated the courtroom with this testimony").

This began with the government's first sentencing witness, Cathy Lambert. Toward the end of her testimony, the prosecutor signaled: "I want to move to talk to something I know is a little difficult to talk about," and showed her the entry from Major's journal on the day of the crime. JA4920. When it apparently left her sobbing, the prosecutor said: "I was going to ask you to read that, but I don't want to make you do that," and read it aloud himself.[75] He then turned to an equally

---

[74] The record also suggests that the victims' family and friends were a substantial presence in the courtroom. *See* JA1424-1425, JA6142, JA4089, JA4229-4230, JA4851.

[75] *See* Lang, *Teary coworkers speak out during sentencing in death-penalty case: 'We were all family,'* The Sun News (Sept. 25, 2019)*,* https://myrtlebeachonline.com/news/local/crime/article235436827.html.

195

emotional subject, how she learned about the crime.  When Lambert began to answer but could not continue, the prosecutor apologized for upsetting her.  He then moved to the climax, the two texts she sent the victims upon hearing news of the crime, desperately asking if they were all right.  Apparently Lambert again became visibly upset, as she could only nod in response to the prosecutor's first question, and could not answer his next one at all.  Once she was finally able to speak, the prosecutor assured her: "I got one more question and then we'll be done, okay."  After she responded, in understandably emotional terms, about how she had to quit her job at CresCom because it was too painful, the prosecutor closed by comforting her: "I understand.  Thank you, Cathy. I know this is very difficult for you."  Defense counsel objected to that commentary at sidebar, but the court defended it as "an honest" statement by the prosecutor.  JA4921-4925.

The next day, the government led Skeen's husband through a similar litany.  As soon as the prosecutor displayed a photograph of Skeen and their two children and began to ask about it, her husband apparently lost his composure, and had to halt his testimony for 21 seconds.  Finally, the prosecutor tried to comfort him: "Take a breath for

196

me, Tracy, I know it's hard." When Skeen's husband was still unable to speak, this time for 15 seconds, again the prosecutor stepped in: "Look at me, I'm going to ask you a couple of questions, so talk to me, okay?" JA4958-4959, JA6727, JA6735.

A few minutes later, the prosecutor had Skeen's husband reenact, moment by moment, what it was like when he "learned about what happened to Katie." Like Lambert, he understandably broke down and again could not speak for 14 seconds, during which he was visibly crying.[76] This was the fourth time he had to halt his testimony. The prosecutor then asked Skeen's husband to read a letter his elder son had written to Skeen after her death: "Tracy, I know this is really hard . . . I'm going to ask you, do you want me to read that." Even though Skeen preferred that ("You can read it. I will if you want me to."), the prosecutor displayed it on the monitor, and pressed him: "Why don't you read that to the jury if you can." Skeen's husband attempted to do so, through tears, but when he was unable to continue, the prosecutor

---

[76] JA6723; *see* Lang*, Council trial: CresCom bank robbery victim's family details getting news of her death*, The Sun News (Sept. 25, 2019), https://myrtlebeachonline.com/news/local/crime/article235456667.html.

stepped in, saying "Tracy, would you let me read the rest of that? Okay, take a break," and read the jury the letter's moving last words. The prosecutor concluded by displaying and asking about a birthday picture of Skeen, saying: "This is my last question for you, take a breath, if you can, just tell the jury . . ." JA4953, JA4958, JA4959, JA4963-4968.

The next witness was Skeen's mother, Betty Davis. She too had to halt her testimony for almost ten seconds after the prosecutor asked about the last day she saw her daughter. Again, the prosecutor comforted her, as she sobbed through her answer: "Take your time, Ms. Betty . . . I know this may be hard for you to talk about."[77] JA4978, JA6724. The prosecutor also elicited that Davis was haunted by her decision to follow police instructions to stay away from the scene when she first learned of the incident: "I would have went to the bank," Davis said, in full tears.[78] Jurors finally witnessed her silent but

---

[77] *See* Naik, *Loved ones talk about woman killed in CresCom Bank murders during Brandon Council's trial*, MyHorryNews.com (Sept. 25, 2019), https://myhorrynews.com/news/loved-ones-talk-about-woman-killed-in-crescom-bank-murders-during-brandon-council-s-trial/article_18a1298c-dfca-11e9-b830-539b400a9184.html.

[78] *See* Lang, *Council trial*, *supra*.

dramatic confrontation with Council after she finished testifying, walked past counsel table, and "turned and . . . stared at Council, who sat just feet away."[79]  At this point, even the government acknowledged that its "presentation was getting emotional," and sought a short break before returning with "another emotional witness."  JA4981.

That was Patricia Floyd, a long-time friend of Skeen's.  About two-thirds of the way through her testimony, the prosecutor asked her as well "about . . . the day Katie was killed."  After recounting how she visited Skeen at work that day and reciting the last words they spoke to one another, Floyd paused before the jury for 15 seconds, presumably also overwrought.  JA6724, JA5003-5005.

The government's questioning prompted similar moments on the third and final day, from Major's adult son, Doug McCrea, and her two adult daughters, Katie McCrea and Heather Turner.  All of them wept during their testimony (Katie, as she clutched a quilt her mother had made).[80]  The prosecutor showed Doug his "favorite" photograph, one of

---

[79] *See id.*

[80] Lang, *'She was everything to me': Children of CresCom murder victim testify in capital trial*, The Sun News (Sept. 26, 2019),

Major and his daughter on a special trip they all took.  When the prosecutor asked, "Tell me, Doug about this picture," he grew so distraught that he had to stop his testimony for six seconds, before telling jurors: "That's what I can't handle." JA5296, JA6724.  Major's daughters also were unable to continue, each for nearly ten seconds, apparently also understandably overcome when asked certain triggering questions.  JA5273, JA5303, JA5308, JA6724.

Testimony about personal loss and suffering from a loved one's death is admissible only if it "does not cross the line to a highly emotional and inflammatory appeal to the jury's passions and prejudices." *Simpkins v. State*, 486 S.E.2d 833, 837 (Ga. 1997).  The extended weeping and repeated emotional breakdowns by multiple witnesses here went well into that territory.  *See also Johnson*, 713 F. Supp. 2d at 624 ("highly charged emotional content of the victim impact testimony created an atmosphere of overwhelming sympathy for the victim and the victim's family").

---

https://myrtlebeachonline.com/news/local/crime/article235518397.html.

200

And several things made it worse. The prosecutors demonstrated awareness that certain questions or photographs would be especially painful for each witness, and they appear to have planned their questioning to climax with such displays. *See Johnson*, 713 F. Supp. 2d at 625 (victim's widow's extended sobbing on witness stand "could have been easily predicted by the government"). This is clear from how each line of examination followed a prosecutorial warning or signal, for example, that the questioning was turning to a "difficult" or "hard" area.

Furthermore, several of these emotional moments came when prosecutors asked the witnesses to read statements or add commentary to photographs that were already in evidence. Thus, much of the testimony during which they broke down or were overcome in front of the jury was gratuitous. And the rest was cumulative. For example, the prosecutor questioned all three of Major's children about not only their own reactions to news of her death and their own pain and loss, but also each other's. JA5269-5271, JA5294-5296, JA5305-5307.

Finally, this problem was not an inevitable byproduct of victim impact. The court could have been prevented or at least substantially

201

mitigated it by heeding defense counsel's entreaties to preview and control the testimony.  *See, e.g., United States v. Henderson*, 485 F. Supp. 2d 831, 849-50 (S.D. Ohio 2007) (court reviewed proposed victim-impact statements, redacted them, and had witnesses read them to jury without deviation).

## D. The government's improper presentation was highly prejudicial, especially in this cross-racial case with a predominantly White jury.

Council preserved these issues by unsuccessfully objecting to various victim-impact testimony and exhibits and by repeatedly asking the court to vet and confine the evidence to avoid the very transgressions of legal boundaries that resulted.[81]  JA4083-4084, JA4089 (allowing Council's denied motions *in limine* to carry forward as standing objections).  S*ee* Fed. R. Crim. P. 51(b) ("A party may preserve a claim of error by informing the court — when the court ruling or order is made or sought — of the action the party wishes the court to take"); *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996)

---

[81] As noted, counsel also explained how they were hamstrung from objecting further by the lack of notice of the presentation's contents and their reasonable apprehension of the prejudice that would ensue from interrupting emotional family witnesses with lengthy sidebars.

("motions *in limine* may serve to preserve issues that they raise without any need for renewed objections at trial").[82]

Accordingly, vacatur is required because the government cannot prove beyond a reasonable doubt that the offending portions of the presentation did not contribute to Council's death verdicts. *See* § 3595(c)(2); *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009). The inadmissible testimony and emotional displays were attention-grabbing and laced throughout the government's case across ten witnesses over three days. In closing, the prosecutor called victim impact (which the jurors unanimously found, JA2308, JA2322) "arguably the most significant aggravator in this case." JA5954. And he spent considerable time reprising it (with an accompanying slideshow), including the overreaching aspects. JA5934-5935, JA5940, JA5954-5957, JA7872-7875.

Empirical studies confirm that capital juries are powerfully influenced by such evidence, particularly by the improper elements

---

[82] Moreover, because the presentation injected "passion, prejudice," and "arbitrary factor[s]" into the sentencing decision, relief is required regardless of preservation. § 3595(c)(2)(A).

here, such as highly emotional displays and a focus on the victim's social or community value.[83]  This research also shows that victim impact can activate jurors' biases in favor of victims of the same color and class, with whom they are most inclined to identify and empathize, a risk heightened by the government's over-the-top presentation here.[84]

Nor, finally, can this error be dismissed as harmless on a theory that a death sentence was somehow a foregone conclusion.  Federal juries in this Circuit usually decline to return death verdicts, even in comparably or more aggravated cases.  *See* Point II.D.  Here, moreover,

---

[83] *See, e.g.,* Estrada-Reynolds, *et al.*, *Emotions in the Courtroom: How Sadness, Fear, Anger and Disgust Affect Jurors' Decisions*, 16 Wyo. L. Rev. 343, 343-44 (2016); Myers & Greene, *The Prejudicial Nature of Victim Impact Statements*, 10 Psychol. Pub. Pol'y & L. 492, 498, 499-500 (2004); Nadler & Rose, *Victim Impact Testimony and the Psychology of Punishment*, 88 Cornell L. Rev. 419, 431 (2003); Sundby, *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell L. Rev. 343, 353-54 (2003).

[84] *See, e.g.,* Salerno, *The Impact of Experienced and Expressed Emotion on Legal Factfinding*, Annu. Rev. Law & Soc. Sci. 17:181, 187-88 (2021); Karp & Warshaw, *Their Day in Court: The Role of Murder Victims' Families in Capital Juror Decision Making*, 45 Crim. L. Bull. 4, 10 (2009); Schweitzer & Nunez, *Victim Impact Statements: How Victim Social Class Affects Juror Decision Making*, 32 Violence & Victims 521 (2017); Phillips, *Thou Shalt Not Kill Any Nice People: The Problem of Victim-Impact Statements in Capital Sentencing,* 35 Am. Crim. L. Rev. 93, 102-03 (1997).

most or all of the jurors credited several substantial mitigating factors for Council. These centered around his traumatic youth marked by the death of his grandmother, his sole caretaker, at age 12. This loss had a devastating impact on the course of Council's life. He was often severely beaten by his stepfather, torn away from supportive adults in school and church, and soon abandoned to the streets of his crime-ridden neighborhood. Just a year after his grandmother's death, when Council was only 13, he was confined in a violent and corrupting juvenile prison, and kept there for several years. *See* Point II.D. Had this mitigating evidence not been swamped by the inadmissible and highly prejudicial victim-impact, at least one juror might well have found it counterbalanced the aggravation and made a life sentence harsh enough punishment for Council.

Accordingly, this Court should set aside his death sentences and remand for resentencing. *See* § 3595(c)(2)(C).

# VII.

**Contrary to Congress's mandate, the court refused to properly instruct jurors to consider what sentence they would choose if Council's and the victims' races were reversed.**

## A.    Introduction and Standard of Review

Because of grave, well-founded concerns about racial bias in the death penalty, Congress mandated that jurors be instructed to pause and consider whether they would recommend a death sentence if the defendant's and victim's races were different than they are.  18 U.S.C. § 3593(f).  Such a "race-switching" exercise is recognized as an invaluable tool for helping jurors self-identify and avoid any "less consciously held racial attitudes,"  *Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality); *Georgia v. McCollum*, 505 U.S. 42, 58 (1992) (acknowledging problem of jurors "incapable of confronting and suppressing" such biases), which, empirical studies have confirmed, pose a special risk in cross-racial cases like Council's.

Rejecting the proposed defense charge, the court's instruction did not clarify this important yet unfamiliar step, or even distinguish it from the separate prohibition against considering race.  Worse, in a

straightforward statutory error, it simply omitted the race-switching step from the process of choosing a sentence. Instead, the court merely told jurors that, *after* a sentence was decided and recorded, they would formalize it by attesting to this anti-bias requirement. And neither the instructions nor the verdict form gave jurors a way to do anything *but* so attest.

The refusal of the defense instruction is a preserved error, *see Jones v. United States*, 527 U.S. 373, 379-83 (1999), reviewed for abuse of discretion, *see United States v. Simmons*, 11 F.4th 239, 264 (4th Cir. 2021). Though Council did not specifically object to the court's charge as delivered to the jury, the omission of the mandatory race-switching step from the sentencing process is a non-waivable error, *see United States v. Young*, 424 F.3d 499, 508-09 (6th Cir. 2005); *United States v. Green*, 407 F.3d 434, 443-44 (1st Cir. 2005), and should be reviewed *de novo*, *see United States v. Zhou*, 838 F.3d 1007, 1011 n.2 (9th Cir. 2016), *citing Musacchio v. United States*, 577 U.S. 237, 245 (2016); *see also United States v. Woods*, 710 F.3d 195, 207 (4th Cir. 2013).

207

**B.    To identify and avoid racial bias, the FDPA required the court to instruct Council's jurors to engage in a race-switching exercise before deciding his sentence.**

When Congress reenacted the death penalty in 1988 with the Anti-Drug Abuse Act (ADAA), many legislators were determined that it avoid racial discrimination.  Much of the concern focused on *McCleskey v. Kemp*, 481 U.S. 279, 287 (1987), a controversial decision from the year before in which the Supreme Court had denied relief while accepting that Georgia defendants charged with killing White victims were more than four times as likely to receive a death sentence as those charged with killing Black ones.[85]

To address such worries, Congress required a "special" two-part jury instruction at capital sentencings.  18 U.S.C. § 3593(f) ("Special

---

[85] *See, e.g.*, 134 Cong. Rec. S7472-02, 1988 WL 171042 (June 9, 1988) (comments of Sens. Kennedy, Levin, Simon, and D'Amato); 134 Cong. Rec. S7556-01, 1988 WL 171191 (June 10, 1988) (comments of Sens. Kennedy, D'Amato, Harkin, Bumpers, and Conrad); 134 Cong. Rec. H7259-02, 1988 WL 175612 (Sept. 8, 1988) (comments of Reps. Rangel, Edwards, Conyers, Gekas, Rodino, and Skaggs); 134 Cong. Rec. S15746-01, 1988 WL 181094 (Oct. 13, 1988) (comments of Sens. Kennedy, D'Amato, and Harkin).

precaution to ensure against discrimination").[86]  It reflected Congress's intent to "take every possible step to eliminate discrimination by juries."  134 Cong. Rec. S15746-01, 1988 WL 181094 (Oct. 13, 1988) (lead sponsor, Sen. D'Amato); *see also id.* (another Republican sponsor touts "extraordinary steps that will be taken at the specific level of the jury . . . that that body of 12 citizens was not acting in a discriminatory manner"); 134 Cong. Rec. S7472-02, 1988 WL 171042 (June 9, 1988) (Sen. D'Amato: "As it related to the question of race, this bill exercises a high degree of care, seeing to it that there is no prejudice in the application of the death penalty").

Section 3593(f)'s two related but distinct instructions ask jurors to ignore race, but then check themselves by affirmatively considering the role it may less consciously be playing in their decision-making.  Thus, the statute requires first telling the jury to "not consider" the "race, color" or certain other demographic characteristics "of the defendant or of any victim . . . in considering whether a sentence of death is justified."  *Id.*  It then mandates a second instruction that the jury is

---

[86] The original 1988 provision, 21 U.S.C. § 848(o)(1), was copied six years later in the FDPA with no relevant change, as § 3593(f).

"not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race" or other prescribed demographic characteristics "of the defendant or any victim may be."[87]  *Id.*

This second, affirmative instruction demands that jurors determine if they would impose a death sentence if the races of the defendant and victim were hypothetically altered.  In other words, having ignored race consciously, at this next, complementary step, each juror must consider whether race is affecting their decision-making less consciously, by imagining, in a Black-on-White case like Council's, that the defendant were White and the victims were Black, then seeing if that changes the juror's view of the appropriate sentence.  Only if the jurors affirmatively engage in that *race-switching* process and it does

---

[87] The second instruction obviously requires something of jurors beyond ignoring race; otherwise it would simply be redundant of the first, prohibitory instruction, and Congress would have had no reason to add it.  *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (court's interpretation must "give effect, if possible, to every clause and word of a statute").  Thus the Sixth Circuit was wrong when it remarked, without explanation, that the second instruction is "substantially duplicative" of the first.  *United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013).

not change their sentencing calculus can it be said the jury "has concluded" that it would opt for a death sentence "no matter what the race . . . of the defendant or of any victim may be." § 3593(f).  (Upon returning a verdict, each juror also must sign a certificate affirming that it satisfies both anti-bias requirements.  *Id.*)

Other similar race-switching instructions have been used or proposed to address "less consciously held racial attitudes," 476 U.S. at 35, as understanding of this problem has grown in the years since *Turner*.  *See, e.g., Woods v. City of Greensboro*, 855 F.3d 639, 641 & n.1 (4th Cir. 2017) ("studies have shown that most people harbor implicit biases and even well-intentioned people unknowingly act on racist attitudes").  Most prominently, a model charge, adopted by the A.B.A. and recommended by the leading voir-dire treatise, advises jurors to engage in essentially the same exercise: "Ask yourself if your opinion of the parties or witnesses or of the case would be different if the people participating looked different or if they belonged to a different group?"  And: "If your evaluation of the case before you is different after engaging in race-switching, this suggests a subconscious reliance on stereotypes.  You may then wish to reevaluate the case from a neutral,

unbiased perspective." A.B.A., *Achieving an Impartial Jury: Removing Bias in Voir Dire and Deliberations: Toolbox*, at 19, 22 (2015); 1 *Jurywork Systematic Techniques*, § 2:12, Restructuring the voir dire — The role of the Judge (Dec. 2020 Update) (recommending ABA "race-switching" instruction); *see also*, e.g., N.Y. Criminal Jury Instructions, *Implicit Bias*, https://nycourts.gov/judges/cji/1-General/cjigc.shtml (state-approved model race-switching instruction); *State v. Plain*, 898 N.W.2d 801, 816-17 (Iowa 2017) (encouraging lower courts to give race-switching instruction, "which is a correct statement of antidiscrimination principles").

## C. The court refused to explain the statutory race-switching step to jurors, and failed even to include it in the process for deciding Council's sentence.

Council's lawyers repeatedly warned that the case's cross-racial nature and other circumstances created a risk that jurors could be swayed by racial biases, including less-conscious ones, and thus required cautionary instructions on this issue, among other measures. JA1403, JA1445-1453, JA1476-1477, JA1487-1493, JA1651-1659, JA1670-1672, JA1706, JA1712-1714, JA1949-1950, JA2134-2136. *See* Facts-I, II, V.

That included a full, comprehensible version of the charge

mandated by § 3593(f).  Council's proposal, which resembled portions of the ABA model quoted above, would have distinguished the two statutory anti-bias steps, and explained that the second involved a race-switching exercise, which jurors needed to engage in before settling on a sentence.  JA1633, JA1651-1659, JA1670-1673, JA1706.  It would have said that the second step required jurors to consider during "your deliberations" whether "the way you are responding to the evidence and testimony of various witnesses or parties differs depending on the backgrounds of the various people involved" and to "think through your responses again, imagining this time that everyone's backgrounds were reversed from what they actually are.  That is a way of checking yourself, and in that way making sure that your decision . . . is truly . . . free of any other influence of race." JA1670-1673.

The defense argued that jurors needed to hear such a "detailed instruction" on the required "race-switching exercise," a distinct "second task" that called on them to "imagine" and then make a "specific assessment of what they would conclude if Mr. Council or the victims were of different races."  JA1653-1654.  The government's opposing suggestion, that the court just recite the bare statutory language, *see*

JA1613, JA1622-1623; *see also* JA1469-1470, JA2141-2142, would not

be enough to "explain it or give it effect." JA1651-1659, JA1949-1950.

But the court rebuffed the defense proposal in favor of passing

references that failed to convey the key elements of § 3593(f) or, indeed,

even mention the second step at all in recounting how, in "the weighing

process," jurors should actually decide whether to "return a sentence of

death."[88]  In that section of its final instructions, the court mentioned

only the first step, saying jurors "must not consider the race" of Council

or the victims.  JA6040, JA2300.

Only at the very close of the *oral* charge (which took up almost 60

transcript pages), after the court had finished explaining "the process"

---

[88] At the charge conference to review the court's draft charge that omitted the defense request, *see* JA2243, JA2245, Council's attorney noted there had been "conversations" between the parties and the court about "3593(f), the implicit bias discussion." JA5345. After the final charge, trial counsel said: "Subject to all prior requests, no objection to the instructions." JA6065. This together with the litigation that preceded it timely apprised the court of Council's requested instruction and the grounds for it, prompted the court to convey that it would not give the instruction, and thus satisfied Federal Rule of Criminal Procedure 30. *See Jones,* 527 U.S. at 379-83 (instructional request preserved court's refusal to give the instruction); *but see United States v. Romer*, 148 F.3d 359, 367 (4th Cir. 1998) (suggesting counsel might also need to object after charge omitting denied instruction is delivered).

214

for deciding a sentence and moved on to how to then complete the

verdict forms, JA6043-6044, did it even mention, again in passing, the

second part of § 3593(f).  JA6063.  (The written charge, provided to

jurors as a guide in deliberations, never touched on it at all.  JA2276).[89]

Even then, the court couched it as just a *pro forma* mechanism to

formalize the verdict, rather than a necessary step in determining

Council's sentence.  After telling jurors where on the form to record a

"unanimous vote" for "a sentence of death" and that each juror would

sign and date that page, the court added that the next and "last page

. . . is the certification page . . . by signing" which "each juror certifies"

he or she had not considered race and "would have made the same"

sentence recommendation "regardless of the race . . . of the defendant

or either of the victims."  JA6063.  Never mentioning the possibility

that any juror might balk or even pause at affirming this, let alone

---

[89] The court had briefly recited the statutory language about both
steps — though, again, without explanation and without distinguishing
them— in the middle of its 23-page preliminary instructions more than
a week before, JA4866, and in an orientation video shown to prospective
jurors almost a month before, JA1828-1829.  *See United States v.
McKoy*, 277 Fed. Appx. 283, 285-86 (4th Cir. 2008) (relying on final
rather than preliminary charge in determining whether jury was
misinstructed).

what a juror should do then, the court thus presented the signatures as a foregone conclusion, a mere formality. *Compare, e.g.,* N.Y. Criminal Jury Instructions, *supra* ("If the answer is yes," that race switching *would* change juror's decision, then juror should "reconsider your views and conclusions along with the other jurors").

The verdict form for each of the two counts tracked these instructions. The final page included the promised spaces for jurors to certify they "would have made the same recommendation" of death "regardless" of the defendant's and victims' races, but did not say what to do if any could not attest to this, and included no space to record anything but an affirmative answer. JA2316, JA2318, JA2330, JA2332. *Cf. Mills v. Maryland*, 486 U.S. 367, 378-79 (1988) ("Nothing in the verdict form or the judge's instructions even arguably is construable as suggesting the jury could leave an answer blank").

**D.    The court erred in its deficient charge and abused its discretion by refusing Council's clear, complete, and correct instruction. These errors require resentencing.**

The district court erred in refusing Council's proposed instruction clarifying § 3593(f)'s race-switching step, because it was correct and not substantially covered by the court's charge. *See United States v.*

216

*Hamilton*, 701 F.3d 404, 409-10 (4th Cir. 2012); *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). The court further erred in delivering a deficient charge. Section 3593(f) mandates two specific jury instructions about the sentencing process, but the court simply omitted the second. This violated the statute as well as the Fifth Amendment. *See Clemons v. Mississippi*, 494 U.S. 738, 746 (1990) (when statutory law "creates for a defendant a liberty interest in having a jury make particular findings," that creates an "entitlement for due process purposes").

The court must instruct the jury "clearly" on the "law to be applied in the case." *United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995). While not every point of law requires explanation beyond how it is stated for lawyers and judges in statute books, some do. *Compare, e.g., United States v. Baird*, 134 F.3d 1276, 1281-83 (6th Cir. 1998) (where terms of statute have "peculiar legal significance," it will "not suffice merely to read to the jury the statute") *with United States v. Anderton*, 629 F.2d 1044, 1048-49 (5th Cir. 1980) ("terms which are reasonably within the common understanding of juries, and which are not technical or ambiguous, need not be defined in the trial court's charge").

217

And this one certainly did.  For a lay juror, just hearing for the

first time a passing reference to the statute's bare words would not have

assuredly made clear the race-switching step, a foreign and unusual

one.  *United States v. Bolden*, 514 F.2d 1301, 1308-09 (D.C. Cir. 1975)

(it can be problematic to allow a jury to "rely on a layman's

interpretation of a superficially simple but actually complex statute").

Worse, the court's charge completely omitted that step, even the

statutory language, from the process by which jurors were to determine

Council's sentence.  *See Lewis*, 53 F.3d at 34 (denial of instruction not

error where court's charge "substantially cover[ed]" the issue).  Instead,

the court affirmatively miscast it as just a technicality to be dispensed

with afterwards, upon returning the verdict.  *See Lawrence*, 735 F.3d at

402 (certification requirement involves only "the jury's memorialization

of its sentencing decision").[90]  As the defense had feared, this ultimately

---

[90] A former senior federal prosecutor and member of the Justice
Department's Capital Case Review Committee explained that the
certificate was "intended to impress upon the jurors the importance" of
the anti-bias steps required in deciding on a sentence, Little, *The
Federal Death Penalty: History and Some Thoughts About the
Department of Justice's Role*, 26 Fordham Urb. L.J. 347 (1999), *cited in*
JA1652 —not to take the place of those steps.

turned the race-switching step into a "mere 'check-the-box' formality." JA1949-1950.

The government cannot establish that these errors were harmless beyond a reasonable doubt. 18 U.S.C. § 3595(c)(2)(C). The instruction would have equipped jurors to identify and avoid less-conscious racial bias, a "point in the trial so important," *Lewis*, 53 F.3d at 34, that Congress explicitly mandated guidance on it. And it was especially important in Council's case, which involved a cross-racial crime, a trial with additional racial overtones, and a predominantly White jury. *See* Facts-I, II, V.

Empirical research, including studies cited to the district court, JA1449-1452, JA1656-1657, JA2131-2134, has since confirmed Congress's concern, and the Supreme Court's in *Turner*, that less-conscious racial bias poses a special problem for capital sentencing, especially in such cross-racial cases. Interviews with 1,198 actual capital jurors from 353 trials in 14 states, including South Carolina, revealed that, for such crimes, White jurors were significantly more likely than Black ones to hold a more aggravated perception of the defendant as "dangerous to other people," "emotionally unstable," and not knowing "his place in

219

society."  They were also significantly less likely to have a mitigated

perception of the Black defendant as "a good person who got off on the

wrong foot," "sorry for what he did," or "someone who loved his own

family," or to imagine themselves in the defendant's situation.[91]  Bowers,

*et al.*, *Crossing Racial Boundaries:  A Closer Look at the Roots of Racial

Bias in Capital Sentencing When the Defendant is Black and the Victim

is White*, 53 DePaul L. Rev. 1497, 1499-1515 (2004).

Even more troubling for a dark-skinned African-American

defendant with dreadlocks, like Council, is research showing that, in

interracial cases particularly, capital jurors are also influenced "by the

extent to which the defendant appears stereotypically Black."  A study

of more than 600 death-penalty trials in Philadelphia, over two decades,

revealed that a death sentence was more than twice as likely for a

---

[91] Such studies also suggest that having one or two Black members
on the jury, as Council did, cannot be counted on to alleviate this
problem.  For example, detailed interviews with almost 200 South
Carolina jurors who had served in more than 50 state cases revealed
that "[a] death verdict is close to guaranteed if the prosecution can
persuade at least nine of the 12 jurors to cast their first vote for death."
Eisenberg, *et al.*, *Forecasting Life and Death: Juror Race, Religion, and
Attitude Toward the Death Penalty*, 30 J. Legal Stud. 277, 280, 303-04
(June 2001).

Black defendant if his appearance was independently rated more stereotypically Black.[92]  Eberhardt, *et al.*, *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Death Penalty Outcomes*, 17 Psychol. Sci. 383, 383-85 (2006).

Such research underscores the observation of a leading national scholar on the death penalty that "[t]he idea behind" a "race-switching" instruction is that "it is impossible to remove race and its influence upon jurors' perceptions from the jury room; the best we can hope for is that jury service will be a means for jurors to grapple sincerely with their own limited perspectives."  Steiker, *Proposed Instruction*, 3 U. Pa.

---

[92] These were the contrasting images of Council and the victims repeatedly presented to the jury.  JA6422, JA7815, JA7840, JA7849, JA7857, JA7873-7875; Clancy, *FBI: Double murder suspect caught in Greenville admits to killings, says he was 'desperate,'* WNCT 9 (Aug. 24, 2017); JA4395, JA4437.

  

J. Const. L. 276, 281 (2001). This is the protection that Congress, by

enacting § 3593(f), intended to guarantee defendants on trial for their

lives, but which the court denied Council. His death sentences should

be set aside and resentencing ordered. *See* § 3595(c)(2)(C).

**VIII.**

**The FDPA's incorporation of South Carolina's new execution statute and Council's resulting sentence of death by electrocution are *ex post facto* and otherwise violate the Constitution.**

**A.     Introduction and Standard of Review**

After Council was sentenced, South Carolina passed a statute

changing its default method of execution from lethal injection to

electrocution. Council promptly challenged the constitutionality of the

FDPA's incorporation of the new law into his judgment. The district

court did not dispute that, as a result, Council now stands sentenced to

die by electrocution. Nor did it question his proof that electrocution

inflicts excruciating suffering and gross mutilation — which is why it

has been repudiated by every other jurisdiction, and found

unconstitutional in two states. But the court mistakenly believed that

the century-old decision in *Malloy v. South Carolina*, 237 U.S. 180, 185

222

(1915), holds that no legislative change in the method of execution can constitute an *ex post facto* law, and that precedent also forecloses Council's other claims. The court also erroneously ruled that Council's post-trial motion was tardy and not cognizable under Federal Rule of Criminal Procedure 33.

The scope and meaning of precedent and rules are issues of law and thus reviewed *de novo*. *See Brown & Pipkins, LLC v. Service Employees Int'l Union*, 846 F.3d 716, 729 (4th Cir. 2017); *Mitchell v. Genovese*, 974 F.3d 638, 643 (6th Cir. 2020).

## B.    Factual Background

When the district court entered final judgment in late 2019, it directed, per the FDPA, that Council be put to death "'in the manner prescribed by the law of the State in which the sentence is imposed.'" JA2345, *quoting* 18 U.S.C. § 3596(a). At the time, lethal injection was the default method of execution in South Carolina. *See* S.C. Ann. § 24-3-530(A) (1995).

But in May 2021, while Council's appeal was pending, the state revised that law, making electrocution the default method of execution. The new statute permits a condemned prisoner to opt instead for lethal

injection or a firing squad, but not if the alternative method has been

certified as unavailable by the state.  S.C. Ann. § 24-3-530(A)-(D) (May

14, 2021).  The next month, the state formally certified to its supreme

court that electrocution is "the only statutorily-approved method of

execution available," because the alternative methods are neither now

nor expected to become available.[93]  JA6215, JA6216.

Thus, under § 3596(a) and his final judgment, Council stands

sentenced to death by electrocution.  He promptly responded, two

months after South Carolina amended its statute, by filing a new post-

trial motion.  JA6170.  It presented expert affidavits, autopsy reports,

photographs, and other evidence, JA6215-JA6349; *see* JA6182-6186,

showing that "electrocution inflicts intense pain and agonizing

suffering" —"a human being is electrically on fire" — and has a "proven

history of burning and charring bodies."  *State v. Mata*, 745 N.W.2d 229,

278 (Neb. 2008) (electrocution violates state constitution); *Dawson v.*

---

[93] Thereafter, the South Carolina Supreme Court stayed two state prisoners' executions based on their challenges to electrocution.  *State v. Owens & Sigmon*, Nos. 2002-024388, 2006-038802 (S.C. June 16, 2021). The state has not since filed anything indicating it expects either alternative method to become available.

*State*, 554 S.E.2d 137, 144 (Ga. 2001) (same, because it carries "specter of excruciating pain" and "certainty of cooked brains and blistering bodies"). Council argued that the FDPA's incorporation provision and his resulting sentences of death by electrocution violate the prohibitions against *ex post facto* and cruel and unusual punishments, and also unconstitutionally delegate federal authority to South Carolina. JA6189-6212.

After the district court summarily denied his motion, JA6374, Council noticed a timely appeal, JA6387, which this Court consolidated with that from the principal judgment.

## C.    Legal Argument

### 1.    The court erred in holding Council's claims foreclosed by precedent.

The district court did not disagree that Council now stands sentenced to die by electrocution.[94] Nor did it question his evidence or

---

[94] *See also* Dep't of Justice, Office of the Attorney General, *Manner of Federal Executions*, 85 FR 47324, 47325 (Aug. 5, 2020) (should "a State in the future provide that a manner other than lethal injection is the only authorized means of execution[,] Section 3596(a) would then require execution in that manner for a Federal offender sentenced in the State"); *United States v. Higgs*, 2020 WL 7707165, at **3-4 (D. Md. Dec. 29, 2020) (government and court assume that operative state

225

the findings of two state supreme courts that electrocution inflicts agonizing suffering and gross mutilation. Nonetheless, it held, essentially *sua sponte*, that his challenges "fail on the merits" under "binding precedent" from the Supreme Court.[95] JA6384-6386. Plainly, however, the court misapprehended the case law.

Council's primary claim, JA6191-6197, was that the FDPA's incorporation of South Carolina's new execution statute constitutes an *"ex post facto* law," which the Constitution prohibits. Art. I, § 9, cl.3; Art. I, § 10, cl.1; *see Carmell v. Texas*, 529 U.S. 513, 522 (2000) (a law is *ex post facto* if it '"*changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed'"), *quoting Calder v. Bull*, 3 U.S. 386, 390 (1798). He asserted that, because electrocution is significantly more painful, mutilating, and thus inhumane than lethal injection (regardless of whether it also rises to the level of cruel and unusual punishment), the FDPA, by incorporating

---

statute for federal execution is current one, not one from time of sentencing), *rev'd on other grounds*, 141 S. Ct. 645 (2021).

[95] The government's response asserted procedural defenses but made only a vague, passing reference to the merits in a footnote. JA6359 n.2; *see* JA6369-6370, JA6384, n.15.

South Carolina's new statute, constitutes an *ex post facto* law, as applied to him, since his crime and his sentencing occurred before its enactment.  JA6191-6197.

The district court rejected this claim based on its sweeping theory that no retroactive change to a different method of execution, no matter how much less humane, can be *ex post facto*.  Rather, it ruled, "the punishment for Defendant's crimes is still death," and thus any such change is merely "procedural."  JA6385 & n.16.

But that is not the law.  The court relied on *Malloy*, which, a century ago, rejected a challenge to a South Carolina statute substituting electrocution for hanging.  But *Malloy* emphasized the change was salutary because electrocution was then considered "less painful and more humane than hanging."  *Id.* at 184-85.  Thus, as the Court has since recognized, *Malloy* "concluded that a change in the method of execution was not *ex post facto* because evidence showed the new method to be *more* humane."  *Weaver v. Graham*, 450 U.S. 24, 32 n.17 (1980) (emphasis added); *Nelson v. Campbell*, 541 U.S. 637, 644 (2004) ("no *ex post facto* violation to change method of execution to more

humane method," citing *Weaver*); *see also Baze v. Rees*, 553 U.S. 35, 42 (2008) (citing reliance in *Malloy* on "well-grounded belief," as of 1915, "that electrocution is less painful and more humane than hanging"); *Glossip v. Gross*, 576 U.S. 863, 868 (2015) (same).

Because the facts pled and supported by Council show that electrocution is substantially *less* humane than lethal injection, the district court should not have summarily dismissed his *ex post facto* claim.

The same is true for Council's claim that a sentence of death by electrocution constitutes cruel and unusual punishment in violation of the Eighth Amendment, JA6197-6205, which the district court also mistakenly thought foreclosed by precedent. JA6385, *citing In re Kemmler*, 136 U.S. 436, 447 (1890). That 130-year-old decision's view that electrocution, then a new, untried mode of execution, could "produce instantaneous, and therefore, painless, death," *id.* at 443, "does not constitute a dispositive response to litigation of the issue in light of modern knowledge," *Poyner v. Murray*, 508 U.S. 931, 933 (1993) (Souter, Blackmun & Stevens, JJ., dissenting from denial of certiorari), which has now proven otherwise. JA6202-6204, JA6215 to JA6349.

228

*See Mata*, 745 N.W.2d at 271, 278; *Dawson*, 554 S.E.2d at 143.

Finally, the district court also misread precedent in giving short shrift to Council's claim that the FDPA's incorporation provision unconstitutionally delegates the determination of his sentence, which includes how he will be put to death, to the evolving, unfettered discretion of South Carolina officials, simply because he was federally sentenced there.[96]  JA2354-2357, JA2369-2370, JA6207-6212, JA6386. The Constitution vests Congress with the power to define federal crimes and fix the punishment for their violation, Art. I, §§ 1, 8; *see Loving v. United States*, 517 U.S. 748, 768 (1996), and federal courts with the power to set the terms of a defendant's sentence, Art. III, § 3; *see United States v. Johnson*, 48 F.3d 806, 808-09 (4th Cir. 1995); *United States v. Miller*, 77 F.3d 71, 78 (4th Cir. 1996).  The district court mistakenly approved the challenged delegation as based on an "'intelligible principle.'" JA2371 & n.10, *quoting J.W. Hampton, Jr. & Co. v. United*

---

[96] Council also maintains that, by incorporating disparate state execution statutes, the FDPA violates his Fifth Amendment rights to due process and equal protection.  JA6205-6207.  The district court erroneously dismissed this claim because it found "no direct authority" on the precise, novel issue.  JA6386.

*States*, 276 U.S. 394, 409 (1928) (reviewing delegation to federal agency). As Council argued, JA6208-6209 & n.19, that standard should not govern any delegations of Congressional authority. S*ee Gundy v. United States*, 139 S. Ct. 2116, 2134-35 (2019) (Gorsuch, & Thomas, JJ., & Roberts, C.J., dissenting); *see also West Virginia v. EPA*, 142 S. Ct. 420 (2021) (granting certiorari to reconsider this issue). It also is not the correct test for evaluating an irrational, continuing delegation of constitutionally federal authority to *state* officials. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 163, (1987) (Scalia, J., concurring) (because federal statute "required application of future state laws as well as those in effect at the time of its passage, it would have been considered open to serious constitutional challenge as an improper delegation of congressional legislative power to the States had it been anything other than declaratory"), *citing Wayman v. Southard*, 23 U.S. 1, 47-48 (1825). And, in any event, a standard that boils down to "whatever South Carolina says" is not even an "intelligible principle," as it lacks "*any* policy or standard to confine [the state's] discretion." *Gundy*, 139 S. Ct. at 2129 (cleaned up).

## 2. The court erred in holding Council's claims incognizable and untimely.

The district court correctly agreed that Rule 33, which empowers it to "vacate any judgment and grant a new trial if the interest of justice so requires," embraces a challenge to Council's death sentences. JA6378-6380.  *See United States v. Lawrence*, 555 F.3d 254, 261-263 (6th Cir. 2009); *United States v. Lee*, 274 F.3d 485, 493-494 (8th Cir. 2001).  But the court declared, *sua sponte*, that it could only order a resentencing "where death would remain a potential sentence," and that it "likely lacks authority to grant" any other relief, including the *non-*capital resentencing that must follow from reversal of Council's death sentences based on his electrocution claims.[97]  JA6378.

This view was mistaken.  Courts routinely treat a Rule 33 motion as an appropriate vehicle for challenging a conviction even if the requested remedy is not a new trial but dismissing the charge, analogous to dismissing the death penalty from a case.  *See, e.g.*, *United States v. Davis*, 2016 WL 10679065, *2 (W.D. Tenn. Dec. 5, 2016);

---

[97] The government did not dispute that Council's claims as well as the relief he sought were cognizable under Rule 33.  JA6352-6353.

231

*United States v. Augustin*, 2011 WL 294281, *2 (E.D. Tenn. Jan. 27, 2011); *United States v. Lesane*, 2009 WL 891802, *2 (E.D. Va. Apr. 1, 2009); *United States v. McLemore*, 792 F. Supp. 96, 97 (S.D. Ala. 1992). District courts also possess inherent authority to craft the post-trial relief necessary to remedy an unconstitutional federal death sentence, as long as it does not conflict with any rule or statute. *United States v. Runyon*, 652 F. Supp. 2d 716, 718 (E.D. Va. 2009); *United States v. Sampson*, 335 F. Supp. 2d 166, 200 (D. Mass. 2004); *see generally Dietz v. Bouldin*, 579 U.S. 40, 45-46 (2016). Indeed, accepting the court's cramped view here would leave district courts powerless *ever* to dismiss the death penalty against a defendant post-trial, no matter how clear and compelling the grounds for doing so and even though the court of appeals would be authorized to order such relief, § 3595(c)(2)(C).[98] *See Moncrieffe v. Holder*, 569 U.S. 184, 203 (2012) (rejecting government's

---

[98] The district court insisted it was not leaving Council with no forum for his claims, saying he could file a habeas petition under 28 U.S.C. § 2241. JA6378-6379. But as Council explained, JA6179-6180, habeas is not an appropriate remedy since he is challenging the constitutionality of the FDPA and the *per se* legality of his sentence of death by electrocution, not how a valid death sentence is to be implemented. *See United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004); *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997).

statutory interpretation because of "absurd results that would flow" from it).

For similar reasons, the district court was wrong to engraft onto Rule 33, *sua sponte*, an atextual limitation to errors that affected the "fairness or integrity" of the "jury's determination" of the defendant's "guilt" or "sentence." JA6383-6384. Rule 33 "goes no further in defining the grounds that will support a new trial" than if "the interest of justice requires." Wright & Miller, 3 *Federal Practice & Procedure*, § 589 (4th ed. 2021). Thus, "'[a]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial'" under Rule 33. *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004), *quoting* Wright & Miller, *supra*. This includes errors arising from statutory infirmities, not just from the conduct of the trial (or capital-sentencing hearing). *See, e.g., United States v. Gilmore*, 2018 WL 2905766, *4 (W.D.N.C. June 11, 2018); *Davis*, 2016 WL 10679065, at *6; *United States v. Matthews*, 2011 WL 5116587, *1 (E.D. Pa. Oct. 28, 2011); *Augustin*, 2011 WL 294281, at *2; *United States v. Polizzi*, 549 F. Supp. 2d 308, 320 (E.D.N.Y. 2008), *vacated on other grounds*, 564 F.3d 142 (2d

Cir. 2009); *United States v. Davenport*, 2006 WL 1801659, *1 (D. Conn. June 28, 2006).

Finally, the district court was mistaken in finding Council's motion untimely. JA6380-6381. While a Rule 33 motion ordinarily must be filed within 14 days of the verdict, Fed. R. Crim. P. 33(b)(2), Rule 45(b)(1)(B) provides for extending the deadline, including after it has passed, for "good cause" and based on "excusable neglect."[99] *See United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010). And courts have found an intervening change in the law, like South Carolina's electrocution statute, constitutes a valid basis for such an extension. *See, e.g.*, *United States v. Robinson*, 2019 WL 7985173, *2 (W.D. Tenn. Nov. 19, 2019); *United States v. Collins*, 2019 WL 3432591, *2 n.1 (S.D. W.Va. July 30, 2019); *United States v. Kirsch*, 151 F. Supp. 3d 311, 314-15 (W.D.N.Y. 2015); *United States v. Sprouse*, 2011 WL 2414322, **3-5

---

[99] This applies to all new trial motions other than those based on "newly discovered evidence," which, under a different subsection, may be filed within three years of verdict. Fed. Rule Crim. P. 33(b)(1). Although Council also alternatively argued below, and maintains, that the revised South Carolina statute qualifies as newly discovered evidence, JA6178-6179, the Court need not address that, since his motion is clearly timely under Rules 33(b)(2) and 45(b)(1)(B).

234

(W.D.N.C. June 10, 2011), *rev'd on other grounds*, 517 Fed. Appx. 199 (4th Cir. 2013); *United States v. Maricle*, 2010 WL 3927570, **3-4 (E.D. Ky. Oct. 4, 2010).

The district court wrongly found no "excusable neglect," based on its mistaken view that Council could have raised his electrocution claims in his original post-trial motion right after he was sentenced in 2019.  JA6382.  The South Carolina statute then in effect included electrocution as an alternative that would come into play only if affirmatively elected by a prisoner, rather than as the default method (and, indeed, only legally available one), as it now stands under the new statute.  So Council had no legal standing to challenge electrocution under the old one, *see Stewart v. LeGrand*, 526 U.S. 115, 119 (1999); *Bryan v. Moore*, 528 U.S. 1133 (2000), and cannot be faulted for having failed to do so.

## D.    Conclusion

Accordingly, Council's electrocution claims were not foreclosed by precedent, and were properly and timely raised in his post-trial motion filed shortly after South Carolina enacted its new electrocution statute. This Court should remand for an evidentiary hearing on execution by

electrocution, and for merits reconsideration of Council's claims.

## IX.

### Condemning Council to automatic, indefinite solitary confinement on federal death row constitutes cruel and unusual punishment.

The jury recommended execution for Council, not decades of psychological and emotional torture to be followed by execution. But its verdict has condemned him to just that. On federal death row, he is permanently isolated in a cramped cell, perhaps for a quarter century or longer, deprived of most human contact. There, he will watch his fellow prisoners taken away to be killed by the government, until one day he is tapped to join them. That experience is a torturous one that violates the Eighth Amendment's prohibition against cruel and unusual punishment, and requires reversal of Council's death sentence.

Because this issue, though structural, is unpreserved, it should be reviewed for plain error. *See* Fed. R. Crim. P. 52(b)*; United States v. Olano*, 507 U.S. 725, 734 (1992).

### A. Council will be tormented and scarred by permanent isolation in a cell the size of a parking spot, probably for decades, under the looming threat of execution.

Unlike other federal prisoners who may earn their way to less

236

onerous confinement conditions over time with good behavior, Council is

and will permanently remain incarcerated in the "Special Confinement

Unit," federal death row, at USP Terre Haute, as long as he is under a

death sentence.  *See United States v. Fell*, 224 F. Supp. 3d 327, 345 (D.

Vt. 2016).  He can expect to spend decades there before he is executed.

The 13 federal inmates the government put to death during the final

months of the last administration, in 2020-21, had endured, on average,

20 years under a death sentence.  And, of the 45 who remain on death

row, 26 have been confined there for 15 years or more, and 11 of those

longer than two decades.  Five prisoners have been awaiting execution

for at least a quarter century.[100]

The district court in *Fell* heard expert testimony and made

detailed findings about the conditions on federal death row and their

effects on condemned prisoners.  As it recognized, men like Council "are

confined to their cells for 23 out of every 24 hours."  In that six-by-ten-

---

[100] *See United States v. Higgs*, 141 S. Ct. 645, 646 (2021) (Breyer, J., dissenting); Death Penalty Information Center, *Federal Death Penalty: Executions Under the Federal Death Penalty*, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/executions-under-the-federal-death-penalty; *see also Fell*, 224 F. Supp. 3d at 345.

foot box, the size of a parking spot, they eat, sleep, shower, use the toilet, and seek distraction from a small television. They "have very limited contact with other people," including other prisoners and guards. This is "by design," as even "the physical arrangement of . . . death row . . . is set up to minimize contact by prisoners with others." Thus, the cells have solid steel doors and "no view to the outside," and "unusual measures [are] taken to achieve isolation through the use of slots for food trays" and "separation of cells," with inmates often surrounded by empty cells.[101] Even the exercise cages, to which prisoners are taken fully shackled for an hour five times a week, are surrounded by solid walls on all sides.[102] And because death row is so remote from most prisoners' homes and families, they rarely receive visitors. Such conditions make it far more restrictive overall than most solitary-confinement units across the country.[103] *Id.* at 345-47.

The *Fell* court considered "most troubling" the psychological

---

[101] *See Fell*, Tr.65-69, 154-55, No. 2:14-cv-377 (D. Vt. July 11, 2016).

[102] *See Fell*, Tr.52; *id.,* DE98-17.

[103] *See Fell*, Tr.57, 66-72.

effects of such extreme "long term-isolation."  These, it found, included

significant "trauma and distress," "high rates of depression and social

withdrawal," and a "widespread phenomenon" described by a nationally

recognized expert it credited, who had inspected federal death row and

interviewed prisoners there.  That is "a grief that's deeper than

depression, where people just feel like they've lost who they are, who

they were."[104]  *Id.* at 345-47*; see also United States v. Aquart*, No. 3:06-

cr-160, Tr.83 (D. Conn. Oct. 21, 2021) (recognizing "the terrifying and

arbitrary nature of life on [federal] death row and the toll that it takes

nearly driving Mr. Aquart to madness" in his nine years there).  For

prisoners who already suffer from mental illness when they arrive, like

Council, *see* Point I.B, such a bleak setting is especially torturous.[105]

The *Fell* court concluded that "the process of holding prisoners for

indefinite terms extending into decades in solitary confinement" on

federal death row "is highly damaging."  And it discerned "[n]o

persuasive evidence . . . that such severe isolation was necessary for

---

[104] *See Fell*, Tr.44-45, 71.

[105] *See Fell*, Tr.62.

reasons of security or prison safety." 224 F. Supp. 3d at 345-47.

These findings echo this Court's acknowledgment that "prolonged detention of inmates in conditions akin to those . . . on Virginia's death row also leads to psychological deterioration, including declines in mental functioning, difficulties in thinking, concentration and memory problems, and problems with impulse control." *Porter v. Clarke*, 923 F.3d 348, 355-56 (4th Cir. 2019) (cleaned up). They also mirror the observations of several Supreme Court justices. Justice Kennedy recognized "research confirms" that "[y]ears of near-total isolation exact a terrible price. *See* Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation and suicidal thoughts and behaviors)." *Davis v. Ayala*, 576 U.S. 257, 288-89 (2015) (Kennedy, J., concurring) (questioning whether law should "condone or permit this added punishment"); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2765-66 (2015) (Breyer & Ginsburg, JJ., dissenting).

For prisoners, the "dehumanizing effects" of being entombed on federal death row are aggravated by the looming threat of being put to

240

death, a prospect whose inexorable approach they are reminded of with
every execution of a fellow prisoner, the preparation and carrying out of
which unfolds around them.[106]  *Glossip*, 135 S. Ct. at 2765 (Breyer &
Ginsburg, JJ., dissenting).  As one prisoner described it: "I was awake
in the middle of the night before their executions when the guards came
to get each of them.  I saw their faces and witnessed them walking out
of their cells, never to return."[107]  Despite being the most recent
occupant of federal death row, Council has already witnessed 13 of his
fellow prisoners sent to die.

**B.    Such prolonged, isolated, and debilitating confinement
under a death sentence would have been unthinkable to
the Framers.  And neither this Court nor the Supreme
Court have ever determined its constitutionality.**

As several Supreme Court justices have recognized, the passage of
decades between a death sentence and its execution can constitute
"cruel and unusual punishment prohibited by the Eighth Amendment,"

---

[106] *Fell*, Tr.58-59, 86; Breunig, *The Man I Saw Them Kill*, N.Y.
Times (December 17, 2020); Segura, *Trump Prepares to Execute
Christopher Vialva for a Crime He Committed as a Teenager*, The
Intercept (Sept. 20, 2020); Allen, *A Dispatch From Federal Death Row*,
The Marshall Project (July 16, 2020).

[107] *See* Allen, *supra.*

241

*Gomez v. Fierro*, 519 U.S. 918 (1996) (Stevens & Breyer, JJ., dissenting), because it "subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement," *Glossip*, 135 S. Ct. at 2764-69 (Breyer & Ginsburg, JJ., dissenting).

This view derives support from the original understanding of the Eighth Amendment. A delay of even 17 years before execution "if it ever occurred, certainly would have been rare in 1789, and" contrary to "the practice of the Framers." *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of certiorari). "When the Founders wrote the Constitution . . . [e]xecution took place soon after sentencing." *Glossip*, 135 S. Ct. at 2769 (Breyer & Ginsburg, JJ., dissenting). Thus, in 1890, the Supreme Court called a mere four-week delay "horrible," and recognized the "terror" it must inspire in the prisoner. *In re Medley*, 134 U.S. 160, 172 (1890). Indeed, as late as 1960, the average delay between sentencing and execution was only two years. *Glossip*, 135 S. Ct. at 2764 (Breyer & Ginsburg, JJ., dissenting). The cruelty of such delays appears even clearer today, given the growing understanding of the serious psychological damage caused by prolonged solitary confinement.

242

Whether such delay before execution violates the Eighth Amendment has never been decided either by the Supreme Court, *see Jordan v. Mississippi*, 138 S. Ct. 2567, 2568 (2018) (Breyer, J., dissenting from denial of certiorari), or apparently by any circuit in a federal direct appeal. *But see Jones v. Chappell*, 31 F. Supp. 3d 1050. 1066 (C.D. Cal. 2014) (finding execution delays of over 25 years unconstitutional), *rev'd*, 806 F.3d 538 (9th Cir. 2015) (rejecting claim based on procedural habeas rule). This Court should confront the issue, find plain error (since an unconstitutionally cruel punishment is so prejudicial as to violate "substantial rights" and "seriously affect the fairness" of the proceedings, *see Olano*, 507 U.S. at 734), set aside Council's death sentences, and order non-capital resentencing. *See* § 3595(c)(2)(C).

## X.

**The growing abandonment of capital punishment in law and practice reflects an evolved of standard of decency that makes Council's death sentences unconstitutional**.

Nearly two decades ago, this Court ruled that Supreme Court precedent foreclosed another federal prisoner's argument that the death

243

penalty is cruel and unusual punishment. *United States v. Higgs*, 353 F.3d 281, 333 (4th Cir. 2003); *see also United States v. Lighty,* 616 F.3d 321, 370 (4th Cir. 2010) (claim foreclosed by *Higgs*).[108] But the Eighth Amendment's measure is "evolving," *Kennedy v. Louisiana*, 554 U.S. 407, 419-20 (2008), not calcified in 2003, let alone 1976, the year the Supreme Court last decided the constitutionality of the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976). The nation's standards of decency have now evolved away from death as punishment. Council's sentence is cruel and unusual.[109]

In 2003, only 12 states and the nation's capital had abolished the death penalty, and only two since *Gregg*. Following *Higgs*, though, 11 more states have eliminated their death penalty by legislative repeal or state supreme court decision, including, most recently, Virginia, which

---

[108] Subsequent Supreme Court references to the death penalty's constitutionality have come in *dicta* in decisions addressing particular methods of execution. *See, e.g., Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019).

[109] The defense unsuccessfully moved to strike the death penalty under the Eighth Amendment. JA507, JA1070. This Court thus reviews the issue *de novo*. *United States v. Sun*, 278 F.3d 302, 308 (4th Cir. 2002).

244

had executed more people than any other state. And three other states' governors have imposed indefinite moratoria on executions, as has the Attorney General for federal cases. Thus, today, half the nation's jurisdictions do not permit capital punishment.[110]

Furthermore, in states that have retained the death penalty, juries and prosecutors have largely disavowed the punishment. In 2003, 25 state courts and two federal courts imposed a total of 151 death sentences. Last year, by contrast, there were only 18 death sentences from seven states, and none federally. Half of the executing states have not had a death sentence since at least 2018.[111] *See Roper v. Simmons*, 543 U.S. 551, 567 (2005) (finding "objective indicia of consensus" against death penalty for juveniles based on its rejection "in the majority of States; the infrequency of its use even where it remains

---

[110] *See* Death Penalty Information Center*, State by State,* https://deathpenaltyinfo.org/state-and-federal-info/state-by-state; Memorandum of the Attorney General*, Moratorium on Federal Executions* (July 1, 2021).

[111] *See* Death Penalty Information Center, *Death Sentences in the United States Since 1977,* https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-in-the-united-states-from-1977-by-state-and-by-year.

on the books; [and] the consistency in the trend toward abolition of the practice").

Council's death sentences are an anachronism, a lightning strike the Constitution does not abide. This Court should reverse them and order non-capital resentencing. *See* § 3595(c)(2)(C).

## CONCLUSION

The errors Council presents exemplify the "arbitrariness in [the] application" of the federal death penalty and its "disparate impact on people of color" over which even the Department of Justice has now acknowledged "[s]erious concerns." Memorandum of the Attorney General, *Moratorium on Federal Executions* (July 1, 2021). Most are structural, in whole or part, and thus *per se* mandate reversal, vacatur, or a remand. *See* Points I, III, IV, VIII-X. For others that require a determination of prejudice, Points II, V-VII, the Court should consider them collectively as well as individually. "The cumulative effect of two or more individually harmless errors," whether preserved or plain, "has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002) (cleaned up); *see United States v. Basham*, 561 F.3d 302, 330 (4th

246

Cir. 2009).

Such cumulative consideration matters especially in a capital appeal given the gravity and finality of the punishment, the Eighth Amendment's unique requirements, and the Court's special review obligations under the FDPA. These obligations require it to determine if the government has failed to prove "beyond a reasonable doubt" that any errors did not affect the outcome, if any aggravating factor was not supported by "[t]he admissible evidence," and if the death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factors." 18 U.S.C. § 3595(c)(2)(B), (C). Here, the errors demand relief under one or more of these provisions. These errors short-circuited Council's fundamental rights because of the district court's undue haste at critical junctures, created an unacceptable risk that racial bias tainted the outcome, and led the jury to weigh aggravating factors that were invalid or bolstered by inadmissible evidence. The combined effect of all the errors, structural and otherwise, tilted the scales towards death, producing an unreliable verdict based on prejudice, emotion, misconceptions, and other improper considerations.

247

Ultimately, after fulfilling its duty to "review the entire record in the case," § 3595(b), this Court should:

(1) vacate the district court's order finding Council competent to stand trial, and remand for further proceedings on competency (Point I), or

(2) vacate his convictions and remand for a retrial (Point III), or

(3) remand for the district court to consider his *Batson* claim (Point IV), or

(4) reverse his death sentences and remand for non-capital resentencing (Points IX and X), or

(5) vacate the district court's order denying his challenges to death by electrocution, and remand for a hearing and merits reconsideration (Point VIII), or

(6) vacate his death sentences and remand for capital resentencing (Points II, III, V, VI, VII).

248

Respectfully submitted,

/s/ Barry J. Fisher
Barry J. Fisher
Jerome C. Del Pino
Office of the Federal Defender, NDNY
54 State Street, 3rd Floor
Albany, NY 12207
(518) 242-4010 tel.
barry_fisher@fd.org

/s/ Jaclyn L. Tarlton
Jaclyn L. Tarlton
Office of the Federal Defender, EDNC
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236 tel.
jackie_tarlton@fd.org

*Counsel for Defendant-Appellant
Brandon Council*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains fewer than 50,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus complies with the March 1, 2022, order from this Court authorizing a brief containing up to 50,000 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect 2020 in Century Schoolbook 14.

s/ Barry J. Fisher

250

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was filed electronically through the ECF system and notice sent to counsel of record for all parties

|  |
| --- |
| s/ Barry J. Fisher |

251