Nos. 20-1, 21-8

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
| v. | ) |
| BRANDON COUNCIL, | ) |
| Defendant-Appellant. | ) |

On Appeal from the United States District Court
for the District of South Carolina
No. 4:17-cr-866-RBH

# **APPELLANT'S REPLY BRIEF**

Jaclyn L. Tarlton
Federal Defender Office, EDNC
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236 tel.
jackie_tarlton@fd.org

Barry J. Fisher
Jerome C. Del Pino
Federal Defender Office, NDNY
54 State Street, 3rd Fl.
Albany, NY 12207
(518) 650-9031 tel.
barry_fisher@fd.org

*Attorneys for Defendant-Appellant Brandon Council*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... vi

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 3

I.    The court abdicated its unwaivable duty to independently
determine Council's competency after he had a "delusional"
"break with reality" during the trial ............................................... 3

      A.    Ample evidence pointed toward Council's incompetency,
and the court's wholesale abandonment of the
required process was not harmless ........................................ 3

      B.    The basic due-process and statutory requirements
for reliably determining competency may not be waived ....... 7

      C.    *De novo* review is the correct standard for this
Court's determination of what competency procedures
were constitutionally and statutorily required ................... 10

      D.    The procedural protections of the IDRA and due
process are mandatory, but the district court did
not follow them ................................................................... 11

            1.    The two defense experts were neither neutral
court examiners nor presumptively disposed
to find Council incompetent ......................................... 11

            2.    Federal law does not license a district court,
upon finding "reasonable cause," to proceed without
a thorough — let alone any — expert competency
evaluation ..................................................................... 15

            3.    Defense counsel's handing up the summary expert
statement was not the evidence-based "hearing"
required by federal law ................................................. 22

II.   The court prejudicially abused its discretion by denying the defense 90 days to investigate Council's credible allegation of childhood sexual abuse, in deference to the victims' families' vacation plans ................................................................. 24

   A.   Council's prosecution moved at a breakneck pace compared to other, modern federal capital cases even where guilt was not contested ............................................... 25

   B.   The government's justifications for denying the 90-day continuance are factually and legally insupportable .......... 27

       1.   Council's lawyers requested only two continuances unilaterally, the latter shortly after he divulged he had been sexually abused as a child ........................... 27

       2.   The court improperly deferred to the victims' families' vacation plans over Council's right to prepare a constitutionally adequate defense .............. 30

   C.   The government has not demonstrated beyond a reasonable doubt that this error was harmless ................... 35

III.   The court's refusal to ask jurors' racial opinions was neither rectified by other questions, justified by any feared "harm," nor excused by any fault of the defense ........................................ 38

   A.   Knowing if jurors interacted outside their race could not substitute for knowing their racial opinions, particularly about whether Black people are more prone to violence .............................................................. 38

   B.   The court's discretion was bounded by its constitutional obligation to ask questions adequate to identify jurors with disqualifying racial biases ............... 43

   C.   The government offers no justification for the court's refusal to ask jurors whether they thought African Americans are predisposed to violence ................... 45

ii

D.    The court did not license the defense to ask the *Turner* questions itself in voir dire, nor would that have been a realistic alternative ............................................................... 46

IV.   The court denied Council a meaningful opportunity to present a *Batson* claim after the government struck Black jurors at two and a half times the rate of others in this cross-racial case .......... 51

A.    The district court understood and resisted trial counsel's request for a recess — not just 55 seconds at counsel table — to review the record to marshal a *Batson* challenge ............................................................... 51

B.    The government does not rebut Council's strong showing that prosecutors accepted White jurors with responses materially the same as many of the Black ones it struck ...................................................... 55

C.    A remand would serve the public interest in ensuring against racial discrimination in jury service, and would be preferable to one years from now in a § 2255 proceeding ............................................................... 56

V.    Two of the central aggravating factors were, in fact, mutually exclusive. And the government does not dispute that, if true, this would require resentencing ...................................... 58

A.    The "innocent victims" aggravating factor alleged a non-pecuniary motive for the killings, so it contradicted the factor alleging a "pecuniary gain" motive ...................... 58

B.    The "pecuniary gain" factor turns not on whether Council killed *before* obtaining the gain but on whether he did so *in order to* obtain the gain, for which the proof was legally insufficient ......................................... 61

C.    The government's concession that the jurors received "extensive mitigation evidence" only confirms that these aggravating-factor errors were prejudicial ........................... 64

VI.   The government's victim-impact presentation consumed most
      of its sentencing case, transgressed precedent and the FDPA,
      and orchestrated emotional displays from witnesses ................... 65

      A.   The government identifies no other case in which
           the majority of its sentencing presentation consisted
           of testimony from the victims' grieving family and
           friends ................................................................. 66

      B.   The extensive evidence about each victim's youth was not
           proper victim impact, and that about the witnesses' own
           lives was not a necessary foundation ................................... 68

      C.   Proper victim impact does not encompass the reactions of,
           or ripple effects on, members of a larger community
           who lacked a close relationship to the victim ....................... 70

      D.   The government ignores the evidence that prosecutors
           orchestrated emotional displays on the stand from their
           victim-impact witnesses ........................................... 74

VII.  The court seriously prejudiced Council by failing to include, let
      alone explain, the FDPA's second anti-bias step in instructing
      jurors how to decide his sentence .................................... 76

      A.   Council's proposed instruction accurately explained
           the second step, and his reference back to it at the
           charge conference preserved his request ............................. 76

      B.   Neither the court's preliminary remarks nor the jurors'
           post-verdict certification compensated for the omission of
           the second anti-bias step from the instruction on
           deciding sentence ................................................ 80

VIII. Council's challenge to his sentence of death by electrocution
      was timely, ripe, and not foreclosed by precedent ......................... 84

iv

A. The government's untimeliness argument rests on the mistaken premise that South Carolina's new statute did not alter the default method of execution ...................... 84

B. Council's *ex post facto* and Eighth Amendment challenges to his sentence of death by electrocution are ripe for review ................................................................. 86

C. Replacing lethal injection with electrocution as the default and, indeed, only approved method of execution for Council is *ex post facto* ....................................... 91

D. Congress's irrational delegation of the choice of Council's method of execution to South Carolina is distinguishable from the Assimilative Crimes Act ........... 94

CERTIFICATE OF COMPLIANCE ....................................... 97

CERTIFICATE OF SERVICE ................................................. 98

# TABLE OF AUTHORITIES

## CASES

*ABC, Inc. v. Stewart*, 360 F.3d 90 (2d Cir. 2004) .................................... 50

*Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004) (*en banc*) .............................. 52

*Barr v. Lee*, 140 S. Ct. 2590 (2020) .......................................................... 91

*Batson v. Kentucky*, 476 U.S. 79 (1986) .................................................... 51

*Bryan v. Moore*, 528 U.S. 1133 (2000) ...................................................... 86

*Buck v. Davis*, 580 U.S. 100 (2017) ..................................................... 39, 83

*Bucklew v. Precythe*, 139 S. Ct. 112 (2019) .............................................. 86

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ............................................... 10

*Dobbert v. Florida*, 432 U.S. 282 (1977) ................................................... 92

*Drope v. Missouri*, 420 U.S. 162 (1975) ......................................... *passim*

*Georgia v. McCollum*, 505 U.S. 42 (1992) ................................................ 57

*Godfrey v. Georgia*, 446 U.S. 420 (1980) .................................................. 77

*Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ................... 88

*Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) ............................... 68

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
 955 F.3d 106 (D.C. Cir. 2020) ......................................................... 93

*In re Harmon*, 425 F.2d 916 (1st Cir. 1970) ............................................ 14

*In re Vial*, 115 F.3d 1192 (4th Cir. 1997) ................................................. 87

*Jones v. United States*, 527 U.S. 373 (1999)...........................................69

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)............................................38

*Lindsey v. Washington*, 301 U.S. 397 (1937)..........................................88

*Malloy v. South Carolina*, 237 U.S. 180 (1915)......................................92

*McCall v. Dretke*, 390 F.3d 358 (5th Cir. 2004)......................................88

*Medina v. California*, 505 U.S. 437 (1992) .............................................10

*Mitchell v. Genovese*, 974 F.3d 638 (6th Cir. 2020)...............................57

*Owens v. Stirling*, 882 S.E.2d 858 (S.C. 2023) .......................................85

*Pate v. Robinson*, 383 U.S. 375 (1966)...................................10, 20, 21, 22

*Payne v. Tennessee*, 501 U.S. 808 (1991) ....................................69, 71, 73

*Peugh v. United States*, 569 U.S. 530 (2013)...........................................89

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) .............................46

*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002) .......................69

*State v. Hess*, 23 A.3d 373 (N.J. 2011) .....................................................69

*Stewart v. LeGrand*, 526 U.S. 115 (1999) ...............................................86

*Suggs v. Brannon*, 804 F.2d 274 (4th Cir. 1986)....................................90

*Texas v. United States*, 523 U.S. 296 (1998)............................................87

*Turner v. Murray*, 476 U.S. 28 (1986) ........................................39, 44, 75

*United States v. Arenburg*, 605 F.3d 164 (2d Cir. 2010)...........................9

*United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991) ........................... 34

*United States v. Banks*, 482 F.3d 733 (4th Cir. 2007) ............................. 11

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) .................. 61, 66

*United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004) ........................ 63

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2022) .................. 62, 73

*United States v. Bernard*, 708 F.3d 583 (4th Cir. 2013) ........................ 19

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008) .......................... 64

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006) ....................... 64

*United States v. Chandler*, 996 F.2d 1073 (11th Cir. 1993) ................... 92

*United States v. Cowden*, 882 F.3d 464 (4th Cir. 2018) ......................... 79

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) ............................. 74

*United States v. Garcia-Lagunas*, 835 F.3d 479 (4th Cir. 2016) ............ 83

*United States v. General*, 278 F.3d 389 (4th Cir. 2002) ............... 9, 10, 20

*United States v. Giron-Reyes*, 234 F.3d 78 (1st Cir. 2000) ...................... 9

*United States v. Haywood*, 155 F.3d 674 (3d Cir. 1998) .............. 4, 17, 24

*United States v. Hedgepeth*, 418 F.3d 411 (4th Cir. 2005) ..................... 35

*United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995) .................................. 8

*United States v. Kowalczyk*, 805 F.3d 847 (9th Cir. 2015) ...................... 9

*United States v. LaRouche*, 896 F.2d 815 (4th Cir. 1990) ..................... 35

*United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013) ................ 64, 81

*United States v. Little*, 392 F.3d 671 (4th Cir. 2004) .............................. 87

*United States v. Lockhart*, 947 F.3d 187 (4th Cir. 2020) ....................... 83

*United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995) ........................... 20

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) ........................ 82

*United States v. Nicolaou*, 180 F.3d 565 (4th Cir. 1999) ................. 79, 80

*United States v. Olano*, 507 U.S. 725 (1993) .......................................... 83

*United States v. Osborn*, 664 Fed. Appx. 708 (10th Cir. 2016) ................. 5

*United States v. Pogany*, 465 F.2d 72 (3d Cir. 1972) .............................. 14

*United States v. Purnett*, 910 F.2d 51 (2d Cir. 1990) ............................... 8

*United States v. Reason*, 549 F.2d 309 (4th Cir. 1977) ........................... 14

*United States v. Roof*, 10 F.4th 314, 366 (4th Cir. 2021) ....................... 67

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) ............. 61, 66, 71

*United States v. Sampson*, 12 F. Supp. 3d 214 (D. Mass. 2014) ............ 12

*United States v. Seaton*, 773 Fed. Appx. 1013 (10th Cir. 2019) .............. 5

*United States v. Sharpnack*, 355 U.S. 286 (1958) .................................. 94

*United States v. Spivey*, 129 Fed. Appx. 856 (4th Cir. 2005) ................... 8

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) .............................. 92

*United States v. White*, 887 F.2d 705 (6th Cir. 1989) ......................... 9, 14

*United States v. Zedner*, 29 Fed. Appx. 711 (2d Cir. 2002) ...................... 5

*United States v. Ziegler*, 1 F.4th 219 (4th Cir. 2021) ............................. 20

*United v. Mixwell*, 806 Fed. Appx. 180 (4th Cir. 2020) .......................... 87

*Weaver v. Graham*, 450 U.S. 24 (1981) ................................................ 88

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................. 38

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. amend. V ......................................................................... 43

U.S. Const. amend. VI ....................................................................... 43

18 U.S.C. § 13 ................................................................................... 94

18 U.S.C. § 3593 .......................................................................... 76, 83

18 U.S.C. § 3595 .......................................................................... 61, 87

18 U.S.C. § 3596 ...................................................................... 93, 94, 95

18 U.S.C. § 3771 ............................................................................... 32

18 U.S.C. § 4247 ............................................................................... 15

18 U.S.C. § 4241 ...................................................................... 10, 16, 22

28 U.S.C. § 2241 ............................................................................... 87

Fed. R. Crim. P. 33 ........................................................................... 85

Fed. R. Crim. P. 51 ........................................................................... 51

Fed. R. Crim. P. 52 ........................................................................... 83

S.C. Ann. § 24-3-530 (1995) .............................................................. 85

S.C. Ann. § 24-3-530 (2021) ................................................................ 89

## OTHER AUTHORITIES

AP, *Inmate convicted of stabbing guard more than 200 times*
(June 17, 2017) ................................................................ 27

Federal Death Penalty Resource Counsel Project, Declaration,
*Time Between Indictment and Trial for Last Ten Years*
(Jan. 2021), https://fdprc.capdefnet.org .................................... 26, 27

Klein, *Trial Communication Skills*, 15.4 (2d ed. Dec. 2022 Update) ..... 75

Nat'l Inst. of Health, *Bipolar Disorder*,
https://nimh.nih.gov/health/topics/bipolar-disorder ........................ 5

*United States v. Saipov*, No. 17-cr-722, Voir Dire Transcript
(S.D.N.Y. Dec. 19, 2022) ................................................ 54

# <u>INTRODUCTION</u>

During his capital trial, Brandon Council had a "delusional" "break with reality," in which he insisted he was "being persecuted" because he "can't subpoena God" to prove who really killed the victims. The Government casts this as a "recognizable exonerative theory" rather than a profound manifestation of incompetence.

Before trial, Council's lawyers sought just 90 more days to investigate his recent disclosure that he was sexually abused as a child. The court said no, to avoid disrupting the victims' families' vacation plans, and pushed the case to verdict twice as fast as the national average. The government calls this an exercise of the court's "ample calendar-setting discretion."

Council was a dreadlocked Black man who, the government told jurors, liked flashy cars and movies about rap-music gangsters; the victims were two church-going White women. But the court refused to ask prospective jurors whether they believed Black people are more prone to violence, a bias the Supreme Court has said is crucial to identify in cross-racial capital cases. The court denied Council's lawyers a meaningful opportunity to present a *Batson* claim by allowing them

1

just 55 seconds in front of all the jurors to analyze many hundreds of pages of voir dire and questionnaires. It licensed what counsel accurately called a "tidal wave" of highly emotional, often improper testimony about the "White victims and their wonderful lives," every day of the penalty phase. And it failed to instruct jurors, though required by statute, to undertake a critical anti-bias step before deciding on and recording a death verdict. Still, this Court need not be troubled, the government insists, since racial issues were not "bound up" in the trial.

These errors along with others — most important, contradictory aggravating factors about Council's motive — permeate this appeal. And they were consequential, especially since he presented concededly abundant mitigation. The Court should not be lulled into complacency by the government's whitewashed account of the proceedings below.

The Attorney General has acknowledged "serious concerns" about "arbitrariness in [the] application" of the federal death penalty and its "disparate impact on people of color." Those concerns are fully realized here. The Court must act.

# ARGUMENT[1]

## I.

**The court abdicated its unwaivable duty to independently determine Council's competency after he had a "delusional" "break with reality" during the trial.**

The government argues that the claimed errors were harmless because there were no real indications that Council had become incompetent to stand trial.  It argues they were waived by trial counsel.  And it argues that, in any event, they were not errors because the district court needed do no more than declare him competent based on a summary statement signed by defense experts.  The government is wrong on all accounts.

**A.    Ample evidence pointed toward Council's incompetency, and the court's wholesale abandonment of the required process was not harmless.**

Like below, the government does not challenge the district court's "reasonable cause" finding as to Council's incompetency, which was amply supported.  *See* Op. Br. 67-68.  Nonetheless, the government

---

[1] Council replies to the government's arguments on Points I-VIII. As to Points IX and X, he rests on his opening brief.

claims that "compelling" evidence all "pointed in the same direction" —
that there was little out of the ordinary with Council — so that any
subsequent mishandling by the court of the competency issue was
"assuredly harmless."[2]  Resp. Br. 36, 45, 47.

But the government's version is so unmoored from the record, and
so at odds with how the key facts and events were viewed by trial
counsel and the district court at the time, that it borders on fanciful.
*See* Op. Br. 20-21, 46-54; *see also id.* at 89 (discussing why these errors
could not be harmless).

Council ranted in his confession, and later to his lawyer, about
"demons" who "control people's mind."  This was jarring enough for the
attorney to report it to the court at the outset of the case, along with his
assessment that Council was "crazy," and for the court to then invoke it
to question Council's competency.  JA1025.  But the government calls it
an "unremarkable belief" in "the spiritual realm," and perhaps a

_____

[2] The government also argues the court's ultimate competency
ruling is not clearly erroneous, but it recognizes that issue is not before
this Court, Resp. Br. 47, since Council's position is that the district
court's abandonment of the mandated procedures deprived it of an
adequate "evidentiary basis for a judicial finding of competence."
*United States v. Haywood*, 155 F.3d 674, 680 (3d Cir. 1998).

"normal part of religious experience" in Council's "culture."[3]  Resp. Br. 49-50 (cleaned up).

Similarly, a defense expert tentatively diagnosed Council pretrial with Bipolar Disorder (and recommended confirmatory testing that appears never to have been done).  This is a major mental illness that often raises doubts about competency because (according to the government's cited authority, Nat'l Inst. of Health, *Bipolar Disorder*, https://nimh.nih.gov/health/topics/bipolar-disorder), it can produce delusions like those Council manifested.[4]  But the government dismisses this out of hand because the condition is not so rare and does

---

[3] The speculation about Council's "culture" harkens to studies showing how mental illness among Black offenders is often overlooked or misinterpreted because of racial stereotypes and assumptions.  *See* Op. Br. 82 n.29.

[4] *See also, e.g., United States v. Seaton*, 773 Fed. Appx. 1013, 1014 (10th Cir. 2019) (defendant's "delusional thinking would have to resolve for him to understand the nature and consequences of the proceedings and to assist properly in his defense"); *United States v. Osborn*, 664 Fed. Appx. 708, 709, 716 (10th Cir. 2016) (incompetency finding upheld in light of "Osborn's expressed desire to introduce her delusions as part of her defense strategy"); *United States v. Zedner*, 29 Fed. Appx. 711, 713 (2d Cir. 2002) (same, because "Zedner's delusions regarding the authenticity of the bonds at issue in the case and his exalted role in the world financial system make it impossible [for him] to effectively cooperate with counsel").

not "categorically" make a defendant incompetent.  Resp. Br. 53 & n.10.

Most important, during trial, Council suffered what his lawyers described as a "delusional" "break with reality," in which he claimed he was "being persecuted" because he wanted to "subpoena God" to testify about who really killed the victims.  This breakdown prompted his lawyers to attest to Council's incompetency.  The court found "reasonable cause" to credit this after it reviewed their allegations, questioned counsel about their interactions with him, and witnessed his bizarre behavior for itself in the courtroom the next day (during which a weeping Council incanted: "I did not kill those women … God did it. I did not kill them").  But, to the government, this was much ado about nothing:  Contrary to what counsel and the court believed, Council was urging "a recognizable exonerative theory," indicating, at worst, that he "lacked a sophisticated understanding of evidentiary rules."  Resp. Br. 50-51 & n.9.

The government's tortured efforts to normalize Council's bizarre statements and behavior do not extend to his series of *pro se* letters to this Court over the last year and a half that manifest the same kind of delusional, disordered thinking.  *See* Op. Br. 60-62, 68 n.26.  Although

not part of the trial record, they further indicate his mid-trial

breakdown was hardly a "fleeting" episode, Resp. Br. 50.

## B.    The basic due-process and statutory requirements for reliably determining competency may not be waived.

The court's mid-trial finding of "reasonable cause" to believe

Council may have been incompetent triggered a series of procedural

requirements under due process and by statute: a thorough evaluation

by a neutral expert, a comprehensive report, an evidence-based hearing,

and an independent judicial determination.  Op. Br. 69-88.  The

government seeks to absolve the court's violation of every one of these

requirements by noting that Council's trial lawyers either suggested or

agreed to the court's actions.  Therefore, according to the government,

these were, at worst, "invited errors" — in other words, waived for

appeal.[5]  Resp. Br. 39; *see United States v. Spivey*, 129 Fed. Appx. 856,

---

[5] The government suggests that issues about Council's competency might be cognizable through a claim his trial counsel were ineffective, Resp. Br. 41 n.5, which could not be raised until a § 2255 proceeding. But it has been three and a half years since Council's trial, and it would almost certainly be years more before any competency inquiry in such a proceeding.  And the longer that interval grows, the harder it will become to retrospectively determine Council's trial competency.  *See, e.g., Drope v. Missouri*, 420 U.S. 162, 183 (1975) (inquiry six years after trial would not be "adequate").

7

859 (4th Cir. 2005) ("Whether we call the error an invited error or a waived error . . . is irrelevant.  Invited errors are by definition waived errors.").

But the government does not cite a single decision involving competency and waiver (or invited error).  Worse, it simply ignores Council's discussion of Supreme Court and Circuit decisions recognizing that district courts must independently follow the process required to reliably determine competency, *sua sponte* if necessary, even if defense counsel does not request or wishes to avoid it. *See* Op. Br. 65-67; *see also United States v. Purnett*, 910 F.2d 51, 55 (2d Cir. 1990) (dismissing "the suggestion that a defendant whose competency is suspect can still waive his right to thorough competency proceedings"); *United States v. Hurley*, 63 F.3d 1, 18-19 (1st Cir. 1995) ("For obvious reasons, competency claims are not subject to ordinary waiver doctrine").

In a passing footnote, the government suggests that at least some parts of the process can be waived, but never draws a line or provides any authority or rationale for one.  Resp. Br. 39 n.3.  To the contrary, caselaw recognizes that district courts maintain independent obligations throughout the competency process.  *See* Op. Br. 65-67.

That includes, for example, the duties to, *sua sponte*, "inquire into a defendant's competency," *e.g.*, *United States v. White*, 887 F.2d 705, 709 (6th Cir. 1989); order an examination, *e.g., Drope v. Missouri*, 420 U.S. 162, 173-77 (1975); conduct an evidentiary hearing, *e.g., United States v. General*, 278 F.3d 389, 396 (4th Cir. 2002); compel the defendant to be represented by counsel at the hearing, *e.g., United States v. Kowalczyk*, 805 F.3d 847, 857 (9th Cir. 2015); revisit the defendant's competency again during trial, *United States v. Arenburg*, 605 F.3d 164, 169 (2d Cir. 2010); and conduct another hearing if an incompetent defendant is reportedly restored to competency, *e.g., United States v. Giron-Reyes*, 234 F.3d 78, 81 (1st Cir. 2000).

That a district court maintains its independent obligations throughout the process also comports with the rationale underlying the Supreme Court's competency decisions and the Insanity Defense Reform Act (IDRA). *See* Op. Br. 63, 65 & n.25. The right not to be tried while incompetent is unwaivable, and is jealously safeguarded for the benefit of society as well as defendants. *See* Op. Br. 62, 65 & n.25. Due process prohibits any procedural departure, even if acceded to by defense counsel, that "imposes a significant risk of an erroneous

determination that the defendant is competent," *i.e.*, a violation of that unwaivable right, *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996). *See Medina v. California*, 505 U.S. 437, 449 (1992); *Drope*, 420 U.S. at 172; *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *General*, 278 F.3d at 396, *citing* 18 U.S.C. §§ 4241 *et seq.*

All of the basic procedures at issue here were required by Congress and the Supreme Court specifically to ensure reliable competency determinations and thereby avoid such a violation. *See* Op. Br. 69, 72, 77-80, 83-87. Yet the court created a significant risk of error by denying Council every one of these protections and deferring to a bare-bones expert opinion without knowing the opinion's basis or reliability or even communicating with the experts — essentially the same unwaivable error as in *Pate*, 383 U.S. at 385.

**C.    *De novo* review is the correct standard for this Court's determination of what competency procedures were constitutionally and statutorily required.**

The government also wrongly asserts that any challenge to the "procedural course undertaken by the district court in adjudicating [Council's] competency" is (if not waived) reviewed only "for abuse of discretion." Resp. Br. 33. The single decision it cites applied that

deferential standard to whether the "indicia of incompetency" before the

district court rose to the level of "reasonable cause." *United States v.*

*Banks*, 482 F.3d 733, 742-43 (4th Cir. 2007). That differs entirely from

the issue of what procedures the IDRA and due process mandate a

district court to follow in determining competency once it has found

"reasonable cause." As the authorities cited by Council make clear, that

issue presents legal questions this Court reviews *de novo*. Op. Br. 46.

Alternatively, as discussed below, any discretion the district court

maintained over how to carry out the required process was not

unlimited, as the government essentially argues, but rather quite

bounded, and was clearly abused by the court.

## D. The procedural protections of the IDRA and due process are mandatory, but the district court did not follow them.

### 1. The two defense experts were neither neutral court examiners nor presumptively disposed to find Council incompetent.

In the government's telling, the two defense experts who signed

the competency statement were "appointed by and responsible to the

court," and professionally bound to provide a "neutral and detached

opinion."[6]  Resp. Br. 38-40.  Not so.  The problem was not just that the experts were suggested by and had worked with the defense; as the government correctly notes, those facts alone did not prevent the court from re-designating them and having them function thereafter as independent court experts.  Yet the court did not do so.  Contrary to the government's claim, it never said or did anything to make them responsible to the court.[7]  JA6130 n.2.  The government quotes an earlier, preliminary discussion in which the court indicated it "would appoint" an expert.  Resp. Br. 38.  But it did not even follow through on that.  *See* Op. Br. 54-60.

More important, the government does not dispute that the court made no effort to vet the defense experts (it was not even told their

---

[6] This suggestion that the court satisfied the IDRA's independent-expert requirement conflicts with the government's later contention that the statute's accompanying requirements of a comprehensive report and evaluation were not triggered because the district court never directed an evaluation under the IDRA.  *See* Section D.2, *post*.

[7] The government analogizes the defense experts here to the BOP examiner appointed by the district court in *United States v. Sampson*, 12 F. Supp. 3d 214, 217, 220 (D. Mass. 2014).  Resp. Br. 40.  But the expert in *Sampson* had not been retained by either side or otherwise involved in the case and, to keep her "neutral and detached," the court forbade the parties from communicating with her directly.  It also carefully supervised the nature and scope of her evaluation.  *Id.*

qualifications); had no direct communication with them; gave them no direction, even through defense counsel; and never learned what the defense lawyers told them they should or should not address with Council, consider in their evaluation, or disclose to the court. Nor does the government disagree that it is unclear who even composed the summary statement they signed. *See* Op. Br. 74-75; *see also* JA2185, JA2188-2206, JA6153, JA6156.

Indeed, the government's portrayal now of the two experts as "neutral" and "responsible to the court" clashes directly with its own and the district court's representations below. After the trial was over, the court confirmed the two experts who signed the statement were "[d]efendant's experts," and *not* "independent mental health expert[s]." JA6130 n.2. And during trial, the government repeatedly pushed back on the court's plan to leave the competency issue to the two defense experts, noting that the IDRA instead required an independent, court-directed expert, Op. Br. 55-57, two of whom had already been contacted by the court and one of whom had already begun work, Op. Br. 75.[8]

---

[8] The government incorrectly claims the court "acceded to Council's objection" to one of the two independent experts, Dr. James Ballenger. Resp. Br. 38. Rather, the court never addressed that

"In any event," the government also argues, the lack of such an expert could not have prejudiced Council because this Court should assume the defense experts were "favorably disposed towards his interests." Resp. Br. 41. But an independent, court expert means one "not responsible to the prosecution *or defense*." *In re Harmon*, 425 F.2d 916, 918 (1st Cir. 1970) (emphasis added); *United States v. Pogany*, 465 F.2d 72, 78 (3d Cir. 1972) (same); *see also* Op. Br. 70-74. That is because a thorough competency inquiry may clash with defense counsel's "tactical decisions," *United States v. White*, 887 F.2d 705, 707-10 (6th Cir. 1989), including instructions to their experts.[9] That appears to have been true here, as Council's lawyers repeatedly worried to the court about the government's ability to use a thorough

---

objection and never ultimately chose between Ballenger or Dr. Thomas Martin, the other independent expert it had contacted who had started reviewing the case, because it decided not to order *any* "evaluation by an independent mental health expert." JA6130 n.2; *see* Op. Br. 56-57, 60.

[9] A defense expert is expected to be "a partisan witness" responsive to the needs of defense counsel, who decides the scope and nature of the expert's evaluation as well as what findings, if any, to share with the court. *United States v. Reason*, 549 F.2d 309, 311 (4th Cir. 1977). Thus, the issue is not, as the government suggests, whether the defense experts were unqualified or unethical. *See* Resp. Br. 37, 41.

14

competency inquiry to generate additional aggravating evidence.  *See*

Op. Br. 47-49, 51, 55-56.

> **2.    Federal law does not license a district court, upon finding "reasonable cause," to proceed without a thorough — let alone any — expert competency evaluation.**

Council maintains that, once the district court found "reasonable

cause" as to his incompetency — a finding amply supported by his

"delusional" "break from reality" and other evidence — the court was

obligated not only to designate an independent, court-directed expert,

but to have the expert conduct a thorough evaluation and provide a full

report covering, among other things, Council's "history," his "present

symptoms," any "tests" that needed to be administered and their

"results," a "diagnosis," and his "prognosis."  18 U.S.C. § 4247(c)(1)-(4);

Op. Br. 76.  Below, the government recognized this.  *See* Op. Br. 54-57.

But now it contends otherwise.  It believes that, even at that

juncture — indeed, even had defense counsel requested it — the court

did not have to order *any* expert competency evaluation, let alone the

comprehensive one and correspondingly detailed report from an

independent expert contemplated by § 4247(b)-(c).  In other words, the

government supposes that those requirements only come into play when

15

a district court orders an expert evaluation under the IDRA, which the court here did not and never was obliged to do.[10]  Thus, the government insists those portions of the statute governing the nature and scope of the examination and report are simply "not relevant here."[11]  Resp. Br. 35, 42.

The problem with the government's argument is that it hears a single word in § 4241(b) — that a court "*may*" order an expert examination — but then shuts its ears to everything else.  That includes Council's discussion of the authoritative Congressional report on this provision (which said such an evaluation should be "routine in virtually

---

[10] This contradicts the government's suggestion that the two defense experts were re-designated by the court as neutral, independent ones under the IDRA.  *See* Section D.1, *ante*.

[11] The government focuses almost exclusively on the report requirement, as if the problem were just experts not showing the court their work and that it supports their opinions, Resp. Br. 42-45, which would be bad enough.  But this disregards that the statute's enumeration of matters to be reported on to the court, such as the defendant's history and test results, is also designed to ensure that the examiner obtains and considers this information in the first place, *i.e.*, actually *does* the work to arrive at reliable opinions.  *See* Op. Br. 76, 77 n.28; *Amicus* Brief of Mental Health Professionals, at 1-2, 20-23.  There is no evidence that occurred here, especially as the defense experts conducted a hastily-arranged Sunday meeting with Council at the jail, then quickly signed a summary statement that he was competent.

all cases" once "reasonable cause" is found), its grounding in Supreme
Court decisions, its consistent application by this and other lower
courts, and its fit with the IDRA's overall structure and purpose. Op.
Br. 69-70, 76-79. These, along with common sense, all demonstrate
that, while a court has discretion to not "*order*" a competency evaluation
after finding "reasonable cause" if a recent-enough one compliant with
the IDRA has already occurred, it ordinarily must have at least one
such examination and report to consider in ultimately determining
competency.[12] *Id.* (Indeed, the government does not cite another case
besides Council's in which a federal court ever departed from this.)

That was especially necessary here where, contrary to the
government's assertion, the court lacked *any* other reliable basis to
determine whether Council was competent notwithstanding its finding
of "reasonable cause." According to the government, there was no need
for a "full" examination and report because the court had the statement
signed by the two defense experts attesting to competency, defense

_____

[12] There could conceivably be unusual circumstances, not present
here, in which no competency evaluation is necessary upon a
"reasonable cause" finding. Those might include, for example, where
the basis for the finding is "withdrawn . . . for credibly explained
reasons" and "error is confessed." *Haywood*, 155 F.3d at 681.

17

counsel's "further observations of Council's behavior," and its own "observations." Resp. Br. 42-43. But the government slides past the wholesale deficiencies of the hurriedly signed statement — and thus presumably of the rushed exam. Those include its failure to address any of the record indicia of incompetency, most notably, Council's "delusional" "break with reality" just two days earlier.[13] *See* Op. Br. 80-82 & n.30; s*ee also Amicus* Brief of Mental Health Professionals, at 3, 20-24, 28-29 (no indication statement had "adequate basis," nor did it "provide information" for independent court determination of competency); *id.* at 25 (statement referred to Council's "possibility of decompensation," but "[t]hat term is typically applied to disorders of severe mental illness," not "to sleep deprivation or anxiety").[14]

---

[13] The government also invokes defense counsel's one-page statement to the court a year and a half before, representing that a different psychologist had evaluated Council and believed him competent back then. Resp. Br. 45. But the government does not deny that competency is fluid, and thus a defendant's decompensation during trial may not be discounted based on such a remote pretrial opinion. *See* Op. Br. 63-65. Nor does the government suggest the earlier conclusory statement by counsel, even aside from its staleness, resembled the thorough expert report required by the IDRA and due process.

[14] The *amicus* brief, by ten leading national psychiatric and psychological experts on forensic competency assessments, also concluded that, overall, "the process by which Mr. Council was

Nor does the record indicate that either defense counsel or the
court had the chance to make (let alone that the court considered) *any*
"further observations" of Council between his overtly psychotic
interaction with the court that Friday, just before it recessed for the
weekend, and the brief conference the following Monday morning, when
the court declared him competent. *See* Op. Br. 53-59. At the start of
court Monday, Council's lawyer noted the statement signed by the
defense experts relayed the previous evening, and said that defense
counsel now believed Council was competent to continue trial. JA4781-
4782. Based on that alone, and without a pause, the court found him
so. *Id.* (The Court: "All right, *based on what's been presented* then, I'm
going to find that he is competent to proceed.") (emphasis added).

Moreover, the cases cited by the government merely say that a
court may consider its own observations or those shared by defense
counsel.[15] They in no way suggest that lay impressions can obviate the

_____

evaluated did not satisfy the minimum standards accepted in the
professional community for determining competence to stand trial." *Id.*
at 3. The government completely ignores this brief.

[15] *See* Resp. Br. 43-44, *citing United States v. Bernard*, 708 F.3d
583, 593-94 (4th Cir. 2013); United *States v. Ziegler*, 1 F.4th 219, 230

need for a thorough expert examination and report once a court finds "reasonable cause" to believe the defendant may be incompetent. *See* Op. Br. 75-79; *Amicus* Brief of Mental Health Professionals, at 12; *see also Pate*, 383 U.S. at 385-86 (observations of defendant's "demeanor at trial might be relevant to the ultimate decision" but "cannot be relied upon" to dispense with full competency inquiry).

Here again, though the government pretends otherwise, it reverses the position it took below. There, it did not merely remind the court of its right to inspect a report "to the extent" one "was produced." Resp. Br. 42 n.6. Rather, it specifically told the court that, upon a finding of "reasonable cause," the IDRA required a comprehensive evaluation and report, and thus asked the court to order both. *See* Op. Br. 55-57, 59; *see also id.* at 48.

No less was demanded by due process, which the IDRA was designed to ensure, *General*, 278 F.3d at 396; Op. Br. 63. That is clear from *Pate*, where the Supreme Court found constitutional error because the trial court deferred to a remarkably similar bare-bones opinion, a

_____

(4th Cir. 2021); *United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995).

20

written stipulation that a named court psychiatrist would testify the defendant understood the charges and could cooperate with counsel.[16] *See* Op. Br.77-78, 84.  The government mischaracterizes *Pate* as holding that the stipulation was properly relied on by the trial court but "outweighed" by lay trial testimony about the defendant's history of irrational behavior.  Resp. Br. 44-45.  In fact, the Court found not an evidence-weighing error but a due-process one: When the issue of competency was raised by the prosecutor during the trial, the trial court should not have "relied upon" the stipulation "to dispense" with further inquiry, including an "adequate hearing" with "expert witnesses."  383 U.S. at 386-87; *see also Drope*, 420 U.S. at 173 (trial court erroneously ignored state statute that "prescribes the contents of a report of the psychiatric examination").

Here too, ultimately, whether the district court is said to have violated a duty or abused its discretion, the result is the same: It erred by not ordering a thorough examination and report, especially given its

---

[16] In addition to agreeing to the stipulation, defense counsel in *Pate* argued in summation that "the defendant has been able to cooperate with counsel" and, despite a defense of insanity at the time of the crime, was now "lucid."  383 U.S. at 386 n.8.

other reinforcing errors.[17]

### 3. Defense counsel's handing up the summary expert statement was not the evidence-based "hearing" required by federal law.

The government acknowledges that, once the court found "reasonable cause" to doubt Council's competency, federal law required a competency "hearing." As discussed, the government is wrong to insist that is all it required. But the government is also wrong to recast what occurred here — a *pro forma* exchange where the court just rubber-stamped the conclusory expert opinion, Op. Br. 59-60 — as a "hearing," let alone the "adequate," evidentiary one required by *Pate*, 383 U.S. at 386, and the IDRA.

Without citing any authority or contending with Council's discussion of the law, the government argues that because his lawyers changed course and were no longer contesting competency, the only

---

[17] It is difficult to understand how the government thinks Council has waived any argument that, in this failure, the district court abused its discretion if this Court determines that is the standard of review. His brief argued that the court erred even if the "may" provision in § 4241(b) afforded it some "discretion." Op. Br. 69; *id.* at 80-83 (discussing specific facts here that made court's inaction unacceptable). And, as noted, the government's brief proceeds to address that contention. Resp. Br. 42-43.

alternative would have been for the court to "incite adversarial proceedings."[18]  Resp. Br. 46.  Not true.  Due process and the IDRA obliged the court to make, *sua sponte*, an independent, evidence-based finding about Council's competency.  *See* Op. Br. 83-88.  Thus, even though neither party pressed the issue at that time, the court had to review a full report of a thorough examination, other relevant information it had received, its observations of the defendant, and (after doing so), any additional evidence it decided it needed to obtain.  *See id*; *Amicus* Brief of Mental Health Professionals, at 18-20.

Here, though, the court never had *any* report, let alone a complete one.  And the record indicates it never paused to consider any other record information suggesting Council's incompetency, most notably, his "delusional" "break with reality" at his last court appearance just three days before.  Instead, the court delegated its role to defense counsel and

---

[18] The government does not deny the court's single-minded determination to avoid delaying the trial, *see* Op. Br. 45-55, and instead defends it.  Resp. Br. 46.  But it ignores that the trial was running well ahead of schedule; at least two independent experts had already been contacted by the court, one of whom was prepared to conduct an examination that week; and other federal courts have paused capital trials to properly address competency issues that arose in their midst. *See* Op. Br. 55, 56, 73, 79-80; *see also Drope*, 420 U.S. at 181 ("the correct course was to suspend the trial").

their two experts, by deferring to the summary statement — which also never mentioned any of the other relevant information. *See* Section D.2, *ante*. This truncated process abdicated the judicial function, substantially risked an erroneous determination of competency, and deprived this Court of an "evidentiary basis" to review the ultimate "finding" that Council was competent to proceed. *Haywood*, 155 F.3d at 680.

Accordingly, this Court should vacate the district court's competency order and remand for further proceedings. *See* Op. Br. 89-90.

## II.

**The court prejudicially abused its discretion by denying the defense 90 days to investigate Council's credible allegation of childhood sexual abuse, in deference to the victims' families' vacation plans.**

The government's brief tries to have it both ways: A 90-day continuance was *so long* it would have deprived victims' families of a trial free of unreasonable delay and also *so short* that Council's lawyers could not possibly have used that time to secure witnesses able to

testify about the sexual abuse he endured at a juvenile institution.[19]
Both arguments are wrong.

The government misdescribes the time sought and received by
defense counsel for trial preparation and misunderstands the
significance of the 90 days that were denied to investigate Council's
credible allegation of childhood sexual abuse, a mitigating factor the
Supreme Court has deemed particularly powerful for capital jurors.
What the government minimizes as an exercise of the district court's
"ample calendar-setting discretion" was instead a denial of a
constitutionally adequate defense primarily in deference to the victims'
families' vacation plans.  This Court should say so.

## A.    Council's prosecution moved at a breakneck pace compared to other, modern federal capital cases even where guilt was not contested.

The government does not meaningfully confront the fact that
Council's case went from indictment to death verdict almost *two years*
faster than the national average.  Op. Br. 102.  Instead, it cites Dylann
Roof's case in which, as Council discussed, the district court questioned

---

[19] The government overlooks Council's refutation of the latter
argument.  *See* Op. Br. 105-06.

25

whether counsel could adequately prepare in the unusually tight time frame the defense itself inexplicably demanded. *See* Op. Br. 93 & n.32. And the government references three other cases that were tried in the same district twelve and fifteen years before this one, without acknowledging that the modern standard of practice in federal capital representation, including in this Circuit, has evolved dramatically since then, resulting in a nationwide average of nearly four years from indictment to verdict. *See* Op. Br. 102 & n.37.[20]

Neither can this compressed schedule be explained by the fact that Council did not contest guilt, as the government speculates. Resp. Br. 64 n.12. Death-penalty trials are rarely "whodunnits." And capital defendants who concede guilt often still take issue with significant aspects of the government's trial evidence since it bears on aggravating and mitigating factors. Here too, Council's lawyers cross-examined most of the government's trial witnesses. JA4088, JA4324, JA4532. So it is unsurprising the government cites nothing to support its

---

[20] *See* Federal Death Penalty Resource Counsel Project, Declaration, *Time Between Indictment and Trial for Last Ten Years* (2021), at 4-5 & Appendix A, https://fdprc.capdefnet.org/project-declarations/time.

speculative theory.  Or that statistics show, even in federal capital cases where guilt is uncontested, courts still consistently allow much more preparation time than defense counsel received here.[21]  There is no getting around that Council's case is an outlier in how quickly the government and court pressed it to trial.

## B.  The government's justifications for denying the 90-day continuance are factually and legally insupportable.

### 1.  Council's lawyers requested only two continuances unilaterally, the latter shortly after he divulged he had been sexually abused as a child.

The government initially tries to discredit Council's July 2019 request for a brief continuance to corroborate his childhood sexual abuse by casting it as the last in a slew of many such requests, all the others of which the district court had generously granted.  Resp. Br. 54.

---

[21] *See, e.g., United States v. Sanders*, No. 1:10-cr-351-DDD-JDK, DE 5 (W.D. La. Nov. 18, 2010) (indictment filed); *Id.*, DE 379 at 26 (at trial four years later, defense counsel concedes in opening statement that defendant committed charged murder); AP, *Inmate convicted of stabbing guard more than 200 times* (June 17, 2017) ("Jessie Con-ui's attorney conceded his client was guilty"); Declaration, Appendix A, *supra* (Con-ui tried more than four years after indictment); *United States v. Lujan*, No. CR 05-924, DE 1074 at 30 (D.N.M. July 29, 2011) (counsel concedes defendant's guilt in opening statement); Declaration, Appendix A, *supra* (Lujan tried six years after indictment).

But this is misleading.  In October 2017, and again soon after in January and February 2018, the parties filed *joint* continuance motions prior to the Government's decision to seek the death penalty.  JA79-81, JA109-112, JA132-135.  Not only were those motions filed jointly, within just a few months of the indictment, they also did not specify dates certain for trial.  *See* JA79-81, JA109-112, JA132-135 (each seeking a continuance "beyond the current term of court").  The next month, March 2018, defense counsel moved to continue a status conference for two weeks due to one defense lawyer's unexpected medical leave.  JA145-146.  It was not until September 2018, when there was a genuine trial date, that Council's lawyers sought a nine-month continuance to ensure his effective representation; even then, the government did not oppose three months of that request.  JA643. The court granted an eight-month continuance.  JA1046-1053.

In April 2019, five months before trial was set to begin, Council divulged to his lawyers that he was the victim of sexual abuse at Dobbs, the youth prison where he had been kept several years from age 13.[22]

_____

[22] Council's lawyers initially told the court he had recently revealed an "encounter," but it stood to reason there might well have

JA1926.  As his lawyers explained to the court, he had been loath to

disclose the abuse because it was "humiliating" and "not something that

people disclose lightly at all."  JA1927.  His counsel had immediately set

to work to corroborate that account, including by finding others at

Dobbs who had perhaps seen evidence of this encounter or encounters,

noticed changes in Council or the staff members' behavior, or could

otherwise testify about his abuse.[23]  JA1454-1467.  Three months later,

and two months before trial was scheduled to start, once it became

apparent the defense was struggling to locate and question critical

witnesses given the sensitive nature of this inquiry, Council's lawyers

renewed their continuance motion, explaining they needed some

additional time to investigate his disclosure.  Their request would have

---

been more than one incident.  And, in fact, Council did disclose others to
the defense.  JA5805-5808; *see also* Resp. Br. 74 & n.16.

[23] The government argues in passing that defense counsel should
have sought a continuance immediately after Council's April 2019
disclosure, rather than waiting until July.  Resp. Br. 70 n.15.  But
neither the government nor the court ever expressed this below.  And it
makes no sense, since a continuance request would have been
premature before counsel had even tried to corroborate the new
information.

delayed the trial's start only *two months* beyond the date sought in their

first contested motion the previous fall.  JA1428-1434.

In other words, his lawyers asked independently for only *two*

continuances, the second of which, for just 90 days, was necessitated by

Council's then recent revelation of childhood sexual abuse, which they

told the court was critical to his mitigation case.  *See* Op. Br. 96-98.

### 2.    The court improperly deferred to the victims' families' vacation plans over Council's right to prepare a constitutionally adequate defense.

Having misdescribed Council's requests for trial preparation time,

the government next offers reasons for denying a few additional

months that are unsupported by the record or legally illegitimate.

Below, the government argued that Council's requested 90-day

continuance would "uniquely prejudice these families," primarily

because "some victim family members have planned an all-family

vacation the week of January 20, 2020, for which reservations have

been placed."  JA1440.  The lead prosecutor pressed this at argument

on the motion, saying there was "a very practical harm, it's to the

victims and the families in this case," and citing "the reliance that …

the victims and their families have placed upon that schedule."  The

prosecutor added that those families were "here today" in court to support the government's opposition to any continuance (just as they had appeared at an earlier scheduling conference to personally plead for a quick trial, *see* Op. Br. 93-94). JA1909-1910. The prosecutor continued to emphasize the point: "They have very real conflicts. They have planned around this in a very real way, whether it's foregoing family vacations, scheduling them at different times or now having to reschedule them." *Id.* The court accepted and relied on this in denying any continuance, saying that the "victims' families" had "made plans regarding the schedule of this case," and noting "the victims have rights as well."[24] JA1910; *see* Op. Br. 99-100.

Not only was this an improper consideration, but the vacation plans need not have been affected in any case — the court easily could have delayed the start date of the trial until the families returned by

---

[24] This comported with the court's having truncated the previous continuance in deference to "the crime victims' rights" and the perceived need to "balance" those against Council's rights. *See* Op. Br. 95.

ordering a continuance of only slightly longer than the 90 days Council requested.[25]  *See* Op. Br. 100.

Though it pointedly avoids mentioning the word "vacation," the government defends the court's ruling by citing the Crime Victims' Rights Act (CVRA) for the broad proposition that "a district court may permissibly consider the views of the victims' families in structuring the trial schedule."  Resp. Br. 65.  But, as discussed in Council's brief, that statute cannot bear the weight the government places on it.  *See* Op. Br. 106.  The government admits that a scheduling conference is not a proceeding at which victims' families have a right to be heard, but nonetheless suggests their views are appropriate to consider in determining what "delay" is "unreasonable" and thus to be avoided per the CVRA.  18 U.S.C. § 3771(a)(7).

Not so.  Logically, the statute entitles victims' families to be "reasonably heard at any public *proceeding*" only if it is one "involving release, plea, sentencing, or any parole proceeding," § 3771(a)(4) (emphasis added), because those *decisions* — to forego a public trial,

---

[25] Or perhaps the families could have altered their vacation plans without any financial penalty, since the government did not say any reservations were non-refundable.

release a defendant, or set his punishment — are the ones on which Congress believed such relatives should have input. The list does not include determining the amount of trial preparation time required by defense counsel.

Nor does the government cite any decision suggesting that courts should look to the wishes — let alone the vacation plans — of a vocal victim's family, even in part, in deciding what preparation time is "reasonable" under the CVRA. Indeed, for this Court to license such a regime in capital prosecutions would only exacerbate the racial disparities in trial-preparation times (and, as a result, sentences) that have resulted from the greater pressure for a fast trial and death verdict in cases, like Council's, with Black defendants and White victims. *See* Op. Br. 109-111.

The government next invokes the district court's comment that "witnesses" and "jurors" had also "made plans regarding the schedule." Resp. Br. 69; JA1914. But the only scheduling conflict the government identified was the victims' families' vacation plans; none was cited for any other witness in the government's detailed, forceful written

opposition or courtroom argument against a continuance.[26]  JA1437-
1444, JA1907-1911.  As for potential jurors, the government ignores
that the summonses that had gone out only directed them to call a
phone number the next month that would tell them when to report to
court for a single day to fill out additional questionnaires.  Voir dire and
trial would not occur until a later, unspecified date.  The summonses
also did not ask jurors to commit to a particular period of service or ask
about conflicts for any dates.  (Nor did they identify Council's case.)
JA6695-6703; *see* Op. Br. 99.  If a brief continuance had been granted,
the recording could have simply directed them to call again the
following month for a specific court date.

Finally, the government tries to justify the court's ruling as an
exercise of its "ample calendar-setting discretion."  Resp. Br. 61.  But
this was not an instance of choosing a trial date in a vacuum; it was a
flat denial of three months of investigative time to a capital-defense
team fighting for their client's life and responding to a recent revelation

---

[26] Thus, the government's citation, Resp. Br. 70, to *United States
v. Bakker*, 925 F.2d 728 (4th Cir. 1991), is off base.  There, a
continuance would have required halting an ongoing trial and sending
20 government witnesses home.  *Id.* at 735.

of childhood sexual abuse. At no point did the court suggest that the continuance motion was a "dilatory tactic," *United States v. LaRouche*, 896 F.2d 815, 824 (4th Cir. 1990), *cited in* Resp. Br. 69, or that it should have been filed sooner; on the contrary, even the government acknowledged defense counsel's "extremely high" degree of "diligence." JA1908; *see* Op. Br. 98.

## C.   The government has not demonstrated beyond a reasonable doubt that this error was harmless.

The government wrongly places on Council a burden to show that a wrongful denial of his continuance request "specifically prejudiced" his defense. Resp. Br. 60, 70, *quoting United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). *Hedgepeth*, a non-capital case, involved whether a continuance was prejudicial at trial. The government simply ignores that, as discussed in the opening brief, the FDPA standard is quite different for judging sentencing prejudice: The burden lies with the government to prove, beyond a reasonable doubt, that the error was harmless — in other words, that corroboration of Council's childhood sexual abuse the defense might have uncovered with a brief continuance would not have tipped the balance for even a single juror. *See* Op. Br. 108-09, 111-12.

35

The government falls well short of carrying that burden.  It minimizes the prejudice Council suffered by claiming that the six witnesses who were former Dobbs students adequately corroborated that the school staff sexually preyed on some students.  Resp. Br. 72. But that is a far cry from establishing that Council *himself* was sexually abused there.  None of these witnesses claimed to have any evidence, direct or circumstantial, of Council's own victimization.  JA5806-5808.

The government also latches onto defense counsel's comment that they were seeking witnesses who could "circumstantially corroborate what Brandon says," claiming this shows they sought only to elicit testimony from students who were, themselves, abused at Dobbs, and noting that several witnesses so testified.  Resp. Br. 71-72.  But that is a crabbed reading of "circumstantial evidence."  As the court surely understood and as counsel flagged, such evidence would also include testimony of Dobbs students or teachers who were not in the room while Council was being abused but could nonetheless present evidence of this encounter or encounters, who noticed changes in Council's or the staff members' behavior, or could otherwise testify in support of his account. In other words, witnesses who would testify about *Council's* abuse, not

their own.  JA1928 ("The only thing we can try to do is try to find young
men who can say that similar things happened to them *or* that might
circumstantially corroborate what Brandon says") (emphasis added).
And no witness at the sentencing hearing was able to testify about *that*.

The government also argues that the jury's findings are
inconsistent with prejudice because, on the verdict form, none of the five
jurors who found the mitigating factor about sexual abuse at Dobbs
deemed it weighty enough to preclude a death sentence.  Resp. Br. 75.
But the government ignores that this was a compound factor, claiming
generally that "numerous students were sexually exploited by staff
members" at Dobbs *and* also specifically that such employees "sexually
exploited Brandon."  JA2312.  No evidence at all was presented to
corroborate Council's report of the latter to the defense's testifying
social-work expert.  So it is plausible, if not likely, that the number "5"
beside this mitigator factor on the verdict form reflected the general
finding by five jurors of sexual exploitation at Dobbs, but not the
specific one about Council himself.

There is good reason to think that evidence corroborating
Council's disclosure might have mattered quite a bit to at least some of

those five jurors, if not others as well. Childhood sexual abuse often causes deep, long-lasting damage to its victims, *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008), and thus is considered particularly "powerful" "mitigating evidence" in capital cases. *Wiggins v. Smith*, 539 U.S. 510, 532, 534 (2003).

Independent corroboration of Council's personal experience as a victim of such abuse — especially in light of the other "abundant" and "extensive mitigation evidence" the government concedes he presented, Resp. Br. 61, 70, and that jurors found, Op. Br. 30-36, 114 — could well have tipped the balance for at least one juror to consider life imprisonment a sufficient punishment for him. This error compels resentencing. *See* Op. Br. 115.

## III.

**The court's refusal to ask jurors' racial opinions was neither rectified by other questions, justified by any feared "harm," nor excused by any fault of the defense.**

### A. Knowing if jurors interacted outside their race could not substitute for knowing their racial opinions, particularly about whether Black people are more prone to violence.

The government trivializes the district court's decision on race questioning by conflating the defense questions it refused to pose in the

38

questionnaire with the entirely different ones it included, which were

inadequate standing alone.  This appeal focuses on five rejected

questions that would have inquired, in complementary ways, whether

jurors believed that Black people — generally or those partial to the

same hairstyle or movies as Council – are more prone to violence.[27]  Op.

Br. 116-17.  This is the very bias the Supreme Court flagged almost 40

years ago as especially relevant for capital voir dire in a cross-racial

case, *Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality), and that it

more recently recognized remains "powerful" in society, *Buck v. Davis*,

580 U.S. 100, 121 (2017).

Here, though, instead of inquiring into such bias, the court

included three questions asking if jurors would label themselves as

racially "unfair" or "uncomfortable" around other racial groups, and

three questions about jurors' personal experiences.[28]  Op. Br. 119-20.

---

[27] Council's challenge also embraces a sixth, catch-all question that would have asked jurors if the case's interracial nature would "affect how you would view" it.  Op. Br. 117.

[28] While the government observes that some of the experience questions the court asked, like the opinion ones it refused, had been proposed by Council, he never suggested those would suffice standing alone.  Rather, he kept pressing specifically for the opinion questions even after the court agreed to ask some of the experience ones.  *See* Op.

The government wrongly argues these adequately substituted for the questions the court spurned because they were well-suited to identify prejudiced opinions about Black people.  Resp. Br. 80-83.

In fact, none of those questions asked jurors for *any* racial "opinions" or "viewpoints," let alone whether, critically, they believed that African Americans, or a subgroup of them, are more violent.  True, a juror's branding himself as racially "unfair" might imply he holds discriminatory opinions.  But the government ignores that such self-labelling questions are now widely considered ineffective by social scientists, voir-dire treatises, and many courts.  This is not just because they are stigmatizing and thus unlikely to yield honest answers.[29]  Even a White juror harboring racist opinions about Black people could

---

Br. 116-17, 119-20; *see also* JA1655 (again flagging for the court the importance of these opinion questions and *Turner*'s support for them).

[29] The government speculates that jurors would be no less inclined to admit they cannot be "fair" to other races or are "uncomfortable" around them than to acknowledge an opinion that Black people are predisposed to violence.  Resp. Br. 84-85.  That speculation is contradicted by extensive social-science research on how to reliably survey the public and question jurors about racial bias.  *See* Op. Br. 125-27 & n.54 (recommending questions about stereotypical views of Black people, including whether they are more violent); *id.* at 131-132 & n.56 (noting good results from such questions).

*sincerely* answer no when asked if he regards himself as "unfair" or is "uncomfortable" around them. *See* Op. Br. 125-30.

And the results here bear that out. The government says the three self-labelling questions were not an "empty formality," but acknowledges that only a tiny fraction of the venire answered "yes" to either of them: just 22 jurors in a panel of almost 500, or 4.5 percent. Resp. Br. 82 n.18. But research suggests a much higher proportion held stereotypical opinions about Black people's greater predisposition to violence, which the defense's *Turner* questions would have uncovered. *See* Op. Br. 120-21, 130-31 & n.56.

The government also defends the three experience questions as effective tools for ferreting out racial bias through follow-up in voir dire. Resp. Br. 82-83. But the record reveals otherwise. *See* Op. Br. 120-21. That is unsurprising since none asked if jurors held racially-prejudiced opinions of Black people, let alone the critical one about propensity for violence. So although more potential jurors acknowledged either no regular interaction or a bad experience with someone of another race,

those answers were dead ends.[30]  The court never followed up on the interaction question.  And the bad-experience one simply led the court to re-ask some version of the self-labelling question, *i.e.*, could the juror be "fair and impartial" despite the experience?  In response, no veniremember who had denied bias varied from their questionnaire answers.  *See* Op. Br. 120-21 & nn.51-53; *see also* Section D, *post*.

The government plucks, from the panel of 500, a single juror who supposedly illustrated the question's effectiveness.  Juror #475 wrote on her questionnaire that her father was assaulted by someone of a different race.  But, like every other juror who answered "yes" to the bad-experience question, she responded to the next one that she could still be fair and impartial in a cross-racial case.[31]  Based on that, she undoubtedly would have been qualified by the court.  She was excused — but not, as the government suggests, because subsequent "questioning by the court" uncovered undisclosed bias.  Resp. Br. 83.

---

[30] The restrictive-organization question was vague and proved almost useless.  *See* Op. Br. 121.

[31] Juror #475, Supplemental Questionnaire, at 3 (Q.17 and Q.18).  Because the government did not designate this questionnaire, it is not included in the joint appendix, but is available to the Court upon request.

Rather, *on her own*, she approached the jury administrator, *before voir dire*, to volunteer that she should not sit.  JA3657-3658.

## B. The court's discretion was bounded by its constitutional obligation to ask questions adequate to identify jurors with disqualifying racial biases.

The government says the district court "cleared" the minimum "threshold" here because it told jurors the crime was cross-racial and "questioned [jurors] on the issue of racial bias."  Resp. Br. 81.  But while the court had substantial discretion in determining what race questions to ask, the government ignores the Supreme Court's and this Court's warnings that the Fifth and Sixth Amendments demand that such questioning be "adequate to identify unqualified jurors," and "provide a reasonable assurance that prejudice would be discovered if present." *See* Op. Br. 122 (citing quoted decisions).

As discussed above and in the opening brief, the district court's questions fell well short of that mark.  None of them directly asked about — or, in fact, prompted *any* juror to share — racially-prejudiced opinions about African Americans, though surveys demonstrate how common such opinions are, including that Black people are more prone to violence.  *See* Op. Br. 131 n.56.  The government refuses to reckon

43

with *Turner*'s recognition that inquiring about this very opinion is not only appropriate but critical in a cross-racial death-penalty case like Council's, since it could easily make White jurors "less favorably inclined toward" mitigating factors invoking the defendant's background. *Turner*, 476 U.S. at 35; *see* Op. Br. 122-23.

The government also inaccurately suggests that the *Turner* questions Council proposed are "intensive" ones warranted only when racial issues are "bound up" with the trial. Resp. Br. 85. The Supreme Court has never provided for varying levels of questioning about racial bias ("intensive" or otherwise). Rather, effective questioning on this topic was constitutionally mandated here under *Turner* simply because Council's was an interracial capital case. It was mandated as well under the Supreme Court's supervisory powers over federal prosecutions because he was accused of an interracial violent crime. On top of all that, such questioning was required because racial issues were "bound up" with the trial. *See* Op. Br. 123-24.

Certainly, the Court should not take seriously the government's portrayal of the case as one in which race was assuredly a non-factor. Resp. Br. 85. After all, it involved a predominantly White jury deciding

44

the fate of a dark-skinned dreadlocked Black man with an affinity for flashy cars and movies about rap-music gangsters, who had killed two church-going White women in a jurisdiction where juries are almost ten times more likely to order execution for such a cross-racial crime.  As flagged by trial counsel and detailed in the opening brief, the proceedings were rife with these and other racial undercurrents.[32]  *See* Op. Br. 9-11, 28-29 & n.9, 82 & n.29, 93-94, 98, 110, 117-18, 140-41, 144-48, 176, 204, 220-21.

## C.  The government offers no justification for the court's refusal to ask jurors whether they thought African Americans are predisposed to violence.

Below, Council also unsuccessfully proposed several additional questions, about jurors' attitudes toward the Confederate flag, affirmative action, and similar issues.  Though he does not press those on appeal, the government spends several pages arguing that *those* questions would have caused "more harm than good" and

---

[32] Defense counsel's appeal in summation, to "not let race get into the middle of this" because "[t]his is not a racial case," does not suggest otherwise.  *See* Resp. Br. 85-86.  At that point, with the court having denied every defense effort to keep the trial from being marred by race, *see* Op. Br. 11, counsel's comments presumably represented a desperate, last-ditch effort to make the best of a bad situation.

"'exacerbate[d]'" "'prejudice.'" Resp. Br. 76-77, 85-87, *quoting Rosales-Lopez v. United States*, 451 U.S. 182, 195 (1981) (Rehnquist, J., concurring). But the government is silent about the questions at issue, whether any jurors believed Black people or a subset of them are more prone to violence. Its quoted language from then-Justice Rehnquist questioned the wisdom of asking at all about racial bias in an ordinary case. But, again, there was no doubt about that here, given *Turner*, because Council faced a capital trial for a cross-racial crime. And, if anything, the experience questions the court asked were more "pointed," Resp. Br. 86, and personal than the opinion ones it rejected.

Thus, the government's brief only confirms that there was no reason not to include the defense's *Turner* questions on the questionnaire. *See* Op. Br. 131-32.

## D. The court did not license the defense to ask the *Turner* questions itself in voir dire, nor would that have been a realistic alternative.

The government imagines that, in the less than five minutes the defense was allotted in voir dire to directly ask follow-up death-penalty questions, Council's lawyers had "ample leeway" from the court to interject the sensitive racial-opinion questions it declined to include on

the questionnaire.  Resp. Br. 80, 87-89.  The record does not support
that theory.

After Council requested the *Turner* questions and other race ones
for the questionnaire, the government strenuously objected that they
were "invasive" and otherwise "improper[]."  JA1418-1419.  In the
court's order explaining its rejection of most of the defense questions, it
agreed that many generally "far exceeded the scope permitted."
JA1435.  A few days before voir dire began, the defense tried to revisit
the issue in a motion warning that "the negative stereotype of African-
American men as violence-prone" would likely create racial "biases"
among some potential jurors, which needed to be addressed in voir dire.
JA2129-2131, JA2134.  The court responded emphatically with a text
order the next day.  Construing the motion, in large part, as an effort to
reargue for including the defense's race questions, it said that the "six
questions" it had included were the ones appropriate to "probe racial
bias/attitude."  JA2155.

That same day, the defense proposed a list of voir dire questions.
It included a version of the *Turner* question the court had rejected and
several others about race.  JA2157.  Just before voir dire commenced a

few days later, the court announced, in no uncertain terms ("Let me be clear about something"), that it had authorized counsel to submit only "specific follow-up questions … based on some of the responses to the questionnaires" — not "to allow, basically" another "questionnaire." The court ruled it had "covered in my questionnaire … all of the different important areas of inquiry."  Moreover, the court repeated twice, "some of the questions" now proposed were "improper."  JA2679-2681.  Though it did not specify which questions, it is reasonable to infer they included the *Turner* questions the government opposed and the court repeatedly rebuffed.

The court voir dired up to 30 jurors per day, questioning each individually apart from the rest.  Counsel were allowed to question each juror directly, for "relevant follow-up questioning" to the court's, and only for "5 minutes per side."  DE183:3; DE185:7; DE625:2.  Thus, during voir dire, the attorneys stuck to follow-ups to questionnaire answers, almost entirely those pertaining to the death penalty.  Though the government suggests counsel directly asked numerous jurors a variety of race questions including non-follow-ups and ones about their racial "attitudes," Resp. Br. 78-79, 87, the record does not bear that

48

out.[33]  Moreover, the court enforced the time limit, repeatedly

interrupting counsel to tell them to "finish up," *e.g.*, JA2696, JA2713,

JA2768, JA2848, JA2870, JA2991, JA3005, JA3147, JA3858, sometimes

even before five minutes had elapsed, *e.g.*, JA2768 (Court: "Let's finish

up"; Defense Counsel: "I think I'm only two minutes in"; Court: Well,

I'm going to start taking your time").

Despite this, the government claims the court licensed defense

counsel to ask their *Turner* questions directly of jurors, and that

remedied the court's refusal to pose them itself on the questionnaire or

during voir dire.  Resp. Br. 87-89.  The government relies entirely on

the court's passing comment the first morning of voir dire (after its

lengthy statement limiting the process to "follow-up" questions that

were not "improper") that counsel were "free to spend their time asking

---

[33] The government cites exchanges where, as discussed, the court
rotely followed up with jurors who had answered "yes" to the bad-
experience question, by asking if they could still be "fair" and
"impartial."  (They said they could.)  JA2860, JA3252, JA3691-3692,
JA3765, JA3817, JA3960, JA3984-3985, JA4018-4019.  In two other
cited instances, *Black* jurors were asked about such affirmative answers
by *the government*.  JA3030-3031, JA3329-3333.  For the remaining
juror, who was already disqualified based on her bias against
immigrants, defense counsel decided to "stir the pot just a little bit
more" and asked if the fact he and Council were Black would also be a
"problem" for her.  JA3288-3293.  *See also* Op. Br. 121.

some of their questions, if they're appropriate," while stating in the next breath, "but some of them are not appropriate." JA2681. As discussed, the record indicates the court considered the defense's *Turner* questions improper and inappropriate. And even had it not, defense counsel's interjecting them in voir dire would not have been a realistic alternative. The sensitive nature of the questions about racial attitudes required that they be posed by the court, not by the defense. *See, e.g., ABC, Inc. v. Stewart*, 360 F.3d 90, 101 (2d Cir. 2004) (recognizing "sensitive" nature of "voir dire examinations [that] explored the racial views of potential jurors"). And defense counsel, who had only a brief, rushed opportunity to question each juror directly, needed to devote that to follow-up inquiry on the critical issue of their death-penalty opinions.

Accordingly, the court erred by repeatedly refusing to ask any of the defense's *Turner* questions, or indeed, any question about jurors' racial opinions. Relief is required. *See* Op. Br. 132-33.

## IV.

**The court denied Council a meaningful opportunity to present a *Batson* claim after the government struck Black jurors at two and a half times the rate of others in this cross-racial case.**

**A.    The district court understood and resisted trial counsel's request for a recess — not just 55 seconds at counsel table — to review the record to marshal a *Batson* challenge.**

The government does not dispute that, under Federal Rule of Criminal Procedure 51(b), if Council was deprived of a "meaningful" or "fair" opportunity to present his *Batson*[34] claim below, this Court should remand for it to be considered.  Nor does the government seriously dispute that such a deprivation took place if the district court refused the defense a recess to review the voluminous voir dire transcripts and questionnaires, and instead insisted that any *Batson* claim be presented immediately after peremptory strikes were exercised, and in front of all the jurors.[35]

---

[34] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[35] The government does not question that the court contemplated conducting any *Batson* proceeding, like the exercising of peremptory strikes, in open court in front of the jurors; that this would have prejudiced Council; or that, for this reason, it is generally accepted as best practice to present such challenges outside jurors' presence.  *See* Op. Br. 151-52.  Instead, the government simply notes that no decision has yet deemed this constitutionally required, and claims Council's

51

Rather, the government argues that the defense made no such request. According to the government, the court paused the proceedings for 55 seconds for counsel to confer with each other, JA4082, JA6723, because that was all the defense ever wanted. Resp. Br. 90, 91, 95.

Not so. During the colloquy, Assistant Federal Defender Nettles repeatedly conveyed that they needed time "to analyze the strikes for any issues" involving *Batson* — something they "haven't even had a chance to look at yet," since the prosecution had just exercised all 20 of its peremptory challenges only moments before. This was not like the state trial in *Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004) (*en banc*), cited by the government, in which peremptory challenges were exercised on a rolling basis after each successive juror was questioned so that defense counsel had days to review the strikes before the more than week-long jury selection concluded. *See id.* at 325-26 (explaining why *Batson* claim was waived). While Nettles did not use the word "recess" (or specify how long it should last), it was plainly what he was requesting. That is why he twice asked the court not to release the panel. JA4079-

_____

attorneys were not "cowed by having jurors in the room." Resp. Br. 98 & n.23.

4081.  He would not have needed to say any of this if all he wanted was a momentary pause at counsel table; he would have just asked for that.

Furthermore, the defense did not backtrack until *after* the court, over Nettles's repeated protestations, started to summon the selected jurors back into the courtroom for him to present any such challenge right then and there, in front of the entire panel.  Only at that point did CJA co-counsel Bryant respond that he and Nettles would just consult at counsel table and "report right back" — which they did after a 55-second pause, saying they were "fine" and had "no objection to the selection process."  JA4079-4082.

During that brief pause, according to the government, defense counsel made themselves fully "aware of any possible *Batson* issues." Resp. Br. 95.  But it is inconceivable that, in just 55 seconds, any lawyer could have evaluated the evidence for a *Batson* claim from eight days of voir dire and many hundreds of pages of jury questionnaires, especially in a capital case.  Or that an experienced assistant federal defender like Nettles would have thought he could, and only asked for that.  Indeed, in the country's most recent federal capital trial, the district court granted the defense request for a full 24-hour recess to evaluate a

*Batson* claim after prosecutors admitted that DOJ's "capital case section" told them there was precedent for this in other such cases. *United States v. Saipov*, No. 17-cr-722, Voir Dire Tr. at 4973-74 (S.D.N.Y. Dec. 19, 2022).

Perhaps recognizing this problem with its portrait of the colloquy, the government minimizes the time that would have been needed for defense counsel to "analyze" the strikes in this particular trial. It does so by wrongly contending that Council's *prima facie* case on appeal rests "primarily" on just the numbers and ordering of Black jurors removed, which was readily available to his trial counsel. Resp. Br. 97 n.22. In fact, the centerpiece of Council's *Batson* challenge is a side-by-side comparison of the Black jurors struck with similarly situated White ones the prosecutors accepted onto the jury. As his opening brief noted, the Supreme Court has recognized that such comparisons are much "more powerful than . . . bare statistics." Op. Br. 144 (quotation omitted). But developing them requires analyzing the voir dire and questionnaire responses from the struck Black venirepersons; reviewing the record to identify comparable White jurors who were selected; and harnessing such information to demonstrate the two groups' relevant

54

similarities.  *See* Op. Br. 144-49 & n.61 (detailed comparison of responses from eight Black and five White jurors).  There is no way this could have been accomplished in 55 seconds at counsel table.

**B.    The government does not rebut Council's strong showing that prosecutors accepted White jurors with responses materially the same as many of the Black ones it struck.**

The government also questions the merits of the *Batson* challenge Council seeks to present to the district court.  While acknowledging the obvious — the "quantitative disparities," created by the prosecutors' elimination of Black jurors at two and a half times the rate of White ones, provide "relevant" support for a *prima facie* case — it insists the record demonstrates "substantial race-neutral reasons" for the government's starkly disproportionate removal of African-American veniremembers.  Resp. Br. 99-100.  But the government makes no real effort to contend with Council's further showing that five to eight of the struck Black jurors were indistinguishable from a series of White jurors prosecutors accepted onto the jury.  Op. Br. 145-48.  The government mentions only two of these struck African-American jurors, ignoring the rest.  And while it cites those two's death-penalty views as a possible race-neutral reason for removing them, it ignores that several accepted

White jurors expressed remarkably similar positions on capital

punishment.[36]  *See id.*

Ultimately, the government is left to speculate that, whatever the

record shows, prosecutors conceivably could now give extra-record

explanations for their strikes, such as the jurors' "demeanor."  Resp. Br.

101-02.  Perhaps so.  But that argument only favors a remand at which

the district court could take first crack at the *Batson* issue, determine

whether there is a *prima facie* case, and, if so, obtain actual

explanations from the prosecutors that can then be tested.

## C.    A remand would serve the public interest in ensuring against racial discrimination in jury service, and would be preferable to one years from now in a § 2255 proceeding.

According to the government, this Court need not consider

Council's colorable claim that prosecutors kept Black citizens from jury

service because of their race in this high-profile, cross-racial capital

trial, nor should it be remanded for the district court to consider it.

---

[36] The government also speculates that prosecutors might
legitimately have struck Juror #544 because he left blank two of the
nine death-penalty questions on his supplemental questionnaire.
JA7200-7201.  But it fails to note that some White jurors with similar
death-penalty attitudes had also left some of those same questions
blank, *e.g.*, JA6911, JA7217.

Perhaps the government believes the merits of the issue should *never* be considered. But blocking any such review would "suggest[] the justice system is complicit in racial discrimination," "undermine[] respect for the court and the rule of law," *Mitchell v. Genovese*, 974 F.3d 638, 652 (6th Cir. 2020) (cleaned up); Op. Br. 152-53, and fail to account for how "use of discriminatory peremptory challenges harms the jurors," *Georgia v. McCollum*, 505 U.S. 42, 50 (1992).

Perhaps, instead, the government contemplates this claim could be resuscitated in a § 2255 proceeding, especially since the government faults trial counsel, and notes that any question of their ineffectiveness is not cognizable on direct appeal. Resp. Br. 41 n.5. But delaying such a reckoning, perhaps for years, would only exacerbate the problem the government purports to worry about, the "faded memory of the prosecutors." *Id.* at 95. Remand is needed now.

## V.

**Two of the central aggravating factors were, in fact, mutually exclusive. And the government does not dispute that, if true, this would require resentencing.**

A.  **The "innocent victims" aggravating factor alleged a non-pecuniary motive for the killings, so it contradicted the factor alleging a "pecuniary gain" motive.**

The government concedes that Council preserved, for *de novo* review, his challenge to its assertion of mutually exclusive aggravating factors: that he murdered the victims in order to steal money from the bank ("pecuniary gain"), and also that he knew the killings were unnecessary to steal the money ("innocent victims"). Resp. Br. 104. Nor does the government dispute that, if these aggravators were contradictory, it would violate the Constitution and invalidate the jury's findings of both. *See* Op. Br. 163-65.

Instead, the government contends that the two factors presented to the jury were entirely "consistent." Resp. Br. 105, 107. It acknowledges that the "pecuniary gain" aggravator required proof of Council's pecuniary "motive" or "purpose" for the killings — namely, that he "committed the murders in order to obtain the money." Resp. Br. 108-09. But the government now theorizes that the other

challenged aggravator, "innocent victims," relied not on Council's mental state but on his "method of committing the offense." Resp. Br. 102, 105-07, 112.

Not so. Although, as the government notes, the preface to this factor ascribed to Council "particular cruelty and callous disregard for human life," it went on to allege that he "'displayed'" those "by" killing the victims even though "such violence was not necessary to successfully complete the robbery." JA6028-6029. Thus, the prefatory labels described not the "method" of committing the murders, but Council's mental state: He knew the killings were unnecessary to the robbery but committed them anyway, out of "cruelty" and "callous disregard."

The district court agreed these labels lacked independent meaning but were "elucidated" by the allegation of knowingly unnecessary killings that followed. JA1065. And the prosecutors never even mentioned "cruelty" or "callous disregard" to the jury.

Instead, they emphasized that this aggravating factor rested on "*what the defendant knew*, that he didn't have to use violence" to complete the CresCom robbery. JA5947 (emphasis added); *see also*

59

JA5945-5946 ("*[h]e knows* … you can take the money and just walk out … *He knows* you can use a note … *He knows*, in the days and weeks leading up to CresCom, violence is not necessary to rob a bank") (emphasis added).  Likewise, the government's brief acknowledges that underlying the "innocent victims" factor was the allegation that "Council knew how to steal money without killing but opted to kill Major and Skeen anyway."  Resp. Br. 105; *see also id.* at 107 ("Council knew how to steal money without ending lives . . .").  If Council "knew" he could steal the money whether or not he killed the victims (*i.e.*, that "you can take the money and just walk out), it necessarily follows that stealing the money was not his purpose or "motive" for killing them.

The government now also posits that the two aggravators would only have contradicted each other if the second one, that Council knew the killings were unnecessary to the robbery, "amounted to a 'without motive' factor."  Resp. Br. 107.  But that contention fails for two reasons.  First, the prosecutors did argue this factor meant Council committed the killings gratuitously, for no purpose.  *See* Op. Br. 157, 160-61.  Second, and more important, regardless of whether Council had some other motive for the killings or instead "no motive" at all, the

60

mental states of the two aggravating factors — a "pecuniary" motive to

complete the robbery, versus the absence of *that* motive — were still

mutually exclusive.

**B.    The "pecuniary gain" factor turns not on whether Council killed *before* obtaining the gain but on whether he did so *in order to* obtain the gain, for which the proof was legally insufficient.**

As an initial matter, the government is wrong to claim that

Council's challenge to the adequacy of the government's proof of an

aggravating factor is reviewed merely for plain error because he did not

raise it below.  Resp. Br. 104-05.  Rather, the FDPA mandates plenary

review of this question by the Court regardless of preservation.[37]  *See*

Op. Br. 170; *see also United States v. Runyon*, 707 F.3d 475, 503-04 (4th

Cir. 2013); *United States v. Barnette*, 211 F.3d 803, 820-21 (4th Cir.

2000), *citing* 18 U.S.C. § 3595(c)(2)(B).

On the merits, again, the government acknowledges that the

"pecuniary gain" aggravator required proof of a specific "motive," that

"Council committed the murders in order to obtain the money" from the

---

[37] The standard of review is whether a rational juror could have found the aggravating factor proven beyond a reasonable doubt.  *See* Op. Br. 167.

bank, and "expected" that the pecuniary gain — *i.e.*, successfully "obtain[ing] the money" — would "'flow directly from the homicide.'" Resp. Br. 109, *quoting United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2022). The government also admits there are "similarities" between Council's case and *Bernard*, in which the Fifth Circuit held this standard was not met and thus invalidated a pecuniary-gain finding because the defendant killed to "prevent [the victims] from reporting" a carjacking "to police," rather than to obtain their vehicle in the first place. Resp. Br. 109.

Despite all this, the government wrongly dismisses *Bernard* because the defendant there killed the victims while they were in the trunk of their car, *after* he had already seized control of it, *Bernard*, 299 F.3d at 483-84, whereas here the killings occurred just *before* Council grabbed the money. Resp. Br. 109. This is a distinction without a difference. Under *Bernard* and other circuits' decisions, whether the pecuniary-gain factor applies in a robbery-murder scenario depends not on the relative *timing* of the two but on the defendant's *motive* for the murder. *See* Op. Br. 162, 165-66.

The government tries to sidestep this by also weakly suggesting

62

Council may have thought the victims were in a "position to prevent" him "from *obtaining* the pecuniary gain." Resp. Br. 109 (emphasis added). But all of the evidence showed, and the government itself argued, that Council "knew" he could "obtain the money" without killing either victim, by passing Major the robbery note he had written and having her hand over the cash. *See* Resp. Br. 109; Op. Br. 154-57, 160-62.

Nor is it enough, as the government suggests, Resp. Br. 109-10, that there was evidence Council killed to keep the victims from summoning police who might have apprehended him *after* he had already "obtained the money" and departed the bank. That same avoiding-apprehension motive did not suffice in *Bernard*. And it makes no difference precisely how long after the pecuniary gain Council feared apprehension. Rather, robbery-murder cases where this aggravating factor was approved have relied on proof the victim was attempting or threatening to thwart the defendant from "obtaining," Resp. Br. 109-10, the pecuniary gain in the first place. That includes *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005) where this Court said the defendant's "own words" in

63

his confession — that he killed because he thought the carjacking victim was "going to stop me" from taking the car — provided the necessary evidence of "motivation" to support this aggravator. *Id.* at 808 (defendant "got" victim's car "by killing him"); *see also United States v. Lawrence*, 735 F.3d 385, 413-16 (6th Cir. 2013); *United States v. Bolden*, 545 F.3d 609, 613, 615-16 (8th Cir. 2008); *United States v. Brown*, 441 F.3d 1330, 1370-72 (11th Cir. 2006).

Accordingly, the jury's finding of the "pecuniary gain" factor (and of the "innocent victims" factor as well, *see* Op. Br. 165-66), should be invalidated.[38]

## C. The government's concession that the jurors received "extensive mitigation evidence" only confirms that these aggravating-factor errors were prejudicial.

The government does not suggest it would be harmless error if either the "pecuniary "gain" or "innocent victims" aggravators (or both) are invalidated on appeal. Nor does it challenge Council's discussion of why such errors prejudicially skewed the jury's balancing of the

---

[38] Council also rests on his opening brief for his challenge to the government's inducing the jury to redundantly weigh the "unnecessary" nature of the killings to support three different aggravators. *See* Op. Br. 168-72.

aggravating and mitigating factors. *See* Op. Br. 170-72. In fact, the

impact of these errors is only further highlighted by the government's

concession that the jury received "extensive mitigation evidence." Resp.

Br. 61. In other words, right-sizing the death side of the scale could

well have altered the jury's verdict. Accordingly, the Court should

vacate Council's death sentences and remand for resentencing.

## VI.

### The government's victim-impact presentation consumed most of its sentencing case, transgressed precedent and the FDPA, and orchestrated emotional displays from witnesses.

Council has shown how the district court licensed the government

to present a lifetime retrospective about each victim, covering their

value to their professional, church, and local communities, with

repeated, emotional displays from the witness stand. Op. Br. 173-206.

The government, for the most part, does not dispute that this claim is

preserved or that, if meritorious, it would require relief.[39] Instead, it

---

[39] The government says Council's entire victim-impact claim is reviewed for abuse of discretion. Resp. Br. 118. But the decision it cites reviewed *de novo* the district court's *constitutional* rulings on the limits of victim impact — the focus of Council's claim — and applied the abuse-of-discretion standard only to its *non*-constitutional rulings on

argues incorrectly that, in both scope and content, the presentation here

fell well within the bounds of precedent and other federal trials.

**A.    The government identifies no other case in which the majority of its sentencing presentation consisted of testimony from the victims' grieving family and friends**.

Whether highly emotional victim-impact testimony is diffused by

other evidence depends, in large part, on how much other evidence was

presented.  *See United States v. Barnette*, 211 F.3d 803, 818 (4th Cir.

2000).  Here, that was relatively little.  The government does not

dispute that victim impact occupied the majority of its three-day case-

in-chief at sentencing — by every measure, including witnesses,

transcript pages, and days of testimony.[40]  *See* Op. Br. 178-79, 203.  Nor

does the government identify another federal capital trial that featured

victim impact anywhere near so predominantly.

---

exactly which evidence to admit within those limits.  *See United States v. Runyon*, 707 F.3d 475, 499 (4th Cir. 2013); Op. Br. 174.

[40] The government claims the court "pared back" the government's victim-impact case with a "directive" to keep each witness to no more than 15-20 minutes.  Resp. Br. 122.  In fact, the court merely asked the government to "try" to adhere to that range.  JA4910.  And the government substantially breached it the very next morning with the first family witnesses, Skeen's husband and mother, whom they kept on the stand for approximately an hour and a half.  JA4949, JA4968-4969, JA4981-4982, JA4994.

While the government notes it called a similar number of victim-impact witnesses per victim in several trials in other circuits, Resp. Br. 121-22, that testimony, unlike here, represented only a small fraction of the government's overall presentation. *See United States v. Whitten*, No. 07-1320-cr, Gov. Br. at 59 (2d Cir. Dec. 8, 2008) (testimony from victim-impact witnesses "covered fewer than 90 transcript pages out of a 943-page government penalty phase"); *United States v. Barrett*, No. 06-7005, Gov. Br. at 37 (10th Cir. Jan. 8, 2007) ("government's victim impact evidence … encompassed only 64 pages out of a transcript of over 5,400 pages"); *United States v. Allen*, No. 98-2549, Gov. Br. at 131 (8th Cir. Oct. 12, 1999) ("penalty phase … takes up over 1,700 pages of transcript" and victim impact "consumed a mere 88 pages").

The government also observes that there exists no "bright-line rule" on exactly how much victim-impact evidence is excessive, Resp. Br. 120-21, to justify distinguishing this case from the others in this Circuit with smaller proportions and amounts of such evidence per victim, *see* Op. Br.179.[41]  But this ignores Council's main point: that the

---

[41] The government notes the larger total number of victim-impact witnesses in *United States v. Roof*, 10 F.4th 314, 366 (4th Cir. 2021),

highly unusual volume of the government's presentation exacerbated

the multiple errors created by its improper content, *see* Op. Br. 180, and

compounded the resulting prejudice, which must be considered in its

entirety, *see Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005) (*en

banc*), rather than by atomizing each error as the government does.

## B.   The extensive evidence about each victim's youth was not proper victim impact, and that about the witnesses' own lives was not a necessary foundation.

To justify the catalog of evidence from Skeen's and Major's

childhoods and young adult years and the victim-impact witnesses'

gratuitous testimony about their own lives, the government obscures

the facts and stretches precedent beyond the breaking point.

The government does not address the photos and testimony about

each victim's childhood, adolescence, and early adulthood, which made

the penalty phase resemble a memorial service.  *See* Op. Br.181-83.

Instead, the government lumps it all in with other evidence of their

"lives before the CresCom Bank robbery," Resp. Br. 125, wrongly

suggesting that Council would fence out that entire, broader category.

---

but not that it involved nine homicide victims and thus quite *fewer*
witnesses per victim than here.

The government then asserts the challenged evidence was necessary to demonstrate the victims' "uniqueness," as permitted by *Payne v. Tennessee*, 501 U.S. 808, 823-27 (1991). Resp. Br. 125. But this disregards the Supreme Court's explanation that victim impact is properly understood as "aspects of the victim's character and personality that her family would miss the most," *Jones v. United States*, 527 U.S. 373, 399 (1999); Op. Br. 180, not a retrospective about the victim's life from birth to death. That is why a number of lower courts have recognized that childhood images and remembrances of adult victims fall outside the intended sphere of victim impact.[42] *See, e.g., State v. Hess*, 23 A.3d 373, 393–94 (N.J. 2011) ("photographs of the victim's childhood [] do not project anything meaningful about the victim's life as it related to his family and others at the time of his death."); *Salazar v. State*, 90 S.W.3d 330, 337 (Tex. Crim. App. 2002) ("'infant-growing-into-youth' photographs" of adult victim have "de minimis probative value" but "enormous prejudicial effect").

---

[42] Although such evidence was introduced in two cases in this circuit, Resp. Br. 125, facts unique to one made it directly relevant to the crime, and in the other it was an inconsequential portion of a presentation approved by this Court only on the whole. *See* Op. Br. 183.

As for the witnesses' collateral testimony about traumas in their own lives, *see* Op. Br. 183-84, the government defends this as necessary "to lay a foundation" for the relevant victim impact.  Resp. Br. 122-23. That may have licensed, for example, a limited explanation from Laura Davis, a friend of Skeen's, of how the two met.  *See* Resp. Br. 122-23. But the government never explains why Davis's repeated descriptions of her grief over her son's death by gun violence were needed as a "foundation" for her testimony about Skeen's uniqueness.  Such testimony served only to give the jury a prolonged view into Davis's life; it provided no "foundation," let alone a necessary one, for a glimpse into Skeen's.[43]

## C. Proper victim impact does not encompass the reactions of, or ripple effects on, members of a larger community who lacked a close relationship to the victim.

The government does not dispute that much of its evidence extended to the impact of Skeen's and Major's deaths on members of their broader church, work, and local communities.  Or that this larded

---

[43] The government defends similar testimony from Patricia Floyd and Bonnie Reed also without explaining why their extended accounts of their own lives provided a necessary "foundation" for testimony about the victims.  Resp. Br. 124 n.32.

on to the aggravating factor the grief and loss felt by people who were neither family members nor close friends of the two victims, indeed, many of whom did not even know them: employees at competitor banks, strangers who memorialized them in a community rock garden or by sending flowers and cards to CresCom, and local residents who participated in charity events Skeen helped organize. Rather, the government defends all this as entirely permissible. Resp. Br. 125-30.

Though not authorized by *Payne* or the FDPA, *see* Op. Br. 184-85, the government claims that the scope of victim impact was extended by this Court to all forms of "community" impact in *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). Resp. Br. 126. But this seriously misreads *Runyon*. It approved only evidence about the effects of a Naval officer's death on shipmates who had served long deployments with him at sea and "loved" the victim, along with brief, "quick glimpse" testimony about his position among his shipmates. *See* Op. Br. 185-86. By contrast, the grief of strangers and passing acquaintances is not the "specific harm" the Supreme Court countenanced. Op. Br. 186; *Payne*, 501 U.S. at 825.

The government also notes that the district court here gave a supposedly curative instruction following some of the community-impact testimony involving other banks and bank employees. Resp. Br. 127. But it ignores the deficiencies Council identified in that instruction, namely that it was too narrow, too late, and did not clearly state there had been improper testimony, let alone what it was. The government also overlooks that the community-impact testimony continued unabated after that instruction.[44] *See* Op. Br. 188-90.

Finally, the government wrongly insists that the law permitted repeated, extraneous references to the victims' and witnesses' devotion to God and church. The government elicited from seven different witnesses at least 20 comments about the victims' and witnesses' religious faith.[45] *See also* Op. Br.190-92. Despite the government's protestation, this suggested Council "deserves the death penalty" more

---

[44] While, as the government notes, Council did not request a different instruction, he had already unsuccessfully objected to evidence of non-personal impact on community members that the instruction permitted and that the prosecutor continued to introduce. *See* Op. Br. 174-78.

[45] *See* JA4916, JA4917, JA4929, JA5017, JA5021, JA5023, JA5276, JA5280, JA5272, JA5275, JA5283, JA5307.

so because he had killed such good, Christian women, rather than victims "perceived to be less worthy."[46]  *Payne*, 501 U.S. at 819, 823; *see* Op. Br. at 181, 193.

The government defends this with a strained comparison to *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002).  Resp. Br. 129. There, the victims were Christian youth ministers who were killed while driving home from a church revival, and the only witnesses who testified about their own faith were the victims' parents who relied on their religious beliefs for comfort.  299 F.3d at 471, 479.  *Bernard* does not stand for the proposition that a family friend may, as here, testify about opening a Christian counseling service or a coworker about praying for the banking community at large.  JA5275, JA4934-4935. The government does not address these or any of the particular instances highlighted in Council's opening brief, even to try to fit them within *Bernard*.

---

[46] Nor is it plausible, as the government seems to suggest, that the jurors ignored all this testimony merely because the court later instructed them not to consider various demographic factors about the defendant or victims, including their "religious beliefs."  *See* Op. Br. 193 n.73.

**D.    The government ignores the evidence that prosecutors orchestrated emotional displays on the stand from their victim-impact witnesses.**

Council's brief detailed how the prosecutors, who were intimately familiar with the victim-impact witnesses, made each one's emotional flashpoint a climactic moment in their testimony, then dwelt on how it made them feel — which, as the prosecutors must have anticipated, provoked repeated sobbing and breakdowns in front of the jury and halts to their testimony.[47]  *See* Op. Br. 195-200.  The government dismisses this as "unfounded," Resp.  Br. 131, but disregards Council's discussion of the evidence showing it.[48]

Moreover, the government's evidence that the prosecutors sought to "avoid an overly emotional penalty phase case," Resp. Br. 132, demonstrates, if anything, the opposite.  By book-ending their

---

[47] Nor does it matter whether these emotional displays confirmed the "reliability" of the victim-impact testimony.  Resp. Br. 130, *quoting United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006) (citing emotion conveyed by letter in rejecting claim it was unreliable hearsay).  None of the witnesses were cross-examined and Council has never questioned the factual accuracy of their testimony.

[48] In any event, the government also adds, the presentation was not improper because courts have occasionally declined to grant relief for ones with inflammatory features more isolated and not orchestrated. *See* Resp. Br. 130-31.

74

sentencing presentation with victim impact at the start and end of their case-in-chief, the prosecutors only heightened the jury's focus on the grieving witnesses. *See, e.g.*, Klein, *Trial Communication Skills*, 15.4 (2d ed. Dec. 2022 Update) ("The theories of primacy and recency" suggest "the optimal timing in presenting the best arguments, witnesses, or real evidence in the case" is "either the beginning or the end"). So too by pausing the victim-impact presentation after the crescendo of two of their most emotional witnesses, Skeen's husband and mother, *see* Op. Br. 196-99, the prosecutors just let their testimony further sink in.

Finally, the government also turns a blind eye to how, as trial counsel warned the court, such a "tidal wave of positive images of White victims and their wonderful lives," JA2138, accompanied by highly emotional displays from their family and friends, risked "priming" the predominantly White jury's unconscious racial biases in this cross-racial capital case in a jurisdiction where such crimes are almost ten times more likely to result in a death verdict. *See* Op. Br. 9, 176, 204; *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) ("range of discretion entrusted

to a jury in a capital sentencing" means "there is a unique opportunity

for racial prejudice to operate but remain undetected").

## VII.

**The court seriously prejudiced Council by failing to include, let alone explain, the FDPA's second anti-bias step in instructing jurors how to decide his sentence.**

## A.    Council's proposed instruction accurately explained the second step, and his reference back to it at the charge conference preserved his request.

Because Congress harbored grave concerns about racial bias in

the federal death penalty, the FDPA required Council's jurors be

instructed that, in deciding his sentence, they should "not consider" his

or Skeen and Major's race, but then also should ask themselves whether

they would choose the same sentence "for the crime in question no

matter what the race … of the defendant or of any victim may be."  18

U.S.C. § 3593(f).  The government sees no problem with the court's

rejection of Council's proposed instruction explaining the second anti-

bias step.  But its rationales do not bear scrutiny.

The government insists the statutory language needed no

explaining.  Resp. Br. 139-40.  It seems to mock Council's view that the

second anti-bias step calls for any kind of race switching, Resp. Br. 135,

but cannot say what, then, it means.  At another point, the government

suggests the second step adds nothing to the first and is superfluous,

Resp. Br. 144-45 (which certainly is wrong, *see* Op. Br. 210 & n.87).  All

this only confirms that lay jurors needed guidance in making sense of

this unusual and unfamiliar language.[49]  *See* Op. Br. 217-18.

The government also notes, correctly, that other district courts

have not gone beyond the statutory language in their final instructions

or adopted the ABA's model race-switching instruction.  Resp. Br. 140-

41.  But apparently none was asked to do so.  Perhaps that is because

few if any modern federal cases before Council's involved a Black man

who had killed two White women, a trial with further racial

undercurrents, and a jurisdiction that multiplied ten-fold the odds of a

death verdict for such cross-racial crimes.

---

[49] The government also claims that criminal instructions should
hew to a statute's wording unless it is so inscrutable as to be "hopelessly
ambiguous."  Resp. Br. 139, *quoting Godfrey v. Georgia*, 446 U.S. 420,
437 (1980) (Marshall, J., concurring) (discussing when an aggravating-
factor in a state death-penalty case is so vague it violates the Eighth
Amendment).  But that is not the test for when, in a jury instruction, a
federal court should supplement unclear, unfamiliar statutory wording.
*See* Op. Br. 217-18.

The government also argues that even if the statutory language could have used explaining by the court, Council's proposal for doing so was inaccurate and misleading. Specifically, the government says the instruction's use of the word "background" would have led jurors well beyond "race" switching. Resp. Br. 141-43. But the government plucks this word out of context. The proposed instruction began by telling jurors, three times, that the characteristics in question were the ones listed in the statute: "race, color, religious beliefs, national origin, or sex." It also ended by repeating this list twice more. Only in between did the instruction use the word "background." JA1670-1672. In this context, in which the specific list was read five times, jurors readily would have understood "background" the way it was meant, as a shorthand reference to the enumerated characteristics, rather than as some more "capacious" category "untethered" to them.[50] Resp. Br. 143. Thus, Council's instruction was accurate and comprehensible.

---

[50] The government similarly assails the instruction's use of the word "reversed" in the same sentences as "meaningless," Resp. Br. 143 n.36, though, in context, it would have been obvious to jurors this meant imagining Council was White and the victims Black.

Finally, the government wrongly insists that Council forfeited this argument by not objecting more explicitly to the court's refusal to give his proposed instruction. Resp. Br. 137, *citing United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018). The principle the government invokes derives from *United States v. Nicolaou*, 180 F.3d 565 (4th Cir. 1999), on which *Cowden* relied. In *Nicolaou*, the defense proposed an instruction on an element of the charged crime, the court incorporated some but not all of the proposal, and the defense did not object to the court's instruction. Under these circumstances, "the trial judge might well have believed that his instructions as finally formulated incorporated the substance of any instructions previously tendered by the parties." Thus, without some objection, "the court was not apprised adequately of the disputed matter." *Id.* at 569 (cleaned up). *Cowden* involved a similar set of facts.[51] Here, by contrast, Council asked for an explanation of the statutory language, which the government completely opposed. *See* Op. Br. 213-14. At the charge conference, in

---

[51] In *Cowden*, after the defense asked to allow the jury to find different degrees of an offense, the government responded with a similar proposal but in a different format. When the court adopted the government's format, the defense did not object. 882 F.3d at 471.

reviewing the court's draft omitting any such explanation, Council's lawyer flagged the anti-bias issue and at the end said it had no further objections to the charge "subject to all prior requests." *See* Op. Br. 214 n.88. While counsel certainly could have been clearer, surely the court did not think they had done a complete about-face and now agreed *no* explanation of the statutory language was needed. Rather, under these circumstances, the court must have known it had not "incorporated the substance" of Council's proposed charge, and that this remained a "disputed matter." *Nicolaou*, 180 F.3d at 569.

**B.    Neither the court's preliminary remarks nor the jurors' post-verdict certification compensated for the omission of the second anti-bias step from the instruction on deciding sentence.**

The government miscasts this issue as a complaint that the court instructed jurors only three times on the second anti-bias step when perhaps it should have done so several more times, and thus, at worst, "modestly truncated" the jury charge. Resp. Br. 144-45. This ignores the record and Council's detailed discussion of what the court got wrong. *See* Op. Br. 214-16 & n.89.

The government does not deny the court omitted the second anti-bias step *entirely* (*i.e.,* even the statutory language) from its final oral

80

and written instructions to jurors on how to ultimately determine Council's sentence, *see* Op. Br. 214-15, and the corresponding section of the verdict form, *see* JA2316-2317; Op. Br. 215-16. These were all provided to jurors just after they had heard arguments from each side, and just before they retired to deliberate. And these were the three sources jurors would have relied on to guide them when they reached the point of actually choosing between a death sentence and life imprisonment. *See United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013) (no plain error where jury was correctly instructed on both anti-bias steps though second one was omitted from post-verdict certification form, since "jurors are presumed to follow instructions").

Contrary to the government's brief, it hardly helped that the court had previously mentioned the second step in its preliminary remarks before the penalty phase began. *See* Op. Br. 215 n.89. Not only had that been more than a week earlier, but the court had characterized the remarks back then as merely "an introduction to the sentencing proceeding," and not the "final instructions" that would provide jurors the "detailed guidance" for their actual decision-making. JA4855-4858;

*see also* JA6007 (directing jurors not to base verdict on "any other view of the law than what I give you in these [final] instructions").

Nor was this glaring error mitigated, let alone rectified, by the post-verdict certification (or accompanying instruction) jurors would have turned to on the verdict form only *after* they had already *made* and *recorded* their sentencing decision. *See* Resp. Br.145-46. The government also ignores that, because of the certification's language and the absence of a space to record anything but an affirmative answer, it did not meaningfully accommodate a juror who could *not* sincerely affirm he or she "would have made" (past tense) the same sentencing decision "regardless of the race" of the defendant or either victim, let alone convey what such a dissenting juror should do instead.[52] *See* Op. Br. 215-16.

Finally, the government argues that any error here was not plain, the standard it says Council must meet because he did not specifically

---

[52] The government says the certification reflects "'the jurors' assurance that no impermissible considerations of race or religion factored into the verdict.'" Resp. Br. 146, *quoting United States v. Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) (discussing why some testimony defendant claimed touched on his Native heritage was not plain error). But, unlike here, the jurors in *Mitchell*, as in *Lawrence*, were correctly instructed on both anti-bias steps. *See id.*

object to the omission of the second anti-bias step, though he *did* request a charge that included it.  Resp. Br. 137-38 & n.35; *see* Op. Br. 207.  Even if that standard applies to this prong of Council's claim, it is satisfied.  *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734 (1993).  First, the omission of even the mandated statutory language was obvious error under § 3593(f).  Second, the error violated Council's substantial rights.  Had the predominantly White jury in this heavily race-influenced trial actually undertaken the second anti-bias step when deciding Council's sentence, there is "good reason to believe," *United States v. Garcia-Lagunas*, 835 F.3d 479, 497 (4th Cir. 2016), *i.e.*, enough to "undermine confidence in the outcome," *United States v. Lockhart*, 947 F.3d 187, 192-93 (4th Cir. 2020) (*en banc*), that at least one juror might have questioned his vote, and thus balked at joining that decision.  Third and last, the error seriously affected the fairness, integrity, and public reputation of this publicized, capital case.  *See Buck v. Davis*, 580 U.S. 100, 124 (2017) (allowing a defendant's race to influence his capital sentencing "poisons public confidence in the judicial process" and "thus injures not just the defendant, but the law as

an institution, the community at large, and the democratic ideal")
(cleaned up).

Accordingly, this error, too, requires relief.

## VIII.

### Council's challenge to his sentence of death by electrocution was timely, ripe, and not foreclosed by precedent.

The government argues that Council waited until too *late* to
challenge the FDPA's incorporation of South Carolina's new execution
statute and his resulting sentence of death by electrocution, and thus
his claim was untimely.  Paradoxically, the government also says that
he brought it too *early*, and thus it is unripe.  The government is wrong
on both accounts, as it is in its defense of the electric chair as an
execution method no different from lethal injection in any way that
matters.

### A.    The government's untimeliness argument rests on the mistaken premise that South Carolina's new statute did not alter the default method of execution.

The government defends the district court's ruling that Council's
challenge was untimely because he supposedly could and should have
raised it in his original post-trial motion after he was sentenced, though

South Carolina did not adopt its new execution statute until two years later, while his appeal was pending.[53]  The government recycles the court's mistaken premise that the state's old execution statute, like the new one, made electrocution the default method of execution.  Resp. Br. 147-48, 151-52.  Actually, the old statute provided for "lethal injection" if the prisoner made no "election" between that method and electrocution.  S.C. Ann. § 24-3-530(A) (1995).  Thus, as the South Carolina Supreme Court has recognized, the new execution statute, under which such a non-election now requires electrocution, "change[d] the default method of execution from lethal injection to electrocution."[54] *Owens v. Stirling*, 882 S.E.2d 858, 860 (S.C. 2023); *see also Amicus* Brief

---

[53] The government apparently abandons two of the district court's other faulty grounds for rejecting Council's motion, namely, that Federal Rule of Criminal Procedure 33 covers only challenges to the integrity of the jury's verdict, and that it limits relief to a new jury trial or sentencing hearing.  *See* Op. Br. 234-35.

[54] The statute also allows a prisoner to elect execution by firing squad.  *Id.*  Council explained below how this method is also unconstitutionally inhumane, JA6188-6189, and a lower court in South Carolina found it so under the State Constitution.  *See Owens v. Stirling*, 882 S.E.2d at 354.  The government does not suggest that this alternative makes the new default method of electrocution constitutional or otherwise should alter this Court's analysis.

85

of South Carolina Governor, at 23 n.5 (government's "interpretation" of previous statute" is "incorrect").

Accordingly, Council lacked any reason or even the ability to challenge the alternative option of electrocution under the old statute. *See Stewart v. LeGrand*, 526 U.S. 115, 119 (1999); *Bryan v. Moore*, 528 U.S. 1133 (2000). He therefore cannot be faulted for failing to do so in his original post-trial motion, and his later motion, filed promptly after South Carolina amended its statute, was timely. *See* Op. Br. 223-24, 234-35.

## B. Council's *ex post facto* and Eighth Amendment challenges to his sentence of death by electrocution are ripe for review.

The government offers a grab-bag of unpersuasive reasons why most of Council's claims are not ripe.[55] Resp. Br. 160-64.

The government invokes the general principle that a claim is not ripe if its existence "'rests upon contingent future events that may not

---

[55] In the same section, the government initially says Council's Eighth Amendment challenge also is not "relevant" because he has not identified an alternative execution method to electrocution. Resp. Br. 160, *citing Bucklew v. Precythe*, 139 S. Ct. 112, 1129 (2019). But on the very next page the government acknowledges that Council has identified lethal injection as that alternative. *See* Resp. Br. at 161.

occur.'" Resp. Br. 161, *quoting Texas v. United States*, 523 U.S. 296, 300 (1998). Council's claims, however, target not, as in that case, a "sanction" that has not yet been "ordered," *id.*, but *his actual sentence*, as it now stands, prescribed by existing statutes. *See* Op. Br. 224. Such challenges are ordinarily litigated, as Council seeks to do, in a defendant's criminal case. *See also* 18 U.S.C. § 3595(a) (federal death "sentence shall be subject to review by the court of appeals"). This holds true even if implementing the contested sentence is contingent on future events, such as, for example, a condition of supervised release that would follow only if the defendant first successfully completed a lengthy prison term. *See, e.g., United v. Mixwell*, 806 Fed. Appx. 180, 184-86 (4th Cir. 2020).

By contrast, a collateral proceeding under 28 U.S.C. § 2241, the future avenue the government has suggested for these claims, JA6354-6355 & n.1; *see also* JA6378, is reserved for challenges to how a valid sentence is being implemented, not ones, like Council's, to the validity of the sentence itself. *See United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004); *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997); *see also* Resp. Br. 161, *citing Higgs v. United States*, 711 F. Supp. 2d 479, 556

87

(D. Md. 2010) (challenge to details of BOP protocol for administering lethal injection had to be brought in § 2241 action rather than criminal case).

Moreover, Council's *ex post facto* challenge is specifically ripe, regardless of what may happen in the future, since, as the Supreme Court has explained, "[t]he inquiry" into whether a law retroactively "inflict[s] a greater punishment" "looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." *Weaver v. Graham*, 450 U.S. 24, 33 (1981); *Lindsey v. Washington*, 301 U.S. 397, 400-01 (1937); *McCall v. Dretke*, 390 F.3d 358, 362 (5th Cir. 2004) (finding ripeness where "harm asserted" is "the allegedly *ex post facto* application" of statute making supervised-release eligibility discretionary rather than mandatory, "not the actual denial" of supervised release). Under the old South Carolina statute, there was nothing Council needed to do to prevent — or that the government could do to authorize — his punishment to be carried out by electrocution. Regardless of what the future may hold, the new statute is *ex post facto* because it gives the government new legal

authority to put him to death in that manner, and limits his legal rights to avoid it.  *See Peugh v. United States*, 569 U.S. 530, 540-41 (2013).

The government's ripeness arguments not only focus in the wrong direction, away from Council's sentence and the special standard for *ex post facto* claims, but miss even their intended targets.  While it is true a South Carolina trial court last year found that electrocution is both *ex post facto* and cruel and unusual punishment under the state's constitution, Resp. Br. 162, the government cites no authority for applying that ruling to the federal claims of a federal prisoner, and makes no promise it will protect Council.[56]

Nor is the status of lethal injection under South Carolina law "transient," as the government also claims.  Resp. Br. 161.  The execution statute explicitly authorizes the state to certify that method is "unavailable," in which case it is no longer authorized.  S.C. Ann. § 24-3-530(D) (upon certification, "the manner of inflicting a death sentence must be by electrocution").  And the state certified this almost two years

---

[56] Moreover, as the South Carolina Governor explains in his *amicus* brief, at 23 n.5, the government is incorrect that the South Carolina statute recognizes an absolute right to a method of execution other than electrocution, which will protect Council.  Resp. Br. 162.

ago, the month the law was enacted. *See* Op. Br. 224. Moreover, as the

Governor of South Carolina acknowledges, because drug makers have

long refused to sell to the State, lethal injection has been unavailable as

a method of execution there for a decade with no end in sight, which is

why the statute was redrawn.[57] *Amicus* Brief of South Carolina

Governor, at 3-4, 6, 8.

The government also deems Council's claim unripe because he has

other "avenues to judicial relief" from his death sentence if this appeal

fails, and because the Department of Justice is still internally reviewing

its execution policies. Resp. Br. 163. But the government cites no

authority for the odd theory that a defendant's challenge to the legality

of his sentence can be dismissed because some other court might later

invalidate it on a different ground, or because the government itself

declares that it is studying the matter.

Collectively, the government's ripeness arguments are disturbing

because they contradict the litigation position it has consistently

---

[57] Even if there were any prospect of this changing, that might be
a reason to hold Council's appeal in abeyance, but not to just ignore the
claim and affirm his death sentence. *See Suggs v. Brannon*, 804 F.2d
274, 280 (4th Cir. 1986).

asserted against other federal death-row prisoners, including several it

ultimately succeeded in putting to death.  The government criticized

those inmates for waiting years to contest aspects of their execution

methods rather than doing so much earlier.[58]  Indeed, in one case, the

government repeatedly urged the claim be dismissed as untimely

because the condemned prisoners should have raised it *when they were*

*sentenced or in their direct appeals*.[59]  But now the government faults

Council for doing just that.

**C.    Replacing lethal injection with electrocution as the default and, indeed, only approved method of execution for Council is *ex post facto*.**

The government defends the district court's theory that *no*

retroactive statutory change to a different execution method, regardless

how much less humane, can *ever* be *ex post facto*:  Rather, because it

does "not change the penalty — death," any such change is merely

---

[58] *See, e.g.*, Government's Application to Vacate Stay, at 7, 32-35, *Barr v. Lee*, No. 208A8 (July 13, 2020); *Barr v. Lee*, 140 S. Ct. 2590, 2590-91 (2020).

[59] *Roane v. Gonzales*, No. 1:05-cv-2337, DE13 at 22-23; DE60 at 11-16; DE160 at 12-18; DE923 at 12-13 (D.D.C.).

"procedural."[60]  Resp. Br. 154-55.  The government, like the district

court, insists this is the law under *Malloy v. South Carolina*, 237 U.S.

180, 185 (1915).  But it dismisses, in a footnote, the passages in *Malloy*

that premised approval of the change there on the "belief that

electrocution is less painful and more humane than hanging," 237 U.S.

at 185.  *See* Resp. Br. 154-55 n.37.  More important, the government

simply ignores Council's discussion of a trio of modern Supreme Court

decisions that explicitly adopted this less radical reading of *Malloy*.[61]

*See* Op. Br. 227-28.

Even accepting this reading, the government also argues there is

no *ex post facto* violation because the Federal Bureau of Prisons, which

stocks lethal-injection drugs, would not be legally constrained to

---

[60] The government apparently abandons any defense of the district court's ruling that Council's Eighth Amendment challenge to electrocution is foreclosed by precedent.  *See* Op. Br. 228.

[61] Instead, the government mysteriously dwells on a different decision, *Dobbert v. Florida*, 432 U.S. 282, 301 (1977), although its treatment of a retroactive change in the jury's role in capital sentencing as "procedural," and thus not *ex post facto*, has no bearing on a change, as here, to the actual sentence.  Also inapposite are the government's citations to *United States v. Chandler*, 996 F.2d 1073, 1079 (11th Cir. 1993) and *United States v. Tipton*, 90 F.3d 861, 903 (4th Cir. 1996), involving the executive's authority to choose an execution method when the FDPA's precursor provided for none.  *See* Resp. Br. 153-55, 157.

execute Council by electrocution, regardless of South Carolina law. *Id.* at 159-60. But the FDPA's directive is unequivocal and mandatory: "implementation" of a federal death sentence "*shall*" be "in the manner prescribed by the law of the State in which the sentence is imposed." § 3596(a) (emphasis added). And, as discussed, not only does South Carolina law now make electrocution the default "manner" of execution, and thus the one that must be used if Council does not (or is not competent to) make an election, but, under its terms, lethal injection is not currently an approved "manner" of execution. Thus, South Carolina law, as "prescribed," § 3596(a), now forbids the federal government from executing Council by lethal injection. The single decision the government cites only confirms this, requiring it to "adhere at least to a state's choice among execution methods, such as hanging, electrocution or lethal injection" but not "all the subsidiary details set forth in state execution protocols — such as … the method of inserting an intravenous catheter." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 108 (D.C. Cir. 2020) (*per curiam*), *cited in* Resp. Br. 159.

**D.** **Congress's irrational delegation of the choice of Council's method of execution to South Carolina is distinguishable from the Assimilative Crimes Act.**

The government does not dispute that § 3596 delegates to the State of South Carolina a basic feature of Council's sentence, namely, what will be done to him to cause his death. *See* Op. Br. 229-30. The government characterizes this, however, as an "unremarkable" instance of "federal incorporation of state laws," much like the Assimilative Crimes Act (ACA), 18 U.S.C. § 13. The ACA applies state and local criminal laws to minor offenses in federal enclaves not punishable by any other federal statute. As the government notes, the Supreme Court found it constitutional in *United States v. Sharpnack*, 355 U.S. 286 (1958). Resp. Br. 165-66.

But that statute is distinguishable from the FDPA. As *Sharpnack* recognized, Congress "has to proceed largely on a wholesale basis" by incorporating state and local laws "already in force" to address low-level criminal conduct in the myriad variety of federal enclaves across the country, since no one-size-fits-all set of federal statutes would be workable, and it would be impossible to keep up with all the changes in state and local laws over time. *Id.* at 293, 296. Moreover, under the

ACA, the punishment is entirely prescribed by the same state or local law that criminalizes the conduct.

By contrast, § 3596(a) untethers the two, so that federal statutes forbade Council's conduct, but a South Carolina one specifies a key feature of his punishment. More important, this untethering is entirely irrational. In sharp contrast to the ACA's incorporation of state law, which was unavoidable, the government identifies no reason, let alone a compelling one, to vary executions of federal prisoners — conducted by federal officials in a centralized federal prison — according to the method used by the state where the prisoner was tried, switching out a lethal-injection gurney one day, for an electric chair the next, for a nitrogen-hypoxia chamber the next, *ad infinitum*.

Accordingly, the Court should remand for a hearing on execution by electrocution, and merits reconsideration of Council's claims.

Respectfully submitted,

/s/ Barry J. Fisher
Barry J. Fisher
Jerome C. Del Pino
Office of the Federal Defender-NDNY
54 State Street, 3rd Floor
Albany, NY 12207
(518) 650-9031 tel.
barry_fisher@fd.org

Jaclyn L. Tarlton
Office of the Federal Defender-EDNC
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236 tel.
jackie_tarlton@fd.org

*Counsel for Appellant Brandon Council*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains fewer than 23,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus complies with this Court's March 24, 2023, order granting leave to file a reply brief up to 23,000 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 Word in Century Schoolbook 14.

s/   Barry J. Fisher

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was filed electronically through the

ECF system and notice sent to counsel of record for all parties.


_____s/   Barry J. Fisher_____